17a4503

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
SDNY DOCKET UNIT

2017 JUN 12  PM 3: 28

Civil Action No:

| | | |
|---|---|---|
| Robert Zimmerman, | ) | |
| Plaintiff, | ) | COMPLAINT FOR DECLARATORY AND |
| | ) | INJUNCTIVE RELIEF AND DAMAGES |
| | ) | FROM VIOLATIONS OF CIVIL |
| v. | ) | RICO AND VIOLATIONS OF OTHER |
| | ) | FEDERAL SECURITIES LAWS |
| UBS AG,, | ) | |
| UBS GROUP AG, | ) | |
| UBS Securities, LLC, | ) | |
| UBS Financial Services, Inc., | ) | |
| UBS Americas Holding LLC, | ) | |
| Charles Schwab & Co., Inc., | ) | |
| Ernst & Young LLP, | ) | |
| and Individual Defendants: | ) | |
| Charles Schwab, | ) | |
| Walt Bettinger, | ) | |
| Axel Weber, | ) | |
| Michel Demare, | ) | |
| Tom Naritil, | ) | |
| Markus Diethelm, | ) | |
| Sergio Ermotti, | ) | |
| William Parrett, | ) | |
| Ann Godbeher, | ) | |
| Isabelle Romy, | ) | |
| Beatrice Weder di Mauro, | ) | |
| Reto Francioni, | ) | |
| Robert McCann, | ) | |
| Marie-Laure Delaure, | ) | |
| Troy Butner. | ) | |

1

# Table of Plaintiff's Exhibits

A. UBS employees call UBS securities "Crap and Vomit" 1 page.

B. UBS DOJ 2012 Non-Prosecution Agreement….6 pages.

C. Sample of UBS Crimes listed on DOJ website…2 pages.

D. Litigation excerpt from UBS Securities 2015 Financial Statement…7 pages.

E. Page 67 and Note 22 to UBS 2015 Annual Report, 13 pages, 466-477.

F. Page 1 of UBS Product Supplement for CEFL…1 page.

G. The Clintons and the Sordid UBS Affair…2 pages.

H. The UBS Chairman's pay raise…1 page.

I. AG remarks re: UBS crimes dated December, 2012 and May, 2015…6 pages.

J. S.E.C. Cease and Desist Order 30, 2015 dated September …7 pages.

K. "Risk Factors" Section of UBS offering document for CEFL…14 pages.

L. Pages 11-13 of DOJ/UBS Joint Sentencing Memorandum…3 pages.

M. Schwab fails to alert to the dangers inherent in investing in CEFL…3 pages.

N. UBS pleads guilty to aiding and abetting U.S. tax evaders…2 pages.

O. October 20, 2014 DOJ amendment to DOJ/UBS NPA…3 pages.

P. Three letters to the S.E.C. begging for leniency…3pages.

Q. 2009 Deferred Prosecution Agreement…2 pages.

R. Schwab account pages showing Plaintiff's financial loss…2 pages.

S. A partial rendering of EY and Schwab financial crimes…15 pages.

T. May 20, 2015 UBS breach of 2012 DOJ NPA and guilty plea…1 page.

## PARTIES

1. Plaintiff Robert Zimmerman is a 76-year-old retired resident of North Carolina and resides at 329 Sandpiper Lane, Hampstead, NC 28443.

2. UBS is used as a collective term for UBS Group AG, UBS AG, UBS Securities, LLC, UBS Financial Services, Inc, and UBS Americas Holding LLC.

3. UBS Group AG is a holding company for UBS AG (a financial services company and a foreign private issuer under Rule 3b-4(c) of the Securities Exchange Act of 1934), UBS Securities, LLC and UBS Financial Services, Inc., UBS Americas Holding LLC and other UBS subsidiaries.

4. All UBS defendants have as their U.S. mailing address: Law Department, UBS, 1285 Avenue of the Americas, New York, New York, 10019.

5. EY is the U.S. and international auditor of UBS and its subsidiaries. EY's U.S. headquarters are located in New York, New York, mailing address: Law Department, Ernst & Young, 5 Times Square, New York, New York 10036-6530.

6. UBS AG is the issuer of CEFL and UBS Securities, LLC and UBS Financial Services, Inc. are the U.S. underwriters for CEFL.

7. UBS Americas Holding LLC is headquartered at 1285 Avenue of the Americas, New York, New York, 10019 and is a parent of UBS Securities, LLC and UBS financial Services, Inc.

8. Schwab is the broker-dealer through which Plaintiff invested in CEFL. Schwab is headquartered and has as its mailing address is Corporate Legal Services, 211Main St.., 6th Fl., San Francisco, CA 94105.

9. The individual Defendants are:

10. Charles Schwab in his capacity as Chairman of the Board of Directors of Schwab and founder of the firm that bears his name and Walt Bettinger in his capacity as President and CEO of Schwab. They are located at Schwab headquarters at 211Main St., San Francisco, CA 94105

11. Axel Weber is Chairman of UBS's Board of Directors and Chair of UBS's Corporate Culture and Responsibility Committee with shared responsibility and authority with respect to UBS's internal audit function.

12. Michel Demare is Vice Chairman of UBS's Board of Directors and Member of the Audit Committee.

13. Tom Naritil is UBS's Chief Financial Officer.

14. Markus Diethelm is UBS's General Counsel.

15. Sergio Ermotti is UBS's Chief Executive Officer.

16. William Parrett is Chairman of UBS Group AG's Audit Committee.

17. Ann Godbeher is a member of UBS Group AG's Audit Committee.

18. Isabelle Romy is a member of UBS's Audit Committee.

19. Beatrice Weder di Mauro is a member of UBS's Audit Committee.

20. Reto Francioni is a member of UBS AG's Corporate Culture and Responsibility Committee.

21. The above-listed UBS Swiss executives do business in the U.S. at UBS U.S. headquarters at 1285 Avenue of the Americas, New York, New York 10019.

22. Robert McCann is President of UBS Americas Holding LLC and is located at UBS U.S. headquarters at 1285 Avenue of the Americas, New York, New York, 10019.

23. Marie-Laure Delaure is lead EY external and signed the 2015 UBS Audit Report and is located at ET world headquarters in London, England.

24. Troy Butner, is the co-signing EY external auditor for the 2015 UBS Audit Report and is located in the EY Boston office.

## **VENUE & JURISDICTION**

25. Federal courts always have the authority to determine whether it has the jurisdiction to hear a particular case. *United States v. Ruiz,* 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am,* 330 U.S. 258,291 (1947).

26. Venue properly lies in the United States Southern District Court in Manhattan, New York pursuant to Section 27 of the Securities Exchange Act of 1934, U.S.C.  28 U.S.C. § 1391 and Title 18 U.S.C. §§ Sections 1961 and 1962 because UBS and EY, the corporate and partnership Defendants are headquartered in New York, New York.

27. Venue is proper in this Court because on or about November 14, 2014 UBS advertised CEFL, the security involved in this case, to Plaintiff over the Internet on a UBS website.

28. Jurisdiction is proper 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interest and costs and there is complete diversity of citizenship.

29. Jurisdiction is also proper for federal claims pleaded under 18 U.S.C. § 1964 (Section 1962), 15 U.S.C. §§ 77 and 78, Sections 15(b)(4)(E) and (b)(6) of the Securities and Exchange Act of 1934, Section 17(a) of the Securities Act 15 U.S.C. § 77q(a) and 18 U.S.C. §§ 1341 and 1343 and supplemental jurisdiction over state law claims asserted herein pursuant to 28 U.S.C. § 1367.

## NATURE OF THE CASE

30. Plaintiff re-alleges and incorporates paragraphs 1-29 of this Complaint by reference as if set forth verbatim.

31. With this lawsuit Plaintiff seeks declaratory and injunctive relief and damages for losses Plaintiff suffered as a result of his investments in the UBS security called CEFL. **Plaintiff's Exhibit R.**

32. Amongst other things, Plaintiff alleges that, aided and abetted by EY and Schwab, UBS failed to disclose its vast history of financial crimes and the defective aspects of the UBS issued and underwritten UBS security called CEFL in the offering document for CEFL.

33. As set out below, at page 67 of UBS's 2015 Annual Report, UBS describes the reasons why it has omitted its vast history of financial crimes from its offering document for CEFL. **Plaintiff's Exhibit E.**

34. Had Plaintiff been informed of UBS's vast history of financial criminality in the offering document for CEFL, Plaintiff would not have invested in CEFL.

35. On information and belief, given the fact of UBS's long history of criminality, no major investment banking firm or financial advisor will recommend CEFL or any other UBS created security to its customers.

36. The regulation of securities has its roots in the stock market crash in 1929 and the Great Depression that followed. The federal government perceived a need to prevent stock market crashes and protect investors from securities fraud.

37. The result of the federal government's perceived need to protect investors from securities fraud was a continuing series of federal securities laws, which have as their twin essences (1) FULL DISCLOSURE and (2) PREVENTION OF FRAUD as embodied in Section 11 of the Securities Act, S.E.C. Rule 10b-5, S.E.C. Reg. S-K, SA Rule 408, S.E.C. Rule 12b-20 and appropriate sections of U.S.C. Title 17 and elsewhere, dealing with the concealment of material information and other appropriate laws of the U.S. that make it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, not misleading…in connection with the purchase or sale of any security."

38. Furthermore, Section 11 of the Securities Act of 1933 contains a civil antifraud provision for misstatements and omissions in a registration statement and eliminates common-law requirements for proving frauds committed by the underwriters of securities. Moreover, Rule 10b-5 mirrors the common-law action for deceit.

39.   Congress has recognized that the underwriters of securities must disclose all material facts in their public offerings. Underwriters must exercise due diligence and disclose all facts that a prudent person would expect to be disclosed so that that person could quantify for themselves the risk/reward ratio for any given prospective investment.

40.   "We have recognized time and again, a 'fundamental purpose' of the various Securities Acts was to substitute a philosophy of full disclosure for the philosophy of caveat emptor, and thus to achieve a high standard of business ethics in the securities industry." Quoting from SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 1, (1972); Accord, *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151 (1972); *Santa Fe Industries Inc., v. Green,* 430 U.S. 406.

41.   The mandatory disclosure and antifraud provisions of the federal securities laws that form the foundation of this lawsuit are found in the Racketeer Influenced and Corrupt Organizations Act (Civil Rico), 18 U.S.C. § 1961 et seq., in the Securities Act of 1933, 15 U.S.C. §§ 77a-bbbb (1976), and the Securities Act of 1934, 15 U.S.C. §§ 78a-kk (1976). Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organization Act ("RICO") 18 U.S.C. §§1961-68 and U.S.C. § 1964(c)(d) and 28 U.S.C. § 1331(a) and U.S.C. 28 U.S.C. § 1391.

42.   This action also arises under the antifraud provisions of Sections 5, 10, 11, 12(a)(2), 15, 17(a)(2), 22, 23 and 27 of the Securities Act of 1933, and 15 U.S.C. § 78 and the rules and regulations promulgated thereunder, and Sections 9, 10, 12, 13, 20, 21 and 26 of the Securities Exchange Act of 1934, S.E.C, Rule 10b-5, (17 C.F.R. § 240.10b-5) and

Section 34(b) of the Investment Company Act and Section 207 of the Investment Advisors Act of 1940.

43. The 1933 and 1934 Acts "were designed to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 (1976).

44. For example, sections 11, 12(a)(2) and 17(a)(2) of the 1933 Act provide a civil remedy for an offering document for a newly issued security that contains "an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

45. Defendant's not only omitted material facts from the offering document for CEFL, Defendant's did so intentionally, making their omissions concealments.

46. A number of persons may be jointly and severally liable under section 11, including not only the issuer and underwriters of the security, but also high corporate executive from the CEO on down the management hierarchy, financial and accounting officers, its directors and its external auditors.

47. A person who acquires a security pursuant to an offering document need only show a material misstatement or prohibited omission to establish a prima facie case. Once that is done, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements..." *Herman & MacLean v. Huddleson,* 459 U.S. 375, 382 (1983).

48. The principal architects of the 1933 and 1934 Acts were disciples of Justice Brandeis who, in 1913, declared in Other People's Money that: "Publicity is justly commended as

a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants…"

49. The overarching truth of Justice Brandeis's remark is verified by all who have worked with the 1933 and 1934 Acts who have referred to the securities registration process as a housecleaning, an elimination of conflicts of interests and questionable business activities which, if exposed to public view will give prospective investors an opportunity to make an informed decision with regard to investing or not investing in the security in question. S.E.C. Staff Disclosure to Investors (The Wheat Report) 50-51 (CCH Publ. No. 5213, 1969).

50. Section 11(a) of the Securities Act of 1933 authorizes a private action when a registration statement "includes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading."

51. For an omission to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 234 (1988), quoting *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449 (1976).

52. Section 12(a)(2) of the Securities Act of 1933 provides for liability when a security is offered or sold "by means of a prospectus or oral communication, which includes an untrue statement(s) of a material fact(s) or omits to state a material fact necessary to

make the statements, in light of the circumstances under which they were made, not

misleading (the purchaser not knowing of such untruth or omission."

53. Section 34(b) of the Investment Company Act makes it "unlawful for any person to make

any untrue statement of a material fact in any registration statement…or other document

filed or transmitted pursuant to this title" or to "omit to state therein any fact necessary in

order to make the statements made therein, in light of the circumstances under which they

were made from being materially misleading."

54. S.E.C. Rule 10b-5(b) makes it unlawful for any person, in connection with the purchase

or sale of any security, "to make any untrue statement of a material fact or to omit to state

a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading."

55. Rule 408 of the 1933 Act states that "In addition to the information expressly required to

be included in a registration statement, there shall be added such other material

information, if any, as may be necessary to make the required statements, in the light of

the circumstances under which they are made, not misleading."

56. Rule 405 of the 1933 Act explains that "material" information means "matters to which

there is a substantial likelihood that a reasonable investor would attach importance in

determining whether to purchase the security registered."

57. Rules 430B and C, adopted in 2005, codify the S.E.C.'s position that the information

contained in a prospectus supplement required to be filed under Rule 424, whether in

connection with a takedown or otherwise, will be deemed part of and included in the

registration statement containing the base prospectus to which the prospectus supplement

relates. Source: S.E.C. Release No. 33-6714 (May 27, 1987); S.E.C. Release No. 33-7606A (November 13, 1998), Section V.A.1.e, Rule 430B; Rule 430C; and S.E.C. Release 33-8591 (July 19, 2005), Section V.B.1.b, ii.

58. Under the Securities Exchange Act, the pertinent provisions are § 13(a), 15 U.S.C. § 78m(a) (1976) (annual and periodic reporting requirements for publicly-held issuers), § 14(e), §, 15 U.S.C. § 78n(e) (1976) (prohibition of fraud in tender offers), and § 10(b), 15 U.S.C. § 78j(b) (1976) (fraud prohibitions in the purchase or sale of securities).

59. The core provisions of § 5, 15 U.S.C. § 77e (1976) (registration and prospectus requirements for an issuer's offering of securities, and § 17(a), 15 U.S.C. § 77q (1976) (fraud prohibitions in the offer or sale of securities).

60. By its enactment of the Securities Acts of 1933 and 1934, Congress sought to ensure that important information bearing upon the issuer of securities would be regularly disclosed to prospective investors, thus providing prospective investors the opportunity to make informed investment decisions.

61. Addressing the disclosure provisions of the Securities Acts, the House Committee on Interstate and Foreign Commerce explained that the excessive speculation that characterized the securities markets of the 1920's was attributable, in part, to "inadequate corporate reporting which keeps investors in ignorance of the necessary factors for intelligent judgment of the values of securities." H.R. Rep. No. 1383, 73d Cong., 2nd Sess. 5 (1934).

62. Moreover, the Supreme Court articulated a "bright line" standard treating as "per se materiality" any form of corporate conduct known to be illegal, though yet to be

adjudicated. Materiality turns upon "whether there is a substantial likelihood that a reasonable investor would consider an omitted fact important in deciding how to vote…"

63. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

64. Liability for Failure to Supervise and Unsuitability arises under Section 15(b)(4)(E) and (b)(6) of the Securities and Exchange Act of 1934.

Liability for Mail and Wire Fraud arises under Section 17(a) of the Securities Act 15 U.S.C. § 77q(a) and 18 U.S.C. §§ 1341 and 1343.

## FACTS AND CRIMES THAT FORM THE BASIS FOR THIS LAWSUIT

65. Plaintiff re-alleges and incorporates paragraphs 1-64 of this Complaint by reference as if set forth verbatim.

66. UBS is the primary target of this lawsuit. EY, Schwab and the Individual Defendants are secondary targets.

67. UBS could not pursue its criminal activities in the U.S. without the services provided to it by EY and Schwab.

68. UBS has its tentacles in every segment of the U.S. financial industry and represents a clear, present and future danger to the U.S., just as a certain president endangers our representative democracy generally and our judiciary specifically.

69. The UBS propensity for criminal conduct dates back to at least WWII, when UBS made itself available as a repository for massive amounts of NAZI plunder and after the Nazi surrender refused to return that plunder, which included gold filling, watches, jewelry and art, to its rightful owners…UBS executives confiscating the Nazi plunder to enrich themselves.

70. More recently UBS has developed a set of financial skills and a corporate culture that fosters financial crime and have enabled UBS to unlawfully rig and manipulate for its own profit interest rates, foreign exchange rates, precious metals and securities prices.

71. In 2008, in what the S.E.C. called the largest settlement in history, UBS agreed to reimburse its clients $22.7 billion to resolve charges that it had defrauded purchasers of auction-rate securities which were sold to purchasers of those securities through a network of affiliated brokerage firms at a time when top UBS executives knew the market for such securities was in disarray and proceeded to unload their holdings on unsuspecting members of the public. A "predicate act" as that term is defined by 18 U.S.C. Sections §§1961(1) and 1962(c).

72. For that crime, UBS escaped criminal prosecution by the skin of their teeth, instead paying to the S.E.C. $150 million in fines to settle consumer and securities fraud charges filed in New York and other states.

73. In 2009, UBS obtained a deferred prosecution agreement from the DOJ for conspiring to defraud the U.S. of tax revenue by creating more than 17,000 secret Swiss accounts for U.S. tax evaders who had failed to declare income and committed tax fraud. Another "predicate act." **Plaintiff's Exhibits N and Q.**

74. UBS bankers aggressively sought out clients susceptible to tax evasion schemes at tennis matches, polo tournaments and numerous other events.

75. One UBS banker was caught red-handed smuggling diamonds in a tube of toothpaste to accommodate a client.

76. Al Capone was imprisoned for tax evasion, but when UBS pleaded guilty to aiding and abetting at least 17,000 U.S. tax evaders none of their executives was criminally charged they continue to aid and abet tax evaders from nations the world over.

77. It is simply incomprehensible that a firm that enables 17,000 U.S. citizens to evade paying their fair share of income taxes and that has committed hundreds of other financial crimes is allowed to continue its business operation in the U.S. and to continue its pattern of financial criminal racketeering.

78. With regard to another guilty plea, on February 18, 2009, in return for a deferred prosecution agreement UBS paid $780 million in fines and penalties and disclosed the names of its U.S. clients. Seventeen thousand "predicate acts." **Plaintiff's Exhibit Q.**

79. Concurrently, UBS settled S.E.C. charges that it acted as an unregistered broker-dealer and investment adviser to American clients and paid a $200 million fine. Another "predicate act."

80. In May, 2011, UBS admitted that its employees had repeatedly conspired to rig bids in the municipal bonds derivatives market over a five-year period, defrauding more than 100 municipalities and non-profit organizations, and agreed to pay $160 million in fines

and restitution. The S.E.C. described UBS's conduct "a how-to primer for bid-rigging and securities fraud." Many more "predicate acts."

81. These huge fines and penalties did not deter UBS from actively continuing its criminal pursuits, but disgusted UBS employees felt obligated to call UBS securities "crap and vomit." See **Plaintiff's Exhibit A.**

82. While UBS engaged in its financial crime spree, EY, one of the world's largest public audit firms, served as its external auditor and consciously aided and abetted UBS in its numerous concealments of UBS's extensive history of financial crimes and issuance of defective financial products including CEFL from UBS's offering documents.

83. Moreover, EY aided and abetted UBS in the concealment of the fact that UBS was at the time it was issuing and underwriting thousands of securities serving a three-year term of criminal probation imposed on it and administered by the U.S. Department of Justice's Criminal Division (DOJ Criminal Division). The NPA attached as **Plaintiff's Exhibit B.**

84. EY and Schwab (one of several broker-dealers that consciously aided and abetted UBS in the sale of its defective products) each have their own history of financial crimes, all "predicate acts," a partial rendering of which is attached as **Plaintiff's Exhibit S.**

85. On October 20, 2014, the DOJ after learning of new UBS financial crimes issued and amendment to the NPA. **Plaintiff's Exhibit O.**

86. In May 2015, the DOJ exercised its discretion to terminate the NPA based on its determination that we had committed a US crime in relation to US foreign exchange matters. As a consequence, UBS has pleaded guilty to one count of wire fraud, and

agreed to pay a USD 203 million fine and accept a three-year term of probation. **Plaintiff's Exhibit T.**

87.  Not once in 2014, 2015, 2016 or 2017 did UBS or EY disclose in any of the offering documents for thousands of securities it issued from 2014 through May, 2017 any of the numerous financial crimes UBS had committed. A summary description of the UBS financial crimes is listed on the DOJ website, a sample of the which is attached as **Plaintiff's Exhibit C.**

88.  Additionally, in its Statement of Financial Condition dated June 30, 2015 UBS Securities, LLC, a CEFL underwriter set out numerous instances of its own financial crimes. An excerpt from that Statement of Financial Condition is attached as **Plaintiff's Exhibit D.**

89.  Some of the most egregious financial crimes UBS, EY and Schwab concealed from prospective investors are contained throughout the UBS 2015 Annual Report, especially at EY's Note 22, which is attached as **Plaintiff's Exhibit E.**

90.  At page 67 of UBS's 2015 Annual Report, UBS gives the reason why it has omitted its vast history of financial crimes from its offering document for CEFL. UBS states: Our reputation is critical to the success of our strategic plans. Damage to our reputation can have fundamental negative effects on our business and prospects. Reputational damage is difficult to reverse, and improvements tend to be slow and difficult to measure. This was demonstrated in recent years, as our very large losses during the financial crisis, the US cross-border matter (relating to governmental inquiries and investigations, relating to cross-border investment banking services to US private clients during the years 200 to 2007 and the settlements entered into with US authorities with respect to this matter) and

other events seriously damaged our reputation. Reputational damage was an important factor in our loss of clients and client assets across our asset-gathering businesses, and contributed to our loss of and difficulty in attracting employees." **Plaintiff's Exhibit E.**

91. The UBS statement of its aversion to reputational damage as described by UBS at page 67 of UBS's 2015 Annual Report is direct evidence of why UBS concealed its vast history of financial crimes from the offering document for CEFL and is one of several admissions-against-interest. See Federal Rules of Evidence 804(b)(3).

92. The UBS 2015 Annual Report was not referenced in the UBS offering document for CEFL, nor was any UBS Annual Report ever sent to Plaintiff.

93. EY's Note 22 as buried in UBS's 938-page 2015 Annual Report is direct and/or indirect evidence that EY was aware of UBS's long and extensive history of financial crimes, the very crimes that were intentionally omitted from the offering document for CEFL. **Plaintiff's Exhibit E.**

94. The S.E.C.'s position has always been that Section 11 liability under the Securities Act attaches to the prospectus supplement and incorporated Exchange Act reports.

95. The use of the shelf registration process by UBS and EY consciously sought to conceal UBS's vast history of financial crimes from the offering document for CEFL and other UBS issued and underwritten securities.

96. CEFL was one of many UBS issued shelf registration securities offerings, many of which significantly declined in value from the offering prices set by UBS.

97. On information and belief, these shelf-registered UBS issued and underwritten securities
are: CEFL, DVCI, DVHI, DVHL, DVYL, MLPL, MORL, MLPL, MLPV, FMLP,
FMLP, FUD, HDL, HOML, HOMX, LMLP, LRCT, MLPG, MLPI, MLPW, PTM,
RWXL, SDYL, SMHD, SPGH, SPLX, UAG, UBC, UBG, UBM, UBN, UCF, and USV.

98. To date, UBS has never offered a word in explanation of the step decline in the price of
the CEFL shares or any of the other UBS issued and underwritten securities.

99. It is simply unimaginable that given the booming U.S. stock markets that a huge
international investment bank like UBS could so mismanage its securities offerings
without a conscious intent to manage them into a steep decline.

100. UBS engaged in a security offering binge numbering in the thousands in order to
compensate itself for the billions of dollars in fines, penalties, disgorgements, restitutions
and settlements it paid to the DOJ, the S.E.C. and other financial regulatory authorities.

101. At page 67 of UBS's 2015 Annual Report UBS and EY state that UBS expects to engage
in future criminal activity and that UBS is "subject to a large number of claims, disputes,
legal proceedings and government investigations and we anticipate that our ongoing
business activities will give rise to such matters in the future." **Plaintiff's Exhibit E.**

102. With the statement above UBS all but promises a continuation of UBS's financial
criminal activities and that statement should be interpreted as "an-admission-against-
interests." See Federal Rules of Evidence 804(b)(3).

103. At page 437 of the UBS 2015 Annual Report there is a long description of the lengths
UBS has taken to avoid paying the funds it acquired in its dealings with Bernie Madoff's

victims of Madoff's Ponzi fraud, another "admission-against interests." See Federal Rules of Evidence 804(b)(3). **Plaintiff's Exhibit E.**

104.  That scheming by UBS to avoid reimbursing Madoff victims was thwarted when in January 2015 a court of appeals ordered UBS to pay EUR 49 million, plus interest to certain Madoff victims. **Plaintiff's Exhibit E.**

105.  UBS filed an application for leave to appeal the court of appeals' decision, but that application was rejected by the German Federal Supreme Court in December 2015.

106.  At page 446 of the UBS 2015 Annual Report UBS while setting out certain of its financial crimes states: "More recently, the unauthorized trading incident announced in September 2011 and our involvement in the LIBOR matter [arguably the largest financial scam in history] and investigations relating to our foreign exchange and precious metals business have also adversely affected our reputation. Any further reputational damage could have a material adverse effect on our operational results and financial condition and our ability to achieve our strategic goals and financial targets." Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

107.  None of the obviously material admissions of financial crimes and continuing criminal investigations were set out in the "Risk Factors" section of the offering document for CEFL. **Plaintiff's Exhibit K.**

108.  At page 473 of the UBS 2015 Annual Report, at Note 22 EY states: "In 2014, UBS reached settlement with the FCA and, the CFTC in connection with their foreign exchange investigations." Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

109.   At page 474 of the UBS 2015 Annual Report, at Note 22 EY states: "In October, 2015, UBS settled charges with the S.E.C. relating to structured notes issued by UBS that were linked to the UBS V10 Currency Index with Volatility Cap." Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

110.   The Currency Index manipulation depicted above provides direct evidence that UBS had the requisite skills and will to criminally manipulate the index for CEFL that is exclusively administered by UBS as CEFL's Calculation Agent and upon which the value of the CEFL shares and monthly dividend payout are set.

111.   At page 475 of the UBS 2015 Annual Report, at Note 22 EY states: "In May 2015, the Federal Reserve Board and the Connecticut Department of Banking issued an order for UBS to Cease-and-Desist and ordered of an assessment of a civil monetary penalty against UBS amounting to $342 million. Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E** and the Cease-and Desist Order at **Plaintiff's Exhibit J.**

112.   Also at page 475 of the UBS 2015 Annual Report, at Note 22 EY states: In 2012 UBS reached settlements with the FSA (UK Financial Services Authority), the CFTC (Commodity Futures Trading Commission) and the Criminal Division of the DOJ in connection with their investigations of the (UBS rigging) of benchmark interest rates. Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

113.   Concurrently, FINMA (the Swiss equivalent of FINRA), ordered UBS to pay CHF 1.4 billion and disgorgements-including GBP (British pound) of 120 million in fines to the

FSA, USD 700 million to the CFTC, USD 500 million in fines to the DOJ, and CHF 59 million in disgorgements to FINMA.

114. Also at page 475 of the UBS 2015 Annual Report, at Note 22 EY says: "In 2014, UBS reached a settlement with the European Commission (EC) regarding its investigation of bid-ask spreads in connection with Swiss franc interest rate derivatives and paid a EUR 12.7 million fine, which was reduced to this level in part due to UBS's cooperation with the EC." Another "admission-against-interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

115. At page 478 of the UBS 2015 Annual Report, EY declares: Since September 2014, putative class actions have been filed in federal courts in New York and New Jersey against UBS and other defendants, on behalf of parties who entered into interest rate derivative transactions linked to ISDAFIX. The complaints, which have since been consolidated into an amended complaint, allege that the defendants conspired to manipulate ISDAFIX rates from 1 January 2006 through January 2014. Another "admission-against-interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

116. Even more startling, if that is possible, at page 476 of the UBS 2015 Annual Report, EY states: "In May 2015, the DOJ's Criminal Division terminated the December 2012 Non-Prosecution Agreement (NPA) with UBS related to UBS submissions of benchmark interest rates. Another "admission-against-interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

117. As a result, UBS entered into a plea agreement with the Criminal Division pursuant to which UBS agreed to a sentence that includes a USD 203 million fine and a three-year term of felony criminal probation. **Plaintiff's Exhibit B.**

118. An additional UBS and EY concealment from prospective investors in CEFL is the fact that a few weeks into Mrs. Hillary Clinton's position as Secretary of State in 2009, she helped UBS settle a lawsuit with the IRS, saving UBS hundreds of millions of dollars. **Plaintiff's Exhibit G.**

119. Shortly after that, Mrs. Clinton's husband, former President Bill Clinton, received $1.5 million from UBS to participate in a series of question-and-answer sessions with UBS Chief Wealth Management executive Bob McCann, making UBS former President Clinton's biggest single source of speech income since finishing his presidency. **Plaintiff's Exhibit G.**

120. Moreover, donations to the Clinton Foundation increased exponentially from $60,000 to $600,000, which sums do not include additional sums that may have been paid and then secreted away in those infamous UBS secret bank accounts and safe deposit boxes in Zurich and Basel Switzerland. **Plaintiff's Exhibit G.**

121. In 1974, the S.E.C.'s Division of Corporate Finance declared that any illegal domestic campaign contributions must be disclosed in 1933 Act registration statements and reports filed under the Securities Exchange Act. Foreign contributions to the Clintons to purchase their help with charges brought by the DOJ could be construed as illegal campaign contribution or bribes.

122. The large monetary payments to the former president and to the Clinton Foundation taken together with UBS's extensive history of settling its way out of prosecution for criminal and civil offenses are additional material facts that UBS and EY omitted from the offering document for CEFL.

123. Direct evidence of UBS fostering and rewarding a corporate criminal culture is the incredible and undisclosed fact that UBS awarded a substantial pay raise to Axel Weber, its Board Chairman, shortly after paying billions of dollars in fines and penalties to settle guilty pleas with regard to colluding with other banks to rig the foreign exchange market. **Plaintiff's Exhibit H.**

124. It's said that a fish rots from the head down.

125. The huge fines for financial crimes paid by UBS over and over again, numbering in the multiple billions of dollars, is further direct evidence of the long-term criminal activity on the part of several UBS entities.

126. What UBS's huge settlements, penalties and disgorgements hint at but fail to disclose is the enormity of the profits UBS derived from this criminal activity.

127. Presumably, UBS greatly profited from these financial crimes because they commit new financial crimes with great regularity.

128. Whoever it was that said crime doesn't pay was not familiar with UBS.

129. U.S. AG Loretta Lynch and two of her deputies have commented on UBS's extensive history of financial crimes. Their comments are attached as **Plaintiff's Exhibit I.**

130. By failing to direct UBS to include in its offering document for CEFL its long and extensive history of financial crimes, EY failed to inform Plaintiff and other prospective investors in CEFL of the real and substantial risks inherent in the purchase CEFL.

131. In the "Risk Factors" section of the offering document for CEFL, under the federal securities laws, UBS and EY were duty-bound to inform Plaintiff of the risks inherent in an investment in CEFL. **Plaintiff's Exhibit K.**

132. The mostly boilerplate 12-page, single spaced "Risk Factors" section of the UBS offering document for CEFL contains not one word about UBS's vast history of financial crimes. **Plaintiff's Exhibit K.**

133. Not one word about UBS serving a three-year term of criminal probation.

134. Not one word about the risk to investors if the DOJ revokes UBS license to do business in the U.S.

135. Not one word about UBS's criminal pleading to having criminally manipulated the LIBOR interest rate (possibly the largest financial crime in history).

136. Not one word about rigging and manipulating numerous other interest rates, foreign currency rates, and precious metals prices.

137. EY's failure to have UBS disclose its vast history of financial crimes and UBS's exposure to having its license to do business in the U.S. revoked by the DOJ contravenes Generally Accepted Auditing Standards (GAAS) and Generally Accepted Accounting Principles (GAAP) that were established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information.

138. GAAS and GAAP consists of authoritative standards, originally established by the American Institute of Certified Public (AICPA), which were adopted, amended and expanded upon by the Public Company Accounting Oversights Board (PCAOB), authoritative standards with which external auditors must comply when conducting audits and reviews.

139. Under GAAS, GAAP and interpretations of these standards by the American Institute of Certified Public Accounts (AICPA) and additional standards promulgated by PCAOB, EY was required to ensure that the offering document for CEFL presented fairly and in all material respects all matters that would inform prospective investors decisions in assessing the pros and cons of UBS security offerings.

140. Clearly, no reasonable investor would entrust their funds to Bernie Madoff after learning he was running a massive Ponzi-scheme.

141. Nor would any informed investor invest in CEFL if the vast history of UBS's financial crimes, which included the rigging of the LIBOR interest rate (arguably the largest financial scam in history) and the manipulation of foreign exchange markets and various indexes, had been disclosed in the "Risk Factors" section of the offering document for CEFL.

142. UBS uses a network of subsidiary operations to carry out its investment banking and broker-dealer securities activities in the U.S., but furthering its pattern of concealments, fails to disclose in its offering document for CEFL or anywhere else the names of the persons who manage their subsidiary operations in the U.S., including UBS Securities, LLC and UBS Financial Services, Inc., the underwriters of CEFL.

143. Moreover, even when queried by telephone UBS would not disclose the names of the persons who managed UBS underwriting of CEFL.

144. In addition to numerous violations of the U.S. securities laws set out above, on September 30, 2015 the S.E.C. imposed a Cease and Desist Order (File No. 3-16871) citing violations of the antifraud provisions of the federal securities laws in connection with the underwriting of municipal securities offerings, including due diligence failures and material misrepresentations. **Plaintiff's Exhibit J.**

145. The Cease-and-Desist Order stated: "While broker-dealers must have a reasonable basis for recommending securities to customers, underwriters have a heightened obligation (emphasis added) to take steps to ensure adequate disclosure." Dolphin & Bradbury, Inc. v. Sec, 512 f.3d 834, 641 (D.C. Cir. 2008. Cease-and-Desist Order attached as **Plaintiff's Exhibit J.**

146. The Supreme Court in *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449 (1976) confined its "materiality" formulation to proxy rules and solicitation. However, the *TSC* standard has been carried forward to other provisions of the federal securities laws, notably Rule 10b-5.

147. One year after *TSC*, the Supreme Court again suggested that the same materiality standard governed § 10(b) cases as well. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 474 n.14 (1977).

148. Moreover, the presence of misleading statements or concealments is generally a prerequisite to liability and liability may attach even if the misleading statements or omissions are not material.

27

149.  For example, liability accrues under § 11 of the Securities Act of 1933, 15 U.S.C. 77k

(1976) liability hinges on a false statement of a material fact in a registration statement or

the omission of a material fact necessary to make other statements not misleading; under

77(2) (1976) (liability in private action arises from any offer or sale of a security):

17(a)(2), 15 U.S.C. § 77q(a)(2) (is a general antifraud prohibition).

150.  Moreover, liability accrues under the Securities Exchange Act of 1934, § 9(a)(4), 15

U.S.C. § 78(a)(4) (1976) (false statements of material facts by broker-dealers to induce

trading in exchange-listed securities); §§ 14(e) and 78(e) (1976) (material misstatements

or omissions in connection with tender offers); and Rule 10-b5, 17 C.F.R. § 240.10b-6

(1981) (general antifraud prohibitions governing purchase or sale of securities.

151.  Under the "Buried Facts Doctrine," a reporting company may incur liability when

material facts, although disclosed, are obscured by their placement or by the inclusion of

a mass of trivial information. *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 774

(3rd Cir. 1976).

152.  Section 207 of the Investment Advisors Act of 1940 makes it unlawful for any person to

make any untrue statement of a material fact in any registration statement, application,

report, account, record or other document filed or transmitted pursuant to this title" or to

"omit to state therein any fact, necessary in order to prevent the statements made therein,

in light of the circumstances under which they were made, from being materially

misleading.

153.  For an omission/concealment to be material "there must be a substantial likelihood that

the disclosure of the omitted fact would have been viewed by the reasonable investor as

28

having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 234 (1988), quoting *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449 (1976).

154. Clearly, EY's total failure to address UBS's monumental history of financial crimes in the "Risk Factors" section or any other part of the offering document for CEFL as it had in the 2015 Annual Report for UBS was an intentional dereliction of its duty to disclose material risk factors to prospective investors in CEFL. **Plaintiff's Exhibit E.**

155. EY failed in its reportorial duty in order to gain favor with UBS so as to protect against the cancellation of its $73 million-plus annual audit fee.

156. EY had previously fired EY partners for failing to disclose untoward relationships between EY audit partners and their clients and paid fines to the S.E.C. to settle the S.E.C.'s charges, but failed to do so with the EY partners who headed the external audit of UBS, thereby, directly and/or indirectly, encouraging a continuation of EY's audit partners cozy relationship with UBS and the perpetuation of the concealment of UBS's vast history of financial crimes. **Plaintiff's Exhibit S.**

157. Inevitably, occasions arise, as here, in which unlawful conduct by a corporation or a partnership has import under both a substantive statute and the securities laws. When conduct is illegal and has resulted in significant financial loss, as here, the two statutory schemes may readily coexist and complement one another.

158. This request of the Court to enjoin UBS from doing business in the U.S., as set out in Counts 11 and 12 below, is made necessary because the DOJ and the S.E.C. having fined UBS billions of dollars for UBS's commission of almost every serious financial crime

imaginable, have failed to expel UBS from the U.S. securities markets, thus leaving UBS free to defraud U.S. investors, including Plaintiff.

159. In UBS's shelf registration Prospectus that makes zero  mention of CEFL, under the heading **"Limitations on Enforcement of U. S. Laws Against Its Management and Others"** UBS  brags that "most of its directors and executive officers are resident outside the United States, and all or a substantial portion of their assets are located outside the United States, thus making it difficult to serve legal process on them, and there is doubt as to the enforceability in Switzerland, in original actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the securities laws of the U.S.

160. UBS's open bragging that its liability for violating the securities laws of the U.S. lies beyond the reach of U.S. law should be construed as "an-admission-against-interest." See Federal Rules of Evidence 804(b)(3).

161. On December 18, 2012, the DOJ Criminal Division's Fraud Section entered into a Non-Prosecution Agreement related to UBS AG's conduct and involvement in a multi-bank scheme to manipulate LIBOR, the world's premier interest rate, the interest rate that serves as the foundation for many other important interest rates, including certain mortgage interest rates. **Plaintiff's Exhibit B.**

162. UBS consciously, recklessly and deceptively engaged in the unlawful manipulation of LIBOR for the sole purpose of enriching itself at the expense of every citizen of the U.S. and other countries who made unlawfully inflated interest payments as caused by UBS.

163. UBS also profited from manipulating LIBOR by placing interest rate trades in the futures markets and profiting therefrom, another of the many "predicate acts," that together with

others form UBS's patterns of racketeering that caused Plaintiff to suffer a large
monetary loss. **Plaintiff's Exhibit R.**

164.   In 2013, following media reports of widespread irregularities in the foreign exchange
       (FX) markets, UBS notified the DOJ Criminal Division that it had found evidence of
       UBS's involvement in the conscious reckless manipulation of certain FX markets for the
       sole purpose of enriching UBS and its FX market traders at the expense of the FX
       investing public and other brokerage firms and banks. Another "predicate act."

165.   On May 20, 2015, the DOJ Criminal Division determined that UBS had breached the
       LIBOR Non-Prosecution Agreement it had entered into with the DOJ Criminal Division
       on December 18, 2012. **Plaintiff's Exhibit T.**

166.   The DOJ Criminal Division based its determination on (1) fraudulent and deceptive
       currency trading and sales practices in conducting certain FX market transactions with
       customers via telephone, email, and/or electronic chat, to the detriment of UBS AG's
       customers, and collusion with other participants in certain FX markets. Another of the
       numerous "predicate acts," that together with others form UBS's patterns of racketeering
       that caused Plaintiff's monetary loss. **Plaintiff's Exhibit R.**

167.   On September 18, 2013, UBS Securities Japan Co. Ltd. was sentenced for its role in a
       long-running manipulation of the London Interbank Offered Rate (LIBOR), a leading
       benchmark interest rate used in financial products and transactions around the world.

168.   In a plea agreement signed on December 19, 2012, UBS admitted its criminal conduct
       and agreed to pay a $100 million fine, which the court accepted in imposing sentence.
       **Plaintiff's Exhibit B.**

169.  In addition, UBS entered into a non-prosecution agreement (NPA) with the government requiring UBS to pay an additional $400 million penalty, to admit and accept responsibility for its misconduct as set forth in an extensive statement of facts and to continue cooperating with the DOJ in its ongoing investigations of UBS and other investment banks. Another UBS "predicate act," that together with others form UBS's patterns of racketeering that caused Plaintiff's monetary loss. **Plaintiff's Exhibit R.**

170.  UBS traders endeavored to manipulate yen LIBOR on numerous occasions, and during some periods on almost a daily basis. From November 2006 through September 2009, UBS carried out this scheme by making efforts to manipulate: (a) the Yen LIBOR submissions that UBS transmitted to the British Bankers Association; and (b) the Yen LIBOR submissions that other banks transmitted.

171.  As a result of negotiations with the DOJ Criminal Division, the U.K. Financial Authority and the U.S. Commodity Futures Trading Commission, UBS pleaded guilty in the United States District Court in Connecticut to a charge of wire fraud, in violation of Title 18, U.S.C. § Sections 1343.

172.  The UBS guilty plea to a charge of wire fraud was based on UBS admissions that between approximately 2001 and 2010, UBS engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied to the UBS manipulation of the LIBOR interest rate. Another "predicate act," that together with others form the patterns of racketeering that caused Plaintiff's monetary loss. **Plaintiff's Exhibit R.**

173.  As a result of the foregoing guilty plea UBS was being considered as an ineligible issuer of securities in the U.S. **Plaintiff's Exhibit P.**

174.  Previously, UBS had been granted six waivers from being designated as an ineligible issuer of securities in the U.S. Another concealment of a material fact from the offering document for CEFL by UBS and EY. **Plaintiff's Exhibit P.**

175.  To settle the financial crimes underlying the six waivers as set out in Count 1, UBS paid billions of dollars in restitution, penalties, fines and disgorgements.

176.  But these huge settlements, fines, penalties and disgorgements fail to make known the magnitude of the profits UBS has derived from its financial crimes, leaving us to assume UBS greatly profits from its financial crimes because UBS commits new financial crimes with regularity.

177.  Whoever said crime does not pay never came face-to-face with UBS.

178.  In 2014 UBS issued approximately 2,955 securities offerings, including approximately 20 Exchange Traded Notes (ETNs), including CEFL.

179.  From these offerings, UBS took in approximately $2.6 billion, but not once did UBS disclose that they were serving a three-year term of criminal probation imposed on it by the DOJ Criminal Division that was revoked for cause, cause being UBS's commission of new financial crimes in violation of the DOJ's Criminal Divisions' previous Non-Prosecution Agreement.

180.  Additionally, not once did UBS disclose any of the numerous financial crimes logged on the DOJ website, a sample of which is attached as **Plaintiff's Exhibit C**, more "predicate

acts," that together with others form Defendant's patterns of racketeering that caused
Plaintiff's monetary loss.

181.   Moreover, not once did UBS or any of its subsidiaries disclose the fact that new and
continuing investigations by the DOJ Criminal Division, the Securities and Exchange
Commission, the FBI, FINRA, FINMA (A Swiss financial regulatory authority) and other
financial regulatory authorities, domestic and international, could result in UBS having
its licenses to pursue investment banking activities in the U.S. and elsewhere revoked.

182.   On October 15, 2015, pursuant to the Securities Act of 1933, Section 8A, the S.E.C.
ordered UBS to Cease and Desist from three types of conduct undisclosed to investors,
specifically "engaging in hedging with non-systematic-spreads and trading in advance of
certain hedging transactions that negatively, impacted, or in the case of trading before
hedging transactions had the potential to negatively impact, pricing inputs used to
calculate V10. In reality, the V10 was neither transparent nor systematic, market prices
were not consistently used to calculate the Index, and V10 investors were thereby misled
to certain key features of this complex financial instrument. **Plaintiff's Exhibit J.**

183.   As a result of the markups and spreads, the Index was depressed by approximately five
percent causing investor losses of approximately $5.5 million." The S.E.C.'s Cease and
Desist Order is attached as **Plaintiff's Exhibit J.** Another "predicate act," that together
with others form Defendant's patterns of racketeering that caused Plaintiff's monetary
loss.

184.   The UBS conduct that led to the S.E.C. Cease and Desist Order and sanctions, as above,
is the very same sort of conduct by UBS that led to Plaintiff's loss of a large chunk of his

retirement savings from his investment in CEFL, specifically UBS hedging operations and INDEX manipulation to force the price of CEFL down so that UBS could repurchase CEFL from investors in CEFL at highly deflated prices and then force the Index up so that UBS could resell the CEFL shares at artificially inflated prices.

185. Clearly, as described in EY's Note 22 to UBS's 2015 Annual Report, UBS and EY had superior knowledge of the extensive history of UBS's financial crimes, including the manipulation of indexes, the issuance of defective products and the rigging of interest rates and security prices. **Plaintiff's Exhibit E.**

186. The concealment of that superior knowledge by UBS, EY and Schwab from Plaintiff and other investors is, at least, a violation of the "Special Facts Doctrine," a breach of UBS's, EY's and Schwab's fiduciary duty and demonstrates their commercial bad faith and Breach of the Implied Covenant of Good Faith.

187. Based on information and belief, persons and organizations that have pleaded guilty to a crime or crimes have usually committed other, often many other, undetected crimes, the guilty plea representing but the tip of the iceberg with many more undetected crimes lurking beneath the surface.

188. In early 2014, Plaintiff began investing in CEFL and continued investing in CEFL until approximately April 2015 when mounting losses forced Plaintiff to sell all of his CEFL shares.

189. Plaintiff's losses amounted to approximately $180,000-$400,000 depending on the method of loss valuation adopted by this Court. One such method takes only trading

losses into account and another uses a net of trading profits and losses. **Plaintiff's Exhibit R.**

190. This lawsuit is also based on UBS's self-created, managed, marketed and administered defective security product called CEFL. CEFL is an ETN (exchange traded note) that was issued by UBS and underwritten by UBS Securities, LLC and UBS Financial Services, Inc. pursuant to 15 U.S.C. § 1331.

191. Plaintiff maintains that UBS intentionally and with conscious reckless and deceptive disregard for Plaintiff and other investors created, issued, marketed and sold a defective security product they call CEFL to unsuspecting investors for the sole purpose of enriching UBS at the expense of the unsuspecting purchasers of CEFL.

192. The major factor making the CEFL product defective for investors is the fact that the share price of CEFL and the amount of the monthly dividend were both based on an index called the ISE High-Income Index.

193. Based on information and belief the ISE High-Income Index, as administered by UBS is as phony as a three-dollar bill.

194. UBS went to great lengths to conceal the fact that it alone would calculate the index, thus empowering UBS to manipulate the index upward and downward as it saw fit and thus the share price and dividend payment for CEFL as it saw fit, which further empowered UBS to repurchase CEFL shares at prices well below the offering price and then resell them at higher prices in repetitive see-saw cycles over several decades.

195. This index manipulation scheme is intended to run for decades, leaving UBS to reap vast profits at the expense of unsuspecting, mostly elderly investors in CEFL that are drawn to invest in CEFL by the promise of high interest income in the form of monthly dividends in an environment of near zero interest rates.

196. That UBS had the experience and the will to manipulate indexes has been described above.

197. The common shares of CEFL were listed on the NASDAQ securities exchange by UBS and bought and sold by investors as they would most other common shares listed on NASDAQ, vis-vis orders to buy and sell CEFL.

198. On or about January 2, 2015, Plaintiff perused the "Product Supplement" offering document for CEFL on-line on a UBS website, page 1 of which is attached as **Plaintiff's Exhibit F.**

199. The 14-page "Risk Factors" section of the offering document is attached as **Plaintiff's Exhibit K.**

200. The offering document for CEFL did describe a broad array of mostly boilerplate risk factors, but with conscious, reckless, deceptive and fraudulent intent, UBS and EY consciously and with extreme reckless disregard concealed risk factors that would have forcefully dissuaded Plaintiff and most other prospective inventors from investing in CEFL or any other UBS security offering. **Plaintiff's Exhibit K.**

201. EY's failure to force UBS to include in UBS's "Risk Factors" section in the offering document for CEFL the vast history of UBS's crimes as EY had disclosed these crimes in

the 2015 Annual Report for UBS intentionally deceived Plaintiff by portraying UBS as a crime-free organization and not the confessed criminals and probationers that they are.

202. Following are some of the specific material risk factors that UBS and EY intentionally concealed from the UBS offering document for CEFL:

203. UBS, EY and Schwab concealed the fact that UBS has been sued numerous times for price-rigging and other financial crimes and has paid out billions of dollars in fines, disgorgements and to settle lawsuits.

204. That UBS was under investigation by the DOJ Criminal Division and that its three-year term of criminal probationary period as administered by DOJ could be revoked, leaving UBS with the prospect of having its licenses to do business in the U.S. revoked.

205. On January 14, 2015, the Katten law firm representing UBS sent a 9-page letter to the S.E.C. begging for leniency for UBS with regard to certain of its financial crimes, the first page of which is attached as **Plaintiff's Exhibit P.**

206. On May 20, 2015, the Debeviose & Plimpton law firm representing UBS sent two similar letters to the S.E.C. begging for leniency for UBS with regard to certain of its financial crimes. the first pages of which is attached as **Plaintiff's Exhibit P.**

207. The gist of the three letters were pleas by these high-profile law firms to the S.E.C. to not revoke UBS's license to do business in the U.S.

208. As the self-appointed Calculation Agent for CEFL, UBS manipulated the index upon which the share price and monthly dividends for CEFL were set, thus enabling UBS by

repurchasing, reselling, hedging and other means to reap vast profits as the price of the CEFL shares inflated and deflated.

209. Given that level of criminal expertise UBS had acquired over the years, particularly the manipulation and rigging of indexes, of foreign exchange rates, of securities and precious metals futures prices, the manipulation of the index that the value of CEFL is based was a piece of cake for UBS.

210. These manipulative practices and failures to disclose material information on the part of UBS, EY and Schwab cost me a large chunk of my retirement savings amounting to approximately $180,000-$400,000, depending upon the method this Court adopts for calculating the loss. **Plaintiff's Exhibit R.**

211. Ponzi schemes and defective securities, while they cannot survive forever, can persist for a very long time, which for the time they are operational infuses them with an undeserved sense of legitimacy.

212. These schemes persist until their operators of the schemes panic and shut them down, or the courts or government regulators shut them down.

213. Generally speaking, the S.E.C. is far more vigilant when it comes to shutting down small operators and far less so when it comes to large scale schemers like Bernie Madoff, whose Ponzi-like scheme defrauded investors for many years and cost them billions of dollars.

214. In *Pursuit Partners v. UBS Securities, LLC,* the U.S. District Court found UBS guilty of fraudulent concealment, finding that UBS's nondisclosures crossed the line into

actionable securities fraud. These fraudulent concealments, though important and illuminating, are minimal when compared to the nondisclosures in the offering document for CEFL, but do serve as another "predicate act," that together with others forms the patterns of racketeering that led to Plaintiff's monetary loss.

215.   On or about January 2, 2015, Plaintiff learned of the existence of CEFL, and after reading the UBS "Product Supplement" offering document for CEFL, Plaintiff commenced investing in CEFL. Page 1 of which is attached as **Plaintiff's Exhibit F.**

216.   On information and belief, there never was a specific prospectus for CEFL. Instead of a specific prospectus for CEFL, CEFL was one of many securities issued by UBS under the auspices of a shelf registration, which intentionally omitted the same material omissions and other misrepresentations as did the "Product Supplement" offering document for CEFL. **Plaintiff's Exhibit F.**

217.   As we have seen, during the last decade, UBS has been sued civilly and indicted criminally hundreds of times by investors, regulatory agencies and governments and settled claims for almost every financial crime imaginable and paid out billions of dollars in settlements, fines, penalties and disgorgements and none of this vast record of UBS financial crime is disclosed in the UBS offering document for CEFL.

218.   In 2014, the year UBS issued, marketed and sold CEFL to Plaintiff other unwary investors, UBS paid billions of dollars to settle claims of wrongdoing, a material fact that was omitted from UBS offering document for CEFL.

219. UBS has been under continuous investigation and criminal probation by the DOJ
Criminal Division for over a decade and is under scrutiny by the government of France
for helping wealthy French people evade paying taxes.

220. Other instances of UBS financial chicanery include money-laundering, price fixing,
denying Holocaust victims access to their funds, bid rigging, LIBOR manipulation (as
claimed here), improper pricing of securities (as claimed here), the sale of risky securities
(as claimed here), misleading investors (as claimed here), currency manipulation, sex
discrimination, human rights abuses and other egregious conduct unbecoming a large
international bank.

221. One such investigation of UBS by the DOJ involves allegations of price fixing (as
claimed here), illegally rigging markets (as claimed here), and criminal profiteering (as
claimed here).

222. UBS and EY intentionally and recklessly concealed UBS's vast history of financial
crimes from its offering document for CEFL knowing its inclusion would convince
Plaintiff and other prospective investors to abstain from making an investment.

It was not until approximately mid-2015, after Plaintiff had suffered the loss of a of a
large chunk of his retirement savings, that Plaintiff became aware of UBS's long and
extensive history of financial crimes and multi-year term of criminal probation.

## COUNT 1: CIVIL RICO

223. Plaintiff re-alleges and incorporates paragraphs 1-222 of this Complaint by reference as if
set forth verbatim.

224. Plaintiff asserts claims under the Racketeer Influenced and Corrupt Organization Act ("RICO") 18 U.S.C. §§1961-68 and 28 U.S.C. § 1331(a) and U.S.C. 28 U.S.C. § 1391, and Title 18 U.S.C. § Sections 1961 and 1962(c)(d).

225. Under section 1962(c) of RICO, it is unlawful for "any person employed by of associated with any enterprise…to conduct or participate, directly and/or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (2010). The elements of a claim under this statute are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R. L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

226. Under RICO section 1962(d) it is unlawful for any person to conspire to violate any of subsections (a), (b), or (c).

227. "Racketeering activity" is defined to include a wide range of criminal offenses enumerated as "predicate acts" 18 U.S.C. Sections §§1961(1) and 1962(c). These predicate acts range from murder to mail fraud as set out in 18 U.S.C. § 1961(1).

228. EY, Schwab and especially UBS have engaged, and continue to engage, in a wide range of criminal offenses ("predicate acts") through an enterprise that consisted of an enterprise comprised of UBS, EY and Schwab, which criminal offenses form a pattern of racketeering activity.

229. UBS, EY and Schwab jointly contributed to that criminal enterprise by directly and/or indirectly conspiring to conceal: (a) UBS's long and extensive history of the commission of financial crimes; (b) UBS's term of criminal probation; and (c) the defects in CEFL.

42

230. The public interest was affected by UBS/EY/Schwab criminal enterprise because these conscious concealments of material facts were repeated numerous times, which concealments constitute patterns of racketeering and unlawful conduct.

231. Since at least 2014, UBS, EY and Schwab by their actions and inactions, directly and/or indirectly, formed an association (a RICO enterprise) of individuals (Individual Defendants) who engaged in, and whose activities did affect, interstate and foreign commerce.

232. Those high-ranking persons and organizations that formed and participated directly and/or indirectly in the RICO enterprise include:

233. Charles Schwab in his capacity as Chairman of the Board of Directors of Schwab and founder of the firm that bears his name and Walt Bettinger in his capacity as President and CEO of Schwab, who were fully informed from at least 2014 as to UBS's vast history of financial crimes and stood to substantially benefit financially from concealing UBS criminality from Schwab customers by failing to order those employees of Schwab responsible for supervising Schwab customer accounts to alert Schwab customers to the undisclosed risks inherent in investing in CEFL, namely UBS's vast history of financial crimes and other things. Or, in the alternative, removing CEFL from the catalogue of securities Schwab would purchase for its customers. **Plaintiff's Exhibit M.**

234. Axel Weber, as Chairman of UBS's Board of Directors and Chair of UBS's Corporate Culture and Responsibility Committee with shared responsibility and authority with respect to UBS's internal audit function and who as a holder of 488,889 UBS shares, and who, along with each of the other UBS Individual Defendants, from at least 2014 was

fully informed as to UBS's vast history of financial crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

235. Michel Demare, as Vice Chairman of UBS's Board of Directors and Member of the Audit Committee and as a holder of 215, 992 UBS shares.

236. Tom Naritil, as UBS Group AG's Chief Financial Officer and as a holder of 908,229 UBS shares and 555,115 stock options.

237. Markus Diethelm, as UBS Group AG's General Counsel and as a holder of 509,461 UBS shares.

238. William Parrett, as Chairman of UBS Group AG's Audit Committee and who supervised UBS's external auditor EY, and as a holder of 104,271 UBS shares.

239. Ann Godbeher, as a member of UBS Group AG's Audit Committee and as a holder of 169,054 UBS shares.

240. Isabelle Romy, as a member of UBS AG's Audit Committee and a holder of 66,490 UBS shares.

241. Beatrice Weder di Mauro, as a member of UBS AG's Audit Committee and as a holder of 71,261 UBS shares.

242. Reto Francioni, as a member of UBS AG's Corporate Culture and Responsibility Committee, and as a holder of 28,737 UBS shares.

243. Robert McCann, as President of UBS Americas Holding LLC, and as a holder of 1,010,805 UBS shares.

244. EY partners Marie-Laure Delaure and Troy Butner, the EY lead external auditors who signed the UBS 2015 Annual Report, each of whom from at least 2014 was fully informed as to UBS's vast history of financial crimes as they had depicted those crimes in EY's Note 22 to UBS's 2015 Annual Report and who stood to substantially benefit financially from concealing UBS criminality from the investing public by ingratiating themselves to their client, thus protecting EY's $73 million annual audit fee and their positions as UBS partners.

245. Moreover, as of December 31, 2015, member(s) of UBS's Board of Directors had borrowed $3,604,950 from UBS.

246. By their actions and inactions, UBS, EY and Schwab engaged in conduct and/or participated, either directly and/or indirectly, in a RICO enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1961(4), (5) and (9) and 1962(c)(d).

247. Yet to be discovered are the securities trading activities of the Defendants and their organizations that would allow those participating in those activities to reap huge profits by using their superior knowledge of CEFL and other UBS controlled securities.

248. Each of the high-ranking executives and auditors named as defendants herein were aware of UBS's vast history of financial crimes and intentionally failed to disclose any of that vast history of UBS's financial crimes in the UBS offering document for CEFL.

249. UBS, EY and Schwab did cooperate jointly and severally, directly and/or indirectly, in the commission of two or more "predicate acts," as set out above, that are itemized in the RICO laws at 18 U.S.C. Sections §§1961(1) and 1962(c).

250.  The following additional "predicate acts" form an additional pattern of continuing

criminal conduct calculated to produce a continuing threat of UBS, EY and Schwab

repeating their racketeering activities.

251.  The Supreme Court has explained that "[c]ontinuity is both a closed- and open-ended

concept, referring either to a closed period of repeated conduct, or to past conduct that by

its nature projects into the future with a threat of repetition." *H.J. Inc. v. Nw. Bell Tel.*

*Co.,* 492   U.S. 229, 241 (1989.) The conduct alleged in this lawsuit gives rise to RICO

violations where continuity is both closed- and open-ended.

252.  In 2013, following media reports of widespread irregularities in the foreign exchange

(FX) markets, UBS notified the DOJ Criminal Division that it had found evidence of

UBS AG's involvement in the conscious reckless manipulation of certain FX markets for

the sole purpose of enriching UBS and its FX market traders at the expense of the FX

investing public and other brokerage firms and banks.

253.  On May 20, 2015, the DOJ Criminal Division determined that UBS had breached the

LIBOR Non-Prosecution Agreement it had entered into with the DOJ Criminal Division

on December 18, 2012. **Plaintiff's Exhibit T.**

254.  The DOJ Criminal Division based its determination on (1) fraudulent and deceptive

currency trading and sales practices in conducting certain FX market transactions with

customers via telephone, email, and/or electronic chat, to the detriment of UBS AG's

customers, and collusion with other participants in certain FX markets.

255.  As a result of negotiations with the DOJ Criminal Division, the U.K. Financial Authority

and the U.S. Commodity Futures Trading Commission, UBS pleaded guilty in the United

States District Court in Connecticut to a charge of wire fraud, in violation of Title 18, U.S.C. § Section 1343. **Plaintiff's Exhibit P.**

256. The UBS guilty plea to a charge of wire fraud was based on UBS's admission that between approximately 2001 and 2010, UBS engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied to the UBS's manipulation of the LIBOR interest rate.

257. As a result of UBS's guilty plea, UBS was being considered as an ineligible issuer of securities in the U.S. Previously, UBS had been granted the following six waivers from being designated as an ineligible issuer of securities in the U.S., all six waivers evidence of "predicate acts" as that term is defined by 18 U.S.C. Sections §§1961(1) and 1962(c) that together with many of the other "predicate acts" described above form Defendant's patterns of racketeering that caused Plaintiff's monetary loss and another concealment of a material fact from the offering document for CEFL by UBS and EY.

258. The first waiver from being considered an ineligible issuer of securities was issued in connection with the underwriting, marketing and sale of auction rate securities. This matter involved UBS Securities, LLC and UBS Financial Services, Inc. conduct that misled investors into believing that auction rate securities were safe, highly liquid investments that were equivalent to cash or money market funds. The second waiver from being considered an ineligible issuer of securities was issued in connection with an action brought against UBS Financial Services, Inc. by the S.E.C. (*SEC v. UBS Financial Services, Inc.* P-01118, May 6, 2011) addressing the involvement of UBS Financial

Services, Inc. employees engaged in bidding practices that unlawfully affected the prices

for certain reinvestment products and the certifications required under applicable

regulations. The third waiver from being considered an ineligible issuer of securities was

issued in connection with the involvement of UBS Financial Services, Inc. of Puerto Rico

in making misrepresentations and the omission of material facts concerning market prices

and liquidity of certain non-exchange traded closed-end mutual finds.

259. The fourth waiver from being considered an ineligible issuer of securities involved UBS

Securities, LLC (NY-8353, August 6, 2013) in connection with credit default swaps

referenced by UBS employees as collateral to the collateralized debt offering that was

sold to accredited investors.

260. The fifth waiver from being considered an ineligible issuer of securities involved the

*United States of America v. UBS Securities Japan Co. Ltd.* (September 13, 2013) in

connection with the manipulation of benchmark interest rates by UBS Securities Japan

Co. Ltd.

261. The sixth waiver from being considered an ineligible issuer of securities is related to UBS

and an affiliate of UBS (NY-8692) and their failure to disclose to all subscribers two new

features in its automated trading system.

262. In 2014 UBS issued 2,955 offerings, including approximately 20 Exchange Traded Notes

(ETNs) including CEFL, netting UBS approximately $2.6 billion and not once did UBS

or its subsidiaries disclose that UBS and certain of its subsidiaries were serving a three-

year term of criminal probation imposed on it by the DOJ Criminal Division and since

revoked for cause, cause being UBS's commission of new financial crimes in violation of the DOJ's Criminal Divisions' previous Non-Prosecution Agreement.

263. Moreover, not once did UBS disclose any of the numerous financial crimes in any of its offering documents for CEFL.

264. Based on information and belief, those persons and organizations that have pleaded guilty to a crime or crimes have usually committed many more crimes, the guilty plea representing but the tip of the iceberg with many more undetected crimes lurking beneath the surface.

265. It was the UBS/EY criminal enterprise that evolved from UBS's having fostered a culture that awarded financial crimes that produced the financial tools and expertise necessary to deceptively manipulate indexes, interest rates and other things and directly profit from those manipulations.

266. The individual RICO participants named above and the Enterprise Actors (UBS/EY/Schwab) formed an association in fact enterprise with, amongst other things, the intent and purpose of projecting a false image of UBS, a crime free image that concealed UBS's term of criminal probation as imposed on it and administered by the DOJ Criminal Division and UBS's extensive history of financial crimes.

267. When the UBS, EY and Schwab patterns of racketeering is combined with the long and extensive history of financial crimes depicted on the DOJ website, the UBS/EY/Schwab RICO enterprise is likely the most egregious financial criminal enterprise ever assembled on this planet.

268. The Enterprise Actors and the individual RICO participants in that Enterprise attempted to depict UBS as a crime-free organization so that they could impose themselves on an unsuspecting investing public, including Plaintiff and reap vast profits therefrom.

269. After acquiring the requisite skills and expertise necessary to manipulate indexes, as the self-appointed Calculation Agent for the CEFL, UBS manipulated the index that establishes the value of the CEFL shares Plaintiff had invested in and the amount of the monthly dividend Plaintiff would receive from UBS.

270. UBS financially damaged Plaintiff by manipulating the CEFL index and by engaging in "pump-and-dump" securities transactions, hedging transactions, and other self-serving and enriching securities transactions.

271. Therefore, Plaintiff asks that this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and/or indirectly, an interest in and/or control of a RICO enterprise of persons and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b).

272. That all Defendants and all their directors, officers, employees, agents, servants and all other persons in active concert or in participation with them, be enjoined temporarily during pendency of this action, and permanently thereafter, from acquiring or maintaining, whether directly and/or indirectly, any interest in or control of any RICO enterprise of persons, or of other individuals associated in fact who are engaged in, or whose activities do affect, interstate or foreign commerce and from committing any more criminal acts in furtherance of their RICO enterprise.

273. That all Defendants be required to account for all gains, profits, and advantages derived from their acts of racketeering activity in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable state and federal law(s).

274. That all Defendants pay to Plaintiff treble damages for the damages he suffered as a result of Defendant's racketeering conduct as mandated by 18 U.S.C. 1964(c) for all of Defendant's violations of 18 U.S.C. 1962(b).

275. That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non judicial enforcement and all reasonable fee for his time.

That Plaintiff have such other and further relief as this Court deems just and proper.

## COUNT 2: CIVIL CONSPIRACY

276. Plaintiff re-alleges and incorporates paragraphs 1-275 of this Complaint by reference as if set forth verbatim.

277. In the "Risk Factors" section of the offering document for CEFL, UBS and EY failed to disclose UBS's long and extensive history of financial crimes and failed to disclose the three-year term of criminal probation administered by the DOJ Criminal Division.

278. Schwab joined in this civil conspiracy when in 2012 it explored whether it should alert its customers to the special risks inherent in securities like CEFL and then failed to do so. **Plaintiff's Exhibit M.**

279. Schwab failed to do so because doing so would have upset the several profitable long-term business relationships Schwab had established with UBS.

280. CEFL was intentionally designed by UBS to deliver monetary losses to the purchasers of that security, while delivering huge monetary gains to UBS and its executives.

281. With an intent to deceive and mislead Plaintiff and other investors, UBS and EY intentionally concealed material facts from the offering document for CEFL and Schwab failed to alert its customers as to the vast history of UBS's vast history of financial crimes.

282. The intentional concealment of material facts by UBS, EY and Schwab are direct and/or indirect evidence of the conscious, reckless, extreme and outrageous conspiratorial conduct by UBS, EY and Schwab, conduct that rises to the level of a civil conspiracy.

283. It is hard, if not impossible, to conceive of risk factors more serious than the intentionally concealed material facts UBS, AY and Schwab concealed from Plaintiff.

284. UBS and AY knew that they were concealing the material facts regarding UBS's vast history of financial crimes from the offering document for CEFL when they prepared and posted on the Internet on a UBS website the offering document for CEFL.

285. These unwarranted concealments by UBS, EY and Schwab were intentional and made in a conscious reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

286. Plaintiff relied exclusively on UBS's offering document for CEFL and the fact that UBS is a large international bank when he decided to invest in CEFL.

287. Had Plaintiff been informed by UBS and EY in the offering document for CEFL or by Schwab that UBS had a long history of financial crimes including the criminal

manipulation of indexes and the criminal manipulation of security prices, Plaintiff would never have invested in CEFL or any other UBS security.

288. EY conspired with UBS to conceal the material facts, as above, from Plaintiff and the public because they feared losing UBS as a client if they did not do so, a client that paid EY in excess of $73 million annually for their audit, tax and consulting services.

289. EY has served as UBS's external auditor for many years subsequent to UBS issuing CEFL and was full aware of UBS's history of financial crimes, including its criminal guilty plea for manipulating LIBOR as described by EY in EY's Note 22 to UBS's Annual Report for 2015. **Plaintiff's Exhibit E.**

As a proximate and/or indirect result of their conduct, UBS, EY and Schwab are liable to Plaintiff for actual and punitive damages and whatever further relief this Court finds fair and just.

## COUNTS 3 & 4: MAIL AND/OR WIRE FRAUD

290. Plaintiff re-alleges and incorporates paragraphs 1-289 of this Complaint by reference as if set forth verbatim.

291. Plaintiff asserts claims under Section 17(a) of the Securities Act 15 U.S.C. § 77q(a) and 18 U.S.C. §§ 1341 and 1343.

292. UBS, EY and Schwab acted in violation of the federal mail fraud statute 18 U.S.C. § 1341 that provides: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give

away, distribute, supply, or furnish or procure for unlawful use any counterfeit or

spurious coin, obligation, security, or other article, or anything represented to be or

intimated or held out to be such counterfeit or spurious article, for the purpose of

executing such scheme or artifice or attempting so to do, places in any post office or

authorized depository for mail matter, any matter or thing whatever to be sent or

delivered by the Postal Service, or deposits or causes to be deposited any matter or thing

whatever to be sent or delivered by any private or commercial interstate carrier, or takes

or receives therefrom, any such matter or thing, or knowingly causes to be delivered by

mail or such carrier according to the direction thereon, or at the place at which it is

directed to be delivered by the person to whom it is addressed, any such matter or thing,

shall be fined under this title or imprisoned not more than 20 years, or both."

293. UBS has a previous conviction for mail fraud. Another "predicate act."

294. UBS, EY and Schwab acted in violation of the federal wire fraud statute under 18 U.S.C.

§ 1343 that provides: "Whoever, having devised or intending to devise any scheme or

artifice to defraud, or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises, transmits or causes to be transmitted by means of

wire, radio, or television communication in interstate or foreign commerce, any writings,

signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice,

shall be fined under this title or imprisoned not more than 20 years, or both."

295. UBS, EY and Schwab, singly or in concert with others, directly and/or indirectly, in the

offer and sale of CEFL, by use of the mails and Internet websites under their control, by

use of the means or instruments of transportation and communication in interstate

commerce, or by use of the mails: (a) employed devices, schemes, or artifices to defraud Plaintiff; (b) obtained money by means of the concealment of material facts necessary for investors, including Plaintiff, to make an informed decision with regard to whether or not to purchase CEFL; (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon purchasers of the shares of CEFL including Plaintiff.

296.   In light of Defendant's intentional concealment of material facts from the offering document for CEFL, Plaintiff was deceitfully induced to purchase shares of CEFL.

297.   These intentional deceits operated as mail and/or wire frauds and ultimately resulted in causing Plaintiff to suffer large monetary losses and adverse tax consequences.

298.   By failing to disclose UBS's vast history of financial crimes in the "Risk Factors" section for the UBS offering document for CEFL, UBS and EY violated the securities laws of the U.S.

299.   By failing to direct UBS to include in its offering document for CEFL its long and extensive history of financial crimes, UBS and EY failed to inform Plaintiff of the real and substantial risks inherent in an investment in CEFL.

300.   UBS and EY knew that disclosing UBS's vast history of crimes in the offering document for CEFL would substantially reduce investor interest in CEFL and have a negative impact on the value of the securities UBS had already sold to the public.

301.   When UBS and AY prepared and posted on the Internet on a UBS website the offering document for CEFL, UBS and AY knew that they had had no reasonable ground for

concealing the material facts regarding UBS's vast history of financial crimes from the offering document for CEFL.

302. UBS, EY and Schwab knew the disclosure of UBS's vast history of financial crimes would dissuade Plaintiff and other prospective investors from investing in CEFL.

303. These unwarranted concealments were intentional and made in a conscious, reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

304. Had Plaintiff been informed by UBS and EY in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

305. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

306. After suffering a substantial monetary loss, a large chunk of his retirement savings, Plaintiff later learned of UBS's prior history of financial crimes and that UBS, aided and abetted by EY, with outrageous and conscious reckless intent concealed and material facts regarding UBS's vast history of financial crimes from the UBS offering document for CEFL.

307. With respect to the UBS, EY and Schwab violations of Sections 17(a)(2) and (3) of the Securities Act, UBS, EY and Schwab committed fraud or at least were negligent in their actions and inactions.

308.  With respect to violations of Section 17(a)(1) of the Securities Act, UBS acted knowingly and severely recklessly in their actions and inactions. By reason of the foregoing, UBS, EY and Schwab violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

As a proximate and/or indirect result of UBS's, EY's and Schwab's concealment of material facts regarding UBS's vast history of financial crimes, UBS, EY and Schwab are liable to Plaintiff for the actual damages Plaintiff suffered from his investment in CEFL and whatever further relief this Court finds fair and just.

## COUNT 5: SECURITIES FRAUD

309.  Plaintiff re-alleges and incorporates paragraphs 1-308 of this Complaint by reference as if set forth verbatim.

310.  Plaintiff asserts claims under the anti-fraud provisions of Sections 5, 10, 11, 12(a)(2), 15, 17(a)(2), 22, 23 and 27 of the Securities Act of 1933, and 15 U.S.C. § 78j(b) and the rules and regulations promulgated thereunder, and Sections 9, 10, 12, 13, 20, 21 and 26 of the Securities Exchange Act of 1934, S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5) and Section 207 of the Investment Advisors Act of 1940).

311.  UBS, EY and Schwab directly and/or indirectly, singly or in concert with others, in connection with the issuance, underwriting, marketing, sale and distribution of securities, by use of any means or instrumentality of interstate commerce or of the mails, knowingly and with conscious reckless disregard for the truth: (a) employed devices, schemes, or artifices to defraud Plaintiff; (b) obtained money by means of the concealment of material facts necessary for investors, including Plaintiff, to make an informed decision with

regard to whether or not to purchase the UBS security in question; (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon purchasers of the shares of CEFL including the Plaintiff.

312. By failing to disclose UBS's vast history of financial crimes, UBS, EY and Schwab failed to exercise their duty to disclose UBS's vast history of financial crimes.

313. UBS, EY and Schwab knew that disclosing UBS's vast history of crimes in the offering document for CEFL would substantially reduce investor interest in CEFL and have a negative impact on the value of the securities UBS had already sold to the public.

314. With a thoroughgoing intent to deceive and/or defraud and mislead Plaintiff and other investors, UBS, EY and Schwab intentionally failed to disclose the vast history of UBS's financial crimes to Plaintiff.

315. When UBS and AY prepared and posted on the Internet on a UBS website the offering document for CEFL, UBS and AY knew that they had had no reasonable ground for concealing the material facts regarding UBS's vast history of financial crimes.

316. UBS and EY knew the inclusion of UBS's vast history of financial crimes would send prospective investors in CEFL, including Plaintiff running for the hills.

317. These unwarranted concealments were intentional and made in a conscious reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

318. Had Plaintiff been informed by UBS and EY in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of

indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

319.  Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

320.  As a proximate and/or indirect result of UBS's, EY's and Schwab's concealment of material facts regarding CEFL, UBS, EY and Schwab are liable to Plaintiff for the actual damages Plaintiff suffered from his investment in CEFL and whatever further relief this Court finds fair and just.

## COUNTS 6 & 7: NEGLIGENT OR FRAUDULENT MISREPRESENTATION

321.  Plaintiff re-alleges and incorporates paragraphs 1-320 of this Complaint by reference as if set forth verbatim.

322.  Section 17(a)(2) of the Securities Act of 1933 makes it unlawful in the offer or sale of any securities, directly and/or indirectly, to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. 15 U.S.C. § 77q(a)(2). Negligence is sufficient to establish a violation of Section 17(a)(2).  See *Aaron v. SEC,* 446 U.S. 680, 696-97 (1980). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See *Basic Inc. v. Levinson,* 485 U.S. 234, 231-32 (1988).

323.  As a large and experienced issuer of securities UBS had a duty to disclose all material information necessary to make the offering document for CEFL not misleading and EY, as UBS's auditor, had the same duty.

324.  UBS, EY and Schwab failed to exercise their duty to disclose UBS's vast history of financial crimes.

325.  UBS, EY and Schwab knew that disclosing UBS's vast history of crimes would substantially reduce investor interest in CEFL and have a negative impact on the value of the securities UBS had already sold to the public.

326.  With a thoroughgoing intent to deceive and/or defraud and mislead Plaintiff and other investors, UBS, EY and Schwab intentionally concealed the vast history of financial crimes from Plaintiff.

327.  When UBS and AY prepared and posted on the Internet on a UBS website the offering document for CEFL, UBS and AY knew, or should have known, that they had had no reasonable ground for concealing the material facts regarding UBS's vast history of financial crimes from Plaintiff.

328.  These unwarranted concealments were intentional and made in a conscious, reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

329.  Had Plaintiff been informed by UBS and EY in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

330. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

331. As a proximate and/or indirect result of UBS's, EY's and Schwab's concealment of material facts including UBS's vast history of financial crimes, UBS, EY and Schwab are liable to Plaintiff for the actual damages Plaintiff suffered from his investment in CEFL and whatever further relief this Court finds fair and just.

## COUNT 8: BREACH OF FIDUCIARY DUTY

332. Plaintiff re-alleges and incorporates paragraphs 1-331 of this Complaint by reference as if set forth verbatim. Plaintiff re-alleges and incorporates paragraphs x-x of this Complaint by reference as if set forth verbatim.

333. As a large and experienced issuer of securities UBS had a duty to disclose all material information necessary to make the offering document for CEFL not misleading and EY, as UBS's auditor, had the same duty.

334. By failing to disclose UBS's vast history of financial crimes, UBS, EY and Schwab failed to exercise their duty to disclose UBS's vast history of financial crimes. UBS, EY and Schwab knew that disclosing UBS's vast history of crimes would substantially reduce investor interest in CEFL and have a negative impact on the value of the securities UBS had already sold to the public.

335. With a thoroughgoing conscious intent to deceive and/or defraud and mislead Plaintiff and other investors, UBS, EY and Schwab intentionally concealed the vast history of financial crimes.

336. When UBS and AY prepared and posted on the Internet on a UBS website the offering document for CEFL, UBS and AY knew that they had had no reasonable ground for concealing the material facts regarding UBS's vast history of financial crimes from the offering document for CEFL.

337. UBS and EY knew the inclusion of UBS's vast history of financial crimes would send prospective investors in CEFL, including Plaintiff running for the hills.

338. These unwarranted concealments were intentional and made in a conscious. reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

339. Had Plaintiff been informed by UBS and EY in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

340. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

341. As a proximate and/or indirect result of UBS's, EY's and Schwab's concealment of UBS's vast history of financial crime, UBS, EY and Schwab are liable to Plaintiff for the

actual damages Plaintiff suffered from his investment in CEFL and whatever further relief this Court finds fair and just.

## COUNT 9: FAILURE TO SUPERVISE

342. Plaintiff re-alleges and incorporates paragraphs 1-341 of this Complaint by reference as if set forth verbatim.

343. Section 15(b)(4)(E) and (b)(6) of the Securities and Exchange Act of 1934 requires broker-dealers to reasonably supervise the conduct and affairs of their firms so as to prevent violations of the federal securities laws.

344. The S.E.C. has repeatedly emphasized that the "responsibility of broker-dealers to supervise their employees by means of effective, established procedures is a critical component in the federal investor protection scheme regulating the securities."

345. After considering warnings on controversial ETN's, Schwab failed to establish a procedure that would alert their customers, including Plaintiff, to the risks inherent in CEFL.

346. Less greedy brokerage firms like Bank of America Merrill Lynch only allows its more than 17,300 brokers to sell ETN's like CEFL to customers with at least $10 million in assets and Raymond James Financial has prohibited its 5,400 brokers from selling ETN's like CEFL since 2010. **Plaintiff's Exhibit M.**

347. Schwab also failed to supervise Plaintiff's customer account by failing to warn Plaintiff that investing in CEFL was unsuitable for an elderly person with limited income and financial resources.

348.  In fact, Schwab encouraged Plaintiff to invest in CEFL by allowing him to invest in CEFL on margin, thereby magnifying Plaintiff's prospective losses from investing in a security that was already leveraged.

349.  Essentially, the very essence of broker-dealer supervision is to ensure that brokers comply with suitability obligations and that they do not succumb to the ever-present conflict of placing their interests ahead of their customers. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

350.  As a proximate and/or indirect result of UBS's, EY's and Schwab's concealment of UBS's vast history of financial crime, UBS, EY and Schwab are liable to Plaintiff for the actual damages Plaintiff suffered from his investment in CEFL and whatever further relief this Court finds fair and just.

## COUNT 10: UNJUST ENRICHMENT

351.  Plaintiff re-alleges and incorporates paragraphs 1-350 of this Complaint by reference as if set forth verbatim.

352.  As set forth above, the UBS Defendants unjustly enriched itself at Plaintiff's expense by creating, issuing, underwriting, promoting, marketing, and selling to Plaintiff through his broker the defective security called CEFL.

353.  CEFL is a defective security because, as described above, CEFL was intentionally and recklessly created by UBS to defraud purchasers of CEFL including Plaintiff and provide UBS with substantial financial gains.

354. The elements of unjust enrichment are: (1) the defendant benefited; (2) the benefit was at the expense of the plaintiff; and (3) that equity and good conscience require restitution." *Mazzaro de Abreu v. Bank of America Corp.,* 525 F. Sup. 2d 381, 397 (S.D.N.Y. 2007).

355. Three pages of the 19-page **Joint Sentencing Memorandum** dated September 12, 2013 submitted prior to sentencing found at *United States of America v. UBS Securities Japan, LTD* (September 13, 2013) describes in detail certain of the skills UBS deployed to defraud Plaintiff. **Plaintiff's Exhibit L.**

356. The means to defraud Plaintiff include manipulating the price of the CEFL common shares, manipulating the index upon which the shares of CEFL are valued and manipulating the monthly dividend for CEFL downward so as to deflate the value of the CEFL shares. **Plaintiff's Exhibit L.**

357. These manipulations were designed and executed with fraudulent intent to enable UBS to repurchase the shares of CEFL it sold to the public at prices far below the $25 offering price for CEFL.

358. As has been described above, UBS's had the in-house skills and willingness to execute the CEFL manipulations. Once UBS had repurchased CEFL shares at prices far lower the $25 offering price, UBS manipulated the price of CEFL upwards and then resold the CEFL shares to the public at artificially inflated prices.

359. UBS also extracted monthly index administration and finance fees from Plaintiff by deducting them from CEFL's monthly dividend.

360. By inducing Plaintiff into selling his CEFL shares that UBS had fraudulently deflated and then purchasing those CEFL shares at the deflated prices and then reselling those CEFL shares at prices that UBS had manipulated higher and deducting monthly fees from Plaintiff, UBS unjustly enriched itself and continues unimpeded to do so with other investors who have invested in CEFL.

361. Equity, good conscience and the doctrines of Special Facts and Fair Dealing require full restitution of the sums lost by Plaintiff from his investment in CEFL.

## COUNTS 11 & 12: REQUEST FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF

362. Plaintiff re-alleges and incorporates paragraphs 1-361 of this Complaint by reference as if set forth verbatim.

363. Declaratory and injunctive relief is warranted because the dispute between Plaintiff and Defendants is imminent and the disputed predatory actions and inactions, jointly and singularly, of the Defendants is ongoing and relief is necessary to protect the investing public from the predatory conduct of the Defendants and the investing public has no adequate remedy at law.

364. Accordingly, Plaintiff respectfully requests this Court take action to protect the investing public from the predatory conduct of the Defendants, something the U.S. regulatory authorities, even though they have fined UBS billions of dollars, have been reluctant to do.

365. In determining whether declaratory and injunctive relief is warranted under the federal securities laws, courts have examined whether "there is a reasonable likelihood of further

violation in the future." *Securities & Exch. Comm'n v. Monarch Fund,* 608 F.2d 938, 943 (2nd Cir. 1979)."

366.  At page 67 of UBS's 2015 Annual Report UBS is "subject to a large number of claims, disputes, legal proceedings and government investigations and we anticipate that our ongoing business activities will give rise to such matters in the future." Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

367.  This request of the Court to enjoin UBS from doing business in the U.S. is made necessary because the DOJ, the S.E.C. and other regulatory authorities have fined UBS billions of dollars for UBS's commission of almost every serious financial crime imaginable have failed to expel UBS from the U.S. securities markets, thus leaving UBS free to defraud U.S. investors.

368.  This request of the Court to order EY would extend to other external auditors to include in the "Risk Factors" sections of securities prospectuses the issuers' criminal history is made necessary because other external auditors are failing to do so.

369.  This request of the Court to order Schwab and other broker-dealers to alert prospective investors to the risks inherent in investing in securities that have been found defective is made necessary because most broker-dealers, including Schwab, are failing to do so.

370.  In UBS's 2015 Annual Report under the heading "Limitations on Enforcement of U. S. Laws Against Its Management and Others" UBS states that most of its directors and executive officers are resident outside the United States, and all or a substantial portion of their assets are located outside the United States, thus making it difficult to serve legal

process on them, and there is doubt as to the enforceability in Switzerland, in original actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the securities laws of the U.S.

371. As stated in its shelf registration Prospectus, UBS's bragging that its conduct lies beyond the reach of U.S. law should be construed as "an-admission-against-interest." See Federal Rules of Evidence 804(b)(3).

372. Given the fact that at least six criminal waivers were already granted to UBS by the DOJ and the vast history of UBS financial crimes and the UBS admission that future financial crimes are a distinct possibility and the highly evolved UBS corporate culture that rewards financial criminality and the fact that the NPA issued to UBS by the DOJ was revoked by the DOJ because UBS had admitted to committing new crimes.

373. The likelihood that UBS will commit future financial crimes is all but assured as admitted at page 67 of UBS's 2015 Annual Report where UBS states: UBS is "subject to a large number of claims, disputes, legal proceedings and government investigations and we anticipate that our ongoing business activities will give rise to such matters in the future." Another "admission-against interests." See Federal Rules of Evidence 804(b)(3) and **Plaintiff's Exhibit E.**

374. Accordingly, Plaintiff respectfully requests that this Honorable Court use its vested powers to protect the investing public from the predations of the Defendants.

**WHEREFORE,** respectfully asks this Court to find for Plaintiff and against UBS, EY Schwab and the Individual Defendants Plaintiff and further requests: (a) declaratory and injunctive relief as set forth in Counts 11 and 12; (b) actual, treble/punitive and other

damages with accrued interest as this Court sees fit as set forth in counts 1-10-above; and

(c) such other relief, at law or in equity, general or special that this Court deems

appropriate.


Dated: June 8, 2017


Robert Zimmerman, *Pro Se*

329 Sandpiper Lane
Hampstead, NC 28443
Tel: 910-232-8990
Email:

# Exhibit A