IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

2018 JAN 10  PM 3: 25

Civil Action No:  1:17-CV-04503-JMF

| | | |
|---|---|---|
| Robert Zimmerman, | ) | |
|         Plaintiff, | ) | |
| | ) | |
| v. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| UBS AG, | ) | |
| UBS GROUP AG, | ) | DEMAND FOR JURY TRIAL |
| UBS Securities, LLC, | ) | |
| UBS Financial Services, Inc., | ) | |
| UBS Americas Holding LLC, | ) | |
| Charles Schwab & Co., Inc., | ) | |
| EY Global LLP, | ) | |
| Ernst & Young LLP and Ltd., and | ) | |
| Individual Defendants. | ) | |

,

1

# Table of Plaintiff's Exhibits

A. UBS employees call UBS securities "Crap and Vomit" 1 page.

B. One of UBS's DOJ Non-Prosecution Agreements….6 pages.

C. UBS AG Shelf Registration Statement…79 pages.

D. Ernst & Young Ltd. unqualified opinion letters for UBS AG for 2013 to 2016.

E. Page 67 and Note 22 to UBS AG's 2015 Annual Report, 13 pages, 466-477.

F. UBS Product Supplement for CEFL…62 pages.

G. The Clintons and the sordid UBS affair…2 pages.

H. The UBS Chairman's pay raise…1 page.

I. Attorney General remarks re: UBS crimes from 2012 to 2015…6 pages.

J. SEC Cease and Desist Order…7 pages.

K. "Risk Factors" section of UBS Product Supplement for CEFL…14 pages.

L. Pages 11-13 of DOJ/UBS Joint Sentencing Memorandum…3 pages.

M. Schwab fails to alert to the dangers inherent in investing in CEFL…3 pages.

N. UBS pleads guilty to aiding and abetting U.S. tax evaders…2 pages.

O. DOJ amendment to DOJ/UBS NPA…3 pages.

P. Three UBS letters to the SEC imploring them for leniency…39 pages.

Q. Affidavit of Service for Robert McCann…1 page.

R. Schwab account pages showing Plaintiff's financial loss…2 pages.

S. A partial rendering of EY and Schwab crimes…15pages.

T. UBS breach of 2012 DOJ NPA and guilty plea…1 page.

U. EY LLC unqualified audit opinion letters for UBS Securities LLC…5 pages.

V. Letter criticizing FINRA written by a FINRA arbitrator…10 pages.

W. *Why Good Accountants Do Bad Audits*…10 pages.

X. UBS crimes from Note 20 to UBS's Annual Report for 2016…23 pages.

Y. Federal Judge Slams FINRA Arbitration…4 pages.

## PARTIES

1. Plaintiff Robert Zimmerman is a 77-year-old retired resident of North Carolina, a veteran and resides at 329 Sandpiper Lane, Hampstead, NC 28443.

2. Plaintiff worked for Arthur Young & Co. the predecessor of EY Global, from approximately 1965-66 and Arthur Young & Co. became a client of a firm Plaintiff founded and headed from approximately 1968-73.

3. UBS is used as a collective term for UBS Group AG, UBS AG, UBS Securities, LLC, UBS Financial Services, Inc, and UBS Americas Holding LLC. When appropriate the names of the specific UBS entity will be used.

4. UBS Group AG is a holding company for UBS AG (a financial services company and a foreign private securities issuer under Rule 3b-4(c) of the Securities Exchange Act of 1934), UBS Securities, LLC and UBS Financial Services, Inc. are UBS U.S. subsidiaries of UBS and UBS Americas Holding LLC is a subsidiary of UBS and the U.S. holding company for UBS Securities, LLC and UBS Financial Services, Inc.

5. All UBS defendants have as their U.S. mailing address: Law Department, UBS, 1285 Avenue of the Americas, New York, New York, 10019.

6.  Ernst & Young LLC is the U.S. public auditor of UBS Securities LLC, one of the underwriters for the UBS security called CEFL. Ernst & Young LLC is headquartered in New York, New York, mailing address: Law Department, Ernst & Young, 5 Times Square, New York, New York 10036-6530.

7.  Ernst & Young Ltd., UBS's auditor in Europe, is headquartered in London, England.

8.  EY Global is headquartered at 6 More London Place, London England.

9.  UBS AG is the issuer of the UBS security called CEFL and is headquartered in Zurich and Basel, Switzerland with a U.S. office in Manhattan, New York.

10. UBS Americas Holding LLC is headquartered at 1285 Avenue of the Americas, New York, New York, 10019 and is a parent of UBS Securities, LLC and UBS financial Services, Inc.

11. Charles Schwab & Co. (Schwab) is the broker-dealer through which Plaintiff invested in CEFL. Schwab is headquartered and has as its mailing address is Corporate Legal Services, 211Main St., 6th Fl., San Francisco, CA 94105.

12. The Individual Defendants are:

13. Defendant Charles Schwab is sued in his capacity as Chairman of the Board of Directors of Schwab and founder of the firm that bears his name and Defendant Walt Bettinger is sued in his capacity as President and CEO of Schwab, both of whom were fully informed from at least 2014 with regard to UBS's vast history of financial crimes and stood to substantially benefit financially from concealing UBS's criminal record from Schwab customers by failing to order employees responsible for supervising customer accounts to

alert customers to UBS's those undisclosed crimes and other material risks. Or, in the alternative, removing CEFL from the catalogue of securities Schwab will purchase for its customers. **Plaintiff's Exhibit M.**

14. Defendant Axel Weber is sued in his capacity as Chairman of UBS's Board of Directors and Chair of UBS's Corporate Culture and Responsibility Committee with shared responsibility and authority with respect to UBS's internal audit function and who as a holder of 635,751 UBS shares, and who, along with each of the other UBS Individual Defendants, from at least 2014 was fully informed about UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

15. Defendant Michel Demare is sued in his capacity as Vice Chairman of UBS's Board of Directors and Member of the Audit Committee and as a holder of 254,287 UBS shares and was fully informed as to UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

16. Defendant Tom Naritil is sued in his capacity as UBS Group AG's Chief Financial Officer and as a holder of 1,190,827 UBS shares and 555,115 stock options and was fully informed about UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

17. Defendant Markus Diethelm is sued in his capacity as BS Group AG's General Counsel and as a holder of 693,340 UBS shares was fully informed about UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

18. Defendant William Parrett is sued in his capacity as Chairman of UBS Group AG's Audit Committee and who supervised UBS's external auditor EY, and as a holder of 104,385 UBS shares was fully informed about UBS's financial crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

19. Defendant Ann Godbeher is sued in her capacity as a member of UBS Group AG's Audit Committee and as a holder of 201,457 UBS shares was fully informed about UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

20. Defendant Isabelle Romy is sued in her capacity as a member of UBS AG's Audit Committee and a holder of 91.038 UBS shares and was fully informed about UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

21. Defendant Beatrice Weder di Mauro is sued in her capacity as a member of UBS AG's Audit Committee and as a holder of 99,787 UBS shares and was fully informed about UBS's crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

22. Defendant Reto Francioni a m is sued in his capacity as member of UBS AG's Corporate Culture and Responsibility Committee, and as a holder of 51,567 UBS she was fully informed about UBS's financial crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

23. Defendant Robert McCann is sued in his capacity as President of UBS Americas Holding LLC, and as a holder of 1,010,805 UBS shares and was fully informed about UBS's

6

crimes and stood to substantially benefit financially from concealing UBS criminality from the investing public.

24. EY partners Marie-Laure Delaure, Troy Butner and Ira Fitlin are sued in their capacities as the EY lead external auditors who signed the UBS AG  2015 Annual Report, each of whom from at least 2014 was fully informed about UBS's crimes as they had depicted those crimes in EY's Notes 20 and 22 to UBS AG's annual reports and who stood to substantially benefit financially from concealing UBS criminality from the investing public by ingratiating themselves to their client, thus protecting EY's $83 million annual audit fee, their positions as UBS partners and lucrative consulting fees.

25. Defendant EY partner Steve Howe is Area Managing Partner for Ernst & Young Americas, who, as such, supervises the audits of UBS Securities, LLC and is sued in his capacity as an EY control person who knew, or should have known, about UBS's undisclosed crimes.

26. Defendant EY managing partner Mark Weinberger is EY Global Chairman and CEO, and, as such, supervises all of EY's audits and is sued in his capacity as a control person who knew, or should have known, about UBS's undisclosed crimes.

27. Defendant EY partner Andy Baldwin is Area Managing Partner for Ernst & Young Ltd., and as such supervises the audits of UBS AG and UBS Group AG a and is sued in his capacity as an EY control person, who knew, or should have known, about UBS's undisclosed crimes.

28. Defendant EY Partner Ralph Mattone who is sued in his capacity as the person who signs UBS Securities LLC statements filed with the SEC and was fully informed about UBS's crimes.

29. The term "control," as used above, is defined in Rule 12b-2 under the Exchange Act to "mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

30. In *In re Lernout & Hauspie Sec. Litig.,* 286 B.R. 33 (Bankr. D. Mass. 2002) the Court imposed control person liability under §15 of the 1933 Act and §20(a) of the 1934 Act on audit committee members in connection with a securities financial fraud case.

## JURISDICTION AND VENUE

31. Plaintiff re-alleges and incorporates paragraphs 1-30 by reference and verbatim.

32. Federal courts always have the authority to determine whether they have the jurisdiction to hear a particular case. *United States v. Ruiz,* 536 U.S. 622, 628 (2002) (citing *United States v. Mine Workers of Am,* 330 U.S. 258,291 (1947).

33. Jurisdiction is proper 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000, exclusive of interest and costs and there is complete diversity of citizenship.

34. Jurisdiction is also proper pursuant to Sections 21(d)(3) and 27 of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u(d)(3) and 78aa].

35. Jurisdiction is also proper for federal claims pleaded under 15 U.S.C. §§ 77 and 78, and 15 U.S.C. § 77q(a) and supplemental jurisdiction over state law claims asserted herein

pursuant to 28 U.S.C. § 1367. The claims asserted herein arise under and pursuant to

Sections 10(b) and 20(a) of the 1933 and 1934 Exchange Acts, (15 U.S.C. §§78j(b), 78b-

1 and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

36.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

37.   Venue is proper in this Court because on UBS advertised CEFL, the security involved in

this case, to Plaintiff over the Internet.

38.   Venue is proper in this District pursuant to Section 27 of the Exchange Act (15U.S.C.

§78aa), and 28 U.S.C.  §1391(b).


**LAW AND FACTS REGARDING UBS's AND EY's MOTIONS TO DISMISS**

39.   Plaintiff re-alleges and incorporates paragraphs 31-38 by reference and verbatim.

40.   UBS and EY Defendants have filed a Motion to Dismiss and this Court has asked

Plaintiff to address those Motions to Dismiss in this First Amended Complaint.

41.   If need be, this First Amended Complaint relates back to the original Complaint and

incorporates the facts therein.

42.   Federal Rules of Civil Procedure and federal case law set out the applicable legal

standards regarding a 12(b)(6) motion to dismiss and expressly do not require a claimant

to set out in detail the facts upon which he bases his claim.

43.   To the contrary, all the federal Rules require is `a short and plain statement of the claim'

that will give notice of what the plaintiff's claim is and the grounds upon which it rests.

Such simplified notice pleading is made possible by the liberal opportunity for discovery and the other pretrial procedure established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." *Conley v. Gibson,* 355 U.S. 41 at pages 45-48.

44.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

45.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," meaning that there is "more than a sheer possibility that a defendant acted unlawfully." Id. (citing *Twombly,* 550 U.S. at 556-57, 127 S.Ct. 1955).

46.  Moreover, the *Twombly* Court stated that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly,* 550 U.S. at 555.

47.  The *Twombly* plausibility standard, which applies to all civil actions, see *Iqbal,* 129 S.Ct. at 1953, does not prevent a plaintiff from "pleading facts alleged `upon information and belief'" where the facts are peculiarly within the possession and control of the defendant," see, e.g., *Boykin v. KeyCorp,* 521 F.3d 202, 215 (2d Cir.2008), or where the belief is based on factual information that makes the inference of culpability

plausible, see Iqbal, 129 S.Ct. at 1949, "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

48. The *Twombly* Court stated that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." 550 U.S. at 556, 127 S.Ct. 1955.

49. The *Twombly* Court stated, "we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."

50. Nor did *Iqbal* heighten the pleading requirements. Rather, it reiterated much of the discussion in *Twombly* and rejected as insufficient a pleading that the *Iqbal* Court regarded as entirely conclusory. Accordingly, although *Twombly* and *Iqbal* require "'factual amplification [where] needed to render a claim plausible,'" *Turkmen v. Ashcroft,* 589 F.3d 542, 546 (2d Cir.2009) (quoting *Ross v. Bank of America, N.A (USA),* 524 F.3d 217, 225 (2d Cir.2008)), we reject the contention that *Twombly* and *Iqbal* require the pleading of specific facts.

51. It is "only the extraordinary case in which dismissal is proper" for failure to state a claim. *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir. 1981).

52. A court may dismiss a complaint as a matter of law only if the complaint: (1) lacks a cognizable legal theory; or (2) fails to contain sufficient facts to support a cognizable legal claim. *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984).

53. When ruling on a motion to dismiss, the court must assume that the complaint's factual allegations are true and should construe all inferences from them in the non-moving party's favor. *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir. 2002); *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990).

54. The court must not look at whether the plaintiff will "ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

55. Also, courts may not consider materials outside the pleadings when resolving a motion to dismiss. *Schneider v. California Dep't of Corrections,* 151 F.3d 1194, 1197 n.1 (9th Cir.1998). Instead, the court must decide "whether or not it appears to a certainty under existing law that no relief can be granted under any set of facts that might be proved in support of a plaintiff's claims." *De La Cruz v. Tormey,* 582 F.2d 45, 48 (9th Cir. 1978).

56. Moreover, if a motion to dismiss is brought pursuant to CPLR 3211(a)(7), the allegations of the pleading are deemed to be true. *Foley v D'Agostino,* 21 AD2d 60 [1st Dept 1964]). Even more than that, the pleading will be deemed to allege whatever may be implied from its statements by reasonable intention. The pleader is entitled to every favorable inference that might be drawn. *Westhill Exports v Pope,* 12 NY2d 491, 496 (1963).

57. Based on information and belief, neither UBS nor EY has brought their Motion to Dismiss pursuant to CPLR 3211(a)(7).

58. If they had, to succeed on a CPLR 3211(a)(7) motion to dismiss, the moving party "must convince the court that nothing the plaintiff can reasonably be expected to prove would help; that the plaintiff just doesn't have a claim." Siegel, New York Pract. § 265 at 462

[5th ed 2011]; accord John R. Higgitt, CPLR 3211(a)(1) and (a)(7) *Dismissal Motions-Pitfalls and Pointers,* 83 NY ST BJ 32, 33-34 [Nov./Dec. 2011]).

59. With regard to UBS's Motion to Dismiss certain of Plaintiff's claims based on the doctrines of *Res Judicata* and/or Collateral *Estoppel*, UBS ignores the fact that Plaintiff's counterclaim in the North Carolina Federal Court was dismissed without prejudice, which means that the Court has not adjudicated the case on the merits of the counterclaim so that dismissal cannot have any *res judicata* or collateral *estoppel* impact on a later action.

60. With regard to UBS's claim that UBS's Individual Defendants were not timely served, Plaintiff maintains that UBS Defendant Robert McCann was timely served. The Affidavit of Service for Robert McCann is enclosed as **Plaintiff's Exhibit Q.**

61. The remainder of the UBS Individual Defendants are served *de facto* as acknowledged in UBS's Motion to Dismiss at pages 1 and 24, where the Katten law firm, and attorney Goldberg specifically, have moved to dismiss Plaintiff's claims against UBS's Individual Defendants by name.

62. In other words, all UBS Individual Defendants are presently represented in this action by the Katten law firm, which has not withdrawn their representation of them.

63. Moreover, on page 6 of UBS AG's shelf registration statement under which CEFL was issued and underwritten by UBS, under the heading "Limitations on Enforcement of U. S. Laws Against Its Management and Others," UBS AG brazenly brags that "most of its directors and executive officers are resident outside the U.S., and all or a substantial portion of their assets are located outside the U.S., thus making it difficult to serve legal process on them, and there is doubt as to the enforceability in Switzerland, in original

actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the securities laws of the U.S."

64. The above declaration by UBS demonstrates a degree of hubris typically reserved for senior members of criminal organizations.

65. Even so, the UBS AG shelf registration statement states that all legal disputes will be resolved in accord with New York law, and it is inconceivable that New York law would preclude lawsuits against UBS executives because, even though the UBS corporate entities are properly served, the Individual Defendants get a pass because Swiss law requires Swiss executive residents sued by U.S. residents must be served by the Swiss Central Authority, which service of process could take a year or more, well beyond the U.S. timeframe for litigation of the claims against them.

66. Moreover, UBS employs approximately 60,000 people and approximately 1/3 of which are residents of the U.S. and 1/3 of which reside in Switzerland and yet not a single U.S.-based UBS employee is mentioned in the offering document for CEFL or the UBS AG shelf registration statement.

67. UBS had no trouble serving Plaintiff when they sued him in a federal court. They claim they did so by having FEDEX or UPS leave an envelope containing their Summons and Complaint on my front porch.

68. Based on information and belief, Switzerland and Germany were the only European nations that opted out of The Hague Service Convention, which provides for service by mail.

69. Further, in their Motion to Dismiss when claiming that certain UBS Individual Defendants were not timely served, UBS failed to name the specific UBS Individual Defendants that were not timely served.

## APPLICABLE LAW REGARDING ACTIONS FOR SECURITIES FRAUD

70. Plaintiff re-alleges and incorporates paragraphs 39-69 by reference and verbatim.

71. The Securities Acts of 1933 and 1934 "constitute interrelated components of the federal regulatory scheme governing transactions in securities." *Ernst & Ernst v. Hochfelder,* 425 U. S. 185, 425 U. S. 206 (1976). The Acts created several express private rights of action, one of which is contained in § 11 of the 1933 Act.

72. In addition to the private actions created explicitly by the 1933 and 1934 Acts, federal courts have implied private remedies under other provisions of the two laws.

73. When delivering the Opinion of the Court in *Tellabs,* 551 US 308, Justice Ruth Bader Ginsberg stated: "A private right of action under § 10(b) of the 1934 Act and Rule 10b-5 has been consistently recognized for more than 35 years and is well beyond question. Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security … [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U. S. C. §78j(b). SEC Rule 10b–5 implements §10(b) by declaring it unlawful: "(a)  To employ any device, scheme, or artifice to defraud, "(b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made … not misleading, or "(c)  To engage in any act,

practice, or course of business which operates or would operate as a fraud or deceit upon

any person, in connection with the purchase or sale of any security." 17 CFR §240.10b–5.

Section 10(b), this Court has implied from the statute's text and purpose, affords a right

of action to purchasers or sellers of securities injured by its violation. See, e.g., *Dura*

*Pharmaceuticals,* 544 U. S., at 341. See also id., at 345 ("The securities statutes seek to

maintain public confidence in the marketplace … by deterring fraud, in part, through the

availability of private securities fraud actions."); J.I. Case Co., v. *Borak,* 377 U. S., at 432

(private securities fraud actions provide "a most effective weapon in the enforcement" of

securities laws and are "a necessary supplement to Commission action"). To establish

liability §10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted

with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst*

*& Ernst,* 425 U. S., at 193–194…"

74.  With regard to whether Plaintiff has adequately plead scienter, the formulation of the

scienter standard adopted by the U.S. Court of Appeals for the Second Circuit is

illustrative.

75.  Under that standard, a plaintiff may sufficiently plead scienter by alleging facts showing

either that the defendant had both motive and opportunity to commit fraud, or strong

circumstantial evidence of conscious misbehavior or recklessness. *See Novak v. Kasaks*,

216 F.3d 300, 307 (2d Cir. 2000). Only an "extreme departure from the standards of

ordinary care . . . to the extent that the danger was either known to the defendant or so

obvious that the defendant must have been aware of it…may constitute recklessness

severe enough to give rise to liability.

76. Defendants had both motive and opportunity to engage in the frauds and other wrongdoings alleged herein.

77. UBS's primary motive was and is to reap vast profits and then to use certain of those profits to defray the cost of the billions of dollars in settlements, fines, penalties, disgorgements and restitutions levied on them by a numerous courts and regulatory agencies.

78. UBS's opportunity arose with the filing of the UBS AG shelf registration statement with the SEC, which enabled the offering of CEFL, the security at issue in this action, and then intentionally concealed from CEFL's offering document (the Product Supplement) any mention of UBS's financial criminality and 25 the other material risk factors depicted below. The UBS Product Supplement for CEFL is enclosed as **Plaintiff's Exhibit F.** The UBS AG shelf registration statement is enclosed as **Plaintiff's Exhibit C.**

79. EY's primary motive was protecting its audit relationship with UBS, which had, on information and belief, profited EY to the tune of at least a billion dollars from 2004 to 2017. EY's opportunity came in the form of granting UBS a series of undeserved unqualified audit opinions from at least 2004 to 2016, without which it is unlikely UBS could continue its securities business in the U.S. and continue pursuing highly profitable criminal activities.

80. Where violations of the securities laws have been committed in the past by a corporation through its officers, the nature of the corporation and its officers is an important consideration in determining the likelihood of further violations. See *SEC v. Texas Gulf*

*Sulphur Co.*, 446 F.2d at 1306; *SEC v. Mono-Kearsarge Consol. Mining Co.,* 167 F.Supp. 248, 259.

81.   The undisclosed 26 material risk factors were also nowhere to be found in the UBS AG shelf registration statement or the Product Supplement for CEFL, nor was any UBS AG and/or UBS Group AG's and/or UBS Securities, LLC's Annual Reports or any other annual report for any year ever sent to Plaintiff by UBS or Schwab.

82.   The Product Supplement for CEFL was billed by UBS as the "Replacement" for the "Prospectus for CEFL." But there never was a prospectus for CEFL, only a UBS AG shelf registration statement, which never once mentions CEFL or any of UBS's vast history of financial crimes, and was certified by EY as "Expert." The UBS Product Supplement for CEFL is enclosed as **Plaintiff's Exhibit F.** The UBS AG shelf registration statement is enclosed as **Plaintiff's Exhibit C.**

83.   The fact that UBS and EY and Schwab Defendants have admitted that they were aware of UBS's crimes, certain aspects of which were buried hundreds of pages deep in UBS AG and UBS Group AG's annual reports is proof that the omission of the crimes from the purported Product Supplement for CEFL was far more than a mere omission; the omissions were intentional concealments.

84.   Public audit firms like EY are ill-equipped to detect sophisticated fraud and rarely do. But they are duty-bound to report frauds that they are aware of to the SEC and the DOJ. EY does not claim it ever did report a single UBS crime, from amongst the vast history of UBS crimes to the SEC or the DOJ, nor did EY insist that UBS include its crimes in the "Risk Factors" section of its purported Product Supplement for CEFL.

85.  The failure of a public auditor to report fraud violates the Sarbanes-Oxley Act of 2002,
     which requires external auditors to report fraud to the SEC. Rule 240 10A-1 states that
     auditor reports under Section 10A must be submitted to the SEC's Office of the Chief
     Accountant. The report must be in writing and identify the registrant and the auditor and
     the date that the registrant received the Section 10A report from the auditor. In addition,
     the report must include either a copy of the auditor's report or a summary of the report
     including a description of the act that the auditor has identified as a likely illegal act and
     the possible effect of that act on the financial statements. The rule is based on the premise
     that the reports under Section 10A are supposed to assist the SEC in performing its
     enforcement responsibilities.

86.  The International Standard on Auditing 240 also requires auditors to report fraud to the
     appropriate governmental authority in accord with the laws of the country in which the
     fraud took place.

87.  Had EY taken appropriate action, as above, Plaintiff and other investors would likely not
     have suffered the massive losses that they did.

88.  Beyond collecting, on information and belief, approximately a billion dollars in audit,
     management consulting and tax consulting fees, by aiding and abetting the fraudulent
     concealment of UBS's crimes and defective products, UBS by conspiring with UBS to
     coverup its criminal history became known as the auditor of choice for corporations that
     also wished to conceal their crimes and greatly expanded its revenues from at least 2004
     to 2017.

89. Various studies have shown that giant corporations, even when reporting their income, assets and liabilities in conformance with generally accepted accounting rules and principles, have enormous leeway to cook the books.

90. Therefore, given that leeway and the fact that public auditors are ill-equipped to detect fraud, it is not clear as to just what public functions a public auditor such as EY with approximately $34 billion in annual fees does provide other than to aid and abet the concealment of financial crime.

91. Under the "Buried Facts Doctrine," a reporting company may incur liability when material facts, although disclosed, are obscured by their placement or by the inclusion of a mass of trivial information, like UBS AG's and UBS Group AG's annual reports. See *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 774 (3rd Cir. 1976).

92. Under the "Buried Facts Doctrine," a disclosure is deemed inadequate if it is presented in a way that conceals or obscures the information sought to be disclosed. The doctrine applies when the fact in question is hidden in a voluminous document, as here, or is disclosed in a piecemeal fashion which prevents a reasonable shareholder from realizing the correlation and overall import of the various facts interspersed throughout the document. See *Werner v. Werner,* 267 F.3d 288 (3d Cir. Pa. 2001).

93. The SEC's position has always been that Section 11 liability under the Securities Act of 1933 attaches to the product supplement.

94. By making use of the shelf registration process, UBS AG, UBS Group AG, UBS Securities LLC and UBS Americas Holding LLC and EY and Schwab deliberately and/or

recklessly sought to conceal and did conceal UBS's crimes and numerous other material risk factors from the offering document for CEFL.

95. Certain aspects of UBS's criminal activity excerpted from Note 20 to UBS AG and UBS Group AG's 2016 Annual Report are enclosed as **Plaintiff's Exhibit X.** Others are described below under the headings "A Summary Recital of UBS Criminal Activities During WWII" and "A Summary Recital of More Recent UBS Financial Criminality." Still other UBS crimes may be found on the U.S. Department of Justice (DOJ) website.

96. Only a cult of criminality emanating from the highest echelons of the UBS executive management team could produce the mind-boggling array of serious financial crimes described herein.

97. Schwab's primary motive was maintaining its long-term, highly profitable business relationships with UBS. Its opportunity came in the form of failing to alert Plaintiff and other investors to the extreme risks inherent in investing in CEFL, when other less greedy broker-dealers, as shown below, refused to allow their customers to invest in CEFL and other UBS securities.

98. Unlike Schwab Defendants, Bank of America Merrill Lynch only allows its more than 17,300 brokers to sell exchange traded notes (ETN's) including CEFL to customers with at least $10 million in assets and Raymond James Financial has prohibited its 5,400 brokers from selling ETN's including CEFL since 2010. **Plaintiff's Exhibit M.**

99. In addition to recovering his economic loss and opportunity loss with interest, Plaintiff seeks $100,000,000 in punitive damages to punish Defendants for their unlawful conduct and to discourage them from continuing their fraudulent criminal activities.

21

100. In the Southern District of New York, "where the question of intent is at issue matters are 'peculiarly within the defendant's knowledge,' and thus Rule 9(b)'s pleading standards are less stringent." *In re Alstom SA,* 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005) (quoting *Liberty Ridge,* 173 F. Supp. 2d at 136).

101. Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when material facts are omitted or concealed from the registration statement and to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.

102. If a plaintiff has purchased a U.S. registered security issued pursuant to a registration statement, as here, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements. See 15 U.S.C. § 77k(b).

103. Since Plaintiff alleges omissions/concealments rather than affirmative misstatements, the element of reliance may be presumed if the omissions/concealments were material. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,* 552 U.S. 148, 160, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008); *Black,* 418 F.3d at 209

104. In a case involving intentional concealments of material facts, as here, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. See *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 384 [90 S.Ct. 616, 621, 24 L.Ed.2d 593] (1970); *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833,

849 (CA2 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976 [89 S.Ct. 1454, 22 L.Ed.2d 756] (1969); 6 L.Loss, Securities Regulation 3876-3880 (1969 Supp. to 2d ed. of Vol. 3); A. Bromberg, Securities Law, Fraud-SEC Rule 10b-5, Secs. 2.6 and 8.6 (1967).

105.   This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. *Chasins v. Smith, Barney & Co.,* 438 F.2d [1167] at 1172.

106.   "The purpose of the federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear." S*ee In re Am. Int'l,* 741 F.Supp.2d at 531.

107.   A § 10(b) action can be brought by a purchaser or seller of "any security" against "any person" who has used "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of a security. 15 U.S.C. § 78

108.   While some conduct actionable under § 11 may also be actionable under § 10(b), it is hardly a novel proposition that the 1934 Act and the 1933 Act "prohibit some of the same conduct." *United State v. Naftalin,* 441 U. S. 768, 441 U. S. 778 (1979) (applying § 17(a) of the 1933 Act to conduct also prohibited by § 10(b) of the 1934 Act in an action by the SEC). "The fact that there may well be some overlap is neither unusual nor unfortunate.'" Quoting *SEC v. National Securities, Inc.,* 393 U. S. 453, 393 U. S. 468 (1969).

109.   Section 17(a)(2) of the Securities Act makes it unlawful "in the offer or sale of any securities…directly or indirectly…to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2) (2012).

110. Negligence is sufficient to establish a violation of Section 17(a)(2). See *Aaron v. SEC,* 446 U.S. 680, 696-97 (1980). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See *Basic Inc. v. Levinson,* 485 U.S. 234, 231-32 (1988).

111. To establish a prima facie case of negligence under New York law, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon ex rel. Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294, 499 N.Y.S.2d 392, 392 (1985); see also *King v. Crossland Sav. Bank,* 111 F.3d 251, 259 (2d Cir.1997).

112. In the U.S., public auditors have common law liability and statutory law liability. Common law liability arises from fraud, negligence, breach of fiduciary duty.

113. Professional negligence is the "failure to exercise due professional care". Third parties can sue public audit firms and their employees for the tort of negligence, which is a wrongful act, injury, or damage for which a civil action can be brought.

114. Underwriters "[occupy] a vital position" in security offerings because investors rely on an underwriter's honesty, reputation, integrity, independence, and expertise. See *Dolphin & Bradbury, Inc. v. Sec,* 512 F.3d at 841.

115. While broker-dealers must have a reasonable basis for recommending securities to customers, underwriters like UBS Securities LLC have a "heightened obligation" to take

steps to ensure adequate disclosure. Id. (quoting 1988 Proposing Release, 53 Fed. Reg. at 37787 n. 74).

116. "[A]n underwriter must make an adequate investigation of an issuer's financial soundness and prospects and must disclose materially adverse information to the potential investors. Failure to carry out a reasonable investigation will render the underwriter liable for material misrepresentations which such an investigation would have uncovered." *Ades v. Deloitte & Touche,* Nos. 90 Civ. 4959 & 90 Civ. 5056 (RWS), 1993 WL 362364, at *19 (S.D.N.Y. Sept. 17, 1993) (citing *Feit v. Leasco Data Processing Equip. Corp.,* 332 F. Supp. 544, 582 (E.D.N.Y.1971)).

117. Self-regulation is the mainspring of the federal securities laws. No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter. He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so. He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so. Since he often has a financial stake in the issue, he has a special motive thoroughly to investigate the issuer's strengths and weaknesses.

118. Prospective investors look to the underwriter, a fact well known to all concerned and especially to the underwriter, to pass on the soundness of the security and the correctness of the registration statement and prospectus. See generally Note, *Escott v. BarChris:* "Reasonable Investigation" and Prospectus Liability Under Section 11 of the Securities Act of 1933, 82 *Harvard. Law Review,* 908 (1969).

119.   The U.S. Senate Report that accompanied proposed Sec. 14(e) indicates that this degree of involvement by the underwriter in the making or opposing of a tender offer may subject him to liability if the registration materials are misleading:

120.   Under the circumstances of this case, involving primarily a failure to disclose and a defective security, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact. 406 U.S. at 153-54.

121.   Issuers, like UBS, who somehow became eligible for a Rule 415 shelf-registration are also eligible to use a short-form registration statement or product supplement, as here, when taking securities "down off of the shelf." But, the very same due diligence considerations still apply to both issuers and underwriters.

122.   Since only UBS entities are issuers, underwriters and Calculation Agent for CEFL, those facts establish undisclosed conflicts of interest, including the substantial likelihood that CEFL underwriter UBS Securities LLC, and possibly UBS Financial Services, Inc. as well, failed to conduct the necessary due diligence because if they had they would have insisted that CEFL's issuer UBS AG had included the vast history of UBS crimes in the "Risk Factors" section of the Product Supplement for CEFL and in the UBS AG shelf registration statement.

123. In 1975, Congress enacted the "most substantial and significant revision of this country's Federal securities laws since the passage of the Securities Exchange Act in 1934." See *Securities Acts Amendments of 1975,* Pub.L. 94-29, 89 Stat. 97.

124. Prior to the *Securities Acts Amendments* enacted by Congress in 1975, federal courts had consistently and routinely permitted a plaintiff to proceed under § 10(b) even where express remedies under § 11 or other provisions were available. In light of this well-established judicial interpretation, Congress' decision to leave § 10(b) intact suggests that Congress ratified the cumulative nature of the § 10(b) action. See *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U. S. 353, 456 U. S. 381-382 (1982); *Lorillard v. Pons,* 434 U. S. 575, 434 U. S. 580-581 (1978).

125. A cumulative construction of the securities laws also furthers their broad remedial purposes. In enacting the 1934 Act, Congress stated that its purpose was "to impose requirements necessary to make [securities] regulation and control reasonably complete and effective." 15 U.S.C. § 78b. In furtherance of that objective, § 10(b) makes it unlawful to use "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of any security.

126. Securities laws combating fraud should be construed "not technically and restrictively, but flexibly to effectuate [their] remedial purposes." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U. S. 180,375 U. S. 195 (1963). Accord, *Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U. S. 6, 404 U. S. 12 (1971); *Affiliated Ute Citizens v. United States,* 406 U. S. 128 (1972).

127.  In a typical civil suit for money damages, plaintiffs must prove their case by a
preponderance of the evidence. Similarly, in an action by the SEC to establish fraud
under § 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), we have held that proof by a
preponderance of the evidence suffices to establish liability. *SEC v. C. M. Joiner Leasing
Corp.,* 320 U. S. 344, 320 U. S. 355 (1943). "Where . . . proof is offered in a civil action,
a preponderance of the evidence will establish the case..."

## A SUMMARY RECITAL OF UBS CRIMINAL ACTIVITIES DURING WWII

128.  Plaintiff re-alleges and incorporates paragraphs 70-127 by reference and verbatim.

129.  The activities of the UBS (then Union Bank of Switzerland) during World War II were
not publicly revealed until decades after the war, when it was demonstrated that UBS
likely took active roles in trading gold (mostly from fillings), securities, and other assets
stolen from victims of the war by the Nazis during World War II.

130.  The issue of "unclaimed property" of Holocaust victims became a major issue for UBS in
the mid-1990s, and a series of revelations in 1997 brought the issue to the forefront of
national attention in 1996 and 1997.

131.  UBS confirmed that a large number of accounts had gone unclaimed as a result of the
bank's policy of requiring death certificates from family members to claim the contents of
the account. UBS's handling of these revelations was largely criticized and the bank
received immense negative attention in the U.S. and came under significant pressure,
from American politicians, to compensate Holocaust survivors who were making claims
against UBS.

132.  In January 1997, Christoph Meili, a night watchman at the Union Bank of Switzerland (UBS), found employees shredding archives compiled by a subsidiary that had extensive dealings with Nazi Germany.

133.  The shredding was in direct violation of a then-recent Swiss law adopted in December 1996 protecting such material. UBS acknowledged that it had "made a deplorable mistake."

134.  Criminal proceedings then began against the archivist for possible violation of a recent Federal Document Destruction decree and against Meili for possible violation of bank secrecy, which is a criminal offense in Switzerland. Both proceedings were discontinued by the District Attorney in September 1997. Swiss authorities are diligent with regard to protecting the financial criminal activities of Swiss business entities and individuals.

135.  Meili was suspended from his job at the security company that served UBS, following a criminal investigation. Meili and his family left Switzerland for the U.S. where they were granted political asylum.

136.  In 1997, the World Jewish Congress lawsuit against Swiss banks was launched to retrieve deposits made by victims of Nazi persecution during and prior to World War II, ultimately resulting in a settlement of $1.25 billion in August 1998.

## A Summary Recital of More Recent UBS Financial Criminality

137.  Plaintiff re-alleges and incorporates by reference and verbatim paragraphs 128-136.

138. In response to an FBI investigation, UBS announced that it would cease providing cross-border private banking services to U.S.-domiciled clients through its non-U.S. regulated units as of July 2008.

139. In November 2008, a U.S. federal grand jury indicted Raoul Weil, Chairman and CEO of UBS Global Wealth Management and Business Banking and member of UBS's Group Executive Board, in connection with the ongoing investigation of UBS's U.S. cross-border business.

140. UBS would eventually cut its ties to Weil in May 2009 and he faced charges after UBS had settled its criminal case with the government.

141. The U.S. issued an international arrest warrant for Weil, and he was extradited to the U.S. after being arrested in Italy in 2013.

142. In January 2014, Weil plead not-guilty in federal court to helping U.S. taxpayers evade taxes on $20 billion in offshore assets.

143. On 18 February 2009, UBS agreed to pay a fine of $780 million to the U.S. government and entered into a deferred prosecution agreement (DPA) on charges of conspiring to defraud the U.S. by impeding the Internal Revenue Service.

144. The DPA obliged UBS to pay US$780 million to settle criminal charges, and criminal charges were dismissed. The figures include interest, penalties, restitution for unpaid taxes and disgorgement of profits. As part of the deal, UBS also settled SEC charges of having acted as an unregistered broker/dealer and investment adviser for Americans. See **Plaintiff's Exhibit N.**

145.   The day after settling its criminal case on February 19, 2009, the U.S. filed a civil suit against UBS to reveal the names of all 52,000 American customers, alleging that UBS and these tax-evading customers of theirs conspired to defraud the IRS and federal government of the legitimately owed tax revenue. The Swiss Financial Market Supervisory Authority (FINMA) had provided to the U.S. government the identities of, and account information for, certain U.S. customers of UBS's cross-border business as part of its criminal investigation in 2009.

146.   On 12 August 2009, UBS announced a settlement deal that ended its litigation with the IRS. However, this settlement set up a showdown between the U.S. and Swiss governments over the secrecy of Swiss bank accounts.

147.   It was not until June 2010 that Swiss lawmakers approved a deal to reveal client data and account details of U.S. UBS customers suspected of tax evasion.

148.   In February 2015, UBS announced an investigation by the federal government over new charges stating that UBS facilitated tax evasion by its U.S. clients. The focus of the investigation lies on the possible sale of bearer bonds, a type of unregistered security that provides anonymity to the owner. UBS announced that it was cooperating with the investigators. **See Plaintiff's Exhibit N.**

149.   UBS employees allegedly discussed the legal ramifications of the use of bearer bonds with their clients, a type of security that has been virtually illegal in the U.S. The government investigation was trying to determine whether there was a criminal conspiracy to evade taxes and conceal what had allegedly already been done.

150.   The investigation, which was launched in January 2015, also aimed to determine whether bearer bonds were provided as investment vehicles to UBS clients before the expiration of its 2009 deferred prosecution agreement with the DOJ.

151.   The deferred prosecution agreement lapsed in October 2010. If UBS was found to have violated the agreement, the federal government could make new allegations against UBS on charges stemming from the violation. In such a case, prosecutors would likely ask for significant fines and for UBS to be put under regulatory oversight.

152.   On 15 September 2011, UBS became aware of a massive loss, originally estimated at $2 billion, allegedly due to unauthorized trading by Kweku Adoboli. Adoboli was arrested and later charged with fraud by abuse of position and false accounting dating back to 2008.

153.   UBS's actual losses were subsequently confirmed as $2.3 billion, and according to the prosecutor in Adoboli's trial he "was a gamble or two from destroying Switzerland's largest bank for his own benefit." The bank stated that no client positions had been affected and its CEO Oswald Grübel initially dismissed calls for his resignation, commenting that "if someone acts with criminal intent, you can't do anything."

154.   However, UBS's management was subsequently criticized for its "lapses" by the Government of Singapore Investment Corporation, the bank's largest shareholder, in a rare press statement on September 20, 2011.

155.   On September 24, 2011 UBS announced Grübel's resignation, and the appointment of Sergio Ermotti as a Group CEO on an interim basis. On October 5, 2011, Francois Gouws and Yassine Bouhara, co-heads of UBS's Global Equities franchise, also resigned.

156.   In Switzerland, where the Government had bailed out UBS in 2008, particular concern was voiced about the nature of the alleged trading which, it was suggested, might have been directed against the interests of the Swiss economy.

157.   In 2011, UBS was fined $25 million for omissions and misleading statements it made in connection with the sale of Lehman Brothers Holdings structured notes. UBS had underwrote and marketed $900 million worth of 100% Principal-Protection Notes between March 2007 and September 2008; Lehman Bros. went bankrupt in September 2008. UBS also agreed to pay $8.25 million in restitution and interest to American investors.

158.   In August 2013, UBS settled a class action lawsuit filed by holders of Lehman notes. The lawsuit alleged that UBS's depiction of the financial condition of Lehman Bros. was misleading. UBS settled the lawsuit with a payout of $120 million.

159.   In 2011, UBS agreed to pay $160 million in restitution, penalties and disgorgement of profits for rigging bids in the U.S. municipal bond market, after the bank and three of its employees were charged by the DOJ in 2010.

160.   In July 2013, the three employees were convicted of conspiracy in the muni market fraud: former UBS Vice President Gary Heinz was sentenced to 27 months in prison and fined US$400,000; former UBS global commodities chief Peter Ghavami was sentenced to 18 months and fined US $1 million; and former UBS VP Michael Welty received a 16-month sentence and fined $300,000.

161.   In 2011, Hasan Ali Khan, owner of a Pune stud farm, was arrested by India's Enforcement Directorate and charged with serving as a front man for Khashoggi.

,                                                          33

Khan and Kolkata businessman Kashinath Tapuriah were charged under the Prevention of Money Laundering Act. Allegedly, in 2003, Khan helped launder $300 million of money Khashoggi made through arms sales via the Zurich branch of UBS.

162. Introduced to UBS by Khashoggi in 1982, Khan enabled the arms dealer to launder funds held in American accounts through UBS Geneva. One of Khan's accounts eventually was frozen when it was determined that the source of the funds came from Khashoggi's arms sales.

163. *India Today* reported that Mr. Khan allegedly had $8 billion in "black money" (laundered money) in a UBS account. The figures were reported to be verified by *India Today,* based on a letter written by UBS Zurich. The government of India reportedly verified the existence of this account in UBS.

164. UBS denied Indian media reports alleging that it maintained a business relationship with or had any assets or accounts for Hasan Ali Khan. Upon formal request by the Indian and Swiss government authorities, UBS announced that the documentation corroborating such allegations were forged and numerous media reports claiming he had $8 billion in black money at the bank were false.

165. In December 2012, UBS agreed to pay $1.5 billion to settle a case filed by the U.S. Commodity Futures Trading Commission alleging that UBS engaged in a criminal conspiracy to rig the London Interbank Offered Rate (LIBOR) benchmarks used on loans via company's Japan-based subsidiary.

166.   UBS has also been charged by British and Swiss financial regulators for its LIBOR
manipulation scheme. In settling the case, UBS acknowledged wrongdoing. UBS Chief
Executive Sergio Ermotti said, "We are taking responsibility for what happened…"

167.   UBS also paid a fine the equivalent of $300 million to the Financial Conduct Authority,
the largest fine ever issued by the U.K. regulator for LIBOR rigging. The UBS scheme
involved multiple banks, brokers and traders to manipulate interest rates to generate a
profit on trades. The scheme lasted for six years before it was broken up. UBS entered
into a deferred prosecution agreement with the DOJ, following which it was not a subject
of criminal charges, except for company's subsidiary, UBS Securities Japan, which was
not exempted. The UBS Japanese subsidiary plead guilty to wire fraud.

168.   The manipulation scheme's ringleader was former UBS trader Thomas Hayes, who was
indicted by U.S. prosecutors along with Swiss national Roger Darin.

169.   Market regulators in Asia, Switzerland, the United Kingdom, and the U.S. began to
investigate the $5 trillion-a-day foreign-exchange market after *Bloomberg News* reported
in June 2013 that several of the world's largest currency trading banks had been front-
running client orders and rigging the foreign exchange benchmark WM/Reuters rates
by colluding with counterparts. The behavior occurred daily in the spot foreign-exchange
market and went on for at least a decade according to currency traders.

170.   At the center of the investigation were the transcripts of electronic chatrooms in which
senior currency traders discussed with their competitors at other banks the types and
volume of the trades they planned to place. The electronic chatrooms had names such as
"The Cartel," "The Bandits' Club," "One Team, One Dream" and "The Mafia".

171.  UBS set aside approximately $2 billion in expected liability for alleged charges in currency rigging and French tax evasion cases. For the currency rigging charges, UBS paid $800 million to American, British, and Swiss regulators.

172.  In July 2013, UBS settled a lawsuit filed against it and seventeen other banks by the Federal Housing Finance Agency, the U.S. federal agency that oversees Fannie Mae and Freddie Mac, with a payout of $885 million, but without UBS having to admit any wrongdoing. At the time of the settlement, the agency had already settled with two other institutions, but the UBS settlement was the first where the amount paid was released to the public.

173.  On behalf of Fannie and Freddie, the FHFA had sued UBS and 17 other banks in July 2011 over mortgage-backed securities sold to the two government-sponsored enterprises that buy mortgages in the secondary market and repackage them as securities to boost liquidity in the mortgage business. The lawsuit claimed that UBS misrepresented the quality of mortgages sold to the two housing agencies for $4.5 billion.

174.  In February 2015, UBS along with Citigroup and Goldman Sachs Group agreed to a $235 million settlement stemming from residential mortgage-backed securities (RMBS) issued by the defunct Residential Capital LLC (ResCap) and underwritten by the three financial institutions.

175.  The ResCap RMBS were issued before the sub-prime mortgage crisis, and the lawsuit dates from 2008. The lawsuit alleged that the prospectuses and registration statements issued by UBS, Citigroup and Goldman Sachs did not adequately disclose the risks of the

RMBS and were, in fact, misleading to investors, who sustained heavy losses. The lawsuit alleged that the behavior of the three defendants violated securities laws.

176. In 2013, France launched an investigation into UBS France's alleged abetting of tax evasion by French taxpayers. The investigation was spurred by the March 2012 publication of a book about UBS's role in connection with tax evasion, which estimated the amount of tax income lost to UBS-controlled offshore accounts at €600 billion.

177. UBS France executive Patrick de Fayet was among three local branch executives being investigated. UBS wealth management bankers allegedly broke the law by enabling French taxpayers to hide their assets in UBS-controlled offshore assets to avoid paying taxes. The bankers undertook to direct their French clients' assets to UBS's Switzerland operation, rather than keep the money in France. UBS set aside approximately $2 billion in expected liability for its currency rigging and French tax evasion cases.

178. UBS faced fines of up to five billion euros for its alleged role in tax fraud, according to the French newspaper *Le Temps.*

179. In July 2014, UBS was required to post a bond of 1.1 billion euros, which UBS complied with while making multiple appeals in the French court system, finally losing its appeal at the *Cour de Cassation,* France's highest court. UBS appealed the ruling to the European Court of Human Rights on the basis that the bond, by potentially prejudicing the outcome of the case, violated its rights.

180. The Human Rights Court, in a unanimous decision, rejected UBS's appeal on January 12, 2017.

181.  In February 2015, U.S. whistleblower Bradley Birkenfeld, the key figure in the UBS tax evasion scandal in the U.S., was subpoenaed by French magistrate investigating the case. Federal Judge William Zloch granted Birkenfeld permission to travel to France from February 27 to March 1, 2015 to appear before the French court.

182.  UBS Deutschland AG came under investigation by prosecutors in Mannheim, Germany, after a tax probe revealed suspicious funds transfers from Germany to Switzerland allegedly facilitated by UBS Deutschland's Frankfurt office. Prosecutors have investigated UBS's abetting of tax evasion by German taxpayers from 2004 to 2012.

183.  UBS Deutschland's Frankfurt office was raided by tax investigators in May 2012, and over 100,000 computer files and records were seized for evidence. UBS claimed it was cooperating with the investigators and said that "an internal investigation into the specific allegations has not identified any evidence of misbehavior by UBS Deutschland AG."

184.  Nevertheless, in July 2014, UBS paid approximately $400 million to settle similar charges in Bochum, Germany.

185.  In June 2014, the chief executive of UBS Belgium, Marcel Brühwiler, was arrested on suspicion of fraud, while UBS' offices and Brühwiler's residence were searched by police. It is alleged that UBS Belgium actively recruited rich Belgians, proposing to funnel funds to secret Swiss accounts, enabling tax avoidance.

186.  On May 20, 2015, U.S. authorities ruled that UBS was to pay $545 million in order to end an investigation into the manipulation of currency rates. UBS was the first among other fraudulent banks to report the misconduct and was thus escaped from prosecution by the DOJ.

187.  Another $203 million in fines is due to UBS's FX activities breaching a previous deal
made with the U.S. over the rigging of LIBOR. This agreement was dependent on UBS
adhering to U.S. laws and staying out of trouble with the U.S. authorities for two years.
The deal was struck in 2012, and FX investigations started less than a year later, resulting
in the non-prosecution status being scrapped.

188.  On top of the $203 million fine, UBS plead guilty to one count of wire fraud in the
previous LIBOR scandal as part of the deal with the DOJ to end investigations into its
conduct in the FX scandal.

189.  UBS sold a lot of defective Puerto Rico bond funds, which declined as much as 75%
from their initial prices in 2008. Losses began in mid-2013 and were linked to a general
weakness in municipal bond markets and Puerto Rican debt. Authorities are asking for
some $900 million in damages. Direct evidence exists that top executives of UBS knew
the bond funds were defective and still encouraged the aggressive sale of them.

190.  So many elderly small investors in UBS's Puerto Rico bond funds lost their retirement
savings. And for what? To feed the criminal greed of UBS executives and employees.

191.  Recently, UBS and other banks have been alleged by authorities to be involved in secret
offshore financial dealings in what has been called the Panama Papers scandal.

192.  Perhaps it was UBS's own employees who best described UBS issued and underwritten
securities as "crap and vomit," undisputed comments enclosed as **Plaintiff's Exhibit A.**

193.  Where violations of the securities laws have been committed in the past by a corporation
through its officers, the nature of the corporation and its officers is an important

consideration in determining the likelihood of further violations. See *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d at 1306; *SEC v. Mono-Kearsarge Consol. Mining Co.,* 167 F.Supp. 248, 259.

## <u>NATURE OF THIS ACTION, FACTS AND ALLEGATIONS</u>

194.   Plaintiff re-alleges and incorporates paragraphs 137-193 of this First Amended Complaint by reference as if set forth verbatim.

195.   Plaintiff files this First Amended Complaint pursuant to this Court's Order and in so doing adds EY Global and a few EY Individual Defendants and as this Court has instructed responses to UBS's and EY's Motions to Dismiss.

196.   Plaintiff also incorporates by reference Exhibits "A" to "Y" as enclosed, and his Motion for Sanctions against Schwab, and his Oppositions to the Schwab's Motion for Sanctions as previously filed with this Court.

197.   Further, Defendants in their various motions have introduced an incomplete version of a document that is key to an understanding and prosecution of this action, namely the Product Supplement.

198.   Therefore, Plaintiff has enclosed as **Plaintiff's Exhibit F** a copy that Plaintiff believes is a true and correct version of the Product Supplement for CEFL.

199.   However, as will be shown below, Plaintiff's belief may be incorrect as there is at least one indication that UBS may have altered the Product Supplement that Plaintiff relied on when Plaintiff decided to purchase shares of CEFL.

200.   This is a federal securities fraud and common law action brought under federal law, and the laws of New York, Delaware, New Jersey and California where applicable, by Robert Zimmerman, a 77-year-old retired veteran, who invested in the UBS AG issued and UBS Securities LLC underwritten security called CEFL between 2013 and 2015 in order to supplement his modest monthly Social Security allotment and was then defrauded in the purchase of that security out of most of his life's savings by the direct and indirect unlawful conduct of the Defendants in this action.

201.   Plaintiff maintains that UBS Defendants concocted and engaged in an elaborate scheme to defraud investors and were assisted by the actions and inactions of EY Defendants and Schwab Defendants. UBS concocted this scheme to defraud investors partly because it had experienced substantial declines in income, assets and return on equity from 2010 to 2014 and in part to recoup the billions of dollars in fines, penalties, settlements and disgorgements that had obtained as a result of UBS's vast history of financial criminal activity.

202.   The UBS scheme involved making use of a shelf registration statement filed with the SEC, which UBS AG, UBS Group AG, UBS Securities LLC, EY and Schwab deliberately and/or recklessly used to intentionally conceal UBS's numerous financial crimes and 25 other material risk factors from Plaintiff, as depicted below, with regard to the UBS security called CEFL by intentionally omitting these material risk factors from the offering document for CEFL, its Product Supplement.

203.   UBS issued and underwrote thousands of securities, approximately 20 of which were ETN's, shelf registered securities, many of which, including CEFL experienced

substantial declines in value from their offering prices as set by UBS during 2013 to 2015, the timeframe during which Plaintiff was invested in CEFL, this steep decline even though the U.S. stock indices have soared.

204. On information and belief, certain of these shelf-registered UBS issued and underwritten ETNs are: CEFL, DVCI, DVHI, DVHL, DVYL, MLPL, MORL, MLPL, MLPV, FMLP, FMLP, FUD, HDL, HOML, HOMX, LMCP, LRCT, MLPG, MLPI, MLPW, PTM, RWXL, SDYL, SMHD, SPGH, SPLX, UAG, UBC, UBG, UBM, UBN, UCF, and USV.

205. The offering documents for LMCP, MORL, MLPI and others on the list above are nearly identical to the Product Supplement for CEFL and also use UBS Securities LLC as the Calculation Agent for the indexes used to establish the share value and monthly dividend payment of the securities.

206. To date, even though the prices of U.S. shares have soared since CEFL and the other securities were offered for public consumption, UBS has never offered a word in explanation of why there has been such a steep decline in the share prices (usually 40%-60%) of the CEFL, MORL, LMCP, MLPL and many of the other securities issued by UBS AG and underwritten by UBS Securities LLC and other UBS entities.

207. Moreover, as will be shown below, the shares of MLPL were withdrawn from the market by UBS AG as a result of steep price declines that enriched UBS at the expense of investors in MLPL.

208. It is simply unimaginable given the booming U.S. stock markets since UBS introduced CEFL on or about December, 2013 that a huge international investment bank like UBS

could so mismanage its thousands of securities offerings, including CEFL, without a conscious intent to manipulate them into a steep price declines.

209. Based on information and belief, UBS has engaged in a massive ETN underwriting binge, including CEFL, in order to recoup the billions of dollars in fines, penalties, disgorgements, restitutions and settlements it has paid to the DOJ, the SEC, shareholders of UBS securities and other financial regulatory authorities.

210. All by himself Madoff swindled an estimated $64.8 billion from those that entrusted their funds to him with his Ponzi scheme and was given a 150-year prison sentence.

211. Given the fact that UBS is a huge international bank with a vast history of financial criminality, crimes that dwarf in size and scope the Madoff PONZI scheme, and which include being caught red-handed manipulating the world's most important interest rate (LIBOR) to reap huge criminal profits for itself, and the fact that most financial crimes go undetected and therefore are unreported, the total UBS global take from UBS's financial crime spree could easily exceed $500 billion for the period from 2004 to 2016, the time period during which EY has issued UBS an uninterrupted series of undeserved annual unqualified audit opinions.

212. The UBS guilty plea to a charge of wire fraud was based on UBS admissions that between approximately 2001 and 2010, UBS engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied to the UBS manipulation of the LIBOR interest rate.

43

213. As a result of the foregoing guilty plea UBS was being considered by U.S. financial regulators as an ineligible issuer of securities in the U.S. **Plaintiff's Exhibit P.**

214. Previously, UBS had been granted six waivers from being designated as an ineligible issuer of securities in the U.S. Another concealment of a material fact from the offering document for CEFL by UBS and EY. **Plaintiff's Exhibit P.**

215. To settle the financial crimes underlying the six waivers, UBS paid billions of dollars in settlements, restitution, penalties, fines and disgorgements.

216. But these huge settlements, fines, penalties and disgorgements fail to make known the magnitude of the profits UBS has derived from its financial crimes, leaving us to assume UBS greatly profits from its financial crimes because UBS has continued to commit new financial crimes.

217. Whoever said crime does not pay never came face-to-face with the Defendants.

218. Certain aspects of UBS's criminal activity excerpted from Note 20 to UBS AG and UBS Group AG's 2016 Annual Report are enclosed as **Plaintiff's Exhibit X.**

219. The 2015 *True Link Report on Elder Financial Abuse* estimates that seniors are bilked out of $36.4 billion a year by the securities industry, and that's just elderly people like Plaintiff.

220. Unlike Schwab Defendants, less greedy broker-dealers such as Bank of America Merrill Lynch only allow its more than 17,300 brokers to sell ETN's including CEFL to customers with at least $10 million in assets and Raymond James Financial has

prohibited its 5,400 brokers from selling ETN's including CEFL since 2010. **Plaintiff's Exhibit M.**

221.  UBS AG's and UBS Group AG's 2015 Annual Report, UBS and EY state that UBS expects to engage in future criminal activity and that UBS is "subject to a large number of claims, disputes, legal proceedings and government investigations and we anticipate that our ongoing business activities will give rise to such matters in the future." See **Plaintiff's Exhibit E.**

222.  **The Core Questions/Allegations Underlying Much of Plaintiff's Lawsuit are:** Why did UBS and EY opt to conceal the one of the most significant risk factors of all, namely UBS's financial criminality from the "Risk Factors" section of its offering document for CEFL?

223.  The short answer is that the offering document for a security is the primary and often the only source of information that informs an investors decision whether to invest in a security and if UBS's vast history of criminality were disclosed, as it lawfully should have been up-front in the "Risk Factors" section of the Product Supplement for CEFL, no rational investor would have invested in CEFL or possibly any other UBS security.

224.  Moreover, UBS's external auditor EY failed to take appropriate remedial action by insisting that UBS to disclose its financial crimes in its purported Product Supplement for CEFL, or alternatively deny UBS unqualified audit opinions, or resign from the audit, or inform the SEC. Nor does EY deny that it served as "Expert" for the SEC-filed UBS AG shelf registration statement or that it audited the Product Supplement for CEFL.

225.   Further, Schwab Defendants failed to alert Plaintiff and other Schwab customers to the fact of UBS's financial criminality and instead encouraged Plaintiff's purchase of CEFL shares by granting margin loans to Plaintiff for the purchase of additional CEFL shares.

226.   Amongst other statutory and common law asserted herein, Plaintiff asserts claims against all Defendants under the antifraud and other provisions of Sections 10, 11, 12, 15, 17, 22, 23 and 27 of the Securities Act of 1933, and 15 U.S.C. § 78 and the rules and regulations promulgated thereunder, and Sections 9, 10, 12, 13, 20, 21, 26, 32, and 34 of the Securities Exchange Act of 1934, S.E.C, Rule 10b-5, (17 C.F.R. § 240.10b-5), 28 U.S.C. § 1331(a), Section 34(b) of the Investment Company Act and Section 207 of the Investment Advisors Act of 1940.

227.   The Defendants in this action include two giant global corporations, UBS and Schwab, and EY a giant global partnership. Each of these business entities has a history of financial criminality, especially UBS.

228.   What these Defendants have in common is their ability to use their huge financial resources to avoid prison sentences for their top executives and continue their business operations uninterrupted while continuing with their criminal conduct, whereas small businesses and ordinary Americans found guilty of far less serious crimes are far less fortunate and are readily bankrupted and/or their owners and employees imprisoned.

229.   Proof that Defendants willfully committed securities fraud lies in the fact that certain of the most critical concealed material facts set out below, such as UBS's vast criminal history and four-year term of criminal probation and prospective loss of license to

conduct a securities business in the U.S. are so obvious that the Defendants must have been aware of them. See *Anwar v. Fairfield Greenwich Ltd.,* 728 F. Supp. 2d at 407.

230. Proof of a willful violation of the securities laws requires "that the person charged with the duty knows what he is doing." *Wonsover v. SEC,* 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting) *Hughes v. SEC,* 174 F.2d 969, 977 (D.C. Cir. 1949).

231. In their Motions to Dismiss UBS and EY admit that they were fully aware of UBS's financial crime spree, some of which are set out buried hundreds of pages deep in UBS AG's and/or UBS Group AG's annual reports, one of several "admissions-against-interest."

232. Yet, none of the Defendants took any observable steps to alert U.S. investors about UBS's financial criminality in any of the offering documents for UBS securities including CEFL and EY failed to insist that UBS take action to alert U.S. investors to UBS's extensive record of financial crimes.

233. Moreover, UBS and EY Defendants never once address their utter failure to disclose these numerous insidious financial crimes in the "Risk Factors" section of the offering document for CEFL in their separate motions to dismiss other than to claim Plaintiff should have dug hundreds of pages deep into a Swiss banks annual reports to find out, annual reports never distributed or made known to Plaintiff and which never once mention CEFL.

234. Even a brief perusal of the approximately 9,000-word Note 20 (the first page of which appears at page 378) to UBS AG and UBS Group AG's 710-page, single spaced, small print Annual Report for 2016 is enough for any reasonable person to realize why UBS

,                                                    47

and EY Defendants opted to conceal UBS's financial crimes from the investing public by intentionally omitting them from the offering document for CEFL. What is portrayed in Note 20 is perhaps the most extensive history of financial criminality conducted by any corporation at any time anywhere on this planet. Note 20 is enclosed as **Plaintiff's Exhibit X.**

235. Moreover, the offering document for CEFL fails to contain even the slightest hint of UBS's vast history of criminality.

236. Toward the bottom of page 3 of UBS's Motion to Dismiss UBS states that "Plaintiff claims that [t]he learned of those events [the UBS crimes] from other publicly available sources, including Note 22 to the year-end financial statements that were part of UBS's 2015 Annual Report ("Note 22"), which statement by UBS Defendants clearly demonstrates that UBS's crimes as portrayed in Note 22 could not possibly be incorporated by reference into the Product Supplement for CEFL because the Product Supplement is dated November 14, 2014 and Note 22 to the 2015 Annual Report was not published until early in 2016, at approximately the time Plaintiff had terminated his investment in CEFL and suffered his economic loss and lost investment opportunities. The Product Supplement for CEFL is enclosed as **Plaintiff's Exhibit F** and Note 22 is enclosed as **Plaintiff's Exhibit E**.

237. Moreover, the Product Supplement for CEFL states: "The contents of any website referred to in this product supplement **are not** (emphasis added) incorporated by reference in this product supplement or accompanying prospectus." Not only was there

no accompanying prospectus, as there never was a prospectus for CEFL, only a shelf registration statement that never once mentions CEFL.

238.  Making matters even worse is the fact that immediately following the quoted product supplement statement, as above, is an approximately 85-character access code to a SEC website, which on information and belief led users of that 85-access code to an error message. Even if the access code had worked, what reasonable elderly person would attempt to copy and then enter an 85-character access code to a website that had nothing to do with the security in the product supplement.

239.  In their various Motions to Dismiss UBS and EY Defendants seek to avoid litigating this action because they have no meritorious defenses to Plaintiff's allegations.

240.  For example, UBS goes to considerable lengths to establish the fact that certain of UBS's crimes are disclosed in a 2015 Annual Report for UBS AG and UBS Group AG, both Swiss companies headquartered in Basel and Zurich and that their 2015 Annual Report is "publicly-filed," for all the world to see including Plaintiff. See UBS Motion to Dismiss midway through page 7.

241.  However, there are at least five glaring problems with that proposition. First, what does the term "publicly-filed" mean? Does it mean filed with the Swiss authorities or something else? If it means filed with the Swiss authorities, does that mean Plaintiff should have been in communication with the Swiss authorities, whoever they may be, or traveled to Switzerland to view the approximately 1,000-page document?

242.  Second, when was the 2015 Annual Report filed? UBS does not say.

243. Third, the 2015 Annual Report was not even printed until some time in 2016. When it was printed UBS does not say.

244. Fourth, the UBS crimes are buried hundreds of pages deep in the small print, single spaced report.

245. And fifth, the disclosure of material risk factors are by law to be disclosed up front in the "Risk Factors" section of and offering document for a newly issued security and clearly UBS's crimes were not so disclosed or commented on in any way.

246. Instead of proceeding with this action with meritorious defenses, of which they have none other than to claim that a civil RICO action may not be predicated on allegations of securities fraud and that allegations of mail and wire fraud may not be pursued by private parties, UBS and EY Defendants use a bunch of smokescreens in hopes of confusing Plaintiff and EY has opted to dump thousands of pages of documents, the vast majority of which have zero probative value, hoping for the same result.

## A Partial Recital of Plaintiff's Undisputed Facts

247. Plaintiff re-allege sand incorporates paragraphs 194-246 by reference and verbatim.

248. (1) The fact that the CEFL security is defective by design;

249. (2) The fact that the offering document for CEFL is also intentionally defective;

250. (3) The fact that the offering document for CEFL omits 26 material facts from its "Risk Factors" section.

251. (4) The fact that UBS has failed to disclose its vast history of financial criminality.

252.   (5) The fact that UBS has failed to disclose its three-year, extended to four-year, term of criminal probation as administered by the Criminal Division of the U.S. DOJ.

253.   (6) The fact that UBS is under threat of loss of license to conduct a securities business.

254.   (7) The fact that UBS was able to continue to engage in the securities business after paying billions in fines, penalties, disgorgements, restitutions and settlements was due to a series letters from high-profile UBS attorneys to financial regulators imploring them to give UBS another chance before initiating license revocation.

255.   (8) The fact that on January 14, 2015, the Katten law firm sent a 9-page letter to the SEC imploring for leniency for UBS with regard to certain of its financial crimes. On May 20, 2015, the Debeviose & Plimpton sent two similar letters to the SEC imploring them for leniency for UBS with regard to certain of its financial crimes. See **Plaintiff's Exhibit P.** The gist of the three letters were pleas to the SEC to not revoke UBS's license to engage in the securities business in the U.S. and promises that UBS would play nice in the future.

256.   (9) The fact that UBS signed a non-prosecution agreement with the DOJ and was then found by the DOJ to have violated the terms of that agreement by committing new crimes.

257.   (10) The fact that no reasonable investor would invest in CEFL if the 26 material facts had been disclosed in its offering document.

258.   (11) The fact that the deeply rooted culture of criminality makes UBS unfit to conduct a securities business. While financial statements will vary from year-to-year, sometimes substantially, a corporation's culture that is infused with criminal instincts derived from

numerous criminal acts such as UBS's criminal track record since WWII, as described above, will not as UBS's has not as UBS's criminal activity has grown exponentially in size and scope since WWII, and especially from 2007 through 2017.

259.   (12) The related fact that UBS awarded its Chairman a large raise in a year UBS paid out billions to redress its crimes.

260.   (13) The fact that UBS has pocketed huge profits from its decades-long and continuing crime spree.

261.   (14) The fact that UBS has executed some of the most serious financial crimes in history.

262.   (15) The fact that Defendants unjustly enriched themselves at Plaintiff's expense.

263.   (16) The fact that Defendants conspired to conceal material risk factors from the offering document for CEFL.

264.   (17) The fact that Defendants breached the fiduciary duties they owed to Plaintiff.

265.   (18) The fact that UBS paid former President Clinton and the Clinton Foundation huge sums to help them circumvent paying income taxes. The FBI is again investigating the Clinton Foundation for potentially giving donors special political access and favors — either resuming or starting a new probe that was once considered dead, according to two officials familiar with the matter.

266.   (19) The fact that UBS employees called UBS securities "Crap and Vomit."

267.   (20) The fact that FINRA functions more as a trade organization for the securities industry than an impartial arbitrational forum.

268.   (21) The fact that a former FINRA arbitrator has admitted that FINRA is heavily biased against customers of FINRA member firms.

269.   (22) The fact that each of the UBS account agreements are unsigned by either party and are unconscionable contracts of adhesion.

270.   (23) The fact that the Confidential Settlement Agreement is null and void because it is signed by Schwab's in-house attorney and not an authorized Schwab executive.

271.   (24) The fact that EY and Schwab aided and abetted UBS in foisting CEFL on the uninformed investing public.

272.   (25) The fact that CEFL is not once mentioned in the boilerplate offering document for CEFL.

273.   (26) The fact that CEFL is not once mentioned in the d registration statement from which CEFL evolved.

274.   (27) The fact that Schwab failed to disclose it long-term profitable business association with UBS.

275.   (28) The fact that Schwab employees failed to supervise Plaintiff's account.

276.   (29) The fact that Schwab employees unlawfully encouraged Plaintiff to invest in a security fraught with risk by offering Plaintiff margin loans to invest in a security that was already leveraged.

277.   (30) The fact that EY was paid huge audit and consulting fees for issuing UBS as series of undeserved unqualified audit opinion letters.

278.   (31) The fact that EY's undeserved unqlified audit opinion letters enabled UBS to continue its securities business and continue its financial crime spree.

279.   (32) The fact that EY was fully aware of UBS's undisclosed financial crimes and failed to insist that UBS include them in the offering document for CEFL or the shelf registration statement.

280.   (33) The fact that EY failed to inform the SEC about UBS's financial criminality.

281.   (34) The fact that EY failed to withdraw as UBS's auditor after learning about UBS's financial crime spree.

282.   (35) The fact that Steve Owen, the EY Global Area Manager for "the Americas" failed to adequately supervise the Ernst & Young LLC audits of UBS Securities LLC.

283.   (36) The fact that Andy Baldwin, the EY Global Area Manager for EY "EMEIA" failed to adequately supervise the Ernst & Young Ltd. audits of UBS AG and UBS Group AG.

284.   (37) The fact that Mark Weinberger, the Chairman and CEO of EY Global failed to supervise EY Global area managers Steve Owen and Andy Baldwin.

285.   (38) The fact that the Audit Committee for UBS AG and UBS Group AG, which also supervises UBS Securities LLC, UBS Financial Services Inc. and UBS Americas Holding LLC, failed in their duty to insist on the disclosure of UBS's crimes in the offering document for CEFL and failed to dismiss Ernst & Young Ltd. and Ernst & Young LLC for the role they played in helping to conceal those crimes from investors in CEFL and the SEC.

286.   (39) The fact that UBS AG, UBS Group AG and UBS Americas Holding LLC control executives named as Defendants in this action failed to supervise UBS employees responsible for the crimes UBS has committed and failed to supervise the UBS Audit Committee.

287.   (40) The fact that Schwab control executives Charles Schwab and Walt Bettinger failed to supervise Schwab's employees, which resulted in a failure to alert Plaintiff to UBS's crime spree and other wrongdoings and which allowed Schwab employees to grant Plaintiff margin loans with which to purchase additional CEFL shares, an already highly leveraged security that Schwab knew was a defective product as so stated by the attorney representing Schwab after concluding a settlement agreement with Plaintiff.

288.   (41) The fact that Schwab knew CEFL was a defective product and failed to inform Plaintiff of that fact before or during FINRA settlement negotiations is indicative of the further fact that Schwab negotiated with Plaintiff with superior knowledge that if known by Plaintiff likely would have changed his mind with regard to settling certain FINRA claims against Schwab and should serve to invalidate any settlement agreement between Schwab and Plaintiff.

289.   (42)  The fact that not a single executive or employee of any UBS business entity is named in the Product Supplement for CEFL or the UBS AG shelf registration statement under which CEFL was issued and underwritten or the annual reports for UBS Securities LLC.

290.   (43) The fact that FINRA functions more as a highly biased trade association for the securities industry than an impartial forum for the arbitration of disputes between broker-

dealers and their customers or any of the other negative assertions about FINRA made by Plaintiff or a former FINRA arbitrator.

291.   (44) The fact that UBS, a FINRA member firm, sued Plaintiff in federal court and now Schwab, another FINRA member firm, states that Plaintiff has no right to sue them in a federal court is but another manifestation of the giant corporate ta not only preposterous, but a violation of takeover of America, and possibly violative of the equal protection clause of the 14th Amendment and other constitutional due process rights. Apparently, Schwab is guilty of a form of sexist conduct in that their position defies the adage: "What is good for the goose is good for the gander."

292.   (45) The fact that UBS was being considered an ineligible issuer of securities in the U.S. by the DOJ and SEC, but not FINRA, the securities industry trade association masquerading as a financial regulatory agency.

293.   (46) The fact that the securities industry has spent huge sums on lobbyists and attorneys to construct and protect its one-sided, unconscionable adhesion brokerage account agreements and mandatory FINRA arbitration clauses.

294.   **Moving on:** The Court in its decision in *Ausa Life v. Ernst & Young,* 206 F.3d 202 (2000) portrayed EY's auditors lack of insistence with regard to what would be included in financial statements as "spinelessness." Plaintiff maintains EY's conduct could also be portrayed as the manifestation of a fear of losing Ausa Life as a client and the resultant loss of huge audit and consulting fees that would follow.

295. Further, in *Moran v. GTL Const., LLC,* No. 06 Civ. 168 SCR, 2007 WL 2142343, at *4 (S.D.N.Y. July 24, 2007), the Court ruled "…whether a defendant's actions were willful is a factual question that cannot be decided on a motion to dismiss."

296. Tellingly, neither UBS nor EY in their Motions to Dismiss challenge the veracity and import of the facts set out in Exhibits A-T as enclosed with Plaintiff's original Complaint and incorporated herein.

297. The utter and complete failure to disclose to or alert Plaintiff to 26 material risk factors that if disclosed as required by law would negatively impact the offering of CEFL to the public is proof that Defendants UBS and EY breached significant fiduciary duties they owed to Plaintiff, including due care not to mislead, the duty to avoid conflicts of interest, the duty to deal in good faith, the duty to monitor Plaintiff's investment for suitability, and the duty to conduct due diligence.

298. Because the Defendants willfully directly and indirectly participated in the concealment of 26 material risk factors and other wrongdoings, and because these giant global organizations were fully aware of the fiduciary duties they owe to Plaintiff as a prospective CEFL investor, Defendants breached the fiduciary duties they owed to Plaintiff.

299. UBS and EY had a duty under the Exchange Acts to disclose the 26 material risk factors in the Product Supplement for CEFL. See *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,*,538 F.Supp.2d 662, 669 (S.D.N.Y.2008) ("[R]isk disclosures must accurately characterize the scope and specificity of the risk, as understood at the time the statements are made[.]"); see also *In re Am. Int'l Grp., Inc.* 2008 Sec. Litig., 741 F.Supp.2d 511, 531

(S.D.N.Y.2010) ("[G]eneric risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks.").

300. In today's America, we stand witness to the near completion of the anti-democratic takeover of America by law-defying giant global business entities routinely unimpeded by the rule of law.

301. President Dwight David Eisenhower warned us about this looming takeover, he called it a "military and industrial complex, but not much has been done to defend against it. Unconscionable adhesion brokerage account agreements and mandatory FINRA arbitration clauses are prime examples of the giant corporate takeover of America.

302. Making matters far worse is the SEC's admission that it is under-resourced and incapable of adequately protecting investors, particularly small investors from the criminal predations of the securities industry.

303. Federal law requires a prospectus for all newly issued securities in the U.S. be filed with the SEC and for it to be made available to prospective investors.

304. Since its enactment, the SEC's position has always been that Section 11 liability under the Securities Act of 1933 attaches to the prospectus supplement and incorporated Exchange Act security reports, such as the Product Supplement for CEFL, which by the way never once mentions CEFL.

305. Yet, there is no prospectus for the UBS AG issued and UBS Securities LLC underwritten security called CEFL, only a purported Product Supplement and a UBS AG shelf registration statement none of which ever once mentions CEFL.

306. On page 1 of EY's Motion to Dismiss, at the first sentence under the heading "**INTRODUCTION,**" EY claims the CEFL shares at issue in this action were underwritten by UBS AG, a Swiss corporation.

307. Not so. The CEFL shares were underwritten by UBS Securities LLC, a U.S.-based UBS entity and UBS AG was the issuer of the CEFL shares and possibly UBS Financial Services, Inc. as well. Apparently, no reputable underwriting would involve themselves in such a defective offering or with UBS generally.

308. Also on page 1 of EY's Motion to Dismiss at paragraph 2, EY claims that Plaintiff sued the wrong auditor.

309. Not so. **Plaintiff's Exhibit V** shows that UBS Securities LLC, the CEFL underwriter, is audited by named Defendant Ernst & Young LLC.

310. Facts undisputed in UBS and EY's Motions to Dismiss are that:

311. (1) UBS and EY were fully aware of UBS's vast history of financial crimes;

312. (2) UBS and EY did nothing to see that those crimes were disclosed in the offering document for CEFL;

313. (3) No rational investor would invest in CEFL if the UBS financial crimes had been disclosed to prospective investors in the Product Supplement for CEFL;

314. (4) UBS was serving a four-year term of criminal probation for financial crimes administered by the Criminal Division of the DOJ and under threat of loss of license by the DOJ that would negatively impact the share price of CEFL;

315.   (5)  CEFL is a defective product and the Defendants knew CEFL was a defective product and did not disclose that information in any form to Plaintiff until the attorney representing Schwab let it slip shortly after the signing of a settlement agreement that dismissed certain FINRA claims.

316.   (6)  UBS paid billions in settlements, fines, penalties, disgorgements and restitutions;

317.   (7)  Plaintiff's loss from his investment in CEFL amounted to $180,000-$400,000 and resulted from his justified reliance on the Product Supplement for CEFL and the fact that UBS is a large global bank.

318.   (8) UBS's financial crimes are material facts which should have been disclosed up-front in the "Risk Factors" section of the purported Product Supplement for CEFL, purported because the Product Supplement never even once mentions CEFL, but were not.

319.   In EY's Motion to Dismiss at footnote 2 on Page 10, EY admits that it was aware of UBS history of financial crimes because it audited Note 22 and Note 20 to UBS AG's and/or UBS Group AG's annual reports, an "admission-against-interests," which is direct evidence of consciousness of guilt.

320.   Discovery is needed to learn who created and approved Notes 20 and 22 and who and why these notes were buried hundreds of pages deep in the annual reports for UBS AG and UBS Group AG and not included or even mentioned in the Product Supplement for CEFL or any other offering document for CEFL.

321.   Perhaps most telling with regard to UBS and EY Defendants states of mind is the fact that throughout their Motions to Dismiss these Defendants claim they were not required

to disclose UBS's vast history of criminality in the purported Product Supplement for CEFL or other offering documents because Plaintiff could have learned about those crimes by transforming himself into a professional financial analyst or financial investigative reporter and as such sought out other sources that describe UBS's crimes, an incredible "admission-against-interest" by UBS and EY, a preposterous proposition made even more outrageous by the fact that UBS and EY Defendants do not bother to submit what these other sources might have been.

322. To the best of Plaintiff's recollection, something that he cannot remember first prompted him to explore the DOJ's website and it was there that he got his first glimpse of UBS's criminal history.

323. Plaintiff maintains that not one in 1,000,000 ordinary investors would explore the DOJ website before investing in CEFL. That's what a prospectus is for…full disclosure of all material risk factors, especially financial crimes.

324. Plaintiff was not lawfully required to investigate the DOJ website before investing in CEFL, a website that, by the way, never mentions CEFL.

325. The 1933 and 1934 Exchange Acts "were designed to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195 (1976).

326. The U.S. Supreme Court held little back when it declared: "We have recognized time and again, a 'fundamental purpose' of the various Securities Acts was to substitute a philosophy of full disclosure for the philosophy of caveat emptor, and thus to achieve a high standard of business ethics in the securities industry." Quoting from *SEC v. Capital*

*Gains Research Bureau, Inc.,* 375 U.S. 1, (1972); Accord, *Affiliated Ute Citizens v. United States,* 406 U.S. 128 (1972); *Santa Fe Industries Inc., v. Green,* 430 U.S. 406.

327.   The purported approximately 65-page Product Supplement for CEFL, which like the DOJ website and the shelf registration statement and the UBS AG and/or UBS Group AG 2013 to 2016 annual reports never once mention CEFL, contains a 12-page, single spaced "Risk Factors" section, but not the intentionally concealed 26 material risk factors set out below, the concealment of which constitutes a clear, massive and maliciously intolerable intentional violation of both the letter and the spirit of the Exchange Acts and other federal and state laws by UBS and EY Defendants. See **Plaintiff's Exhibit K.**

328.   The UBS's claim on page one of the purported Product Supplement for CEFL that the 79-page, single-spaced UBS AG shelf registration statement is integral to the purported Product Supplement for CEFL is clearly bogus because the shelf registration statement never once mentions CEFL and therefore cannot lawfully be incorporated by reference into the purported Product Supplement for CEFL, which also never once mentions CEFL.

329.   Yet, even if the UBS AG shelf registration statement is somehow integral to the understanding of the purported Product Supplement for CEFL, and thus magically incorporated into the Product Supplement, nothing in the shelf registration statement serves to disprove any of Plaintiff's substantive allegations because the shelf registration statement does not address any of the intentionally concealed 26 material risk factors, nor was it effectively made known to or distributed to Plaintiff, nor does it mention CEFL.

330.   Amongst other material facts that will be set out below, the highly defective purported Product Supplement for CEFL in and of itself makes CEFL a highly defective product.

331.  Responsibility for foisting the highly defective security called CEFL on prospective investors in the U.S., as will be shown below, lies squarely with the Defendants, all of whom, directly or indirectly, profited from the sale of CEFL to Plaintiff and many other investors.

332.  EY issued UBS AG and UBS Group AG undeserved unqualified audit opinions from at least 2004 to 2016 and thus facilitated UBS's financial crime spree, which includes the fraudulent inducement of Plaintiff to invest in CEFL and other crimes by the Defendants, which resulted in Plaintiff's economic loss and lost investment opportunities.

333.  The Defendants, directly and indirectly, with deliberate and/or reckless deceptive intent, opted to conceal at least 26 critical risk factors from the Product Supplement for CEFL.

## Summarized Below are the Twenty-Six Material Risk Facts Intentionally Concealed from the Product Supplement for CEFL and the UBS AG Shelf Registration Statement

334.  Plaintiff re-alleges and incorporates by reference and verbatim paragraphs 247-333.

335.  By intentionally concealing UBS's criminality from Plaintiff, Defendants failed to alert and/or disclose to Plaintiff UBS's vast criminal history.

336.  Schwab Defendants intentionally concealed from Plaintiff its long-term profitable business relationships with UBS, which conflict of interest was instrumental in Schwab's failure to alert Plaintiff to UBS's financial criminality.

337.  UBS and EY Defendants intentionally concealed the profits UBS derived from its crimes.

338. UBS and EY Defendants intentionally concealed the sums UBS paid in fines, penalties, disgorgements and restitutions for their criminal transgressions.

339. UBS and EY Defendants intentionally concealed that UBS has paid billions of dollars in various penalties, fines, disgorgements and restitutions as punishment for its crimes.

340. UBS and EY Defendants intentionally concealed that UBS was serving a four-year term of criminal probation administered by DOJ.

341. UBS and EY Defendants intentionally concealed that the DOJ had revoked the Non-Prosecution Agreement (NPA) it had entered into with UBS because new UBS financial crimes had come to light.

342. UBS and EY Defendants intentionally concealed that the DOJ had threatened UBS with the revocation of its license to conduct a securities business in the U.S.

343. UBS and EY intentionally concealed the fact that UBS was being considered an ineligible issuer of securities in the U.S. by the DOJ and the SEC.

344. UBS and EY Defendants intentionally concealed that loss of UBS's license to conduct a securities business in the U.S. would have a massive negative impact on the value of CEFL and other UBS securities.

345. UBS and EY Defendants intentionally concealed these 26 material risk factors because wide-spread investor awareness of these 26 material risk factors would result in a substantial diminishment of investor interest in CEFL and result in a substantial devaluation of CEFL and other UBS securities prior to their offer to the public, thus reducing UBS AG's take.

346.  UBS and EY Defendants intentionally concealed that UBS had received wily-nily a series of undeserved unqualified audit opinions from EY, without which UBS would have been foreclosed from issuing and underwriting CEFL. True copies of EY's unqualified opinion letters for UBS AG and/or UBS Group AG for 2013, 2014, 2015 and 2016 are enclosed as **Plaintiff's Exhibit D.**

347.  The granting of undeserved unqualified audit opinions by Ernst & Young Ltd. to UBS AG and/or UBS Group AG and the granting of undeserved unqualified audit opinions by Ernst & Young LLC to UBS Securities LLC when UBS was serving a four-year term of criminal probation and could have its license to do business in the U.S. revoked at any time is a dereliction of the duties of a public auditor that is absolutely mind boggling and possibly unprecedented.

348.  UBS and EY Defendants intentionally concealed that UBS paid EY on information and belief over a billion dollars for audit and consulting services spanning the years from at least 2004 to 2017, and perhaps much earlier. These huge fees, including an $83 audit fee for 2015, proved incentive enough for UBS to purchase from EY a series of unqualified audit opinions spanning the time period from at least 2004 to 2016.

349.  Further, the 26 material concealments from the CEFL Product Supplement and shelf registration statement and the issuance and underwriting of a defective security were made in the teeth of various consent decrees with the DOJ and the SEC, that enjoined UBS from the commission of new crimes. See **Plaintiff's Exhibits B, J, L, N, O, P, Q** and **T**, explained, in part, below.

350. **Plaintiff's Exhibit B**, dated December 18, 2012, one of several UBS/DOJ Non-Prosecution Agreements, is signed, in part, by Markus Diethelm for UBS AG, a named UBS Defendant in this action, in part by outside counsel for UBS AG and in part by the Chief of the Fraud Section, Criminal Division of the DOJ. The NPA refers to several appendices that Plaintiff is not, as yet, privy to. "Appendix A" deals with UBS's criminal conduct. "Appendix C" deals with the "an ongoing investigation" that has not been made available to the public by the DOJ. Appendix B, if there is such, is not referred to in the plea agreement. Perhaps these appendices will be produced during discovery.

351. **Plaintiff's Exhibit J**. is an SEC Cease and Desist Order against UBS Financial Services, Inc. for violations of the federal securities laws in much the same way as alleged in this action including failures to conduct due diligence and making misrepresentations and omissions of material facts.

352. **Plaintiff's Exhibit L** is three pages of a Joint Sentencing Memorandum between the DOJ and various UBS entities for the felony manipulation of LIBOR, perhaps the most insidious financial crime in modern times. The manipulation of LIBOR is a criminal skill far more complex that, as here, the manipulation of the Index that established the price of the CEFL shares and the monthly dividend payment.

353. **Plaintiff's Exhibit N** is a "Deferred Prosecution Agreement (DPA)" dated February 18, 2009 between UBS and the DOJ in which UBS AG admits to conspiring to defraud the U.S. government by helping U.S. taxpayers hide accounts from the IRS and thus evade paying their fair share of income taxes, to identify its customers and pay a $780 million fine. Top UBS executives were indicted and plead guilty to charges including defrauding

the U.S. government. The DPA also discloses that "UBS executives knew that UBS's cross-border business violated the law…and refused to stop the activity…" These facts are germane to this action in that it shows the deep dedication to financial criminality at the very top of the UBS organizational structure, the hubris of those executives, several of which are named Defendants in this action and the fact that UBS, despite its vast criminal activity, was allowed to continue doing business in the U.S.

354. **Plaintiff's Exhibit O** is an October 20, 2014 DOJ amendment to DOJ/UBS NPA of December 18, 2012 extending the term of the DOJ enforced period of UBS's criminal probation until such time as all investigations of UBS criminal activity are conclude. His is germane to this action in that the UBS term of criminal probation is one of 26 material facts intentionally concealed for the Product Supplement for CEFL.

355. **Plaintiff's Exhibit P** is three UBS letters to the SEC from UBS AG's external attorneys imploring them for leniency for UBS AG.

356. The first letter, 18 pages long and dated May 15, 2015, describes an array of serious UBS financial crimes and concludes with a plea to the SEC to not revoke UBS's "eligible issuer status," which status enabled the UBS AG shelf registration statement under which CEFL was UBS Ag issued and UBS Securities LLC underwritten.

357. The second letter written by the same law firm now defending UBS in this action and dated January 14, 2015 implores the SEC not to revoke UBS's eligible issuer status under the absurd pretext that the "free-writing-prospectuses (FWP's) UBS uses to communicate with its customers are easy to understand and have enable UBS from "the twelve-month period beginning August 1, 2013, and ending July 31, 2014, UBS AG issued securities in

2,613 offerings, only 17 of which did not utilize an FWP. The Aggregate principal amount of the 2,613 offerings in which UBS used some form of FWP was approximately $3.5 billion." These facts are germane to this action because the CEFL Product Supplement was issued and underwritten by UBS under an FWP.

358. The third letter is much the same as the first letter, though directed to the Chief of Small Business Policy, Division of Corporate Finance of the SEC instead of the Chief of Enforcement Liaison, Division of Corporate Finance of the SEC.

359. **Plaintiff's Exhibit T** is one page of DOJ letter to external attorneys for UBS AG dated December 18, 2012 in which the DOJ states that "It is understood that UBS admits, accepts, and acknowledges responsibility for the conduct set for the in "Appendix A." UBS also agrees to plead guilty to one count of wire fraud.

360. **Moving on:** This is not the first-time huge sums purchased favorable audit opinions and likely will not be the last. Public auditor Arthur Andersen & Co. (now defunct), parts of which on information and belief merged into EY after Andersen's criminal participation in the Enron scandal and collapse is an apt example of how undeserved unqualified audit opinions can wreak havoc on ordinary investors.

361. Further, by his own admission, David G. Friehling for far less than over the alleged billion dollars in fees paid by UBS to EY failed as an auditor for Bernard L. Madoff by rubber-stamping Madoff's financial statements.

362. Asked why he robbed banks, Willie Sutton replied: "That's where the money is."

363. In a sense EY's conduct was not unlike Willie Sutton's because EY protected its huge audit and consulting fees from UBS by issuing UBS at least 18 undeserved unqualified audit opinion letters from 2004 to 2016 and maintained total silence about the UBS financial crime spree instead of insisting that the UBS crimes be included in the offering document for CEFL and alerting the SEC to those crimes.

364. Lest we forget, UBS is a Swiss bank with a specialty in enabling at least 17,000 of its customers to evade paying their fair share of income taxes. Surely such a devious organization is not incapable of adding to the up-front fees it pays to EY with unofficial payments for EY's audit favors.

365. UBS and EY Defendants intentionally concealed that several of the financial crimes UBS had committed were the sort of price and index rigging crimes that were used by UBS to manipulate the share price and monthly dividend payment of CEFL.

366. UBS and EY Defendants intentionally concealed that the offering price of CEFL was intentionally over-priced and set subjectively by UBS to profit UBS AG without regard to any objective pricing factors or the best interests of Plaintiff.

367. UBS and EY Defendants intentionally concealed that the dividend rate of return for CEFL was intentionally set artificially high in order to fraudulently induce Plaintiff to invest in CEFL.

368. UBS and EY Defendants intentionally concealed where the funds for paying the purported dividend for CEFL would come from or who at UBS would profit from the UBS manipulation of the index upon which the value of CEFL shares and the monthly

dividend payment were set by UBS Securities LLC acting in its capacity as UBS AG's Calculation Agent for CEFL and other UBS securities.

369. UBS and EY Defendants intentionally concealed that one of the key functions of an underwriter of securities is to make a market in the underwritten security and that UBS had no plan or intention to make a market for CEFL.

370. For example, since the initial offering of CEFL in 2013-2014 at $25 a share, the U.S. stock market averages have soared and CEFL has traded consistently at a share price at least 30% below its offering price and even as low as 40-45% below its offering price, which is proof of UBS's utter failure to make a market for the CEFL shares.

371. Moreover, a similar UBS offering, MLPL has experienced losses so large UBS has recalled it from the market. While UBS profited greatly from the withdrawal, investors in MLPL lost their shirts, shoes, socks and underwear.

372. Instead of making a market to protect investors in CEFL shares, UBS's manipulated the share price of CEFL up and down to the detriment of CEFL shareholders in order to reap unjust profits for itself.

373. Discovery is required to learn more about UBS's manipulation of the CEFL share price and how they came to initially price CEFL at $25 a share.

374. The steep decline in CEFL shares prices and dividends as manipulated downward by UBS and the lack of interest in the shares by sophisticated investors who were aware of UBS's financial criminality forced Plaintiff to abandon his investment in CEFL at a substantial monetary loss out of fear of losing the entirety of his retirement savings.

375.   UBS and EY Defendants intentionally concealed that CEFL was one of many UBS created, issued and underwritten securities brought to market by UBS for the sole purpose of transferring the proceeds from these underwritings to UBS AG in Switzerland to use to help UBS pay billions of dollars in settlements, fines, penalties, disgorgements and restitutions in settlement for UBS's financial crimes.

376.   UBS and EY Defendants intentionally concealed any description of the management activities, expertise (if any) and names and addresses of the executives and addresses of the underwriters of CEFL, namely UBS Securities LLC and its parent UBS Americas Holding, LLC.

377.   UBS and EY Defendants intentionally concealed a description of the persons and credentials of the persons who created the UBS security called CEFL or why it was created and why UBS Securities LLC was appointed by UBS AG as the Calculation Agent for CEFL.

378.   UBS and EY Defendants intentionally concealed a description of who selected the index upon which the value of CEFL is established, or why that untested index was selected over established indexes.

379.   UBS and EY Defendants intentionally concealed a description of the persons and qualifications of those persons who were selected by UBS AG and or UBS Securities LLC to manage the index.

380.   UBS and EY Defendants intentionally concealed a plain language description of the mathematical formulas UBS used to establish the value of CEFL and the amount of monthly dividend payments worked and thus violated 17 C.F.R. 230.241.

381. If investor knowledge of the 26 intentionally concealed material risk factors were not determinative to an investors decision whether to invest in CEFL, why were these risk factors not included up-front, as required, or at the very least in summary form, in the "Risk Factors" section of the purported Product Supplement for CEFL?

## Schwab's Pursuit of Proceeding with Plaintiff in a FINRA Forum

382. Plaintiff re-alleges and incorporates by reference and verbatim paragraphs 333-381.

383. Prior to conducting the research necessary to bring this action, a prior FINRA claim and opposition to UBS's federal lawsuit claiming Plaintiff was not a customer of UBS and was thus not entitled to arbitrate his claim against UBS in a FINRA forum, Plaintiff was not aware of UBS AG's shelf registration statement, or of any of the UBS annual reports, or the DOJ and SEC websites from which Plaintiff later collected most of the facts presented in this action, and to this day, based on information and belief, none of which even once mentions CEFL.

384. There are many reasons why Plaintiff brought this action against Schwab in this Court instead of a FINRA forum, several of which are set out in Plaintiff's Opposition to Schwab's Motion to Compel Arbitration and Plaintiff's Motion for Sanctions, and each of which Plaintiff hereby requests to incorporate by reference into this First Amended Complaint.

385. **Schwab's Arbitration Agreement is non-conforming with FINRA Rule 2268 (7)(b)(1) and is thus null and void.** Before getting into the many reasons why, under the circumstances, a FINRA arbitration is not a fair or otherwise appropriate way to resolve Plaintiff's dispute with Schwab Defendants in this action, Plaintiff maintains that

Schwab's purported arbitration agreement as contained buried at pages 21-24 of
Schwab's approximately 95-page, small print, single spaced  Brokerage Account
Agreement submitted twice in their multi-thousand-page document dump as Exhibits 3
and 4 fails to conform with FINRA Rule 2268 (7)(b)(1) which reads as follows: (7) The
rules of the arbitration forum in which the claim is filed, and any amendments thereto,
shall be incorporated into this agreement. (b)(1) In any agreement containing a predispute
arbitration agreement, there shall be a highlighted statement immediately preceding any
signature line or other place for indicating agreement that states that the agreement
contains a predispute arbitration clause. The statement shall also indicate at what page
and paragraph the arbitration clause is located.

386. **Schwab's Brokerage Account Agreement violates FINRA's Rule 2268 (7)(b)(1) in at
least three ways:** First by failing to highlight the predispute arbitration statement
immediately preceding the signature line; second by failing to indicate at what page and
paragraph the arbitration clause is located; and third by not providing a signature page.
Schwab's Brokerage Account Agreement as submitted by Schwab Defendants in this
action as Exhibits 3 and 4 have a series of blank pages where the signature page should
be, perhaps in an effort to cover up their violation of FINRA's Rule 2268 (7)(b)(1).

387. Moreover, FINRA arbitrators do not have the power to issue the injunction Plaintiff seeks
in this action and the Federal Arbitration Act (FAA) never once mentions mandatory
arbitration in a FINRA forum, or, for that matter, never once mentions FINRA.
Therefore, there is authority under the FAA for mandatory FINRA arbitration.

388. **Moving on:** FINRA arbitrators are predominately former of present security industry employees, full time and part time, without a single qualification other than two years of college credits, which qualification is not enforced.

389. The complexities involved in this action requires the guidance of a highly educated and experienced judge and cannot be left to the unguided ruminations of inexperienced FINRA operatives that FINRA employs as part-time independent contractors, and whose rulings need not follow the law or take into account legal precedent and the decisions issued are virtually unappealable.

390. The above comment is not meant to demean or disparage FINRA's arbitrators. But even if FINRA's contract with arbitrators whose objectivity are above reproach, a proposition even FINRA considers preposterous given the various anti-bias reforms they are considering, our Founders and the laws of this nation did not provide for FINRA arbitrators to practice or create law, those jobs specifically reserved for elected officials and attorneys appointed by those elected officials. Would any reasonable person opt for brain surgery performed by anyone other than an experienced brain surgeon, this even if there was a brilliant volunteer layperson armed with the proper surgical tools and a book on how to perform brain surgery?

391. The descriptions of the persons and the qualifications of the FINRA arbitrators as described above were taken from the FINRA arbitrator recruitment website. The most insidious role of FINRA is its total control of the mandatory arbitration system that adjudicates disputes between investors and their brokers. Most investors are totally unaware of the fact that, as a condition to opening a brokerage account, they are required

to give up their constitutional right to a jury trial, and agree to submit all disputes to the FINRA-run arbitration system that is heavily biased in favor of FINRA member broker-dealers like Schwb. So far, efforts to abolish this requirement—which is inherently unfair to investors—have been unavailing. The securities industry deploys hundreds of powerful lobbyists. The last thing FINRA and the securities industry wants is a forum where claims against its members will be judged fairly and impartially.

392.   FINRA professes openness and transparency, but the reality is quite different. While you can obtain copies of arbitration decisions, it won't permit access to its database so that academics can conduct an analysis of the overall process.

393.   The Public Investors Arbitration Bar Association (PIABA) is an association of attorneys who represent the interest of investors in securities arbitrations run by FINRA, quite the opposite mindset of FINRA.

394.   In an attempt to pierce the shroud of secrecy zealously embraced by FINRA, PIABA filed a Freedom of Information Request with the SEC. The SEC has responsibility for supervising the activities of FINRA, which it rarely does and then only halfheartedly. The request sought very basic information about the way FINRA administers the arbitration process, including how it selected and removed arbitrators.

395.   The SEC refused to provide these documents. PIABA sought a court order requiring the SEC to do so.

396.   In a decision dated March 14, by Beryl A. Howell, United States District Judge for the United States District Court for the District of Columbia, *Public Investors Arbitration Bar Association v. Unites States Securities and Exchange Commission,* Civil Action No.

75

11-2285, the Court sided with the SEC and affirmed its right to refuse to produce these documents. The Court noted that it was "sympathetic to the plaintiff's parade of horribles" concerning the FINRA process, but found that the requested documents fell with an exemption to the Freedom of Information Act and therefore did not have to be produced.

397. Following are a few comments from attorneys who have experienced the machinations of FINRA arbitrations firsthand:

398. Chief litigation counsel for Honeywell International Inc., Eric C. Liebeler calls arbitration a nightmare.  The liability phase of the $50 million breach of contract dispute, originally scheduled for 10 days, lasted 45 days spread over 18 months. Faced with the prospect of an equally draining damages phase, the company settled, but not before legal fees topped $5 million and each of the three arbitrators took home $480,000.

399. "The arbitrators weren't very hard edged," Liebeler says. "We got no traction whatsoever on any dispositive motions, we got no traction whatsoever on any evidentiary rulings. Either side could put in any evidence they wanted without any relation to the federal rules of procedure." Bottom line: the arbitration took too long and cost too much.

400. "There is tremendous dissatisfaction with domestic arbitration," says another attorney. "It's too expensive, too process oriented, not responsive enough and the quality of arbitrators is all over the map. General counsel after general counsel gets burned, and litigation lawyer after litigation lawyer gets burned. They are turning away from arbitration in droves."

401. Some attorneys are shunning FINRA because they believe any benefits of domestic commercial arbitration are outweighed by the risks of forfeiting protections inherent in the U.S. judicial system: rules of evidence, reasoned judgments and the right to appeal. "Arbitrators don't have to have reasoned decisions and sometimes the parties are left scratching their heads," says David Schlecker, partner at Anderson Kill & Olick. "Then you are essentially stuck with the decision because the right of appeal is very limited."

402. Other attorneys point a finger at arbitrators for failing to keep the process running efficiently. Liebeler puts the blame for the protracted Honeywell case squarely on the arbitration panel. "There is an incentive for them to spread it out," he says, noting that arbitrators, who are paid by the hour, failed to put time limits on the process.

403. "I have heard stories of companies getting an adverse decision and telling the arbitrator, 'you are off the list,'" says Richard Reuben, associate professor of law at the University of Missouri--Columbia. "It would be naïve to suggest that does not have some kind of impact on the arbitrators' judgment."

404. UBS, month after losing an $18.5 million FINRA arbitration case to two former clients, is now crying foul and seeking to vacate the clients' legal victory. UBS spent over a year in a federal court in a successful attempt to avoid FINRA arbitration with Plaintiff. Fortunately for Plaintiff, UBS was successful because when proceeding in FINRA with Schwab Plaintiff experienced FINRA arbitrator extreme bias firsthand when FINRA did nothing to defend its authority to arbitrate Plaintiff's claim other than to abstain from declaring whether or not Plaintiff under FINRA rules was a customer of UBS.

405. Moreover, FINRA's extreme bias in favor of FINRA member firms over customers of those firms is evident in its discovery rules that provide for the forced unlimited document production by claimants, including every aspect of their lives going back 15-20 years or more, and the highly circumscribed document production afforded FINRA member firms, which is restricted to direct communications between FINRA member firms and the claimant.

406. That limited access to discovery would negatively impact Plaintiff's ability to pursue his claims against Schwab Defendants and that is why Schwab is so adamant about relocating this action to a FINRA forum.

407. Thus, mandatory arbitration in a FINRA forum is far more than *forum non conveniens;* to force Plaintiff to arbitrate his claims in a FINRA forum is violative of Plaintiff's Constitutional right to have his day in a court of law generally, and to his right to a jury trial specifically.

408. Further, arbitration of Plaintiff's claims against Schwab would duplicate most of claims against the other defendants in this action and could result in unfair conflicting results for all involved in this action.

409. Moreover, even though Plaintiff's FINRA claim was barely got started, upon Plaintiff's voluntary dismissal of his claim, Plaintiff was billed over three thousand dollars by FINRA.

410. Making matters even worse, UBS sued Plaintiff in federal court in North Carolina to circumvent Plaintiff's FINRA claim against them by forcing Plaintiff to defend a federal action wherein UBS sought to prove that Plaintiff was not a brokerage customer of UBS

Financial Services, Inc, and thus not eligible to launch his claim against UBS in a FINRA forum.

411. UBS was victorious in that action although the presiding judge stated that her decision was a "close call" and proceeded to dismiss Plaintiff's counterclaim without prejudice for lack of specificity in his Counterclaim.

412. Thus, mandatory arbitration in a FINRA forum is far more than *forum non conveniens;* to force Plaintiff to arbitrate his claims in a FINRA forum is violative of Plaintiff's constitutional right to have his day in a court of law generally, and to his right to a jury trial specifically.

413. Moreover, certain of Plaintiff's charges against Schwab are bound at the hip to his charges against UBS and EY, neither of which are eligible for dispute resolution in a FINRA forum, UBS because the federal court in Raleigh ruled that Plaintiff is not a brokerage customer of UBS and EY because it is not a FINRA member firm.

414. Greater detail of how FINRA functions more as a securities industry trade association than a regulatory agency is set out in Plaintiff's Opposition to Schwabs Motion to Compel Arbitration and in a 10-page comments letter written by a former FINRA arbitrator of many years and now a retired attorney. See former FINRA arbitrator Barry Estell's highly critical comments letter regarding FINRA's extreme bias against customers of FINRA member firms enclosed as **Plaintiff's Exhibit V.**

415. Moreover, Schwab claims Plaintiff is bound to FINRA on the basis of three agreements that provided for mandatory FINRA arbitration.

416.   But Schwab, as yet, has summitted only one agreement signed by Plaintiff, the
Confidential Settlement Agreement, which Plaintiff signed under the extreme duress
brought on by multiple illnesses and being forced to litigate his claim against UBS in a
U.S. district court as a defendant and against Schwab in a FINRA forum and itself is null
and void because the Schwab arbitration agreement is null and void under FINRA Rule
2268 (7)(b)(1) as set out above which makes the arbitration clause in that agreement also
null and void.

417.    Few laypersons, including Plaintiff, know what a clause forcing mandatory dispute
resolution in a FINRA forum means or, on information and belief, have even read the
near 100-page Schwab Brokerage Account Agreement.

418.   Moreover, Schwab failed to give to Plaintiff the required explanation of what
constitutional and other rights Schwab's customers are signing away when, and if, they
sign the Schwab Brokerage Account Agreement.

419.   While it is lawful for a person to waive constitutional rights, that waiver is only lawful
when that person is first informed by notice that he or she has the rights he or she is
waiving and agrees to do so. See *Moran v. Burbine,* 475 U.S. 412, 421 (1986).

420.   A perusal of the exclusively take-it-or-leave-it Schwab-constructed Brokerage Account
Agreement and the arbitration clause in the Confidential Settlement Agreement reveals
that no such notice of the constitutional rights being waived by Plaintiff, as above, is
included anywhere in those arbitration agreements or in the arbitration clause or, for that
matter, anywhere else in any communication between Schwab and Plaintiff.

421.  Moreover, the purported Schwab brokerage account agreements **do** contain a clause banning class actions against Schwab, which clause, on information and belief, has been ruled unlawful, a fact which itself may be found to invalidate the entire purported Schwab account agreements until Schwab takes action to update the purported agreements, which it has not done.

422.  Schwab and the securities industry has spent hundreds of millions on special interest security industry lobbyists and attorneys to construct and ram through Congress their unconscionable adhesion account agreements and mandatory FINRA arbitration clauses, and as might be expected, will spend many millions more to avoid their invalidation.

423.  The Sarbanes-Oxley Act began to chip away at unconscionable adhesion brokerage account agreements by voiding Schwab's no class action clause in its account agreements and voiding certain involuntary mandatory arbitration clauses.

424.  Inasmuch as it is undisputed that the Schwab brokerage account agreements and mandatory FINRA arbitration clauses were created entirely by Schwab on a take-it-or-leave-it basis to prevent Schwab customers from seeking justice in courts of law, the purported account agreements and mandatory arbitration clauses are perfect examples of unconscionable contracts of adhesion, which renders them null and void.

425.  Moreover, the purported Confidential Settlement Agreement was not signed by a Schwab executive authorized by law to sign the agreement, which is one more reason that makes its submission in this action unlawful and enforceable. The agreement was signed for Schwab by an attorney for Schwab who was without the authority to sign for Schwab

without express permission from Schwab, which permission was not expressed in the agreement.

426. Further, Plaintiff's claims against Schwab Defendants are inexplicably linked to his claims against the various UBS and EY Defendants and a federal district court has ruled that Plaintiff is not a customer of UBS and cannot proceed against UBS in a FINRA forum.

427. Moreover, EY is not a FINRA member firm and FINRA has no authority to arbitrate Plaintiff's claims against EY, UBS or their Individual Defendants in a FINRA forum.

428. This Court may find interesting the following excerpt from a short article entitled ***Judge Slams FINRA Arbitration,*** enclosed as **Plaintiff's Exhibit Y.** "The FINRA panel decided in favor of Wells Fargo and ordered Watts to pay the principal, interest and to reimburse Wells Fargo for its attorney's fees in the amount of $60,480.25.

429. Stung by this defeat, Watts filed a motion in the United States District Court for the Western District of North Carolina to overturn the award (case # 5:11cv 48, reported at 2012 LEXIS U.S. Dist. LEXIS 32244). Wells Fargo asked the Court to enforce it.

430. Normally, efforts to overturn an arbitration award are unsuccessful because the legal grounds for doing so are very narrow. Motions to enforce an award are almost always granted. That's where it got interesting. The U.S. District Judge assigned to decide the case was Max O. Cogburn Jr. He joined the Court in 2011, after being appointed by President Obama.

431. Judge Cogburn heard oral argument on the motions to vacate and confirm. Ms. Evans argued for Wells Fargo. In a stinging rebuke to both Ms. Evans and (more importantly) to the FINRA arbitration process, Judge Cogburn has some choice words for both. When he asked Ms. Evans if the Court has the power to vacate an award if it found the underlying agreement was illegal (which it clearly does), Ms. Evans "... immediately challenged the Court's statement."

432. Apparently not sensing Judge Cogburn's concerns, Ms. Evans told him that Wells Fargo "... handles hundreds of arbitrations a year" and that she handles 30 or 40 of them as counsel. She then uttered these words, which I am sure she now regrets: "I've never lost one and I've never not gotten attorney's fees. I always win these cases." Judge Cogburn was not impressed with this track record, noting: "Now there's a level playing field."

433. Either Ms. Evans is a combination of Clarence Darrow and F. Lee Bailey or the process is rigged in favor of the securities industry. Judge Cogburn made it clear how he came out on this issue. The Court noted that the securities industry's "constant and prolific participation" in these arbitrations gave it "a clear advantage over the individual employee or customer" because the industry knows which arbitrators will favor its position. That fact, coupled with the limited review permitted by the Courts, results in a "... process in which, as in this case, counsel for the bank can remain undefeated 30 or 40 times a year."

434. Ms. Evans lectured the Judge on the "voluntary" nature of arbitration and its cost savings benefits. Judge Cogburn rejected these arguments as "disingenuous," correctly noting that employees and customers have no recourse other than to sign these agreements. He

turned the "saving money" argument on its head, noting that "... since the individuals seldom win and are forced to reimburse costs and attorney's fees, the only ones saving money are large institutions like the claimant.

435.   Nevertheless, and with obvious misgivings, the Court confirmed that part of the arbitration award requiring repayment of principal and interest of the note. However, it vacated the award of attorney's fees, finding that the amount of those fees was pulled "out of thin air" and was "completely arbitrary."

436.   To date, congressional efforts to ban mandatory arbitration have met with formidable and highly effective resistance from the securities industry and business lobbies. Maybe Judge Cogburn's decision will spur renewed interest in this legislation, which is long overdue. In the interim, attorneys like Ms. Evans should ask themselves whether their stunning success is attributable to their legal skill or the lack of impartiality of FINRA arbitration panels.

437.   Thus, for legal efficiency and to avoid forcing an elderly Plaintiff with limited resources to pursue his claims in multiple forums, Plaintiff respectfully requests that this Court and not FINRA adjudicate Plaintiff's claims against Schwab Defendants.

438.   Even if arbitration were appropriate in the ordinary course of things, arbitration is not appropriate as a forum for the adjudication of this action because a FINRA arbitrator is unlikely to punish the hand that feeds him or her with a punishing award of punitive damages such as Plaintiff seeks in this action.

439.   Punitive sanctions have historically been reserved to the State, a public policy "of such magnitude as to call for judicial intrusion." See *Matter of Associated Gen. Contrs., N. Y. State Chapter [Savin Bros.]*, 36 N.Y.2d 957, 959.

440.   The evil inherent of permitting an arbitrator whose selection is often restricted or manipulatable by the party in a superior bargaining position, to award punitive damages is that it displaces the court and the jury, and therefore the State, as the engine for imposing a social sanction, as was so wisely observed by Justice Bergan in the *Matter of Publishers' Assn. of N. Y. City (Newspaper Union)* (280 App. Div. 500, 503).

441.   Plaintiff had zero bargaining power and would not have been able to obtain an online brokerage account with a major brokerage firm like Schwab without accepting Schwab's Brokerage Account Agreement without change. See *Sanchez v. Simon*, 476 N.Y.S.2d 757.

442.   Moreover, the necessities of life were at stake for Plaintiff who was living on modest savings and a small monthly retirement allotment from Social Security and seeking income to supplement those sources.

443.   Schwab has not submitted any evidence that it ever changed any of the terms of its Brokerage Account Agreement at the request of any small potatoes online investor like Plaintiff, or, for that matter, for any Schwab customer.

444.   Schwab's morally corrupt conduct is similar to that of defendants where punitive damages were awarded in cases where the wrong complained of, as here, is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter them as well as others who might otherwise be so prompted, from

indulging in similar conduct in the future. See, e.g., *Toomey v. Farley*, 2 N.Y.2d 71,

83; *Krug v. Pitass*, 162 N.Y. 154, 161; *Hamilton v. Third Ave. R. R. Co.*, 53 N.Y. 25,

28; and *Oehlhof v. Solomon*, 73 App. Div. 329, 333-334.

445.   Moreover, this Court has — in line with what appears to be the weight of authority (see,

e.g., *Bell v. Preferred Life Soc.,* 320 U.S. 238; *Day v. Woodworth,* 13 How. [54 U. S.]

363, 371; *Greene v. Keithley,* 86 F.2d 238, 241; *Laughlin v. Hopkinson,* 292 Ill.

80; *Whitehead v. Allen,* 63 N.M. 63; *Saberton v. Greenwald,* 146 Ohio St. 414; *Craig v.

Spitzer Motors,* 109 Ohio App. 376; Ann., 165 A. L. R. 614) — sanctioned an award of

such damages in a fraud and deceit case where the defendant's conduct evinced a high

degree of moral turpitude and demonstrated such wanton dishonesty as to imply a

criminal indifference to civil obligations. See *Kujek v. Goldman,* 150 N.Y. 176. Also see

*Garrity v. Lyle Stuart, Inc.,* 40 N.Y. 354.

446.   Punitive damages are more likely to serve their desired purpose of deterring similar

conduct in a fraud case than any other area of tort relief. One who acts out of anger or

hate, for instance, in committing assault or libel, is not likely to be deterred by the fear of

punitive damages. On the other hand, those who deliberately and cooly engage in a far-

flung fraudulent scheme, systematically conducted for profit, as here, as here, are very

much more likely to pause and consider the consequences if they have to pay far more

than the actual loss suffered by an individual plaintiff.

447.   An occasional award of compensatory damages against such parties would have little

deterrent effect. A judgment simply for compensatory damages would require the

offender to do no more than return the money which he had taken from the plaintiff. In

the calculation of his expected profits, the wrongdoer is likely to allow for a certain

amount of money which will have to be returned to those victims who object too

vigorously, and he will be perfectly content to bear the additional cost of litigation as the

price for continuing his illicit business. It stands to reason that the chances of deterring

him are materially increased by subjecting him to the payment of punitive damages. See

*Walker v. Sheldon,* 10 N.Y. 2d 401.

448.   Given the undisputed criminal track record of UBS together with their payment of

numerous settlements, fines, penalties, disgorgements and restitutions, if Plaintiff

succeeds with this action, an award of punitive damages would appear both lawful and

necessary to serve as a deterrent to the commission of future frauds by the Defendants

and the securities industry generally.

449.   Further, there is nothing to prevent Schwab from ignoring its own mandatory arbitration

clauses and suing its customers, as UBS did when Plaintiff attempted to bring a claim

against UBS in a FINRA forum, knowing as it does that the vast majority of small

potatoes elderly investors like Plaintiff are entirely without the wherewithal to defend

themselves in a federal action. And it is possible that this Court could construe Schwab's

request for sanctions in its Motion for Sanctions and its Motion to Compel Arbitration as

having stepped beyond the bounds of its own mandatory arbitration clause.

450.   If Plaintiff is ultimately forced to arbitrate his claims against Schwab, alternative

arbitration forums like AAA and JAMS are far more suitable than FINRA.

451.   **Moving on:** Plaintiff maintains that no rational person beyond Bernie Madoff's

immediate family likely would have entrusted their funds with Madoff, a former

Chairman of the NASDAQ stock exchange, if they had known he would turn out to be one of the biggest financial swindlers in U.S. history.

452.   The very same rationale holds true with regard to UBS's financial criminality, and that is precisely why the Defendants in this lawsuit have conspired to conceal UBS's financial criminality from ordinary, small investors including Plaintiff.

453.   No offering document for CEFL informs investors about UBS's financial crimes or any of the 25 other critical risk factors set out above.

454.   EY Defendants had actual superior knowledge of much of UBS's financial criminality and yet granted UBS undeserved unqualified audit opinions even though this vast history of criminality could at any moment stir a still slumbering DOJ or SEC to revoke UBS's license to conduct a securities business in the U.S. See Ernst & Young Ltd.'s unqualified opinion letters for UBS AG (the issuer of CEFL) and/or UBS Group AG (the parent of UBS AG) enclosed as **Plaintiff's Exhibit D** and Ernst & Young LLC's unqualified opinion letters for UBS Securities LLC (the underwriter of CEFL) enclosed as **Plaintiff's Exhibit U.**

455.   The revocation of UBS's license to conduct a securities business in the U.S. would have a profoundly substantial negative impact on the assets of UBS and the value of all UBS publicly traded entities and on the value of every security issued and underwritten by UBS, including CEFL.

456.   Moreover, the very substantial threat of loss of license did have a profoundly substantial negative impact on the price of the shares of CEFL as the sophisticated professional

financial community, including Schwab Defendants, were aware of that fact and of the numerous intentional concealments from the Product Supplement set out above.

457.   As a long-term business associate of UBS and fully aware of UBS's financial crimes, Schwab should not have engaged in the purchase and sale of UBS securities for Plaintiff and others or at the very least alerted Plaintiff and others to UBS's financial crimes.

458.   Plaintiff's justified reliance on the purported Product Supplement for CEFL was instrumental in his decision to invest in CEFL, which decision resulted Plaintiff's economic loss.

459.   On or about Plaintiff's perusal of the Product Supplement for CEFL, Plaintiff began investing in CEFL and continued investing in CEFL until approximately April 2015, when mounting losses and fear of losing all of his retirement savings, forced Plaintiff to sell all of his CEFL shares.

460.   Plaintiff's direct economic losses amounted to approximately $180,000-$400,000 depending on the method of loss valuation adopted by this Court. One such method takes only trading losses into account and another uses the net of trading profits and losses. **Plaintiff's Exhibit R** is a Schwab account statement that summarizes Plaintiff's direct economic loss.

461.   To prove reliance under New York law, a plaintiff must show that "there was some basis for [him] to have relied on the alleged misstatement or omissions." *Terra Securities Asa Konkursbo v. Citigroup, Inc.,* 740 F. Supp. 2d 441, 448 (S.D.N.Y. 2010), aff'd, 450 F. App'x 32 (2d Cir. 2011).

462.   New York law does not require "ordinary purchasers of securities" to conduct the kind of due diligence required of the sophisticated institutional investors. See *Terra Securities,*

740 F. Supp. 2d at 451; *see also JP Morgan,* 350 F.Supp. 2d at 406 (confirming New York's "higher standard" for sophisticated, institutional investors).

463. The reliance requirement is not 'designed to shield perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest money.'" *Terra Securities,* 740 F. Supp. 2d at 451 (quoting *Alexander v. Evans,* No. 88 Civ. 5309, 1993 WL 427409, at *16 (S.D.N.Y.1993).

464. Like the huge majority of ordinary investors, Plaintiff relied on the purported Product Supplement for CEFL that UBS claimed was the prospectus for CEFL, and the fact that UBS is a gigantic international bank when making his decision to invest in CEFL. After all, that is what prospectuses are for, to inform prospective investors about the nature of the security and the material risks that obtain to it.

465. Amongst many other defects, that purported Product Supplement for CEFL makes zero references to any document that describes UBS's crimes, or UBS's four-year term of criminal probation, or UBS's potential loss of its license to conduct a securities business in the U.S. if it engages in future crimes.

466. Defendants served as Plaintiffs' fiduciaries and therefore owe Plaintiff a duty of full disclosure. See *Dubbs v. Stribling & Associates,* 752 N.E.2d 850, 852 (N.Y. 2001). This disclosure obligation "effectively operate[d] like a written representation that no material facts are undisclosed" which could have "satisfied [Plaintiffs'] obligation to investigate further." See *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.,* 952 N.E.2d 995, 1002 (N.Y. 2011).

467. In *Dodona I v. Goldman Sachs,* 847 F. Supp. 2d at 624 (2012) the Court ruled that examining the parties' relationship as a whole, Plaintiffs have adequately plead

reasonable and justifiable reliance on the information provided by Defendants. That the sophisticated plaintiff could have "unmasked" the fraud by examining SEC filings—because sorting through publicly-filed documents required more than the "minimal diligence" that New York expects of even sophisticated investors. Because the defendants had "proffered nothing to suggest that investors were placed on guard about anything approximating the alleged fraud, that they were practically faced with the facts, or that they had access to truth-revealing information," the court found that the plaintiff had adequately alleged reliance.

468. Moreover, reliance may be presumed in two circumstances. First, "in the case of omissions, reliance on the omitted information may be presumed where such information is material." See *Black v. Finatra Capital, Inc.,* 418 F.3d 203, 209 (2d Cir.2005). Second, the "fraud on the market" theory creates a presumption of reliance if the securities were traded in an efficient market — *i.e.,* an "open and developed" market in which the price of securities are, in theory, determined by all available information. *Basic Inc. v. Levinson,* 485 U.S. 224, 241-42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks omitted); *In re Parmalat Sec. Litig.,* 376 F.Supp.2d 472, 508 (S.D.N.Y.2005) ("*Parmalat II*").

469. Moreover, loss causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA. *See In re Citigroup Inc. Sec. Litig.,* 753 F.Supp.2d 206, 234 (S.D.N.Y.2010) ("Loss causation need not be pled with particularity."). Instead, a short and plain statement suffices, as required under Rule 8 of the Federal Rules of Civil Procedure.

470. There is no statute or case law that would require a plaintiff to undertake extraordinary investigative efforts such as examining filings with the SEC or the DOJ website to check for UBS criminality.

471. Whether a misstatement or omission is material is "an inherently fact-specific finding ... that is satisfied when a plaintiff alleges a statement or omission that a reasonable investor would have considered significant in making investment decisions." See *Litwin v. Blackstone Grp. L.P.,* 634 F.3d 706, 716-17 (2d Cir.2011).

472. The concept of materiality focuses on the weightiness of the misstated or omitted fact in a reasonable investor's decision to buy or sell. See *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811 (1965), "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question." The materiality test is concerned only with whether a prototype reasonable investor would have relied. See *Heit v. Weitzen,* 402 F.2d 909, 912-14 (2 Cir. 1968), cert. denied, 395 U.S. 903 (1969).

473. Account must be taken of all the surrounding circumstances to determine whether the fact under consideration is of such significance that a reasonable investor would weigh it in his decision whether or not to invest. See *SEC v. Texas Gulf Sulphur Co.,* supra, 401 F.2d at 849.

474. Since materiality is a mixed question of law and fact, "a complaint may not properly be dismissed ... on the ground that the alleged misrepresentations or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Local 134 IBEW*

*Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 197 (2d Cir.2009).

475. In fact, courts often conclude that plaintiffs are not responsible for knowing information that appears in exhibits to a defendant's own SEC filings or contemporaneous news articles. See, e.g., *In Re Flag Telecom Holdings Ltd. Sec. Litig.,* 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009).

476. Plaintiff maintains that EY as public auditor for UBS was deliberately and/or reckless and deceitful in failing to fulfill its professional obligation to inform or insist that UBS inform prospective and continuing investors in CEFL of UBS's financial criminality in the Product Supplement for CEFL.

477. EY Defendants deliberate and/or reckless and deceitful conduct in failing to fulfill its professional obligation to inform or insist that UBS inform prospective and continuing investors in CEFL of UBS's financial criminality was motivated by its desire to continue receiving huge annual audit and consulting fees from UBS that based on information and belief amounted over time to at least well over a billion U.S. dollars and to protect itself from the investing public becoming aware of its dereliction of its role as a public auditor by issuing UBS, a self-confessed international crime organization serving a four-year term of criminal probation, a multi-year series of undeserved unqualified audit opinions in contravention of federal and state laws and the professional standards promulgated by GAAS, GAAP and the AICPA.

478. UBS's criminality as partially disclosed buried hundreds of pages deep in the annual reports for UBS Group AG and UBS AG, which annual reports were not known by or distributed to Plaintiff at any time before or during the period of time he was invested in

CEFL, an intentional concealment that entirely fails to meet the legal requirement to inform prospective investors such as Plaintiff of material risk factors up-front in the "Risk Factors" section of the offering document for CEFL.

479.   To claim, as UBS and EY did in their Motions to Dismiss, that highly material risk factors secreted away hundreds of pages deep in Swiss corporations UBS AG and UBS Group AG's annual reports which were never sent to Plaintiff meet the federal securities law standard of full, up-front, disclosure in an offering document is as ludicrous and disingenuous as claiming that climate change and evolution are not occurring and that the moon is cheese and the Earth flat.

480.   Under the "Buried Facts Doctrine," a reporting company may incur liability when material facts, although disclosed, are obscured by their placement or by the inclusion of a mass of trivial information. *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 774 (3rd Cir. 1976).

481.   Any ordinary investor who attempted to read the near 1,000-page annual reports of UBS Ag and UBS Group AG, had they known they existed, would quickly, if elderly, fall asleep, or if not elderly, rapidly become elderly.

482.   To the best of Plaintiff's recollection, prior to Plaintiff's learning of the UBS crimes and concealment thereof, the only annual reports Plaintiff had seen were short, shiny documents of 20 or 30 pages or less, filled with self-congratulatory statements, the smiling faces of executives, short descriptions of current and planned operations and financial reports, whereas the "Risk Factors" section of the Product Supplement for CEFL was silent regarding UBS financial criminality, its four-year term of criminal

probation and the possibility of its loss of license to conduct a securities business in the U.S.

483. The EY undeserved series unqualified audit opinion letters for UBS AG and/or UBS Group AG are each signed by two EY partners, one of whom clearly represents Defendant Ernst & Young LLC as 2013, 2014 and 2015 are signed by Troy Butner U.S. (who operates out of Defendant's Ernst & Young LLC's Boston office) and 2016 by Ira Fitlin U.S. (who operates out of Ernst & Young LLC's Manhattan, N.Y. office).

484. True copies of EY's undeserved unqualified audit opinion letters for UBS AG and/or UBS Group AG for 2013, 2014, 2015 and 2016 are enclosed as **Plaintiff's Exhibit D.**

485. Moreover, in its annual reports for 2015 at page 393 and 2016 at page 308 UBS brags about the unqualified audit opinions issued to UBS AG and UBS Group AG by EY, a form of "admission-against-interest," which is direct evidence of UBS's consciousness of guilt.

486. In sum, the standard for determining liability under Sec. 14(e) on the part of a person making a misleading tender offer, or a responsible officer of a corporation making such an offer, is whether plaintiff has established that defendant either (1) knew the material facts that were misstated or omitted, or (2) failed or refused to ascertain such facts when they were available to him or could have been discovered by him with reasonable effort.

487. Plaintiff maintains that only an organization pervasively infected with a propensity for criminal conduct, such as UBS, would brag, as above, about its receipt of unqualified audit opinions, braggadocio not unlike a mafia don bragging about the skills of his consigliore.

488. As for the concept of culpability, intent to defraud is not an indispensable element in a private action under Rule 10b-5; knowledge of falsity or reckless disregard for the truth may be sufficient. See *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442, 445 (2 Cir. 1971); *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1290-91 (2 Cir. 1969), cert. denied, 397 U.S. 913 (1970); *Heit v. Weitzen,* supra, 402 F.2d at 913-14; *SEC v. Texas Gulf Sulphur Co.*, supra, 401 F.2d at 854-55.

489. UBS, a confessed, repeat financial criminal, has been running rampant in the U.S. securities markets defrauding U.S. investors for many years, and the inadequate and seemingly ineffective system of financial regulation has repeatedly allowed repeat offended UBS, after administering what for UBS were mere wrist slaps, to continue doing so.

490. EY has spent millions reorganizing over and over again in order to evade litigation and to evade paying their fair share of U.S. income taxes and has evolved into what Mark Weinberger, EY Global's Chairman and CEO, calls a "global workforce of the future," with over $32 billion in annual audit and consulting fees, and clients in at least 150 countries, serviced by approximately 225,00 EY partners and employees.

491. EY Global is managed by four area directors and EY Global Chairman and CEO Mark Weinberger. The two areas pertinent to this action are (1) EY Global-EMEIA (Europe, the Middle East, India and Africa), which are under the direction of Area Managing Partner Andy Baldwin; and (2) the EY-Global "the Americas," which is under the direction of Areas Managing Partner Steve Howe.

492. Given these facts, EY Global is clearly not merely a "brand" name as EY disingenuously claims in its Motion to Dismiss.

493.    Moreover, U.S.-based Ernst & Young LLC, signed the undeserved unqualified audit opinion letters for their audits of UBS Securities LLC for the years 2014 and 2015, the signing of which obviates EY's claim throughout various sections of its Motion to Dismiss that Plaintiff sued the wrong auditor.

494.    EY Global is the EY executive business entity that manages all other EY entities.

495.    UBS Defendants UBS Americas Holding LLC and other UBS entities are fully held by UBS AG (a Swiss UBS entity), while UBS Securities LLC is fully held, directly and indirectly, by UBS Americas Holding LLC, a U.S. business entity and is audited by U.S.-based Defendant Ernst & Young LLC.

496.    Plaintiff maintains that EY Defendants undeserved unqualified audit opinion letters for its client UBS, over at least the years from 2004 to 2016, were instrumental in enabling UBS to continue conducting its criminal activities in the U.S.

497.    An unqualified public auditor's opinion letter is regarded by the financial community as proof that a prospectus or other offering document for a security contains the material risk factors necessary for investors to make informed investment decisions, and without which UBS likely would be denied access to conduct a securities business in the U.S.

498.    Accounting Standard 1002 requires that auditors use their best efforts to detect and report fraud, such as the numerous UBS financial crimes, which EY admits were known to them, but which EY failed to insist that UBS disclose in the offering document for CEFL.

499.    True copies of EY's undeserved unqualified opinion letters for UBS AG and/or UBS Group AG for 2013, 2014, 2015 and 2016 as audited by Ernst & Young Ltd. are enclosed as **Plaintiff's Exhibit D.** True copies of EY's undeserved unqualified opinion letters for

UBS Securities LLC as audited by Ernst & Young LLC for 2014 and 2015 are enclosed as **Plaintiff's Exhibit V.**

500.  Plaintiff is unaware of any audited statements for UBS-U.S.-based underwriter UBS Financial Services, Inc. and is uncertain whether that underwriter participated in underwriting CEFL.

501.  It is possible that Ernst & Young LLC never audited UBS Financial Services, Inc., or withdrew as its auditor.

502.  Discovery will reveal if UBS Financial Services, Inc. was ever audited, and if so, when and by whom and if they directly or indirectly participated in the underwing of CEFL along with UBS Securities LLC.

503.  In EY's Motion to Dismiss at footnote 6 on page 17 there is a vague assertion regarding grounds for dismissal based on applicable statutes of limitations. However, to the best of Plaintiff's recollection, Plaintiff did not become aware of EY's misconduct as set out in this action until 2017 and EY is never mentioned in the offering document for CEFL.

504.  Moreover, the Sarbanes-Oxley Act of 2002 provides that a private action claiming fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder must be brought not later than the earlier of 2 years after the discovery of the facts constituting the violation or 5 years after such violation. See 28 U.S.C. § 1658(b). And CPLR 213(8) provides that, as to claims of fraud, there is either a six-year statute of limitations running from the time the cause of action accrued, or a two-year period from the time the plaintiff discovered the fraud, or could with reasonable diligence have discovered it.

505.  Additionally, the UBS action in federal court to halt Plaintiff's claim against UBS in a FINRA forum equitably estopped any statute of limitations that may apply to any of

Plaintiff's claims, and the fact that Plaintiff was ignorant of UBS's vast concealed history of financial crimes also serves to equitably toll any statute of limitations that may apply to any of Plaintiff's claims.

506. It is a generally accepted accounting principle that financial statements must disclose all significant information that would be of interest to a concerned investor.

507. Among the types of information that must be disclosed along with financial records are instances of material gross criminality and litigation in progress.

508. Full disclosure is required when certified financial statements contain a statement of opinion from an auditor, in which the auditor states that it is his or her opinion that the financial statements were prepared in accordance with GAAP and that no material information was left undisclosed. If the auditor has doubts, then a qualified, adverse or disclaimer opinion letter or resignation is required.

509. EY Defendants were well aware that UBS could lose its license to pursue its securities business in the U.S. and, amongst other things, helped UBS conceal that fact from Plaintiff and other ordinary investors.

510. Based on information and belief, the loss of UBS's license to engage in a securities business in the U.S. would crash the values of UBS issued and underwritten securities and knowledge of this by sophisticated investors in the securities industry was decisive in their ignoring UBS securities and instrumental in deflating the value of CEFL and other UBS securities after their initial sale to the uninformed ordinary investor such as Plaintiff.

511. Had EY insisted, as it should have done, that UBS must disclose UBS's financial criminal history in the "Risk Factors" section of the Product Supplement for CEFL or

they would withdraw their unqualified audit opinion, UBS would have done so or sought to replace EY with a public auditor that would grant them an unqualified opinion.

512. Perhaps the advertising slogan for giant public audit firms should be: Have unqualified audit opinion letters for sale and will travel.

513. As matters now stand, it seems justified to consider whether the giant public auditor industry has evolved from trusted ally of investors into sellers of undeserved unqualified audit opinions to the highest corporate bidder.

514. The Public Company Accounting Oversight Board (PCAOB) is a private-sector, nonprofit corporation created by the Sarbanes–Oxley Act of 2002 to oversee the auditors of public companies and other issuers in order to protect the interests of investors and further the public interest in the preparation of informative, accurate and independent audit reports.

515. Since 2010, the PCAOB also oversees the audits of broker-dealers, including compliance reports filed pursuant to federal securities laws, to promote investor protection. All PCAOB rules and standards must be approved by the SEC.

516. In creating the PCAOB, the Sarbanes-Oxley Act required that auditors of U.S. public companies be subject to external and independent oversight for the first time in history. Previously, the profession was self-regulated.

517. The PCAOB has established various public accounting standards for public auditors such as Defendant EY.

518. Following are excerpts from those public accounting standards that Plaintiff maintains are germane as to whether EY had an obligation to inform U.S. investors about the extensive history of financial criminality of its client UBS and the other material matters

such as UBS serving a four-year term of criminal probation as administered by the DOJ

for those financial crimes and the subsequent cancellation of that probation for UBS's

commission of new financial crimes, which cancellation subjects UBS to the cancellation

of its license to engage in the securities business in the U.S.

519. **Accounting Standard 1001: Responsibilities and Functions of the Independent**

**Auditor:** The objective of the ordinary audit of financial statements by the independent

auditor is the expression of an opinion on the fairness with which they present, in all

material respects, financial position, results of operations, and its cash flows in

conformity with generally accepted accounting principles.

520. The auditor's report is the medium through which the auditor expresses their opinion or,

if circumstances require, disclaims an opinion. In either case, the auditor states whether

their audit has been made in accordance with the standards of the PCAOB.

521. These standards require him to state whether, in his opinion, the financial statements are

presented in conformity with generally accepted accounting principles and to identify

those circumstances in which such principles have not been consistently observed in the

preparation of the financial statements of the current period in relation to those of the

preceding period.

522. **Accounting Standard 1002: Distinction Between Responsibilities of Auditor and**

**Management:** The auditor has a responsibility to plan and perform the audit to obtain

reasonable assurance about whether the financial statements are free of material

misstatement, whether caused by error or fraud. Because of the nature of audit, evidence

and the characteristics of fraud, the auditor is able to obtain reasonable, but not absolute,

assurance that material misstatements are detected.

523.   **Accounting Standard 1003: The financial statements are management's responsibility:** The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.

524.   The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management.

525.   The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles3 is an implicit and integral part of management's responsibility.

526.   The independent auditor may make suggestions about the form or content of the financial statements or draft them, in whole or in part, based on information from management during the performance of the audit. However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.

527.   There are four types of auditor opinions: Unqualified, Qualified, Adverse and Disclaimer.

528.   An unqualified audit opinion indicates that auditors could find no significant violations or misstatements in a company's financial information. An alternate name for this report is a clean opinion, which is a comparison to a patient's clean bill of health. Auditors typically write this report referencing the company's ability to record financial information according to generally accepted accounting principles (GAAP). The report also may

include a brief summary of how the audit was conducted and what information was reviewed.

529.  A qualified audit opinion letter indicates that auditors found issues in a company's financial information. These issues prevent the auditors from issuing a clean opinion on the company's operations. Qualified audit opinions often have one of two specific qualifications. The first qualification represents a single deviation from GAAP. This indicates the business has improperly applied GAAP, and the company's financial statements do not conform to standard accounting principles. Another qualification is limitation of scope. Limitation of scope indicates that auditors cannot review one or more areas related to the company's financial statement. This qualification relates only to the financial information not reviewed by auditors.

530.  An adverse opinion letter is one of two significantly negative audit reports. An adverse opinion indicates the auditor found significant material misstatements relating to financial information. These misstatements typically mean financial statements do not conform to GAAP and the information is inaccurate or unreliable. Banks and lenders typically avoid companies that have adverse audit opinions. Financial information with significant flaws does not present an accurate representation of the company's financial health.

531.  A disclaimer audit opinion letter is the worst audit report a company can receive. Auditors issue the disclaimer letter to indicate they cannot form an opinion regarding the company' financial statements.

532.  Auditors also use the disclaimer when they refuse to issue an opinion on the company's financial statements. A disclaimer opinion is often the result when an auditor lacks independence from his client.

533. A lack of independence can occur when auditors provide management advisory services in conjunction with an audit. This prevents the auditor from giving a clear, third-party opinion on the company's financial information. Significant audit scope limitations (the inability to review a company's entire financial information) or companies who may file bankruptcy in the near future may also receive audit disclaimer opinions.

534. The Financial Accounting Standards Board has stated that: "[m]any people base economic decisions on their relationships to and knowledge about business enterprises and thus are potentially interested in the information provided by financial reporting. Among the potential users are owners, lenders, suppliers, **potential investors** and creditors, employees, management, directors, customers, financial analysts and advisors and the public." See *Rosenblum* v. *Adler,* 93 N.J. at 343-47, 461 A.2d at 147-50; 2 American Institute of Certified Public Accountants, Professional Standards Et §§ 51.04, 101.01 (1981).

535. In the case of *United States v Young & Co.* (US appeal No. 82-687]) the Court expanded the duty that an accountant issuing financial reports owes to the public. In the opinion for the Court, Chief Justice Burger wrote: "by certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client * * * [The accountant performs a] public watchdog * * * [function and] * * * owes ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public."

536. The type of audit opinion issued by an auditor depends upon the compliance of the audit with generally accepted auditing standards (GAAS) and upon the conformity of the

audited party's financial statements with generally accepted accounting principles (GAAP), as promulgated by the American Institute of Certified Public Accountants (AICPA and the Financial Accounting Standards Board (accounting principles). See *D. Taylor & G. Glezen, Auditing: Integrated Concepts and Procedures* 18-20 (2d ed. 1982).

537. An unqualified auditor opinion indicates full compliance with both GAAS and GAAP. The three other types of opinions-qualified, disclaimer, and adverse are used to indicate varying levels of non-conformity with GAAS or GAAP. See the Court's analysis of the duty owed by public auditor in *Credit Alliance Corp., v. Arthur Andersen,* 101 App. Div. 2d 236, and 476 N.Y.S.2d 539 (1st Dep't 1984).

538. GAAS and GAAP require that public auditors conduct a comprehensive investigation of the organizations they are auditing.

539. Obviously, inasmuch as EY has been engaged as UBS's auditor since at least 2004, they have conducted at least several comprehensive investigations and have admitted they are aware of UBS's crimes.

540. Yet, EY and UBS's controlling executives and UBS's Audit Committee have seen fit to conceal UBS's vast criminal history from scrutiny by ordinary investors such as Plaintiff by intentionally failing to include that history of criminality from the "Risk Factors" section of the Product Supplement for CEFL.

541. These actions and inactions by Defendants facilitated the fraudulent inducement of Plaintiff to invest in CEFL, which investment would never have occurred had Plaintiff been aware of UBS's vast criminal history, which fraud resulted in economic loss and lost investment opportunities.

542.   Moreover, these actions and inactions by EY and UBS, as facilitated by Schwab, prove

that Defendants conspired to defraud Plaintiff and were unjustly enriched by Plaintiff's

economic loss, Plaintiff's investment fees and those of other investors.

543.   Regarding Liability to a Foreseen Class: The Second Restatement of Torts provides that:

"[o]ne who, in the course of his business, profession or employment, or in any other

transaction in which he has a pecuniary interest, supplies false information for the

guidance of others in their business transactions, is subject to liability for pecuniary loss

caused to them by their justifiable reliance upon the information, if he fails to exercise

reasonable care or competence in obtaining or communicating the information provided

the loss is suffered by the person or one of a limited group of persons for whose benefit

and guidance he intends to supply the information or knows that the recipient intends to

supply it…"

544.   Significant public policy reasons support the extension of accountants' liability to all

foreseen users of financial statements. Financial statements are often used to persuade

existing investors, creditors, and customers of a given company to maintain and further

business relationships.

545.   The knowledge of a company of the need for financial information by foreseen third

parties compels the company to seek the expertise of public auditors to ensure that

accurate information is provided. Thus, auditors receive the benefit of increased billing

from their clients.

546.   In *Credit Alliance* the Court's analysis of the duty owed by public auditor Arthur

Andersen comports directly with the Restatement approach. Compare *Credit Alliance,*

101 App. Div. 2d at 236, 476 N.Y.S.2d at 542 with the *Second Restatement of Torts* § 552 (1976).

547.   **Regarding Public auditor liability to Third Parties Such as Plaintiff:**  In 1995, the SEC established the Private Securities Litigation Reform Act (PSLRA), which in essence mandated auditors to have even stricter guidelines as they pertain to any fraudulent or misleading behavior of their clients. The PSLRA requires that the auditors promptly report any illegal acts of their clients to the company's board of directors, and if severe enough, as here, to the SEC in a timely manner.

548.   In its Motion to Dismiss EY presented nothing by way of noticing the SEC or the DOJ of any of UBS's financial crimes, which in a sense makes them culpable as accessories to the UBS crimes and the cover-up of those crimes by facilitating the concealment of those crimes.

549.   Moreover, accounting professional standards indicate that the objectives behind financial reporting "stem primarily from the informational needs of external users who lack the authority to prescribe the financial information they want from an enterprise and therefore must use the information that management communicates to them." See Financial Accounting Standards Board, supra note 41, 28; *Rosenblum,* 93 N.J. at 349-50 & n.11, 461 A.2d at 151 & n.11. Also see *Contemporary Approach*, supra note 4, at 415 & nn.81, 83; cf. Horan & Guerrini, *Accountants' Professional Liability: Insurance Issues,* 15 Forum 516, 519-20 (1980) (accountants' liability insurance does not limit claims based on "dishonest, fraudulent, criminal, or malicious acts").

550.   Plaintiff maintains that UBS's criminality is so vast and diverse that it makes Bernie Madoff's Ponzi Scheme, for which he was sentenced to 150 years, seem like small

potatoes and if known by prospective investors is more than sufficient to send them running for the hills.

551. Fraud is defined to be the misrepresentation or omission/concealment of a material fact by a person who is aware of his or her actions, with the intention of misleading the other party with the other party injured as a result. Fraudulent representations by accountants generally are actionable without the establishment of privity.

552. In *Ultramares,* 255 N.Y. at 189, 174 N.E. at 448 Chief Judge Cardozo wrote that to escape liability for fraud, accountants must have a "sincere or genuine belief when they certify to an opinion that the balance sheet faithfully reflect[s] the condition of the business ..." Id. at 193, 174 N.E. at 450.

553. Chief Judge Cardozo stated that a jury may be able to infer fraud from negligent conduct. Id. at 190-91, 174 N.E. at 449; see also *State St. Trust Co. v. Ernst,* 278 N.Y. 104, 112, 15 N.E.2d 416, 419 (1938) ("[a] refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud").

554. With this lawsuit Plaintiff seeks declaratory and injunctive relief, damages for economic losses and lost investment opportunities, plus interest and punitive damages to punish Defendants for their insidious actions and inactions Plaintiff suffered as a result of his investments in CEFL as caused by the Defendants acting jointly and singularly. See **Plaintiff's Exhibit R.**

**555.** On information and belief, given the fact of UBS's vast history of criminality, many major investment banking firms and financial advisors will not recommend CEFL or any other UBS created security to their customers.

556.   The regulation of securities in the U.S. is rooted in the stock market crash of 1929 and the Great Depression that followed.

557.   The stock market crash and mass misery that flowed therefrom motivated the U.S. Congress to enact laws in hopes preventing a future crash and protect investors from securities fraud.

558.   The result of the Congress's perceived need to protect investors from securities fraud was a continuing series of federal securities laws, which have as their twin essences (1) FULL DISCLOSURE and (2) PREVENTION OF FRAUD.

559.   These laws are embodied in Section 11 of the Securities Act, SEC Rule 10b-5, SEC Reg. S-K, SA Rule 408, SEC Rule 12b-20 and appropriate sections of U.S.C. Title 17 and, amongst many other things, make it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, not misleading…in connection with the purchase or sale of any security."

560.   Furthermore, Section 11 of the Securities Act of 1933 contains a civil antifraud provision for misstatements and omissions in a registration statement and eliminates common-law requirements for proving frauds committed by the underwriters of securities. Moreover, Rule 10b-5 mirrors the common-law action for deceit.

561.   Congress has recognized that the underwriters of securities must disclose all material risk factors in their public offerings, which would include the UBS issued and underwritten security called CEFL.

562. Underwriters must exercise due diligence and disclose all facts that a prudent person would expect to be disclosed so that that person could quantify for themselves the risk/reward ratio for any given prospective investment, which would include UBS's financial crimes.

563. The Securities Exchange Act of 1934 requires all companies under SEC jurisdiction to file an annual audit and have conducted a quarterly review of financial statements.

564. The 1933 Act creates liability only to those investors involved in the initial distribution of public offerings. The 1934 Act increases that liability to subsequent purchasers and sellers of the stock. This act provides absolute protection to original and subsequent purchasers and sellers of securities.

565. "We have recognized time and again, a 'fundamental purpose' of the various Securities Acts was to substitute a philosophy of full disclosure for the philosophy of caveat emptor, and thus to achieve a high standard of business ethics in the securities industry." Quoting from *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 1, (1972); Accord, *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972); *Santa Fe Industries Inc., v. Green*, 430 U.S. 406.

566. The 1933 and 1934 Exchange Acts "were designed to provide investors with full disclosure of material information concerning public offerings." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

567. For example, sections 11, 12(a)(2) of the 1933 Act provide a civil remedy if an offering document for a newly issued security contains "an untrue statement of a material fact or

omits to state a material fact required to be stated therein or necessary to make the

statements therein not misleading."

568.  Defendant UBS, as facilitated by EY Defendants, not only omitted 26 material facts from

the offering document for CEFL, Defendant's did so intentionally, making their

omissions concealments.

569.  Section 11(a) of the Securities Act of 1933 authorizes a private action when a registration

statement "includes any untrue statement of a material fact or omits to state any material

fact required to be stated therein or necessary to make the statements therein not

misleading."

570.  A number of persons may be jointly and severally liable under section 11, including not

only the issuer and underwriters of the security, but also high corporate executives from

the CEO on down the management hierarchy, financial and accounting officers, its

directors and its external auditors.

571.  A person who acquires a registered U.S. security pursuant to an offering document need

only show a material misstatement or omission to establish a prima facie case. Once that

is done, "[l]iability against the issuer of a security is virtually absolute, even for innocent

misstatements…" *Herman & MacLean v. Huddleson,* 459 U.S. 375, 382 (1983).

572.  Plaintiff maintains that the 26 material concealments/omissions of material risk factors

set out above are hardly innocent and serve to firmly establish a prima facie case against

Defendants.

573. The principal architects of the 1933 and 1934 Exchange Acts were disciples of Justice Brandeis who, in 1913, declared in *Other People's Money* that: "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants…"

574. The overarching truth of Justice Brandeis's remark is verified by all who have worked with the 1933 and 1934 Acts who have variously referred to the securities registration process as a housecleaning, an elimination of conflicts of interests and questionable business activities which if exposed to public view will give prospective investors an opportunity to make an informed decision with regard to investing or not investing in the security in question. See SEC Staff Disclosure to Investors (*The Wheat Report*) 50-51 (CCH Publ. No. 5213, 1969).

575. For an omission or concealment to be material "there must be a substantial likelihood that the disclosure of the omitted/concealed fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." See *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 234 (1988), quoting *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449 (1976).

576. Plaintiff maintains that UBS's intentionally concealed criminality surely meets the U.S. Supreme Court's definition of materiality.

577. Section 12(a)(2) of the Securities Act of 1933 provides for liability when a security is offered or sold "by means of a prospectus or oral communication, which includes an untrue statement(s) of a material fact(s) or omits to state a material fact necessary to

make the statements, in light of the circumstances under which they were made, not

misleading (the purchaser not knowing of such untruth or omission)."

578. Section 34(b) of the Investment Company Act makes it "unlawful for any person to make

any untrue statement of a material fact in any registration statement…or other document

filed or transmitted pursuant to this title" or to "omit to state therein any fact necessary in

order to make the statements made therein, in light of the circumstances under which they

were made from being materially misleading."

579. SEC Rule 10b-5(b) makes it unlawful for any person, in connection with the purchase or

sale of any security, "to make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading."

580. Rule 408 of the 1933 Act states that "In addition to the information expressly required to

be included in a registration statement, there shall be added such other material

information, if any, as may be necessary to make the required statements, in the light of

the circumstances under which they are made, not misleading."

581. Rule 405 of the 1933 Act explains that "material" information means "matters to which

there is a substantial likelihood that a reasonable investor would attach importance in

determining whether to purchase the security registered."

582. Rules 430B and C, adopted in 2005, codify the SEC's position that the information

contained in a prospectus supplement required to be filed under Rule 424, whether in

connection with a takedown or otherwise, will be deemed part of and included in the

registration statement containing the base prospectus to which the prospectus supplement

relates. Source: SEC Release No. 33-6714 (May 27, 1987); SEC Release No. 33-7606A
(November 13, 1998), Section V.A.1.e, Rule 430B; Rule 430C; and SEC Release 33-
8591 (July 19, 2005), Section V.B.1.b, ii.

583.    By its enactment of the Securities Acts of 1933 and 1934, Congress sought to ensure that
important information bearing upon the issuer of securities would be regularly disclosed
to prospective investors, thus providing prospective investors the opportunity to make
informed investment decisions.

584.    Addressing the disclosure provisions of the Securities Acts, the House Committee on
Interstate and Foreign Commerce explained that the excessive speculation that
characterized the securities markets of the 1920's was attributable, in part, to "inadequate
corporate reporting which keeps investors in ignorance of the necessary factors for
intelligent judgment of the values of securities." H.R. Rep. No. 1383, 73d Cong., 2nd
Sess. 5 (1934).

585.    Moreover, the Supreme Court articulated a "bright line" standard treating as "per se
materiality" any form of corporate conduct known to be illegal, though yet to be
adjudicated. Materiality turns upon "whether there is a substantial likelihood that a
reasonable investor would consider an omitted fact important in deciding how to vote…"

586.    Put another way, there must be a substantial likelihood that the disclosure of the omitted
fact would have been viewed by the reasonable investor as having significantly altered
the total mix of information made available. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.
438, 449 (1976).

587. UBS could not pursue its criminal activities in the U.S. without the undeserved unqulified audit opinions provided to it by EY and the distribution services of cooperating broker-dealers like Schwab Defendants.

588. Berift of the bedrock moral and ethical norms of Western civilization, and much like cancer, heart attacks, stroke, infectious diseases and political corruption which strike everywhere, UBS has imposed its criminally-driven tentacles in most every segment of the U.S. and the global financial industries and represents a clear, present and future danger to U.S. financial markets, just as a certain president endangers our representative democracy generally and our judiciary specifically, particularly with the appointment of numerous fully unqualified right-wing extremists to high positions on the federal bench.

589. The UBS propensity for criminal conduct dates back to WWII, when UBS served as a repository for massive amounts of NAZI plunder. After the Nazi surrender UBS refused to return that plunder, which included gold fillings, watches, jewelry and art, to its rightful owners…UBS executives confiscating the Nazi plunder to enrich themselves.

590. Apparently, once UBS gets its hands on your property, a person must move heaven and earth in order to get it back.

591. More recently UBS has developed a set of financial skills and a corporate culture that fosters financial crime and has enabled UBS to unlawfully rig and manipulate for its own profit interest rates, foreign exchange rates, commodities prices, precious metals prices and securities prices.

592. For example, in 2011, UBS was fined $25 million for omissions and misleading statements it made in connection with the sale of Lehman Brothers Holdings structured

notes. UBS underwrote and marketed $900 million worth of 100% Principal-Protection Notes between March 2007 and September 2008; Lehman Bros. went bankrupt in September 2008. UBS also agreed to pay $8.25 million in restitution and interest to American investors.

593. A claim of market manipulation under § 10(b) and Rule 10b-5 "requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." See *ATSI,* 493 F.3d at 101.

594. "In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." See *Wilson v. Merrill Lynch & Co.,* 671 F.3d 120, 130 (2d Cir.2011). Defendant's conduct embraced concealment, misrepresentation and nondisclosure in spades.

595. However, allegations of misrepresentations or omissions alone cannot support a claim of market manipulation. *ATSI,* 493 F.3d at 101. Rather, "[t]here must be some market activity, such as 'wash sales, matched orders, or rigged prices.'" Id. (quoting *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)).

596. Essentially, a claim of market manipulation requires a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security.... The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are

determined by the natural interplay of supply and demand, not rigged by manipulators. See *Wilson,* 671 F.3d at 130.

597.  In order to satisfy the heightened pleading standards for fraud, a complaint alleging market manipulation must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants," including "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI,* 493 F.3d at 102. See also *Dodona I v. Goldman Sachs,* 847 F.Supp.2d 638.

598.  In 2008, in what the SEC called the largest settlement in history, UBS agreed to reimburse its clients $22.7 billion to resolve charges that it had defrauded purchasers of auction-rate securities which were sold to purchasers of those securities through a network of affiliated brokerage firms at a time when top UBS executives knew the market for such securities was in disarray and proceeded to unload their holdings on unsuspecting members of the public.

599.  For that crime, UBS escaped criminal prosecution by the skin of their teeth, instead paying to the SEC $150 million in fines to settle consumer and securities fraud charges filed in New York and other states.

600.  In 2009, UBS obtained a deferred prosecution agreement from the DOJ for conspiring to defraud the U.S. of tax revenue by creating more than 52,000 secret Swiss accounts for U.S. tax evaders who had failed to declare income and committed tax fraud. See **Plaintiff's Exhibits N and Q.**

601. UBS bankers aggressively sought out clients susceptible to tax evasion schemes at tennis matches, polo tournaments and numerous other events.

602. One UBS banker was caught red-handed smuggling diamonds in a tube of toothpaste to accommodate a client.

603. Al Capone was imprisoned for tax evasion, but when UBS plead guilty to aiding and abetting at least 17,000 U.S. tax evaders none of their executives were criminally charged and they continue to aid and abet tax evaders from nations the world over.

604. It is simply incomprehensible that UBS, a firm that has enabled at least 17,000 U.S. citizens to evade paying their fair share of U.S. income taxes, and that has committed hundreds, if not thousands of other financial crimes, is allowed to continue doing business in the U.S. where to this day it continues its financial criminal activity by at the very least failing to alert investors about its extensive record of financial criminality.

605. With regard to another guilty plea, on February 18, 2009, in return for a deferred prosecution agreement, UBS paid $780 million in fines and penalties and disclosed the names of its U.S. clients. See **Plaintiff's Exhibit N.**

606. Concurrently, UBS settled SEC charges that it acted as an unregistered broker-dealer and investment adviser to American clients and paid a $200 million fine.

607. In May, 2011, UBS admitted that its employees had repeatedly conspired to rig bids in the municipal bonds derivatives market over a five-year period, defrauding more than 100 municipalities and non-profit organizations, and agreed to pay $160 million in fines

and restitution. **The SEC described UBS's conduct "a how-to primer for bid-rigging and securities fraud."**

608. These huge fines and penalties did not deter UBS from actively continuing its criminal pursuits.

609. UBS AG and UBS Securities LLC were sued in 2008, accused by Pursuit Partners of fraudulent concealment for selling it $40.5 million of collateralized debt obligations (CDOs) from July 2007 to October 2007. Some of the UBS's disgusted employees referred to as "crap and vomit" in e-mails. UBS avoided a trial by settling the lawsuit. See *Pursuit Partners LLC v. UBS AG,* UWY-CV-08-40331-48-S, Connecticut Superior Court (Waterbury). See **Plaintiff's Exhibit A.**

610. While UBS engaged in its highly profitable financial crime spree from 2004 to 2017, EY served as its external auditor and consciously facilitated UBS in its 26 concealments of material risk factors from UBS's offering document for CEFL by granting UBS a series of undeserved unqualified audit opinions from 2004 to 2016, which served to empower UBS AG, UBS Group Ag and UBS Securities LLC in the issuance and underwriting of defective financial products including CEFL.

611. Moreover, EY facilitated UBS in the concealment of the fact that UBS was at the time it was issuing and underwriting thousands of securities including CEFL while serving a four-year term of criminal probation imposed on it and administered by the DOJ Criminal Division. The Non-Prosecution Agreement (NPA) is attached as **Plaintiff's Exhibit B.**

612. EY and Schwab (one of several broker-dealers that consciously facilitated UBS in the sale of CEFL) each have their own history of financial crimes, a partial rendering of which is enclosed as **Plaintiff's Exhibit S.**

613. Shortly after dismissing the FINRA claim against Schwab, Plaintiff called the attorney representing Schwab and asked him what he thought about Plaintiff's claims against UBS. Schwab's attorney did not answer the question directly, but did say that CEFL is a defective product.

614. For example, since the initial offering of CEFL in 2013-2014 at $25 a share, the U.S. stock market averages have soared and CEFL has traded consistently at a share price at least 30% below its offering price and even as low as 40-45% below its offering price.

615. Plaintiff maintains that UBS intentionally and with deliberate and/or reckless and deceptive disregard for Plaintiff and other investors created, issued, marketed and sold a defective security product UBS called CEFL to unsuspecting investors for the sole purpose of enriching UBS at the expense of the unsuspecting purchasers of CEFL, Plaintiff included.

616. One of the factors that makes the CEFL product defective is the way the ISE High-Yield Index upon which the value of the CEFL shares and the monthly dividend payout is manipulated to enrich UBS and its employees and business associates at the expense (loss of investment) of Plaintiff and other CEFL investors, mostly elderly people seeking retirement income.

617. Based on information and belief the ISE High-Yield Index and other aspects of CEFL are as phonier than a three-dollar bill, and following are some of the reasons why that is so:

,

618.   UBS AG intentionally appointed UBS Securities LLC to serve as Calculation Agent for
       CEFL and other UBS created so-called securities so that UBS Securities LLC and other
       UBS entities could use their acquired index-rigging skills to manipulate the ISE High-
       Yield Index and other indexes to defraud Plaintiff and other investors.

619.   This index manipulation scheme is intended to run for decades, leaving UBS to reap tens
       of billions in profits at the expense of unsuspecting, mostly elderly investors in CEFL and
       numerous other UBS-created ETN's that are fraudulently induced to invest in CEFL and
       other UBS ETN's by the promise of high interest income in the form of monthly
       dividends in an environment of near zero interest rates.

620.   The Index Calculation Agent for CEFL and other UBS ETN's is UBS Securities LLC.

621.   The Calculation Agent calculates CEFL's ISE High-Yield Index in consultation with an
       unnamed Index Sponsor.

622.   The Index Sponsor, whoever that might be, can add, delete or substitute the securities
       underlying the Index or make other methodological changes that could change the Index
       Closing Level.

623.   The changing of securities in the relevant Index may affect that Index, as a newly added
       security may perform significantly better or worse than the security or securities it
       replaces. Additionally, the Index Sponsor or the Index Calculation Agent, as applicable,
       may alter, discontinue or suspend calculation or dissemination of the relevant Index.

624.   Any of these actions can and did adversely affect the value of CEFL and other ETN's.

625.  UBS maintains that neither the unnamed Index Sponsor nor the Index Calculation Agent will have any obligation to consider CEFL shareholder interests when calculating or revising the ISE High-Yield Index.

626.  Changes that affect the composition and calculation of the ISE High-Yield Index will affect the market value of the securities and the cash settlement amount, all settlement, amount, acceleration amount or redemption amount.

627.  The amount payable on the securities of any series and their market value could be affected if the applicable Index Sponsor, in its sole discretion, discontinues or suspends calculation of the ISE High-Yield Index and other relevant ETN indexes.

628.  UBS further maintains that UBS and/ or its affiliate entities may hedge their obligations under CEFL by purchasing the relevant Index Constituent Securities, futures or options on those securities or the relevant Index, or exchange-traded funds or other derivative instruments with returns linked or related to changes in the performance of those securities or the relevant Index, and they may adjust these hedges by, among other things, purchasing or selling those Index Constituent Securities, futures, options, or exchange-traded funds or other derivative instruments with returns linked or related to changes in the performance of those securities or the relevant Index at any time.

629.  UBS did receive substantial returns from these hedging activities while the market value of CEFL and other UBS created ETN's suffered substantial price declines.

630.  UBS and its affiliates also engaged in trading in the relevant Index Constituent Securities and other investments relating to those securities or the relevant Index on a regular basis, including block transactions.

631. These activities adversely affected the market price of those Index Constituent Securities and the level of the relevant Index and, therefore, the market value of CEFL and other UBS-created ETN's.

632. UBS and/or its affiliates also issued and/or underwrote the relevant Index Constituent Securities and other securities and financial derivative instruments with returns linked or related to changes in the performance of the Index Constituent Securities and the ISE High-Yield Index and other indexes.

633. By introducing competing products into the marketplace in this manner, UBS or its affiliates adversely affected the market value of the CEFL and other UBS-created ETN's such as such as UBS-created ETN MLPL.

634. These activities did adversely affect the level of the ISE High-Yield Index and other relevant indexes and with regard to UBS MLPL triggered a UBS call on MLPL, which call greatly enriched UBS to the tune of billions of dollars.

635. That MLPL call is described by UBS as follows: UBS Investment Bank today announced that all outstanding notes of the 2xMonthly Leveraged Long Exchange-Traded Access Securities (ETRACS) linked to the Alerian MLP Infrastructure Index due July 9, 2040 (Ticker: MLPL) (the "Securities") will be mandatorily redeemed in accordance with the terms of the Securities as a result of the occurrence of an Acceleration Event, triggered as a result of the intraday index value decreasing by more than 30% from the most recent Monthly Initial Closing Level (as defined in the prospectus supplement relating to the Securities) to below 349.81 on January 20, 2016 (the "Acceleration Date").

636.   Moreover, UBS brags that they and/or their affiliates may publish research, express opinions or provide recommendations that are inconsistent with investing in or holding CEFL and other UBS-created ETN's.

637.   Further, UBS brags that its business activities and/or those of its affiliates may create conflicts of interest as UBS and/or its affiliates expect to engage in trading activities related to the relevant Index and the Index Constituent Securities that are not for the account of holders of any UBS-created ETN or on their behalf. These trading activities may present a conflict between the holders' interest in the ETN's and the interests UBS and/or its affiliates will have in their proprietary accounts, in facilitating transactions, including options and other derivatives transactions, for their customers and in accounts under their management. These trading activities, if they influence the level of the relevant Index, could have an adverse impact on the market value of the ETN's.

638.   UBS further brags that there are potential conflicts of interest between holders of the shares of UBS-created ETN's and the Calculation Agent.

639.   As Calculation Agent, UBS Securities LLC will, among other things, decide the amount of the return paid out to you on the Securities at maturity or call, or upon acceleration or upon early redemption.

640.   The Calculation Agent will exercise its judgment when performing its functions. For example, the Calculation Agent may have to determine whether a market disruption event affecting the Index Constituent Securities or the relevant Index has occurred or is continuing on a day during the applicable Measurement Period or on the Redemption Valuation Date. This determination may, in turn, depend on the Calculation Agent's

judgment whether the event has materially interfered with our ability to unwind our hedge positions.

641. Since these determinations by the Calculation Agent may affect the market value of any series of the Securities, the Calculation Agent may have a conflict of interest if it needs to make any such decision.

642. With regard to Plaintiff's allegation that UBS manipulated CEFL's share price and dividend payout for its own ends, Plaintiff maintains that UBS AG intentionally selected an unproven index in order to manipulate that unproven index and then appointed its affiliate UBS Securities LLC as Calculation Agent to do just that.

643. Moreover, in its Product Supplement UBS declares: "**Who calculates and publishes the relevant Index?**"  And answers its own question by stating, "The Index Calculation Agent will calculate the level of the relevant Index and will be named in the applicable pricing supplement. Levels of the relevant Index will be published approximately every 15 seconds (assuming that the level of such Index has changed within such 15-second interval) from 9:30 a.m. to 4:00 p.m., New York City time, and a daily Index Closing Level will be published at approximately 4:00 p.m., New York City time, on each Trading Day. The relevant Index information providers and relevant Index symbol will be specified in the applicable pricing supplement."

644. Apparently, UBS was at first attempting to conceal who would be the Calculation Agent and then changed their mind when later in the Product Supplement UBS named UBS Securities LLC will serve as the Calculation Agent but neglected to change the original declaration.

645.  Given the pitiful price performance of CEFL while the U.S. stock markets have soared, it

seems fair to conclude that the Calculation Agent and/or the Index Sponsor were asleep at

the wheel or intentionally manipulated the ISE High-Yield Index to favor the interests of

UBS and its affiliates at the expense of CEFL shareholders.

646.  The specific person or persons that engaged in this complex manipulative scheme will be

fleshed out in during the period of discovery and with the presentations of UBS and

expert witnesses at trial.

647.  On October 20, 2014, the DOJ after learning of new UBS financial crimes issued an

amendment to the NPA. **Plaintiff's Exhibit O.**

648.  In May 2015, the DOJ exercised its discretion to terminate the NPA based on its

determination that UBS had committed a new U.S. crime in relation to U.S. foreign

exchange matters. As a consequence, UBS plead guilty to one count of wire fraud, and

agreed to pay a $ 203 million dollar fine and accept a four-year term of probation.

649.  On information and belief, not once has UBS or EY disclosed in any of the offering

documents for the thousands of securities that UBS issued and sold into U.S. markets

from 2013 through December, 2017 any of the numerous financial crimes UBS has

committed.

650.  Certain of UBS's financial crimes are listed Note 20 to UBS AG and UBS Group AG's

Annual Report for 2016 enclosed as **Plaintiff's Exhibit X.**

651.  At page 67 of UBS AG and UBS Group AG's 2015 Annual Report, UBS admits the

reason why it has omitted its vast history of financial crimes from its offering document

for CEFL. UBS states flat out that: "Our reputation is critical to the success of our strategic plans. Damage to our reputation can have fundamental negative effects on our business and prospects. Reputational damage is difficult to reverse, and improvements tend to be slow and difficult to measure. This was demonstrated in recent years, as our very large losses during the financial crisis, the US cross-border matter (relating to governmental inquiries and investigations, relating to cross-border investment banking services to US private clients during the years 2000 to 2007 and the settlements entered into with US authorities with respect to this matter) and other events seriously damaged our reputation. Reputational damage was an important factor in our loss of clients and client assets across our asset-gathering businesses, and contributed to our loss of and difficulty in attracting employees." Another "admission-against-interest," and consciousness of guilt. **Plaintiff's Exhibit E.**

652. Not mentioned in any UBS annual report is the fact that the named individual UBS Defendants own an aggregate of approximately 5.5 million shares of UBS common stock and reputational damage very well would cost the UBS's Individual Defendants huge personal losses and is one of several motives for their concealment of UBS criminality from the investing public.

653. The UBS statement, as above, is one of several "admissions-against-interest" of UBS's aversion to reputational damage and one of the reasons why it seeks to conceal its vast history of financial crimes from investors.

654.   Moreover, that admission-against-interest" is direct evidence of why UBS and EY have

concealed UBS's financial crimes from the offering document for CEFL and Plaintiff and

are direct evidence of consciousness of guilt.

655.   EY facilitated the concealment, which in turn facilitated UBS's to continuing to engage

in the security business in the U.S. and EY to continue receiving at least $83 million in

annual audit fees, plus more profitable consulting fees, which together amounted to over

a billion dollars for the period from 2004 to 2017.

656.   It is a mix of excessive greed and the fear of being fired by UBS that prompted the sort of

bias and/or lack of independence that led to EY Defendants to grant UBS a series of

undeserved unqualified audit opinion letters from at least 2004 to 2016.

657.   These undeserved unqualified audit opinion letters facilitated the UBS concealment of its

financial criminality. See *Harvard Business Review* article entitled *Why Good

Accountants Do Bad Audits* enclosed as **Plaintiff's Exhibit W**.

658.   CEFL was not referred to even once in the UBS AG shelf registration statement, which

UBS stated preceded the Product Supplement for CEFL that replaced it.

659.    The undisclosed 26 material risk factors were also nowhere to be found in the UBS AG

shelf registration statement as filed with the SEC or the purported Product Supplement

for CEFL, nor was any UBS AG and/or UBS Group AG and/or UBS Securities, LLC

Annual Report or any other annual report for any year ever sent to Plaintiff by UBS or

Schwab.

660. The fact that UBS and EY and Schwab Defendants have admitted that they were aware of UBS's crimes, certain aspects of which were buried hundreds of pages deep in UBS AG and UBS Group AG's annual reports is proof that the omission of the crimes from the purported Product Supplement for CEFL was far more than a mere omission; the omissions were intentional concealments.

661. Under the "Buried Facts Doctrine," a reporting company may incur liability when material facts, although disclosed, are obscured by their placement or by the inclusion of a mass of trivial information, like UBS and UBS's annual reports. See *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 774 (3rd Cir. 1976).

662. The SEC's position has always been that Section 11 liability under the Securities Act of 1933 attaches to the prospectus supplement and incorporated Exchange Act reports, such as the Product Supplement for CEFL.

663. By making use of the shelf registration process as a vehicle for deceiving the public, UBS AG, UBS Group AG, UBS Securities LLC and UBS Americas Holding LLC and EY and Schwab deliberately and/or recklessly concealed UBS's crimes and numerous other material risk factors from the offering document for CEFL.

664. CEFL was one of many UBS issued and underwritten shelf registration securities offerings, many of which significantly declined in value from the offering prices set by UBS during 2013 to 2015, the timeframe in which Plaintiff was invested in CEFL.

665. Certain of these shelf-registered UBS issued and underwritten securities are: CEFL, DVCI, DVHI, DVHL, DVYL, MLPL, MORL, MLPL, MLPV, FMLP, FMLP, FUD,

HDL, HOML, HOMX, LMCP, LRCT, MLPG, MLPI, MLPW, PTM, RWXL, SDYL, SMHD, SPGH, SPLX, UAG, UBC, UBG, UBM, UBN, UCF, and USV.

666. The Product Supplements for LMCP, MORL, MLPI and others on the list above are nearly identical to the Product Supplement for CEFL and also use UBS Securities LLC as the Calculation Agent for the indexes used to establish the share value of the security.

667. To date, even though the prices of U.S. shares have soared, UBS has never offered a word in explanation of the steep decline in the price (usually 40%-60%) of the CEFL, MORL, LMCP and MLPI shares or many of the other UBS securities.

668. With actual superior knowledge that UBS had greatly profited from its financial crimes and by not revealing that fact to prospective investors in CEFL, EY intentionally deceived and defrauded Plaintiff and other investors in possibly thousands of other UBS issued and underwritten securities that UBS has foisted upon all who have invested in their securities.

669. It is simply unimaginable that given the booming U.S. stock markets that a huge international investment bank like UBS could so mismanage its securities offerings, including CEFL, without a conscious intent to manage them into a steep decline.

670. UBS has engaged in a massive security offering binge in order to compensate itself for the billions of dollars in fines, penalties, disgorgements, restitutions and settlements it paid to the DOJ, the SEC and other financial regulatory authorities.

671. All by himself Madoff swindled an estimated $64.8 billion from those persons that entrusted their funds to him with his Ponzi scheme and when caught received a 150-year prison sentence.

672. Given the vast history of known UBS financial crimes, UBS (a giant international bank that dwarfs the scope of the Madoff Ponzi swindle) it is reasonable to presume that most of UBS's crimes have gone undetected, much like the typical thief who is never charged for the majority of his robberies.

673. Taking UBS's undetected crimes into consideration, the total UBS global take from financial crime could exceed $500 billion for the time period from 2004 to 2016, the time period when EY issued UBS an uninterrupted series of 13 yearly undeserved unqualified audit opinions.

674. The 2015 *True Link Report on Elder Financial Abuse* estimates that seniors are bilked out of $36.4 billion a year, and that's just elderly people like Plaintiff.

675. At page 67 of UBS AG's 2015 Annual Report UBS and EY state that UBS expects to engage in future criminal activity and that UBS is "subject to a large number of claims, disputes, legal proceedings and government investigations and we anticipate that our ongoing business activities will give rise to such matters in the future." See **Plaintiff's Exhibit E.** With that statement UBS all but promises a continuation of UBS's financial criminal activities and serves as another "admission-against-interests," which is direct evidence of consciousness of guilt.

676. At page 437 of the UBS AG's 2015 Annual Report there is a long description of the lengths UBS has taken to avoid paying the funds it acquired in its dealings with Bernie

131

Madoff's victims of Madoff's Ponzi swindle, another "admission-against interests." See **Plaintiff's Exhibit E.**

677. That scheming by UBS to avoid reimbursing Madoff victims was thwarted when in January 2015 a court of appeals ordered UBS to pay EUR 49 million, plus interest to certain Madoff victims. **Plaintiff's Exhibit E.** UBS filed an application for leave to appeal the court of appeals' decision, but that application was rejected by the German Federal Supreme Court in December 2015.

678. Page 446 of the UBS AG 2015 Annual Report, UBS while setting out certain of its financial crimes states: "More recently, the unauthorized trading incident announced in September 2011 and our involvement in the LIBOR matter [arguably the largest financial scam in history] and investigations relating to our foreign exchange and precious metals business have also adversely affected our reputation. Any further reputational damage could have a material adverse effect on our operational results and financial condition and our ability to achieve our strategic goals and financial targets." Another "admission-against interests," which is direct evidence of consciousness of guilt. See **Plaintiff's Exhibit E.**

679. None of the obviously material admissions of financial crimes and continuing criminal investigations were set out in the "Risk Factors" section of the offering document for CEFL. **Plaintiff's Exhibit K.**

680. Page 473 of UBS AG's 2015 Annual Report, at Note 22, UBS states: "In 2014, UBS reached settlement with the FCA and the CFTC in connection with their foreign

exchange investigations." Another "admission-against interests," which is direct evidence of consciousness of guilt. **Plaintiff's Exhibit E.**

681. Page 474 of the UBS AG 2015 Annual Report, at Note 22 UBS states: "In October, 2015, UBS settled charges with the SEC relating to structured notes issued by UBS that were linked to the UBS V10 Currency Index with Volatility Cap." Another "admission-against-interests, which is direct evidence of consciousness of guilt." See **Plaintiff's Exhibit E.**

682. The case is the SEC's first involving misstatements and omissions by an issuer of structured notes, a complex financial product that typically consists of a debt security with a derivative tied to the performance of other securities, commodities, currencies, or proprietary indices. The return on the structured note is linked to the performance of the derivative over the life of the note.

683. Based on information and belief, $40 billion to $50 billion of structured notes are registered with the SEC each year and many of those notes are sold to relatively unsophisticated retail investors.

684. UBS, one of the largest issuers of structured notes in the world, agreed to settle the SEC's charges that it misled U.S. investors in structured notes tied to the V10 Currency Index with Volatility Cap by falsely stating that the investment relied on a "transparent" and "systematic" currency trading strategy using "market prices" to calculate the financial instruments underlying the index, when undisclosed hedging trades by UBS reduced the index price by about five percent.

685. The SEC's order found that UBS acted negligently by misleading investors through material misstatements or omissions in the offering documents. Without admitting or denying the SEC's findings, UBS agreed to cease and desist from committing or causing any similar future violations, to pay disgorgement and prejudgment interest of $11.5 million, to distribute $5.5 million of the disgorgement funds to V10 investors to cover the total amount of investor losses, and to pay a civil monetary penalty of $8 million. In determining to accept the offer, the SEC considered UBS's substantial cooperation afforded its staff and certain remedial measures UBS implemented voluntarily.

686. "This first-of-its-kind case involving misstatements and omissions by a structured notes issuer shows that the SEC continues its commitment to pursue wrongdoing across the securities industry in order to better protect investors," said SEC Chair Mary Jo White. "It is critical that large global financial institutions have and implement policies and procedures designed to ensure that all facts relevant to investors are made known to individuals responsible for disclosures."

687. "This case demonstrates the importance of being truthful in offering materials to be used in the offer and sale of structured notes to retail investors," said Andrew Ceresney, Director of the SEC's Division of Enforcement. "We will remain focused on protecting investors who are not in a position to protect themselves by virtue of their limited access to information, the complexity of the product, or both."

688. According to the SEC's order instituting a settled administrative proceeding: UBS perceived that investors looking to diversify their portfolios in the wake of the financial crisis were attracted to structured products so long as the underlying trading strategy was

transparent.  In registered offerings of the notes in the U.S., UBS depicted the V10

Currency Index as "transparent" and "systematic." Between December 2009 and

November 2010 approximately 1,900 U.S. investors bought approximately $190 million

of structured notes linked to the V10 index.

689.  UBS lacked an effective policy, procedure, or process to make the individuals with

primary responsibility for drafting, reviewing and revising the offering documents for the

structured notes in the U.S. aware that UBS employees in Switzerland were engaging in

hedging practices that had or could have a negative impact on the price inputs used to

calculate the V10 index.

690.  UBS did not disclose that it took unjustified markups on hedging trades, engaged in

hedging trades with non-systemic spreads, and traded in advance of certain hedging

transactions. The unjustified markups on hedging trades resulted in market prices not

being used consistently to calculate the V10 index.  In addition, UBS did not disclose that

certain of its traders added spreads to the prices of hedging trades largely at their

discretion.

691.  As a result of the undisclosed markups and spreads on these hedging transactions, the

V10 index was depressed by approximately five percent, causing investor losses of

approximately $5.5 million.

692.  The Currency Index manipulation depicted above provides more direct evidence that

UBS had the requisite manipulative skills and will to criminally manipulate the index for

CEFL that is exclusively administered by UBS Securities LLC as CEFL's Calculation

Agent and upon which the value of the CEFL shares and monthly dividend payout are set.

693.  For example, in 2011, UBS agreed to pay $160 million in restitution, penalties and disgorgement of profits for rigging bids in the U.S. municipal bond market, after the bank and three of its employees were charged by the DOJ in 2010. In July 2013, the three employees were convicted of conspiracy in the muni market fraud: former UBS Vice President Gary Heinz was sentenced to 27 months in prison and fined US$400,000; former UBS global commodities chief Peter Ghavami was sentenced to 18 months and fined US $1 million; and former UBS VP Michael Welty received a 16-month sentence and fined $300,000.

694.  At page 475 of the UBS AG 2015 Annual Report, at Note 22 UBS states: "In May 2015, the Federal Reserve Board and the Connecticut Department of Banking issued an order for UBS to Cease-and-Desist and ordered of an assessment of a civil monetary penalty against UBS amounting to $342 million. Another "admission-against interests," which is direct evidence of consciousness of guilt.  See **Plaintiff's Exhibit E,** and the Cease-and-Desist Order at **Plaintiff's Exhibit J.**

695.  Also at page 475 of the UBS AG 2015 Annual Report, at Note 22 UBS states: In 2012 UBS reached settlements with the FSA (UK Financial Services Authority), the CFTC (Commodity Futures Trading Commission) and the Criminal Division of the DOJ in connection with their investigations of the (UBS rigging) of benchmark interest rates. Another "admission-against interests," which is direct evidence of consciousness of guilt. See **Plaintiff's Exhibit E.**

696.    Concurrently, FINMA (the Swiss equivalent of FINRA), ordered UBS to pay CHF 1.4

billion and disgorgements-including GBP (British pound) of 120 million in fines to the

FSA, USD 700 million to the CFTC, USD 500 million in fines to the DOJ, and CHF 59

million in disgorgements to FINMA.

697.    Page 475 of the UBS AG 2015 Annual Report, at Note 22 UBS states: "In 2014, UBS

reached a settlement with the European Commission (EC) regarding its investigation of

bid-ask spreads in connection with Swiss franc interest rate derivatives and paid a EUR

12.7 million fine, which was reduced to this level in part due to UBS's cooperation with

the EC." Another UBS "admission-against interests," which is direct evidence of

consciousness of guilt.  See **Plaintiff's Exhibit E.**

698.    Page 478 of the UBS AG 2015 Annual Report, UBS states: Since September 2014,

putative class actions have been filed in federal courts in New York and New Jersey

against UBS and other defendants, on behalf of parties who entered into interest rate

derivative transactions linked to ISDAFIX. The First Amended Complaints, which have

since been consolidated into an amended First Amended Complaint, allege that the

defendants conspired to manipulate ISDAFIX rates from 1 January 2006 through January

2014. Yet another UBS "admission-against interests," which is direct evidence of

consciousness of guilt. See **Plaintiff's Exhibit E.**

699.    Even more startling, if that is possible, page 476 of the UBS AG 2015 Annual Report,

UBS states: "In May 2015, the DOJ's Criminal Division terminated the December 2012

NPA with UBS related to UBS submissions of benchmark interest rates. Yet another

UBS "admission-against interests," which is direct evidence of consciousness of guilt. See **Plaintiff's Exhibit E.**

700. As a result, UBS entered into a plea agreement with the Criminal Division pursuant to which UBS agreed to a sentence that includes a USD 203 million fine and a four-year term of criminal probation. **Plaintiff's Exhibit B.**

701. An additional UBS and EY concealment from prospective investors in CEFL is the fact that a few weeks into Mrs. Hillary Clinton's position as Secretary of State in 2009, she helped UBS settle a lawsuit with the IRS, saving UBS hundreds of millions of dollars. **Plaintiff's Exhibit G.**

702. Shortly after Mrs. Clinton's intervention with the IRS, former President Bill Clinton, received $1.5 million from UBS to participate in a series of question-and-answer sessions with UBS Chief Wealth Management executive Bob McCann, a named UBS Defendant, making UBS former President Clinton's biggest single source of speech income since finishing his presidency. The FBI is again investigating the Clinton Foundation for potentially giving donors special political access and favors. **Plaintiff's Exhibit G.**

703. Moreover, donations to the Clinton Foundation increased exponentially from $60,000 to $600,000, which sums do not include additional sums that may have been paid and then secreted away in those infamous UBS secret bank accounts and safe deposit boxes in Zurich and Basel Switzerland. **Plaintiff's Exhibit G.**

704. In 1974, the SEC's Division of Corporate Finance declared that any illegal domestic campaign contributions must be disclosed in 1933 Act registration statements and reports filed under the Securities Exchange Act. Foreign contributions to the Clintons to

purchase their help with charges brought by the DOJ could be construed as illegal campaign contribution or bribes.

705. The large monetary payments to former President Clinton and to the Clinton Foundation taken together with UBS's extensive history of settling its way out of prosecution for criminal and civil offenses possibly are additional material facts that UBS and EY omitted from the offering document for CEFL.

706. Direct evidence that a fish rots from the head down is found in the fact that UBS fostered and rewarded a corporate criminal culture by awarding a substantial pay raise to Axel Weber, its Board Chairman, shortly after paying billions of dollars in settlements, fines, disgorgements, restitutions and penalties to settle guilty pleas with regard to colluding with other banks to rig the foreign exchange market. **Plaintiff's Exhibit H.**

707. Only a cult of criminality emanating from the highest echelons of the UBS executive management team could produce the mind-boggling array of serious financial crimes described herein.

708. The huge fines for financial crimes paid by UBS over and over again, numbering in the multiple billions of dollars, is further direct evidence of the long-term undisclosed criminal activity on the part of several UBS entities and that the UBS controlling executives and members of the UBS Audit Committee and EY's auditors were well aware of those crimes, yet UBS aggressively engaged in a securities offering spree in the U.S. with able assists from ET and Schwab and other but not all broker dealers, involving thousands of UBS issued and underwritten securities including CEFL without disclosing that criminality in the offering documents for those securities.

709.  What UBS's huge settlements, penalties and disgorgements hint at but fail to disclose is the enormity of the profits UBS derived from this criminal activity.

710.  Presumably, UBS greatly profited from these financial crimes because they commit new financial crimes with great regularity.

711.  Whoever it was that said crime doesn't pay was not familiar with the Defendants.

712.  Former U.S. Attorney General Loretta Lynch and two of her deputies have commented on UBS's extensive history of financial crimes. Their comments are attached as **Plaintiff's Exhibit I.**

713.  By failing to insist that UBS include in its offering document for CEFL its long and extensive history of financial crimes, EY facilitated the concealment of those crimes from Plaintiff and other prospective investors in CEFL.

714.  In the 12-page "Risk Factors" section of the offering document for CEFL, under the federal securities laws, UBS and EY were duty-bound to inform Plaintiff of the material risks inherent in an investment in CEFL, but intentionally did not. **Plaintiff's Exhibit K.**

715.  The 12-page, single spaced "Risk Factors" section of the UBS Product Supplement for CEFL contains not one word about the 26 material risk factors set out above and thus and offers not one word about UBS serving a four-year term of criminal probation and not one word about the risk to investors if the DOJ revokes UBS license to do business in the U.S. See **Plaintiff's Exhibit K.**

716.  Further, not one word about UBS's criminal pleading to having criminally manipulated the LIBOR interest rate (possibly the largest financial crime in history). LIBOR is the

interest rate that is used to set benchmark interest rates for many of the world's major currencies or one word about UBS rigging and manipulating numerous other interest rates, foreign currency rates, and precious metals prices.

717.  EY's failure to have UBS disclose its financial crimes and UBS's exposure to having its license to conduct a securities business in the U.S. revoked by the DOJ contravenes Generally Accepted Auditing Standards (GAAS) and Generally Accepted Accounting Principles (GAAP) that were established to ensure that external auditors fulfill their obligations to investigate their clients when conducting their audit.

718.  GAAS and GAAP consist of authoritative standards, originally established by the American Institute of Certified Public (AICPA), adopted, amended and expanded upon by the Public Company Accounting Oversights Board (PCAOB), authoritative standards with which external auditors must comply when conducting their audits.

719.  Under GAAS, GAAP and interpretations of these standards by the American Institute of Certified Public Accounts (AICPA) and additional standards promulgated by PCAOB, EY was required to ensure that the offering document for CEFL presented fairly and in all material respects all matters that would inform prospective investors decisions in assessing the pros and cons of UBS security offerings.

720.  With regard to representations and conduct in connection with the preparation of required reports and documents17 C.F.R. § 240.13b2-2 states: No director or officer of an issuer shall, directly or indirectly: (1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or (2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements

made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with: (i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or (ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise."

721. Further, 17 C.F.R. § 240.13 (b)(1) states: "No officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading."

722. For purposes of paragraphs (b)(1) and (c)(2) of section 17 C.F.R. § 240.13, actions that, "if successful, could result in rendering the issuer's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor: (i) To issue or reissue a report on an issuer's financial statements that is not warranted in the circumstances (due to material violations of generally accepted accounting principles, generally accepted auditing standards, or other professional or regulatory standards); (ii) Not to perform audit, review or other procedures required by generally accepted auditing standards or other professional standards; (iii) Not to withdraw an issued report; or (iv) Not to communicate matters to an issuer's audit

committee. (c) In addition, in the case of an investment company registered under section 8 of the Investment Company Act of 1940 ( 15 U.S.C. 80a-8), or a business development company as defined in section 2(a)(48) of the Investment Company Act of 1940 ( 15 U.S.C. 80a-2(a)(48)), no officer or director of the company's investment adviser, sponsor, depositor, trustee, or administrator (or, in the case of paragraph (c)(2) of this section, any other person acting under the direction thereof) shall, directly or indirectly:

723.   (1) (i) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or (ii) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with: (A) Any audit, review, or examination of the financial statements of the investment company required to be made pursuant to this subpart; or (B) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise;

724.   or (2) Take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that investment company that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the investment company's financial statements materially misleading.

725. Clearly, no reasonable investor would entrust their funds to Bernie Madoff after learning he was running a massive Ponzi-scheme.

726. Nor would any informed investor invest in CEFL if UBS's financial crimes, which included the rigging of the LIBOR interest rate (arguably the largest financial scam in history) and the manipulation of foreign exchange markets and various indexes, and the other 26 material risk factors had been disclosed in instead of concealed from the "Risk Factors" section of the Product Supplement for CEFL.

727. UBS uses a network of subsidiary organizations to carry out its investment banking and broker-dealer securities activities in the U.S., but furthering its pattern of concealments, fails to disclose in its offering document for CEFL or anywhere else the names of the persons who manage their subsidiary operations in the U.S., including UBS Securities, LLC, the underwriters of CEFL.

728. Moreover, even when queried by telephone UBS would not disclose the names of the persons who managed UBS Securities LLC underwriting of CEFL.

729. In addition to numerous violations of the U.S. securities laws set out above, on September 30, 2015 the SEC imposed a Cease and Desist Order (File No. 3-16871) citing violations of the antifraud provisions of the federal securities laws in connection with the underwriting of municipal securities offerings, including due diligence failures and material misrepresentations. **Plaintiff's Exhibit J.**

730. The SEC Cease-and-Desist Order against UBS stated: "While broker-dealers must have a reasonable basis for recommending securities to customers, underwriters have a heightened obligation to take steps to ensure adequate disclosure." *Dolphin & Bradbury,*

*Inc. v. Sec,* 512 f.3d 834, 641 (D.C. Cir. 2008). Cease-and-Desist Order attached as

**Plaintiff's Exhibit J.**

731. The Supreme Court in *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449 (1976)

     confined its "materiality" formulation to proxy rules and solicitation. However, the *TSC*

     standard has been carried forward to other provisions of the federal securities laws,

     notably Rule 10b-5.

732. One year after *TSC,* the Supreme Court again suggested that the same materiality

     standard governed § 10(b) cases as well. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462,

     474 n.14 (1977).

733. Moreover, liability accrues under § 11 of the Securities Act of 1933, 15 U.S.C. 77k even

     if the omissions/concealments are not material.

734. Liability, in part, hinges on a false statement of a material fact in a registration statement

     or the omission/concealment of a material fact necessary to make other statements not

     misleading; under 15 U.S.C. 77(2) (liability in private action arises from any offer or sale

     of a security).

735. Moreover, liability accrues, in part, under the Securities Exchange Act of 1934, § 9(a)(4),

     10(b) and 15 U.S.C. § 78(a)(4) and § 78(e) and Rule 10-b5, 17 C.F.R. § 240.10b-6.

736. Section 207 of the Investment Advisors Act of 1940 makes it unlawful for any person to

     make any untrue statement of a material fact in any registration statement, application,

     report, account, record or other document filed or transmitted pursuant to this title" or to

     "omit to state therein any fact, necessary in order to prevent the statements made therein,

in light of the circumstances under which they were made, from being materially misleading."

737. For an omission/concealment to be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 234 (1988), quoting *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 449 (1976).

738. Clearly, UBS's EY's total failure to address UBS's monumental history of financial crimes in the "Risk Factors" section of the Product Supplement for CEFL or any other part of the Product Supplement for CEFL as it had in Note 22 buried hundreds of pages deep in annual reports for UBS AG and UBS Group AG was an intentional dereliction of its fiduciary and other duties to Plaintiff to disclose all material risk factors in its offering document for CEFL.

739. EY failed to perform its public auditor duties by failing to insist that UBS's financial crimes be disclosed in the CEFL Product Supplement. They did this in order to gain favor with UBS so as to protect against the cancellation of its $83 million-plus audit fee for 2015 and in excess of a billion dollars from 2004 to 2017 for their audit, tax and consulting service fees.

740. EY had previously fired EY partners for failing to disclose corrupt relationships between the EY audit partners and their clients and paid fines to the SEC to settle the SEC's charges, but failed to do so with the EY partners who headed the audit of UBS from at least 2004 to 2017, thereby, directly and/or indirectly, encouraging a continuation of

EY's audit partners cozy relationship with UBS and the perpetuation of the concealment of UBS's financial crimes by the continuing to grant undeserved unqualified audit opinions to UBS. **Plaintiff's Exhibit S.**

741. Inevitably, occasions arise, as here, in which unlawful conduct by a corporation or a partnership has import under both a substantive statute and the securities laws. When conduct is illegal and has resulted in significant financial loss, as here, the two statutory schemes may readily coexist and complement one another.

742. The request herein of the Court to enjoin UBS from doing business in the U.S, and for EY to discontinue issuing undeserved unqualified audit opinions to UBS and for Schwab to stop purchasing securities for customers that are issued and/or underwritten by organizations that have a history of financial criminality is made necessary because the DOJ and the SEC having fined UBS, EY and Schwab billions of dollars for the commission of almost every serious financial crime imaginable, have failed to adequately protect unsophisticated U.S. investors by leaving UBS free to continue defrauding U.S. investors, including Plaintiff.

743. Neither UBS AG's shelf registration statement, (which was never distributed to Plaintiff by UBS or Schwab) nor the Product Supplement for CEFL ever mentions even a single word about CEFL.

744. Moreover, in UBS AG's shelf registration statement, under the heading "Limitations on Enforcement of U. S. Laws Against Its Management and Others," UBS AG brazenly brags that "most of its directors and executive officers are resident outside the U.S., and all or a substantial portion of their assets are located outside the U.S., thus making it

difficult to serve legal process on them, and there is doubt as to the enforceability in Switzerland, in original actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the securities laws of the U.S."

745. UBS AG's open bragging that its liability for violating the securities laws of the U.S. lies beyond the reach of U.S. law should be construed as "an-admission-against-interest," which is direct evidence of consciousness of guilt.

746. On December 18, 2012, the DOJ Criminal Division's Fraud Section entered into a Non-Prosecution Agreement related to UBS AG's conduct and involvement in a multi-bank scheme to manipulate LIBOR, the world's premier interest rate, the interest rate that serves as the foundation for many other important interest rates, including certain mortgage interest rates. **Plaintiff's Exhibit B.**

747. UBS deliberately and/or recklessly and deceptively engaged in the unlawful manipulation of LIBOR for the sole purpose of enriching itself at the expense of every citizen of the U.S. and other countries who suffered economic loss while UBS unjustly enriched itself.

748. The manipulation of LIBOR and foreign exchange markets, as well as many other financial crimes, demonstrates that UBS possessed both the skills and the will to manipulate the shares prices and dividend payments of CEFL for their own profit at the expense of CEFL shareholders such as Plaintiff.

749. For example, in 2011, UBS was fined $25 million for omissions and misleading statements it made in connection with the sale of Lehman Brothers Holdings structured notes. UBS underwrote and marketed $900 million worth of 100% Principal-Protection Notes between March 2007 and September 2008; Lehman Bros. went bankrupt in

September 2008. UBS also agreed to pay $8.25 million in restitution and interest to American investors.

750. It also demonstrates that EY was derelict in its fiduciary duty to CEFL shareholders when it issued UBS a series of unqualified audit opinions spanning from 2004 to 2016 and failed to insist that UBS to disclose the 26 risk factors in its offering document for CEFL, or issue a qualified audit opinion or resign its audit engagement with UBS.

751. Schwab too was derelict in its fiduciary duties to Plaintiff by failing to alert Plaintiff to UBS's criminal history and thrn allowing Plaintiff to invest in CEFL on margin knowing CEFL was a highly leveraged security and thoroughly unsuitable as an investment vehicle for Plaintiff, an elderly retiree seeking retirement income to supplement meager monthly Social Security payments.

752. In 2013, following media reports of widespread irregularities in the foreign exchange (FX) markets, UBS notified the DOJ Criminal Division that it had found evidence of its involvement in the conscious reckless manipulation of certain FX markets for the sole purpose of enriching UBS and its FX market traders at the expense of the FX investing public and other brokerage firms and banks.

753. On May 20, 2015, the DOJ Criminal Division determined that UBS had breached the LIBOR Non-Prosecution Agreement it had entered into with the DOJ Criminal Division on December 18, 2012.

754. The DOJ Criminal Division based its determination that UBS had breached the LIBOR Non-Prosecution Agreement on (1) UBS's fraudulent and deceptive currency trading and sales practices in certain FX market transactions with customers via telephone, email,

and/or electronic chat, to the detriment of UBS AG's customers, and collusion with other participants in certain FX markets.

755. On September 18, 2013, UBS Securities Japan Co. Ltd. was sentenced for its role in a long-running manipulation of the London Interbank Offered Rate (LIBOR), a leading benchmark interest rate used in financial products and transactions around the world.

756. In a plea agreement signed on December 19, 2012, UBS admitted its criminal conduct and agreed to pay a $100 million fine, which the court accepted in imposing sentence. **Plaintiff's Exhibit B.**

757. In addition, UBS entered into a NPA with the DOJ requiring UBS to pay an additional $400 million penalty, to admit and accept responsibility for its misconduct as set forth in an extensive statement of facts and to continue cooperating with the DOJ in its ongoing investigations of UBS and other investment banks.

758. UBS traders endeavored to manipulate yen LIBOR on numerous occasions, and during some periods on almost a daily basis.

759. From November 2006 through September 2009, UBS carried out this scheme by making efforts to manipulate: (a) the Yen LIBOR submissions that UBS transmitted to the British Bankers Association; and (b) the Yen LIBOR submissions that other banks transmitted.

760. As a result of negotiations with the DOJ Criminal Division, the U.K. Financial Authority and the U.S. Commodity Futures Trading Commission, UBS plead guilty in the U.S. District Court in Connecticut to a charge of wire fraud, in violation of Title 18, U.S.C. § Sections 1343.

761. The UBS guilty plea to a charge of wire fraud was based on UBS admissions that
between approximately 2001 and 2010, UBS engaged in a scheme to defraud
counterparties to interest rate derivatives transactions by secretly manipulating
benchmark interest rates to which the profitability of those transactions was tied to the
UBS manipulation of the LIBOR interest rate.

762. As a result of the foregoing guilty plea UBS was being considered as an ineligible issuer
of securities in the U.S. **Plaintiff's Exhibit P.**

763. Previously, UBS had been granted six waivers from being designated as an ineligible
issuer of securities in the U.S. Another concealment of a material fact from the offering
document for CEFL by UBS and EY. **Plaintiff's Exhibit P.**

764. To settle the financial crimes underlying the six waivers, UBS paid billions of dollars in
settlements, restitutions, penalties, fines and disgorgements.

765. But these huge settlements, fines, penalties and disgorgements fail to make known the
magnitude of the profits UBS has derived from its financial crimes, leaving us to assume
UBS greatly profits from its financial crimes because UBS has continued to commit new
financial crimes.

766. Whoever said crime does not pay never came face-to-face with the Defendants.

767. Based on information and belief, UBS AG issued approximately 2,955 securities
offerings, including approximately 20 ETNs, including CEFL.

768. From these offerings, UBS took in approximately $2.6 billion, but not once did UBS
disclose that they were serving a four-year term of criminal probation imposed on it by

the DOJ Criminal Division that was revoked for cause, cause being UBS's commission of new financial crimes in violation of the DOJ's Criminal Divisions' previous NPA.

769. Moreover, not once did UBS or any of its subsidiaries disclose the fact that new and continuing investigations by the DOJ Criminal Division, the SEC, the FBI, FINRA, FINMA (A Swiss financial regulatory authority) and other financial regulatory authorities, domestic and international, could result in UBS having its licenses to pursue investment banking activities in the U.S. and elsewhere revoked.

770. On October 15, 2015, pursuant to the Securities Act of 1933, Section 8A, the SEC ordered UBS to Cease and Desist from three types of conduct undisclosed to investors, specifically "engaging in hedging with non-systematic-spreads and trading in advance of certain hedging transactions that negatively, impacted, or in the case of trading before hedging transactions had the potential to negatively impact, pricing inputs used to calculate V10. In reality, the V10 was neither transparent nor systematic, market prices were not consistently used to calculate the Index, and V10 investors were thereby misled to certain key features of this complex financial instrument. **Plaintiff's Exhibit J.**

771. As a result of the markups and spreads, the Index was depressed by approximately five percent causing investor losses of approximately $5.5 million." The SEC's Cease and Desist Order is enclosed as **Plaintiff's Exhibit J.**

772. The UBS conduct that led to the SEC Cease and Desist Order and sanctions, as above, is the sort of conduct that led to Plaintiff's loss of a large chunk of his retirement savings from his investment in CEFL, specifically hedging operations and Index manipulation to force the price of CEFL down so that UBS could repurchase CEFL from investors in

CEFL at highly deflated prices and then force the Index up so that UBS could resell the CEFL shares at artificially inflated prices.

773. Clearly, as described in EY's Note 22 to UBS AG's 2015 Annual Report, UBS and EY had superior actual knowledge of the extensive history of UBS's financial crimes, including the manipulation of indexes, the issuance of defective products and the rigging of interest rates and security prices and concealed that information from Plaintiff. See **Plaintiff's Exhibit E.**

774. The concealment of all of that superior knowledge by UBS's **audit committee members** and the controlling top executives and other employees of UBS, EY and Schwab from Plaintiff and other investors is, at the very least, a violation of the "Special Facts Doctrine," and is a breach of UBS's, EY's and Schwab's fiduciary duty and demonstrates their commercial bad faith and a Breach of the Implied Covenant of Good Faith, as well as 15 U.S.C. § 78t. See also *Smith v. Gorkom,* 488 A.2d 858.

775. At the very least, an **audit committee is responsible for** (1) **Regulatory compliance;** (2) Oversight of the public auditor and (3) Overseeing disclosure and reporting requirements, none of which were fulfilled by UBS's Audit Committee with regard to the purported Product Supplement for CEFL.

776. Based on information and belief, persons and organizations that have plead guilty to a crime or crimes have usually committed other, often many other, undetected crimes.

777. UBS's numerous guilty pleas and settlements represent but the tip of the iceberg with many more crimes lurking beneath the surface undetected.

778. The offering document for CEFL did describe a broad array of risk factors, but with deliberate and/or reckless and deceptive fraudulent intent, UBS management and EY's auditors deliberately and/or with reckless disregard concealed the 26 material risk factors that would have forcefully dissuaded Plaintiff and most other prospective inventors from investing in CEFL or any other UBS security offering. **Plaintiff's Exhibit K.**

779. EY's failure to insist that UBS include in the "Risk Factors" section of the offering document for CEFL the vast history of UBS's crimes intentionally deceived Plaintiff by portraying UBS as a crime-free organization and not the confessed financial criminals and criminal probationers that they are.

780. Following are some of the specific material risk factors that UBS and EY intentionally concealed from the UBS offering document for CEFL:

781. UBS, EY and Schwab concealed the fact that UBS has been criminally charged and/or civilly sued numerous times for price-rigging and other financial crimes and has paid out billions of dollars in fines, disgorgements and to settle lawsuits.

782. That UBS was under investigation by the DOJ Criminal Division and that its four-year term of criminal probationary period as administered by DOJ could be revoked, leaving UBS with the prospect of having its licenses to do business in the U.S. revoked.

783. On January 14, 2015, the Katten law firm representing UBS sent a 9-page letter to the SEC imploring the SEC for leniency for UBS with regard to certain of its financial crimes. The letter is enclosed as part of **Plaintiff's Exhibit P.**

784. On May 20, 2015, the Debeviose & Plimpton law firm representing UBS sent two similar letters to the SEC imploring the SEC for leniency for UBS with regard to certain of its financial crimes. The letters are enclosed as part of **Plaintiff's Exhibit P.**

785. The gist of the three letters were pleas by these high-profile law firms to the SEC to not revoke UBS's license to do business in the U.S.

786. As the self-appointed Calculation Agent for CEFL, UBS Securities LLC manipulated the index upon which the share price and monthly dividends for CEFL were set, thus enabling UBS by repurchasing, reselling, hedging and other means to reap enormous profits as the price of the CEFL shares were artificially and criminally inflated and deflated.

787. Given that level of criminal expertise UBS acquired over the years, particularly the manipulation and rigging of indexes, of foreign exchange rates, of securities and precious metals futures prices, the manipulation of the index that the value of CEFL is based was a piece of cake for UBS.

788. Three pages of the 19-page **Joint Sentencing Memorandum** dated September 12, 2013 submitted prior to sentencing found at *United States of America v. UBS Securities Japan, LTD* (September 13, 2013) describes in detail certain of the criminally-oriented financial techniques UBS used to defraud Plaintiff, which included manipulating the price of the CEFL common shares, manipulating the index upon which the shares of CEFL are valued and manipulating the monthly dividend for CEFL downward so as to deflate the value of the CEFL shares. See **Plaintiff's Exhibit L.**

789. These manipulations were designed and executed by UBS with willful fraudulent intent and enabled UBS to repurchase the shares of CEFL it sold to the public at prices far below the $25 offering price for CEFL.

790. These manipulative practices and failures to disclose 26 material risk factors in the Product Supplement for CEFL by UBS, EY and Schwab cost me a large chunk of Plaintiff's retirement savings amounting to approximately $180,000-$400,000, depending upon the method this Court adopts for calculating the loss. See **Plaintiff's Exhibit R.**

791. Ponzi schemes and defective securities, while they cannot survive forever, can persist for a very long time, which for the time they are operational infuses them with an undeserved sense of legitimacy.

792. These schemes persist until their operators of the schemes panic and shut them down, or the courts or government regulators shut them down.

793. Generally speaking, the SEC is far more vigilant when it comes to shutting down small operators and far less so when it comes to large scale swindlers like Bernie Madoff, whose Ponzi-like scheme defrauded investors for many years and cost them billions of dollars and that has defrauded investors worldwide out of sums Plaintiff estimates in the hundreds of billions of dollars.

794. In *Pursuit Partners v. UBS Securities, LLC,* the U.S. District Court found UBS guilty of fraudulent concealment, finding that UBS's nondisclosures crossed the line into actionable securities fraud. These fraudulent concealments, though important and illuminating, are minimal when compared to the nondisclosures of material facts in the offering document for CEFL.

795. On or about December 16, 2013, Plaintiff learned of the existence of CEFL, and after reading the UBS "Product Supplement" for CEFL, Plaintiff commenced investing in CEFL, which is enclosed as **Plaintiff's Exhibit F.**

796. Based on information and belief, there never was a specific prospectus for CEFL, only the Product Supplement.

797. Instead of a specific prospectus for CEFL, CEFL was one of many securities issued by UBS under the auspices of a UBS AG shelf registration statement, which intentionally concealed the same 26 material risk factors as did the Product Supplement" for CEFL. The 76-page UBS AG shelf registration statement is enclosed as **Plaintiff's Exhibit C.**

798. As we have seen, during the last decade, UBS has been sued civilly and indicted criminally numerous times by investors, regulatory agencies and governments and settled claims for almost every financial crime imaginable and paid out billions of dollars in settlements, fines, penalties and disgorgements and none of this vast record of UBS financial crime is disclosed in the UBS offering document for CEFL.

799. During the years UBS issued, marketed and sold CEFL to Plaintiff and other unwary investors, UBS paid billions of dollars to settle claims of wrongdoing, one of the many material facts that was omitted from UBS offering document for CEFL.

800. UBS has been under continuous investigation and criminal probation by the DOJ Criminal Division for over a decade and is under scrutiny by the government of France for helping wealthy French people evade paying taxes.

801.   Other instances of UBS financial chicanery include money-laundering, price fixing, denying Holocaust victims access to their funds, bid rigging, LIBOR manipulation (as claimed here), improper pricing of securities (as claimed here), the sale of risky securities (as claimed here), misleading investors (as claimed here), currency manipulation, sex discrimination, human rights abuses and other insidious conduct unbecoming a large international bank.

802.   One such investigation of UBS by the DOJ involves allegations of price fixing (as claimed here), illegally rigging markets (as claimed here), and criminal profiteering (as claimed here).

803.   UBS management and EY's auditors with deliberate and/or reckless intent concealed UBS's vast history of financial crimes from its offering document for CEFL knowing its inclusion would convince Plaintiff and other prospective investors to abstain from making an investment.

804.   Under New York law, a plaintiff may satisfy the intent/ scienter requirement by showing a "rational basis" to infer that a defendant knowingly made a misrepresentation. See *Houbigant, Inc. v. Deloitte & Touche LLP,* 753 N.Y.S.2d 493, 498 (N.Y. App. Div. 2003).

805.   The burden is low because "[t]he element of scienter…is, of course, the element most likely to be within the sole knowledge of the defendant and least amenable to direct proof." Id.; accord *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets,* LLC, 910 N.Y.S.2d 762, at *7 (N.Y. Sup. Ct. May 10, 2010); see also *Pludeman v. N. Leasing Sys., Inc.,* 890 N.E.2d 184, 187 (N.Y.2008) (common law fraud

claims, including the element of scienter, are properly pleaded "when the facts are sufficient to permit a reasonable inference of the alleged conduct").

806. Where the defendants are entities, it is sufficient to allege that "someone whose intent could be imputed to the corporation acted with the requisite scienter." *In re Citigroup Inc. Sec. Litig.,* 753 F. Supp. 2d 206, 233 (S.D.N.Y. 2010).

807. In the Southern District of New York, "where the question of intent is at issue, matters are 'peculiarly within the defendant's knowledge,' and thus Rule 9(b)'s pleading standards are less stringent." *In re Alstom SA,* 406 F. Supp. 2d 433, 456 (S.D.N.Y. 2005) (quoting *Liberty Ridge,* 173 F. Supp. 2d at 136).

808. The policy of vigorous enforcement through private litigation has been the instrument for forging many salutary developments in the securities fraud area, including a broadening of standing to sue and a relaxation of the elements of proof in a private action. A private right of action for damages has been implied for purchasers or sellers defrauded in violation of Rule 10b-5. *Kardon v. National Gypsum Co.,* 69 F.Supp. 512, 513-14 (E.D.Pa.1946).

809. Shareholders deceived by misleading proxy solicitations have been held to have a cause of action under Sec. 14(a) of the 1934 Act, 15 U.S.C. Sec. 78n(a) (1970). *J. I. Case Co. v. Borak,* 377 U.S. 426. The scienter requirement in a Rule 10b-5 private damage action appears to have been reduced to a knowledge of falsity or reckless disregard for the truth standard by our decisions in *Heit v. Weitzen,* 402 F.2d 909, 914 (2 Cir. 1968), cert. denied, 395 U.S. 903 (1969), and *Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1290-91 (2 Cir. 1969), cert. denied, 397 U.S. 913 (1970), "to insure the maintenance of

,

fair and honest markets in . . . [securities] transactions." Section 2 of the 1934 Act, 15 U.S.C. Sec. 78b (1970).

810.   The reliance standard has been relaxed under certain circumstances; for example, if a material omission or misstatement is proven, a presumption may be raised that the plaintiff relied on the deception to his detriment. See *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972) (Rule 10b-5 violation); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 385 (1970) (Sec. 14(a) violation).

811.   Congress was concerned about the plight of the average public investor who is at a serious disadvantage in dealing with persons possessing superior knowledge, skill and resources. But the public in the role of investor is only part of the picture. The integrity and efficiency of the securities markets are even more important since our entire economy is dependent upon these markets.

812.   The securities markets perform the essential function of assessing the value that society places upon the efforts of a particular enterprise so that society can obtain the maximum amount of its preferred goods and services that our resources can produce.

813.   This function can be performed effectively only if the delicately calibrated balance of factors affecting demand and supply are allowed to have their impact upon the market place through an unrestricted flow of information and funds. See Crossland & James, *The Gods of the Marketplace: An Examination of the Regulation of the Securities Business,* 48 B.U.L.Rev. 515 (1968).

814.   The securities laws seek to prevent the non-disclosure of material facts and defective securities which serve to distort the market's estimate of value.

815. Considering the weighty interests at stake, Congress and the courts justifiably have outlawed all unfair and deceptive practices related to the issuance and underwriting of securities and have encouraged private damage actions to implement the enforcement of our nation's federal and state securities laws.

## COUNT 1: FRAUDULENT INDUCEMENT TO PURCHASE CEFL AGAINST ALL DEFENDANTS

816. Plaintiff re-alleges and incorporates paragraphs 382-815 of this First Amended Complaint by reference as if set forth verbatim.

817. In a claim for fraudulent inducement, a plaintiff must allege "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury. See *Lama Holding Co. v Smith Barney,* 88 NY2d 413, 421 [1996]; see also *Channel Master Corp. v Aluminum Ltd. Sales,* 4 NY2d 403, 406-407 [1958]).

818. To prove fraudulent inducement the plaintiff must prove that (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." See *Travelers Indemnity Co. of Illinois* v. *CDL Hotels USA, Inc.,* 322 F Sup 2d 482, 499 (S.D.N.Y. 2004).

819. Liability for violations of § 20(a) of the Exchange Act is derivative of liability for violations of § 10(b). See *Sec. & Exch. Comm'n v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996). Section 20(a) imposes liability upon "every person who, directly or indirectly, controls any person liable under any provision of [§ 10(b)] or of any rule or

regulation thereunder ... unless the controlling person acted in good faith and did not

directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. § 78t.

820.  Defendants deliberately conspired to conceal UBS's vast history of criminality and its

four-year term of criminal probation and the defectiveness inherent in the CEFL ETN

from prospective investors, which, amongst other wrongdoings, constituted a massive

fraud that damaged Plaintiff and many other investors in UBS-created ETNs.

821.  In *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F. Supp. 256, 259

(S.D.N.Y.1989) the Court ruled that: "An egregious refusal to see the obvious, or to

investigate the doubtful, may in some cases give rise to an inference of gross negligence

which can be the functional equivalent of recklessness." See also *Jordan v. Madison

Leasing Co.,* 596 F. Supp. 707, 710 (S.D.N.Y.1984) ("negligence, if gross, or blindness,

although not equivalent to fraud, is sufficient to sustain an inference of fraud").

822.  The Securities Act of 1933 requires a company to register its securities with the SEC. In

order to complete a registration, the company must include audited financial statements

and numerous other material disclosures. If the registration statement is to be found

materially misstated, both the company and its auditors may be held liable.

823.  UBS, EY and Schwab directly and/or indirectly, singly or in concert with others, in

connection with the issuance, underwriting, marketing, sale and distribution of UBS

ETN's including CEFL, by use of any means or instrumentality of interstate commerce or

of the mails or the Internet, knowingly and with deliberate and/or reckless disregard for

the truth: (a) employed devices, schemes, or artifices to defraud Plaintiff; (b) obtained

money by means of the concealment of 26 material facts from investors, including

Plaintiff, needed to make an informed decision with regard to whether or not to purchase CEFL; (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon purchasers of the shares of CEFL including the Plaintiff.

824.  By failing to disclose UBS's vast history of financial crimes and 25 other material concealments set out above, UBS, EY and Schwab fraudulently induced Plaintiff to invest in CEFL and are thereby responsible for his economic loss and lost investment opportunities.

825.  UBS, EY and Schwab knew that disclosing UBS's crimes and other material concealments in the offering document for CEFL would substantially reduce investor interest in CEFL and have a negative impact on the value of the securities UBS had already sold to the public.

826.  When UBS prepared and EY audited and then posted on the Internet on a UBS website the offering document for CEFL (its Product Supplement), UBS and AY knew that they had no reasonable ground for concealing the 26 material facts set out above other than to defraud prospective investors by inducing them to invest in CEFL and other UBS-created ETN's.

827.  Defendants knew the disclosure of UBS's vast history of financial crimes and other material facts in the Product Supplement for CEFL would send prospective investors in CEFL, including Plaintiff, running for the hills.

828.  Had Plaintiff been informed by UBS in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of indexes and the

criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

829. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

830. UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they inflicted on Plaintiff.

831. As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages to punish Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## COUNT 2: AIDING AND ABETTING SECURITIES FRAUD AGAINST ALL DEFENDANTS

832. Plaintiff re-alleges and incorporates paragraphs 816-831 of this First Amended Complaint by reference as if set forth verbatim.

833.  To establish liability for aiding and abetting fraud, a plaintiff must show "(1) the
existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the
defendant provided substantial assistance to advance the fraud's commission." *JP Morgan
Chase Bank v. Winnick,* 406 F.Supp.2d 247, 252 (S.D.N.Y. 2005) (internal quotation
marks and citations omitted); see also *Franco v. English,* 210 A.D.2d 630, 633, 620
N.Y.S.2d 156, 159 (3d Dep't 1994) (requiring "nexus between the primary fraud,
[defendant's] knowledge of the fraud and what it did with the intention of advancing the
fraud's commission").

834.  The leading opinion interpreting New York law in this respect is *Kolbeck v. LIT America,
Inc.,* 939 F.Supp. 240 (S.D.N.Y. 1996), in which Judge Mukasey concluded that
"[t]ogether, *H2O Swimwear[Ltd. v. Lomas,* 164 A.D.2d 804, 560 N.Y.S.2d 19 (1st Dep't
1990),] and *AA Tube Testing[Co. v. Sohne,* 20 A.D.2d 639, 246 N.Y.S.2d 247 (2d Dep't
1964),] demonstrate that actual knowledge is required to impose liability on an aider and
abettor under New York law." Id. at 246, 246 N.Y.S.2d 247; see also *JP Morgan Chase
Bank,* 406 F.Supp.2d at 252 n. 4 ("[T]he weight of the case law ... defines knowledge in
the context of an aiding and abetting claim as actual knowledge.").

835.  By virtue of  their  high level positions, contractual rights and participation in and/or
awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors
from the Product Supplement for CEFL, UBS and EY Defendants had the power to
influence and control, and did influence and control, directly or indirectly, the decision-
making to omit the 26 material risk factors from the Product Supplement for CEFL.
**Plaintiff's Exhibit F.**

836. In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they helped inflict on Plaintiff.

837. As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL from Plaintiff, UBS, EY and Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if applicable, to punish Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## COUNT 3: FRAUDULENT CONCEALMENT AGAINST ALL DEFENDANTS

838. Plaintiff re-alleges and incorporates paragraphs 832-837 of this First Amended Complaint by reference as if set forth verbatim.

839. A cause of action for fraudulent concealment must be predicated on acts of concealment where the defendant had a duty to disclose material information. *Kaufman,* 307 A.D.2d at 119-20, 760 N.Y.S.2d at 165.

840. We have explained that "[d]uring the course of negotiations surrounding a business transaction, a duty to disclose may arise in two situations: first, where the parties enjoy a fiduciary relationship, and second, where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984).

841. To maintain an action based on fraudulent concealment for damages, it is sufficient to show that the defendant knowingly concealed material information that deceived and damaged Plaintiff. See *Brackett v. Griswold,* 112 N.Y. 454, 467; *Hadcock v. Osmer,* 153 N.Y. 604, 608; *Rice v. Manley,* 66 N.Y. 82, 84; 3 Restatement, Torts, § 525, p. 59; 1 Harper & James on The Law of Torts [1956], § 7.1, pp. 527-528; Prosser on Torts [2 d ed., 1955], § 86, p. 523.)

842. Accordingly, one who fraudulently conceals material information for the purpose of inducing another to act in reliance thereon in a business transaction is liable for the harm caused by the other's justifiable reliance upon the concealment. (3 Restatement, Torts, § 525, p. 59).

843. By virtue of their high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

844. In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations

alleged herein by virtue of their positions as control persons and members of the UBS

Audit Committee, making all Defendants liable for the damages they helped inflict on

Plaintiff.

845. As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of

26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and

Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus

interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if

applicable, to punish Defendants for their insidious actions and inactions and whatever

further relief this Court finds fair and just.

## COUNT 4: FEDERAL SECURITIES FRAUD AGAINST ALL DEFENDANTS

846. Plaintiff re-alleges and incorporates paragraphs 838-845 of this First Amended Complaint

by reference as if set forth verbatim.

847. To maintain an action based on securities fraud for damages it is sufficient to show that

the defendant knowingly concealed material information that deceived and damaged

Plaintiff. See *Brackett v. Griswold,* 112 N.Y. 454, 467; *Hadcock v. Osmer,* 153 N.Y. 604,

608; *Rice v. Manley,* 66 N.Y. 82, 84; 3 Restatement, Torts, § 525, p. 59; 1 Harper &

James on The Law of Torts [1956], § 7.1, pp. 527-528; Prosser on Torts [2 d ed., 1955], §

86, p. 523.)

848. Accordingly, one "who fraudulently makes a misrepresentation...for the purpose of

inducing another to act or refrain from action in reliance thereon in a business

transaction" is liable for the harm caused by the other's justifiable reliance upon the

misrepresentation. (3 Restatement, Torts, § 525, p. 59.).

,

849. By virtue of  their  high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, UBS and EY Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

850. In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they helped inflict on Plaintiff.

851. As a proximate and/or indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and Schwab Defendants are liable to Plaintiff for the economic loss and lost investment opportunities, plus interest, Plaintiff suffered from his investment in CEFL, punitive damages, if applicable, to punish Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## COUNT 5: CIVIL CONSPIRACY TO COMMIT FRAUD AGAINST ALL DEFENDANTS

852. Plaintiff re-alleges and incorporates paragraphs 846-851 of this First Amended Complaint by reference as if set forth verbatim.

853. "A plaintiff may plead the existence of a conspiracy in New York State in order to connect the actions of the individual defendants with an actionable, underlying tort and establish that those actions were part of a common scheme." See *Litras v Litras,* 254 A.D.2d 395, 396 (1998); *Alexander & Alexander of N.Y. v Fritzen,* 68 NY2d at 969; *Brackett v Griswold,* 112 NY at 466-467; *Romano v Romano,* 2 A.D.3d 430, 431-432 (2003).

854. "The allegation of conspiracy carries no greater burden, but also no less, than to assert adequately common action for a common purpose by common agreement or understanding among a group, from which common responsibility derives."

855. In the "Risk Factors" section of the offering document for CEFL, amongst many other intentional concealments/omissions, UBS and EY failed to disclose UBS's long and extensive history of financial crimes, failed to disclose its four-year term of criminal probation and the other material facts set out above as levied on it and administered by the DOJ's Criminal Division.

856. Schwab joined UBS and EY in this civil conspiracy when in 2012 it explored whether it should alert its customers to the special risks inherent in securities like CEFL and then failed to do so. See **Plaintiff's Exhibit M.** Schwab failed to do so because doing so would have upset the several profitable long-term business relationships Schwab had established with UBS.

857. Schwab also failed to alert Plaintiff to UBS's long and extensive history of financial crimes.

858. CEFL was intentionally designed by UBS AG to deliver monetary losses to the purchasers of the CEFL security, while delivering huge monetary gains to UBS AG and its executives.

859. With an intent to deceive and mislead Plaintiff and other investors, UBS and EY intentionally concealed many material facts from the offering document for CEFL and Schwab failed to alert its customers as to the vast history of UBS's vast history of financial crimes.

860. EY's granting to UBS a series of unqualified audit opinions from at least 2004 to 2016 also served to enable the civil conspiracy to defraud Plaintiff.

861. The intentional concealment of 26 material facts from the offering document for CEFL by UBS and EY, and Schwab's failure to alert Plaintiff to the absence of those material facts from the offering document for CEFL and their participation in and encouragement of Plaintiff's investment in CEFL shares are direct and/or indirect evidence of the conscious, reckless, extreme and outrageous conspiratorial conduct by UBS, EY and Schwab, conduct that rises to the level of a civil conspiracy.

862. It is hard, if not impossible, to conceive of risk factors more serious than certain of the intentionally concealed 26 material risk factors UBS, EY and Schwab concealed from Plaintiff.

863. UBS and EY knew that they were concealing the material facts regarding UBS's vast history of financial crimes from the offering document for CEFL when they prepared and posted on the Internet on a UBS website the offering document for CEFL.

864. These unwarranted intentional concealments by UBS, EY and Schwab were made in a deliberate and/or reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

865. Plaintiff relied exclusively on UBS's offering document for CEFL and the fact that UBS is a large international bank when he decided to invest in CEFL.

866. Had Plaintiff been informed by UBS and EY in the offering document for CEFL or by Schwab that UBS had a long history of financial crimes including the criminal manipulation of indexes and the criminal manipulation of security prices, Plaintiff would never have invested in CEFL or any other UBS security.

867. EY conspired with UBS to conceal the 26 material facts from Plaintiff and the public because they feared losing UBS as a client if they did not do so, a client that paid on information and belief EY $83 million for its 2015 audit and in excess of a billion dollars from 2004 to 2017 for their audit, tax and consulting services.

868. EY has served as UBS's public auditor since at least 2004, many years subsequent to UBS AG issued CEFL and was fully aware of UBS's history of financial crimes, including its criminal guilty plea for manipulating LIBOR as described in Note 22 to UBS AG's Annual Report for 2015. See **Plaintiff's Exhibit E.**

869. By virtue of  their  high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, UBS and EY Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

870.   In particular, UBS, EY and Schwab Defendants and named control person Individual
       Defendants had the power to control or influence the particular events and transactions
       giving rise to the securities violations alleged herein, and directly and/or indirectly did
       control or influence the particular events and transactions giving rise to the securities
       violations alleged herein by virtue of their positions as control persons and members of
       the UBS Audit Committee, making all Defendants liable for the damages they inflicted
       on Plaintiff.

871.   As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of
       26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and
       Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus
       interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if
       applicable, to punish Defendants for their insidious actions and inactions and whatever
       further relief this Court finds fair and just.

### COUNT 6: COMMON LAW FRAUD AGAINST ALL DEFENDANTS

872.   Plaintiff re-alleges and incorporates paragraphs 846-871 of this First Amended Complaint
       by reference as if set forth verbatim.

873.   New York's Court of Appeals ruled on December 20, 2011 that private plaintiffs, such as
       investors, can assert common law claims such as fraud, breach of fiduciary duty and
       gross negligence in securities-related litigation.  The ruling is significant because it
       settled the issue that New York's Blue-Sky statute, known as the Martin Act, does not
       preempt common law claims where the claims have a legal basis independent of the
       statute.  As a consequence, plaintiffs will now have greater opportunity to assert common

law claims under New York law in connection with investor or securities disputes. See *Assured Guaranty (UK) Ltd. v. J.P. Morgan Investment Management Inc.*

874. The elements of common law fraud under New York law are: "(1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Haggerty v. Ciarelli & Dempsey,* 374 F. App'x. 92 (2d Cir.2010) (*citing Eurycleia Partners, LP v. Seward & Kissel, LLP,* 12 N.Y.3d 553, 883 N.Y.S.2d 147, 910 N.E.2d 976 (2009)). "Because the elements of common-law fraud in New York are substantially identical to those governing § 10(b), the identical analysis applies." *In re Optimal U.S. Litig.,* 837 F.Supp.2d 244, 2011 WL 6424988 (S.D.N.Y.2011).

875. To state a claim for aiding and abetting fraud under New York law, a plaintiff must plead facts showing (1) the existence of a fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *See Wight v. BankAmerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). "The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud." *JP Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247, 252 (S.D.N.Y.2005). "A defendant provides substantial assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed."

876. In addition to his federal securities fraud claims, Plaintiff hereby alleges common law fraud. In a claim for common law fraud, a plaintiff must allege "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other

party on the misrepresentation or material omission, and injury. See *Lama Holding Co. v
Smith Barney,* 88 NY2d 413, 421 [1996]; see also *Channel Master Corp. v Aluminum
Ltd. Sales,* 4 NY2d 403, 406-407 [1958]).

877.  To state a claim a claim for common law fraud under New York State law, a plaintiff
must allege: "(1) a material representation or omission of fact; (2) made with knowledge
of its falsity; (3) with an intent to defraud; and (4) reasonable reliance on the part of the
plaintiff, (5) that causes damage to the plaintiff." *Haggerty v. Ciarelli & Dempsey,* 374
Fed. Appx. 92, 94 (2d Cir.2010) (citing *Eurycleia Partners, LP v. Seward & Kissel,
LLP,* 12 N.Y.3d 553, 883 N.Y.S.2d 147, 910 N.E.2d 976 (2009)).

878.  UBS and EY Defendant's deliberate concealment of 26 material risk factors from the
Product Supplement for CEFL, in addition to violating New York State common law,
constitutes a massive, long-term, fraud-fraud-on-the-market by allowing UBS to issue
and underwrite its own securities without full public disclosure of its criminal history, its
four-year term of criminal probation, its prospective loss of its license to conduct a
securities business in the U.S. and the revocation of its NPA by the DOJ.

879.  In *Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F. Supp. 256, 259
(S.D.N.Y.1989) the Court ruled that: "An egregious refusal to see the obvious, or to
investigate the doubtful, may in some cases give rise to an inference of gross negligence
which can be the functional equivalent of recklessness." See also *Jordan v. Madison
Leasing Co.,* 596 F. Supp. 707, 710 (S.D.N.Y.1984) ("negligence, if gross, or blindness,
although not equivalent to fraud, is sufficient to sustain an inference of fraud").

880.   The Securities Act of 1933 requires a company to register its securities with the SEC In order to complete registration, the company must include audited financial statements and numerous other material disclosures. If the registration statement was to be found materially misstated, both the company and its auditors may be held liable.

881.   UBS, EY and Schwab directly and/or indirectly, singly or in concert with others, in connection with the issuance, underwriting, marketing, sale and distribution of UBS securities including CEFL, by use of any means or instrumentality of interstate commerce or of the mails or of the Internet, knowingly and with deliberate and/or reckless disregard for the truth: (a) employed devices, schemes, or artifices to defraud Plaintiff; (b) obtained money by means of the concealment of 26 material facts from investors, including Plaintiff, needed to make an informed decision with regard to whether or not to purchase CEFL; (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon purchasers of the shares of CEFL including the Plaintiff.

882.   By failing to disclose UBS's vast history of financial crimes and the many other material omissions/concealments set out above, UBS, EY and Schwab fraudulently induced Plaintiff to invest in CEFL and are thereby responsible for his economic loss.

883.   UBS, EY and Schwab knew that disclosing UBS's vast history of crimes and other material omissions/concealments in the offering document for CEFL would substantially reduce investor interest in CEFL and have a negative impact on the value of the securities UBS had already sold to the public.

884. With a thoroughgoing deliberate intent to deceive and defraud and mislead Plaintiff and other investors, UBS, EY and Schwab intentionally failed to disclose the vast history of UBS's financial crimes and other material facts to Plaintiff.

885. When UBS prepared and EY audited and then posted on the Internet on a UBS website the offering document for CEFL, UBS and AY knew that they had had no reasonable ground for concealing the 26 material facts set out above other than to defraud prospective investors.

886. UBS and EY knew the inclusion of UBS's vast history of financial crimes and other material facts would send prospective investors in CEFL, including Plaintiff running for the hills.

887. These unwarranted concealments were intentional and made in a deliberate and/or reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

888. Had Plaintiff been informed by UBS and EY in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

889. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

890. By virtue of  their  high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors

from the Product Supplement for CEFL, UBS and EY Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

891.   In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they helped inflict on Plaintiff.

892.   As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if applicable, to punish Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## COUNTS 7 & 8: NEGLIGENCE AND NEGLIGENT CONCEALMENT AGAINST ALL DEFENDANTS

893.   Plaintiff re-alleges and incorporates paragraphs 872-892 of this First Amended Complaint by reference as if set forth verbatim.

894.   A negligence cause of action traditionally consists of four elements: (1) the existence of a duty between the plaintiff and the defendant; (2) a failure to fulfill that duty adequately; (3) an injury to one who is owed the duty; and (4) a causal relationship between the

failure of the duty and the resulting injury. See *Mandarin Trading Ltd. v. Wildenstein,*

944 N.E.2d at 1108, *Frazier v. United States,* 481 F. Supp. 645, 646-47 (N.D. Cal. 1979);

*Barr v. County of Albany,* 69 App. Div. 2d 914, 915, 415 N.Y.S.2d 471, 473 (3d Dep't

1979), modified, 50 N.Y.2d 247, 406 N.E.2d 481, 428 N.Y.S.2d 665 (1980). See

also *Solomon ex rel. Solomon v. City of New York,* 66 N.Y.2d 1026, 1027, 489 N.E.2d

1294, 1294, 499 N.Y.S.2d 392, 392 (1985); see also *King v. Crossland Sav. Bank,* 111

F.3d 251, 259 (2d Cir.1997).

895. To establish a prima facie case of negligence under New York law, "a plaintiff must

demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and

(3) injury proximately resulting therefrom." *Solomon ex rel. Solomon v. City of New*

*York,* 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294, 499 N.Y.S.2d 392, 392 (1985); see

also *King v. Crossland Sav. Bank,* 111 F.3d 251, 259 (2d Cir.1997).

896. Plaintiff alleges that Defendants owed him a duty to provide correct information in the

Product Supplement for CEFL, that Defendants breached that duty by

omitting/concealing 26 material facts from the offering document for CEFL, which facts

would greatly expand the extremely risky nature of an investment in CEFL, and that

Plaintiff reasonably relied on the information Defendants did provide. A fiduciary duty is

more than sufficient to give rise to a duty for negligent misrepresentation. See *CMMF,*

*LLC v. J.P. Morgan Inv. Mgmt. Inc.,* 915 N.Y.S.2d 2, 6 (N.Y. App.Div. 2010).

897. In *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536 (1985), the Court held

that a party without privity, as here, can recover from auditors provided the party is

within a limited class of foreseen users, and suggested in dictum that an auditors' liability

be extended to all foreseeable users of negligently prepared financial statements.

898. It unlawful in the offer or sale of any securities, directly and/or indirectly, to obtain

money or property by means of any untrue statement of a material fact or any omission to

state a material fact necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading. See *Aaron v. SEC,* 446 U.S.

680, 696-97 (1980).

899. A misrepresentation or omission is material, as here, if there is a substantial likelihood

that a reasonable investor would consider it important in making an investment decision.

See *Basic Inc. v. Levinson,* 485 U.S. 234, 231-32 (1988).

900. As a large and highly experienced issuer and underwriter of securities UBS as, here, had

a duty to disclose all material information necessary to make the offering document for

CEFL not misleading and EY, as UBS's international and domestic public auditor, had

the same duty and Schwab as a giant brokerage firm has the very similar duty to alert its

customers to the substantial risks inherent in investing in CEFL and other UBS securities.

901. UBS, EY and Schwab failed to exercise their duty to disclose UBS's vast history of

financial crimes to Plaintiff and other investors and by so doing induced Plaintiff to

invest in CEFL and subsequently lose most of his life savings.

902. Had Plaintiff been informed by UBS and EY in the offering document for CEFL that

UBS had a long history of financial crimes including the criminal manipulation of

indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never

have invested in CEFL or any other UBS security.

903. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

904. By virtue of their high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

905. In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they helped inflict on Plaintiff.

906. As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if applicable, to punish Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## COUNT 9: BREACH OF FIDUCIARY DUTIES AGAINST ALL DEFENDANTS

907.   Plaintiff re-alleges and incorporates paragraphs 893-906 of this First Amended Complaint by reference as if set forth verbatim.

908.   To state a claim for breaches of fiduciary duty a plaintiff must allege that the defendant owed him a fiduciary duty and that the defendant breached that duty. See *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010) ("A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."

909.   "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169; accord *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir.2005); see also *Wechsler v. Bowman*, 285 N.Y. 284, 291, 34 N.E.2d 322, 326 (1941) ("Anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the *cestuis que trust.*").

910.   With respect to the second requirement, "[a]lthough a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." *Kaufman*, 307 A.D.2d at 125, 760 N.Y.S.2d at 169.

911.   Plaintiff alleges that Defendants breached their fiduciary duties to Plaintiff by knowingly or grossly negligently omitting 26 material facts from the offering document for CEFL. See also *Arnold v. Society for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1276-77 (Del.1994) A

182

number of New York and Delaware court decisions have recognized the existence of fiduciary disclosure obligations.

912.   For many of the same facts set forth above regarding his fraudulent inducement, fraudulent concealment, security fraud, civil conspiracy and negligence claims, Plaintiff alleges that UBS and EY Defendants breached their fiduciary duties to Plaintiff by omitting 26 material risk factors from the offering document for CEFL and Schwab did as well by failing to alert Plaintiff to the extreme risks involved in investing in CEFL, a security issued and underwritten by UBS, their undisclosed business partner.

913.   In order to recover from an auditor under common-law, a plaintiff must prove: Duty of care; Breach of Duty; and Losses. See *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 207 (1976) (federal securities law subjects accountants to liability for fraud based on "willing, knowing, or purposeful conduct"); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F. Supp. 112, 131 (S.D.N.Y. 1974) (accountants owe common-law duty to third parties to act without fraud in the preparation of financial statements), aff'd in part and rev'd in part, 540 F.2d 27 (2d Cir. 1976); *Fidelity & Deposit Co. v. Atherton,* 47 N.M. 443, 449, 144 P.2d 157, 161 (1943) (accountants who knew or should have known their employer intended to display financial statements to third persons owe those third persons a duty not to act fraudulently).

914.   Through the Securities and Exchange Act of 1934, ch. 404, § 1, 48 Stat. 881, codified as amended at 15 U.S.C. §§ 78a-78kk (1982), Congress attempted to promulgate standards of conduct for participants in the securities markets to prevent repetition of the chaos of

the early 1930's. See *Vernava, Responsibility of the Accountant Under the Federal Securities Exchange Act of 1934,* 6 J. Corp. L. 317, 318 (1981).

915.   Investors relying on intentionally or knowingly misleading statements to their detriment may employ § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), in conjunction with Rule l0b-5, 17 C.F.R. § 240.10b-5 (1984), to recover for such statements from accountants.

916.   The modern accounting profession is most capable of adequately distributing risk of making negligent misstatement to non-privy third party through professional malpractice insurance. There is little economic justification for allowing auditors to escape traditional negligence liability since the present-day accounting industry is typically fiscally sound.

917.   The changing function of accountants in modern business presents another compelling argument for the imposition of liability on accountants without privity.

918.   Today, commercial and private investors use financial statements to evaluate business opportunities, and federal securities laws require filings and distribution of such statements to stockholders, see Securities Act of 1933, § 7, schedule A & B, 15 U.S.C. §§ 77g and 77aa.

919.   As a large and experienced issuer of securities UBS had a fiduciary duty to disclose all material information necessary to make the offering document for CEFL not misleading and EY, as UBS's auditor, had the same fiduciary duty. See *Smith v. Gorkom,* 488 A.2d 858.

920. By failing to disclose UBS's financial crimes along with 25 other material risk factors in the offering document for CEFL, the named executives and partners of UBS, EY and Schwab breached their fiduciary duties they owed to Plaintiff.

921. These named executives and partners of UBS and Schwab and EY knew that disclosing UBS's vast history of crimes and other risk factors would substantially reduce investor interest in CEFL and have a negative impact on the value of CEFL and other UBS securities.

922. With a thoroughgoing deliberate intent to deceive and thus defraud Plaintiff, UBS, EY and Schwab intentionally concealed UBS's financial crimes and 25 other material risk factors from the offering document for CEFL.

923. When UBS prepared and AY audited the UBS offering document for CEFL and the UBS financial statements, and UBS posted on the Internet on a UBS website the Product Supplement for CEFL, UBS and AY knew that they had had no reasonable ground for concealing the 26 material risk factors from the Product Supplement for CEFL.

924. UBS and EY knew the inclusion of UBS's crimes in the offering document for CEFL would send prospective investors in CEFL, including Plaintiff, running for the hills.

925. These unwarranted concealments were intentional and made in a deliberate and/or reckless and deceptive manner to induce Plaintiff and others to invest in CEFL.

926. Had Plaintiff been informed by UBS and EY in the offering document for CEFL that UBS had a long history of financial crimes including the criminal manipulation of

indexes and the criminal manipulation of foreign exchange markets, Plaintiff would never have invested in CEFL or any other UBS security.

927. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss.

928. By virtue of their high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

929. In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they helped inflict on Plaintiff.

930. As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if

applicable, to punish Defendants for their insidious actions and inactions and whatever

further relief this Court finds fair and just.

## COUNT 10: AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES AGAINST ALL DEFENDANTS

931.  Plaintiff re-alleges and incorporates paragraphs 907-930 of this First Amended Complaint

by reference as if set forth verbatim.

932.  To state a claim for aiding and abetting a breach of fiduciary duty under New York law, a

plaintiff must allege the primary violation, and that the aider and abettor knew about the

breach. Harbert, on the other hand, "assumes" that New York law governs Plaintiffs'

aiding and abetting claim. New York courts in this district have described aiding and

abetting claims as+ "garden-variety torts" that are subject to New York's "interest

analysis" test.18 See *Solow v. Stone,* 994 F. Supp. 173, 177 (S.D.N.Y. 1998), aff'd, 163

F.3d 151 (2d Cir. 1998); see also *LaSala v. Bank of Cyprus Pub. Co. Ltd.,* 510 F. Supp.

2d 246, 266 n. 7 (S.D.N.Y. 2007) ("[The] normal interest analysis is appropriate even for

plaintiffs' aiding and abetting claim.").

933.  New York's "interest analysis" test "looks 'almost exclusively' at the parties' domiciles

and the locus of the tort." See *Krock v. Lipsay,* 97 F.3d 640, 646 (2d Cir. 1996)). Under

this standard, New York law applies to most of Plaintiff's claims because the tortious

conduct primarily occurred in New York, North Carolina and California and several

where the parties are domiciled.

934.  Because a federal court sitting in diversity applies the choice-of-law analysis of its forum

state, New York choice-of-law principles apply. See *Klaxon Co. v. Stentor Elec. Mfg.

Co.,* 313 U.S. 487, 496-97 (1941); *Fed. Hous. Fin. Agency v. Deutsche Bank AG,* No. 11

Civ. 6192 DLC, 2012WL 5471864, at *4 (S.D.N.Y. Nov. 12, 2012). Case 1:12-cv-01244-AJN Document 107 Filed 02/15/13.

935. To establish liability for aiding and abetting a breach of fiduciary duty, a plaintiff must show "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *JP Morgan Chase Bank v. Winnick,* 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005); see also *Franco v. English,* 210 A.D.2d 630, 633, 620 N.Y.S.2d 156, 159 (3d Dep't 1994) (requiring "nexus between the primary fraud, [defendant's] knowledge of the fraud and what it did with the intention of advancing the fraud's commission").

936. Under New York law, to establish knowing participation by EY and Schwab defendants, Plaintiffs must also show that EY and Schwab gave UBS "substantial assistance" in breaching his fiduciary duty to his clients. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. However, the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." *Kaufman,* 307 A.D.2d at 126, 760 N.Y.S.2d at 170; see also In Re *Sharp,* 403 F.3d at 50-51.

937. By virtue of  their  high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, UBS and EY Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

938.  In particular, UBS, EY and Schwab Defendants and named control person Individual Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and members of the UBS Audit Committee, making all Defendants liable for the damages they helped inflict on Plaintiff.

939.  As a proximate, direct and indirect result of UBS's, EY's and Schwab's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS, EY and Schwab are liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if applicable, to punish Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## COUNT 11: FAILURE TO SUPERVISE AGAINST ALL  DEFENDANTS

940.  Plaintiff re-alleges and incorporates paragraphs 931-939 of this First Amended Complaint by reference as if set forth verbatim.

941.  The Securities and Exchange Acts of 1933 and 1934 require banks and broker-dealers like Schwab and UBS and public auditors to reasonably supervise the conduct and affairs of their employees so as to prevent violations of the federal and state securities laws.

942.  The SEC has repeatedly emphasized that the "responsibility of broker-dealers to supervise liability for failure to supervise and unsuitability arises under Section 15(b)(4)(E) and (b)(6) of the Securities and Exchange Act of 1934.

943. After considering warnings on controversial ETN's, Schwab Defendants failed to establish a procedure that would alert their customers, including Plaintiff, to the extreme risks inherent in investing in CEFL.

944. A less greedy brokerage firm like Bank of America Merrill Lynch only allows its more than 17,300 brokers to sell ETN's including CEFL to customers with at least $10 million in assets and Raymond James Financial has prohibited its 5,400 brokers from selling ETN's including CEFL since 2010. **Plaintiff's Exhibit M.**

945. Schwab also failed to supervise Plaintiff's customer account by failing to warn Plaintiff that investing in CEFL was unsuitable for an elderly person with limited retirement income and financial resources.

946. In fact, Schwab encouraged Plaintiff to invest in CEFL by allowing him to invest in CEFL on margin, thereby magnifying Plaintiff's prospective losses from investing in a security that was already highly leveraged.

947. Essentially, the very essence of broker-dealer supervision is to ensure that brokers comply with suitability obligations and that they do not succumb to the ever-present conflict of placing their interests ahead of their customers.

948. Having relied exclusively on the offering document for CEFL and the fact that UBS was a large international bank, Plaintiff invested in CEFL and suffered a substantial monetary loss, which failed to supervise its executives and employees. EY Global and the rest of the EY named entities also failed to supervise their employees.

949. As a proximate, direct and indirect result of Defendants failure to supervise their employees operations and by failing to alert Plaintiff to the 26 undisclosed material risks inherent in purchasing shares of CEFL, and by Schwabs failure to disclose their long-term business association with UBS (a serious conflict of interest), and by Schwabs failure to supervise Plaintiff's brokerage account by allowing Plaintiff to invest his life savings in CEFL and by granting him permission to invest in the highly leveraged CEFL shares on margin., Defendants are liable to Plaintiff for the actual damages and lost opportunities plus interest Plaintiff suffered from his investment in CEFL, plus punitive damages, if applicable, to punish Defendants for their insidious actions and inactions and for whatever further relief this Court finds fair and just.

## COUNT 12: UNJUST ENRICHMENT AGAINST ALL UBS DEFENDANTS

950. Plaintiff re-alleges and incorporates paragraphs 939-949 of this First Amended Complaint by reference as if set forth verbatim.

951. To state a claim for unjust enrichment, a plaintiff must show "(1) the other party was enriched, (2) at that party's expense, and (3) it is against equity and good conscience to permit the other party to retain what is sought to be recovered." See *Trotta v. Ollivier,* 933 N.Y.S.2d 66, 68 (N.Y. App. Div. 2011). See also *Mazzaro de Abreu v. Bank of America Corp.,* 525 F. Sup. 2d 381, 397 (S.D.N.Y. 2007) and *Citibank, N.A. v Walker,* 12 AD3d 480, 481 [2d Dept 2004].

952. Plaintiff alleges that UBS Defendants, jointly and singularly, directly and indirectly, engaged in conduct that led to the concealment 26 material risk factors from the offering

document for CEFL, conduct that induced Plaintiff to invest in CEFL, which investment served to unjustly enrich the Defendants and thereby caused Plaintiff to suffer what was for him a substantial economic loss and lost investment opportunities.

953. "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered" *Paramount Film Distrib. Corp. v State of New York,* 30 NY2d 415, 421 [1972]).

954. As set forth above, the UBS Defendants unjustly enriched themselves at Plaintiff's expense by failing to disclose 26 material facts in the offering document for CEFL and by creating, issuing, underwriting, promoting, marketing, and selling to Plaintiff through Schwab the defective security called CEFL, a defective security intentionally created by UBS AG to defraud purchasers of CEFL including Plaintiff and provide the UBS Defendants with the fruits of Plaintiff's financial losses.

955. By virtue of  their  high level positions, contractual rights and participation in and/or awareness and/or intimate knowledge of the 26 intentionally omitted material risk factors from the Product Supplement for CEFL, UBS Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making to omit the 26 material risk factors from the Product Supplement for CEFL.

956. In particular, IBS Defendants had the power to control or influence the particular events and transactions giving rise to the securities violations alleged herein, and directly or indirectly did control or influence the particular events and transactions giving rise to the securities violations alleged herein by virtue of their positions as control persons and

members of the UBS Audit Committee, making all UBS Defendants liable for the damages they inflicted on Plaintiff.

957.   As a proximate, direct and indirect result of UBS's concealment of 26 material facts regarding CEFL and other torts and wrongdoings, UBS is liable to Plaintiff for his economic loss and lost investment opportunities plus interest that Plaintiff suffered from his investment in CEFL, and punitive damages, if applicable, to punish UBS Defendants for their insidious actions and inactions and whatever further relief this Court finds fair and just.

## REQUEST FOR DECLARATORY JUDGMENT & INJUNCTIVE RELIEF

958.   Plaintiff re-alleges and incorporates paragraphs 949-957 of this First Amended Complaint by reference as if set forth verbatim.

959.   Declaratory and injunctive relief is warranted because the dispute between Plaintiff and Defendants is imminent and the disputed predatory actions and inactions, jointly and singularly, of the Defendants is ongoing and relief is necessary to protect the investing public from the predatory conduct of the Defendants and the investing public has no adequate remedy at law.

960.   Further, there exists nothing in law or fact that would serve to mitigate Defendants abominable conduct.

961.   Accordingly, Plaintiff respectfully requests this Court take action to protect the investing public from the predatory conduct of the Defendants, something the U.S. regulatory

authorities, even though they have fined UBS billions of dollars, have been reluctant to do.

962. In determining whether declaratory and injunctive relief is warranted under the federal securities laws, courts have examined whether "there is a reasonable likelihood of further violation in the future." *Securities & Exch. Comm'n v. Monarch Fund,* 608 F.2d 938, 943 (2nd Cir. 1979)."

963. At page 67 of UBS AG's 2015 Annual Report UBS states: UBS is "subject to a large number of claims, disputes, legal proceedings and government investigations and we anticipate that our ongoing business activities will give rise to such matters in the future." Another UBS and EY "admission-against interests." See **Plaintiff's Exhibit E.**

964. This request of the Court to enjoin UBS from doing business in the U.S. is made necessary because the DOJ, the SEC and other regulatory authorities have fined UBS billions of dollars for UBS's commission of almost every serious financial crime imaginable have failed to expel UBS from the U.S. securities markets, thus leaving UBS free to defraud U.S. investors.

965. This request of the Court to order EY would extend to other external auditors to include in the "Risk Factors" sections of securities prospectuses the issuers' criminal history is made necessary because other external auditors are failing to do so.

966. This request of the Court to order Schwab and other broker-dealers to alert prospective investors to the risks inherent in investing in securities that have been found defective is made necessary because most broker-dealers, including Schwab, are failing to do so.

967. In UBS AG's 2015 Annual Report under the heading "Limitations on Enforcement of U.
S. Laws Against Its Management and Others" UBS states that most of its directors and
executive officers are resident outside the U.S., and all or a substantial portion of their
assets are located outside the U.S., thus making it difficult to serve legal process on them,
and there is doubt as to the enforceability in Switzerland, in original actions or in actions
for enforcement of judgments of U.S. courts, of liabilities based solely on the securities
laws of the U.S.

968. In its shelf registration statement, UBS AG brags that its conduct lies beyond the reach of
U.S. law, which should be construed as "an-admission-against-interest."

969. Given the fact that at least six criminal waivers were granted to UBS by the DOJ, the
UBS AG and UBS Group AG admissions in their annual reports that future UBS crimes
are a distinct possibility, the highly evolved UBS criminal corporate culture that rewards
financial criminality and the fact that an NPA issued to UBS by the DOJ was revoked by
the DOJ because UBS had admitted to committing new crimes, Plaintiff's request for this
Court to revoke UBS's license to engage in the securities business in the U.S. seems
lawfully justified.

970. As this Court has noted, the primary factor in deciding whether past violations, now
terminated, constitute a proper basis upon which to find a reasonable likelihood that
defendants will commit further violations is the nature of the past violations. *SEC v.
Manor Nursing Centers, Inc.,* supra, 458 F.2d at 1100-01; *SEC v. Culpepper,* supra, 270
F.2d at 250; *United States v. W. T. Grant Co.*, 345 U.S. at 633.

971.  It is undisputed that UBS's vast history of past and continuing financial crimes places it at the very apex of those corporations guilty of financial wrongdoing.

972.  The likelihood that UBS will commit future financial crimes in the U.S. is all but assured as admitted at page 67 of UBS AG's 2015 Annual Report where UBS AG states: UBS AG is "subject to a large number of claims, disputes, legal proceedings and government investigations and we anticipate that our ongoing business activities will give rise to such matters in the future." Another "admission-against interests." See **Plaintiff's Exhibit E.**

973.  Where violations of the securities laws have been committed in the past by a corporation through its officers, the nature of the corporation and its officers is an important consideration in determining the likelihood of further violations. See *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d at 1306; *SEC v. Mono-Kearsarge Consol. Mining Co.,* 167 F.Supp. 248, 259.

974.  This Court has held that "[i]t was entirely proper to issue an injunction" when, inter alia, "appellants continued to violate the federal securities laws even after a consent decree had been entered enjoining them from such conduct." *SEC v. Koenig,* 469 F.2d 198, 202 (2 Cir. 1972).

975.  Accordingly, Plaintiff respectfully requests that this Honorable Court use its vested powers to protect U.S. investors from the criminal predations of the UBS Defendants.

## **PRAYER FOR RELIEF**

976.  Plaintiff respectfully asks this Court to find for Plaintiff and against UBS, EY and Schwab corporate and Individual Defendants. Plaintiff requests: (a) declaratory and

injunctive relief as set out above; (b) actual economic and lost opportunity damages with accrued interest and costs; (c) punitive damages of $100,000,000; and (d) such other relief, at law, or in equity, general or special that this Court deems appropriate under the extraordinary circumstances set forth herein.

Dated: January 8, 2018

Robert Zimmerman, *Pro Se*
329 Sandpiper Lane
Hampstead, NC 28443
Tel: 910-232-8990
Email: BobZimmerman@usa.com

# Exhibit A

6/6/2017
Case 1:17-cv-04503-JMF   Document 65-1   Filed 01/10/18   Page 199 of 228
UBS just settled 'crap' and 'vomit' suit - Business Insider

# BUSINESS INSIDER

# UBS just settled with a hedge fund over deals its staff called 'crap' and 'vomit'



JONATHAN MARINO
SEP. 1, 2015, 1:26 PM

Investment bank UBS has settled with a hedge fund that accused it of selling securities it knew were on the precipice of a downfall, just hours before a potentially damaging trial for the bank was set to begin.

A source confirmed to Business Insider that UBS settled with Pursuit Partners, a Connecticut hedge fund, but declined to provide specifics.

In emails sent between bank employees, staff conducting 2007 collateralized-debt-obligation trades between UBS and hedge fund Pursuit Partners refer to securities being dealt as "crap" and "vomit," according to court documents.

Men hold their noses on a boat traveling down a polluted waterway.

*REUTERS*

From July through August 2007, UBS sold about $45 million in CDOs to Pursuit Partners. Initially, Pursuit Partners ............................ from the suit.

"UBS knew, at least as early as July 2007, based upon private communications by and between UBS and Moody's, that Moody's no longer believed that CDO notes of the type that UBS later sold to Pursuit deserved an 'investment-grade' rating," the suit alleges.

But the suit also cites emails between UBS staffers that really drive the point home.

"Kewl," wrote UBS trader Evan Malik to Hugh Corcoran in an August 2007 email that began with the bankers talking over company email about wine purchases. "Sold some more crap to pursuit."

In another email, UBS employee Tim Goodell said to Jared Menzel that the securities were "vomit" — this in September 2007.

# Exhibit B



**U.S. Department of Justice**

Criminal Division

_____

*Washington, D.C. 20530*

December 18, 2012

Gary R. Spratling, Esq.                              David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP                          Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000                       1050 Connecticut Ave NW
San Francisco, CA 94105                              Washington, DC 20036

      **Re:    UBS AG**

Dear Mr. Spratling and Mr. Burns:

      On the understandings specified below, the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") will not criminally prosecute UBS AG and its subsidiaries and affiliates (collectively, "UBS"), with the exception of UBS Securities Japan Co., Ltd. ("UBS Securities Japan"), for any crimes (except for criminal tax violations, as to which the Fraud Section cannot and does not make any agreement) related to UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate (known as LIBOR), the Euro Interbank Offered Rate (known as EURIBOR), and the Tokyo InterBank Offered Rate (known as TIBOR), as described in the attached Appendix A, which is incorporated in this Non-Prosecution Agreement ("Agreement").[1]

      It is understood that UBS admits, accepts, and acknowledges responsibility for the conduct set forth in Appendix A and agrees not to make any public statement contradicting Appendix A.

      The Fraud Section and UBS further agree that as a term and condition of this Agreement, UBS Securities Japan will plead guilty to one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, in accordance with the Plea Agreement that is attached as Appendix B, which is incorporated in this Agreement.

      The Fraud Section enters into this Agreement based, in part, on its consideration of the following factors:

_____

      [1]     Although not addressed in Appendix A, this Agreement also encompasses UBS's submissions for the additional benchmark rates listed in Appendix C, which is also incorporated in this Agreement. The rates listed in Appendix C are the focus of an ongoing investigation and, for that reason, Appendix C will be held in confidence by the parties to this Agreement and will not be made available to the public until the Department of Justice, in its sole discretion, determines that such information can and should be disclosed.

(a)     UBS has made a timely, voluntary, and complete disclosure of the facts described in Appendix A.

(b)     UBS conducted a thorough internal investigation of the misconduct described in Appendix A, reported all of its findings to the Fraud Section, cooperated fully with the Fraud Section's investigation of this matter, and sought to effectively remediate any problems it discovered.

1.     Although UBS was not the first bank to provide the Fraud Section with helpful information, and its self-disclosure and cooperation commenced after the Fraud Section had obtained certain evidence implicating UBS and, in particular, efforts to manipulate Yen benchmarks, UBS made its self-disclosure before the Fraud Section had contacted UBS regarding the criminal investigation.

2.     UBS provided highly valuable information that significantly expanded and advanced the criminal investigation. UBS's cooperation has been exceptional in many important respects. Through its internal investigation, UBS has sought to uncover and disclose evidence of misconduct without restricting the focus of its investigation to issues the government had already identified. Over the past two years, it has made substantial efforts to assist the government in obtaining access to sources of evidence located abroad, including documents and witnesses. UBS's extensive cooperation is a particularly significant and favorable consideration in the Fraud Section's decision to enter into this Agreement.

3.     The Fraud Section received compelling information from UBS, as well as from regulatory agencies, demonstrating that in recent years, under its new senior leadership, UBS has made important and positive changes in its compliance, training, and overall approach to ensuring its adherence to the law. Moreover, UBS appears to have substantially improved the manner in which it responds to regulatory and criminal investigations and to its discovery of potential misconduct, as the Department of Justice has observed in this matter.

a.     In order to ensure that misconduct of this nature does not recur, UBS has implemented a modified and significantly enhanced control framework for its LIBOR submission process and has expanded that program to encompass all other benchmark interest rate submissions. UBS has also implemented significant remedial measures in response to the misconduct discovered during this investigation.

2

      b.    The Fraud Section has also received favorable reports from the Swiss Financial Market Supervisory Authority ("FINMA") and the Japan Financial Services Authority (the "JFSA") describing, respectively, (1) positive progress that UBS has made in its approach to compliance and enforcement, and (2) UBS Securities Japan's effective implementation of the remedial measures previously imposed by the JFSA based on its findings relating to the attempted manipulation of Yen benchmarks.

This recent record is commendable, and partially mitigates the adverse implications of UBS's prior history of misconduct.

This Agreement does not provide any protection against prosecution for any crimes except as set forth above, and applies only to UBS and not to any other entities or to any individuals, including but not limited to employees or officers of UBS. The protections provided to UBS shall not apply to any acquirer or successor entities unless and until such acquirer or successor formally adopts and executes this Agreement.

This Agreement shall have a term of two years from the date of this Agreement, except as specifically provided below. It is understood that for the two-year term of this Agreement, UBS shall: (a) commit no United States crime whatsoever; (b) truthfully and completely disclose non-privileged information with respect to the activities of UBS, its officers and employees, and others concerning all matters about which the Fraud Section inquires of it, which information can be used for any purpose, except as otherwise limited in this Agreement; (c) bring to the Fraud Section's attention all potentially criminal conduct by UBS or any of its employees that relates to violations of U.S. laws (i) concerning fraud or (ii) governing securities and commodities markets; and (d) bring to the Fraud Section's attention all criminal or regulatory investigations, administrative proceedings or civil actions brought by any governmental authority in the United States against UBS or its employees that alleges fraud or violations of the laws governing securities and commodities markets.

Until the date upon which all investigations and prosecutions arising out of the conduct described in this Agreement are concluded, including the investigations of the matters listed in Appendix C, whether or not they are concluded within the two-year term specified in the preceding paragraph, UBS shall, in connection with any investigation or prosecution arising out of the conduct described in this Agreement: (a) cooperate fully with the Fraud Section, the Federal Bureau of Investigation, and any other law enforcement or government agency designated by the Fraud Section; (b) assist the Fraud Section in any investigation or prosecution by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding; (c) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent or employee at any meeting or interview or before the grand jury or at any trial or other court proceeding; and (d) provide the Fraud Section, upon request, all non-privileged information, documents, records, or other tangible evidence about which the Fraud Section or any designated law enforcement or

government agency inquires.

It is understood that, if the Fraud Section determines in its sole discretion that UBS has committed any United States crime subsequent to the date of this Agreement, or that UBS has given false, incomplete, or misleading testimony or information at any time, or that UBS has otherwise violated any provision of this Agreement, UBS shall thereafter be subject to prosecution for any federal violation of which the Fraud Section has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against UBS, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the term of the Agreement plus one year. Thus, by signing this Agreement, UBS agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed shall be tolled for the term of this Agreement plus one year.

It is understood that, if the Fraud Section determines in its sole discretion that UBS has committed any United States crime after signing this Agreement, or that UBS has given false, incomplete, or misleading testimony or information at any time, or that UBS has otherwise violated any provision of this Agreement: (a) all statements made by UBS or any of its employees to the Fraud Section or other designated law enforcement agents, including Appendix A, and any testimony given by UBS or any of its employees before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any criminal proceeding brought against UBS; and (b) UBS shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads derived therefrom are inadmissible or should be suppressed. By signing this Agreement, UBS waives all rights in the foregoing respects.

The decision whether any public statement contradicts Appendix A and whether it shall be imputed to UBS for the purpose of determining whether UBS has breached this Agreement shall be in the sole discretion of the Fraud Section. If the Fraud Section determines that a public statement contradicts in whole or in part a statement contained in Appendix A, the Fraud Section shall so notify UBS, and UBS may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. This paragraph is not intended to apply to any statement made by any former UBS officers, directors, or employees. Further, nothing in this paragraph precludes UBS from taking good-faith positions in litigation involving a private party that are not inconsistent with Appendix A. In the event that the Fraud Section determines that UBS has breached this Agreement in any other way, the Fraud Section agrees to provide UBS with written notice of such breach prior to instituting any prosecution resulting from such breach. UBS shall, within 30 days of receipt of such notice, have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions UBS has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to institute a prosecution.

It is understood that UBS, by a branch or agency located in Connecticut, agrees to pay a monetary penalty of $500,000,000.  UBS must pay this sum to the United States Treasury within ten days of the sentencing of UBS Securities Japan, in connection with its guilty plea and plea agreement attached as Appendix B.  The parties agree that any criminal penalties that might be imposed by the Court on UBS Securities Japan in connection with its guilty plea and plea agreement will be deducted from the $500,000,000 penalty agreed to under this Agreement.  UBS acknowledges that no tax deduction may be sought in connection with this payment.

It is further understood that, as noted above, UBS has strengthened its compliance and internal controls standards and procedures, and that it will further strengthen them as required by FINMA, the U.S. Commodity Futures Trading Commission, the JFSA, the United Kingdom Financial Services Authority, and any other regulatory or enforcement agencies that have addressed the misconduct set forth in Appendix A.  In addition, in light of active investigations by various regulators of the conduct described in Appendix A and the role that regulators such as those listed above will continue to play in reviewing UBS's compliance standards, the Fraud Section has determined that adequate compliance measures have been and will be established.  It is further understood that UBS will report to the Fraud Section, upon request, regarding its remediation and implementation of any compliance program and internal controls, policies, and procedures that relate to its submission of benchmark interest rates.  Moreover, UBS agrees that it has no objection to any regulatory agencies providing to the Fraud Section any information or reports generated by such agencies or UBS relating to the submissions of benchmark interest rates.  Such information and reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the information and reports could discourage cooperation, impede pending or potential government investigations, and thus undermine the objectives of the reporting requirement.  For these reasons, among others, the information and reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

It is further understood that this Agreement does not bind any federal, state, local, or foreign prosecuting authority other than the Fraud Section.  The Fraud Section will, however, bring the cooperation of UBS to the attention of other prosecuting and investigative authorities, if requested by UBS.

It is further understood that UBS and the Fraud Section may disclose this Agreement to the public, except with respect to Appendix C as set forth above.

With respect to this matter, from the date of execution of this Agreement forward, this Agreement supersedes all prior, if any, understandings, promises and/or conditions between the Fraud Section and UBS.  No additional promises, agreements, and conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

Fraud Section and UBS.  No additional promises, agreements, and conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

Sincerely,

DENIS J. McINERNEY
Chief, Fraud Section
Criminal Division
United States Department of Justice

By: _____
Daniel A. Braun, Deputy Chief
Luke B. Marsh, Trial Attorney

AGREED AND CONSENTED TO:

UBS AG

By: _____          _____
Markus U. Diethelm                                    Date
Group General Counsel, UBS AG

APPROVED:

By: _____
Gary R. Spratling, Esq.                            Date
David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP
Attorneys for UBS AG

6

# Exhibit C

424B3 1 d816529d424b3.htm DEBT AND WARRANTS PROSPECTUS DATED NOVEMBER 14, 2014

Table of Contents

**Filed Pursuant to Rule 424(b)(3)**
**Registration Statement Nos. 333-200212**
**333-200212-04**

PROSPECTUS

# UBS AG
## DEBT SECURITIES AND WARRANTS

### UBS Americas Inc.
Debt Securities
Fully and Unconditionally Guaranteed by UBS AG

UBS AG from time to time may offer to sell debt securities and warrants.

UBS AG may offer and sell these securities to or through one or more underwriters, dealers and agents, including the firms named below, or directly to purchasers, on a delayed or continuous basis.

This prospectus describes some of the general terms that may apply to these securities and the general manner in which they may be offered. The specific terms of any securities to be offered, and the specific manner in which they may be offered, will be described in the applicable prospectus supplement.

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The securities are not deposit liabilities of UBS AG and are not insured by the United States Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction.

UBS AG may use this prospectus in the initial sale of the securities. In addition, UBS AG, UBS Securities LLC, UBS Financial Services Inc. or any other affiliate of UBS AG may use this prospectus in market-making transactions involving the securities or similar securities after their initial sale, including debt securities of UBS Americas Inc. guaranteed by UBS AG. Unless UBS AG or its agent informs the purchaser otherwise in the confirmation of sale, this prospectus is being used in a market-making transaction.

**UBS Investment Bank**                              **UBS Financial Services Inc.**

The date of this Prospectus is November 14, 2014

Table of Contents

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| Introduction | 1 | Legal Ownership and Book-Entry Issuance | 47 |
| Cautionary Note Regarding Forward-Looking Statements | 3 | Considerations Relating to Indexed Securities | 52 |
| Incorporation of Information About UBS AG | 4 | Considerations Relating to Securities Denominated or | |
| Where You Can Find More Information | 5 | Payable in or Linked to a Non-U.S. Dollar Currency | 55 |
| Presentation of Financial Information | 6 | U.S. Tax Considerations | 58 |
| Limitations on Enforcement of U.S. Laws Against UBS | | Tax Considerations Under the Laws of Switzerland | 69 |
| AG, Its Management and Others | 6 | Benefit Plan Investor Considerations | 71 |
| UBS | 7 | Plan of Distribution | 73 |
| Swiss Regulatory Powers | 10 | Conflicts of Interest | 75 |
| Use of Proceeds | 11 | Validity of the Securities | 76 |
| Description of Debt Securities We May Offer | 12 | Experts | 76 |
| Description of Warrants We May Offer | 32 | | |

## CERTAIN TERMS

In this prospectus:

- when we refer to "UBS AG," we mean UBS AG on a parent only basis.

- when we refer to "UBS" or "UBS Group," we mean UBS AG and its consolidated subsidiaries.

- when we refer to "USD," we mean United States dollars.

- when we refer to "CHF," we mean Swiss francs.

i

**Table of Contents**

# Introduction

### The Securities We Are Offering

We may offer debt securities and warrants from time to time. When we use the term "securities" in this prospectus, we mean any of the securities we may offer with this prospectus, unless we say otherwise. This prospectus, including the following summary, describes the general terms that may apply to the securities; the specific terms of any particular securities that we may offer will be described in a separate supplement to this prospectus. If there are differences between this prospectus and your prospectus supplement, your prospectus supplement will control.

### Debt Securities

For any particular debt securities we offer, the applicable prospectus supplement will describe the specific designation, the aggregate principal or face amount and the purchase price; the stated maturity; the redemption terms, if any; the rate or manner of calculating the rate and payment dates for interest, if any; the amount, or manner of calculating the amount, payable at maturity and whether that amount may be paid by delivering cash, securities or other property; the terms on which the debt securities may be convertible into or exercisable or exchangeable for common stock or other securities of issuers other than UBS AG, if any; whether the obligations of UBS AG under the debt securities are secured by any form of collateral or credit support and, if so, its nature and terms; and any other specific terms.

The debt securities are not deposit liabilities of UBS AG and are not insured by the United States Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction. We will issue the debt securities under a debt indenture between us and U.S. Bank Trust National Association, as trustee.

### Warrants

We may offer two types of warrants:

- warrants to purchase our debt securities; and
- warrants to purchase or sell, or whose cash value is determined by reference to the performance, level or value of, one or more of the following:
  - securities of one or more issuers other than UBS AG;
  - one or more currencies;
  - one or more commodities;
  - any other financial, economic or other measure or instrument, including the occurrence or non-occurrence of any event or circumstance; and
  - one or more indices or baskets of the items described above.

For any particular warrants we offer, the applicable prospectus supplement will describe the underlying property; the expiration date; the exercise price or the manner of determining the exercise price; the amount and kind, or the manner of determining the amount and kind, of property to be delivered by you or us upon exercise; and any other specific terms. We may issue the warrants under a warrant indenture between us and U.S. Bank Trust National Association, or under warrant agreements between us and one or more other warrant agents that will be named in the applicable prospectus supplement.

### Form of Securities

We will issue the securities in book-entry form through one or more depositaries, such as The Depository Trust Company, Euroclear or Clearstream, named in the applicable prospectus supplement. Each sale of a security in book-entry form will settle in immediately available funds through the depositary, unless otherwise stated. In most cases, we will issue the securities only in registered form, without coupons, although we may issue the securities in bearer form if so specified in the applicable prospectus supplement.

1

Table of Contents

**Payment Currencies**

Amounts payable in respect of the securities, including the purchase price, will be payable in U.S. dollars, unless the applicable prospectus supplement says otherwise.

If any securities are to be listed or quoted on a securities exchange or quotation system, the applicable prospectus supplement will say so.

**Use of Proceeds**

We intend to use the net proceeds from the sales of securities to provide additional funds for our operations and for other general corporate purposes outside of Switzerland.

**Plan of Distribution**

The securities will be offered in connection with their initial issuance or in market-making transactions by us or our affiliates after initial issuance. Those offered in market-making transactions may be securities that we will not issue until after the date of this prospectus as well as securities that we have previously issued.

When we issue new securities, we may offer them for sale to or through underwriters, dealers and agents, including our affiliates, or directly to purchasers. The applicable prospectus supplement will include any required information about the firms we use and the discounts or commissions we may pay them for their services.

Our affiliates that we refer to above may include, among others, UBS Securities LLC and UBS Financial Services Inc.

**Branches**

We expect the securities will be booked through our Jersey branch, our London branch, or such other branch as is specified in the applicable prospectus supplement.

**Conflicts of Interest**

Each of UBS Securities LLC and UBS Financial Services Inc. is an affiliate of UBS and, as such, has a "conflict of interest" in any offering of the securities within the meaning of Rule 5121 of the Financial Industry Regulatory Authority, Inc. ("FINRA"). Consequently, any offering of the securities will be conducted in compliance with the provisions of Rule 5121. Neither UBS Securities LLC nor UBS Financial Services Inc. will be permitted to sell securities in any offering to an account over which it exercises discretionary authority without the prior specific written approval of the account holder.

**Risk Factors Relating to UBS and Other Considerations Relating to the Securities**

For a discussion of important business and financial risks relating to UBS AG, please see "Risk Factors" in Part I, Item 3D of our Annual Report on Form 20-F for the fiscal year ended December 31, 2013, which is incorporated in this prospectus by reference (and in any of our annual or quarterly reports for a subsequent fiscal period that are so incorporated).

There are a number of considerations that you should take into account prior to investing in the securities. Please read "Considerations Relating to Indexed Securities" and "Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency" for more information.

2

Table of Contents

# Cautionary Note Regarding Forward-Looking Statements

This prospectus and the documents incorporated by reference herein contain statements that constitute "forward-looking statements," including but not limited to management's outlook for UBS's financial performance and statements relating to the anticipated effect of transactions and strategic initiatives on UBS's business and future development. While these forward-looking statements represent UBS's judgments and expectations concerning the matters described, a number of risks, uncertainties and other important factors could cause actual developments and results to differ materially from UBS's expectations. These factors include, but are not limited to: (1) the degree to which we are successful in executing our announced strategic plans, including our efficiency initiatives and the planned further reduction in Basel III risk-weighted assets (RWA) and leverage ratio denominator (LRD); (2) developments in the markets in which UBS operates or to which it is exposed, including movements in securities prices or liquidity, credit spreads, currency exchange rates and interest rates and the effect of economic conditions and market developments on the financial position or creditworthiness of our clients and counterparties; (3) changes in the availability of capital and funding, including any changes in UBS's credit spreads and ratings, or arising from requirements for bail-in debt or loss-absorbing capital; (4) changes in or the implementation of financial legislation and regulation in Switzerland, the U.S., the UK and other financial centers that may impose more stringent capital (including leverage ratio), liquidity and funding requirements, incremental tax requirements, additional levies, limitations on permitted activities, constraints on remuneration or other measures; (5) uncertainty as to when and to what degree the Swiss Financial Market Supervisory Authority (FINMA) will approve reductions to the incremental RWA resulting from the supplemental operational risk capital analysis mutually agreed to by UBS and FINMA, or will approve a limited reduction of capital requirements due to measures to reduce resolvability risk; (6) the degree to which UBS is successful in executing the announced creation of a new Swiss banking subsidiary, a holding company for the UBS Group (including the pending offer to exchange shares of UBS AG for shares of such holding company), a U.S. intermediate holding company, changes in the operating model of UBS Limited and other changes which we may make in our legal entity structure and operating model, including the possible consequences of such changes, and the potential need to make other changes to the legal structure or booking model of UBS Group in response to legal and regulatory requirements, including capital requirements, resolvability requirements and proposals in Switzerland and other countries for mandatory structural reform of banks; (7) changes in UBS's competitive position, including whether differences in regulatory capital and other requirements among the major financial centers will adversely affect UBS's ability to compete in certain lines of business; (8) the liability to which UBS may be exposed, or possible constraints or sanctions that regulatory authorities might impose on UBS, due to litigation, contractual claims and regulatory investigations; (9) the effects on our cross-border banking business of tax or regulatory developments and of possible changes in our policies and practices relating to this business; (10) UBS's ability to retain and attract the employees necessary to generate revenues and to manage, support and control its businesses, which may be affected by competitive factors including differences in compensation practices; (11) changes in accounting or tax standards or policies, and determinations or interpretations affecting the recognition of gain or loss, the valuation of goodwill, the recognition of deferred tax assets and other matters; (12) limitations on the effectiveness of internal processes for risk management, risk control, measurement and modeling, and of financial models generally; (13) whether UBS will be successful in keeping pace with competitors in updating its technology, particularly in trading businesses; (14) the occurrence of operational failures, such as fraud, unauthorized trading and systems failures; and (15) the effect that these or other factors or unanticipated events may have on our reputation and the additional consequences that this may have on our business and performance. The sequence in which the factors above are presented is not indicative of their likelihood of occurrence or the potential magnitude of their consequences. Our business and financial performance could be affected by other factors identified in our past and future filings and reports, including those filed with the SEC. More detailed information about those factors is set forth in documents furnished by UBS and filings made by UBS with the SEC, including UBS's Annual Report on Form 20-F for the year ended December 31, 2013. UBS is not under any obligation to (and expressly disclaims any obligation to) update or alter its forward-looking statements, whether as a result of new information, future events, or otherwise.

Table of Contents

# Incorporation of Information About UBS AG

The SEC allows us to "incorporate by reference" into this prospectus the information that we file with them, which means that:

- The incorporated documents are considered part of this prospectus.
- We can disclose important information to you by referring you to those documents.
- Information that we file with the SEC from time to time will automatically be considered to update and supersede the information in this prospectus.

We incorporate by reference in this prospectus:

- UBS AG's Annual Report on Form 20-F for the year ended December 31, 2013, which UBS AG filed with the SEC on March 14, 2014;
- UBS AG's Reports of Foreign Issuer on Form 6-K, which UBS AG filed with the SEC on April 1, 2014, April 4, 2014, May 6, 2014 (six Reports), May 7, 2014, May 19, 2014, July 29, 2014 (four Reports), August 27, 2014, September 29, 2014 (two Reports), October 2, 2014, October 28, 2014 (three Reports), October 31, 2014, and November 12, 2014 (two Reports); and
- Solely with regard to the securities covered by this prospectus that were initially offered and sold under previously filed registration statements of UBS AG and UBS Americas Inc. and that from time to time may be reoffered and resold in market-making transactions under this prospectus, the information in the prospectus supplements relating to those securities that were previously filed by UBS AG (and, if applicable, the information in the base prospectus and prospectus supplements previously filed by UBS Americas Inc. in connection with their initial offer and sale) (except to the extent that any such information has been modified or superseded by other information included or incorporated by reference in this prospectus).

All subsequent reports that we file on Form 20-F under the Securities Exchange Act of 1934 prior to the termination of this offering will also be deemed to be incorporated by reference into this prospectus. We may also incorporate any other Form 6-K that we submit to the SEC on or after the date of this prospectus and prior to the termination of this offering if the Form 6-K filing specifically states that it is incorporated by reference into the registration statement of which this prospectus forms a part.

Any statement in this prospectus contained in a document incorporated or deemed to be incorporated by reference into this prospectus will be deemed to be modified or superseded for purposes of this prospectus to the extent that a statement in this prospectus or in any later filed document modifies or supersedes that statement. Any statement that is modified or superseded in this manner will no longer be a part of this prospectus, except as modified or superseded.

You (including any beneficial owner) may request a copy, at no cost, of any or all of the documents that are incorporated by reference into this prospectus, excluding exhibits (other than those that we specifically incorporate by reference into the documents that you request) by contacting us, orally or in writing, at the following address:

UBS AG
Investor Relations
Bahnhofstrasse 45
P.O. Box
CH-8098 Zurich
Switzerland
Phone: +41-44-234 41 00
Fax: +41-44-234 34 15
E-mail: *SH-investorrelations@ubs.com*
Internet: *www.ubs.com/investor-relations*

Table of Contents

# Where You Can Find More Information

UBS AG files periodic reports and other information with the SEC. You may read and copy any document that UBS AG files with the SEC at the SEC's public reference room at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the operation of its public reference room. The SEC also maintains an internet site at *http://www.sec.gov* that contains reports, proxy and information statements, and other information about issuers like UBS AG that file electronically with the SEC.

We have filed a registration statement under the Securities Act of 1933 on Form F-3 with the SEC covering the securities. For further information about the securities and UBS, you should review our registration statement, its exhibits and the documents incorporated by reference into this prospectus. This prospectus summarizes material provisions of the contracts and other documents that we refer you to. Since this prospectus may not contain all the information that you may find important, you should review the full text of these documents. We have included copies of these documents as exhibits to our registration statement.

**Table of Contents**

# Presentation of Financial Information

UBS's financial statements, which are incorporated by reference into this prospectus, have been prepared in accordance with International Financial Reporting Standards and are denominated in Swiss francs, or "CHF," the legal tender of Switzerland.

The tables below set forth, for the periods and dates indicated, information concerning the noon buying rate for the Swiss franc, expressed in United States dollars or "USD," per one Swiss franc. The "noon buying rate" is the rate in New York City for cable transfers in foreign currencies as certified for customs purposes by the Federal Reserve Bank of New York. On November 7, 2014, the noon buying rate was 1.03263 USD per 1 CHF.

| Year ended December 31, | High | Low | (USD per 1 CHF) Average rate[1] | At period end |
|---|---|---|---|---|
| 2009 | 1.0016 | 0.8408 | 0.9260 | 0.9654 |
| 2010 | 1.0673 | 0.8610 | 0.9670 | 1.0673 |
| 2011 | 1.3706 | 1.0251 | 1.1398 | 1.0668 |
| 2012 | 1.1174 | 1.0043 | 1.0724 | 1.0923 |
| 2013 | 1.1292 | 1.0190 | 1.0826 | 1.1231 |
| Six Months Ended June 30, 2014 | 1.1436 | 1.1101 | 1.1250 | 1.1280 |

| Month | High | Low |
|---|---|---|
| January 2014 | 1.1176 | 1.0970 |
| February 2014 | 1.1351 | 1.1050 |
| March 2014 | 1.1478 | 1.1271 |
| April 2014 | 1.1431 | 1.1213 |
| May 2014 | 1.1436 | 1.1133 |
| June 2014 | 1.1276 | 1.1101 |
| July 2014 | 1.1273 | 1.0994 |
| August 2014 | 1.1079 | 1.0900 |
| September 2014 | 1.0886 | 1.0467 |
| October 2014 | 1.0491 | 1.0392 |
| November 2014, through November 7 | 1.0421 | 1.0307 |

(1)   *The average of the noon buying rates on the last business day of each full month during the relevant period.*

# Limitations on Enforcement of U.S. Laws Against UBS AG, Its Management and Others

UBS AG is a Swiss bank. Many of its directors and executive officers, including the majority of the persons who signed the registration statement of which this prospectus is a part, and certain experts named in this prospectus, are resident outside the United States, and all or a substantial portion of our assets and the assets of those persons are located outside the United States. As a result, it may be difficult for you to serve legal process on UBS AG or its management or have any of them appear in a U.S. court. We have been advised by UBS internal counsel that there is doubt as to the enforceability in Switzerland, in original actions or in actions for enforcement of judgments of U.S. courts, of liabilities based solely on the federal securities laws of the United States.

6

Table of Contents

# UBS

## OVERVIEW

UBS AG with its subsidiaries ("UBS") draws on its over 150-year heritage to serve private, institutional and corporate clients worldwide, as well as retail clients in Switzerland. UBS's business strategy is centered on its (in UBS's own opinion) pre-eminent global wealth management businesses and its (in UBS's own opinion) leading universal bank in Switzerland, complemented by its Global Asset Management business and its Investment Bank, with a focus on capital efficiency and businesses that offer a superior structural growth and profitability outlook. Headquartered in Zurich and Basel, Switzerland, UBS has offices in more than 50 countries, including all major financial centers.

On September 30, 2014 UBS's common equity tier 1 capital ratio[1] was 13.7% on a fully applied basis and 19.1% on a phase-in basis, invested assets stood at CHF 2,640 billion, equity attributable to UBS shareholders was CHF 50,824 million and market capitalization was CHF 64,047 million. On the same date, UBS employed 60,292 people[2].

For further information about UBS, including more detailed descriptions of the Business Groups and Corporate Center, see "Where You Can Find More Information."

## BUSINESS OVERVIEW

UBS operates as a group with five business divisions (Wealth Management, Wealth Management Americas, Retail & Corporate, Global Asset Management and the Investment Bank) and a Corporate Center. Each of the business divisions and the Corporate Center are described below. A description of the Group's strategy can be found in the annual report of UBS AG as of December 31, 2013 (the "Annual Report 2013"), which forms an integral part of the 2013 Form 20-F, on pages 26-29 (inclusive); a description of the businesses, strategies, clients, organizational structures, products and services of the business divisions and the Corporate Center can be found in the Annual Report 2013, on pages 33-49 (inclusive).

### Wealth Management

Wealth Management provides comprehensive financial services to wealthy private clients around the world – except those served by Wealth Management Americas. Its clients benefit from the entire spectrum of UBS resources, ranging from investment management to estate planning and corporate finance advice, in addition to specific wealth management products and services.

### Wealth Management Americas

Wealth Management Americas provides advice-based solutions and banking services through financial advisors who deliver a fully integrated set of products and services specifically designed to address the needs of ultra high net worth and high net worth individuals and families. It includes the domestic U.S. business, the domestic Canadian business and international business booked in the U.S.

### Retail & Corporate

Retail & Corporate maintains (in its own opinion) a leading position across retail, corporate and institutional client segments in Switzerland and constitutes a central building block of UBS Switzerland's (in its own opinion) pre-

---

[1]   Based on the Basel III framework, as applicable to Swiss systemically relevant banks. The common equity tier 1 capital ratio is the ratio of common equity tier 1 capital to risk-weighted assets. The information provided on a fully applied basis entirely reflects the effects of the new capital deductions and the phase-out of ineligible capital instruments. The information provided on a phase-in basis gradually reflects those effects during the transition period. For information as to how common equity tier 1 capital is calculated, refer to the "Capital management" section of UBS AG's third quarter 2014 report.

[2]   Full-time equivalents.

Table of Contents

## UBS

eminent universal bank model. It provides comprehensive financial products and services embedded in a true multi-channel experience, offering clients convenient access. It continues to enhance the range of life-cycle products and services offered to clients, while pursuing additional growth in advisory and execution services.

### Global Asset Management

Global Asset Management is (in its own opinion) a large-scale asset manager with diversified businesses across investment capabilities, regions and distribution channels. It offers investment capabilities and styles across all major traditional and alternative asset classes including equities, fixed income, currencies, hedge funds, real estate, infrastructure and private equity that can also be combined into multi-asset strategies. The fund services unit provides professional services including fund set-up, accounting and reporting for both traditional investment funds and alternative funds.

### Investment Bank

The Investment Bank provides corporate, institutional and wealth management clients with expert advice, innovative financial solutions, outstanding execution and comprehensive access to the world's capital markets. It offers financial advisory and capital markets, research, equities, foreign exchange, precious metals and tailored fixed income services in rates and credit through its two business units, Corporate Client Solutions and Investor Client Services. The Investment Bank is an active participant in capital markets flow activities, including sales, trading and market-making across a range of securities.

### Corporate Center

The Corporate Center comprises Corporate Center—Core Functions and Corporate Center—Non-core and Legacy Portfolio. Corporate Center—Core Functions provides Group-wide control functions including finance, risk control (including compliance) and legal. In addition, it provides all logistics and support functions, including operations, information technology, human resources, regulatory relations and strategic initiatives, communications and branding, corporate real estate and administrative services, physical security, information security, offshoring and treasury services such as funding, balance sheet and capital management. Corporate Center—Core Functions allocates most of its treasury income, operating expenses and personnel associated with the abovementioned activities to the businesses. Corporate Center—Non-core and Legacy Portfolio comprises the non-core businesses and legacy positions previously part of the Investment Bank.

### CORPORATE INFORMATION

The legal and commercial name of the company is UBS AG. The company was incorporated under the name SBC AG on February 28, 1978, for an unlimited duration and entered in the Commercial Register of Canton Basel-City on that day. On December 8, 1997, the company changed its name to UBS AG. The company in its present form was created on June 29, 1998, by the merger of Union Bank of Switzerland (founded 1862) and Swiss Bank Corporation (founded 1872). UBS AG is entered in the Commercial Registers of Canton Zurich and Canton Basel-City. The registration number is CHE-101.329.561.

UBS AG is incorporated and domiciled in Switzerland and operates under the Swiss Code of Obligations and the Swiss Federal Banking Law as an *Aktiengesellschaft,* a corporation that has issued shares of common stock to investors.

According to Article 2 of the Articles of Association of UBS AG ("Articles of Association"), the purpose of UBS AG is the operation of a bank. Its scope of operations extends to all types of banking, financial, advisory, trading and service activities in Switzerland and abroad.

UBS AG shares are listed on the SIX Swiss Exchange and the New York Stock Exchange.

The addresses and telephone numbers of UBS AG's two registered offices and principal places of business are: Bahnhofstrasse 45, CH-8001 Zurich, Switzerland, telephone +41 44 234 1111; and Aeschenvorstadt 1, CH-4051 Basel, Switzerland, telephone +41 61 288 5050.

8

Table of Contents

**UBS**

## MEASURES TO MODIFY LEGAL STRUCTURE

Described below are certain measures being taken by UBS which are intended to substantially improve the resolvability of UBS in response to Swiss "too big to fail" requirements and applicable requirements in other countries in which UBS operates.

On September 29, 2014, UBS commenced a share-for-share exchange offer in order to create a group holding company, UBS Group AG. Upon completion of the offer, which is subject to certain conditions, UBS Group AG will become the holding company for UBS and its subsidiaries and will be listed on the SIX Swiss Exchange and the New York Stock Exchange (NYSE). UBS has also continued to progress its plan to transfer its Retail & Corporate business division and the Swiss-booked business of its Wealth Management business division into UBS Switzerland AG. UBS has filed an application for a banking license in Switzerland and expects to implement the transfer in a phased approach starting in mid-2015.

In the UK, and in consultation with the UK and Swiss regulators, UBS Limited, UBS's UK bank subsidiary, has implemented a modified business operating model under which UBS Limited bears and retains a greater degree of risk and reward in its business activities.

In the U.S., UBS will comply with new rules for banks under the Dodd-Frank Wall Street Reform and Consumer Protection Act that will require an intermediate holding company to own all of its operations other than U.S. branches of UBS AG by July 1, 2016. As a result, UBS will designate an intermediate holding company to hold all U.S. subsidiaries of UBS.

These measures have been discussed with FINMA and other regulatory authorities. The dialogue with regulators will continue and the changes remain subject to uncertainties that may affect their feasibility, scope or timing.

For more information, refer to the "Regulatory and legal developments and financial reporting and accounting changes" section of UBS AG's third quarter 2014 report, filed with the SEC on October 28, 2014 ("UBS third quarter 2014 report"), which is incorporated by reference into this prospectus, and to discussions of further updates contained in any subsequent report UBS files with or submits to the SEC on or after the date of this prospectus and prior to the termination of this offering that are incorporated by reference into this prospectus or the registration statement of which this prospectus forms a part, as described above under "Incorporation of Information About UBS AG".

Table of Contents

# Swiss Regulatory Powers

Under certain circumstances, FINMA has the power to open restructuring or liquidation proceedings in respect of, and/or impose protective measures in relation to, UBS, which proceedings or measures may have a material adverse effect on the terms and value of the debt securities and the warrants and/or the ability of UBS to make payments thereunder. Pursuant to article 25 et seq. of the Swiss Banking Act, FINMA has broad statutory powers to take measures and actions in relation to UBS if it (i) is overindebted, (ii) has serious liquidity problems or (iii) fails to fulfill the applicable capital adequacy provisions after expiration of a deadline set by FINMA. If one of these prerequisites is met, FINMA is authorized to open restructuring proceedings (*Sanierungsverfahren*) or liquidation (bankruptcy) proceedings (*Bankenkonkurs*) in respect of, and/or impose protective measures (*Schutzmassnahmen*) in relation to, UBS. The Swiss Banking Act, as last amended as of January 1, 2013, grants significant discretion to FINMA in connection with the aforementioned proceedings and measures. In particular, a broad variety of protective measures may be imposed by FINMA, including a bank moratorium (*Stundung*) or a maturity postponement (*Fälligkeitsaufschub*), which measures may be ordered by FINMA either on a stand-alone basis or in connection with restructuring or liquidation proceedings. In a restructuring proceeding, the resolution plan may, among other things, (a) provide for the transfer of UBS's assets or a portion thereof, together with debts and other liabilities, and contracts of UBS, to another entity, (b) provide for the conversion of UBS's debt and/or other obligations, including its obligations under the debt securities and the warrants, into equity, and/or (c) potentially provide for haircuts on obligations of UBS, including its obligations under the debt securities and the warrants.

The resolution regime of the Swiss Banking Act is further detailed in the FINMA Banking Insolvency Ordinance (BIO-FINMA) that entered into force as of 1 November 2012. Pursuant to article 48 lit. a-c BIO-FINMA, a debt-to-equity swap and/or a partial or full haircut on its debt and other obligations including the debt securities and the warrants may only take place after (i) all debt instruments issued by UBS AG qualifying as additional tier 1 capital or tier 2 capital (such as contingent write-down bonds) have been converted into equity, and (ii) the existing equity of UBS AG has been fully cancelled. Further, pursuant to article 48 lit. d of the BIO-FINMA, debt-to-equity swaps (but arguably not haircuts) must occur in the following order: (i) all subordinated claims not qualifying as regulatory capital, (ii) all other claims not excluded by law from a debt-to-equity swap, and (iii) deposits (in excess of the amount privileged by law). With respect to a haircut, the BIO-FINMA does not contain any guidance as to the order in which different categories of claims shall be partially or fully written off. Therefore, it cannot be excluded that any resolution plan in respect of UBS AG could provide that the claims under or in connection with the debt securities and the warrants will be partially or fully converted or written-off and that in case of a write-off claims ranking junior to the claims under the debt securities and the warrants will be preserved. In such case, holders of the debt securities and the warrants may lose all or some of their investment in such debt securities and warrants. In case of a restructuring of a systemically important bank (such as UBS AG), the creditors whose claims are affected by the resolution plan will not have a right to vote on, opt out of, or dismiss the resolution plan. In addition, if a resolution plan has been approved by FINMA, the rights of a creditor to seek judicial review of the resolution plan (*e.g.*, on the grounds that the plan would unduly prejudice the rights of the holders of the debt securities and the warrants or otherwise be in violation of the Swiss Banking Act) are very limited in that the competent court may not grant suspensory effect (*aufschiebende Wirkung*) to the approval of the resolution plan and, even if the objection of a creditor against the resolution plan is approved, the court can only award a compensation payment but not invalidate or override the resolution plan.

As of the date of this prospectus, there are no precedents as to what impact the revised regime would have on the rights of holders of the debt securities or the ability of UBS to make payments thereunder if one or several of the measures under the revised insolvency regime were imposed in connection with a resolution of UBS.

For a description of the regulation and supervision of UBS AG more generally, please see the UBS 2013 Form 20-F and the other documents incorporated by reference into this prospectus.

Table of Contents

# Use of Proceeds

We intend to use the proceeds from the sale of the securities to provide additional funds for our operations and for general corporate purposes outside of Switzerland. We will receive the net proceeds from sales of the securities made in connection with their original issuance and in connection with any market-making resales that UBS AG itself undertakes. We do not expect to receive any proceeds from resales of the securities, including the debt securities of UBS Americas Inc., by UBS Securities LLC, UBS Financial Services Inc. or any of our other affiliates in market-making transactions. We expect our affiliates to retain the proceeds of their market-making resales and not to pay the proceeds to us.

11

Table of Contents

# Description of Debt Securities We May Offer

*Please note that in this section entitled "Description of Debt Securities We May Offer," references to UBS, we, our and us refer only to UBS AG and not to its consolidated subsidiaries. Also, in this section, references to "holders" and "you" mean those who own debt securities registered in their own names on the books that we or the trustee maintain for this purpose, and not those who own beneficial interests in debt securities registered in street name or in debt securities issued in book-entry form through one or more depositaries. Owners of beneficial interests in the debt securities should read the section below entitled "Legal Ownership and Book-Entry Issuance."*

### The Debt Indenture

As required by U.S. federal law for publicly offered bonds and notes, the debt securities are governed by a document called an indenture. The debt indenture is a contract between us and U.S. Bank Trust National Association, which acts as trustee.

The trustee has two main roles:

- First, the trustee can enforce your rights against us if we default. There are limitations on the extent to which the trustee acts on your behalf, which we describe below under "—Default, Remedies and Waiver of Default."

- Second, the trustee performs administrative duties for us, such as sending you interest payments and notices.

See "—Our Relationship with the Trustee" below for more information about the trustee.

### We May Issue Many Series of Debt Securities Under the Debt Indenture

We may issue as many distinct series of debt securities under the debt indenture as we wish. This section summarizes terms of the debt securities that apply generally to all series. The provisions of the debt indenture allow us not only to issue debt securities with terms different from those of debt securities previously issued under the debt indenture, but also to "reopen" a previous issue of a series of debt securities and issue additional debt securities of that series. Most of the financial and other specific terms of your series, will be described in the prospectus supplement accompanying this prospectus. Those terms may vary from the terms described here.

We may issue debt securities separately or together with other debt securities or with our warrants.

As you read this section, please remember that the specific terms of your debt security as described in your prospectus supplement will supplement and, if applicable, may modify or replace the general terms described in this section. If there are any differences between your prospectus supplement and this prospectus, your prospectus supplement will control. Thus, the statements we make in this section may not apply to your debt security.

When we refer to a series of debt securities, we mean a series issued under the debt indenture. When we refer to your prospectus supplement, we mean the prospectus supplement describing the specific terms of the debt security you purchase. The terms used in your prospectus supplement will have the meanings described in this prospectus, unless otherwise specified.

Unless we indicate otherwise in your prospectus supplement, the debt securities we issue to you will be part of the series of debt securities referred to as our "medium-term notes, Series A." The Series A notes are a single distinct series under the debt indenture, and we may issue Series A notes in such amounts, at such times and on such terms as we wish. The Series A notes will differ from one another, and from any other series, in their terms, but all of the Series A notes together will constitute a single series for all purposes under the debt indenture pursuant to which they will be issued.

12

Table of Contents

## Description of Debt Securities We May Offer

### Amounts That We May Issue

The debt indenture does not limit the aggregate amount of debt securities that we may issue or the number of series or the aggregate amount of any particular series. We have already issued Series A notes, many of which are currently outstanding. We intend to issue additional Series A notes, and may issue additional Series A notes at any time, without your consent and without notifying you. We may also issue debt securities and other securities at any time without your consent and without notifying you.

The debt indenture and the debt securities do not limit our ability to incur other indebtedness or to issue other securities. Also, we are not subject to financial or similar restrictions by the terms of the debt securities.

### Principal Amount, Stated Maturity and Maturity

The principal amount of a debt security means the principal amount payable at its stated maturity, unless that amount is not determinable, in which case the principal amount of a debt security is its face amount.

The term "stated maturity" with respect to any debt security means the day on which the principal amount of your debt security is scheduled to become due. The principal may become due sooner, by reason of redemption or acceleration after a default or otherwise in accordance with the terms of the debt security. The day on which the principal actually becomes due, whether at the stated maturity or earlier, is called the "maturity" of the principal.

We also use the terms "stated maturity" and "maturity" to refer to the days when other payments become due. For example, we may refer to a regular interest payment date when an installment of interest is scheduled to become due as the "stated maturity" of that installment.

When we refer to the "stated maturity" or the "maturity" of a debt security without specifying a particular payment, we mean the stated maturity or maturity, as the case may be, of the principal.

### This Section Is Only a Summary

The debt indenture and its associated documents, including your debt security, contain the full legal text governing the matters described in this section and your prospectus supplement. We have filed a copy of the debt indenture with the SEC as an exhibit to our registration statement. See "Where You Can Find More Information" above for information on how to obtain a copy.

This section and your prospectus supplement summarize all the material terms of the debt indenture and your debt security. They do not, however, describe every aspect of the debt indenture and your debt security. For example, in this section and your prospectus supplement, we use terms that have been given special meaning in the debt indenture, but we describe the meaning of only the more important of those terms.

### Governing Law

The debt indenture is, and the debt securities will be, governed by New York law.

### Currency of Debt Securities

Amounts that become due and payable on your debt security in cash will be payable in a currency, composite currency, basket of currencies or currency unit or units specified in your prospectus supplement. We refer to this currency, composite currency, basket of currencies or currency unit or units as a "specified currency." The specified currency for your debt security will be U.S. dollars, unless your prospectus supplement states otherwise. Some debt securities may have different specified currencies for principal and interest. You will have to pay for your debt securities by delivering the requisite amount of the specified currency to UBS Securities LLC, UBS Financial Services Inc. or another firm that we name in your prospectus supplement, unless other arrangements have been made between you and us or you and that firm. We will make payments on your debt securities in the specified currency, except as described below in "—Payment Mechanics for Debt Securities." See "Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency" below for more information about risks of investing in this kind of debt securities.

13

Table of Contents

## Description of Debt Securities We May Offer

### Types of Debt Securities

We may issue any of the three types of debt securities described below. A debt security may have elements of each of the three types of debt securities described below. For example, a debt security may bear interest at a fixed rate for some periods and at a floating rate in others. Similarly, a debt security may provide for a payment of principal at maturity linked to an index and also bear interest at a fixed or floating rate.

#### Fixed Rated Debt Securities

A debt security of this type will bear interest at a fixed rate described in the applicable prospectus supplement. This type includes zero coupon debt securities, which bear no interest and are instead issued at a price lower than the principal amount. See "—Original Issue Discount Debt Securities" below for more information about zero coupon and other original issue discount debt securities.

Each fixed rate debt security, except any zero coupon debt security, will bear interest from its original issue date or from the most recent date to which interest on the debt security has been paid or made available for payment. Interest will accrue on the principal of a fixed rate debt security at the fixed yearly rate stated in the applicable prospectus supplement, until the principal is paid or made available for payment or the security has been converted or exchanged. Each payment of interest due on an interest payment date or the date of maturity will include interest accrued from and including the last date to which interest has been paid, or made available for payment, or from the issue date if none has been paid or made available for payment, to but excluding the interest payment date or the date of maturity. We will compute interest on fixed rate debt securities on the basis of a 360-day year of twelve 30-day months. We will pay interest on each interest payment date and at maturity as described below under "—Payment Mechanics for Debt Securities."

#### Floating Rate Debt Securities

**Interest Rate Formulas.**   A debt security of this type will bear interest at rates that are determined by reference to an interest rate formula. In some cases, the rates may also be adjusted by adding or subtracting a spread or multiplying by a spread multiplier and may be subject to a minimum rate or a maximum rate. If your debt security is a floating rate debt security, the formula and any adjustments that apply to the interest rate will be specified in your prospectus supplement.

Each floating rate debt security will bear interest from its original issue date or from the most recent date to which interest on the debt security has been paid or made available for payment. Interest will accrue on the principal of a floating rate debt security at the yearly rate determined according to the interest rate formula stated in the applicable prospectus supplement, until the principal is paid or made available for payment. We will pay interest on each interest payment date and at maturity as described below under "—Payment Mechanics for Debt Securities."

**Calculation of Interest.**   Calculations relating to floating rate debt securities will be made by the calculation agent, an institution that we appoint as our agent for this purpose. That institution may include any affiliate of ours, such as UBS Securities LLC. The prospectus supplement for a particular floating rate debt security will name the institution that we have appointed to act as the calculation agent for that debt security as of its original issue date. We may appoint a different institution to serve as calculation agent from time to time after the original issue date of the debt security without your consent and without notifying you of the change. Absent manifest error, all determinations of the calculation will be final and binding on you and us, without any liability on the part of the calculation agent.

For each floating rate debt security, the calculation agent will determine, on the corresponding interest calculation or determination date, as described in the applicable prospectus supplement, the interest rate that takes effect on each interest reset date. In addition, the calculation agent will calculate the amount of interest that has accrued during each interest period—*i.e.*, the period from and including the original issue date, or the last date to which interest has been paid or made available for payment, to but excluding the payment date. For each interest period, the calculation agent will calculate the amount of accrued interest by multiplying the face or other specified amount of the floating rate debt security by an accrued interest factor for the interest period. This factor will equal the sum of the interest factors

14

Table of Contents

**Description of Debt Securities We May Offer**

calculated for each day during the interest period. The interest factor for each day will be expressed as a decimal and will be calculated by dividing the interest rate, also expressed as a decimal, applicable to that day by 360 or by the actual number of days in the year, as specified in the applicable prospectus supplement.

Upon the request of the holder of any floating rate debt security, the calculation agent will provide the interest rate then in effect for that debt security—and, if determined, the interest rate that will become effective on the next interest reset date. The calculation agent's determination of any interest rate, and its calculation of the amount of interest for any interest period, will be final and binding in the absence of manifest error.

All percentages resulting from any calculation relating to a debt security will be rounded upward or downward, as appropriate, to the next higher or lower one hundred-thousandth of a percentage point, *e.g.*, 9.876541% (or .09876541) being rounded down to 9.87654% (or .0987654) and 9.876545% (or .09876545) being rounded up to 9.87655% (or .0987655). All amounts used in or resulting from any calculation relating to a floating rate debt security will be rounded upward or downward, as appropriate, to the nearest cent, in the case of U.S. dollars, or to the nearest corresponding hundredth of a unit, in the case of a currency other than U.S. dollars, with one-half cent or one-half of a corresponding hundredth of a unit or more being rounded upward.

In determining the base rate that applies to a floating rate debt security during a particular interest period, the calculation agent may obtain rate quotes from various banks or dealers active in the relevant market, as described in the applicable prospectus supplement. Those reference banks and dealers may include the calculation agent itself and its affiliates, as well as any underwriter, dealer or agent participating in the distribution of the relevant floating rate debt securities and its affiliates, and they may include UBS AG or its affiliates.

**Indexed Debt Securities**

A debt security of this type provides that the principal amount payable at its maturity, and/or the amount of interest payable on an interest payment date, will be determined by reference to:

- securities of one or more issuers;
- one or more currencies;
- one or more commodities;
- any other financial, economic or other measure or instrument, including the occurrence or non-occurrence of any event or circumstance; and/or
- one or more indices or baskets of the items described above.

If you are a holder of an indexed debt security, you may receive an amount at maturity (including upon acceleration following an event of default) that is greater than or less than the face amount of your debt security depending upon the formula used to determine the amount payable and the value of the applicable index at maturity. The value of the applicable index will fluctuate over time.

An indexed debt security may provide either for cash settlement or for physical settlement by delivery of the underlying property or another property of the type listed above. An indexed debt security may also provide that the form of settlement may be determined at our option or at the holder's option. Some indexed debt securities may be convertible, exercisable or exchangeable, at our option or the holder's option, into or for securities of an issuer other than UBS AG.

If you purchase an indexed debt security, your prospectus supplement will include information about the relevant index, about how amounts that are to become payable will be determined by reference to the price or value of that index and about the terms on which the security may be settled physically or in cash. The prospectus supplement will also identify the calculation agent that will calculate the amounts payable with respect to the indexed debt security and may exercise significant discretion in doing so. The calculation agent may be UBS Securities LLC or another of our affiliates. See "Considerations Relating to Indexed Securities" for more information about risks of investing in debt securities of this type.

Table of Contents

## Description of Debt Securities We May Offer

### Original Issue Discount Debt Securities

A fixed rate debt security, a floating rate debt security or an indexed debt security may be an original issue discount debt security. A debt security of this type is issued at a price lower than its principal amount and provides that, upon redemption or acceleration of its maturity, an amount less than its principal amount will be payable. An original issue discount debt security may be a zero coupon debt security. A debt security issued at a discount to its principal may, for U.S. federal income tax purposes, be considered an original issue discount debt security, regardless of the amount payable upon redemption or acceleration of maturity. See "U.S. Tax Considerations—Taxation of Debt Securities—Original Issue Discount" below for a brief description of the U.S. federal income tax consequences of owning an original issue discount debt security.

### Information In Your Prospectus Supplement

Your prospectus supplement will describe the specific terms of your debt security, which will include some or all of the following:

- any limit on the total principal amount of the debt securities of the same series;

- the stated maturity;

- the specified currency or currencies for principal and interest, if not U.S. dollars;

- the price at which we originally issue your debt security, expressed as a percentage of the principal amount, and the original issue date;

- whether your debt security is a fixed rate debt security, a floating rate debt security or an indexed debt security;

- if your debt security is a fixed rate debt security, the yearly rate at which your debt security will bear interest, if any, and the interest payment dates;

- if your debt security is a floating rate debt security, the interest rate basis; any applicable index currency or maturity, spread or spread multiplier or initial base rate, maximum rate or minimum rate; the interest reset, determination, calculation and payment dates; the day count used to calculate interest payments for any period; the business day convention; and the calculation agent;

- if your debt security is an indexed debt security, the principal amount, if any, we will pay you at maturity, the amount of interest, if any, we will pay you on an interest payment date or the formula we will use to calculate these amounts, if any, and the terms on which your debt security will be exchangeable for or payable in cash, securities or other property;

- if your debt security may be converted into or exercised or exchanged for debt or equity securities of one or more third parties, the terms on which conversion, exercise or exchange may occur, including whether conversion, exercise or exchange is mandatory, at the option of the holder or at our option, the period during which conversion, exercise or exchange may occur, the initial conversion, exercise or exchange price or rate and the circumstances or manner in which the amount of securities issuable upon conversion, exercise or exchange may be adjusted;

- if your debt security is also an original issue discount debt security, the yield to maturity;

- if applicable, the circumstances under which your debt security may be redeemed at our option or repaid at the holder's option before the stated maturity, including any redemption commencement date, repayment date(s), redemption price(s) and redemption period(s);

- the authorized denominations, if other than $1,000 and integral multiples of $1,000;

- the depositary for your debt security, if other than DTC, and any circumstances under which the holder may request securities in non-global form, if we choose not to issue your debt security in book-entry form only;

Table of Contents

## Description of Debt Securities We May Offer

- if your debt security will be issued in bearer form, any special provisions relating to bearer securities;
- if applicable, the circumstances under which we will pay additional amounts on any debt securities held by a person who is not a United States person for tax purposes and under which we can redeem the debt securities if we have to pay additional amounts;
- the names and duties of any co-trustees, depositaries, authenticating agents, paying agents, transfer agents or registrars for your debt security, as applicable; and
- any other terms of your debt security, which could be different from those described in this prospectus.

If you purchase your debt security—or any of our other securities we describe in this prospectus—in a market-making transaction, you will receive information about the price you pay and your trade and settlement dates in a separate confirmation of sale. A market-making transaction is one in which we, UBS Securities LLC, UBS Financial Services Inc. or another of our affiliates resells a security that it has previously acquired from another holder. A market-making transaction in a particular security occurs after the original issuance and sale of the security.

## Extension of Maturity

If specified in the applicable prospectus supplement, we will have the option to extend the stated maturity of your debt security for one or more periods of whole years up to but not beyond the final maturity date specified in the prospectus supplement. We call a debt security whose maturity we may extend an extendible debt security. We call the period of time as to which we may extend the maturity the extension period. The following procedures will apply to extendible debt securities, unless otherwise indicated in the applicable prospectus supplement.

We may extend the maturity of an extendible debt security by notifying the paying agent between 45 and 60 days before the stated maturity then in effect. The stated maturity may be the original stated maturity, as described in the prospectus supplement, or a maturity that we previously extended by following these procedures. If we notify the paying agent that we will extend the maturity, the paying agent will send a notice to each holder by first class mail, postage prepaid, or by other means agreed upon between us and the paying agent, at least 30 days before the stated maturity then in effect. The notice sent by the paying agent will provide the following information:

- our election to extend the maturity of the extendible debt security;
- the extended maturity date or, if the maturity date had previously been extended, the new extended maturity date;
- the interest rate that will apply during the extension period or, in the case of a floating rate debt security, the spread and/or spread multiplier, if any, applicable during the extension period; and
- the provisions, if any, for redemption and repayment during the extension period.

Once the paying agent has mailed the notice to each holder, the extension of the maturity date will take place automatically. All of the terms of the debt security will be the same as the terms of the debt security as originally issued, except those terms that are described in the notice sent by the paying agent to each holder and except as described in the following paragraph.

Not later than 10:00 a.m., New York City time, on the twentieth calendar day before the maturity date then in effect for an extendible debt security or, if that day is not a business day, on the next succeeding business day, we may revoke the interest rate set forth in the extension notice sent by the paying agent to each holder and establish a higher interest rate for the extension period. If we elect to establish a higher interest rate, the paying agent will send a notice to each holder by first class mail, postage prepaid, or by other means agreed between us and the paying agent, of the higher interest rate in the case of a floating rate debt security, the higher spread and/or spread multiplier, if any. The notice of the higher rate cannot be revoked. All extendible debt securities as to which the maturity date has been extended will bear the higher rate for the extension period, whether or not tendered for repayment.

Table of Contents

## Description of Debt Securities We May Offer

If we elect to extend the maturity date of an extendible debt security, each holder may elect repayment of all or part of its debt security on the maturity date then in effect at a price equal to the principal amount plus any accrued and unpaid interest to that date. To elect repayment, a holder must give notice to the paying agent between 25 and 35 days before the maturity date in effect. The notice must consist of either:

- the debt security along with the completed form entitled "Option to Elect Repayment," which will be attached to your debt security.

- a telegram, facsimile transmission or letter from a member of a national securities exchange, the Financial Industry Regulatory Authority, Inc. or a commercial bank or trust company in the United States setting forth the name of the holder, the principal amount of the debt security, the principal amount of the debt security to be repaid, the certificate number or a description of the tenor and terms of the debt security, a statement that the option to elect repayment is being elected and a guarantee that the debt security, together with the completed form entitled "Option to Elect Repayment" will be received by the paying agent no later than the fifth business day after the date of the telegram, facsimile transmission or letter. The telegram, facsimile transmission or letter will become effective upon receipt, by that fifth business day, of the debt security and complete form.

The holder may revoke the election of repayment by sending to the paying agent written notice by 3:00 p.m., New York City time, on the twentieth day before the maturity date then in effect or, if that day is not a business day, on the next succeeding business day.

If an extendible debt security is represented by a global debt security, the depositary or its nominee, as the holder, will be the only person that can exercise the right to elect repayment or revoke such an election. Any indirect owners who own beneficial interests in the global debt security and wish to make such an election must give proper and timely instructions to the banks or brokers through which they hold their interests, requesting that they notify the depositary to make a repayment election or revoke such an election on their behalf. Different firms have different deadlines for accepting instructions from their customers, and you should take care to act promptly enough to ensure that your request is given effect by the depositary before the applicable deadline for exercise.

### Redemption and Repayment

Unless otherwise indicated in your prospectus supplement, your debt security will not be entitled to the benefit of any sinking fund—that is, we will not deposit money on a regular basis into any separate custodial account to repay your debt securities. In addition, we will not be entitled to redeem your debt security before its stated maturity (except for certain tax reasons, as described below) unless your prospectus supplement specifies a redemption date or redemption commencement date. You will not be entitled to require us to buy your debt security from you, before its stated maturity, unless your prospectus supplement specifies one or more repayment dates.

If your prospectus supplement specifies one or more redemption dates, a redemption commencement date or a repayment date, it will also specify one or more redemption prices or repayment prices, which may be expressed as a percentage of the principal amount of your debt security. It may also specify one or more redemption periods during which the redemption prices relating to a redemption of debt securities during those periods will apply.

If your prospectus supplement specifies one or more redemption dates, your debt security will be redeemable at our option on any of those dates. If your prospectus supplement specifies a redemption commencement date, your debt security will be redeemable at our option at any time on or after that date. If we redeem your debt security, we will do so at the specified redemption price. If different prices are specified for different redemption periods, the price we pay will be the price that applies to the redemption period during which your debt security is redeemed.

If your prospectus supplement specifies a repayment date, your debt security will be repayable at your option on the specified repayment date at the specified repayment price, together with interest accrued to the repayment date.

18

Table of Contents

**Description of Debt Securities We May Offer**

If we exercise an option to redeem any debt security, we will give the trustee and the holders written notice of the principal amount of the debt security to be redeemed, not less than 5 business days nor more than 60 days before the applicable redemption date unless otherwise specified in your prospectus supplement. We will give the notice in the manner described below in "—Notices."

If a debt security represented by a global debt security is subject to repayment at the holder's option, the depositary or its nominee, as the holder, will be the only person that can exercise the right to repayment. Any indirect holders who own beneficial interests in the global debt security and wish to exercise a repayment right must give proper and timely instructions to the banks or brokers through which they hold their interests, requesting that they notify the depositary to exercise the repayment right on their behalf. Different firms have different deadlines for accepting instructions from their customers, and you should take care to act promptly enough to ensure that your request is given effect by the depositary before the applicable deadline for exercise.

Street name and other indirect holders should contact their banks or brokers for information about how to exercise a repayment right in a timely manner.

We or our affiliates may purchase debt securities from investors who are willing to sell from time to time, either in the open market at prevailing prices or in private transactions at negotiated prices. Debt securities that we or they purchase may, at our discretion, be held, resold or cancelled.

**Optional Tax Redemption**

In addition to the situations described above under "—Redemption and Repayment," we also have the option to redeem the debt securities in two situations described below, unless otherwise indicated in your prospectus supplement. The redemption price for the debt securities, other than original issue discount debt securities, will be equal to the principal amount of the debt securities being redeemed plus accrued interest and any additional amounts due on the date fixed for redemption. The redemption price for original issue discount debt securities will be specified in the prospectus supplement for such debt securities. Furthermore, we must give you between 10 and 60 days' notice before redeeming the debt securities unless otherwise specified in your prospectus supplement.

- The first situation is where, as a result of a change in, execution of or amendment to any laws or treaties or the official application or interpretation of any laws or treaties, we would be required to pay additional amounts as described below under "—Payment of Additional Amounts."

  This applies only in the case of changes, executions, amendments, applications or interpretations that occur on or after the date specified in the prospectus supplement for the applicable debt securities and in a relevant jurisdiction, as defined in "—Payment of Additional Amounts" below. If UBS is succeeded by another entity, the applicable jurisdiction will be the jurisdiction in which the successor entity is organized, and the applicable date will be the date the entity became a successor.

  We would not have the option to redeem in this case if we could have avoided the payment of additional amounts or the deduction or withholding by using reasonable measures available to us.

- The second situation is where a person located outside of a relevant jurisdiction into which UBS is merged or to whom it has conveyed, transferred or leased its property is required to pay an additional amount. We would have the option to redeem the debt securities even if we are required to pay additional amounts immediately after the merger, conveyance, transfer or lease. We are not required to use reasonable measures to avoid the obligation to pay additional amounts in this situation.

**Payment of Additional Amounts**

A relevant jurisdiction may require UBS to withhold amounts from payments on the principal or interest on a debt security for taxes or any other governmental charges. If the relevant jurisdiction requires a withholding of this type, UBS may be required to pay you an additional amount so that the net amount you receive will be the amount specified in the debt security to which you are entitled.