Table of Contents

## Description of Debt Securities We May Offer

By relevant jurisdiction, we mean Switzerland or a jurisdiction in which the UBS branch through which debt securities are issued is located. UBS will not have to pay additional amounts in respect of taxes or other governmental charges that are required to be deducted or withheld by any paying agent from a payment on a debt security, if such payment can be made without such deduction or withholding by any other paying agent, or in respect of taxes or other governmental charges that would not have been imposed but for

- the existence of any present or former connection between you and the relevant jurisdiction, other than the mere holding of the debt security and the receipt of payments on it;

- your status as an individual resident of a member state of the European Union;

- a failure to comply with any reasonable certification, documentation, information or other reporting requirement concerning your nationality, residence, identity or connection with the relevant jurisdiction, if such compliance is required as a precondition to relief or exemption from such taxes or other governmental charges (including, without limitation, a certification that you are not resident in the relevant jurisdiction or are not an individual resident of a member state of the European Union); or

- a change in law that becomes effective more than 30 days after a payment on the debt security becomes due and payable or on which the payment is duly provided for, whichever occurs later.

In addition, no additional amounts will be required to be paid on account of any deduction or withholding imposed or required pursuant to Sections 1471 through 1474 of the Internal Revenue Code (as defined below under "U.S. Tax Considerations"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Internal Revenue Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Internal Revenue Code.

These provisions will also apply to any taxes or governmental charges imposed by any jurisdiction in which a successor to UBS is organized. The prospectus supplement relating to the debt security may describe additional circumstances in which UBS would not be required to pay additional amounts.

## Mergers and Similar Transactions

We are generally permitted to merge or consolidate with another firm. We are also permitted to sell our assets substantially as an entirety to another firm. With regard to any series of debt securities, we may not take any of these actions, however, unless all the following conditions are met:

- If the successor firm in the transaction is not UBS, the successor firm must be organized as a corporation, partnership or trust and must expressly assume our obligations under the debt securities of that series and the debt indenture. The successor firm must be organized under the laws of Switzerland.

- Immediately after the transaction, no default under the debt securities of that series has occurred and is continuing. For this purpose, "default under the debt securities of that series" means an event of default with respect to that series or any event that would be an event of default with respect to that series if the requirements for giving us default notice and for our default having to continue for a specific period of time were disregarded. We describe these matters below under "—Default, Remedies and Waiver of Default."

If the conditions described above are satisfied with respect to the debt securities of any series, we will not need to obtain the approval of the holders of those debt securities in order to merge or consolidate or to sell our assets. Also, these conditions will apply only if we wish to merge or consolidate with another firm or sell our assets substantially as an entirety to another firm. We will not need to satisfy these conditions if we enter into other types of transactions, including any transaction in which we acquire the stock or assets of another firm, any transaction that involves a change of control of UBS but in which we do not merge or consolidate and any transaction in which we sell less than substantially all our assets.

Table of Contents

## Description of Debt Securities We May Offer

Also, if we merge, consolidate or sell our assets substantially as an entirety and the successor firm is a non-Swiss entity, neither we nor any successor would have any obligation to compensate you for any resulting adverse tax consequences to the debt securities.

### Defeasance and Covenant Defeasance

If indicated in the applicable prospectus supplement for a debt security, the provisions for full defeasance and covenant defeasance described below will apply to that debt security. In general, we expect these provisions to apply to each debt security that has a specified currency of U.S. dollars and is not a floating rate or indexed debt security.

**Full Defeasance**

If there is a change in U.S. federal tax law, as described below, we can legally release ourselves from all payment and other obligations on your debt security. This is called full defeasance. To do so, each of the following must occur:

- We must deposit in trust for the benefit of all holders of those debt securities, money, U.S. government or U.S. government agency notes or bonds or a combination of money and U.S. government or U.S. government agency notes or bonds that will, in each case, in the opinion of a nationally recognized firm of independent public accountants, generate enough cash to make interest, principal and any other payments on those debt securities on their various due dates.

- There must be a change in current U.S. federal tax law or an Internal Revenue Service ruling that lets us make the above deposit without causing the holders to be taxed on those debt securities any differently than if we did not make the deposit and just repaid the debt securities ourselves. Under current federal tax law, the deposit and our legal release from your debt securities would be treated as though we took back your debt security and gave you your share of the cash and notes or bonds deposited in trust. In that event, you could recognize gain or loss on your debt security.

- We must deliver to the trustee a legal opinion of our counsel confirming the tax law change described above.

If we ever fully defease your debt security, you would have to rely solely on the trust deposit for payments on your debt security. You would not be able to look to us for payment in the event of any shortfall.

**Covenant Defeasance**

Under current U.S. federal tax law, we can make the same type of deposit described above and be released from any restrictive covenants relating to your debt security that may be described in your prospectus supplement. This is called covenant defeasance. In that event, you would lose the protection of those restrictive covenants. In order to achieve covenant defeasance for any debt securities, we must do both of the following:

- We must deposit in trust for the benefit of all holders of those debt securities, money, U.S. government or U.S. government agency notes or bonds or a combination of money and U.S. government or U.S. government agency notes or bonds that will, in each case, in the opinion of a nationally recognized firm of independent public accountants, generate enough cash to make interest, principal and any other payments on those debt securities on their various due dates.

- We must deliver to the trustee a legal opinion of our counsel confirming that under U.S. federal income tax law as then in effect we may make the above deposit without causing you to be taxed on those debt securities any differently than if we did not make the deposit and just repaid those debt securities ourselves.

If we accomplish covenant defeasance with regard to your debt security, the following provisions of the debt indenture and your debt security would no longer apply:

- Any covenants that your prospectus supplement may state are applicable to your debt security; and

- The events of default resulting from a breach of covenants, described below in the fourth bullet point under "—Default, Remedies and Waiver of Default — Events of Default."

<u>Table of Contents</u>

**Description of Debt Securities We May Offer**

Any right we have to redeem will survive covenant defeasance with regard to those debt securities.

If we accomplish covenant defeasance on your debt security, you can still look to us for repayment of your debt security in the event of any shortfall in the trust deposit. You should note, however, that if one of the remaining events of default occurred, such as our bankruptcy, and your debt security became immediately due and payable, there may be a shortfall. Depending on the event causing the default you may not be able to obtain payment of the shortfall.

**Default, Remedies and Waiver of Default**

You will have special rights if an event of default with respect to your series of debt securities occurs and is not cured, as described in this subsection.

**Events of Default**

Unless your prospectus supplement says otherwise, when we refer to an event of default with respect to any series of debt securities, we mean any of the following:

- We do not pay the principal or any premium (including delivering any security or other property deliverable) on any debt security of that series at its maturity;
- We do not pay interest on any debt securities of that series within 30 days after it becomes due and payable;
- We do not deposit a sinking fund payment with regard to any debt securities of that series on its due date, but only if the payment is required in the applicable prospectus supplement;
- We remain in breach of any other covenant we make in the debt indenture for the benefit of the debt securities of that series, for 60 days after we receive a notice of default stating that we are in breach and requiring us to remedy the breach. The notice must be sent by the trustee or the holders of not less than 10% in principal amount of the relevant series of debt securities then outstanding;
- We file for bankruptcy or certain other bankruptcy, insolvency or reorganization events relating to UBS occur; or
- If the applicable prospectus supplement states that any additional event of default applies to your series, that event of default occurs.

**Remedies If an Event of Default Occurs**

If an event of default has occurred with respect to any series of debt securities and has not been cured or waived, the trustee or the holders of not less than 25% in principal amount of all debt securities of that series then outstanding may declare the entire principal amount of the debt securities of that series to be due immediately. If an event of default occurs because of bankruptcy, insolvency or reorganization events relating to UBS, the entire principal amount of the debt securities of that series will be automatically accelerated, without any action by the trustee or any holder.

Each of the situations described above is called an acceleration of the maturity of the affected series of debt securities. If the maturity of any series is accelerated and a judgment for payment has not yet been obtained, the holders of a majority in principal amount of the debt securities of that series may cancel the acceleration for the entire series.

If an event of default occurs, the trustee will have special duties. The trustee will be obligated to use those of its rights and powers under the debt indenture, and to use the same degree of care and skill in doing so, that a prudent person would use in that situation in conducting his or her own affairs.

Except as described in the prior paragraph, the trustee is not required to take any action under the debt indenture at the request of any holders unless the holders offer the trustee reasonable protection from expenses and liability. This is called an indemnity. If the trustee is provided with an indemnity reasonably satisfactory to it, the holders of a majority in principal amount of all debt securities of the relevant series may direct the time, method and place of conducting any lawsuit or other formal legal action seeking any remedy available to the trustee with respect to that series. These majority holders may also direct the trustee in performing any other action under the debt indenture with respect to the debt securities of that series.

22

Table of Contents

## Description of Debt Securities We May Offer

Before you bypass the trustee and bring your own lawsuit or other formal legal action or take other steps to enforce your rights or protect your interests relating to any debt security, all of the following must occur:

- The holder of your debt security must give the trustee written notice that an event of default has occurred, and the event of default must not have been cured or waived.

- The holders of not less than 25% in principal amount of all debt securities of your series must make a written request that the trustee take action because of the default, and they or other holders must offer to the trustee indemnity reasonably satisfactory to the trustee against the cost and other liabilities of taking that action.

- The trustee must not have taken action for 60 days after the above steps have been taken.

- During those 60 days, the holders of a majority in principal amount of the debt securities of your series must not have given the trustee directions that are inconsistent with the written request of the holders of not less than 25% in principal amount of all debt securities of your series.

You are, however, entitled at any time to bring a lawsuit for the payment of money due on your debt security on or after its due date.

### Waiver of Default

The holders of not less than a majority in principal amount of the debt securities of any series may waive a default for all debt securities of that series. If this happens, the default will be treated as if it has not occurred. No one can waive a payment default on your debt security, however, without the approval of the particular holder of that debt security.

### We Will Give the Trustee Information About Defaults Annually

We will furnish to the trustee every year a written statement of two of our officers certifying that to their knowledge we are in compliance with the debt indenture and the debt securities, or else specifying any default under the debt indenture.

Book-entry and other indirect holders should consult their banks or brokers for information on how to give notice or direction to or make a request of the trustee and how to declare or cancel an acceleration of the maturity of the debt securities. Book-entry and other indirect owners are described below under "Legal Ownership and Book-Entry Issuance."

## Modification and Waiver of Covenants

There are three types of changes we can make to the debt indenture and the debt securities of any series.

### Changes Requiring Each Holder's Approval

First, there are changes that cannot be made without the approval of each holder of a debt security affected by the change. Here is a list of those types of changes:

- change the stated maturity for any principal or interest payment on a debt security;

- reduce the principal amount, the amount payable on acceleration of the maturity after a default, the interest rate or the redemption price for a debt security;

- permit redemption of a debt security if not previously permitted;

- impair any right a holder may have to require repayment of his or her debt security;

- impair any right that a holder of an indexed or any other debt security may have to exchange or convert the debt security for or into securities or other property;

Table of Contents

**Description of Debt Securities We May Offer**

- change the currency of any payment on a debt security other than as permitted by the debt security;

- change the place of payment on a debt security, if it is in non-global form;

- impair a holder's right to sue for payment of any amount due on his or her debt security;

- reduce the percentage in principal amount of the debt securities of any one or more affected series, taken separately or together, as applicable, the approval of whose holders is needed to change the debt indenture or those debt securities;

- reduce the percentage in principal amount of the debt securities of any one or more affected series, taken separately or together, as applicable, the consent of whose holders is needed to waive our compliance with the debt indenture or to waive defaults; and

- change the provisions of the debt indenture dealing with modification and waiver in any other respect, except to increase any required percentage referred to above or to add to the provisions that cannot be changed or waived without approval of the holder of each affected debt security.

**Changes Not Requiring Approval of Holders**

The second type of change does not require any approval by holders of the debt securities of an affected series. This type of change is limited to clarifications and changes that would not adversely affect the debt securities of that series in any material respect. We also do not need any approval to make changes that affect only debt securities to be issued under the debt indenture after the changes take effect.

We may also make changes or obtain waivers that do not adversely affect a particular debt security, even if they affect other debt securities. In those cases, we do not need to obtain the approval of the holder of the unaffected debt security; we need only obtain any required approvals from the holders of the affected debt securities.

**Changes Requiring Majority Approval**

Any other change to the debt indenture and the debt securities would require the following approval:

- If the change affects only the debt securities of a particular series, it must be approved by the holders of 66 2/3% in principal amount of the debt securities of that series.

- If the change affects the debt securities of more than one series of debt securities issued under the debt indenture, it must be approved by the holders of 66 2/3% in principal amount of all series affected by the change, with the debt securities of all the affected series voting together as one class for this purpose (and of any affected series that by its terms is entitled to vote separately as a series, as described below).

In each case, the required approval must be given by written consent.

Majority approval would be required for us to obtain a waiver of any of our covenants in the debt indenture. Our covenants include the promises we make about merging, which we describe above under "—Mergers and Similar Transactions." If the holders approve a waiver of a covenant, we will not have to comply with that covenant. The holders, however, cannot approve a waiver of any provision in a particular debt security, or in the debt indenture as it affects that debt security, that we cannot change without the approval of the holder of that debt security as described above under "—Changes Requiring Each Holder's Approval," unless that holder approves the waiver.

Book-entry and other indirect holders should consult their banks or brokers for information on how approval may be granted or denied if we seek to change the debt indenture or the debt securities or request a waiver.

24

Table of Contents

**Description of Debt Securities We May Offer**

**Special Rules for Action by Holders**

When holders take any action under the debt indenture, such as giving a notice of default, declaring an acceleration, approving any change or waiver or giving the trustee an instruction, we will apply the following rules.

**Only Outstanding Debt Securities Are Eligible**

Only holders of outstanding debt securities of the applicable series will be eligible to participate in any action by holders of debt securities of that series. Also, we will count only outstanding debt securities in determining whether the various percentage requirements for taking action have been met. For these purposes, a debt security will not be "outstanding":

- if it has been surrendered for cancellation;
- if we have deposited or set aside, in trust for its holder, money for its payment or redemption;
- if we have fully defeased it as described above under "—Defeasance and Covenant Defeasance—Full Defeasance"; or
- if we or one of our affiliates, such as UBS Securities LLC or UBS Financial Services Inc., is the beneficial owner.

**Special Series Voting Rights**

We may issue series of debt securities that are entitled, by their terms, to vote separately on matters (for example, modification or waiver of provisions in the debt indenture) that would otherwise require a vote of all affected series, voting together as a single class. Any such series would be entitled to vote together with all other affected series, voting together as one class, and would also be entitled to vote separately, as a series only. These special voting rights will be described in the applicable prospectus supplement. For a series that does not have these special rights, voting will occur as described in the preceding section, but subject to any separate voting rights of any series having special rights. We may issue a series having these or other special voting rights without obtaining the consent of or giving notice to holders of outstanding series.

**Eligible Principal Amount of Some Debt Securities**

In some situations, we may follow special rules in calculating the principal amount of a debt security that is to be treated as outstanding for the purposes described above. This may happen, for example, if the principal amount is payable in a non-U.S. dollar currency, increases over time or is not to be fixed until maturity. For any debt security of the kind described below, we will decide how much principal amount to attribute to the debt security as follows:

- For an original issue discount debt security, we will use the principal amount that would be due and payable on the action date if the maturity of the debt security were accelerated to that date because of a default.
- For a debt security whose principal amount is not known, we will use any amount that we indicate in the prospectus supplement for that debt security. The principal amount of a debt security may not be known, for example, because it is based on an index that changes from time to time and the principal amount is not to be determined until a later date.
- For debt securities with a principal amount denominated in one or more non-U.S. dollar currencies or currency units, we will use the U.S. dollar equivalent, which we will determine.

**Determining Record Dates for Action by Holders**

We will generally be entitled to set any day as a record date for the purpose of determining the holders that are entitled to take action under the debt indenture. In certain limited circumstances, only the trustee will be entitled to set a record date for action by holders. If we or the trustee set a record date for an approval or other action to be taken by holders, that vote or action may be taken only by persons or entities who are holders on the record date and must be taken

25

Table of Contents

**Description of Debt Securities We May Offer**

during the period that we specify for this purpose, or that the trustee specifies if it sets the record date. We or the trustee, as applicable, may shorten or lengthen this period from time to time. This period, however, may not extend beyond the 180th day after the record date for the action. In addition, record dates for any global debt security may be set in accordance with procedures established by the depositary from time to time. Accordingly, record dates for global debt securities may differ from those for other debt securities.

**Form, Exchange and Transfer of Debt Securities**

We will issue each debt security in global—*i.e.*, book-entry—form only, unless we specify otherwise in the applicable prospectus supplement. Debt securities in book-entry form will be represented by a global security registered in the name of a depositary, which will be the holder of all the debt securities represented by the global security. Those who own beneficial interests in a global debt security will do so through participants in the depositary's securities clearance system, and the rights of these indirect owners will be governed solely by the applicable procedures of the depositary and its participants. We describe book-entry securities below under "Legal Ownership and Book-Entry Issuance." Unless we specify otherwise in the applicable prospectus supplement, The Depository Trust Company, New York, New York, known as DTC, will be the depositary for all debt securities in global form.

In addition, we will generally issue each debt security in registered form, without coupons, unless we specify otherwise in the applicable prospectus supplement. If we issue a debt security in bearer form, the applicable prospectus supplement will describe the provisions that would apply to that security.

If a debt security is issued as a global debt security, only the depositary—*e.g.*, DTC, Euroclear and Clearstream—will be entitled to transfer and exchange the debt security or exercise any other rights of a holder as described in this subsection, since the depositary will be the sole holder of the debt security.

If any debt securities cease to be issued in global form, then unless we indicate otherwise in your prospectus supplement, they will be issued:

- only in fully registered form;
- without interest coupons; and
- unless we indicate otherwise in your prospectus supplement, in denominations of $1,000 and integral multiples of $1,000.

Holders may exchange their debt securities for debt securities of smaller denominations (subject to the limit above) or combined into fewer debt securities of larger denominations, as long as the total principal amount is not changed. You may not exchange your debt securities for securities of a different series or having different terms, unless your prospectus supplement says you may.

Holders may exchange or transfer their debt securities at the office of the trustee. They may also replace lost, stolen, destroyed or mutilated debt securities at that office. We have appointed the trustee to act as our agent for registering debt securities in the names of holders and transferring and replacing debt securities. We may appoint another entity to perform these functions or perform them ourselves.

Holders will not be required to pay a service charge to transfer or exchange their debt securities, but they may be required to pay for any tax or other governmental charge associated with the exchange or transfer. The transfer or exchange, and any replacement, will be made only if our transfer agent is satisfied with the holder's proof of legal ownership. The transfer agent may require an indemnity before replacing any debt securities.

If we have designated additional transfer agents for your debt security, they will be named in your prospectus supplement. We may appoint additional transfer agents or cancel the appointment of any particular transfer agent. We may also approve a change in the office through which any transfer agent acts.

If the debt securities of any series are redeemable and we redeem less than all those debt securities, we may block the transfer or exchange of those debt securities during the period beginning 15 days before the day we mail the notice of redemption and ending on the day of that mailing or during any other period specified in the applicable prospectus

<u>Table of Contents</u>

**Description of Debt Securities We May Offer**

supplement, in order to freeze the list of holders who will receive the mailing. We may also refuse to register transfers of or exchange any debt security selected for redemption, except that we will continue to permit transfers and exchanges of the unredeemed portion of any debt security being partially redeemed.

The rules for exchange described above apply to exchanges of debt securities for other debt securities of the same series and kind. If a debt security is convertible, exercisable or exchangeable into or for a different kind of security, such as one that we have not issued, or for other property, the rules governing that type of conversion, exercise or exchange will be described in the applicable prospectus supplement.

**Payment Mechanics for Debt Securities**

**Who Receives Payments?**

If interest is due on a debt security on an interest payment date, we will pay the interest to the person in whose name the debt security is registered at the close of business on the regular record date described below relating to the interest payment date. If interest is due at maturity but on a day that is not an interest payment date, we will pay the interest to the person entitled to receive the principal of the debt security. If principal or another amount besides interest is due on a debt security at maturity, we will pay the amount to the holder of the debt security against surrender of the debt security at a proper place of payment (or, in the case of a global debt security, in accordance with the applicable policies of the depositary).

**Payment Dates and Regular Record Dates for Interest**

Unless we specify otherwise in the applicable prospectus supplement, interest on any fixed rate debt security will be payable semiannually each May 15 and November 15 and at maturity, and the regular record date relating to an interest payment date for any fixed rate debt security will be the May 1 or November 1 next preceding that interest payment date. The regular record date relating to an interest payment date for any floating rate debt security will be the 15th calendar day before that interest payment date. These record dates will apply whether or not a particular record date is a business day. For the purpose of determining the holder at the close of business on a regular record date when business is not being conducted, the close of business will mean 5:00 P.M., New York City time, on that day.

The term "business day" means, for any debt security, a day that meets all the following applicable requirements:

- for all debt securities, is a Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in New York City generally are authorized or obligated by law, regulation or executive order to close and that satisfies any other criteria specified in your prospectus supplement;

- if the debt security is a floating rate debt security whose interest rate is based on LIBOR, is also a day on which dealings in the relevant index currency specified in the applicable prospectus supplement are transacted in the London interbank market;

- if the debt security has a specified currency other than U.S. dollars or euros, is also a day on which banking institutions are not authorized or obligated by law, regulation or executive order to close in the principal financial center of the country issuing the specified currency;

➢ if the debt security either is a floating rate debt security whose interest rate is based on EURIBOR or has a specified currency of euros, is also a day on which the Trans-European Automated Real-time Gross settlement Express Transfer (TARGET) System, or any successor system, is open for business;

➢ if the debt security is held through Euroclear, is also not a day on which banking institutions in Brussels, Belgium are generally authorized or obligated by law, regulation or executive order to close; and

➢ if the debt security is held through Clearstream, is also not a day on which banking institutions in Luxembourg are generally authorized or obligated by law, regulation or executive order to close.

27

Table of Contents

## Description of Debt Securities We May Offer

### How We Will Make Payments Due in U.S. Dollars

We will follow the practices described in this subsection when paying amounts due in U.S. dollars. Payments of amounts due in other currencies will be made as described in the next subsection.

**Payments on Global Debt Securities.**   We will make payments on a global debt security in accordance with the applicable policies of the depositary as in effect from time to time. Under those policies, we will pay directly to the depositary, or its nominee, and not to any indirect owners who own beneficial interests in the global debt security. An indirect owner's right to receive those payments will be governed by the rules and practices of the depositary and its participants, as described under "Legal Ownership and Book-Entry Issuance —What Is a Global Security?"

**Payments on Non-Global Debt Securities.**   We will make payments on a debt security in non-global, registered form as follows. We will pay interest that is due on an interest payment date by check mailed on the interest payment date to the holder at his or her address shown on the trustee's records as of the close of business on the regular record date. We will make all other payments by check at the paying agent described below, against surrender of the debt security. All payments by check will be made in next-day funds—that is, in funds that become available on the day after the check is cashed.

Alternatively, if a non-global debt security has a face amount of at least $1,000,000 and the holder asks us to do so, we will pay any amount that becomes due on the debt security by wire transfer of immediately available funds to an account at a bank in New York City, on the due date. To request wire payment, the holder must give the paying agent appropriate wire transfer instructions at least five business days before the requested wire payment is due. In the case of any interest payment due on an interest payment date, the instructions must be given by the person who is the holder on the relevant regular record date. In the case of any other payment, payment will be made only after the debt security is surrendered to the paying agent. Any wire instructions, once properly given, will remain in effect unless and until new instructions are given in the manner described above.

Book-entry and other indirect owners should consult their banks or brokers for information on how they will receive payments on their debt securities.

### How We Will Make Payments Due in Other Currencies

We will follow the practices described in this subsection when paying amounts that are due in a specified currency other than U.S. dollars.

**Payments on Global Debt Securities.**   We will make payments on a global debt security in accordance with the applicable policies of the depositary as in effect from time to time. We understand that these policies, as currently in effect at DTC, are as follows:

Unless otherwise indicated in your prospectus supplement, if you are an indirect owner of global debt securities denominated in a specified currency other than U.S. dollars and if you have the right to elect to receive payments in that other currency and you do make that election, you must notify the participant through which your interest in the global debt security is held of your election:

- on or before the applicable regular record date, in the case of a payment of interest, or
- on or before the 16th day prior to stated maturity, or any redemption or repayment date, in the case of payment of principal or any premium.

You may elect to receive all or only a portion of any interest, principal or premium payment in a specified currency other than U.S. dollars.

Your participant must, in turn, notify DTC of your election on or before the third DTC business day after that regular record date, in the case of a payment of interest, and on or before the 12th DTC business day prior to stated maturity, or on the redemption or repayment date if your debt security is redeemed or repaid earlier, in the case of a payment of principal or any premium.

Table of Contents

**Description of Debt Securities We May Offer**

DTC, in turn, will notify the paying agent of your election in accordance with DTC's procedures.

If complete instructions are received by the participant and forwarded by the participant to DTC, and by DTC to the paying agent, on or before the dates noted above, the paying agent, in accordance with DTC's instructions, will make the payments to you or your participant by wire transfer of immediately available funds to an account maintained by you or your participant with a bank located in the country issuing the specified currency or in another jurisdiction acceptable to us and the paying agent.

If the foregoing steps are not properly completed, we expect DTC to inform the paying agent that payment is to be made in U.S. dollars. In that case, we or our agent will convert the payment to U.S. dollars in the manner described below under "—Conversion to U.S. Dollars." We expect that we or our agent will then make the payment in U.S. dollars to DTC, and that DTC in turn will pass it along to its participants.

Book-entry and other indirect holders of a global debt security denominated in a currency other than U.S. dollars should consult their banks or brokers for information on how to request payment in the specified currency.

**Payments on Non-Global Debt Securities.**   Except as described in the second to last paragraph under this heading, we will make payments on debt securities in non-global form in the applicable specified currency. We will make these payments by wire transfer of immediately available funds to any account that is maintained in the applicable specified currency at a bank designated by the holder and is acceptable to us and the trustee. To designate an account for wire payment, the holder must give the paying agent appropriate wire instructions at least five business days before the requested wire payment is due. In the case of any interest payment due on an interest payment date, the instructions must be given by the person who is the holder on the regular record date. In the case of any other payment, the payment will be made only after the debt security is surrendered to the paying agent. Any instructions, once properly given, will remain in effect unless and until new instructions are properly given in the manner described above.

If a holder fails to give instructions as described above, we will notify the holder at the address in the trustee's records and will make the payment within five business days after the holder provides appropriate instructions. Any late payment made in these circumstances will be treated under the debt indenture as if made on the due date, and no interest will accrue on the late payment from the due date to the date paid.

Although a payment on a debt security in non-global form may be due in a specified currency other than U.S. dollars, we will make the payment in U.S. dollars if the holder asks us to do so. To request U.S. dollar payment, the holder must provide appropriate written notice to the trustee at least five business days before the next due date for which payment in U.S. dollars is requested. In the case of any interest payment due on an interest payment date, the request must be made by the person who is the holder on the regular record date. Any request, once properly made, will remain in effect unless and until revoked by notice properly given in the manner described above.

Indirect owners of a non-global debt security with a specified currency other than U.S. dollars should contact their banks or brokers for information about how to receive payments in the specified currency or in U.S. dollars.

**Conversion to U.S. Dollars.**   When we are asked by a holder to make payments in U.S. dollars of an amount due in another currency, either on a global debt security or a non-global debt security as described above, we will determine the U.S. dollar amount the holder receives as follows. The exchange rate agent described below will request currency bid quotations expressed in U.S. dollars from three or, if three are not available, then two, recognized foreign exchange dealers in New York City, any of which may be the exchange rate agent, which may be UBS Securities LLC, an affiliate of UBS, as of 11:00 A.M., New York City time, on the second business day before the payment date. Currency bid quotations will be requested on an aggregate basis, for all holders of debt securities requesting U.S. dollar payments of amounts due on the same date in the same specified currency. The U.S. dollar amount the holder receives will be based on the highest acceptable currency bid quotation received by the exchange rate agent. If the exchange rate agent determines that at least two acceptable currency bid quotations are not available on that second business day, the payment will be made in the specified currency.

To be acceptable, a quotation must be given as of 11:00 A.M., New York City time, on the second business day before the due date and the quoting dealer must commit to execute a contract at the quotation in the total amount due in that

Table of Contents

**Description of Debt Securities We May Offer**

currency on all series of debt securities. If some but not all of the relevant debt securities are LIBOR debt securities or EURIBOR debt securities, the second preceding business day will be determined for this purpose as if none of those debt securities were LIBOR debt securities or EURIBOR debt securities.

A holder that requests payment in U.S. dollars will bear all associated currency exchange costs, which will be deducted from the payment.

**When the Specified Currency Is Not Available.**    If we are obligated to make any payment in a specified currency other than U.S. dollars, and the specified currency or any successor currency is not available to us or cannot be paid to you due to circumstances beyond our control—such as the imposition of exchange controls or a disruption in the currency markets—we will be entitled to satisfy our obligation to make the payment in that specified currency by making the payment in U.S. dollars, on the basis specified in the applicable prospectus supplement.

For a specified currency other than U.S. dollars, the exchange rate will be the noon buying rate for cable transfers of the specified currency in New York City as quoted by the Federal Reserve Bank of New York on the then-most recent day on which that bank has quoted that rate.

The foregoing will apply to any debt security, whether in global or non-global form, and to any payment, including a payment at maturity. Any payment made under the circumstances and in a manner described above will not result in a default under any debt security or the debt indenture.

**Exchange Rate Agent.**    If we issue a debt security in a specified currency other than U.S. dollars, we will appoint a financial institution to act as the exchange rate agent and will name the institution initially appointed when the debt security is originally issued in the applicable prospectus supplement. We may select UBS Securities LLC or another of our affiliates to perform this role. We may change the exchange rate agent from time to time after the original issue date of the debt security without your consent and without notifying you of the change.

All determinations made by the exchange rate agent will be at its sole discretion unless we state in your prospectus supplement that any determination is subject to our approval. In the absence of manifest error, those determinations will be conclusive for all purposes and binding on you and us, without any liability on the part of the exchange rate agent.

**Payment When Offices Are Closed**

If any payment is due on a debt security on a day that is not a business day, we will make the payment on the next day that is a business day. Unless specified otherwise in the applicable prospectus supplement, payments postponed to the next business day in this situation will be treated under the debt indenture as if they were made on the original due date. Postponement of this kind will not result in a default under any debt security or the debt indenture, and no interest will accrue on the postponed amount from the original due date to the next day that is a business day. The term business day has a special meaning, which we describe above under "—Payment Dates and Regular Record Dates for Interest."

**Paying Agent**

We may appoint one or more financial institutions to act as our paying agents, at whose designated offices debt securities in non-global entry form may be surrendered for payment at their maturity. We call each of those offices a paying agent. We may add, replace or terminate paying agents from time to time. We may also choose to act as our own paying agent. Initially, we have appointed the trustee, at its corporate trust office in New York City, as the paying agent. We must notify the trustee of changes in the paying agents.

**Settlement Mechanics**

The settlement mechanics applicable to debt securities calling for physical settlement will be described in the applicable prospectus supplement.

30

Table of Contents

## Description of Debt Securities We May Offer

### Unclaimed Payments

Regardless of who acts as paying agent, all money paid by us to a paying agent that remains unclaimed at the end of two years after the amount is due to a holder will be repaid to us. After that two-year period, the holder may look only to us for payment and not to the trustee, any other paying agent or anyone else.

### Notices

Notices to be given to holders of a global debt security will be given only to the depositary, in accordance with its applicable policies as in effect from time to time. Notices to be given to holders of debt securities not in global form will be sent by mail to the respective addresses of the holders as they appear in the trustee's records, and will be deemed given when mailed. Neither the failure to give any notice to a particular holder, nor any defect in a notice given to a particular holder, will affect the sufficiency of any notice given to another holder.

Book-entry and other indirect holders should consult their banks or brokers for information on how they will receive notices.

### Our Relationship with the Trustee

U.S. Bank Trust National Association has provided commercial banking and other services for us and our affiliates in the past and may do so in the future. Among other things, U.S. Bank Trust National Association holds debt securities issued by us and serves as trustee or agent with regard to other obligations of UBS or its subsidiaries.

U.S. Bank Trust National Association is serving as the trustee for the debt securities and the warrants issued under our warrant indenture. Consequently, if an actual or potential event of default occurs with respect to any of these securities, the trustee may be considered to have a conflicting interest for purposes of the Trust Indenture Act of 1939. In that case, the trustee may be required to resign under one or more of the indentures, and we would be required to appoint a successor trustee. For this purpose, a "potential" event of default means an event that would be an event of default if the requirements for giving us default notice or for the default having to exist for a specific period of time were disregarded.

31

Table of Contents

# Description of Warrants We May Offer

*Please note that in this section entitled "Description of Warrants We May Offer," references to UBS AG, we, our and us refer only to UBS AG and not to its consolidated subsidiaries. Also, in this section, references to "holders" mean those who own warrants registered in their own names, on the books that we or the trustee or warrant agent, as applicable, maintain for this purpose, and not those who own beneficial interests in warrants registered in street name or in warrants issued in book-entry form through one or more depositaries. Owners of beneficial interests in the warrants should read the section below entitled "Legal Ownership and Book-Entry Issuance."*

## We May Issue Many Series of Warrants

We may issue warrants that are debt warrants or universal warrants. We may offer warrants separately or together with other warrants or with our debt securities.

We may issue warrants in such amounts or in as many distinct series as we wish. We will issue each series of warrants under either the warrant indenture between UBS and U.S. Bank Trust National Association, or a warrant agreement, to be entered into before the first issuance of warrants under such warrant agreement, between UBS and a warrant agent to be named in the prospectus supplement applicable to the first series of warrants to be issued pursuant to such a warrant agreement. This section summarizes terms of the warrant indenture and warrant agreements and terms of the warrants that apply generally to all series of warrants. Most of the financial and other specific terms of your warrant will be described in the prospectus supplement accompanying this prospectus. Those terms may vary from the terms described here.

As you read this section, please remember that the specific terms of your warrant as described in your prospectus supplement will supplement and, if applicable, may modify or replace the general terms described in this section. If there are differences between your prospectus supplement and this prospectus, your prospectus supplement will control. Thus, the statements we make in this section may not apply to your warrant.

When we refer to a series of warrants, we mean all warrants issued as part of the same series under the warrant indenture or warrant agreement. When we refer to your prospectus supplement, we mean the prospectus supplement describing the specific terms of the warrant you purchase. The terms used in your prospectus supplement will have the meanings described in this prospectus, unless otherwise specified.

## Types of Warrants

We may issue any of the following types of warrants:

### Debt Warrants

We may issue warrants for the purchase of our debt securities on terms to be determined at the time of sale. We refer to this type of warrant as a "debt warrant."

### Universal Warrants

We may also issue warrants, on terms to be determined at the time of sale, for the purchase or sale of, or whose cash value is determined by reference to the performance, level or value of, one or more of the following:

- securities of one or more issuers other than UBS AG;
- one or more currencies;
- one or more commodities;
- any other financial, economic or other measure or instrument, including the occurrence or non-occurrence of any event or circumstance; and
- one or more indices or baskets of the items described above.

32

Table of Contents

## Description of Warrants We May Offer

We refer to this type of warrant as a "universal warrant." We refer to each property described above as a "warrant property."

We may satisfy our obligations, if any, and the holder of a universal warrant may satisfy its obligations, if any, with respect to any universal warrants by delivering:

- the warrant property;
- the cash value of the warrant property; or
- the cash value of the warrants determined by reference to the performance, level or value of the warrant property.

The applicable prospectus supplement will describe what we may deliver to satisfy our obligations, if any, and what the holder of a universal warrant may deliver to satisfy its obligations, if any, with respect to any universal warrants.

### Information In Your Prospectus Supplement

### All Warrants

Your prospectus supplement will describe the specific terms of your warrant, which will include some or all of the following:

- the specific designation and aggregate number of, and the price at which we will issue, the warrants;
- the currency with which the warrants may be purchased;
- the warrant indenture or warrant agreement under which we will issue the warrants;
- the date on which the right to exercise the warrants will begin and the date on which that right will expire or, if you may not continuously exercise the warrants throughout that period, the specific date or dates on which you may exercise the warrants;
- whether the warrants will be issued in fully registered form or bearer form, in global or non-global form or in any combination of these forms;
- the identities of the warrant agent, any depositaries and any paying, transfer, calculation or other agents for the warrants;
- any securities exchange or quotation system on which the warrants or any securities deliverable upon exercise of the warrants may be listed;
- whether the warrants are to be sold separately or with other securities; and
- any other terms of the warrants.

If we issue warrants together with any other warrants or any debt securities, the applicable prospectus supplement will specify whether the warrants will be separable from the other securities before the warrants' expiration date.

No holder of a warrant will have any rights of a holder of the warrant property purchasable under the warrant.

An investment in a warrant may involve special risks, including risks associated with indexed securities and currency-related risks if the warrant or the warrant property is linked to an index or is payable in or otherwise linked to a non-U.S. dollar currency. We describe some of these risks below under "Considerations Relating to Indexed Securities" and "Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency."

We and our affiliates may resell warrants in market-making transactions after their initial issuance. We discuss these transactions above under "Description of Debt Securities We May Offer—Information in Your Prospectus Supplement."

<u>Table of Contents</u>

## Description of Warrants We May Offer

### Debt Warrants

If you purchase debt warrants, your prospectus supplement may contain, where applicable, the following additional information about your warrants:

- the designation, aggregate principal amount, currency and terms of the debt securities that may be purchased upon exercise of the debt warrants;

- the exercise price and whether the exercise price may be paid in cash, by the exchange of any debt warrants or other securities or both and the method of exercising the debt warrants; and

- the designation, terms and amount of debt securities, if any, to be issued together with each of the debt warrants and the date, if any, after which the debt warrants and debt securities will be separately transferable.

### Universal Warrants

If you purchase universal warrants, your prospectus supplement may contain, where applicable, the following additional information about your warrants:

- whether the universal warrants are put warrants or call warrants, including in either case warrants that may be settled by means of net cash settlement or cashless exercise, or any other type of warrants;

- the money or warrant property, and the amount or method for determining the amount of money or warrant property, payable or deliverable upon exercise of each universal warrant;

- the price at which and the currency with which the warrant property may be purchased or sold upon the exercise of each universal warrant, or the method of determining that price;

- whether the exercise price may be paid in cash, by the exchange of any universal warrants or other securities or both, and the method of exercising the universal warrants; and

- whether the exercise of the universal warrants is to be settled in cash or by delivery of the warrant property or both and whether settlement will occur on a net basis or a gross basis.

### This Section Is Only a Summary

The warrant indenture or warrant agreement and its associated documents, including your warrant, contain the full legal text of the matters described in this section and your prospectus supplement. We have filed a copy of the warrant indenture with the SEC as an exhibit to our registration statement. See "Where You Can Find More Information" above for information on how to obtain a copy of it. We will describe the warrant agreement under which we issue any warrants in the applicable prospectus supplement, and we will file that agreement with the SEC as an exhibit to an amendment to the registration statement of which this prospectus is a part or as an exhibit to a Form 6-K and incorporated herein by reference. See "Where You Can Find More Information" above for information on how to obtain a copy of a warrant agreement when it is filed.

This section and your prospectus supplement summarize all the material terms of the warrant indenture or warrant agreement and your warrant. They do not, however, describe every aspect of the warrant indenture or warrant agreement and your warrant. For example, in this section and in your prospectus supplement, we use terms that have been given special meaning in the warrant indenture or warrant agreement, but we describe the meaning for only the more important of those terms.

### The Warrant Indenture

We may issue universal warrants under the warrant indenture. Warrants of this kind will not be secured by any property or assets of UBS or its subsidiaries. Thus, by owning a warrant issued under the warrant indenture, you hold one of our unsecured obligations.

The warrants issued under the warrant indenture will be contractual obligations of UBS and will rank equally with all of our other unsecured contractual obligations and unsecured and unsubordinated debt. The warrant indenture does not limit our ability to incur additional contractual obligations or debt.

34

Table of Contents

## Description of Warrants We May Offer

The warrant indenture is a contract between us and U.S. Bank Trust National Association, which acts as trustee. The trustee has two main roles:

- First, the trustee can enforce your rights against us if we default. There are limitations on the extent to which the trustee acts on your behalf, which we describe later under "—Default, Remedies and Waiver of Default."
- Second, the trustee performs administrative duties for us, such as sending you payments and notices.

### We May Issue Many Series of Warrants Under the Warrant Indenture

We may issue as many distinct series of warrants under the warrant indenture as we wish. This section summarizes terms of the warrants that apply generally to all series issued under the warrant indenture. The provisions of the warrant indenture allow us not only to issue warrants with terms different from those of warrants previously issued under the warrant indenture, but also to "reopen" a previous issue of a series of warrants and issue additional warrants of that series.

### Amounts That We May Issue

The warrant indenture does not limit the aggregate number of warrants that we may issue or the number of series or the aggregate amount of any particular series. We may issue warrants and other securities at any time without your consent and without notifying you.

The warrant indenture and the warrants do not limit our ability to incur other contractual obligations or indebtedness or to issue other securities. Also, the terms of the warrants do not impose financial or similar restrictions on us.

### Expiration Date and Payment or Settlement Date

The term "expiration date" with respect to any warrant means the date on which the right to exercise the warrant expires. The term "payment or settlement date" with respect to any warrant means the date when any money or warrant property with respect to that warrant becomes payable or deliverable upon exercise or redemption of that warrant in accordance with its terms.

### Governing Law

The warrant indenture is, and the warrants issued under it will be, governed by New York law.

### Currency of Warrants

Amounts that become due and payable on your warrant will be payable in a currency, composite currency, basket of currencies or currency unit or units specified in your prospectus supplement. We refer to this currency, composite currency, basket of currencies or currency unit or units as a "specified currency." The specified currency for your warrant will be U.S. dollars, unless your prospectus supplement states otherwise. You will have to pay for your warrant by delivering the requisite amount of the specified currency to UBS Securities LLC, UBS Financial Services Inc. or another firm that we name in your prospectus supplement, unless other arrangements have been made between you and us or you and that firm. We will make payments on your warrants in the specified currency, except as described below in "—Payment Mechanics for Warrants." See "Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency" below for more information about risks of investing in warrants of this kind.

### Redemption

We will not be entitled to redeem your warrant before its expiration date unless your prospectus supplement specifies a redemption commencement date.

If your prospectus supplement specifies a redemption commencement date, it will also specify one or more redemption prices. It may also specify one or more redemption periods during which the redemption prices relating to a redemption of warrants during those periods will apply.

Table of Contents

## Description of Warrants We May Offer

If your prospectus supplement specifies a redemption commencement date, your warrant will be redeemable at our option at any time on or after that date or at a specified time or times. If we redeem your warrant, we will do so at the specified redemption price. If different prices are specified for different redemption periods, the price we pay will be the price that applies to the redemption period during which your warrant is redeemed.

If we exercise an option to redeem any warrant, we will give to the trustee and holders written notice of the redemption price of the warrant to be redeemed, not less than 10 days nor more than 60 days before the applicable redemption date or within any other period before the applicable redemption date specified in the applicable prospectus supplement. We will give the notice in the manner described below in "—Notices."

We or our affiliates may purchase warrants from investors who are willing to sell from time to time, either in the open market at prevailing prices or in private transactions at negotiated prices. Warrants that we or they purchase may, at our discretion, be held, resold or cancelled.

### Mergers and Similar Transactions

We are generally permitted to merge or consolidate with another corporation or other entity. We are also permitted to sell our assets substantially as an entirety to another corporation or other entity. With regard to any series of warrants, however, we may not take any of these actions unless all the following conditions are met:

- If the successor entity in the transaction is not UBS, the successor entity must be organized as a corporation, partnership or trust and must expressly assume our obligations under the warrants of that series and the warrant indenture. The successor entity may be organized under the laws of any jurisdiction, whether in Switzerland or elsewhere.

- Immediately after the transaction, no default under the warrants of that series has occurred and is continuing. For this purpose, "default under the warrants of that series" means an event of default with respect to that series or any event that would be an event of default with respect to that series if the requirements for giving us default notice and for our default having to continue for a specific period of time were disregarded. We describe these matters below under "—Default, Remedies and Waiver of Default."

If the conditions described above are satisfied with respect to the warrants of any series, we will not need to obtain the approval of the holder of those warrants in order to merge or consolidate or to sell our assets. Also, these conditions will apply only if we wish to merge or consolidate with another entity or sell our assets substantially as an entirety to another entity. We will not need to satisfy these conditions if we enter into other types of transactions, including any transaction in which we acquire the stock or assets of another entity, any transaction that involves a change of control of UBS but in which we do not merge or consolidate and any transaction in which we sell less than substantially all our assets.

Also, if we merge, consolidate or sell our assets substantially as an entirety and the successor is a non-Swiss entity, neither we nor any successor would have any obligation to compensate you for any resulting adverse tax consequences relating to your warrants.

### Default, Remedies and Waiver of Default

You will have special rights if an event of default with respect to your warrant occurs and is continuing, as described in this subsection.

**Events of Default.** Unless your prospectus supplement says otherwise, when we refer to an event of default with respect to any series of warrants issued under the warrant indenture, we mean that, upon satisfaction by the holder of the warrant of all conditions precedent to our relevant obligation or covenant to be satisfied by the holder, any of the following occurs:

- We do not pay any money or deliver any warrant property with respect to that warrant on the payment or settlement date in accordance with the terms of that warrant;

36

<u>Table of Contents</u>

## Description of Warrants We May Offer

- We remain in breach of any covenant we make in the warrant indenture for the benefit of the holder of that warrant for 60 days after we receive a notice of default stating that we are in breach and requiring us to remedy the breach. The notice must be sent by the trustee or the holders of at least 10% in number of the relevant series of warrants;

- We file for bankruptcy or certain other bankruptcy, insolvency or reorganization events relating to UBS occur; or

- If the applicable prospectus supplement states that any additional event of default applies to the series, that event of default occurs.

If we do not pay any money or deliver any warrant property when due with respect to a particular warrant of a series, as described in the first bullet point above, that failure to make a payment or delivery will not constitute an event of default with respect to any other warrant of the same series or any other series.

**Remedies If an Event of Default Occurs.**   If an event of default occurs with respect to any series of warrants issued under the warrant indenture, the trustee will have special duties. In that situation, the trustee will be obligated to use those of its rights and powers under the warrant indenture, and to use the same degree of care and skill in doing so, that a prudent person would use in that situation in conducting his or her own affairs.

Except as described in the prior paragraph, the trustee is not required to take any action under the warrant indenture at the request of any holders unless the holders offer the trustee reasonable protection from expenses and liability. This is called an indemnity. If the trustee is provided with an indemnity reasonably satisfactory to it, the holders of a majority in number of all warrants of the relevant series may direct the time, method and place of conducting any lawsuit or other formal legal action seeking any remedy available to the trustee. These majority holders may also direct the trustee in performing any other action under the warrant indenture with respect to the warrants of that series.

Before you bypass the trustee and bring your own lawsuit or other formal legal action or take other steps to enforce your rights or protect your interests relating to any warrant issued under the warrant indenture, all of the following must occur:

- The holder of your warrant must give the trustee written notice that an event of default has occurred, and the event of default must not have been cured or waived.

- The holders of not less than 25% in number of all warrants of your series must make a written request that the trustee take action because of the default, and they or other holders must offer to the trustee indemnity reasonably satisfactory to the trustee against the cost and other liabilities of taking that action.

- The trustee must not have taken action for 60 days after the above steps have been taken.

- During those 60 days, the holders of a majority in number of the warrants of your series must not have given the trustee directions that are inconsistent with the written request of the holders of not less than 25% in number of the warrants of your series.

You are, however, entitled at any time to bring a lawsuit for the payment of any money or delivery of any warrant property due on your warrant on or after its payment or settlement date.

**Waiver of Default.**   The holders of not less than a majority in number of the warrants of any series may waive a default for all warrants of that series. If this happens, the default will be treated as if it has not occurred. No one can waive a default in payment of any money or delivery of any warrant property due on any warrant, however, without the approval of the particular holder of that warrant.

**We Will Give the Trustee Information About Defaults Annually.**   We will furnish to the trustee every year a written statement of two of our officers certifying that to their knowledge we are in compliance with the warrant indenture and the warrants issued under it, or else specifying any default under the indenture.

Book-entry and other indirect owners should consult their banks or brokers for information on how to give notice or direction to or make a request of the trustee. Book-entry and other indirect owners are described below under "Legal Ownership and Book-Entry Issuance."

Table of Contents

## Description of Warrants We May Offer

### Modification and Waiver of Covenants

There are three types of changes we can make to the warrant indenture and the warrants of any series issued under the warrant indenture.

**Changes Requiring Each Holder's Approval.**   First, there are changes that cannot be made without the approval of each holder of a warrant affected by the change. Here is a list of those types of changes:

- change the exercise price of the warrant;

- change the terms of any warrant with respect to the payment or settlement date of the warrant;

- reduce the amount of money payable or reduce the amount or change the kind of warrant property deliverable upon the exercise of the warrant or any premium payable upon redemption of the warrant;

- change the currency of any payment on a warrant;

- change the place of payment on a warrant;

- permit redemption of a warrant if not previously permitted;

- impair a holder's right to exercise its warrant, or sue for payment of any money payable or delivery of any warrant property deliverable with respect to its warrant on or after the payment or settlement date or, in the case of redemption, the redemption date;

- if any warrant provides that the holder may require us to repurchase the warrant, impair the holder's right to require repurchase of the warrant;

- reduce the percentage in number of the warrants of any one or more affected series, taken separately or together, as applicable, the approval of whose holders is needed to change the indenture or those warrants;

- reduce the percentage in number of the warrants of any one or more affected series, taken separately or together, as applicable, the consent of whose holders is needed to waive our compliance with the indenture or to waive defaults; and

- change the provisions of the indenture dealing with modification and waiver in any other respect, except to increase any required percentage referred to above or to add to the provisions that cannot be changed or waived without approval of the holder of each affected warrant.

**Changes Not Requiring Approval of Holders.**   The second type of change does not require any approval by holders of the warrants of an affected series. These changes are limited to clarifications and changes that would not adversely affect the warrants of that series in any material respect. Nor do we need any approval to make changes that affect only warrants to be issued under the warrant indenture after the changes take effect.

We may also make changes or obtain waivers that do not adversely affect a particular warrant, even if they affect other warrants. In those cases, we do not need to obtain the approval of the holder of that warrant; we need only obtain any required approvals from the holders of the affected warrants.

**Changes Requiring Majority Approval.**   Any other change to the warrant indenture and the warrants issued under the warrant indenture would require the following approval:

- If the change affects only the warrants of a particular series, it must be approved by the holders of a majority in number of the warrants of that series.

- If the change affects the warrants of more than one series issued under the warrant indenture, it must be approved by the holders of a majority in number of all series affected by the change, with the warrants of all the affected series voting together as one class for this purpose.

In each case, the required approval must be given by written consent.

The same majority approval would be required for us to obtain a waiver of any of our covenants in the warrant indenture. If the holders approve a waiver of a covenant, we will not have to comply with that covenant. The holders,

<u>Table of Contents</u>

## Description of Warrants We May Offer

however, cannot approve a waiver of any provision in a particular warrant, or in the warrant indenture as it affects that warrant, that we cannot change without the approval of the holder of that warrant as described above in "—Changes Requiring Each Holder's Approval," unless that holder approves the waiver.

Book-entry and other indirect owners should consult their banks or brokers for information on how approval may be granted or denied if we seek to change the warrant indenture or any warrants or request a waiver.

### Special Rules for Action by Holders

When holders take any action under the warrant indenture, such as giving a notice of default, approving any change or waiver or giving the trustee an instruction, we will apply the following rules.

**Only Outstanding Warrants Are Eligible.**   Only holders of outstanding warrants of the applicable series will be eligible to participate in any action by holders of warrants of that series. Also, we will count only outstanding warrants in determining whether the various percentage requirements for taking action have been met. For these purposes, a warrant will not be "outstanding":

- if it has been surrendered for cancellation;
- if it has been called for redemption;
- if we have deposited or set aside, in trust for its holder, money or warrant property for its payment or settlement; or
- if we or one of our affiliates, such as UBS Securities LLC or UBS Financial Services Inc., is the beneficial owner.

**Determining Record Dates for Action by Holders.**   We will generally be entitled to set any day as a record date for the purpose of determining the holders that are entitled to take action under the warrant indenture. In certain limited circumstances, only the trustee will be entitled to set a record date for action by holders. If we or the trustee set a record date for an approval or other action to be taken by holders, that vote or action may be taken only by persons or entities who are holders on the record date and must be taken during the period that we specify for this purpose, or that the trustee specifies if it sets the record date. We or the trustee, as applicable, may shorten or lengthen this period from time to time. This period, however, may not extend beyond the 180th day after the record date for the action. In addition, record dates for any global warrant may be set in accordance with procedures established by the depositary from time to time. Accordingly, record dates for global warrants may differ from those for other warrants.

### Notices

Notices to be given to holders of a global warrant will be given only to the depositary, in accordance with its applicable policies as in effect from time to time. Notices to be given to holders of warrants not in global form will be sent by mail to the respective addresses of the holders as they appear in the trustee's records, and will be deemed given when mailed. Neither the failure to give any notice to a particular holder, nor any defect in a notice given to a particular holder, will affect the sufficiency of any notice given to another holder.

Book-entry and other indirect owners should consult their banks or brokers for information on how they will receive notices.

### The Warrant Agreements

We may issue debt warrants and some universal warrants in one or more series and under one or more warrant agreements, each to be entered into between us and a bank, trust company or other financial institution as warrant agent. We may add, replace or terminate warrant agents from time to time. We may also choose to act as our own warrant agent. We will describe the warrant agreement under which we issue any warrants in the applicable prospectus supplement, and we will file that agreement with the SEC as an exhibit to an amendment to the registration statement of which this prospectus is a part or as an exhibit to a Form 6-K and incorporated herein by reference. See "Where You Can Find More Information" above for information on how to obtain a copy of a warrant agreement when it is filed.

39

<u>Table of Contents</u>

## Description of Warrants We May Offer

We may also issue universal warrants under the warrant indenture. For these warrants, the applicable provisions of the warrant indenture described above would apply instead of the provisions described in this section.

### Enforcement of Rights

The warrant agent under a warrant agreement will act solely as our agent in connection with the warrants issued under that agreement. The warrant agent will not assume any obligation or relationship of agency or trust for or with any holders of those warrants. Any holder of warrants may, without the consent of any other person, enforce by appropriate legal action, on its own behalf, its right to exercise those warrants in accordance with their terms. No holder of any warrant will be entitled to any rights of a holder of the debt securities or any other warrant property purchasable upon exercise of the warrant, including any right to receive payments on those debt securities or other warrant property or to enforce any covenants or rights in the relevant indenture or any other agreement.

### Warrant Agreement Will Not Be Qualified Under Trust Indenture Act

No warrant agreement will be qualified as an indenture, and no warrant agent will be required to qualify as a trustee, under the Trust Indenture Act. Therefore, holders of warrants issued under a warrant agreement will not have the protection of the Trust Indenture Act with respect to their warrants.

### Modification and Waiver of Covenants

There are three types of changes we can make to the warrants of any series and the related warrant agreement.

**Changes Requiring Each Holder's Approval.**   We may not amend any particular warrant or a warrant agreement with respect to any particular warrant unless we obtain the consent of the holder of that warrant, if the amendment would:

- change the exercise price of the warrant;
- change the kind or reduce the amount of the warrant property or other consideration receivable upon exercise, cancellation or expiration of the warrant, except as permitted by the antidilution or other adjustment provisions of the warrant;
- shorten, advance or defer the period of time during which the holder may exercise the warrant or otherwise impair the holder's right to exercise the warrant; or
- reduce the percentage of outstanding, unexpired warrants of any series or class the consent of whose holders is required to amend the series or class, or the applicable warrant agreement with regard to that series or class, as described below.

**Changes Not Requiring Approval of Holders.**   We and the applicable warrant agent may amend any warrant or warrant agreement without the consent of any holder:

- to cure any ambiguity;
- to cure, correct or supplement any defective or inconsistent provision; or
- to make any other change that we believe is necessary or desirable and will not adversely affect the interests of the affected holders in any material respect.

We do not need any approval to make changes that affect only warrants to be issued after the changes take effect. We may also make changes that do not adversely affect a particular warrant in any material respect, even if they adversely affect other warrants in a material respect. In those cases, we do not need to obtain the approval of the holder of the unaffected warrant; we need only obtain any required approvals from the holders of the affected warrants.

**Changes Requiring Majority Approval.**   Any other change to a particular warrant agreement and the warrants issued under that agreement would require the following approval:

- If the change affects only the warrants of a particular series issued under that agreement, the change must be approved by the holders of a majority of the outstanding, unexpired warrants of that series.

40

Table of Contents

## Description of Warrants We May Offer

- If the change affects the warrants of more than one series issued under that agreement, the change must be approved by the holders of a majority of all outstanding, unexpired warrants of all series affected by the change, with the warrants of all the affected series voting together as one class for this purpose.

In each case, the required approval must be given in writing.

### Mergers and Similar Transactions Are Permitted; No Restrictive Covenants or Events of Default

The warrant agreements and any warrants issued under the warrant agreements will not restrict our ability to merge or consolidate with, or sell our assets to, another corporation or other entity or to engage in any other transactions. If at any time we merge or consolidate with, or sell our assets substantially as an entirety to, another corporation or other entity, the successor entity will succeed to and assume our obligations under the warrants and warrant agreements. We will then be relieved of any further obligation under the warrants and warrant agreements.

The warrant agreements and any warrants issued under the warrant agreements will not include any restrictions on our ability to put liens on our assets, including our interests in our subsidiaries, nor will they restrict our ability to sell our assets. The warrant agreements and any warrants issued under the warrant agreements also will not provide for any events of default or remedies upon the occurrence of any events of default.

### Governing Law

Each warrant agreement and any warrants issued under the warrant agreement will be governed by New York law.

### Form, Exchange and Transfer of Warrants

We will issue each warrant in global—*i.e.*, book-entry—form only, unless we say otherwise in the applicable prospectus supplement. Warrants in book-entry form will be represented by a global security registered in the name of a depositary, which will be the holder of all the warrants represented by the global security. Those who own beneficial interests in a global warrant will do so through participants in the depositary's system, and the rights of these indirect owners will be governed solely by the applicable procedures of the depositary and its participants. We describe book-entry securities below under "Legal Ownership and Book-Entry Issuance." Unless we specify otherwise in the applicable prospectus supplement, The Depository Trust Company, New York, New York, known as DTC, will be the depositary for all warrants in global form.

If a warrant is issued as a registered global warrant, only the depositary—*e.g.*, DTC, Euroclear and Clearstream—will be entitled to transfer and exchange the warrant as described in this subsection, since the depositary will be the sole holder of the warrant.

In addition, we will issue each warrant in registered form, unless we say otherwise in the applicable prospectus supplement. If we issue a warrant in bearer form, the applicable prospectus supplement will describe the provisions that would apply to that security.

If any warrants cease to be issued in registered global form, then unless we indicate otherwise in your prospectus supplement, they will be issued:

- only in fully registered form; and
- in denominations of 100 warrants and any multiple of 100 warrants.

Holders may exchange their warrants for warrants of smaller denominations or combined into fewer warrants of larger denominations, as long as the total number of warrants is not changed.

Holders of non-global warrants may exchange or transfer their warrants at the office of the trustee or warrant agent, as applicable. They may also replace lost, stolen, destroyed or mutilated warrants at that office. We have appointed the trustee or warrant agent, as applicable, to act as our agent for registering warrants in the names of holders and transferring and replacing warrants. We may appoint another entity to perform these functions or perform them ourselves.

Table of Contents

## Description of Warrants We May Offer

Holders will not be required to pay a service charge to transfer or exchange their warrants, but they may be required to pay for any tax or other governmental charge associated with the transfer or exchange. The transfer or exchange, and any replacement, will be made only if our transfer agent is satisfied with the holder's proof of legal ownership. The transfer agent may require an indemnity before replacing any warrants.

If we have the right to redeem, accelerate or settle any warrants before their expiration, and we exercise our right as to less than all those warrants, we may block the transfer or exchange of those warrants during the period beginning 15 days before the day we mail the notice of exercise and ending on the day of that mailing or during any other period specified in the applicable prospectus supplement, in order to freeze the list of holders who will receive the mailing. We may also refuse to register transfers of or exchange any warrant selected for early settlement, except that we will continue to permit transfers and exchanges of the unsettled portion of any warrant being partially settled.

If we have designated additional transfer agents for your warrant, they will be named in your prospectus supplement. We may appoint additional transfer agents or cancel the appointment of any particular transfer agent. We may also approve a change in the office through which any transfer agent acts.

The rules for exchange described above apply to exchange of warrants for other warrants of the same series and kind. If a warrant is exercisable for a different kind of security, such as one that we have not issued, or for other property, the rules governing that type of exercise will be described in the applicable prospectus supplement.

## Payment Mechanics for Warrants

### Who Receives Payment?

If money is due on a warrant at its payment or settlement date, we will pay the amount to the holder of the warrant against surrender of the warrant at a proper place of payment or, in the case of a global warrant, in accordance with the applicable policies of the depositary.

### How We Will Make Payments Due in U.S. Dollars

We will follow the practices described in this subsection when paying amounts due in U.S. dollars. Payments of amounts due in other currencies will be made as described in the next subsection.

**Payments on Global Warrants.**   We will make payments on a global warrant in accordance with the applicable policies of the depositary as in effect from time to time. Under those policies, we will pay directly to the depositary, or its nominee, and not to any indirect owners who own beneficial interests in the global warrant. An indirect owner's right to receive those payments will be governed by the rules and practices of the depositary and its participants, as described in the section entitled "Legal Ownership and Book-Entry Issuance—What Is a Global Security?".

**Payments on Non-Global Warrants.**   We will make payments on a warrant in non-global, registered form as follows. We will make all payments by check at the paying agent described below, against surrender of the warrant. All payments by check will be made in next-day funds—that is, in funds that become available on the day after the check is cashed.

Alternatively, if a non-global warrant has an original issue price of at least $1,000,000 and the holder asks us to do so, we will pay any amount that becomes due on the warrant by wire transfer of immediately available funds to an account at a bank in New York City, on the payment or settlement date. To request wire payment, the holder must give the paying agent appropriate wire transfer instructions at least five business days before the requested wire payment is due. Payment will be made only after the warrant is surrendered to the paying agent.

Book-entry and other indirect owners should consult their banks or brokers for information on how they will receive payments on their warrants.

42

<u>Table of Contents</u>

**Description of Warrants We May Offer**

## How We Will Make Payments Due in Other Currencies

We will follow the practices described in this subsection when paying amounts that are due in a specified currency other than U.S. dollars.

**Payments on Global Warrants.**    We will make payments on a global warrant in accordance with the applicable policies of the depositary as in effect from time to time. We understand that these policies, as currently in effect at DTC, are as follows:

Unless otherwise indicated in your prospectus supplement, if you are an indirect owner of global warrants denominated in a specified currency other than U.S. dollars and if you have the right to elect to receive payments in that other currency and do make that election, you must notify the participant through which your interest in the global warrant is held of your election on or before the 16th day before the payment or settlement date. Your participant must, in turn, notify DTC of your election on or before the 12th DTC business day before the payment or settlement date.

DTC, in turn, will notify the paying agent of your election in accordance with DTC's procedures.

If complete instructions are received by the participant and forwarded by the participant to DTC, and by DTC to the paying agent, on or before the dates noted above, the paying agent, in accordance with DTC's instructions, will make the payment to you or your participant by wire transfer of immediately available funds to an account maintained by you or your participant with a bank located in the country issuing the specified currency or in another jurisdiction acceptable to us and the paying agent.

If the foregoing steps are not properly completed, we expect DTC to inform the paying agent that payment is to be made in U.S. dollars. In that case, we or our agent will convert the payment to U.S. dollars in the manner described below under "—Conversion to U.S. Dollars." We expect that we or our agent will then make the payment in U.S. dollars to DTC, and that DTC in turn will pass it along to its participants.

Book-entry and other indirect owners of a global warrant denominated in a currency other than U.S. dollars should consult their banks or brokers for information on how to request payment in the specified currency.

**Payments on Non-Global Warrants.**    Except as described in the second to last paragraph under this heading, we will make payments on warrants in non-global form in the applicable specified currency. We will make these payments by wire transfer of immediately available funds to any account that is maintained in the applicable specified currency at a bank designated by the holder and is acceptable to us and the trustee or warrant agent, as applicable. To designate an account for wire payment, the holder must give the paying agent appropriate wire instructions at least five business days before the requested wire payment is due. The payment will be made only after the warrant is surrendered to the paying agent.

If a holder fails to give instructions as described above, we will notify the holder at the address in the records of the trustee or warrant agent, as applicable, and will make the payment within five business days after the holder provides appropriate instructions. Any late payment made in these circumstances will be treated under the warrant indenture or warrant agreement, as applicable, as if made on the payment or settlement date, and no interest will accrue on the late payment from the payment or settlement date to the date paid.

Although a payment on a warrant in non-global form may be due in a specified currency other than U.S. dollars, we will make the payment in U.S. dollars if the holder asks us to do so. To request U.S. dollar payment, the holder must provide appropriate written notice to the trustee or warrant agent, as applicable, at least five business days before the payment or settlement date for which payment in U.S. dollars is requested.

Indirect owners of a non-global warrant with a specified currency other than U.S. dollars should contact their banks or brokers for information about how to receive payments in the specified currency or in U.S. dollars.

**Conversion to U.S. Dollars.**    When we are asked by a holder to make payments in U.S. dollars of an amount due in another currency, either on a global warrant or a non-global warrant as described above, we will determine the U.S. dollar amount the holder receives as follows. The exchange rate agent described below will request currency bid quotations expressed in U.S. dollars from three or, if three are not available, then two, recognized foreign exchange dealers in New York City, any of which may be the exchange rate agent, an affiliate of UBS, as of 11:00 A.M., New

<u>Table of Contents</u>

## Description of Warrants We May Offer

York City time, on the second business day before the payment date. Currency bid quotations will be requested on an aggregate basis, for all holders of warrants requesting U.S. dollar payments of amounts due on the same date in the same specified currency. The U.S. dollar amount the holder receives will be based on the highest acceptable currency bid quotation received by the exchange rate agent. If the exchange rate agent determines that at least two acceptable currency bid quotations are not available on that second business day, the payment will be made in the specified currency.

To be acceptable, a quotation must be given as of 11:00 A.M., New York City time, on the second business day before the due date and the quoting dealer must commit to execute a contract at the quotation in the total amount due in that currency on all series of warrants. If some but not all of the relevant warrants are LIBOR warrants or EURIBOR warrants, the second preceding business day will be determined for this purpose as if none of those warrants were LIBOR warrants or EURIBOR warrants.

A holder that requests payment in U.S. dollars will bear all associated currency exchange costs, which will be deducted from the payment.

**When the Specified Currency Is Not Available.**   If we are obligated to make any payment in a specified currency other than U.S. dollars, and the specified currency or any successor currency is not available to us due to circumstances beyond our control—such as the imposition of exchange controls or a disruption in the currency markets—we will be entitled to satisfy our obligation to make the payment in that specified currency by making the payment in U.S. dollars, on the basis specified in the applicable prospectus supplement.

For a specified currency other than U.S. dollars, the exchange rate will be the noon buying rate for cable transfers of the specified currency in New York City as quoted by the Federal Reserve Bank of New York on the then-most recent day on which that bank has quoted that rate.

The foregoing will apply to any warrant, whether in global or non-global form, and to any payment, including a payment at the payment or settlement date. Any payment made under the circumstances and in a manner described above will not result in a default under any warrant or the indenture.

**Exchange Rate Agent.**   If we issue a warrant in a specified currency other than U.S. dollars, we will appoint a financial institution to act as the exchange rate agent and will name the institution initially appointed when the warrant is originally issued in the applicable prospectus supplement. We may select UBS Securities LLC or another of our affiliates to perform this role. We may change the exchange rate agent from time to time after the original issue date of the warrant without your consent and without notifying you of the change.

All determinations made by the exchange rate agent will be in its sole discretion unless we state in the applicable prospectus supplement that any determination requires our approval. In the absence of manifest error, those determinations will be conclusive for all purposes and binding on you and us, without any liability on the part of the exchange rate agent.

## Payment When Offices Are Closed

If any payment or delivery of warrant property is due on a warrant on a day that is not a business day, we will make the payment or delivery on the next day that is a business day. Unless otherwise specified in the applicable prospectus supplement, payments or deliveries postponed to the next business day in this situation will be treated under the indenture as if they were made on the original payment or settlement date. Postponement of this kind will not result in a default under any warrant or the indenture, and no interest will accrue on the postponed amount from the original payment or settlement date to the next day that is a business day.

The term "business day" means, for any warrant, a day that meets all the following applicable requirements:

- for all warrants, is a Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in New York City generally are authorized or obligated by law, regulation or executive order to close and that satisfies any other criteria specified in your prospectus supplement;

44

Table of Contents

**Description of Warrants We May Offer**

- if the warrant has a specified currency other than U.S. dollars or euros, is also a day on which banking institutions are not authorized or obligated by law, regulation or executive order to close in the principal financial center of the country issuing the specified currency;
- if the warrant is held through Euroclear, is also not a day on which banking institutions in Brussels, Belgium are generally authorized or obligated by law, regulation or executive order to close; and
- if the warrant is held through Clearstream, is also not a day on which banking institutions in Luxembourg are generally authorized or obligated by law, regulation or executive order to close.

## Paying Agent

We may appoint one or more financial institutions to act as our paying agents, at whose designated offices warrants in non-global form may be surrendered for payment at their payment or settlement date. We call each of those offices a paying agent. We may add, replace or terminate paying agents from time to time. We may also choose to act as our own paying agent. Initially, we have appointed the trustee, at its corporate trust office in New York City, as the paying agent for warrants issued under the warrant indenture. We must notify the trustee of changes in the paying agents for warrants issued under the warrant indenture.

## Unclaimed Payments

Regardless of who acts as paying agent, all money paid or warrant property delivered by us to a paying agent that remains unclaimed at the end of two years after the amount is due to a holder will be repaid or redelivered to us. After that two-year period, the holder may look only to us for payment of any money or delivery of any warrant property, and not to the trustee or warrant agent, as applicable, any other paying agent or anyone else.

## Payment of Additional Amounts

A relevant jurisdiction may require UBS to withhold amounts from payments on a warrant for taxes or any other governmental charges. If the relevant jurisdiction requires a withholding of this type, UBS may be required to pay you an additional amount so that the net amount you receive will be the amount specified in the warrant to which you are entitled.

By relevant jurisdiction, we mean Switzerland or a jurisdiction in which the UBS branch through which warrants are issued is located. UBS will not have to pay additional amounts in respect of taxes or other governmental charges that are required to be deducted or withheld by any paying agent from a payment on a warrant, if such payment can be made without such deduction or withholding by any other paying agent, or in respect of taxes or other governmental charges that would not have been imposed but for

- the existence of any present or former connection between you and the relevant jurisdiction, other than the mere holding of the warrant and the receipt of payments on it;
- your status as an individual resident of a member state of the European Union;
- a failure to comply with any reasonable certification, documentation, information or other reporting requirement concerning your nationality, residence, identity or connection with the relevant jurisdiction, if such compliance is required as a precondition to relief or exemption from such taxes or other governmental charges (including, without limitation, a certification that you are not resident in the relevant jurisdiction or are not an individual resident of a member state of the European Union); or
- a change in law that becomes effective more than 30 days after a payment on the warrant becomes due and payable or on which the payment is duly provided for, whichever occurs later.

In addition, no additional amounts will be required to be paid on account of any deduction or withholding imposed or required pursuant to Sections 1471 through 1474 of the Internal Revenue Code, any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Internal Revenue Code, or any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such Sections of the Internal Revenue Code.

Table of Contents

**Description of Warrants We May Offer**

These provisions will also apply to any taxes or governmental charges imposed by any jurisdiction in which a successor to UBS is organized. The prospectus supplement relating to the warrant may describe additional circumstances in which UBS would not be required to pay additional amounts.

**Calculation Agent**

Calculations relating to warrants will be made by the calculation agent, an institution that we appoint as our agent for this purpose. That institution may include any affiliate of ours, such as UBS Securities LLC. The prospectus supplement for a particular warrant will name the institution that we have appointed to act as the calculation agent for that warrant as of its original issue date. We may appoint a different institution to serve as calculation agent from time to time after the original issue date of the warrant without your consent and without notifying you of the change.

The calculation agent's determination of any amount of money payable or warrant property deliverable with respect to a warrant will be final and binding in the absence of manifest error.

All percentages resulting from any calculation relating to a warrant will be rounded upward or downward, as appropriate, to the next higher or lower one hundred-thousandth of a percentage point, *e.g.*, 9.876541% (or .09876541) being rounded down to 9.87654% (or .0987654) and 9.876545% (or .09876545) being rounded up to 9.87655% (or .0987655). All amounts used in or resulting from any calculation relating to a warrant will be rounded upward or downward, as appropriate, to the nearest cent, in the case of U.S. dollars, or to the nearest corresponding hundredth of a unit, in the case of a currency other than U.S. dollars, with one-half cent or one-half of a corresponding hundredth of a unit or more being rounded upward.

46

Table of Contents

# Legal Ownership and Book-Entry Issuance

In this section, we describe special considerations that will apply to registered securities issued in global—*i.e.*, book-entry—form. First we describe the difference between legal ownership and indirect ownership of registered securities. Then we describe special provisions that apply to global securities.

## Who is The Legal Owner of a Registered Security?

Each debt security or warrant in registered form will be represented either by a certificate issued in definitive form to a particular investor or by one or more global securities representing the entire issuance of securities. We refer to those who have securities registered in their own names, on the books that we or the trustee, warrant agent or other agent maintain for this purpose, as the "holders" of those securities. These persons are the legal holders of the securities. We refer to those who, indirectly through others, own beneficial interests in securities that are not registered in their own names as indirect owners of those securities. As we discuss below, indirect owners are not legal holders, and investors in securities issued in book-entry form or in street name will be indirect owners.

## Book-Entry Owners

We will issue each security in book-entry form only. This means securities will be represented by one or more global securities registered in the name of a financial institution that holds them as depositary on behalf of other financial institutions that participate in the depositary's book-entry system. These participating institutions, in turn, hold beneficial interests in the securities on behalf of themselves or their customers.

Under each indenture or warrant agreement, only the person in whose name a security is registered is recognized as the holder of that security. Consequently, for securities issued in global form, we will recognize only the depositary as the holder of the securities and we will make all payments on the securities, including deliveries of any property other than cash, to the depositary. The depositary passes along the payments it receives to its participants, which in turn pass the payments along to their customers who are the beneficial owners. The depositary and its participants do so under agreements they have made with one another or with their customers; they are not obligated to do so under the terms of the securities.

As a result, investors will not own securities directly. Instead, they will own beneficial interests in a global security, through a bank, broker or other financial institution that participates in the depositary's book-entry system or holds an interest through a participant. As long as the securities are issued in global form, investors will be indirect owners, and not holders, of the securities.

## Street Name Owners

In the future we may terminate a global security or issue securities initially in non-global form. In these cases, investors may choose to hold their securities in their own names or in street name. Securities held by an investor in street name would be registered in the name of a bank, broker or other financial institution that the investor chooses, and the investor would hold only a beneficial interest in those securities through an account he or she maintains at that institution.

For securities held in street name, we will recognize only the intermediary banks, brokers and other financial institutions in whose names the securities are registered as the holders of those securities and we will make all payments on those securities, including deliveries of any property other than cash, to them. These institutions pass along the payments they receive to their customers who are the beneficial owners, but only because they agree to do so in their customer agreements or because they are legally required to do so. Investors who hold securities in street name will be indirect owners, not holders, of those securities.

Table of Contents

## Legal Ownership and Book-Entry Issuance

### Legal Holders

Our obligations, as well as the obligations of the trustee and the obligations, if any, of any warrant agents and any other third parties employed by us, the trustee or any of those agents, run only to the holders of the securities. We do not have obligations to investors who hold indirect interests in global securities, in street name or by any other indirect means. This will be the case whether an investor chooses to be an indirect owner of a security or has no choice because we are issuing the securities only in global form.

For example, once we make a payment or give a notice to the holder, we have no further responsibility for that payment or notice even if that holder is required, under agreements with depositary participants or customers or by law, to pass it along to the indirect owners but does not do so. Similarly, if we want to obtain the approval of the holders for any purpose—for example, to amend the indenture for a series of debt securities or warrants or the warrant agreement for a series of warrants or to relieve us of the consequences of a default or of our obligation to comply with a particular provision of the indenture—we would seek the approval only from the holders, and not the indirect owners, of the relevant securities. Whether and how the holders contact the indirect owners is up to the holders.

When we refer to "you" in this prospectus, we mean those who invest in the securities being offered by this prospectus, whether they are the holders or only indirect owners of those securities. When we refer to "your securities" in this prospectus, we mean the securities in which you will hold a direct or indirect interest.

### Special Considerations for Indirect Owners

If you hold securities through a bank, broker or other financial institution, either in book-entry form or in street name, you should check with your own institution to find out:

- how it handles securities payments and notices;
- whether it imposes fees or charges;
- whether and how you can instruct it to exercise any rights to purchase or sell warrant property under a warrant or to exchange or convert a security for or into other property;
- how it would handle a request for the holders' consent, if ever required;
- whether and how you can instruct it to send you securities registered in your own name so you can be a holder, if that is permitted in the future;
- how it would exercise rights under the securities if there were a default or other event triggering the need for holders to act to protect their interests; and
- if the securities are in book-entry form, how the depositary's rules and procedures will affect these matters.

### What Is a Global Security?

We will issue each security in book-entry form only. Each security issued in book-entry form will be represented by a global security that we deposit with and register in the name of one or more financial institutions or clearing systems, or their nominees, which we select. A financial institution or clearing system that we select for any security for this purpose is called the "depositary" for that security. A security will usually have only one depositary but it may have more.

Each series of securities will have one or more of the following as the depositaries:

- The Depository Trust Company, New York, New York, which is known as "DTC";
- a financial institution holding the securities on behalf of Morgan Guaranty Trust Company of New York, acting out of its Brussels, Belgium, office, as operator of the Euroclear system, which is known as "Euroclear";

48

Table of Contents

## Legal Ownership and Book-Entry Issuance

- a financial institution holding the securities on behalf of Clearstream Banking, *société anonyme*, which is known as "Clearstream"; and

- any other clearing system or financial institution named in the applicable prospectus supplement. The depositaries named above may also be participants in one another's systems. Thus, for example, if DTC is the depositary for a global security, investors may hold beneficial interests in that security through Euroclear or Clearstream, as DTC participants.

The depositary or depositaries for your securities will be named in your prospectus supplement; if none is named, the depositary will be DTC.

A global security may represent one or any other number of individual securities. Generally, all securities represented by the same global security will have the same terms. We may, however, issue a global security that represents multiple securities of the same kind, such as debt securities, that have different terms and are issued at different times. We call this kind of global security a master global security. Your prospectus supplement will not indicate whether your securities are represented by a master global security.

A global security may not be transferred to or registered in the name of anyone other than the depositary or its nominee, unless special termination situations arise. We describe those situations below under "—Holder's Option to Obtain a Non-Global Security; Special Situations When a Global Security Will Be Terminated." As a result of these arrangements, the depositary, or its nominee, will be the sole registered owner and holder of all securities represented by a global security, and investors will be permitted to own only indirect interests in a global security. Indirect interests must be held by means of an account with a broker, bank or other financial institution that in turn has an account with the depositary or with another institution that does. Thus, an investor whose security is represented by a global security will not be a holder of the security, but only an indirect owner of an interest in the global security.

If the prospectus supplement for a particular security indicates that the security will be issued in global form only, then the security will be represented by a global security at all times unless and until the global security is terminated. We describe the situations in which this can occur below under "—Holder's Option to Obtain a Non-Global Security; Special Situations When a Global Security Will Be Terminated." If termination occurs, we may issue the securities through another book-entry clearing system or decide that the securities may no longer be held through any book-entry clearing system.

## Special Considerations for Global Securities

As an indirect owner, an investor's rights relating to a global security will be governed by the account rules of the depositary and those of the investor's financial institution or other intermediary through which it holds its interest (such as Euroclear or Clearstream, if DTC is the depositary), as well as general laws relating to securities transfers. We do not recognize this type of investor or any intermediary as a holder of securities and instead deal only with the depositary that holds the global security.

If securities are issued only in the form of a global security, an investor should be aware of the following:

- An investor cannot require the securities to be registered in his or her own name, and cannot obtain non-global certificates for his or her interest in the securities, except in the special situations we describe below.

- An investor will be an indirect holder and must look to his or her own bank or broker for payments on the securities and protection of his or her legal rights relating to the securities, as we describe above under "—Who Is the Legal Owner of a Registered Security?"

- An investor may not be able to sell interests in the securities to some insurance companies and other institutions that are required by law to own their securities in non-book-entry form.

- An investor may not be able to pledge his or her interest in a global security in circumstances where certificates representing the securities must be delivered to the lender or other beneficiary of the pledge in order for the pledge to be effective.

<u>Table of Contents</u>

**Legal Ownership and Book-Entry Issuance**

- The depositary's policies will govern payments, deliveries, transfers, exchanges, notices and other matters relating to an investor's interest in a global security, and those policies may change from time to time. We, the trustee and any warrant agents will have no responsibility for any aspect of the depositary's policies, actions or records of ownership interests in a global security. We, the trustee and any warrant agents also do not supervise the depositary in any way.

- The depositary will require that those who purchase and sell interests in a global security within its book-entry system use immediately available funds and your broker or bank may require you to do so as well.

- Financial institutions that participate in the depositary's book-entry system and through which an investor holds its interest in the global securities, directly or indirectly, may also have their own policies affecting payments, deliveries, transfers, exchanges, notices and other matters relating to the securities, and those policies may change from time to time. For example, if you hold an interest in a global security through Euroclear or Clearstream, when DTC is the depositary, Euroclear or Clearstream, as applicable, will require those who purchase and sell interests in that security through them to use immediately available funds and comply with other policies and procedures, including deadlines for giving instructions as to transactions that are to be effected on a particular day. There may be more than one financial intermediary in the chain of ownership for an investor. We do not monitor and are not responsible for the policies or actions or records of ownership interests of any of those intermediaries.

**Holder's Option to Obtain a Non-Global Security; Special Situations When a Global Security Will Be Terminated**

If we issue any series of securities in book-entry form but we choose to give the beneficial owners of that series the right to obtain non-global securities, any beneficial owner entitled to obtain non-global securities may do so by following the applicable procedures of the depositary, any transfer agent or registrar for that series and that owner's bank, broker or other financial institution through which that owner holds its beneficial interest in the securities. If you are entitled to request a non-global certificate and wish to do so, you will need to allow sufficient lead time to enable us or our agent to prepare the requested certificate.

In addition, in a few special situations described below, a global security will be terminated and interests in it will be exchanged for certificates in non-global form representing the securities it represented. After that exchange, the choice of whether to hold the securities directly or in street name will be up to the investor. Investors must consult their own banks or brokers to find out how to have their interests in a global security transferred on termination to their own names, so that they will be holders. We have described the rights of holders and street name investors above under "—Who Is the Legal Owner of a Registered Security?"

The special situations for termination of a global security are as follows:

- if the depositary notifies us that it is unwilling, unable or no longer qualified to continue as depositary for that global security and we do not appoint another institution to act as depositary within 60 days; or

- in the case of a global security representing debt securities or warrants issued under an indenture, if an event of default has occurred with regard to these debt securities or warrants and has not been cured or waived.

If a global security is terminated, only the depositary, and not we, the trustee for any debt securities or warrants or the warrant agent for any warrants, is responsible for deciding the names of the institutions in whose names the securities represented by the global security will be registered and, therefore, who will be the holders of those securities.

**Considerations Relating to Euroclear and Clearstream**

Euroclear and Clearstream are securities clearance systems in Europe. Both systems clear and settle securities transactions between their participants through electronic, book-entry delivery of securities against payment.

Euroclear and Clearstream may be depositaries for a global security. In addition, if DTC is the depositary for a global security, Euroclear and Clearstream may hold interests in the global security as participants in DTC.

50

Table of Contents

## Legal Ownership and Book-Entry Issuance

As long as any global security is held by Euroclear or Clearstream as depositary, you may hold an interest in the global security only through an organization that participates, directly or indirectly, in Euroclear or Clearstream. If Euroclear or Clearstream is the depositary for a global security and there is no depositary in the United States, you will not be able to hold interests in that global security through any securities clearance system in the United States.

Payments, deliveries, transfers, exchanges, notices and other matters relating to the securities made through Euroclear or Clearstream must comply with the rules and procedures of those systems. Those systems could change their rules and procedures at any time. We have no control over those systems or their participants and we take no responsibility for their activities. Transactions between participants in Euroclear or Clearstream, on one hand, and participants in DTC, on the other hand, when DTC is the depositary, would also be subject to DTC's rules and procedures.

## Special Timing Considerations for Transactions in Euroclear and Clearstream

Investors will be able to make and receive through Euroclear and Clearstream payments, deliveries, transfers, exchanges, notices and other transactions involving any securities held through those systems only on days when those systems are open for business. Those systems may not be open for business on days when banks, brokers and other institutions are open for business in the United States.

In addition, because of time-zone differences, U.S. investors who hold their interests in the securities through these systems and wish to transfer their interests, or to receive or make a payment or delivery or exercise any other right with respect to their interests, on a particular day may find that the transaction will not be effected until the next business day in Luxembourg or Brussels, as applicable. Thus, investors who wish to exercise rights that expire on a particular day may need to act before the expiration date. In addition, investors who hold their interests through both DTC and Euroclear or Clearstream may need to make special arrangements to finance any purchases or sales of their interests between the U.S. and European clearing systems, and those transactions may settle later than would be the case for transactions within one clearing system.

51

Table of Contents

# Considerations Relating to Indexed Securities

We use the term "indexed securities" to mean debt securities and warrants whose value is linked to an underlying property or index, including equity, commodity and credit indexed securities and equity, commodity, currency and credit linked securities. Indexed securities may present a high level of risk, and those who invest in some indexed securities may lose their entire investment. In addition, the treatment of indexed securities for U.S. federal income tax purposes is often unclear due to the absence of any authority specifically addressing the issues presented by any particular indexed security. Thus, if you propose to invest in indexed securities, you should independently evaluate the federal income tax consequences of purchasing an indexed security that apply in your particular circumstances. You should also read "U.S. Tax Considerations" for a discussion of U.S. tax matters.

### Investors in Indexed Securities Could Lose Their Investment

The amount of principal and/or interest payable on an indexed debt security and the cash value or physical settlement value of a physically settled debt security and the cash value or physical settlement value of an indexed warrant will be determined by reference to the price, value or level of one or more securities, currencies, commodities or other properties, any other financial, economic or other measure or instrument, including the occurrence or non-occurrence of any event or circumstance, and/or one or more indices or baskets of any of these items. We refer to each of these as an "index." The direction and magnitude of the change in the price, value or level of the relevant index will determine the amount of principal and/or interest payable on an indexed debt security and the cash value or physical settlement value of a physically settled debt security and the cash value or physical settlement value of an indexed warrant. The terms of a particular indexed debt security may or may not include a promised return of a percentage of the face amount at maturity or a minimum interest rate. An indexed warrant generally will not provide for any guaranteed minimum settlement value. Thus, if you purchase an indexed security, you may lose all or a portion of the principal or other amount you invest and may receive no interest on your investment.

### The Issuer of a Security or Currency That Serves as an Index Could Take Actions That May Adversely Affect an Indexed Security

The issuer of a security that serves as an index or part of an index for an indexed security will have no involvement in the offer and sale of the indexed security and no obligations to the holder of the indexed security. The issuer may take actions, such as a merger or sale of assets, without regard to the interests of the holder. Any of these actions could adversely affect the value of a security indexed to that security or to an index of which that security is a component.

If the index for an indexed security includes a non-U.S. dollar currency or other asset denominated in a non-U.S. dollar currency, the government that issues that currency will also have no involvement in the offer and sale of the indexed security and no obligations to the holder of the indexed security. That government may take actions that could adversely affect the value of the security. See "Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency—Government Policy Can Adversely Affect Currency Exchange Rates and an Investment in a Non-U.S. Dollar Security" below for more information about these kinds of government actions.

### An Indexed Security May Be Linked to a Volatile Index, Which Could Hurt Your Investment

Some indices are highly volatile, which means that their value may change significantly, up or down, over a short period of time. The amount of principal or interest that can be expected to become payable on an indexed debt security or the expected settlement value of an indexed warrant may vary substantially from time to time. Because the amounts payable with respect to an indexed security are generally calculated based on the value or level of the relevant index on a specified date or over a limited period of time, volatility in the index increases the risk that the return on the indexed security may be adversely affected by a fluctuation in the level of the relevant index.

The volatility of an index may be affected by political or economic events, including governmental actions, or by the activities of participants in the relevant markets. Any of these events or activities could adversely affect the value of an indexed security.

Table of Contents

**Considerations Relating to Indexed Securities**

### An Index to Which a Security is Linked Could Be Changed or Become Unavailable

Some indices compiled by us or our affiliates or third parties may consist of or refer to several or many different securities, commodities or currencies or other instruments or measures. The compiler of such an index typically reserves the right to alter the composition of the index and the manner in which the value or level of the index is calculated. An alteration may result in a decrease in the value of or return on an indexed security that is linked to the index. The indices for our indexed securities may include published indices of this kind or customized indices developed by us or our affiliates in connection with particular issues of indexed securities.

A published index may become unavailable, or a customized index may become impossible to calculate in the normal manner, due to events such as war, natural disasters, cessation of publication of the index or a suspension or disruption of trading in one or more securities, commodities or currencies or other instruments or measures on which the index is based. If an index becomes unavailable or impossible to calculate in the normal manner, the terms of a particular indexed security may allow us to delay determining the amount payable as principal or interest on a debt security or the settlement value of an indexed warrant, or we may use an alternative method to determine the value of the unavailable index. Alternative methods of valuation are generally intended to produce a value similar to the value resulting from reference to the relevant index. It is unlikely, however, that any alternative method of valuation we use will produce a value identical to the value that the actual index would produce. If we use an alternative method of valuation for a security linked to an index of this kind, the value of the security, or the rate of return on it, may be lower than it otherwise would be.

Some indexed securities are linked to indices that are not commonly used or that have been developed only recently. The lack of a trading history may make it difficult to anticipate the volatility or other risks associated with an indexed security of this kind. In addition, trading in these indices or their underlying stocks, commodities or currencies or other instruments or measures, or options or futures contracts on these stocks, commodities or currencies or other instruments or measures, may be limited, which could increase their volatility and decrease the value of the related indexed securities or their rates of return.

### We May Engage in Hedging Activities That Could Adversely Affect an Indexed Security

In order to hedge an exposure on a particular indexed security, we may, directly or through our affiliates, enter into transactions involving the securities, commodities or currencies or other instruments or measures that underlie the index for that security, or involving derivative instruments, such as swaps, options or futures, on the index or any of its component items. By engaging in transactions of this kind, we could adversely affect the value of an indexed security. It is possible that we could achieve substantial returns from our hedging transactions while the value of the indexed security may decline.

### Information About Indices May Not Be Indicative of Future Performance

If we issue an indexed security, we may include historical information about the relevant index in the applicable prospectus supplement. Any information about indices that we may provide will be furnished as a matter of information only, and you should not regard the information as indicative of the range of, or trends in, fluctuations in the relevant index that may occur in the future.

### We May Have Conflicts of Interest Regarding an Indexed Security

UBS Securities LLC, UBS Financial Services Inc. and our other affiliates may have conflicts of interest with respect to some indexed securities. UBS Securities LLC, UBS Financial Services Inc. and our other affiliates may engage in trading, including trading for hedging purposes, for their own accounts or for other accounts under their management, in indexed securities and in the securities, commodities or currencies or other instruments or measures on which the index is based or in other derivative instruments related to the index or its component items. These trading activities could adversely affect the value of indexed securities. We and our affiliates may also issue or underwrite securities or derivative instruments that are linked to the same index as one or more indexed securities. By introducing competing products into the marketplace in this manner, we could adversely affect the value of an indexed security.

Table of Contents

## Considerations Relating to Indexed Securities

UBS Securities LLC, UBS Financial Services Inc. or another of our affiliates may serve as calculation agent for the indexed securities and may have considerable discretion in calculating the amounts payable in respect of the securities. To the extent that UBS Securities LLC, UBS Financial Services Inc. or another of our affiliates calculates or compiles a particular index, it may also have considerable discretion in performing the calculation or compilation of the index. Exercising discretion in this manner could adversely affect the value of an indexed security based on the index or the rate of return on the security.

54

Table of Contents

# Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency

If you intend to invest in a non-U.S. dollar security—*e.g.*, a security whose principal and/or interest is payable in a currency other than U.S. dollars or that may be settled by delivery of or reference to a non-U.S. dollar currency or property denominated in or otherwise linked to a non-U.S. dollar currency—you should consult your own financial and legal advisors as to the currency risks entailed by your investment. Securities of this kind may not be an appropriate investment for investors who are unsophisticated with respect to non-U.S. dollar currency transactions.

The information in this prospectus is directed primarily to investors who are U.S. residents or whose base currency is the U.S. dollar. Investors who are not U.S. residents or whose base currency is not the U.S. dollar should consult their own financial and legal advisors about currency-related risks particular to their investment.

### An Investment in a Non-U.S. Dollar Security Involves Currency-Related Risks

An investment in a non-U.S. dollar security entails significant risks that are not associated with a similar investment in a security that is payable solely in U.S. dollars and where settlement value is not otherwise based on a non-U.S. dollar currency. These risks include the possibility of significant changes in rates of exchange between the U.S. dollar and the various non-U.S. dollar currencies or composite currencies and the possibility of the imposition or modification of foreign exchange controls or other conditions by either the United States or non-U.S. governments. When payments are made in the non-U.S. dollar currency, the total principal plus interest in that currency may be less than the initial principal invested on a U.S. dollar basis, if converted back into U.S. dollars at the then-current spot price, despite any interest or enhanced yield that may have been earned. These risks generally depend on factors over which we have no control, such as economic and political events and the supply of and demand for the relevant currencies in the global markets.

### There Are Limited Facilities for Non-U.S. Dollar Currencies in the United States

At the present time, there are limited facilities in the United States for the conversion of U.S. dollars into foreign currencies, currency units or composite currencies and vice versa, and commercial banks generally do not offer non-U.S. dollar checking or savings account facilities in the United States. The agents are prepared to arrange for the conversion of U.S. dollars into the non-U.S. dollar specified currency in which a security may be denominated in order to enable the purchaser to pay for the security, provided that a request is made to the applicable agent on or prior to the third business day preceding the date of delivery of the security, or by such other day as determined by such agent. Each such conversion will be made by the applicable agent on such terms and subject to such conditions, limitations and charges as the agent may from time to time establish in accordance with its regular foreign exchange practices. All costs of conversion will be borne by the purchaser of such security denominated in a non-U.S. dollar specified currency.

### Changes in Currency Exchange Rates Can Be Volatile and Unpredictable

Rates of exchange between the U.S. dollar and many other currencies have been highly volatile, and this volatility may continue and perhaps spread to other currencies in the future. Fluctuations in currency exchange rates could adversely affect an investment in a security denominated in, or where value is otherwise linked to, a specified currency other than U.S. dollars. Depreciation of the specified currency against the U.S. dollar could result in a decrease in the U.S. dollar-equivalent value of payments on the security, including the principal payable at maturity or settlement value payable upon exercise. That in turn could cause the market value of the security to fall. Depreciation of the specified currency against the U.S. dollar could result in a loss to the investor on a U.S. dollar basis.

55

<u>Table of Contents</u>

## Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency

### Government Policy Can Adversely Affect Currency Exchange Rates and an Investment in a Non-U.S. Dollar Security

Currency exchange rates can either float or be fixed by sovereign governments. From time to time, governments use a variety of techniques, such as intervention by a country's central bank or imposition of regulatory controls or taxes, to affect the exchange rate of their currencies. Governments may also issue a new currency to replace an existing currency or alter the exchange rate or exchange characteristics by devaluation or revaluation of a currency. Thus, a special risk in purchasing non-U.S. dollar securities is that their yields or payouts could be significantly and unpredictably affected by governmental actions. Even in the absence of governmental action directly affecting currency exchange rates, political or economic developments in the country issuing the specified currency for a non-U.S. dollar security or elsewhere could lead to significant and sudden changes in the exchange rate between the U.S. dollar and the specified currency. These changes could affect the value of the security as participants in the global currency markets move to buy or sell the specified currency or U.S. dollars in reaction to these developments.

Governments have imposed from time to time and may in the future impose exchange controls or other conditions, including taxes, with respect to the exchange or transfer of a specified currency that could affect exchange rates as well as the availability of a specified currency for a security at its maturity or on any other payment date. In addition, the ability of a holder to move currency freely out of the country in which payment in the currency is received or to convert the currency at a freely determined market rate could be limited by governmental actions.

### Non-U.S. Dollar Securities May Permit Us to Make Payments in U.S. Dollars or Delay Payment If We Are Unable to Obtain the Specified Currency

Securities payable in a currency other than U.S. dollars may provide that, if the other currency is subject to convertibility, transferability, market disruption or other conditions affecting its availability at or about the time when a payment on the securities comes due because of circumstances beyond our control, we will be entitled to make the payment in U.S. dollars or delay making the payment. These circumstances could include the imposition of exchange controls or our inability to obtain the other currency because of a disruption in the currency markets. If we made payment in U.S. dollars, the exchange rate we would use would be determined in the manner described above under "Description of Debt Securities We May Offer—Payment Mechanics for Debt Securities—How We Will Make Payments Due in Other Currencies—When the Specified Currency Is Not Available" and "Description of Warrants We May Offer—Payment Mechanics for Warrants—How We Will Make Payments Due in Other Currencies—When the Specified Currency Is Not Available." A determination of this kind may be based on limited information and would involve significant discretion on the part of our foreign exchange agent. As a result, the value of the payment in U.S. dollars an investor would receive on the payment date may be less than the value of the payment the investor would have received in the other currency if it had been available, or may be zero. In addition, a government may impose extraordinary taxes on transfers of a currency. If that happens, we will be entitled to deduct these taxes from any payment on notes payable in that currency.

### We Will Not Adjust Non-U.S. Dollar Securities to Compensate for Changes in Currency Exchange Rates

Except as described above, we will not make any adjustment or change in the terms of a non-U.S. dollar security in the event of any change in exchange rates for the relevant currency, whether in the event of any devaluation, revaluation or imposition of exchange or other regulatory controls or taxes or in the event of other developments affecting that currency, the U.S. dollar or any other currency. Consequently, investors in non-U.S. dollar securities will bear the risk that their investment may be adversely affected by these types of events.

### In a Lawsuit for Payment on a Non-U.S. Dollar Security, an Investor May Bear Currency Exchange Risk

Our securities will be governed by New York law. Under Section 27 of the New York Judiciary Law, a state court in the State of New York rendering a judgment on a security denominated in a currency other than U.S. dollars would be required to render the judgment in the specified currency; however, the judgment would be converted into U.S. dollars

Case 1:17-cv-04503-JMF   Document 34-2   Filed 10/26/17   Page 60 of 79

Table of Contents

## Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency

at the exchange rate prevailing on the date of entry of the judgment. Consequently, in a lawsuit for payment on a security denominated in a currency other than U.S. dollars, investors would bear currency exchange risk until judgment is entered, which could be a long time.

In courts outside of New York, investors may not be able to obtain judgment in a specified currency other than U.S. dollars. For example, a judgment for money in an action based on a non-U.S. dollar security in many other U.S. federal or state courts ordinarily would be enforced in the United States only in U.S. dollars. The date used to determine the rate of conversion of the currency in which any particular security is denominated into U.S. dollars will depend upon various factors, including which court renders the judgment.

## Information About Exchange Rates May Not Be Indicative of Future Performance

If we issue a non-U.S. dollar security, we may include in the applicable prospectus supplement currency disclosure that provides information about historical exchange rates for the relevant non-U.S. dollar currency or currencies. Any information about exchange rates that we may provide will be furnished as a matter of information only, and you should not regard the information as indicative of the range of, or trends in, fluctuations in currency exchange rates that may occur in the future. That rate will likely differ from the exchange rate used under the terms that apply to a particular security.

Table of Contents

# U.S. Tax Considerations

Unless as otherwise stated in the applicable prospectus supplement, this section describes the material United States federal income tax consequences to United States holders, as defined below, of owning the debt securities. It is the opinion of Sullivan & Cromwell LLP, United States tax counsel to UBS. It applies to you only if you hold your securities as capital assets for tax purposes. This section does not apply to you if you are a member of a class of holders subject to special rules, such as:

- a dealer in securities or currencies;
- a trader in securities that elects to use a mark-to-market method of tax accounting for your securities holdings;
- a bank;
- a life insurance company;
- a tax-exempt organization;
- a person subject to alternative minimum tax;
- a person that owns debt securities that are a hedge or that are hedged against interest rate or currency risks;
- a person that owns debt securities as part of a straddle or conversion transaction for tax purposes;
- a person that purchases or sells debt securities as part of a wash sale for tax purposes;
- a person whose functional currency for tax purposes is not the U.S. dollar; or
- a person that is not a United States holder, as defined below.

This section deals only with debt securities that are booked through a non-U.S. branch of UBS AG, that are in registered form and that are due to mature 30 years or less from the date on which they are issued. The United States federal income tax consequences of owning debt securities that are booked through a U.S. branch of UBS AG, that are due to mature more than 30 years from their date of issue or that are in bearer form, as well as the restrictions on ownership for debt securities that are in bearer form, and the tax consequences of owning warrants will be discussed in an applicable prospectus supplement. This section is based on the U.S. Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), its legislative history, existing and proposed regulations under the Internal Revenue Code, and published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis.

If a partnership holds the debt securities, the United States federal income tax treatment of a partner will generally depend on the status of the partner and the tax treatment of the partnership. A partner in a partnership holding the debt securities should consult its tax advisor with regard to the United States federal income tax treatment of an investment in the debt securities.

Please consult your own tax advisor concerning the consequences of owning these debt securities in your particular circumstances under the Internal Revenue Code and the laws of any other taxing jurisdiction.

You are a United States holder if you are a beneficial owner of a debt security and you are:

- a citizen or resident of the United States;
- a domestic corporation;
- an estate whose income is subject to United States federal income tax regardless of its source; or
- a trust if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized to control all substantial decisions of the trust.

58

<u>Table of Contents</u>

## U.S. Tax Considerations

### Taxation of Debt Securities

This subsection describes the material United States federal income tax consequences of owning, selling and disposing of the debt securities UBS AG is offering.

**Payments of Interest**

Except as described below in the case of interest on a discount debt security that is not qualified stated interest, each as defined below under "Original Issue Discount—General," you will be taxed on any interest on your debt security, whether payable in U.S. dollars or a foreign currency, including a composite currency or basket of currencies other than U.S. dollars, as ordinary income at the time you receive the interest or it accrues, depending on your method of accounting for tax purposes.

Interest we pay on the debt securities and original issue discount, if any, accrued with respect to the debt securities (as described below under "—Original Issue Discount") and any additional amounts paid with respect to withholding tax on the debt securities, including withholding tax on payments of such additional amounts, constitutes income from sources outside the United States, and will, depending on your circumstances be either "passive" or "general" income for purposes of the rules regarding the foreign tax credit allowable to a United States holder.

**Cash Basis Taxpayers.**    If you are a taxpayer that uses the cash receipts and disbursements method of accounting for tax purposes and you receive an interest payment that is denominated in, or determined by reference to, a foreign currency, you must recognize income equal to the U.S. dollar value of the interest payment, based on the exchange rate in effect on the date of receipt, regardless of whether you actually convert the payment into U.S. dollars.

**Accrual Basis Taxpayers.**    If you are a taxpayer that uses an accrual method of accounting for tax purposes, you may determine the amount of income that you recognize with respect to an interest payment denominated in, or determined by reference to, a foreign currency by using one of two methods. Under the first method, you will determine the amount of income accrued based on the average exchange rate in effect during the interest accrual period or, with respect to an accrual period that spans two taxable years, that part of the period within the taxable year.

If you elect the second method, you would determine the amount of income accrued on the basis of the exchange rate in effect on the last day of the accrual period or, in the case of an accrual period that spans two taxable years, the exchange rate in effect on the last day of the part of the period within the taxable year. Additionally, under this second method, if you receive a payment of interest within five business days of the last day of your accrual period or taxable year, you may instead translate the interest accrued into U.S. dollars at the exchange rate in effect on the day that you actually receive the interest payment. If you elect the second method, it will apply to all debt instruments that you hold at the beginning of the first taxable year to which the election applies and to all debt instruments that you subsequently acquire. You may not revoke this election without the consent of the Internal Revenue Service.

When you actually receive an interest payment, including a payment attributable to accrued but unpaid interest upon the sale or retirement of your debt security, denominated in, or determined by reference to, a foreign currency for which you accrued an amount of income, you will recognize ordinary income or loss measured by the difference, if any, between the exchange rate that you used to accrue interest income and the exchange rate in effect on the date of receipt, regardless of whether you actually convert the payment into U.S. dollars.

**Original Issue Discount**

**General.**    If you own a debt security, other than a short-term debt security with a term of one year or less, it will be treated as a discount debt security issued at an original issue discount if the amount by which the debt security's stated redemption price at maturity exceeds its issue price is more than a de minimis amount. Generally, a debt security's issue price will be the first price at which a substantial amount of debt securities included in the issue of which the debt security is a part is sold to persons other than bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers. A debt security's stated redemption price at maturity is the total of all payments provided by the debt security that are not payments of qualified stated interest. Generally, an

Table of Contents

**U.S. Tax Considerations**

interest payment on a debt security is qualified stated interest if it is one of a series of stated interest payments on a debt security that are unconditionally payable at least annually at a single fixed rate, with certain exceptions for lower rates paid during some periods, applied to the outstanding principal amount of the debt security. There are special rules for variable rate debt securities that are discussed under "—Variable Rate Debt Securities."

In general, your debt security is not a discount debt security if the amount by which its stated redemption price at maturity exceeds its issue price is less than the de minimis amount of 1/4 of 1% of its stated redemption price at maturity multiplied by the number of complete years to its maturity. Your debt security will have de minimis original issue discount if the amount of the excess is less than the de minimis amount. If your debt security has de minimis original issue discount, you must include the de minimis amount in income as stated principal payments are made on the debt security, unless you make the election described below under "—Election to Treat All Interest as Original Issue Discount." You can determine the includible amount with respect to each such payment by multiplying the total amount of your debt security's de minimis original issue discount by a fraction equal to:

•   the amount of the principal payment made

divided by

•   the stated principal amount of the debt security.

Generally, if your discount debt security matures more than one year from its date of issue, you must include original issue discount, or OID, in income before you receive cash attributable to that income. The amount of OID that you must include in income is calculated using a constant-yield method, and generally you will include increasingly greater amounts of OID in income over the life of your debt security. More specifically, you can calculate the amount of accrued OID that you must include in income by adding the daily portions of OID with respect to your discount debt security for each day during the taxable year or portion of the taxable year that you hold your discount debt security. You can determine the daily portion by allocating to each day in any accrual period a pro rata portion of the OID allocable to that accrual period. You may select an accrual period of any length with respect to your debt security and you may vary the length of each accrual period over the term of your debt security. However, no accrual period may be longer than one year and each scheduled payment of interest or principal on the debt security must occur on either the first or final day of an accrual period.

You can determine the amount of OID allocable to an accrual period by:

•   multiplying your discount debt security's adjusted issue price at the beginning of the accrual period by your debt security's yield to maturity; and then

•   subtracting from this figure the sum of the payments of qualified stated interest on your debt security allocable to the accrual period.

You must determine the debt security's yield to maturity on the basis of compounding at the close of each accrual period and adjusting for the length of each accrual period. Further, you can determine your discount debt security's adjusted issue price at the beginning of any accrual period by:

•   adding your debt security's issue price and any accrued OID for each prior accrual period; and then

•   subtracting any payments previously made on your debt security that were not qualified stated interest payments.

If an interval between payments of qualified stated interest on your debt security contains more than one accrual period, then, when you determine the amount of OID allocable to an accrual period, you must allocate the amount of qualified stated interest payable at the end of the interval, including any qualified stated interest that is payable on the first day of the accrual period immediately following the interval, pro rata to each accrual period in the interval based on their relative lengths. In addition, you must increase the adjusted issue price at the beginning of each accrual period in the interval by the amount of any qualified stated interest that has accrued prior to the first day of the accrual period but that is not payable until the end of the interval. You may compute the amount of OID allocable to an initial short accrual period by using any reasonable method if all other accrual periods, other than a final short accrual period, are of equal length.

60

Table of Contents

## U.S. Tax Considerations

The amount of OID allocable to the final accrual period is equal to the difference between:

- the amount payable at the maturity of your debt security, other than any payment of qualified stated interest; and
- your debt security's adjusted issue price as of the beginning of the final accrual period.

**Acquisition Premium.** If you purchase your debt security for an amount that is less than or equal to the sum of all amounts, other than qualified stated interest, payable on your debt security after the purchase date but is greater than the amount of your debt security's adjusted issue price, as determined above under "General," the excess is acquisition premium. If you do not make the election described below under "Election to Treat All Interest as Original Issue Discount," then you must reduce the daily portions of OID by a fraction equal to:

- the excess of your adjusted basis in the debt security immediately after purchase over the adjusted issue price of the debt security

divided by

- the excess of the sum of all amounts payable (other than qualified stated interest) on the debt security after the purchase date over the debt security's adjusted issue price.

**Pre-Issuance Accrued Interest.** An election may be made to decrease the issue price of your debt security by the amount of pre-issuance accrued interest if:

- a portion of the initial purchase price of your debt security is attributable to pre-issuance accrued interest;
- the first stated interest payment on your debt security is to be made within one year of your debt security's issue date; and
- the payment will equal or exceed the amount of pre-issuance accrued interest.

If this election is made, a portion of the first stated interest payment will be treated as a return of the excluded pre-issuance accrued interest and not as an amount payable on your debt security.

**Debt Securities Subject to Contingencies Including Optional Redemption.** Your debt security is subject to a contingency if it provides for an alternative payment schedule or schedules applicable upon the occurrence of a contingency or contingencies, other than a remote or incidental contingency, whether such contingency relates to payments of interest or of principal. In such a case, you must determine the yield and maturity of your debt security by assuming that the payments will be made according to the payment schedule most likely to occur if:

- the timing and amounts of the payments that comprise each payment schedule are known as of the issue date; and
- one of such schedules is significantly more likely than not to occur.

If there is no single payment schedule that is significantly more likely than not to occur, other than because of a mandatory sinking fund, you must include income on your debt security in accordance with the general rules that govern contingent payment obligations. These rules will be discussed in the applicable prospectus supplement.

Notwithstanding the general rules for determining yield and maturity, if your debt security is subject to contingencies, and either you or we have an unconditional option or options that, if exercised, would require payments to be made on the debt security under an alternative payment schedule or schedules, then:

- in the case of an option or options that we may exercise, we will be deemed to exercise or not exercise an option or combination of options in the manner that minimizes the yield on your debt security and,
- in the case of an option or options that you may exercise, you will be deemed to exercise or not exercise an option or combination of options in the manner that maximizes the yield on your debt security.

<u>Table of Contents</u>

## U.S. Tax Considerations

If both you and we hold options described in the preceding sentence, those rules will apply to each option in the order in which they may be exercised. You may determine the yield on your debt security for the purposes of those calculations by using any date on which your debt security may be redeemed or repurchased as the maturity date and the amount payable on the date that you chose in accordance with the terms of your debt security as the principal amount payable at maturity.

If a contingency, including the exercise of an option, actually occurs or does not occur contrary to an assumption made according to the above rules then, except to the extent that a portion of your debt security is repaid as a result of this change in circumstances and solely to determine the amount and accrual of OID, you must redetermine the yield and maturity of your debt security by treating your debt security as having been retired and reissued on the date of the change in circumstances for an amount equal to your debt security's adjusted issue price on that date.

**Election to Treat All Interest as Original Issue Discount.**    You may elect to include in gross income all interest that accrues on your debt security using the constant-yield method described above under "General," with the modifications described below. For purposes of this election, interest will include stated interest, OID, de minimis original issue discount, market discount, de minimis market discount and unstated interest, as adjusted by any amortizable bond premium, described below under "Debt Securities Purchased at a Premium," or acquisition premium.

If you make this election for your debt security, then, when you apply the constant-yield method:

- the issue price of your debt security will equal your cost;

- the issue date of your debt security will be the date you acquired it; and

- no payments on your debt security will be treated as payments of qualified stated interest.

Generally, this election will apply only to the debt security for which you make it; however, if the debt security for which this election is made has amortizable bond premium, you will be deemed to have made an election to apply amortizable bond premium against interest for all debt instruments with amortizable bond premium, other than debt instruments the interest on which is excludible from gross income, that you hold as of the beginning of the taxable year to which the election applies or any taxable year thereafter. Additionally, if you make this election for a market discount debt security, you will be treated as having made the election discussed below under "Market Discount" to include market discount in income currently over the life of all debt instruments having market discount that you acquire on or after the first day of the first taxable year to which the election applies. You may not revoke any election to apply the constant-yield method to all interest on a debt security or the deemed elections with respect to amortizable bond premium or market discount debt securities without the consent of the Internal Revenue Service.

**Variable Rate Debt Securities.**    Your debt security will be a variable rate debt security if:

- your debt security's issue price does not exceed the total noncontingent principal payments by more than the lesser of:

    1.  .015 multiplied by the product of the total noncontingent principal payments and the number of complete years to maturity from the issue date, or

    2.  15 percent of the total noncontingent principal payments; and

- your debt security provides for stated interest, compounded or paid at least annually, only at:

    1.  one or more qualified floating rates,

    2.  a single fixed rate and one or more qualified floating rates,

    3.  a single objective rate, or

    4.  a single fixed rate and a single objective rate that is a qualified inverse floating rate.

<u>Table of Contents</u>

## U.S. Tax Considerations

Your debt security will have a variable rate that is a qualified floating rate if:

- variations in the value of the rate can reasonably be expected to measure contemporaneous variations in the cost of newly borrowed funds in the currency in which your debt security is denominated; or

- the rate is equal to such a rate multiplied by either:

  1. a fixed multiple that is greater than 0.65 but not more than 1.35, or

  2. a fixed multiple that is greater than 0.65 but not more than 1.35, increased or decreased by a fixed rate; and

- the value of the rate on any date during the term of your debt security is set no earlier than three months prior to the first day on which that value is in effect and no later than one year following that first day.

If your debt security provides for two or more qualified floating rates that are within 0.25 percentage points of each other on the issue date or can reasonably be expected to have approximately the same values throughout the term of the debt security, the qualified floating rates together constitute a single qualified floating rate.

Your debt security will not have a qualified floating rate, however, if the rate is subject to certain restrictions (including caps, floors, governors, or other similar restrictions) unless such restrictions are fixed throughout the term of the debt security or are not reasonably expected to significantly affect the yield on the debt security.

Your debt security will have a variable rate that is a single objective rate if:

- the rate is not a qualified floating rate;

- the rate is determined using a single, fixed formula that is based on objective financial or economic information that is not within the control of or unique to the circumstances of the issuer or a related party; and

- the value of the rate on any date during the term of your debt security is set no earlier than three months prior to the first day on which that value is in effect and no later than one year following that first day.

Your debt security will not have a variable rate that is an objective rate, however, if it is reasonably expected that the average value of the rate during the first half of your debt security's term will be either significantly less than or significantly greater than the average value of the rate during the final half of your debt security's term.

An objective rate as described above is a qualified inverse floating rate if:

- the rate is equal to a fixed rate minus a qualified floating rate; and

- the variations in the rate can reasonably be expected to inversely reflect contemporaneous variations in the cost of newly borrowed funds.

Your debt security will also have a single qualified floating rate or an objective rate if interest on your debt security is stated at a fixed rate for an initial period of one year or less followed by either a qualified floating rate or an objective rate for a subsequent period, and either:

- the fixed rate and the qualified floating rate or objective rate have values on the issue date of the debt security that do not differ by more than 0.25 percentage points; or

- the value of the qualified floating rate or objective rate is intended to approximate the fixed rate.

In general, if your variable rate debt security provides for stated interest at a single qualified floating rate or objective rate (or one of those rates after a single fixed rate for an initial period), all stated interest on your debt security is qualified stated interest. In this case, the amount of OID, if any, is determined by using, for a qualified floating rate or qualified inverse floating rate, the value as of the issue date of the qualified floating rate or qualified inverse floating rate, or, for any other objective rate, a fixed rate that reflects the yield reasonably expected for your debt security.

63

Table of Contents

## U.S. Tax Considerations

If your variable rate debt security does not provide for stated interest at a single qualified floating rate or a single objective rate, and also does not provide for interest payable at a fixed rate other than a single fixed rate for an initial period, you generally must determine the interest and OID accruals on your debt security by:

- determining a fixed rate substitute for each variable rate provided under your variable rate debt security;

- constructing the equivalent fixed rate debt instrument (using the fixed rate substitute described above);

- determining the amount of qualified stated interest and OID with respect to the equivalent fixed rate debt instrument; and

- adjusting for actual variable rates during the applicable accrual period.

When you determine the fixed rate substitute for each variable rate provided under the variable rate note, you generally will use the value of each variable rate as of the issue date or, for an objective rate that is not a qualified inverse floating rate, a rate that reflects the reasonably expected yield on your debt security.

If your variable rate debt security provides for stated interest either at one or more qualified floating rates or at a qualified inverse floating rate, and also provides for stated interest at a single fixed rate other than a single fixed rate for an initial period, you generally must determine interest and OID accruals by using the method described in the previous paragraph. However, your variable rate debt security will be treated, for purposes of the first three steps of the determination, as if your debt security had provided for a qualified floating rate, or a qualified inverse floating rate, rather than the fixed rate. The qualified floating rate, or qualified inverse floating rate, that replaces the fixed rate must be such that the fair market value of your variable rate debt security as of the issue date approximates the fair market value of an otherwise identical debt instrument that provides for the qualified floating rate, or qualified inverse floating rate, rather than the fixed rate.

**Short-Term Debt Securities.**   In general, if you are an individual or other cash basis United States holder of a short-term debt security, you are not required to accrue OID, as specially defined below for the purposes of this paragraph, for United States federal income tax purposes unless you elect to do so. However, you may be required to include any stated interest in income as you receive it. If you are an accrual basis taxpayer, a taxpayer in a special class, including, but not limited to, a regulated investment company, common trust fund, or a certain type of pass-through entity, or a cash basis taxpayer who so elects, you will be required to accrue OID on short-term debt securities on either a straight-line basis or under the constant-yield method, based on daily compounding. If you are not required and do not elect to include OID in income currently, any gain you realize on the sale or retirement of your short-term debt security will be ordinary income to the extent of the accrued OID, which will be determined on a straight-line basis unless you make an election to accrue the OID under the constant-yield method, through the date of sale or retirement. However, if you are not required and do not elect to accrue OID on your short-term debt securities, you will be required to defer deductions for interest on borrowings allocable to your short-term debt securities in an amount not exceeding the deferred income until the deferred income is realized.

When you determine the amount of OID subject to these rules, you must include all interest payments on your short-term debt security, including stated interest, in your short-term debt security's stated redemption price at maturity.

**Foreign Currency Discount Debt Securities.**   If your discount debt security is denominated in, or determined by reference to, a foreign currency, you must determine OID for any accrual period on your discount debt security in the foreign currency and then translate the amount of OID into U.S. dollars in the same manner as stated interest accrued by an accrual basis United States holder, as described under "—Payments of Interest." You may recognize ordinary income or loss when you receive an amount attributable to OID in connection with a payment of interest or the sale or retirement of your debt security.

64

<u>**Table of Contents**</u>

## U.S. Tax Considerations

**Market Discount**

You will be treated as if you purchased your debt security, other than a short-term debt security, at a market discount, and your debt security will be a market discount note if:

- in the case of an initial purchaser, you purchase your debt security for less than its issue price as determined above under "—Original Issue Discount—General"; and

- in the case of all purchasers, the difference between the debt security's stated redemption price at maturity or, in the case of a discount debt security, the debt security's revised issue price, and the price you paid for your debt security is equal to or greater than 1/4 of 1 percent of your debt security's stated redemption price at maturity or revised issue price, respectively, multiplied by the number of complete years to the debt security's maturity. To determine the revised issue price of your debt security for these purposes, you generally add any OID that has accrued on your debt security to its issue price.

If your debt security's stated redemption price at maturity or, in the case of a discount debt security, its revised issue price, exceeds the price you paid for the debt security by less than 1/4 of 1% multiplied by the number of complete years to the debt security's maturity, the excess constitutes de minimis market discount, and the rules discussed below are not applicable to you.

You must treat any gain you recognize on the maturity or disposition of your market discount debt security as ordinary income to the extent of the accrued market discount on your debt security. Alternatively, you may elect to include market discount in income currently over the life of your debt security. If you make this election, it will apply to all debt instruments with market discount that you acquire on or after the first day of the first taxable year to which the election applies. You may not revoke this election without the consent of the Internal Revenue Service. If you own a market discount debt security and do not make this election, you will generally be required to defer deductions for interest on borrowings allocable to your debt security in an amount not exceeding the accrued market discount on your debt security until the maturity or disposition of your debt security.

If you own a market discount debt security, the market discount would accrue on a straight-line basis unless an election is made to accrue market discount using a constant-yield method. If you make this election, it will apply only to the debt security with respect to which it is made and you may not revoke it. You would, however, not include accrued market discount in income unless you elect to do so as described above.

**Debt Securities Purchased at a Premium**

If you purchase your debt security for an amount in excess of its principal amount (or, in the case of a discount debt security, in excess of its stated redemption price at maturity), you may elect to treat the excess as amortizable bond premium. If you make this election, you will reduce the amount required to be included in your income each year with respect to interest on your debt security by the amount of amortizable bond premium allocable to that year, based on your debt security's yield to maturity. If your debt security is denominated in, or determined by reference to, a foreign currency, you will compute your amortizable bond premium in units of the foreign currency and your amortizable bond premium will reduce your interest income in units of the foreign currency. Gain or loss recognized that is attributable to changes in exchange rates between the time your amortized bond premium offsets interest income and the time of the acquisition of your debt security is generally taxable as ordinary income or loss. If you make an election to amortize bond premium, it will apply to all debt instruments, other than debt instruments the interest on which is excludible from gross income, that you hold at the beginning of the first taxable year to which the election applies or that you thereafter acquire, and you may not revoke it without the consent of the Internal Revenue Service. See also "—Original Issue Discount—Election to Treat All Interest as Original Issue Discount."

<u>**Table of Contents**</u>

## U.S. Tax Considerations

**Purchase, Sale and Retirement of the Debt Securities**

Your tax basis in your debt security will generally be the U.S. dollar cost, as defined below, of your debt security, adjusted by:

- adding any OID or market discount previously included in income with respect to your debt security; and then

- subtracting any payments on your debt security that are not qualified stated interest payments and any amortizable bond premium applied to reduce the interest on your debt security.

If you purchase your debt security with foreign currency, the U.S. dollar cost of your debt security will generally be the U.S. dollar value of the purchase price on the date of purchase. However, if you are a cash basis taxpayer, or an accrual basis taxpayer if you so elect, and your debt security is traded on an established securities market, as defined in the applicable Treasury regulations, the U.S. dollar cost of your debt security will be the U.S. dollar value of the purchase price on the settlement date of your purchase.

You will generally recognize gain or loss on the sale or retirement of your debt security equal to the difference between the amount you realize on the sale or retirement, excluding any amounts attributable to accrued but unpaid interest (which will be treated as interest payments), and your tax basis in your debt security. If your debt security is sold or retired for an amount in foreign currency, the amount you realize will be the U.S. dollar value of such amount on the date the debt security is disposed of or retired, except that in the case of a debt security that is traded on an established securities market, as defined in the applicable Treasury regulations, a cash basis taxpayer, or an accrual basis taxpayer that so elects, will determine the amount realized based on the U.S. dollar value of the foreign currency on the settlement date of the sale.

You will recognize capital gain or loss when you sell or retire your debt security, except to the extent:

- described above under "—Original Issue Discount—Short-Term Debt Securities" or "—Market Discount,"

- the rules governing contingent payment obligations apply, or

- attributable to changes in exchange rates as described below.

Capital gain of a noncorporate United States holder is generally taxed at preferential rates where the property is held for more than one year.

You must treat any portion of the gain or loss that you recognize on the sale or retirement of a debt security as ordinary income or loss to the extent attributable to changes in exchange rates. However, you only take exchange gain or loss into account to the extent of the total gain or loss you realize on the transaction.

**Exchange of Amounts in Other Than U.S. Dollars**

If you receive foreign currency as interest on your debt security or on the sale or retirement of your debt security, your tax basis in the foreign currency will equal its U.S. dollar value when the interest is received or at the time of the sale or retirement. If you purchase foreign currency, you generally will have a tax basis equal to the U.S. dollar value of the foreign currency on the date of your purchase. If you sell or dispose of a foreign currency, including if you use it to purchase debt securities or exchange it for U.S. dollars, any gain or loss recognized generally will be ordinary income or loss.

**Medicare Tax**

A United States holder that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% tax on the lesser of (1) the United States holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year and (2) the excess of the United States holder's modified adjusted gross income for the taxable year over a certain threshold

Table of Contents

**U.S. Tax Considerations**

(which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances). A United States holder's net investment income generally includes its interest income and its net gains from the disposition of debt securities, unless such interest income or net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). If you are a United States holder that is an individual, estate or trust, you are urged to consult your tax advisors regarding the applicability of the Medicare tax to your income and gains in respect of your investment in the debt securities.

**Extendible, Indexed and Other Debt Securities**

The applicable prospectus supplement will discuss any special United States federal income tax rules with respect to extendible debt securities, contingent foreign currency debt securities, debt securities the payments on which are determined by reference to the value of any index or stock and debt securities that are subject to the rules governing contingent payment obligations.

**Treasury Regulations Requiring Disclosure of Reportable Transactions**

Treasury regulations require United States taxpayers to report certain transactions that give rise to a loss in excess of certain thresholds (a "Reportable Transaction"). Under these regulations, if the debt securities are denominated in, or linked to, a foreign currency, a United States holder that recognizes a loss with respect to the debt securities that is characterized as an ordinary loss due to changes in currency exchange rates (under any of the rules discussed above) would be required to report the loss on Internal Revenue Service Form 8886 (Reportable Transaction Statement) if the loss exceeds the thresholds set forth in the regulations. For individuals and trusts, this loss threshold is $50,000 in any single taxable year. For other types of taxpayers and other types of losses, the thresholds are higher. You should consult with your tax advisor regarding any tax filing and reporting obligations that may apply in connection with acquiring, owning and disposing of debt securities.

**Foreign Account Tax Compliance Withholding**

Certain non-U.S. financial institutions must comply with information reporting requirements or certification requirements in respect of their direct and indirect United States shareholders and/or United States accountholders to avoid becoming subject to withholding on certain payments. UBS and other non-U.S. financial institutions may accordingly be required to report information to the IRS regarding the holders of debt securities and to withhold on a portion of payments under the debt securities to certain holders that fail to comply with the relevant information reporting requirements (or hold debt securities directly or indirectly through certain non-compliant intermediaries). However, such withholding would generally not apply to payments made before January 1, 2017. Moreover, such withholding would only apply to debt securities issued at least six months after the date on which final regulations implementing such rule are enacted. Holders are urged to consult their own tax advisors and any banks or brokers through which they will hold debt securities as to the consequences (if any) of these rules to them.

**Information with Respect to Foreign Financial Assets**

Owners of "specified foreign financial assets" with an aggregate value in excess of $50,000 (and in some circumstances, a higher threshold) may be required to file an information report with respect to such assets with their tax returns. "Specified foreign financial assets" may include financial accounts maintained by foreign financial institutions (which would include debt of a foreign financial institution that is not regularly traded on an established securities market, and thus may include your debt securities), as well as any of the following but only if they are held for investment and not held in accounts maintained by financial institutions: (i) stocks and securities issued by non-United States persons, (ii) financial instruments and contracts that have non-United States issuers or counterparties, and (iii) interests in foreign entities. Holders are urged to consult their tax advisors regarding the application of this reporting requirement to their ownership of the debt securities.

<u>Table of Contents</u>

## U.S. Tax Considerations

### Backup Withholding and Information Reporting

If you are a noncorporate United States holder, information reporting requirements, on Internal Revenue Service Form 1099, generally will apply to:

- payments of principal and interest on a debt security within the United States, including payments made by wire transfer from outside the United States to an account you maintain in the United States, and

- the payment of the proceeds from the sale of a debt security effected at a United States office of a broker.

Additionally, backup withholding will apply to such payments if you are a noncorporate United States holder that:

- fails to provide an accurate taxpayer identification number,

- is notified by the Internal Revenue Service that you have failed to report all interest and dividends required to be shown on your federal income tax returns, or

- in certain circumstances, fails to comply with applicable certification requirements.

In general, payment of the proceeds from the sale of debt securities effected at a foreign office of a broker will not be subject to information reporting or backup withholding. However, a sale effected at a foreign office of a broker will generally be subject to information reporting and backup withholding if:

- the proceeds are transferred to an account maintained by you in the United States,

- the payment of proceeds or the confirmation of the sale is mailed to you at a United States address, or

- the sale has some other specified connection with the United States as provided in U.S. Treasury regulations,

unless the broker does not have actual knowledge or reason to know that you are a United States person and the documentation requirements described above are met or you otherwise establish an exemption.

In addition, payment of the proceeds from the sale of debt securities effected at a foreign office of a broker will generally be subject to information reporting if the broker is:

- a United States person,

- a controlled foreign corporation for United States tax purposes,

- a foreign person 50% or more whose gross income is effectively connected with the conduct of a United States trade or business for a specified three-year period, or

- a foreign partnership, if at any time during its tax year:

  - one or more of its partners are "U.S. persons," as defined in U.S. Treasury regulations, who in the aggregate hold more than 50% of the income or capital interest in the partnership, or

  - such foreign partnership is engaged in the conduct of a United States trade or business

unless the broker does not have actual knowledge or reason to know that you are United States person and the documentation requirements described above are met or you otherwise establish an exemption.

Backup withholding will apply if the sale is subject to information reporting and the broker has actual knowledge that you are a United States person.

## Taxation of Warrants

U.S. tax considerations with respect to warrants will be discussed in an applicable prospectus supplement.

Table of Contents

# Tax Considerations Under the Laws of Switzerland

## General

Unless as otherwise stated in the applicable prospectus supplement, this section describes the principal tax consequences under the laws of Switzerland for non-Swiss investors (*i.e.*, for investors who are not residents of Switzerland and have no permanent establishment or fixed place of business situated in Switzerland for Swiss tax purposes) of acquiring, owning or disposing of debt securities and warrants issued and booked by a non-Swiss-branch of UBS AG, which has the status of a bank, and the proceeds from which are used outside Switzerland. This summary does not address the tax treatment of Swiss investors (*i.e.*, for investors who are residents of Switzerland or have a permanent establishment or fixed place of business situated in Switzerland for Swiss tax purposes). The tax information set forth below is based on the opinion of Homburger AG, Zürich, Switzerland, dated November 14, 2014, and has been approved by them for its accuracy.

The following is a summary based on legislation as of the date of this prospectus and does not aim to be a comprehensive description of all the Swiss tax considerations that may be relevant to a decision to invest in debt securities and warrants. The tax treatment for each debt-holder and warrant-holder depends on the particular situation. All holders and prospective holders are advised to consult their own professional tax advisors in light of their particular circumstances as to the Swiss tax legislation that could be relevant for them in connection with the purchase, ownership and disposition of debt securities and warrants and the consequences of such actions under the tax legislation of Switzerland.

## Swiss Income and Wealth Tax

Holders of debt securities and warrants who are not residents of Switzerland and have not engaged in a trade or business through a permanent establishment or fixed place of business situated in Switzerland to which the debt securities and warrants are attributable or to which the debt securities and warrants belong will not be subject to any Swiss federal, cantonal or communal corporate or individual income and capital or wealth tax or capital gains tax on the holding and disposition of the debt securities and warrants or the exercise of warrants.

## Issuance Stamp Tax

Under the condition that UBS AG will book the debt securities and warrants in its Jersey branch, London branch or any other branch not situated in Switzerland and under the conditions that the respective branch has the status of a bank and UBS AG does not use the proceeds of the sale of the debt securities and the warrants in Switzerland, the issuance of the debt securities and warrants will not be a taxable event for Swiss issuance stamp tax purposes.

## Withholding Tax

Under the condition that UBS AG will book the debt securities or warrants in its Jersey branch, London branch or any other branch not situated in Switzerland and under the conditions that the respective branch has the status of a bank and UBS AG does not use the proceeds of the sale of the debt securities and warrants in Switzerland, the payment of interest on and the redemption of debt securities or warrants and the exercise of warrants is not subject to Swiss withholding tax. On August 24, 2011 the Swiss Federal Council issued draft legislation, which, if enacted, may require any paying agent in Switzerland to deduct Swiss withholding tax at a rate of 35 percent. on any payment of interest in respect of debt securities or warrants that are classified as debt instruments for Swiss taxation purposes to an individual resident in Switzerland or to a person resident outside of Switzerland.

## Securities Turnover Tax

Dealings in debt securities or warrants where a bank or another securities dealer in Switzerland (as defined in the Swiss Federal Stamp Tax Act) acts as an intermediary, or is a party, to the transaction, may be subject to Swiss federal stamp tax on the turnover in securities at an aggregated rate of up to 0.3 percent of the purchase price of the debt securities or warrants. A branch of UBS AG situated, or a subsidiary of UBS AG resident, outside Switzerland will not be a Swiss securities dealer under the Swiss Federal Stamp Tax Act.

Table of Contents

## Tax Considerations Under the Laws of Switzerland

### European Directive on the Taxation of Savings Income

On October 26, 2004, the European Community and Switzerland entered into an agreement on the taxation of savings income pursuant to which Switzerland will adopt measures equivalent to those of the European Directive 2003/48/EC of June 3, 2003 on the taxation of savings income in the form of interest payments. The agreement came into force as of July 1, 2005.

In accordance with this agreement, Swiss paying agents have to withhold tax at a rate of 35 percent on interest payments made under the debt securities and warrants to a beneficial owner who is an individual and resident of an EU member state, with the option of the individual to have the paying agent and Switzerland provide to the tax authorities of the EU member state the details of the interest payments in lieu of the withholding.

### Foreign Final Withholding Tax

The Swiss Federal Council signed treaties with the United Kingdom and Austria providing, inter alia, for a final withholding tax. The treaties entered into force on 1 January 2013 and might be followed by similar treaties with other European countries.

According to the treaties, a Swiss paying agent may levy a final withholding tax on capital gains and on certain income items deriving, inter alia, from debt securities and warrants. The final withholding tax will substitute the ordinary income tax due by an individual resident of a contracting state on such gains and income items. In lieu of the final withholding, individuals may opt for a voluntary disclosure of the relevant capital gains and income items to the tax authorities of their state of residency.

Holders of debt securities and warrants who might be in the scope of the abovementioned treaties should consult their own tax adviser as to the tax consequences relating to their particular circumstances.

70

Table of Contents

# Benefit Plan Investor Considerations

A fiduciary of a pension, profit-sharing or other employee benefit plan subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") (each, a "Plan"), should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before authorizing an investment in the debt securities and warrants. Among other factors, the fiduciary should consider whether the investment would satisfy the prudence and diversification requirements of ERISA and would be consistent with the documents and instruments governing the Plan, and whether the investment would involve a prohibited transaction under ERISA or the U.S. Internal Revenue Code (the "Code").

Section 406 of ERISA and Section 4975 of the Code prohibit Plans, as well as individual retirement accounts, Keogh plans and any other plans that are subject to Section 4975 of the Code (also "Plans"), from engaging in certain transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to the Plan. A violation of these prohibited transaction rules may result in excise tax or other liabilities under ERISA or the Code for those persons, unless exemptive relief is available under an applicable statutory, regulatory or administrative exemption. Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3(33) of ERISA) and non-U.S. plans (as described in Section 4(b)(4) of ERISA) ("Non-ERISA Arrangements") are not subject to the requirements of Section 406 of ERISA or Section 4975 of the Code but may be subject to similar provisions under applicable federal, state, local, non-U.S. or other laws ("Similar Laws").

The acquisition of debt securities and warrants by a Plan or any entity whose underlying assets include "plan assets" by reason of any Plan's investment in the entity (a "Plan Asset Entity") with respect to which we, UBS Securities LLC, UBS Financial Services Inc. and other of our affiliates is or becomes a party in interest or disqualified person may result in a prohibited transaction under ERISA or Section 4975 of the Code, unless the debt securities and warrants are acquired pursuant to an applicable exemption. The U.S. Department of Labor has issued five prohibited transaction class exemptions, or "PTCEs", that may provide exemptive relief if required for direct or indirect prohibited transactions that may arise from the purchase or holding of debt securities and warrants. These exemptions are PTCE 84-14 (for certain transactions determined by independent qualified professional asset managers), PTCE 90-1 (for certain transactions involving insurance company pooled separate accounts), PTCE 91-38 (for certain transactions involving bank collective investment funds), PTCE 95-60 (for transactions involving certain insurance company general accounts), and PTCE 96-23 (for transactions managed by in-house asset managers). In addition, ERISA Section 408(b)(17) and Section 4975(d)(20) of the Code may *provide* an exemption for the purchase and sale of debt securities and warrants offered hereby, provided that neither the issuer of securities offered hereby nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Plan involved in the transaction, and *provided further* that the Plan pays no more and receives no less than "adequate consideration" in connection with the transaction (the "service provider exemption"). There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Any purchaser or holder of debt securities and warrants or any interest therein will be deemed to have represented by its purchase and holding or conversion of debt securities and warrants offered hereby that it either (1) is not a Plan, a Plan Asset Entity or a Non-ERISA Arrangement and is not purchasing the debt securities and warrants on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement or (2) the purchase or holding of the debt securities and warrants will not result in a non-exempt prohibited transaction or a similar violation under any applicable Similar Laws.

Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is important that fiduciaries or other persons considering purchasing debt securities and warrants on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement consult with their counsel regarding the availability of exemptive relief under any of the PTCEs listed above, the service provider exemption or the potential consequences of any purchase or holding under Similar Laws, as applicable. Purchasers of debt securities and warrants have exclusive responsibility for ensuring that their purchase and holding of debt securities

Table of Contents

**Benefit Plan Investor Considerations**

and warrants do not violate the fiduciary or prohibited transaction rules of ERISA or the Code or any similar provisions of Similar Laws. The sale of any debt securities and warrants to a Plan, Plan Asset Entity or Non-ERISA Arrangement is in no respect a representation by us or any of our affiliates or representatives that such an investment meets all relevant legal requirements with respect to investments by any such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement or that such investment is appropriate for such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement.

72

Table of Contents

# Plan of Distribution

### Plan of Distribution for the Initial Offer and Sale of Securities

We plan to issue the securities under a distribution agreement with UBS Securities LLC and UBS Financial Services Inc., as the agents. We have filed a copy of the form of distribution agreement with the SEC as an exhibit to our registration statement. See "Where You Can Find More Information" above for information on how to obtain a copy of it. Subject to certain conditions, the agents would agree to use their reasonable efforts to solicit purchases of the securities. We would have the right to accept offers to purchase securities and may reject any proposed purchase of the securities. The agents may also reject any offer to purchase securities. We would pay the agents a commission on any securities sold through the agents. In accordance with Rule 5110 of the Financial Industry Regulatory Authority, Inc. ("FINRA"), in no situation will underwriting compensation exceed 8% of the principal amount of the securities.

UBS Securities LLC and UBS Financial Services Inc. are affiliates of UBS. Rule 5121 of FINRA imposes certain requirements when a FINRA member such as UBS Securities LLC or UBS Financial Services Inc. distributes an affiliated company's securities. UBS Securities LLC and UBS Financial Services Inc. have advised UBS that this offering will comply with the applicable requirements of Rule 5121.

We may also sell securities to the agents who will purchase the securities as principal for their own accounts. In that case, the agents will purchase the securities at a price equal to the issue price specified in the applicable prospectus supplement, less a discount. The discount will equal the applicable commission on an agency sale of securities with the same stated maturity.

The agents may resell any securities they purchase as principal to other brokers or dealers at a discount, which may include all or part of the discount the agents received from us. If all the securities are not sold at the initial offering price, the agents may change the offering price and the other selling terms.

We may also sell securities directly to investors. We will not pay commissions on securities we sell directly.

The agents, whether acting as agent or principal, may be deemed to be "underwriters" within the meaning of the Securities Act of 1933. We have agreed to indemnify the agents against certain liabilities, including liabilities under the Securities Act.

If the agents sell securities to dealers who resell to investors and the agents pay the dealers all or part of the discount or commission they receive from us, those dealers may also be deemed to be "underwriters" within the meaning of the Securities Act.

In connection with an offering, the agents may purchase and sell securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by an agent of a greater number of securities than they are required to purchase in an offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the securities while an offering is in progress.

The agents may also impose a penalty bid. This occurs when a particular agent repays to the agents a portion of the discount received by it because the agents have repurchased securities sold by or for the account of that agent in stabilizing or short-covering transactions.

These activities by the agents may stabilize, maintain or otherwise affect the market price of the securities. As a result, the price of the securities may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the agents at any time. These transactions may be effected on an exchange or automated quotation system, if the securities are listed on that exchange or admitted for trading on that automated quotation system, or in the over-the-counter market or otherwise.

The purchase price of the securities will be required to be paid in immediately available funds in New York City, unless otherwise indicated in your prospectus supplement.

Table of Contents

## Plan of Distribution

We may appoint agents other than or in addition to UBS Securities LLC and UBS Financial Services Inc. with respect to the securities. Any other agents will be named in the applicable prospectus supplements and those agents will enter into the distribution agreement referred to above. The other agents may be affiliates or customers of UBS and may engage in transactions with and perform services for UBS in the ordinary course of business. UBS Securities LLC and UBS Financial Services Inc. may resell securities to or through another of our affiliates, as selling agents.

The securities are a new issue of securities, and there will be no established trading market for any security before its original issue date. We may or may not list the securities on a securities exchange or quotation system. We have been advised by UBS Securities LLC and UBS Financial Services Inc. that they intend to make a market in the securities. However, neither UBS Securities LLC, UBS Financial Services Inc. nor any of our other affiliates nor any other agent named in your prospectus supplement that makes a market is obligated to do so and any of them may stop doing so at any time without notice. No assurance can be given as to the liquidity or trading market for the securities.

Under Rule 15c6-1 of the Securities Exchange Act of 1934, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Your prospectus supplement may provide that the original issue date for your securities may be more than three scheduled business days after the trade date for your securities. Accordingly, in such a case, if you wish to trade securities on any date prior to the third business day before the original issue date for your securities, you will be required, by virtue of the fact that your securities initially are expected to settle in more than three scheduled business days after the trade date for your securities, to make alternative settlement arrangements to prevent a failed settlement.

### Market-Making Resales by Affiliates

This prospectus may be used by UBS, UBS Securities LLC, UBS Financial Services Inc. or any other affiliate of UBS in connection with offers and sales of the securities in market-making transactions. In a market-making transaction, each of UBS, UBS Securities LLC, UBS Financial Services Inc. or any other affiliate of UBS may resell a security it acquires from other holders, after the original offering and sale of the security. Resales of this kind may occur in the open market or may be privately negotiated at prevailing market prices at the time of resale or at related or negotiated prices. In these transactions, UBS, UBS Securities LLC, UBS Financial Services Inc. or any other affiliate of UBS may act as principal or agent, including as agent for the counterparty in a transaction in which it acts as principal, or as agent for both counterparties in a transaction in which it does not act as principal. UBS, UBS Securities LLC, UBS Financial Services Inc. or any other affiliate of UBS may receive compensation in the form of discounts and commissions, including from both counterparties in some cases.

The securities to be sold in market-making transactions include securities to be issued after the date of this prospectus as well as securities previously issued.

UBS does not expect to receive any proceeds from market-making transactions other than those it undertakes on its own. UBS does not expect that UBS Securities LLC, UBS Financial Services Inc. or any other affiliate that engages in these transactions will pay any proceeds from its market-making resales to UBS.

Information about the trade and settlement dates, as well as the purchase price, for a market-making transaction will be provided to the purchaser in a separate confirmation of sale.

Unless UBS or an agent informs you in your confirmation of sale that your security is being purchased in its original offering and sale, you may assume that you are purchasing your security in a market-making transaction.

### Matters Relating to Initial Offering and Market-Making Resales

In this prospectus, the term "this offering" means the initial offering of the securities made in connection with their original issuance. This term does not refer to any subsequent resales of securities in market-making transactions.

74

Table of Contents

**Plan of Distribution**

**Conflicts of Interest**

Each of UBS Securities LLC and UBS Financial Services Inc. is an affiliate of UBS and, as such, has a "conflict of interest" in any offering of the securities within the meaning of Rule 5121. Consequently, any offering of the securities will be conducted in compliance with the provisions of Rule 5121. Neither UBS Securities LLC nor UBS Financial Services Inc. will be permitted to sell securities in any offering to an account over which it exercises discretionary authority without the prior specific written approval of the account holder.

Table of Contents

# Validity of the Securities

In connection with particular offerings of the securities in the future, and if stated in the applicable prospectus supplement, the validity of those securities may be passed upon for UBS AG by Sullivan & Cromwell LLP as to matters of New York law and by Homburger AG as to matters of Swiss law, and for any underwriters or agents by Sullivan & Cromwell LLP or other counsel named in the applicable prospectus supplement.

# Experts

Ernst & Young Ltd, independent registered public accounting firm, has audited our consolidated financial statements included in our Annual Report on Form 20-F for the year ended December 31, 2013, and the effectiveness of our internal control over financial reporting as of December 31, 2013, as set forth in their reports, which are incorporated by reference in the prospectuses and elsewhere in the registration statement. Our financial statements are incorporated by reference in reliance on Ernst & Young Ltd's reports, given on their authority as experts in accounting and auditing.

76

# Exhibit D

Consolidated financial statements
UBS Group AG consolidated financial statements

EY
Building a better
working world

Ernst & Young Ltd
Aeschengraben 9
P.O. Box
CH-4002 Basel

Phone   +41 58 286 86 86
Fax      +41 58 286 86 00
www.ey.com/ch

To the General Meeting of

**UBS Group AG, Zurich**

Basel, 10 March 2016

## Report of independent registered public accounting firm on internal control over financial reporting

We have audited the internal control over financial reporting of UBS Group AG and subsidiaries as of 31 December 2015, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework) (the COSO criteria). UBS Group AG's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in Management's Report on Internal Control Over Financial Reporting on page 393.

Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.



Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, UBS Group AG and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of 31 December 2015, based on the COSO criteria.

We also have audited, in accordance with Swiss law, Swiss Auditing Standards, International Standards on Auditing and the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of UBS Group AG and subsidiaries as of 31 December 2015 and 2014, and the related consolidated statements of income,  comprehensive income, changes in equity and cash flows, and notes thereto, for each of the three years in the period ended 31 December 2015, and our report dated 10 March 2016 expresses an unqualified opinion thereon.

Ernst & Young Ltd

Marie-Laure Delarue
Licensed Audit Expert
(Auditor in Charge)

Troy J. Butner
Certified Public Accountant (U.S.)

Consolidated
financial statements

Financial information
UBS AG consolidated financial statements



Ernst & Young Ltd
Aeschengraben 9
P.O. Box
CH-4002 Basel

Phone    +41 58 286 86 86
Fax      +41 58 286 86 00
www.ey.com/ch

To the General Meeting of

**UBS AG, Zurich and Basel**

Basel, 5 March 2015

### Report of independent registered public accounting firm on internal control over financial reporting

We have audited the internal control over financial reporting of UBS AG and its subsidiaries as of 31 December 2014, based on criteria established in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework) (the COSO criteria). UBS AG's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in Management's Report on Internal Control Over Financial Reporting on page 347.

Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.



In our opinion, UBS AG and its subsidiaries maintained, in all material respects, effective internal control over financial reporting as of 31 December 2014, based on the COSO criteria.

We also have audited, in accordance with Swiss law, Swiss Auditing Standards, International Standards on Auditing and the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of UBS AG and its subsidiaries as of 31 December 2014 and 2013, and the related consolidated income statements and consolidated statements of comprehensive income, changes in equity and cash flows and notes thereto for each of the three years in the period ended 31 December 2014, of UBS AG and our report dated 5 March 2015 expresses an unqualified opinion thereon.

Ernst & Young Ltd

Jonathan Bourne
Licensed Audit Export
(Auditor in Charge)

Troy J. Butner
Certified Public Accountant (U.S.)

Financial information
Consolidated financial statements


Building a better
working world

**Ernst & Young Ltd**
Aeschengraben 9
P.O. Box
CH-4002 Basel

Phone     +41 58 286 86 86
Fax         +41 58 286 86 00
www.ey.com/ch

To the General Meeting of

**UBS AG, Zurich and Basel**

Basel, 6 March 2014

**Report of independent registered public accounting firm on
internal control over financial reporting**

We have audited the internal control over financial reporting of UBS AG and its subsidiaries as of 31
December 2013, based on criteria established in Internal Control–Integrated Framework issued by the
Committee of Sponsoring Organizations of the Treadway Commission (1992 Framework) (the COSO
criteria). UBS AG's management is responsible for maintaining effective internal control over financial
reporting, and for its assessment of the effectiveness of internal control over financial reporting
included in Management's Report on Internal Control Over Financial Reporting on page 345.

Our responsibility is to express an opinion on the Company's internal control over financial reporting
based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting
Oversight Board (United States). Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether effective internal control over financial reporting was maintained
in all material respects. Our audit included obtaining an understanding of internal control over
financial reporting, assessing the risk that a material weakness exists, testing and evaluating the
design and operating effectiveness of internal control based on the assessed risk, and performing
such other procedures as we considered necessary in the circumstances. We believe that our audit
provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable
assurance regarding the reliability of financial reporting and the preparation of financial statements
for external purposes in accordance with generally accepted accounting principles. A company's
internal control over financial reporting includes those policies and procedures that (1) pertain to the
maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and
dispositions of the assets of the company; (2) provide reasonable assurance that transactions are
recorded as necessary to permit preparation of financial statements in accordance with generally
accepted accounting principles, and that receipts and expenditures of the company are being made
only in accordance with authorizations of management and directors of the company; and (3) provide
reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or
disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect
misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to
the risk that controls may become inadequate because of changes in conditions, or that the degree of
compliance with the policies or procedures may deteriorate.



In our opinion, UBS AG and its subsidiaries maintained, in all material respects, effective internal control over financial reporting as of 31 December 2013, based on the COSO criteria.

We also have audited, in accordance with Swiss law, Swiss Auditing Standards, International Standards on Auditing and the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of UBS AG and its subsidiaries as of 31 December 2013 and 2012, and the related consolidated income statements and consolidated statements of comprehensive income, changes in equity and cash flows and notes thereto for each of the three years in the period ended 31 December 2013, of UBS AG and our report dated 6 March 2014 expresses an unqualified opinion thereon.

Ernst & Young Ltd

Jonathan Bourne
Licensed Audit Expert
(Auditor in Charge)

Troy J. Butner
Certified Public Accountant (U.S.)

Ernst & Young Ltd          Phone   +41 58 286 86 86
Aeschengraben 9            Fax     +41 58 286 86 00
P.O. Box                   www.ey.com/ch
CH-4002 Basel

## Report of Independent Registered Public Accounting Firm

The Board of Directors and Shareholders of

**UBS Group AG**

We have audited UBS Group AG and subsidiaries' internal control over financial reporting as of 31 December 2016, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework) (the COSO criteria). UBS Group AG's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting.

Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, UBS Group AG and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of 31 December 2016, based on the COSO criteria.

Consolidated financial statements

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of UBS Group AG and subsidiaries as of 31 December 2016 and 2015, and the related consolidated income statements, statements of comprehensive income, changes in equity and cash flows, and notes thereto, for each of the three years in the period ended 31 December 2016, and our report dated 9 March 2017 expresses an unqualified opinion thereon.

*Ernst & Young Ltd*

Ernst & Young Ltd
Basel, 9 March 2017

Ernst & Young Ltd          Phone   +41 58 286 86 86
Aeschengraben 9            Fax     +41 58 286 86 00
P.O. Box                   www.ey.com/ch
CH-4002 Basel

To the General Meeting of                              Basel, 9 March 2017
UBS Group AG, Zurich

## Statutory auditor's report on the audit of the consolidated financial statements

### Opinion

We have audited the consolidated financial statements of UBS Group AG and its subsidiaries (the Group), which comprise the consolidated balance sheets as of 31 December 2016 and 2015, and the consolidated income statements, statements of comprehensive income, changes in equity and cash flows for each of the three years in the period ended 31 December 2016, and notes to the consolidated financial statements, including a summary of significant accounting policies on pages 314 to 459.

In our opinion, the accompanying consolidated financial statements give a true and fair view of the consolidated financial position of the Group as at 31 December 2016 and 2015, and the consolidated results of its operations and its cash flows for each of the three years in the period ended 31 December 2016 in accordance with International Financial Reporting Standards (IFRS) and comply with Swiss law.

### Basis for opinion

We conducted our audit in accordance with Swiss law, Swiss Auditing Standards and International Standards on Auditing (ISAs). Our responsibilities under those provisions and standards are further described in the Auditor's responsibilities for the audit of the consolidated financial statements section of our report.

We are independent of the Group in accordance with the provisions of Swiss law and the requirements of the Swiss audit profession, as well as the IESBA Code of Ethics for Professional Accountants, and we have fulfilled our other ethical responsibilities in accordance with these requirements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

### Key audit matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the consolidated financial statements of the current period. These matters were addressed in the context of our audit of the consolidated financial statements as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters. For each matter below, our description of how our audit addressed the matter is provided in that context.

We have fulfilled the responsibilities described in the Auditor's responsibilities for the audit of the consolidated financial statements section of our report, including in relation to these

matters. Accordingly, our audit included the performance of procedures designed to respond to our assessment of the risks of material misstatement of the consolidated financial statements. The results of our audit procedures, including the procedures performed to address the matters below, provide the basis for our audit opinion on the accompanying consolidated financial statements.

**Deferred tax asset valuation**

| | |
|---|---|
| **Area of focus** | We focused on this area because there is significant judgment exercised when determining the valuation of Deferred Tax Assets ("DTAs") given the significant amount of tax net operating loss carryforwards (net operating losses or "NOLs") the Group has available.  DTAs can be recognized to the extent it is probable they will be utilized to offset taxable profits within the loss carryforward period or be used against deductible temporary differences. The estimate of future taxable income is based on the strategic plan which is then allocated to the tax-paying entities in the various jurisdictions. The recognition of deferred tax assets is therefore sensitive to changes in the strategic plan as well as to assumptions made in the allocation of future taxable income.

See note 8 to the financial statements on pages 353 to 356. |
| **Our audit response** | We tested the design and operational effectiveness of the Group's key controls over the recognition and measurement of DTAs and the assumptions used in estimating the Group's future taxable income.

We assessed the completeness and accuracy of the data used for the estimations of future taxable income. This included auditing of computations of the models applied to the recognition process for DTAs and testing the control framework around the models.

We involved EY specialists to assess the key economic assumptions embedded in the strategic plan. We compared key inputs used by the Group to forecast future taxable income to externally available data, the Group's historical data and performance and assessed the sensitivity of the outcomes to reasonably possible changes in assumptions.

We assessed the completeness and accuracy of the data used in the determination of the legal entity allocation, the assumptions applied by the Group, and the accuracy of the computation of the legal entity allocations.

We also assessed whether the Group's disclosure regarding the application of judgment in estimating recognized and unrecognized DTAs reflect the Group's deferred tax position (within note 8). |

**Legal provision & contingencies**

| | |
|---|---|
| Area of focus | We focused on this area because the Group operates in a legal and regulatory environment that is exposed to significant litigation and similar risks arising from disputes and regulatory proceedings. Such matters are subject to many uncertainties and the outcome may be difficult to predict. These uncertainties inherently affect the amount and timing of potential outflows with respect to the provisions which have been established and other contingent liabilities. Overall, the legal provision should represent the Group's best estimate for existing legal matters that have a probable and estimable impact on the Group's financial position.<br><br>See note 20 to the financial statements on pages 373 to 384. |
| Our audit response | We tested the design and operational effectiveness of the Group's key controls over the legal provision and contingencies process.<br><br>We assessed the methodologies on which the provision amounts are based, recalculated the provisions, and tested the completeness and accuracy of the underlying information. We read the legal analyses supporting the judgmental aspects impacted by legal interpretations. We obtained correspondence directly from external legal counsel to corroborate the information provided by the Group and followed up directly with external counsel as deemed necessary.<br><br>We also assessed the Group's provisions and contingent liabilities disclosure (within note 20). |

**Valuation of complex or illiquid trading portfolio assets and liabilities, financial assets and liabilities and derivative financial instruments held at fair value**

| | |
|---|---|
| **Area of focus** | We focused on this area because of the complexity and judgments and assumptions over the fair valuation of financial assets and liabilities with significant unobservable inputs. |
| | We have continued to focus on market developments in fair value methodologies and specifically on the Group's higher estimation uncertainty ("HEU") products, Credit Valuation Adjustment ("CVA") / Funding Valuation Adjustment ("FVA"), and Own Credit Adjustment ("OCA") Curve. |
| | See note 22 to the financial statements on pages 386 to 406. |
| **Our audit response** | We tested the design and operating effectiveness of the key controls over the financial instrument valuation processes, including controls over market data inputs into valuation models, model governance, and valuation adjustments. |
| | We tested a sample of the valuation models and the inputs used in those models, using a variety of techniques, including comparing inputs to available market data. |
| | We selected a sample of positions and independently determined estimated values and compared the values to the Group's recorded values. |
| | In addition, we evaluated the methodology and inputs used by the Group in determining funding and credit fair value adjustments on uncollateralized derivatives and fair value option liabilities. |
| | We also assessed the Group's disclosure (within note 22). |

**IT Controls relevant to financial reporting**

| | |
|---|---|
| **Area of focus** | We focused on this area because the Group is highly dependent on its IT systems for business processes and financial reporting. The Group continues to invest in its IT systems to meet client needs and business requirements including the effectiveness of its logical access and change management IT controls. |
| **Our audit response** | In assessing the reliability of electronic data processing, we included specialized IT auditors as part of our audit team. Our audit procedures focused on the IT infrastructure and applications relevant to financial reporting including testing of the design and operating effectiveness of key IT general controls and IT automated controls. |
| | Our audit procedures related to logical access included testing of user access management, privileged user access, periodic access right recertifications and user authentication controls. |

**Other information in the annual report**
The Board of Directors is responsible for the other information in the Annual Report. The other information comprises all information included in the Annual Report, but does not include the consolidated financial statements (pages 314 – 459), the unconsolidated financial statements of UBS Group AG (pages 463 – 477), the compensation report (pages 272-275 and page 297), disclosures denoted with an audited "signpost", and our auditor's report thereon.

Our opinions on the consolidated financial statements, the standalone financial statements of UBS Group AG and the compensation report do not cover the other information and we do not express any form of assurance conclusion thereon other than the disclosures denoted with an audited "signpost".

In connection with our audit of the consolidated financial statements, our responsibility is to read the other information in the Annual Report and, in doing so, consider whether the other information is materially inconsistent with the consolidated financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

**Responsibility of the Board of Directors for the consolidated financial statements**
The Board of Directors is responsible for the preparation of the consolidated financial statements that give a true and fair view in accordance with IFRS and the provisions of Swiss law, and for such internal control as the Board of Directors determines is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, the Board of Directors is responsible for assessing the Group's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Board of Directors either intends to liquidate the Group or to cease operations, or has no realistic alternative but to do so.

**Auditor's responsibilities for the audit of the consolidated financial statements**
Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with Swiss law, Swiss Auditing Standards and ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these consolidated financial statements.

A further description of our responsibilities for the audit of the consolidated financial statements is located at the website of EXPERTsuisse: http://www.expertsuisse.ch/en/audit-report-for-public-companies. This description forms part of our auditor's report.

**Report on other legal and regulatory requirements**

In accordance with article 728a paragraph 1 item 3 CO and Swiss Auditing Standard 890, we confirm that an internal control system exists, which has been designed for the preparation of consolidated financial statements in accordance with the instructions of the Board of Directors.

We recommend that the consolidated financial statements submitted to you be approved.

Ernst & Young Ltd

Marie-Laure Delarue                             Ira S. Fitlin
Licensed Audit Expert                           Certified Public Accountant (U.S.)
(Auditor in Charge)

# Exhibit E

Our reputation is critical to the success of our strategic plans. Damage to our reputation can have fundamental negative effects on our business and prospects. Reputational damage is difficult to reverse, and improvements tend to be slow and difficult to measure. This was demonstrated in recent years, as our very large losses during the financial crisis, the US cross-border matter (relating to the governmental inquiries and investigations relating to our cross-border private banking services to US private clients during the years 2000–2007 and the settlements entered into with US authorities with respect to this matter) and other events seriously damaged our reputation. Reputational damage was an important factor in our loss of clients and client assets across our asset-gathering businesses, and contributed to our loss of and difficulty in attracting staff in 2008 and 2009. These developments had short-term and also more lasting adverse effects on our financial performance, and we recognized that restoring our reputation would be essential to maintaining our relationships with clients, investors, regulators and the general public, as well as with our employees. More recently, the unauthorized trading incident announced in September 2011 and our involvement in the LIBOR matter and investigations relating to our foreign exchange and precious metals business have also adversely affected our reputation. Any further reputational damage could have a material adverse effect on our operational results and financial condition and on our ability to achieve our strategic goals and financial targets.

Our businesses are materially affected by market and economic conditions. Adverse changes in interest rates, credit spreads, securities' prices, market volatility and liquidity, foreign exchange levels, commodity prices, and other market fluctuations, as well as changes in investor sentiment, can affect our earnings and ultimately our financial and capital positions.

A market downturn and weak macroeconomic conditions can be precipitated by a number of factors, including geopolitical events, changes in monetary or fiscal policy, trade imbalances, natural disasters, pandemics, civil unrest, war or terrorism. Because financial markets are global and highly interconnected, even local and regional events, such as the ongoing European sovereign debt concerns or concerns around the potential exit from the EU by the UK or a significant slowing of economic growth in China can have widespread impact well beyond the countries in which they occur.

A crisis could develop, regionally or globally, as a result of disruptions in emerging markets as well as developed markets that are susceptible to macroeconomic and political developments, or as a result of the failure of a major market participant. Macroeco-nomic and political developments can have unpredictable and destabilizing effects, as reflected in our Global Recession scenario, which we implemented in 2015 as the binding scenario in our combined stress-testing framework, and which assumes a hard landing in China leading to severe contagion of Asian and emerging markets economies and at the same time multiple debt restructurings in Europe, related direct losses for European banks and fear of a eurozone breakup severely affecting developed markets such as Switzerland, the UK and the US.

We have material exposures to a number of markets, both as a wealth manager and as an investment bank. Moreover, our strategic plans depend more heavily on our ability to generate growth and revenue in emerging markets, including China, causing us to be more exposed to the risks associated with them. Toward the end of 2015, uncertainties regarding macroeconomic developments in China, and emerging markets more broadly, as well as weakening of commodity prices, particularly oil, have given rise to increased market volatility, which could well persist throughout 2016.

A reduction in business and client activity and market volumes, as significant market volatility can determine and, as we have recently experienced, affects transaction fees, commissions and margins, particularly in our wealth management businesses and our Investment Bank. A market downturn is likely to reduce the volume and valuations of assets we manage on behalf of clients, reducing our asset and performance-based fees. On the other side, reduced market liquidity or volatility limits trading and arbitrage opportunities and impedes our ability to manage risks, impacting both trading income and performance-based fees. Additionally, deteriorating market conditions could cause a decline in the value of assets that we own and account for as investments or trading positions.

The regional balance of our business mix also exposes us to risk. Our Investment Bank equities business, for example, is more heavily weighted to Europe and Asia, and therein our derivatives business is more heavily weighted to structured products for wealth management clients, in particular with European and Asian underlyings. Turbulence in these markets can therefore affect us more than other financial service providers.

The ongoing low interest rate environment will further erode interest margins in several of our businesses and adversely affect our net defined benefit obligations in relation to our pension plans. Moreover, negative interest rates announced by central banks in Switzerland or elsewhere may also affect client behavior. Also, changes to our deposit and lending pricing and structure that we have made and may make to respond to negative interest rates and client behavior may cause deposit outflows (as happened with Wealth Management's balance sheet and capital optimization program in 2015), reduce business volumes or otherwise adversely affect our businesses, particularly given the associated cost of maintaining the high-quality liquid assets required to cover regulatory outflow assumptions embedded in the LCR.

Consolidated financial statements
Notes to the UBS Group AG consolidated financial statements

**Note 22  Provisions and contingent liabilities (continued)**

The Group operates in a legal and regulatory environment that exposes it to significant litigation and similar risks arising from disputes and regulatory proceedings. As a result, UBS (which for purposes of this Note may refer to UBS Group AG and/or one or more of its subsidiaries, as applicable) is involved in various disputes and legal proceedings, including litigation, arbitration, and regulatory and criminal investigations.

Such matters are subject to many uncertainties and the outcome is often difficult to predict, particularly in the earlier stages of a case. There are also situations where the Group may enter into a settlement agreement. This may occur in order to avoid the expense, management distraction or reputational implications of continuing to contest liability, even for those matters for which the Group believes it should be exonerated. The uncertainties inherent in all such matters affect the amount and timing of any potential outflows for both matters with respect to which provisions have been established and other contingent liabilities. The Group makes provisions for such matters brought against it when, in the opinion of management after seeking legal advice, it is more likely than not that the Group has a present legal or constructive obligation as a result of past events, it is probable that an outflow of resources will be required, and the amount can be reliably estimated. Where these factors are otherwise satisfied, a provision may be established for claims that have not yet been asserted against the Group, but are nevertheless expected to be, based on the Group's experience with similar asserted claims. If any of those conditions is not met, such matters result in contingent liabilities. If the amount of an obligation cannot be reliably estimated, a liability exists that is not recognized even if an outflow of resources is probable. Accordingly, no provision is established even if the potential outflow of resources with respect to select matters could be significant.

Specific litigation, regulatory and other matters are described below, including all such matters that management considers to be material and others that management believes to be of significance due to potential financial, reputational and other effects. The amount of damages claimed, the size of a transaction or other information is provided where available and appropriate in order to assist users in considering the magnitude of potential exposures.

In the case of certain matters below, we state that we have established a provision, and for the other matters, we make no such statement. When we make this statement and we expect disclosure of the amount of a provision to prejudice seriously our position with other parties in the matter, because it would reveal what UBS believes to be the probable and reliably estimable outflow, we do not disclose that amount. In some cases, we are subject to confidentiality obligations that preclude such disclosure. With respect to the matters for which we do not state whether we have established a provision, either (a) we have not established a provision, in which case the matter is treated as a contingent liability under the applicable accounting standard or (b) we have established a provision but expect disclosure of that fact to prejudice seriously our position with other parties in the matter because it would reveal the fact that UBS believes an outflow of resources to be probable and reliably estimable.

With respect to certain litigation, regulatory and similar matters for which we have established provisions, we are able to estimate the expected timing of outflows. However, the aggregate amount of the expected outflows for those matters for which we are able to estimate expected timing is immaterial relative to our current and expected levels of liquidity over the relevant time periods.

## Note 22  Provisions and contingent liabilities (continued)

The aggregate amount provisioned for litigation, regulatory and similar matters as a class is disclosed in Note 22a above. It is not practicable to provide an aggregate estimate of liability for our litigation, regulatory and similar matters as a class of contingent liabilities. Doing so would require us to provide speculative legal assessments as to claims and proceedings that involve unique fact patterns or novel legal theories, which have not yet been initiated or are at early stages of adjudication, or as to which alleged damages have not been quantified by the claimants. Although we therefore cannot provide a numerical estimate of the future losses that could arise from litigation, regulatory and similar matters, we believe that the aggregate amount of possible future losses from this class that are more than remote substantially exceeds the level of current provisions. Litigation, regulatory and similar matters may also result in non-monetary penalties and consequences. For example, the non-prosecution agreement (NPA) described in paragraph 5 of this Note, which we entered into with the US Department of Justice (DOJ), Criminal Division, Fraud Section in connection with our submissions of benchmark interest rates, including, among others, the British Bankers' Association London Interbank Offered Rate (LIBOR), was terminated by the DOJ based on its determination that we had committed a US crime in relation to foreign exchange matters. As a consequence, UBS AG has pleaded guilty to one count of wire fraud for conduct in the LIBOR matter, and has agreed to pay a USD 203 million fine and accept a three-year term of probation. A guilty plea to, or conviction of, a crime (including as a result of termination of the NPA) could have material consequences for UBS. Resolution of regulatory proceedings may require us to obtain waivers of regulatory disqualifications to maintain certain operations, may entitle regulatory authorities to limit, suspend or terminate licenses and regulatory authorizations and may permit financial market utilities to limit, suspend or terminate our participation in such utilities. Failure to obtain such waivers, or any limitation, suspension or termination of licenses, authorizations or participations, could have material consequences for UBS.

The risk of loss associated with litigation, regulatory and similar matters is a component of operational risk for purposes of determining our capital requirements. Information concerning our capital requirements and the calculation of operational risk for this purpose is included in the "Capital management" section of this report.

| CHF million | Wealth Manage-ment | Wealth Manage-ment Americas | Personal & Corporate Banking | Asset Manage-ment | Investment Bank | CC – Services | CC – Group ALM | CC – Non-core and Legacy Portfolio | Total 31.12.14 |
|---|---|---|---|---|---|---|---|---|---|
| Balance at the beginning of the year | 188 | 209 | 92 | 53 | 1,258 | 312 | 0 | 941 | 1,622 |
| Increase in provisions recognized in the income statement | 114 | 372 | 0 | 0 | 17 | 15 | 0 | 744 | 2,941 |
| Release of provisions recognized in the income statement | (10) | (19) | (3) | (3) | (15) | (1) | 0 | (115) | (395) |
| Provisions used in conformity with designated purpose | (36) | (110) | (5) | (33) | (675) | (13) | 0 | (302) | (1,286) |
| Reclassifications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (2) |
| Foreign currency translation / unwind of discount | (12) | 7 | (2) | (1) | 0 | (3) | 0 | 18 | 172 |
| Balance at the end of the year | 245 | 459 | 83 | 16 | 585 | 310 | 0 | 1,284 | 3,053 |

Provisions, if any, for the matters described in this Note are recorded in Wealth Management (item 3), Wealth Management Americas (item 4), Corporate Center – Services (item 7) and Corporate Center – Non-core and Legacy Portfolio (items 2 and 8). Provisions, if any, for the matters described in this Note in items 1 and 6 are allocated between Wealth Management and Personal & Corporate Banking, and provisions, if any, for the matters described in this Note in item 5 are allocated between the Investment Bank, Corporate Center – Services and Corporate Center – Non-core and Legacy Portfolio.

Consolidated financial statements

467

Consolidated financial statements
Notes to the UBS Group AG consolidated financial statements

## Note 22  Provisions and contingent liabilities (continued)

Tax and regulatory authorities in a number of countries have made inquiries, served requests for information or examined employees located in their respective jurisdictions relating to the cross-border wealth management services provided by UBS and other financial institutions. It is possible that implementation of automatic tax information exchange and other measures relating to cross-border provision of financial services could give rise to further inquiries in the future.

As a result of investigations in France, in 2013, UBS (France) S.A. and UBS AG were put under formal examination ("mise en examen") for complicity in having illicitly solicited clients on French territory, and were declared witness with legal assistance ("témoin assisté") regarding the laundering of proceeds of tax fraud and of banking and financial solicitation by unauthorized persons. In 2014, UBS AG was placed under formal examination with respect to the potential charges of laundering of proceeds of tax fraud, and the investigating judges ordered UBS to provide bail ("caution") of EUR 1.1 billion. UBS AG appealed the determination of the bail amount, but both the appeal court ("Cour d'Appel") and the French Supreme Court ("Cour de Cassation") upheld the bail amount and rejected the appeal in full in late 2014. UBS AG has filed and has had accepted a petition to the European Court of Human Rights to challenge various aspects of the French court's decision. In September 2015, the former CEO of UBS Wealth Management was placed under formal examination in connection with these proceedings. In addition, the investigating judges have sought to issue arrest warrants against three Swiss-based former employees of UBS AG who did not appear when summoned by the investigating judge. In February 2016, the investigating judge notified UBS that he does not intend to conduct further investigation. This notification commences a period in which the prosecutor may file a request for a judge to issue formal charges.

In March 2015, UBS (France) S.A. was placed under formal examination for complicity regarding the laundering of proceeds of tax fraud and of banking and financial solicitation by unauthorized persons for the years 2004 until 2008 and declared witness with legal assistance for the years 2009 to 2012. A bail of EUR 40 million was imposed, and was reduced by the Court of Appeals in May 2015 to EUR 10 million. Separately, in 2013, the French banking supervisory authority's disciplinary commission reprimanded UBS (France) S.A. for having had insufficiencies in its control and compliance framework around its cross-border activities and know your customer obligations. It imposed a penalty of EUR 10 million, which was paid.

UBS AG has been notified by the Brussels public prosecutor's office that it is investigating various aspects of UBS's cross-border business.

In January 2015, UBS received inquiries from the US Attorney's Office for the Eastern District of New York and from the US Securities and Exchange Commission (SEC), which are investigating potential sales to US persons of bearer bonds and other unregistered securities in possible violation of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) and the registration requirements of the US securities laws. UBS is cooperating with the authorities in these investigations.

UBS has, and reportedly numerous other financial institutions have, received inquiries from authorities concerning accounts relating to the Fédération Internationale de Football Association (FIFA) and other constituent soccer associations and related persons and entities. UBS is cooperating with authorities in these inquiries.

Our balance sheet at 31 December 2015 reflected provisions with respect to matters described in this item 1 in an amount that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information, and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

From 2002 through 2007, prior to the crisis in the US residential loan market, UBS was a substantial issuer and underwriter of US residential mortgage-backed securities (RMBS) and was a purchaser and seller of US residential mortgages. A subsidiary of UBS, UBS Real Estate Securities Inc. (UBS RESI), acquired pools of residential mortgage loans from originators and (through an affiliate) deposited them into securitization trusts. In this manner, from 2004 through 2007, UBS RESI sponsored approximately USD 80 billion in RMBS, based on the original principal balances of the securities issued.

UBS RESI also sold pools of loans acquired from originators to third-party purchasers. These whole loan sales during the period 2004 through 2007 totaled approximately USD 19 billion in original principal balance.

We were not a significant originator of US residential loans. A subsidiary of UBS originated approximately USD 1.5 billion in US residential mortgage loans during the period in which it was active from 2006 to 2008, and securitized less than half of these loans.

**Note 22  Provisions and contingent liabilities (continued)**

*RMBS-related lawsuits concerning disclosures:* UBS is named as a defendant relating to its role as underwriter and issuer of RMBS in lawsuits related to approximately USD 6.2 billion in original face amount of RMBS underwritten or issued by UBS. Of the USD 6.2 billion in original face amount of RMBS that remains at issue in these cases, approximately USD 3.2 billion was issued in offerings in which a UBS subsidiary transferred underlying loans (the majority of which were purchased from third-party originators) into a securitization trust and made representations and warranties about those loans (UBS-sponsored RMBS). The remaining USD 3 billion of RMBS to which these cases relate was issued by third parties in securitizations in which UBS acted as underwriter (third-party RMBS).

In connection with certain of these lawsuits, UBS has indemnification rights against surviving third-party issuers or originators for losses or liabilities incurred by UBS, but UBS cannot predict the extent to which it will succeed in enforcing those rights.

UBS is a defendant in two lawsuits brought by the National Credit Union Administration (NCUA), as conservator for certain failed credit unions, asserting misstatements and omissions in the offering documents for RMBS purchased by the credit unions. Both lawsuits were filed in US District Courts, one in the District of Kansas and the other in the Southern District of New York (SDNY). The original principal balance at issue in the Kansas case is approximately USD 1.15 billion and the original principal balance at issue in the SDNY case is approximately USD 400 million. In February 2016, UBS made an offer of judgment to NCUA in the SDNY case, which NCUA has accepted, pursuant to which UBS will pay USD 33 million plus an amount of prejudgment interest that will be determined by the court and reasonable attorneys' fees. Once these amounts are determined and judgment is entered, the SDNY case will end. Prejudgment interest and attorneys' fees are expected to significantly increase the total amount to be paid in the SDNY case.

*Lawsuits related to contractual representations and warranties concerning mortgages and RMBS:* When UBS acted as an RMBS sponsor or mortgage seller, we generally made certain representa-

tions relating to the characteristics of the underlying loans. In the event of a material breach of these representations, we were in certain circumstances contractually obligated to repurchase the loans to which the representations related or to indemnify certain parties against losses. UBS has received demands to repurchase US residential mortgage loans as to which UBS made certain representations at the time the loans were transferred to the securitization trust aggregating approximately USD 4.1 billion in original principal balance.  Of this amount, UBS considers claims relating to approximately USD 2 billion in original principal balance to be resolved, including claims barred by the statute of limitations. Substantially all of the remaining claims are in litigation, including the matters described in the next paragraph. UBS believes that new demands to repurchase US residential mortgage loans are time-barred under a decision rendered by the New York Court of Appeals.

In 2012, certain RMBS trusts filed an action (Trustee Suit) in the SDNY seeking to enforce UBS RESI's obligation to repurchase loans in the collateral pools for three RMBS securitizations (Transactions) with an original principal balance of approximately USD 2 billion, for which Assured Guaranty Municipal Corp. (Assured Guaranty), a financial guaranty insurance company, had previously demanded repurchase. In January 2015, the court rejected plaintiffs' efforts to seek damages for all loans purportedly in breach of representations and warranties in any of the three Transactions and limited plaintiffs to pursuing claims based solely on alleged breaches for loans identified in the complaint or other breaches that plaintiffs can establish were independently discovered by UBS. In February 2015, the court denied plaintiffs' motion seeking reconsideration of its ruling. With respect to the loans subject to the Trustee Suit that were originated by institutions still in existence, UBS intends to enforce its indemnity rights against those institutions. Trial is currently scheduled for April 2016.

We also have tolling agreements with certain institutional purchasers of RMBS concerning their potential claims related to substantial purchases of UBS-sponsored or third-party RMBS.

Consolidated financial statements
Notes to the UBS Group AG consolidated financial statements

**Note 22  Provisions and contingent liabilities (continued)**

| USD million | 31.12.14 |
|---|---|
| Balance at the beginning of the year | 817 |
| Increase in provision recognized in the income statement | 239 |
| Release of provision recognized in the income statement | (120) |
| Provision used in conformity with designated purpose | (87) |
| Balance at the end of the year | 849 |

*Mortgage-related regulatory matters:* In 2014, UBS received a subpoena from the US Attorney's Office for the Eastern District of New York issued pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), which seeks documents and information related to UBS's RMBS business from 2005 through 2007. In September 2015, the Eastern District of New York identified a number of transactions that are currently the focus of their inquiry, as to which we are providing additional information. UBS continues to respond to the FIRREA subpoena and to subpoenas from the New York State Attorney General (NYAG) relating to its RMBS business. In addition, UBS has also been responding to inquiries from both the Special Inspector General for the Troubled Asset Relief Program (SIGTARP) (who is working in conjunction with the US Attorney's Office for Connecticut and the DOJ) and the SEC relating to trading practices in connec-

tion with purchases and sales of mortgage-backed securities in the secondary market from 2009 through the present. We are cooperating with the authorities in these matters. Numerous other banks reportedly are responding to similar inquiries from these authorities.

As reflected in the table "Provision for claims related to sales of residential mortgage-backed securities and mortgages," our balance sheet at 31 December 2015 reflected a provision of USD 1,218 million with respect to matters described in this item 2. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of this matter cannot be determined with certainty based on currently available information, and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

## Note 22  Provisions and contingent liabilities (continued)

In relation to the Bernard L. Madoff Investment Securities LLC (BMIS) investment fraud, UBS AG, UBS (Luxembourg) SA and certain other UBS subsidiaries have been subject to inquiries by a number of regulators, including the Swiss Financial Market Supervisory Authority (FINMA) and the Luxembourg Commission de Surveillance du Secteur Financier (CSSF). Those inquiries concerned two third-party funds established under Luxembourg law, substantially all assets of which were with BMIS, as well as certain funds established in offshore jurisdictions with either direct or indirect exposure to BMIS. These funds now face severe losses, and the Luxembourg funds are in liquidation. The last reported net asset value of the two Luxembourg funds before revelation of the Madoff scheme was approximately USD 1.7 billion in the aggregate, although that figure likely includes fictitious profit reported by BMIS. The documentation establishing both funds identifies UBS entities in various roles including custodian, administrator, manager, distributor and promoter, and indicates that UBS employees serve as board members. UBS (Luxembourg) SA and certain other UBS subsidiaries are responding to inquiries by Luxembourg investigating authorities, without, however, being named as parties in those investigations. In 2009 and 2010, the liquidators of the two Luxembourg funds filed claims on behalf of the funds against UBS entities, non-UBS entities and certain individuals including current and former UBS employees. The amounts claimed are approximately EUR 890 million and EUR 305 million, respectively. The liquidators have filed supplementary claims for amounts that the funds may possibly be held liable to pay the BMIS Trustee. These amounts claimed by the liquidator are approximately EUR 564 million and EUR 370 million, respectively. In addition, a large number of alleged beneficiaries have filed claims against UBS entities (and non-UBS entities) for purported losses relating to the Madoff scheme. The majority of these cases are pending in Luxembourg, where appeals were filed by the claimants against the 2010 decisions of the court in which the claims in a number of test cases were held to be inadmissible. In July 2014, the Luxembourg Court of Appeal dismissed one test appeal in its entirety, which decision was appealed by the investor. In July 2015, the Luxembourg Supreme Court found in favor of UBS and dismissed the investor's appeal. In the US, the BMIS Trustee filed claims in 2010 against UBS entities, among others, in relation to the two Luxembourg funds and one of the offshore funds. The total amount claimed against all defendants in these actions was not less than USD 2 billion. Following a motion by UBS, in 2011, the SDNY dismissed all of the BMIS Trustee's claims other than claims for recovery of fraudulent conveyances and preference payments that were allegedly transferred to UBS on the ground that the BMIS Trustee lacks standing to bring such claims. In 2013, the Second Circuit affirmed the District Court's decision and, in June 2014, the US Supreme Court denied the BMIS Trustee's petition seeking review of the Second Circuit ruling. In December 2014, several claims, including a purported class action, were filed in the US by BMIS customers against UBS entities, asserting claims similar to the ones made by the BMIS Trustee, seeking unspecified damages. One claim was voluntarily withdrawn by the plaintiff. In July 2015, following a motion by UBS, the SDNY dismissed the two remaining claims on the basis that the New York courts did not have jurisdiction to hear the claims against the UBS entities. In Germany, certain clients of UBS are exposed to Madoff-managed positions through third-party funds and funds administered by UBS entities in Germany. A small number of claims have been filed with respect to such funds. In January 2015, a court of appeal reversed a lower court decision in favor of UBS in one such case and ordered UBS to pay EUR 49 million, plus interest (approximately EUR 15.3 million). UBS filed an application for leave to appeal the decision. That application was rejected by the German Federal Supreme Court in December 2015, meaning that the Court of Appeal's decision is final.

Consolidated
financial statements

471

### Note 22  Provisions and contingent liabilities (continued)

Declines since August 2013 in the market prices of Puerto Rico municipal bonds and of closed-end funds (the funds) that are sole-managed and co-managed by UBS Trust Company of Puerto Rico and distributed by UBS Financial Services Incorporated of Puerto Rico (UBS PR) have led to multiple regulatory inquiries, as well as customer complaints and arbitrations with aggregate claimed damages of USD 1.6 billion, of which claims with aggregate claimed damages of approximately USD 374 million have been resolved through settlements or arbitration. The claims are filed by clients in Puerto Rico who own the funds or Puerto Rico municipal bonds and/or who used their UBS account assets as collateral for UBS non-purpose loans; customer complaint and arbitration allegations include fraud, misrepresentation and unsuitability of the funds and of the loans. A shareholder derivative action was filed in 2014 against various UBS entities and current and certain former directors of the funds, alleging hundreds of millions in losses in the funds. In 2015, defendants' motion to dismiss was denied. Defendants are seeking leave to appeal that ruling to the Puerto Rico Supreme Court. In 2014, a federal class action complaint also was filed against various UBS entities, certain members of UBS PR senior management, and the co-manager of certain of the funds seeking damages for investor losses in the funds during the period from May 2008 through May 2014. Defendants have moved to dismiss that complaint. In March 2015, a class action was filed in Puerto Rico state court against UBS PR seeking equitable relief in the form of a stay of any effort by UBS PR to collect on non-purpose loans it acquired from UBS Bank USA in December 2013 based on plaintiffs' allegation that the loans are not valid.

In 2014, UBS reached a settlement with the Office of the Commissioner of Financial Institutions for the Commonwealth of Puerto Rico (OCFI) in connection with OCFI's examination of UBS's operations from January 2006 through September 2013. Pursuant to the settlement, UBS contributed USD 3.5 million to an investor education fund, offered USD 1.68 million in restitution to certain investors and, among other things, committed to undertake an additional review of certain client accounts to determine if additional restitution would be appropriate. That review resulted in an additional USD 2.1 million in restitution being offered to certain investors.

In September 2015, the SEC and the Financial Industry Regulatory Authority (FINRA) announced settlements with UBS PR of their separate investigations stemming from the 2013 market events. Without admitting or denying the findings in either matter, UBS PR agreed in the SEC settlement to pay USD 15 million (which includes USD 1.18 million in disgorgement, a civil penalty of USD 13.63 million and pre-judgment interest), and USD 18.5 million in the FINRA matter (which includes up to USD 11 million in restitution to 165 UBS PR customers and a civil penalty of USD 7.5 million). The SEC settlement involves a charge against UBS PR of failing to supervise the activities of a former financial advisor who had recommended the impermissible investment of non-purpose loan proceeds into the UBS PR closed-end funds, in violation of firm policy and the customer loan agreements. In the FINRA settlement, UBS PR is alleged to have failed to supervise certain customer accounts which were both more than 75% invested in UBS PR closed-end funds and leveraged against those positions. We also understand that the DOJ is conducting a criminal inquiry into the impermissible reinvestment of non-purpose loan proceeds. We are cooperating with the authorities in this inquiry.

In 2011, a purported derivative action was filed on behalf of the Employee Retirement System of the Commonwealth of Puerto Rico (System) against over 40 defendants, including UBS PR and other consultants and underwriters, trustees of the System, and the President and Board of the Government Development Bank of Puerto Rico. The plaintiffs alleged that defendants violated their purported fiduciary duties and contractual obligations in connection with the issuance and underwriting of approximately USD 3 billion of bonds by the System in 2008 and sought damages of over USD 800 million. UBS is named in connection with its underwriting and consulting services. In 2013, the case was dismissed by the Puerto Rico Court of First Instance on the grounds that plaintiffs did not have standing to bring the claim, but that dismissal was subsequently overturned on appeal. Defendants have renewed their motion to dismiss the complaint on grounds not addressed when the court issued its prior ruling.

Also, in 2013, an SEC Administrative Law Judge dismissed a case brought by the SEC against two UBS executives, finding no violations. The charges had stemmed from the SEC's investigation of UBS's sale of closed-end funds in 2008 and 2009, which UBS settled in 2012. Beginning in 2012, two federal class action complaints, which were subsequently consolidated, were filed against various UBS entities, certain of the funds, and certain members of UBS PR senior management, seeking damages for investor losses in the funds during the period from January 2008 through May 2012 based on allegations similar to those in the SEC action. A motion for class certification was denied without prejudice to the right to refile the motion after limited discovery, and that motion has since been refiled.

## Note 22  Provisions and contingent liabilities (continued)

In June 2015 Puerto Rico's Governor stated that the Commonwealth is unable to meet its obligations. In addition, certain agencies and public corporations of the Commonwealth have held discussions with their creditors to restructure their outstanding debt, and certain agencies and public corporations of the Commonwealth have defaulted on certain interest payments that were due in August 2015 and January 2016. The United States Supreme Court has agreed to hear Puerto Rico's appeal of a US District Court's invalidation of the Puerto Rico Public Corporations Debt Enforcement and Recovery Act (the Act), under which Puerto Rico's public corporations would be permitted to effect a mandatory restructuring of their respective debts with a specified creditor vote that would be binding on all applicable creditors, once approved by a court or, alternatively, under a court-supervised bankruptcy type restructuring. The foregoing events, any further defaults by the Commonwealth or its agencies and public corporations on (or any debt restructurings proposed by them with respect to) their outstanding debt, a Supreme Court decision upholding the Act (or sending it back to the District Court for further proceedings) and any further actions taken by Puerto Rico's public corporations under the Act, as well as any market reactions to any of the foregoing, may increase the number of claims against UBS concerning Puerto Rico securities as well as potential damages sought.

Our balance sheet at 31 December 2015 reflected provisions with respect to matters described in this item 4 in amounts that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information, and accordingly may ultimately prove to be substantially greater (or may be less) than the provisions that we have recognized.

*Foreign exchange-related regulatory matters*: Following an initial media report in 2013 of widespread irregularities in the foreign exchange markets, UBS immediately commenced an internal review of its foreign exchange business, which includes our precious metals and related structured products businesses. Since then, various authorities have commenced investigations concerning possible manipulation of foreign exchange markets, including FINMA, the Swiss Competition Commission (WEKO), the DOJ, the SEC, the US Commodity Futures Trading Commission (CFTC), the Board of Governors of the Federal Reserve System (Federal Reserve Board), the UK Financial Conduct Authority (FCA) (to which certain responsibilities of the UK Financial Services Authority (FSA) have passed), the UK Serious Fraud Office (SFO), the Australian Securities and Investments Commission (ASIC), the Hong Kong Monetary Authority (HKMA), the Korea Fair Trade Commission (KFTC) and the Brazil Competition Authority (CADE). In addition, WEKO is, and a number of other authorities reportedly are, investigating potential manipulation of precious metals prices. UBS has taken and will take appropriate action with respect to certain personnel as a result of its ongoing review.

In 2014, UBS reached settlements with the FCA and the CFTC in connection with their foreign exchange investigations, and FINMA issued an order concluding its formal proceedings with respect to UBS relating to its foreign exchange and precious metals businesses. UBS has paid a total of approximately CHF 774 million to these authorities, including GBP 234 million in fines to the FCA, USD 290 million in fines to the CFTC, and CHF 134 million to FINMA representing confiscation of costs avoided and profits. In May 2015, the Federal Reserve Board and the Connecticut Department of Banking issued an Order to Cease and Desist and Order of Assessment of a Civil Monetary Penalty Issued upon Consent (Federal Reserve Order) to UBS AG. As part of the Federal Reserve Order, UBS AG paid a USD 342 million civil monetary penalty.

Consolidated
financial statements

Consolidated financial statements
Notes to the UBS Group AG consolidated financial statements

## Note 22  Provisions and contingent liabilities (continued)

In May 2015, the DOJ's Criminal Division (Criminal Division) terminated the December 2012 Non-Prosecution Agreement (NPA) with UBS AG related to UBS's submissions of benchmark interest rates. As a result, UBS AG entered into a plea agreement with the Criminal Division pursuant to which UBS AG agreed to and did plead guilty to a one-count criminal information filed in the US District Court for the District of Connecticut charging UBS AG with one count of wire fraud in violation of 18 USC Sections 1343 and 2. Under the plea agreement, UBS AG agreed to a sentence that includes a USD 203 million fine and a three-year term of probation. The criminal information charges that between approximately 2001 and 2010, UBS AG engaged in a scheme to defraud counterparties to interest rate derivatives transactions by manipulating benchmark interest rates, including Yen LIBOR. Sentencing is currently scheduled for 9 May 2016. The Criminal Division terminated the NPA based on its determination, in its sole discretion, that certain UBS AG employees committed criminal conduct that violated the NPA, including fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange market transactions with clients and collusion with other participants in certain foreign exchange markets.

We have ongoing obligations to cooperate with these authorities and to undertake certain remediation, including actions to improve processes and controls.

UBS has been granted conditional immunity by the Antitrust Division of the DOJ (Antitrust Division) from prosecution for EUR/USD collusion and entered into a non-prosecution agreement covering other currency pairs. As a result, UBS AG will not be subject to prosecutions, fines or other sanctions for antitrust law violations by the Antitrust Division, subject to UBS AG's continuing cooperation. However, the conditional immunity grant does not bar government agencies from asserting other claims and imposing sanctions against UBS AG, as evidenced by the set-

tlements and ongoing investigations referred to above. UBS has also been granted conditional leniency by authorities in certain jurisdictions, including WEKO, in connection with potential competition law violations relating to precious metals, and as a result, will not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in those jurisdictions, subject to UBS AG's continuing cooperation.

In October 2015, UBS AG settled charges with the SEC relating to structured notes issued by UBS AG that were linked to the UBS V10 Currency Index with Volatility Cap.

Investigations relating to foreign exchange and precious metals matters by numerous authorities, including the CFTC, remain ongoing notwithstanding these resolutions.

*Foreign exchange-related civil litigation:* Putative class actions have been filed since November 2013 in US federal courts and in other jurisdictions against UBS and other banks on behalf of putative classes of persons who engaged in foreign currency transactions with any of the defendant banks. They allege collusion by the defendants and assert claims under the antitrust laws and for unjust enrichment. In 2015, additional putative class actions were filed in federal court in New York against UBS and other banks on behalf of a putative class of persons who entered into or held any foreign exchange futures contracts and options on foreign exchange futures contracts since 1 January 2003. The complaints assert claims under the Commodity Exchange Act (CEA) and the US antitrust laws. In July 2015, a consolidated complaint was filed on behalf of both putative classes of persons covered by the US federal court class actions described above. UBS has entered into a settlement agreement that would resolve all of these US federal court class actions. The agreement, which has been preliminarily approved by the court and is subject to final court approval, requires, among other things, that UBS pay an aggregate of USD 141 million and provide cooperation to the settlement classes.

## Note 22  Provisions and contingent liabilities (continued)

In June 2015, a putative class action was filed in federal court in New York against UBS and other banks on behalf of participants, beneficiaries, and named fiduciaries of plans qualified under the Employee Retirement Income Security Act of 1974 (ERISA) for whom a defendant bank provided foreign currency exchange transactional services, exercised discretionary authority or discretionary control over management of such ERISA plan, or authorized or permitted the execution of any foreign currency exchange transactional services involving such plan's assets. The complaint asserts claims under ERISA.

In 2015, UBS was added to putative class actions pending against other banks in federal court in New York and other jurisdictions on behalf of putative classes of persons who bought or sold physical precious metals and various precious metal products and derivatives. The complaints in these lawsuits assert claims under the antitrust laws and the CEA, and other claims.

*LIBOR and other benchmark-related regulatory matters*: Numerous government agencies, including the SEC, the CFTC, the DOJ, the FCA, the SFO, the Monetary Authority of Singapore (MAS), the HKMA, FINMA, the various state attorneys general in the US, and competition authorities in various jurisdictions have conducted or are continuing to conduct investigations regarding submissions with respect to LIBOR and other benchmark rates. These investigations focus on whether there were improper attempts by UBS, among others, either acting on our own or together with others, to manipulate LIBOR and other benchmark rates at certain times.

In 2012, UBS reached settlements with the FSA, the CFTC and the Criminal Division of the DOJ in connection with their investigations of benchmark interest rates. At the same time, FINMA issued an order concluding its formal proceedings with respect to UBS relating to benchmark interest rates. UBS has paid a total of approximately CHF 1.4 billion in fines and disgorgement – including GBP 160 million in fines to the FSA, USD 700 million in fines to the CFTC, USD 500 million in fines to the DOJ, and CHF 59 million in disgorgement to FINMA. UBS Securities Japan Co. Ltd.

(UBSSJ) entered into a plea agreement with the DOJ under which it entered a plea to one count of wire fraud relating to the manipulation of certain benchmark interest rates, including Yen LIBOR. UBS entered into an NPA with the DOJ, which (along with the plea agreement) covered conduct beyond the scope of the conditional leniency/immunity grants described below, required UBS to pay the USD 500 million fine to the DOJ after the sentencing of UBSSJ, and provided that any criminal penalties imposed on UBSSJ at sentencing be deducted from the USD 500 million fine. Under the NPA, we agreed, among other things, that for two years from 18 December 2012 UBS would not commit any US crime, and we would advise DOJ of any potentially criminal conduct by UBS or any of its employees relating to violations of US laws concerning fraud or securities and commodities markets. The term of the NPA was extended by one year to 18 December 2015. In May 2015, the Criminal Division terminated the NPA based on its determination, in its sole discretion, that certain UBS AG employees committed criminal conduct that violated the NPA. As a result, UBS entered into a plea agreement with the DOJ under which it entered a guilty plea to one count of wire fraud relating to the manipulation of certain benchmark interest rates, including Yen LIBOR, and agreed to pay a fine of USD 203 million and accept a three-year term of probation. Sentencing is currently scheduled for 9 May 2016.

In 2014, UBS reached a settlement with the European Commission (EC) regarding its investigation of bid-ask spreads in connection with Swiss franc interest rate derivatives and paid a EUR 12.7 million fine, which was reduced to this level based in part on UBS's cooperation with the EC. The MAS, HKMA and the Japan Financial Services Agency have also resolved investigations of UBS (and in some cases, other banks). We have ongoing obligations to cooperate with the authorities with whom we have reached resolutions and to undertake certain remediation with respect to benchmark interest rate submissions.

Investigations by the CFTC, ASIC and other governmental authorities remain ongoing notwithstanding these resolutions.

Consolidated financial statements
Notes to the UBS Group AG consolidated financial statements

### Note 22  Provisions and contingent liabilities (continued)

UBS has been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ, WEKO and the EC, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR. WEKO has also granted UBS conditional immunity in connection with potential competition law violations related to submissions for CHF LIBOR and certain transactions related to CHF LIBOR. As a result of these conditional grants, we will not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in the jurisdictions where we have conditional immunity or leniency in connection with the matters covered by the conditional grants, subject to our continuing cooperation. However, the conditional leniency and conditional immunity grants we have received do not bar government agencies from asserting other claims and imposing sanctions against us, as evidenced by the settlements and ongoing investigations referred to above. In addition, as a result of the conditional leniency agreement with the DOJ, we are eligible for a limit on liability to actual rather than treble damages, were damages to be awarded in any civil antitrust action under US law based on conduct covered by the agreement and for relief from potential joint and several liability in connection with such civil antitrust action, subject to our satisfying the DOJ and the court presiding over the civil litigation of our cooperation. The conditional leniency and conditional immunity grants do not otherwise affect the ability of private parties to assert civil claims against us.

*LIBOR and other benchmark-related civil litigation:* A number of putative class actions and other actions are pending in, or expected to be transferred to, the federal courts in New York against UBS and numerous other banks on behalf of parties who transacted in certain interest rate benchmark-based derivatives. Also pending are actions asserting losses related to various products whose interest rate was linked to USD LIBOR, including adjustable rate mortgages, preferred and debt securities, bonds pledged as collateral, loans, depository accounts, investments and other interest-bearing instruments. All of the complaints allege manipulation, through various means, of various benchmark interest rates, including USD LIBOR, Euroyen TIBOR, Yen LIBOR, EURIBOR, CHF LIBOR, GBP LIBOR or USD ISDAFIX rates and seek unspecified compensatory and other damages under varying legal theories. In 2013, the court in the USD action dismissed the fed-

eral antitrust and racketeering claims of certain USD LIBOR plaintiffs and a portion of their claims brought under the CEA and state common law. Plaintiffs have appealed the dismissal, and the appeal remains pending. In 2014, the court in one of the Euroyen TIBOR lawsuits dismissed certain of the plaintiff's claims, including federal antitrust claims. In 2015, the same court dismissed plaintiff's federal racketeering claims and affirmed its previous dismissal of plaintiff's antitrust claims. UBS and other defendants in other lawsuits including those related to EURIBOR, CHF LIBOR and GBP LIBOR have filed motions to dismiss.

Since September 2014, putative class actions have been filed in federal court in New York and New Jersey against UBS and other financial institutions, among others, on behalf of parties who entered into interest rate derivative transactions linked to ISDAFIX. The complaints, which have since been consolidated into an amended complaint, allege that the defendants conspired to manipulate ISDAFIX rates from 1 January 2006 through January 2014, in violation of US antitrust laws and the CEA, among other theories, and seeks unspecified compensatory damages, including treble damages. UBS and other defendants have filed a motion to dismiss, which remains pending.

*Government bonds:* Putative class actions have been filed in US federal courts against UBS and other banks on behalf of persons who participated in markets for US Treasury securities since 2007. The complaints generally allege that the banks colluded with respect to and manipulated prices of US Treasury securities sold at auction. They assert claims under the antitrust laws and the CEA and for unjust enrichment. The cases have been consolidated in the SDNY. Following filing of these complaints, UBS and reportedly other banks have received requests for information from various authorities regarding US Treasury securities and other government bond trading practices.

With respect to additional matters and jurisdictions not encompassed by the settlements and order referred to above, our balance sheet at 31 December 2015 reflected a provision in an amount that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information, and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

**Note 22  Provisions and contingent liabilities (continued)**

The Federal Supreme Court of Switzerland ruled in 2012, in a test case against UBS, that distribution fees paid to a firm for distributing third party and intra-group investment funds and structured products must be disclosed and surrendered to clients who have entered into a discretionary mandate agreement with the firm, absent a valid waiver.

FINMA has issued a supervisory note to all Swiss banks in response to the Supreme Court decision. The note sets forth the measures Swiss banks are to adopt, which include informing all affected clients about the Supreme Court decision and directing them to an internal bank contact for further details. UBS has met the FINMA requirements and has notified all potentially affected clients.

The Supreme Court decision has resulted, and may continue to result, in a number of client requests for UBS to disclose and potentially surrender retrocessions. Client requests are assessed on a case-by-case basis. Considerations taken into account when assessing these cases include, among others, the existence of a discretionary mandate and whether or not the client documentation contained a valid waiver with respect to distribution fees.

Our balance sheet at 31 December 2015 reflected a provision with respect to matters described in this item 6 in an amount that UBS believes to be appropriate under the applicable accounting standard. The ultimate exposure will depend on client requests and the resolution thereof, factors that are difficult to predict and assess. Hence, as in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information, and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Pursuant to the 2009 sale of Banco UBS Pactual S.A. (Pactual) by UBS to BTG Investments, LP (BTG), BTG has submitted contractual indemnification claims that UBS estimates amount to approximately BRL 2.4 billion, including interest and penalties, which is net of liabilities retained by BTG. The claims pertain principally to several tax assessments issued by the Brazilian tax authorities against Pactual relating to the period from December 2006 through March 2009, when UBS owned Pactual. The majority of these assessments relate to the deductibility of goodwill amortization in connection with UBS's 2006 acquisition of Pactual and payments made to Pactual employees through various profit-sharing plans. These assessments are being challenged in administrative and judicial proceedings. In May 2015, the administrative court issued a decision that was largely in favor of the tax authority with respect to the goodwill amortization assessment. This decision has been appealed.

In 2013, the EC issued a Statement of Objections against 13 credit default swap (CDS) dealers including UBS, as well as data service provider Markit and the International Swaps and Derivatives Association (ISDA). The Statement of Objections broadly alleges that the dealers infringed European Union antitrust rules by colluding to prevent exchanges from entering the credit derivatives market between 2006 and 2009. In December 2015, the EC issued a statement that it had decided to close its investigation against all 13 dealers, including UBS. The EC's investigation regarding Markit and ISDA is ongoing. Since mid-2009, the Antitrust Division of the DOJ has also been investigating whether multiple dealers, including UBS, conspired with each other and with Markit to restrain competition in the markets for CDS trading, clearing and other services. In 2014, putative class action plaintiffs filed consolidated amended complaints in the SDNY against 12 dealers, including UBS, as well as Markit and ISDA, alleging violations of the US Sherman Antitrust Act and common law. Plaintiffs allege that the defendants unlawfully conspired to restrain competition in and/or monopolize the market for CDS trading in the US in order to protect the dealers' profits from trading CDS in the over-the-counter market. In September 2015, UBS and the other defendants entered into settlement agreements to resolve the litigation, pursuant to which UBS has paid USD 75 million out of a total settlement amount paid by all defendants of approximately USD 1.865 billion. The agreements have received preliminary court approval but are subject to final court approval.

Consolidated
financial statements

477

# Exhibit F

You should rely only on the information incorporated by reference or provided in this product supplement or the accompanying prospectus. We have not authorized anyone to provide you with different information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this product supplement is accurate as of any date other than the date on the front of the document.

**TABLE OF CONTENTS**

**Product Supplement**

Product Supplement Summary .............. S-1
Hypothetical Examples .................... S-12
Risk Factors ............................. S-18
Valuation of the Index and the Securities ...... S-30
General Terms of the Securities .............. S-32
Use of Proceeds and Hedging ............... S-49
Material U.S. Federal Income Tax
   Consequences ......................... S-50
Benefit Plan Investor Considerations ......... S-56
Supplemental Plan of Distribution ........... S-58
   Conflicts of Interest ..................... S-58
Form of Notice of Early Redemption ......... A-1
Form of Broker's Confirmation of
   Redemption .......................... B-1

**Prospectus**

Introduction ............................ 1
Cautionary Note Regarding Forward-Looking
   Statements ........................... 3
Incorporation of Information About UBS AG .. 4
Where You Can Find More Information ...... 5
Presentation of Financial Information ....... 6
Limitations on Enforcement of U.S. Laws
   Against UBS AG, Its Management and
   Others ............................... 6
UBS ................................... 7
Swiss Regulatory Powers .................... 10
Use of Proceeds ......................... 11
Description of Debt Securities We May Offer .. 12
Description of Warrants We May Offer ....... 32
Legal Ownership and Book-Entry Issuance .... 47
Considerations Relating to Indexed Securities .. 52
Considerations Relating to Securities
   Denominated or Payable in or Linked to a
   Non-U.S. Dollar Currency ................ 55
U.S. Tax Considerations ................... 58
Tax Considerations Under the Laws of
   Switzerland ........................... 69
Benefit Plan Investor Considerations ......... 71
Plan of Distribution ...................... 73
   Conflicts of Interest ..................... 75
Validity of the Securities ................... 76
Experts ................................ 76



# UBS AG Monthly Pay 2×Leveraged Exchange Traded Access Securities (ETRACS)

**Product Supplement dated November 14, 2014**
**(To Prospectus dated November 14, 2014)**

**UBS Investment Bank**

424B2 1 d818453d424b2.htm PRODUCT SUPPLEMENT

**Table of Contents**



PRODUCT SUPPLEMENT
(To Prospectus dated November 14, 2014)

Filed Pursuant to Rule 424(b)(2)
Registration Statement No. 333-200212

# UBS AG Monthly Reset 2xLeveraged Exchange Traded Access Securities (ETRACS)

UBS AG from time to time may offer and sell separate series of Monthly Reset 2xLeveraged Exchange Traded Access Securities (ETRACS) (which we refer to as the "Securities"), linked to an underlying index (the "Index"). The Securities will be senior unsecured debt securities issued by UBS AG (UBS). The Securities are designed to provide a two times leveraged long exposure to the performance of the Index compounded on a monthly basis, reduced by the Accrued Fees (as described below). Because the Securities will be two times leveraged with respect to the Index, the Securities may benefit from two times any positive, but will be exposed to two times any negative, performance of the Index. The return on the Securities, however, can, and most likely will, differ significantly from two times the return on a direct investment in the Index. The Securities are very sensitive to changes in the performance of the Index, and returns on the Securities may be negatively impacted in complex ways by volatility of the Index on a monthly basis. Accordingly, the Securities should be purchased only by knowledgeable investors who understand the potential consequences of investing in the Index and of seeking monthly compounding leveraged investment results. Investors should actively and frequently monitor their investment in the Securities.

Any payment at maturity or call, upon acceleration or upon early redemption will be subject to the creditworthiness of UBS. In addition, the actual and perceived creditworthiness of UBS will affect the market value, if any, of the Securities prior to maturity, call, acceleration or early redemption. **Investing in the Securities involves significant risks. You may lose some or all of your principal at maturity, early redemption, acceleration or upon exercise by UBS of its call right if the monthly compounded leveraged return of the Index (calculated as described herein) is not sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable. You will not receive any interest payments or coupon payments during the term of the Securities**

This product supplement describes some of the general terms that may apply to any series of the Securities and the general manner in which they may be offered. The specific terms of any series of Securities that we may offer, including the name and sponsor of the Index, and the specific manner in which such series of Securities may be offered, will be described in an applicable pricing supplement to this product supplement (a "pricing supplement"). If there is any inconsistency between the terms described in the applicable pricing supplement and those described in this product supplement or in the accompanying prospectus, the terms described in the applicable pricing supplement will be controlling. The general terms of the Securities are described in this product supplement and, unless otherwise specified in the applicable pricing supplement, include the following:

| | |
|---|---|
| Issuer: | UBS AG (London Branch) |
| Term: | 30 years, subject to your right to receive payment for your Securities upon redemption, acceleration upon minimum indicative value or exercise of the UBS Call Right, each as described below. |
| Denomination/Principal Amount: | $25.00 per Security |
| Underlying Index: | The return on the Securities will be linked to the performance of the relevant Index, which will be identified in the applicable pricing supplement. The Index will be an index of equity or other securities, as further described in the applicable pricing supplement. |
| Payment at Maturity: | For each Security, unless earlier redeemed, called or accelerated, you will receive at maturity a cash payment equal to (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the applicable Measurement Period, minus (b) the Accrued Fees as of such last Trading Day. We refer to this cash payment as the "Cash Settlement Amount". If the amount so calculated is less than zero, the payment at maturity will be zero. |
| Current Principal Amount: | For the period from the Initial Trade Date specified in the applicable pricing supplement to the applicable initial Monthly Valuation Date (such period, the "Initial Calendar Month"), the Current Principal Amount will equal $25.00 per Security of any series. For each subsequent calendar month, the Current Principal Amount for each Security of that series will be reset as follows on the Monthly Reset Date: |
| | *New* Current Principal Amount = *previous* Current Principal Amount × Index Factor on the applicable Monthly Valuation Date - Accrued Fees on the applicable Monthly Valuation Date |
| | If any series of the Securities undergoes a split or reverse split, the Current Principal Amount of that series will be adjusted accordingly. |
| Index Factor: | 1 + (2 × Index Performance Ratio) |

See "Risk Factors" beginning on page S-18 for additional risks related to an investment in the Securities.

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this product supplement or the accompanying prospectus. Any representation to the contrary is a criminal offense.**

## UBS Investment Bank

*(cover continued on next page)*

Product Supplement dated November 14, 2014

**Table of Contents**

Index Performance Ratio:

On any Monthly Valuation Date, any Redemption Valuation Date, or as of the last Trading Day in the applicable Measurement Period, as applicable:

Index Valuation Level — Monthly Initial Closing Level
Monthly Initial Closing Level

Accrued Fees:

As of any date of determination for any series of Securities, the sum of (i) the Accrued Tracking Fee (as defined herein) as of such date and (ii) the Accrued Financing Charge (as defined herein) as of such date.

No Interest or Coupon Payments:

You will not receive any interest payments or coupon payments during the term of the Securities.

Early Redemption:

Subject to the minimum redemption amount of 50,000 Securities of the affected series and your compliance with the procedures described under "General Terms of the Securities — Early Redemption at the Option of the Holders", you may elect to require UBS to redeem your Securities. Pursuant to your request, we will redeem your Securities on any of the Redemption Dates specified in the applicable pricing supplement.

Redemption Amount:

Upon early redemption, you will receive per Security a cash payment on the relevant Redemption Date equal to (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the applicable Redemption Valuation Date, minus (b) the Accrued Fees as of such Redemption Valuation Date, minus (c) the Redemption Fee. We refer to this cash payment as the "Redemption Amount".

Redemption Fee:

As of any date of determination for a series of Securities, an amount per Security equal to the product of (a) 0.125%, (b) the Current Principal Amount and (c) the Index Factor as of the applicable Redemption Valuation Date.

UBS Call Right:

On any Trading Day specified in the applicable pricing supplement through and including the Maturity Date specified in the applicable pricing supplement (the "Call Settlement Date"), UBS may at its option redeem all, but not less than all, issued and outstanding Securities of any series. To exercise its Call Right, UBS must provide notice to the holders of the Securities of that series not less than eighteen calendar days prior to the Call Settlement Date. Upon early redemption in the event UBS exercises this right, holders of that series of Securities will receive per Security a cash payment (the "Call Settlement Amount") (as defined below), which will be paid on the Call Settlement Date. If the amount so calculated is less than zero, the payment to holders of that series of Securities upon exercise of the Call Right will be zero.

Call Settlement Amount:

In the event UBS exercises its Call Right with respect to any series of the Securities, you will receive per Security a cash payment on the relevant Call Settlement Date equal to (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the applicable Measurement Period, minus (b) the Accrued Fees as of such last Trading Day.

Acceleration upon Minimum Indicative Value:

If, at any time, the indicative value for any series of the Securities on any Trading Day (1) equals $5.00 or less or (2) decreases 60% in value from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date (each such day, an "Acceleration Date"), all issued and outstanding Securities of that series will be automatically accelerated and mandatorily redeemed by UBS (even if the indicative value of that series would later exceed $5.00 or increase from the -60% level on such Acceleration Date or any subsequent Trading Day during the applicable Measurement Period) for a cash payment equal to the Acceleration Amount. The "Acceleration Amount" will equal (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day of the applicable Measurement Period, minus (b) the Accrued Fees as of such last Trading Day. If the minimum indicative value threshold of any series of Securities has been breached, holders of that series of Securities will receive on the Acceleration Settlement Date only the Acceleration Amount in respect of their investment in that series of the Securities. The "Acceleration Settlement Date" will be the third Trading Day following the last Trading Day of the applicable Measurement Period.

Indicative Value:

The "indicative value" meant to approximate the expected trading value of each series of Securities in a liquid market at a given time and date is equal to (i) the Current Principal Amount multiplied by the Index Factor calculated using the intraday indicative value of the relevant Index as of such time as the Index Valuation Level, minus (ii) the Accrued Fees as of such time and date, assuming such time and date is the Redemption Valuation Date. The indicative value for any series of the Securities on any Trading Day will be published under a Bloomberg ticker symbol specified in the applicable pricing supplement. The indicative value for any series of Securities is not the same as the closing price or any other trading price of such Securities in the secondary market. The trading price of any series of Securities at any time may vary significantly from the

<u>**Table of Contents**</u>

| | |
|---|---|
| | indicative value at such time. See "Valuation of the Index and the Securities — Intraday Security Values" on page S-30. |
| Monthly Initial Closing Level: | The Monthly Initial Closing Level for the Initial Calendar Month will be specified in the applicable pricing supplement and will be the Index Closing Level on the applicable Initial Trade Date. For each subsequent calendar month, the Monthly Initial Closing Level on the Monthly Reset Date will equal the Index Closing Level on the Monthly Valuation Date for the previous calendar month. |
| Index Valuation Level: | As determined by the Calculation Agent, the arithmetic mean of the Index Closing Levels measured on each Trading Day during the applicable Measurement Period, or the Index Closing Level on any Monthly Valuation Date or any Redemption Valuation Date, provided that if the Redemption Valuation Date falls in any Measurement Period, for the purposes of calculating the Index Performance Ratio as of the Redemption Valuation Date, the Index Valuation Level on any date of determination during such Measurement Period shall equal (a) 1/t *times* (b) (i) the sum of the Index Closing Levels on each Trading Day from, and including, the Call Valuation Date, Acceleration Date or the Calculation Date, as applicable, to, but excluding, the date of determination, *plus* (ii) the number of Trading Days from and including the date of determination to and including the last Trading Day in such Measurement Period, *times* the Index Closing Level on such date of determination. For purposes of this definition, "t" equals the number of Trading Days in the applicable Measurement Period. |
| Index Closing Level: | For any series of the Securities, the closing level of the relevant Index as reported on Bloomberg L.P. or any other publicly available information provider specified in the applicable pricing supplement. |
| Calculation Agent: | UBS Securities LLC |
| Listing: | We intend to list each series of the Securities on NYSE Arca. There can be no assurance that an active secondary market will develop; if it does, we expect that investors will purchase and sell the Securities primarily in this secondary market. |
| Additional Key Terms: | See "Product Supplement Summary — Additional Key Terms — Fees" on page S-5. |

The applicable pricing supplement will describe the specific terms of the Securities, including any changes to the terms specified in this product supplement.

We may use this product supplement and the accompanying prospectus in the initial sale of the Securities. In addition, UBS Securities LLC or another of our affiliates may use this product supplement and the accompanying prospectus in market-making transactions in any Securities after their initial sale. *Unless we or our agent informs you otherwise in the confirmation of sale or in a notice delivered at the same time as the confirmation of sale, this product supplement and the accompanying prospectus are being used in a market-making transaction.*

The Securities are not deposit liabilities of UBS AG and are not insured by the Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction.

### Table of Contents

The UBS AG Monthly Reset 2xLeveraged Exchange Traded Access Securities (ETRACS) being offered as described in this product supplement, the applicable pricing supplement and the accompanying prospectus will constitute one offering in a series of offerings of ETRACS exchange traded notes. We are offering and may continue to offer from time to time ETRACS linked to different underlying indices, which may have the same or different terms and conditions relative to those set forth in this product supplement and the accompanying pricing supplement.

This product supplement contains the general financial and other terms that apply to the series of Securities that will be offered pursuant to the applicable pricing supplement. Terms that apply generally to all our Medium-Term Notes, Series A, are described under "Description of Debt Securities We May Offer" in the accompanying prospectus. Each series of Securities offered by this product supplement, the accompanying prospectus and the applicable pricing supplement are part of our Medium-Term Notes, Series A. The terms described here (*i.e.*, in this product supplement) modify or supplement those described in the accompanying prospectus and, if the terms described here are inconsistent with those described there, the terms described here are controlling. The contents of any website referred to in this product supplement are not incorporated by reference in this product supplement or the accompanying prospectus.

You may access the accompanying prospectus dated November 14, 2014 at:
http://www.sec.gov/Archives/edgar/data/1114446/000119312514413375/d816529d424b3.htm

**You should rely only on the information incorporated by reference or provided in this product supplement or the accompanying prospectus. We have not authorized anyone to provide you with different information. We are not making an offer of these Securities in any state where the offer is not permitted. You should not assume that the information in this product supplement is accurate as of any date other than the date on the front of the document.**

### TABLE OF CONTENTS

**Product Supplement**

| | |
|---|---|
| Product Supplement Summary | S-1 |
| Hypothetical Examples | S-12 |
| Risk Factors | S-18 |
| Valuation of the Index and the Securities | S-30 |
| General Terms of the Securities | S-32 |
| Use of Proceeds and Hedging | S-46 |
| Material U.S. Federal Income Tax Consequences | S-47 |
| Benefit Plan Investor Considerations | S-52 |
| Supplemental Plan of Distribution | S-54 |
|     Conflicts of Interest | S-54 |
| Form of Notice of Early Redemption | A-1 |
| Form of Broker's Confirmation of Redemption | B-1 |

**Prospectus**

| | |
|---|---|
| Introduction | 1 |
| Cautionary Note Regarding Forward-Looking Statements | 3 |
| Incorporation of Information About UBS AG | 4 |
| Where You Can Find More Information | 5 |
| Presentation of Financial Information | 6 |
| Limitations on Enforcement of U.S. Laws Against UBS AG, Its Management and Others | 6 |
| UBS | 7 |
| Swiss Regulatory Powers | 10 |
| Use of Proceeds | 11 |
| Description of Debt Securities We May Offer | 12 |
| Description of Warrants We May Offer | 32 |
| Legal Ownership and Book-Entry Issuance | 47 |
| Considerations Relating to Indexed Securities | 52 |
| Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency | 55 |
| U.S. Tax Considerations | 58 |
| Tax Considerations Under the Laws of Switzerland | 69 |
| Benefit Plan Investor Considerations | 71 |
| Plan of Distribution | 73 |
|     Conflicts of Interest | 75 |
| Validity of the Securities | 76 |
| Experts | 76 |

i

Table of Contents

# Product Supplement Summary

*The following is a summary of terms that will apply generally to the Securities, as well as a discussion of factors you should consider before purchasing the Securities. In connection with an offering of any series of Securities, UBS AG will prepare a pricing supplement that, in addition to the identity of the relevant Index and any changes to the general terms specified below, will also include the specific pricing terms for that issuance. Any pricing supplement should be read in connection with this product supplement and the accompanying prospectus.*

*References to "UBS", "we", "our" and "us" refer only to UBS AG and not to its consolidated subsidiaries. In this product supplement, when we refer to the "Securities", we mean the Monthly Reset 2xLeveraged ETRACS. Also, references to the "accompanying prospectus" mean the accompanying prospectus of UBS, titled "Debt Securities and Warrants", dated November 14, 2014. References to the "applicable pricing supplement" mean the pricing supplement that describes the specific terms of your Securities unless the context otherwise requires.*

**What are the Securities?**

The Securities are senior unsecured debt securities issued by UBS that provide a monthly compounded two times leveraged long exposure to the performance of the relevant Index. The name of the relevant Index will be specified in the applicable pricing supplement. The relevant Index will be an index of equity or other securities. We refer to the companies issuing such securities as the "Index Constituents" and the securities constituting the relevant Index as the "Index Constituent Securities".

The Securities seek to approximate the monthly returns that might be available to investors through a leveraged "long" investment in the Index Constituent Securities. A leveraged "long" investment strategy involves the practice of borrowing money from a third party lender at an agreed-upon rate of interest and using the borrowed money together with investor capital to purchase assets (*e.g.*, the Index Constituent Securities). A leveraged "long" investment strategy terminates with the sale of the underlying assets and repayment of the third party lender, provided that the proceeds of the sale of underlying assets are sufficient to repay the loan. By implementing a leveraged strategy, the leveraged investor seeks to benefit from an anticipated increase in the value of the assets between the purchase and sale of such assets, and assumes that the increase in value of the underlying assets will exceed the cumulative interest due to the third party lender over the term of the loan. In order to seek to replicate a leveraged "long" investment strategy in the Index Constituent Securities, the Securities provide that each $25 invested by investors on the Initial Trade Date is leveraged through a notional loan of $25 on the Initial Trade Date. Investors are thus considered to have notionally borrowed $25, which, together with the $25 invested, represents a notional investment of $50 in the Index Constituent Securities on the Initial Trade Date. During the term of your Securities, the leveraged portion of the notional investment, which will be equal to the Current Principal Amount, accrues financing charges for the benefit of UBS referred to as the "Accrued Financing Charge", which seeks to represent the monthly amount of interest that leveraged investors might incur if they sought to borrow funds at a similar rate from a third-party lender. Upon maturity or call, upon acceleration or upon early redemption, the investment in the Index Constituent Securities is notionally sold at the then-current values of the Index Constituent Securities, and the investor then notionally repays UBS an amount equal to the principal of the notional loan plus accrued interest. In order to mitigate the risk to UBS that the value of the Index Constituent Securities is not sufficient to repay the principal and Accrued Financing Charge of the notional loan, an automatic early termination of the Securities is provided for under the "Acceleration upon Minimum Indicative Value" provisions hereunder.

**Any depreciation of the Index will reduce your payment at maturity, and you could lose your entire investment. You will not receive any interest payments or coupon payments during the term of the Securities.**

Table of Contents

The Securities do not guarantee any return of principal at, or prior to, maturity or call, or upon acceleration or upon early redemption. Instead, at maturity, you will receive a cash payment per Security based on the performance of the Index equal to (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the applicable Measurement Period, minus (b) the Accrued Fees as of such last Trading Day. We refer to this cash payment as the "Cash Settlement Amount". If the amount calculated above is less than zero, the payment at maturity will be zero. **You may lose some or all of your investment at maturity. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees in order for you to receive an aggregate amount over the term of the Securities equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at maturity.** See "General Terms of the Securities — Cash Settlement Amount at Maturity" beginning on page S-33.

As a result of compounding, the performance of the Securities for periods greater than one month is likely to be either greater than or less than two times the performance of the Index, before accounting for the Accrued Fees. In addition, because the Accrued Fees are calculated and subtracted from the Current Principal Amount on a monthly basis, the net negative effect of the Accrued Fees accumulates over time, and the absolute level of the Accrued Fees are dependent on the path taken by the level of the Index over the term of the Securities.

*Because the Current Principal Amount is reset each month, the Securities do not offer a return based on the simple performance of the Index from the Initial Trade Date to the Maturity Date.* Instead, the amount you receive at maturity or call, or upon acceleration or upon early redemption, will be contingent upon the monthly compounded two times leveraged long performance of the Index during the term of the Securities, subject to the negative effect of the Accrued Fees. Accordingly, even if over the term of the Securities, the level of the Index has increased, there is no guarantee that you will receive at maturity or call, or upon acceleration or upon early redemption, your initial investment back or any return on that investment. This is because the amount you receive at maturity or call, or upon acceleration or upon early redemption, depends on how the Index has performed on a monthly compounded leveraged basis prior to maturity or call, or upon acceleration or upon early redemption, and consequently, how the Current Principal Amount has been reset in each month. In particular, significant adverse monthly performances for your Securities may not be offset by any beneficial monthly performances of the same magnitude.

The amount of your payment upon maturity or call, or upon acceleration or upon early redemption will depend, in part, upon the level of the Index. However, positive or negative monthly changes in the Index Closing Level or the Index Valuation Level will not solely determine the return on your Securities due to the combined effects of leverage, monthly compounding and any applicable fees and financing charges.

For the Initial Calendar Month, the Current Principal Amount will equal $25.00 per Security of any series. For each subsequent calendar month, the Current Principal Amount for each Security of that series will be reset as follows on the Monthly Reset Date:

*New* Current Principal Amount = *previous* Current Principal Amount × Index Factor on the applicable Monthly Valuation Date — Accrued Fees on the applicable Monthly Valuation Date

If any series of the Securities undergoes a split or reverse split, the Current Principal Amount of that series will be adjusted accordingly, as described under "Valuation of the Index and the Securities — Split or Reverse Split of the Securities" below.

S-2

Table of Contents

The Index Factor will be calculated as follows:

$$1 + (2 \times \text{Index Performance Ratio})$$

The Index Performance Ratio on any Monthly Valuation Date, any Redemption Valuation Date, or as of the last Trading Day in the applicable Measurement Period, as applicable, will be:

$$\frac{\text{Index Valuation Level} - \text{Monthly Initial Closing Level}}{\text{Monthly Initial Closing Level}}$$

The "Monthly Initial Closing Level" for the Initial Calendar Month will be specified in the applicable pricing supplement and will be the Index Closing Level on the applicable Initial Trade Date. For each subsequent calendar month, the Monthly Initial Closing Level will equal the Index Closing Level on the Monthly Valuation Date for the previous calendar month.

The "Index Valuation Level" will equal the arithmetic mean of the Index Closing Levels measured on each Trading Day during the applicable Measurement Period, or the Index Closing Level on any Monthly Valuation Date or any Redemption Valuation Date, as determined by the Calculation Agent, provided that if the Redemption Valuation Date falls in any Measurement Period, for the purposes of calculating the Index Performance Ratio as of the Redemption Valuation Date, the Index Valuation Level on any date of determination during such Measurement Period shall equal (a) $1/t$ *times* (b) (i) the sum of the Index Closing Levels on each Trading Day from, and including, the Call Valuation Date, Acceleration Date or the Calculation Date, as applicable, to, but excluding, the date of determination, *plus* (ii) the number of Trading Days from and including the date of determination to and including the last Trading Day in such Measurement Period, *times* the Index Closing Level on such date of determination. For purposes of this definition, "t" equals the number of Trading Days in the applicable Measurement Period.

Unless specified otherwise in the applicable pricing supplement, the applicable "Measurement Period" means the five Trading Days from and including the Call Valuation Date, Acceleration Date or the Calculation Date, as applicable, subject to adjustment as described under "General Terms of the Securities — Market Disruption Event".

### How and why is the Current Principal Amount reset?

Initially, the Current Principal Amount is equal to $25 per Security. At the start of each subsequent calendar month, the Current Principal Amount is reset by applying the Index Factor and the Accrued Fees to the previous Current Principal Amount.

For example, if for August the Current Principal Amount is $20 and the Index Factor as of the Monthly Valuation Date for August is equal to 0.90 and the Accrued Fees are equal to $0.02, the Current Principal Amount for September will equal $17.98. Subsequently, the Index Factor and the Accrued Fees as of the Monthly Valuation Date for September will be applied to the Current Principal Amount for September to derive the Current Principal Amount for October.

The Current Principal Amount is reset each calendar month to ensure that a consistent degree of leverage is applied, on a monthly basis, to any performance of the Index. If the Current Principal Amount is reduced by an adverse monthly performance, the Index Factor of any further adverse monthly performance will lead to a smaller dollar loss when applied to that reduced Current Principal Amount than if the Current Principal Amount were not reduced. Equally, however, if the Current Principal Amount increases, the dollar amount lost for a certain level of adverse monthly performance will increase correspondingly.

Table of Contents

Resetting the Current Principal Amount also means that the dollar amount which may be gained from any beneficial monthly performance will be contingent upon the Current Principal Amount. If the Current Principal Amount is above $25, then any beneficial monthly performance will result in a gain of a larger dollar amount than would be the case if the Current Principal amount were reduced below $25. Conversely, as the Current Principal Amount is reduced towards zero, the dollar amount to be gained from any beneficial monthly performance will decrease correspondingly.

**Unlike ordinary debt securities, the Securities do not guarantee any return of principal at maturity or call, or upon acceleration or upon early redemption. You may lose some or all of your initial investment. In addition, you will not receive any interest payments or coupon payments during the term of the Securities.**

### Early Redemption

You may elect to require UBS to redeem your Securities, subject to a minimum redemption amount of at least 50,000 Securities of that series. If you elect to have your Securities redeemed and have done so under the redemption procedures described under "General Terms of the Securities — Redemption Procedures", you will receive payment for your Securities on the Redemption Date. The first and final Redemption Dates will be specified in the applicable pricing supplement. In addition, if a call notice has been issued or if acceleration has been triggered, in each case with respect to any series of the Securities, the last Redemption Valuation Date for that series of Securities will be the fifth Trading Day prior to the Call Settlement Date or the Acceleration Settlement Date, as applicable. If you redeem your Securities, you will receive a cash payment equal to the Redemption Amount, as defined below. You must comply with the redemption procedures described below in order to redeem your Securities. To satisfy the minimum redemption amount, your broker or other financial intermediary may bundle your Securities for redemption with those of other investors to reach this minimum amount of 50,000 Securities of the same series; however, there can be no assurance that they can or will do so. We may from time to time in our sole discretion reduce this minimum requirement in whole or in part. Any such reduction will be applied on a consistent basis for all holders of the Securities of the affected series at the time the reduction becomes effective.

Upon early redemption, you will receive per Security a cash payment on the relevant Redemption Date equal to (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the applicable Redemption Valuation Date minus, (b) the Accrued Fees as of such Redemption Valuation Date, minus (c) the Redemption Fee. We refer to this cash payment as the "Redemption Amount". **You may lose some or all of your investment upon early redemption. Because the Accrued Fees and the Redemption Fee Amount reduce your final payment, the monthly compounded leveraged return of the Index will need to be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee in order for you to receive an aggregate amount over the term of the Securities equal to your initial investment in the Securities. If the monthly compounded leveraged return of the Index is insufficient to offset such a negative effect or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment upon early redemption.** See "General Terms of the Securities — Early Redemption at the Option of the Holders" beginning on page S-35 and "— Redemption Procedures" beginning on page S-37.

For any early redemption, the applicable "Redemption Valuation Date" means the first Trading Day following the date on which a Redemption Notice and Redemption Confirmation, each as described under "General Terms of the Securities — Redemption Procedures", are delivered. The applicable "Redemption Date" means the third Business Day following the corresponding Redemption Valuation Date or, if such day is not a Business Day, the next following Business Day. Any applicable Redemption Valuation Date is subject to adjustment as described under "General Terms of the Securities — Market Disruption Event".

S-4

Table of Contents

**UBS's Call Right**

On any Trading Day specified in the applicable pricing supplement through and including the Maturity Date specified in the applicable pricing supplement, UBS may at its option redeem all, but not less than all, issued and outstanding Securities of any series. To exercise its Call Right, UBS must provide notice to the holders of the Securities of that series not less than eighteen calendar days prior to the Call Settlement Date specified by UBS. In the event UBS exercises its Call Right, you will receive per Security a cash payment on the relevant Call Settlement Date equal to (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the applicable Measurement Period, minus (b) the Accrued Fees as of such last Trading Day. We refer to this cash payment as the "Call Settlement Amount". If UBS issues a call notice on any Trading Day, the "Call Valuation Date" will be the fifth Trading Day following the Trading Day on which the call notice is issued. The Call Settlement Date will be at least three, but not greater than six, Trading Days following the last Trading Day in the applicable Measurement Period. We will inform you of such Call Settlement Date in the call notice. See also "Description of Debt Securities We May Offer — Redemption and Repayment" in the attached prospectus.

**Acceleration Upon Minimum Indicative Value**

If, at any time, the indicative value for any series of the Securities on any Trading Day (1) equals $5.00 or less or (2) decreases 60% in value from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date (each such day, an "Acceleration Date"), all issued and outstanding Securities of that series will be automatically accelerated and mandatorily redeemed by UBS (even if the indicative value of that series would later exceed $5.00 or increase from the -60% level on such Acceleration Date or any subsequent Trading Day during the applicable Measurement Period) for a cash payment equal to the Acceleration Amount. The "Acceleration Amount" will equal (a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day of such Measurement Period, minus (b) the Accrued Fees as of such last Trading Day. If the minimum indicative value threshold of any series of Securities has been breached, you will receive on the Acceleration Settlement Date only the Acceleration Amount in respect of your investment in that series of the Securities. The "Acceleration Settlement Date" will be the third Trading Day following the last Trading Day of the applicable Measurement Period. UBS will provide notice to the holders of the Securities that the minimum indicative value threshold has been breached not less than five calendar days prior to the Acceleration Settlement Date. For a detailed description of how the intraday indicative value of the Securities is calculated see "Valuation of the Index and the Securities — Intraday Security Values" on page S-30.

**Additional Key Terms — Fees**

Any cash payment made on any series of Securities will be reduced by the Accrued Fees and, if applicable, the Redemption Fee, in each case calculated as described below:

| | |
|---|---|
| Accrued Fees: | As of any date of determination for any series of Securities, the sum of (i) the Accrued Tracking Fee as of such date and (ii) the Accrued Financing Charge as of such date. |
| Accrued Tracking Fee: | (1) The Accrued Tracking Fee with respect to the initial Monthly Valuation Date is an amount equal to the product of |
| |     (a) the Annual Tracking Fee as of the initial Monthly Valuation Date and |
| |     (b) a fraction, the numerator of which is the total number of calendar days from, but excluding, the Initial Trade Date to, and including, the initial Monthly Valuation Date, and the denominator of which is 365. |

S-5

Table of Contents

(2) The Accrued Tracking Fee with respect to any Monthly Valuation Date other than the first Monthly Valuation Date is an amount equal to the product of

    (a) the Annual Tracking Fee as of such Monthly Valuation Date and

    (b) a fraction, the numerator of which is the total number of calendar days from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such Monthly Valuation Date, and the denominator of which is 365.

(3) The Accrued Tracking Fee as of the last Trading Day of the applicable Measurement Period, or as of the Redemption Valuation Date, as applicable, is an amount equal to the product of

    (a) the Annual Tracking Fee calculated as of the last Trading Day of such Measurement Period, or as of such Redemption Valuation Date, as applicable, and

    (b) a fraction, the numerator of which is the total number of calendar days from, but excluding, the immediately preceding Monthly Valuation Date to, and including, (i) such last Trading Day of such Measurement Period, or (ii) such Redemption Valuation Date (or if the Acceleration Date or Redemption Valuation Date occurs prior to the initial Monthly Valuation Date, the period from, and excluding, the Initial Trade Date), as applicable, and the denominator of which is 365.

| | |
|---|---|
| Annual Tracking Fee: | As of any date of determination, an amount per Security equal to the product of (i) the Annual Tracking Rate and (ii) the Current Indicative Value as of the immediately preceding Trading Day. |
| Annual Tracking Rate: | A per annum rate described in the applicable pricing supplement. |
| Redemption Fee: | As of any date of determination for a series of Securities, an amount per Security equal to the product of (a) 0.125%, (b) the Current Principal Amount and (c) the Index Factor as of the applicable Redemption Valuation Date. |
| Accrued Financing Charge: | On the Initial Trade Date, the Accrued Financing Charge for each Security will equal $0. On the initial Monthly Valuation Date, the Accrued Financing Charge for each Security will equal (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the Initial Trade Date to, and including, the initial Monthly Valuation Date *times* (ii) the Financing Rate as of such date, *divided by* (b) 360. |
| | On any subsequent Monthly Valuation Date, the Accrued Financing Charge for each Security will equal (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including, the then current Monthly Valuation Date *times* (ii) the Financing Rate as of such date, *divided by* (b) 360. |
| | The Accrued Financing Charge as of the last Trading Day of the applicable Measurement Period, or as of any Redemption Valuation Date, as applicable, is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date (or, if the Redemption Valuation Date falls in the Initial |

Table of Contents

|  | |
|---|---|
| | Calendar Month, the Initial Trade Date) to, and including, such last Trading Day in such Measurement Period, or such Redemption Valuation Date, as applicable, *times* (ii) the Financing Rate as of such date, *divided by* (b) 360. |
| | *The Accrued Financing Charge seeks to compensate UBS for providing investors with the potential to receive a leveraged participation in movements in the Index Closing Level and is intended to approximate the financing costs that investors may have otherwise incurred had they sought to borrow funds at a similar rate from a third party to invest in the Securities. These charges accrue on a daily basis during the applicable period.* |
| Financing Level: | As of any date of determination, the Financing Level will equal the Current Principal Amount. |
| Financing Rate: | The Financing Rate will equal the sum of (a) the "Financing Spread" to be specified in the applicable pricing supplement and (b) the London interbank offered rate (British Banker's Association) for three-month deposits in U.S. Dollars, which is displayed on Reuters page LIBOR01 (or any successor service or page for the purpose of displaying the London interbank offered rates of major banks, as determined by the Calculation Agent), as of 11:00 a.m., London time, on the day that is two London business days prior to the immediately preceding Monthly Valuation Date. "London business day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in London generally are authorized or obligated by law, regulation or executive order to close and is also a day on which dealings in U.S. dollars are transacted in the London interbank market. |

## Selected Risk Considerations

An investment in the Securities involves risks. Selected risks are summarized here, but we urge you to read the more detailed explanation of risks described under "Risk Factors" beginning on page S-18 and in the "Risk Factors" section of the applicable pricing supplement.

➢ **You may lose some or all of your investment** — The Securities are exposed to two times any monthly decline in the level of the Index. The monthly compounded leveraged return of the Index will need to be sufficient to offset the negative effect of the Accrued Fees and Redemption Fee, if applicable, in order for you to receive an aggregate amount over the term of the Securities equal to your initial investment in the Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the fees, or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at maturity or call, or upon early redemption or acceleration.

➢ **Correlation and compounding risk** — A number of factors may affect the Security's ability to achieve a high degree of correlation with the performance of the Index, and there can be no guarantee that the Security will achieve a high degree of correlation. Because the Current Principal Amount is reset monthly, you will be exposed to compounding of monthly returns. As a result, the performance of the Securities for periods greater than one month is likely to be either greater than or less than the Index performance times the leverage factor of two, before accounting for Accrued Fees and the Redemption Fee, if any. In particular, significant adverse monthly performances of your Securities may not be offset by subsequent beneficial monthly performances of equal magnitude.

➢ **Leverage risk** — The Securities are two times leveraged long with respect to the Index, which means that you may benefit two times from any positive, but will be exposed to two times any negative, monthly performance of the Index, before accounting for the Accrued Fees and Redemption Fee, if any.

Table of Contents

> **No interest or coupon payments on the Securities** — You will not receive any interest payments or coupon payments during the term of the Securities.

> **Market risk** — The return on the Securities, which may be positive or negative, is linked to the monthly compounded leveraged return on the Index as measured by the Index Factor, and which, in turn, is affected by a variety of market and economic factors, interest rates in the markets and economic, financial, political, regulatory, judicial or other events that affect the Index Constituent Securities or the markets generally.

> **Credit of issuer** — The Securities are senior unsecured debt obligations of the issuer, UBS, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. Any payment to be made on the Securities, including any payment at maturity or call, or upon acceleration or upon early redemption, depends on the ability of UBS to satisfy its obligations as they come due. As a result, the actual and perceived creditworthiness of UBS will affect the market value, if any, of the Securities prior to maturity or call, or upon acceleration or upon early redemption. In addition, in the event UBS were to default on its obligations, you may not receive any amounts owed to you under the terms of the Securities.

> **A trading market for the Securities may not develop** — Although we intend to list each series of the Securities on NYSE Arca, a trading market for the Securities may not develop. Certain affiliates of UBS may engage in limited purchase and resale transactions in the Securities of any series, although they are not required to and may stop at any time. We are not required to maintain any listing of any series of the Securities on NYSE Arca or any other exchange. In addition, we are not obliged to, and may not, sell the full aggregate principal amount of any series of the Securities shown on the cover of the applicable pricing supplement. We may suspend or cease sales of the Securities at any time, at our discretion. Therefore, the liquidity of any series of the Securities may be limited.

> **The Securities may not provide a hedge against price and/or value decreases or increases** — The Securities may not provide a hedge against a decrease or increase in the price and/or value of any asset, sector or index.

> **Minimum redemption amount** — You must elect to redeem at least 50,000 of the same series of the Securities for UBS to repurchase your Securities, unless we determine otherwise or your broker or other financial intermediary bundles your Securities for redemption with those of other investors (and of the same series) to reach this minimum requirement and there can be no assurance that they can or will do so. Therefore, the liquidity of the Securities may be limited.

> **Your redemption election is irrevocable** — You will not be able to rescind your election to redeem your Securities after your redemption notice is received by UBS. Accordingly, you will be exposed to market risk in the event market conditions change after UBS receives your offer and the Redemption Amount is determined on the Redemption Valuation Date.

> **Potential automatic acceleration** — In the event the indicative value of any series of the Securities is equal to $5.00 or less on any Trading Day or decreases 60% in value from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date, the Securities of that series will be automatically accelerated and mandatorily redeemed by UBS and you will receive a cash payment equal to the Acceleration Amount as determined during the applicable Measurement Period. The Acceleration Amount you receive on the Acceleration Settlement Date may be significantly less than $5.00 per Security and may be zero if the price of the Securities continues to decrease during trading on one or more Trading Days during such Measurement Period.

> **Uncertain tax treatment** — Significant aspects of the tax treatment of the Securities are uncertain. You should consult your own tax advisor about your own tax situation.

> **UBS's Call Right** — UBS may redeem all outstanding Securities at any time on or after the date specified in the applicable pricing supplement, as described under "General Terms of the Securities — UBS's Call Right" beginning on page S-37.

S-8

Table of Contents

The Securities may be a suitable investment for you if:

➢ You seek an investment with a return linked to a monthly compounded two times leveraged long performance of the relevant Index.

➢ You understand (i) leverage risk, including the risks inherent in maintaining a constant two times leverage on a monthly basis, and (ii) the consequences of seeking monthly leveraged investment results generally, and you intend to actively monitor and manage your investment.

➢ You believe the monthly compounded two times leveraged long performance of the Index will be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable.

➢ You are willing to accept the risk that you may lose some or all of your investment.

➢ You are willing to hold securities that may be redeemed early by UBS, pursuant to the UBS Call Right.

➢ You are willing to hold securities that have a long-term maturity (30 years).

➢ You are willing to hold securities that do not pay periodic interest or coupons.

➢ You are willing to accept the risk that the price at which you are able to sell the Securities in the secondary market may be significantly less than the amount you invested.

➢ You understand and accept the risks associated with the fact that significant aspects of the tax treatment of the Securities are uncertain.

➢ You are not seeking an investment for which there will be an active secondary market.

➢ You are willing to be exposed to the credit risk of UBS, as issuer of the Securities.

The Securities may *not* be a suitable investment for you if:

➢ You seek a guaranteed return of principal and you are not willing to accept the risk that you may lose some or all of your investment.

➢ You do not seek an investment with a return linked to a monthly compounded two times leveraged long performance of the relevant Index.

➢ You do not understand (i) leverage risk, including the risks inherent in maintaining a constant two times leverage on a monthly basis, and (ii) the consequences of seeking monthly leveraged investment results generally, and you do not intend to actively monitor and manage your investment.

➢ You do not believe the monthly compounded two times leveraged long performance of the Index will be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable.

➢ You are not willing to hold securities that may be redeemed early by UBS, pursuant to the UBS Call Right.

➢ You are not willing to hold securities that have a long-term maturity (30 years).

➢ You are not willing to accept the risk that the price at which you are able to sell the Securities in the secondary market may be significantly less than the amount you invested.

➢ You do not understand and do not accept the risks associated with the fact that significant aspects of the tax treatment of the Securities are uncertain.

➢ You seek an investment that will pay periodic interest or coupons.

➢ You seek an investment for which there will be an active secondary market.

➢ You are not willing to be exposed to the credit risk of UBS, as issuer of the Securities.

---

**Who calculates and publishes the relevant Index?**

The "Index Calculation Agent" will calculate the level of the relevant Index and will be named in the applicable pricing supplement. Levels of the relevant Index will be published approximately every 15 seconds (assuming that the level of such Index has changed within such 15-second interval) from 9:30 a.m. to 4:00 p.m., New York City time, and a daily Index Closing Level will be published at approximately 4:00 p.m., New York City time, on each Trading Day. The relevant Index information providers and relevant Index symbol will be specified in the applicable pricing supplement.

**What are the tax consequences of owning the Securities?**

**The United States federal income tax consequences of your investment in the Securities are uncertain. Some of these tax consequences are summarized below, but we urge you to read the more detailed discussion under "Material U.S. Federal Income Tax Consequences" on page S-47.**

The tax treatment of your Securities will depend on their terms. Consequently, except to the extent the applicable pricing supplement indicates otherwise, the discussion below (including the tax opinion below) will not necessarily apply to your Securities. The summary below is subject to the assumptions, limitations and exceptions set forth under "Material U.S. Federal Income Tax Consequences" on page S-47.

Pursuant to the terms of the Securities, you and we agree, in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary, to characterize the Securities as a pre-paid derivative contract with respect to the Index. Under that treatment, you should generally recognize capital gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference between the amount realized and the amount you paid for your Securities. Such gain or loss should generally be long-term capital gain or loss if you held your Securities for more than one year. The deductibility of capital losses is subject to limitations.

**In the opinion of our counsel, Sullivan & Cromwell LLP, the Securities should be treated in the manner described above. However, because there is no authority that specifically addresses the tax treatment of the Securities, it is possible that the Securities could be treated for tax purposes in an alternative manner described under "Material U.S. Federal Income Tax Consequences — Alternative Treatments" on page S-48.**

The Internal Revenue Service ("IRS") released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current basis, whether additional gain or loss upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Internal Revenue Code of 1986, as amended (the "Code"), should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income over the term of an instrument such as the Securities. The outcome of this process is uncertain.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of

---

Table of Contents

the Securities despite the fact that there will be no interest payments over the term of the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. Except to the extent otherwise required by law, we intend to treat your Securities for United States federal income tax purposes in accordance with the treatment described above and under "Material U.S. Federal Income Tax Consequences" on page S-47 unless and until such time as the Treasury Department and IRS determine that some other treatment is more appropriate.

## Conflicts of Interest

UBS Securities LLC is an affiliate of UBS and, as such, has a "conflict of interest" in any potential offering within the meaning of FINRA Rule 5121. In addition, UBS may receive the net proceeds from the offering of the Securities, thus creating an additional conflict of interest within the meaning of Rule 5121. Consequently, any offering will be conducted in compliance with the provisions of Rule 5121. UBS Securities LLC is not permitted to sell Securities in any offering to an account over which it exercises discretionary authority without the prior specific written approval of the account holder.

S-11

**Table of Contents**

# Hypothetical Examples

The following four examples illustrate how a hypothetical series of the Securities would perform at maturity or call, or upon early redemption, in hypothetical circumstances. We have included an example in which the Index Closing Level increases at a constant rate of 3.00% per month for twelve months (Example 1), as well as an example in which the Index Closing Level decreases at a constant rate of 3.00% per month for twelve months (Example 2). In addition, Example 3 shows the Index Closing Level increasing by 3.00% per month for the first six months and then decreasing by 3.00% per month for the next 6 months, whereas Example 4 shows the reverse scenario of the Index Closing Level decreasing by 3.00% per month for the first six months, and then increasing by 3.00% per month for the next six months. For ease of analysis and presentation, **the following four examples assume that the term of the Securities is twelve months, the last Trading Day of the Call Measurement Period, or the Redemption Valuation Date, occurs on the month end and that no acceleration upon minimum indicative value has occurred.**

The following assumptions are used in each of the four examples:

➢ the initial level for the relevant Index is 2500;

➢ the Redemption Fee Rate is 0.125%;

➢ the Financing Rate is 0.90%;

➢ the Current Principal Amount on the first day is $25.00; and

➢ the Annual Tracking Rate is 0.60%.

The examples highlight the effect of two times leverage and monthly compounding, and the impact of the Accrued Fees on the payment at maturity or call, or upon early redemption, under different circumstances. The assumed Financing Rate is not an indication of the Financing Rate throughout the term of any series of the Securities. The Financing Rate will change during the term of any series of the Securities, which will affect the performance of the Securities of that series.

Because the Accrued Fees take into account the monthly performance of the relevant Index, as measured by the Index Closing Level, the absolute level of the Accrued Fees are dependent on the path taken by the Index Closing Level to arrive at its ending level. The figures in these examples have been rounded for convenience. The Cash Settlement Amount figures for month twelve are as of the hypothetical Calculation Date, and given the indicated assumptions, a holder will receive payment at maturity in the indicated amount, according to the indicated formula.

S-12

Table of Contents

Hypothetical Examples

**Example 1: The Index Closing Level increases at a constant rate of 3.00% per month for twelve months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| | | ((Index Closing Level - Monthly Initial Closing Level)/Monthly Initial Closing Level) | (1 +(2 x C)) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2575.00 | 0.0300 | 1.060 | 0.0188 | $ 26.50 | $ 0.0131 | $ 0.0318 | $      26.47 | $      26.4369 |
| 2 | 2652.25 | 0.0300 | 1.060 | 0.0199 | $ 28.06 | $ 0.0138 | $ 0.0337 | $      28.02 | $      27.9895 |
| 3 | 2731.82 | 0.0300 | 1.060 | 0.0210 | $ 29.70 | $ 0.0146 | $ 0.0357 | $      29.67 | $      29.6332 |
| 4 | 2813.77 | 0.0300 | 1.060 | 0.0223 | $ 31.45 | $ 0.0155 | $ 0.0378 | $      31.41 | $      31.3735 |
| 5 | 2898.19 | 0.0300 | 1.060 | 0.0236 | $ 33.30 | $ 0.0164 | $ 0.0400 | $      33.26 | $      33.2160 |
| 6 | 2985.13 | 0.0300 | 1.060 | 0.0249 | $ 35.25 | $ 0.0174 | $ 0.0423 | $      35.21 | $      35.1667 |
| 7 | 3074.68 | 0.0300 | 1.060 | 0.0264 | $ 37.32 | $ 0.0184 | $ 0.0448 | $      37.28 | $      37.2319 |
| 8 | 3166.93 | 0.0300 | 1.060 | 0.0280 | $ 39.51 | $ 0.0195 | $ 0.0474 | $      39.47 | $      39.4185 |
| 9 | 3261.93 | 0.0300 | 1.060 | 0.0296 | $ 41.83 | $ 0.0206 | $ 0.0502 | $      41.78 | $      41.7334 |
| 10 | 3359.79 | 0.0300 | 1.060 | 0.0313 | $ 44.29 | $ 0.0218 | $ 0.0532 | $      44.24 | $      44.1843 |
| 11 | 3460.58 | 0.0300 | 1.060 | 0.0332 | $ 46.89 | $ 0.0231 | $ 0.0563 | $      46.83 | $      46.7791 |
| 12 | 3564.40 | 0.0300 | 1.060 | 0.0351 | $ 49.64 | $ 0.0245 | $ 0.0596 | $      49.58 | $      49.5263 |

Cumulative Index Return:                                                        42.58%
Return on Securities (assumes no early redemption):                             98.34%

---

\*      The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount

\*\*      Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations)

\*\*\*      Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations)

\*\*\*\*      *Previous* Current Principal Amount is also the Financing Level

\#      This is also the Call Settlement Amount

^      For month twelve, this is also the Cash Settlement Amount

Table of Contents

**Hypothetical Examples**

**Example 2: The Index Closing Level decreases at a constant rate of 3.00% per month for twelve months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#/^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| | | ((Index Closing Level - Monthly Initial Closing Level)/Monthly Initial Closing Level) | (1 + (2 x C )) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2425.00 | -0.0300 | 0.940 | 0.0188 | $ 23.50 | $ 0.0116 | $ 0.0303 | $         23.47 | $      23.4384 |
| 2 | 2352.25 | -0.0300 | 0.940 | 0.0176 | $ 22.06 | $ 0.0109 | $ 0.0285 | $         22.03 | $      22.0037 |
| 3 | 2281.68 | -0.0300 | 0.940 | 0.0165 | $ 20.71 | $ 0.0102 | $ 0.0267 | $         20.68 | $      20.6567 |
| 4 | 2213.23 | -0.0300 | 0.940 | 0.0155 | $ 19.44 | $ 0.0096 | $ 0.0251 | $         19.42 | $      19.3923 |
| 5 | 2146.84 | -0.0300 | 0.940 | 0.0146 | $ 18.25 | $ 0.0090 | $ 0.0236 | $         18.23 | $      18.2052 |
| 6 | 2082.43 | -0.0300 | 0.940 | 0.0137 | $ 17.14 | $ 0.0085 | $ 0.0221 | $         17.11 | $      17.0908 |
| 7 | 2019.96 | -0.0300 | 0.940 | 0.0128 | $ 16.09 | $ 0.0079 | $ 0.0208 | $         16.07 | $      16.0446 |
| 8 | 1959.36 | -0.0300 | 0.940 | 0.0120 | $ 15.10 | $ 0.0074 | $ 0.0195 | $         15.08 | $      15.0625 |
| 9 | 1900.58 | -0.0300 | 0.940 | 0.0113 | $ 14.18 | $ 0.0070 | $ 0.0183 | $         14.16 | $      14.1404 |
| 10 | 1843.56 | -0.0300 | 0.940 | 0.0106 | $ 13.31 | $ 0.0066 | $ 0.0172 | $         13.29 | $      13.2748 |
| 11 | 1788.25 | -0.0300 | 0.940 | 0.0100 | $ 12.49 | $ 0.0062 | $ 0.0161 | $         12.48 | $      12.4622 |
| 12 | 1734.61 | -0.0300 | 0.940 | 0.0094 | $ 11.73 | $ 0.0058 | $ 0.0151 | $         11.71 | $      11.6994 |

**Cumulative Index Return:**                                    **-30.62%**
**Return on Securities (assumes no early redemption):**          **-53.14%**

---

| | |
|---|---|
| * | The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount |
| ** | Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations) |
| *** | Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations) |
| **** | *Previous* Current Principal Amount is also the Financing Level |
| # | This is also the Call Settlement Amount |
| ^ | For month twelve, this is also the Cash Settlement Amount |

S-14

Table of Contents

Hypothetical Examples

**Example 3: The Index Closing Level increases by 3.00% per month for the first six months and then decreases by 3.00% per month for the next six months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#/^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| | | ((Index Closing Level - Monthly Initial Closing Level)/Monthly Initial Closing Level) | (1 + (2 x C )) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2575.00 | 0.0300 | 1.060 | 0.0188 | $ 26.50 | $ 0.0131 | $ 0.0318 | $      26.47 | $  26.4369 |
| 2 | 2652.25 | 0.0300 | 1.060 | 0.0199 | $ 28.06 | $ 0.0138 | $ 0.0337 | $      28.02 | $  27.9895 |
| 3 | 2731.82 | 0.0300 | 1.060 | 0.0210 | $ 29.70 | $ 0.0146 | $ 0.0357 | $      29.67 | $  29.6332 |
| 4 | 2813.77 | 0.0300 | 1.060 | 0.0223 | $ 31.45 | $ 0.0155 | $ 0.0378 | $      31.41 | $  31.3735 |
| 5 | 2898.19 | 0.0300 | 1.060 | 0.0236 | $ 33.30 | $ 0.0164 | $ 0.0400 | $      33.26 | $  33.2160 |
| 6 | 2985.13 | 0.0300 | 1.060 | 0.0249 | $ 35.25 | $ 0.0174 | $ 0.0423 | $      35.21 | $  35.1667 |
| 7 | 2895.58 | -0.0300 | 0.940 | 0.0264 | $ 33.10 | $ 0.0163 | $ 0.0427 | $      33.05 | $  33.0090 |
| 8 | 2808.71 | -0.0300 | 0.940 | 0.0248 | $ 31.07 | $ 0.0153 | $ 0.0401 | $      31.03 | $  30.9884 |
| 9 | 2724.45 | -0.0300 | 0.940 | 0.0233 | $ 29.17 | $ 0.0144 | $ 0.0377 | $      29.13 | $  29.0915 |
| 10 | 2642.71 | -0.0300 | 0.940 | 0.0218 | $ 27.38 | $ 0.0135 | $ 0.0354 | $      27.35 | $  27.3107 |
| 11 | 2563.43 | -0.0300 | 0.940 | 0.0205 | $ 25.71 | $ 0.0127 | $ 0.0332 | $      25.67 | $  25.6389 |
| 12 | 2486.53 | -0.0300 | 0.940 | 0.0193 | $ 24.13 | $ 0.0119 | $ 0.0312 | $      24.10 | $  24.0695 |

**Cumulative Index Return:**                          -0.54%
**Return on Securities (assumes no early redemption):**    -3.59%

---

\*      The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount

\*\*     Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations)

\*\*\*    Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations)

\*\*\*\*   *Previous* Current Principal Amount is also the Financing Level

\#      This is also the Call Settlement Amount

\^      For month twelve, this is also the Cash Settlement Amount

S-15

Table of Contents

Hypothetical Examples

**Example 4: The Index Closing Level decreases by 3.00% per month for the first six months, and then increases by 3.00% per month for the next six months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
|   |   | ((Index Closing Level - Monthly Initial Closing Level )/Monthly Initial Closing Level) | (1 + (2 x C)) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2425.00 | -0.0300 | 0.940 | 0.0188 | $ 23.50 | $ 0.0116 | $ 0.0303 | $ 23.47 | $ 23.4384 |
| 2 | 2352.25 | -0.0300 | 0.940 | 0.0176 | $ 22.06 | $ 0.0109 | $ 0.0285 | $ 22.03 | $ 22.0037 |
| 3 | 2281.68 | -0.0300 | 0.940 | 0.0165 | $ 20.71 | $ 0.0102 | $ 0.0267 | $ 20.68 | $ 20.6567 |
| 4 | 2213.23 | -0.0300 | 0.940 | 0.0155 | $ 19.44 | $ 0.0096 | $ 0.0251 | $ 19.42 | $ 19.3923 |
| 5 | 2146.84 | -0.0300 | 0.940 | 0.0146 | $ 18.25 | $ 0.0090 | $ 0.0236 | $ 18.23 | $ 18.2052 |
| 6 | 2082.43 | -0.0300 | 0.940 | 0.0137 | $ 17.14 | $ 0.0085 | $ 0.0221 | $ 17.11 | $ 17.0908 |
| 7 | 2144.90 | 0.0300 | 1.060 | 0.0128 | $ 18.14 | $ 0.0089 | $ 0.0218 | $ 18.12 | $ 18.0972 |
| 8 | 2209.25 | 0.0300 | 1.060 | 0.0136 | $ 19.21 | $ 0.0095 | $ 0.0231 | $ 19.18 | $ 19.1600 |
| 9 | 2275.53 | 0.0300 | 1.060 | 0.0144 | $ 20.33 | $ 0.0100 | $ 0.0244 | $ 20.31 | $ 20.2852 |
| 10 | 2343.79 | 0.0300 | 1.060 | 0.0152 | $ 21.53 | $ 0.0106 | $ 0.0258 | $ 21.50 | $ 21.4765 |
| 11 | 2414.11 | 0.0300 | 1.060 | 0.0161 | $ 22.79 | $ 0.0112 | $ 0.0274 | $ 22.76 | $ 22.7378 |
| 12 | 2486.53 | 0.0300 | 1.060 | 0.0171 | $ 24.13 | $ 0.0119 | $ 0.0290 | $ 24.10 | $ 24.0731 |

**Cumulative Index Return:**                                          -0.54%
**Return on Securities (assumes no early redemption):**               -3.59%

| | |
|---|---|
| * | The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount |
| ** | Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations) |
| *** | Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations) |
| **** | *Previous* Current Principal Amount is also the Financing Level |
| # | This is also the Call Settlement Amount |
| ^ | For month twelve, this is also the Cash Settlement Amount |

S-16

<u>Table of Contents</u>

**Hypothetical Examples**

*We cannot predict the actual Index Closing Level on any Trading Day or the market value of your Securities, nor can we predict the relationship between the Index Closing Level and the market value of your Securities at any time prior to the Maturity Date. The actual amount that a holder of the Securities will receive at maturity or call, upon acceleration or upon early redemption, as the case may be, and the rate of return on the Securities, will depend on the monthly compounded leveraged return of the relevant Index, and if positive, whether it will be sufficient to offset the negative effect of the Accrued Fees over the relevant period and, if applicable, the Redemption Fee. Moreover, the assumptions on which the hypothetical returns are based are purely for illustrative purposes. Consequently, the amount, in cash, to be paid in respect of your Securities, if any, on the Maturity Date, Call Settlement Date, Acceleration Settlement Date or the relevant Redemption Date, as applicable, may be very different from the information reflected in the tables above.*

**The hypothetical examples above are provided for purposes of information only. The hypothetical examples are not indicative of the future performance of the relevant Index on any Trading Day, the Index Valuation Level, or what the value of your Securities may be. Fluctuations in the hypothetical examples may be greater or less than fluctuations experienced by the holders of the Securities. The performance data shown above is for illustrative purposes only and does not represent the actual or expected future performance of the Securities.**

**Table of Contents**

# Risk Factors

Your investment in the Securities will involve significant risks. The Securities are not secured debt and are significantly riskier than ordinary unsecured debt securities. Unlike ordinary debt securities, the return on the Securities is linked to the performance of the relevant Index. The Securities are two times leveraged with respect to the relevant Index and, as a result, may benefit from two times any positive, but will be exposed to two times any negative, monthly performance of the relevant Index. As described in more detail below, the trading price of the Securities may vary considerably before the Maturity Date, due to events that are difficult to predict and beyond our control. Investing in the Securities is not equivalent to investing directly in the Index Constituent Securities or the Index itself. This section describes the most significant risks relating to an investment in the Securities. *We urge you to read the following information about these risks as well as the risks described under "Risk Factors" in the applicable pricing supplement and "Considerations Relating to Indexed Securities" in the accompanying prospectus, together with the other information in this product supplement and the accompanying prospectus, before investing in the Securities.*

**Even if the Index Valuation Level at maturity or call, or upon early redemption or acceleration, has increased relative to the Index Closing Level at the time you purchased the Securities, or the applicable Index Valuation Level is greater than the Index Closing Level on the Initial Trade Date, you may receive less than your initial investment in the Securities.**

Because the return on your Securities at maturity or call, or upon acceleration or upon early redemption, is dependent upon the month over month performance of the Index prior to the Maturity Date, Call Settlement Date, Acceleration Settlement Date or Redemption Date, and is also subject to Accrued Fees, even if the Index Valuation Level at maturity or call, or upon acceleration or upon early redemption, has increased relative to the Index Closing Level at the time you purchased the Securities, or the applicable Index Valuation Level is greater than the Index Closing level on the Initial Trade Date, there is no guarantee that you will receive a positive return on, or a full return of, your initial investment. The Accrued Fees will also reduce the Current Principal Amount. In addition, if you redeem your Securities prior to maturity, you will be charged a Redemption Fee equal to 0.125% of the product of the Current Principal Amount and the Index Factor as of the applicable Redemption Valuation Date. Further, the increase of the applicable Index Valuation Level relative to the Index Closing Level at the time you purchased the Securities may not be enough to offset prior months of adverse monthly performance, which could have reduced the Current Principal Amount below its value at the time you purchased the Securities. Similarly, any beneficial movement of the Index Closing Level during a month will not be reflected in the Current Principal Amount unless that beneficial movement is sustained at the end of the month.

**The Securities are not suitable for all investors. In particular, the Securities should be purchased only by investors who understand leverage risk and the consequences of seeking monthly compounded leveraged investment results, and who intend to actively monitor and manage their investments.**

The Securities are not suitable for all investors. In particular, the Securities entail leverage risk and should be purchased only by investors who understand leverage risk, including the risks inherent in maintaining a constant two times leverage on a monthly basis, and the consequences of seeking monthly compounded leveraged investment results generally. Investing in the Securities is not equivalent to a direct investment in the Index because the Current Principal Amount is reset each month, resulting in the compounding of monthly returns.

S-18

Table of Contents

**Risk Factors**

The Securities are designed to achieve their stated investment objective on a monthly basis, but their performance can differ significantly from their stated monthly objective because the relationship between the level of the Index and the Current Principal Amount of the Securities will begin to break down as the length of an investor's holding period increases. The Securities are not long term substitutes for long positions in the Index Constituent Securities.

Investors should carefully consider whether the Securities are appropriate for their investment portfolio. As discussed above, because the Securities are meant to provide leveraged exposure to changes in the monthly Index Closing Level, their performance over days, months or years can differ significantly from the performance of the Index during the same period of time. **Therefore, it is possible that you will suffer significant losses even if the long-term performance of the Index is positive. It is possible for the level of the Index to increase over time while the market value of the Securities declines over time. You should proceed with caution in considering an investment in the Securities.**

The Securities seek to provide a leveraged return based on the performance of the Index (as adjusted for the Accrued Fees). The Securities do not attempt to, and should not be expected to, provide returns that reflect leverage on the return of the Index for periods longer than a single month. The Securities rebalance their theoretical exposure on a monthly basis, increasing exposure in response to that month's gains or reducing exposure in response to that month's losses.

Monthly rebalancing will impair the performance of the Securities if the Index experiences volatility from month to month and such performance will be dependent on the path of monthly returns during the holder's holding period. At higher ranges of volatility, there is a significant chance of a complete loss of the value of the Securities even if the performance of the Index is flat.

The amount you receive at maturity or call, or upon acceleration or upon early redemption, will be contingent upon the monthly compounded leveraged performance of the Index during the term of the Securities. There is no guarantee that you will receive at maturity, call, or upon acceleration or upon early redemption, your initial investment back or any return on that investment. Significant adverse monthly performances for your Securities may not be offset by any beneficial monthly performances of the same magnitude.

**Due to the effect of compounding, if the Current Principal Amount increases, any subsequent adverse monthly performance will result in a larger dollar reduction from the Current Principal Amount than if the Current Principal Amount remained constant.**

If the Current Principal Amount increases, the dollar amount which you can lose in any single month from an adverse monthly performance will increase correspondingly so that the dollar amount lost will be greater than if the Current Principal Amount were maintained at a constant level. The compounding effect is magnified because the Accrued Fees are calculated and subtracted from the Current Principal Amount on a monthly basis, causing the net negative effect of the Accrued Fees to accumulate over time. This means that if you invest in the Securities, you could lose more than 2% of your initial investment for each 1% of adverse monthly performance of the Index.

**Due to the effect of compounding, if the Current Principal Amount decreases, any subsequent beneficial monthly performance will result in a smaller dollar increase on the Current Principal Amount than if the Current Principal Amount remained constant.**

If the Current Principal Amount decreases, the dollar amount which you can gain in any single month from a beneficial monthly performance will decrease correspondingly. This is because the Index Factor will be applied to a smaller Current Principal Amount. As such, the dollar amount which you can gain

S-19

Table of Contents

Risk Factors

from any beneficial monthly performance will be less than if the Current Principal Amount were maintained at a constant level. This means that if the Current Principal Amount decreases, it will take larger beneficial monthly performances to restore the value of your investment back to the amount of your initial investment than would have been the case if the Current Principal Amount were maintained at a constant level. The compounding effect is magnified because the Accrued Fees are calculated and subtracted from the Current Principal Amount on a monthly basis, causing the net negative effect of the Accrued Fees to accumulate over time. Further, if you invest in the Securities, you could gain less than 2% of your initial investment for each 1% of beneficial monthly performance.

**Investors in the Securities are unlikely to be exposed to exactly two times the performance of the Index (before accounting for the Accrued Fees) during the period of time that they hold the Securities.**

After the Current Principal Amount is reset on each Monthly Reset Date, the leverage to which investors will be exposed is unlikely to be exactly two times the performance of the Index. As the level of the Index increases or decreases after the Current Principal Amount is reset, the leverage exposure will vary. If an investor purchases the Securities at a point in time when the level of the Index has increased as compared to the Index Closing Level on the preceding Monthly Valuation Date, such investor will be exposed to *less* than two times the performance of the Index (before accounting for the Accrued Fees). If the level of the index decreases as compared to the Closing Index Level on the Monthly Valuation Date, such investor will be exposed to *more* than two times the performance of the Index (before accounting for the Accrued Fees). Such increased or decreased exposure will last until the next Monthly Reset Date when the Current Principal Amount of the Securities is reset again.

**The Accrued Financing Charge may be greater than financing costs that you would incur if you borrowed funds from a third party.**

The Accrued Financing Charge seeks to compensate UBS for providing investors with the potential to receive a leveraged participation in movements in the level of the Index, and is intended to approximate the financing costs that investors may have otherwise incurred had they sought to borrow funds at a similar rate from a third party to invest in the Securities. However, there is no guarantee that the Accrued Financing Charge will correspond to the lowest level of financing costs that may be available to you. If the Accrued Financing Charge is greater than the financing costs you may otherwise incur or accrue from borrowing available funds from a third party for the same time period, your return on the Securities may be less than your return on an investment in a different instrument linked to the performance of the Index where you used funds borrowed on more favorable terms from the third party to leverage your investment in such instrument.

**Changes in the LIBOR rate may affect the value of your Securities.**

Your payment at maturity or call, or upon acceleration or upon early redemption, will be reduced, in part, by the Accrued Financing Charge over the relevant period, which is linked, in part, to the three-month U.S. Dollar LIBOR rate increased by the Financing Spread. As a result, if the three-month U.S. Dollar LIBOR rate increases during the term of the Securities, the Accrued Financing Charge will increase at a faster rate, which will reduce the amount payable on your Securities at maturity or call, or upon acceleration or redemption, and may adversely affect the market value of your Securities.

In addition, concerns about the under-reporting and manipulation of interbank lending rates, which are used to calculate LIBOR, have existed since 2008. Final rules for the regulation and supervision of LIBOR by the Financial Conduct Authority (the "FCA") were published and came into effect on April 2, 2013 (the "FCA Rules"). In particular, the FCA Rules include requirements that (1) an independent LIBOR administrator monitor and survey LIBOR submissions to identify breaches of practice standards and/or potentially manipulative behavior, and (2) firms submitting data to LIBOR establish and maintain

S-20

<u>Table of Contents</u>

Risk Factors

a clear conflicts of interest policy and appropriate systems and controls. In addition, ICE Benchmark Rate Administration Ltd. (the "ICE Administration") has been appointed as the independent LIBOR administrator, effective February 1, 2014.

It is not possible to predict the effect of the FCA Rules, any changes in the methods pursuant to which the LIBOR rates are determined and any other reforms to LIBOR that will be enacted in the U.K. and elsewhere, which may adversely affect the trading market for LIBOR-based securities. Any such changes or reforms to LIBOR may result in a sudden or prolonged increase or decrease in reported LIBOR rates, which could have an adverse impact on the value of your Securities. In addition, any changes announced by the FCA, the ICE Administration or any other successor governance or oversight body, or future changes adopted by such body, in the method pursuant to which the LIBOR rates are determined may result in a sudden or prolonged increase or decrease in the reported LIBOR rates. If that were to occur, the Accrued Financing Charges and the value of your Securities may be affected.

**Credit of UBS.**

The Securities are senior unsecured debt obligations of the issuer, UBS, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. Any payment to be made on the Securities, including any payment at maturity or call, or upon acceleration or upon early redemption, depends on the ability of UBS to satisfy its obligations as they come due. As a result, the actual and perceived creditworthiness of UBS will affect the market value, if any, of the Securities prior to maturity or call, or upon acceleration or upon early redemption. In addition, in the event UBS were to default on its obligations, you may not receive any amounts owed to you under the terms of the Securities.

**You will not receive interest payments or coupon payments on the Securities.**

You will not receive any periodic interest payments, coupon payments or other distributions on the Securities. No payments will be made on your notes prior to the Stated Maturity Date, Call Settlement Date, Redemption Date or Acceleration Settlement Date, as applicable. Further, as described above, there is no guarantee that you will receive at maturity, call, or upon acceleration or upon early redemption, your initial investment back or any return on that investment.

**The Index Valuation Level as of the last Trading Day of the applicable Measurement Period may be less than the Index Closing Level on the Maturity Date, Call Settlement Date or Acceleration Settlement Date, or at other times during the term of the Securities.**

The Index Closing Level on the Maturity Date, Call Settlement Date or Acceleration Settlement Date, or at other times during the term of the Securities, including dates near the applicable Measurement Period could be higher than the Index Valuation Level as of the last Trading Day of such Measurement Period because such Index Valuation Level is calculated based on the Index Closing Levels measured on each Trading Day in such Measurement Period. This difference could be particularly large if there is a significant decrease in the Index Closing Levels during the applicable Measurement Period or if there is significant volatility in the Index Closing Levels during the term of the Securities.

**The Securities may be automatically accelerated and mandatorily redeemed, resulting in a loss of some or all of your investment.**

In the event the indicative value for any series of the Securities on any Trading Day equals $5.00 or less or decreases 60% in value from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date, all issued and outstanding Securities of that series will be automatically accelerated and mandatorily redeemed by UBS and holders of that series of Securities will receive the Acceleration Amount as determined by the Calculation Agent as described herein. The Acceleration Amount you receive on the Acceleration Settlement Date may be significantly less than $5.00 per Security

Table of Contents

Risk Factors

and may be zero if the level of the Index continues to decrease during one or more Trading Days during the applicable Measurement Period. As a result, depending on the level of the Index on such Trading Day, you may lose some or all of your investment. The Securities of any series will be automatically accelerated and redeemed even if the indicative value on that Trading Day or any subsequent Trading Day would exceed $5.00 or increases from the -60% level, as compared to the previous Monthly Valuation Date. High volatility and/or unexpected market conditions could result in significant movements in the level of the relevant Index, which, in turn, may trigger the automatic acceleration and mandatory redemption of the Securities.

**There are restrictions on the minimum number of Securities you may redeem and on the procedures and timing for early redemption.**

You must redeem at least 50,000 Securities of the same series of Securities at one time in order to receive payment for your Securities on any Redemption Date. You may only receive payment for your Securities on a Redemption Date if we receive a notice of redemption from your broker by no later than 12:00 noon (New York City time) and a confirmation of redemption by no later than 5:00 p.m. (New York City time) on the Trading Day prior to the applicable Redemption Valuation Date. If we do not receive your notice of redemption by 12:00 noon (New York City time), or the confirmation of redemption by 5:00 p.m. (New York City time) on the Trading Day prior to the applicable Redemption Valuation Date, your notice will not be effective and you will not receive payment for your Securities on the applicable Redemption Date. Your notice of redemption will not be effective until we confirm receipt. In addition, we may request a medallion signature guarantee or such assurances of delivery as we may deem necessary in our sole discretion. See "General Terms of the Securities — Early Redemption at the Option of the Holders" on page S-35 for more information.

**You will not know the Redemption Amount at the time you elect to request that we redeem your Securities.**

You will not know the Redemption Amount you will receive at the time you elect to request that we redeem your Securities. Your notice to us to redeem your Securities is irrevocable and must be received by us no later than 12:00 noon, New York City time, on the Trading Day immediately preceding the applicable Redemption Valuation Date and a completed and signed confirmation of such redemption must be received by us no later than 5:00 p.m., New York City time, on the same date. The Redemption Valuation Date is the first Trading Day following the date on which such notice and confirmation are received by us. You will not know the Redemption Amount until after the Redemption Valuation Date, and we will pay you the Redemption Amount, if any, on the Redemption Date, which is the third Business Day following the Redemption Valuation Date. As a result, you will be exposed to market risk in the event the market fluctuates after we confirm the validity of your notice of election to exercise your rights to have us redeem your Securities, and prior to the relevant Redemption Date.

**Owning the Securities is not the same as owning interests in the Index Constituents or a security directly linked to the performance of the Index.**

The return on your Securities will not reflect the return you would have realized if you had actually owned interests in the Index Constituents or a security directly linked to the leveraged performance of the Index, and held such investment for a similar period. Any return on your Securities is subject to correlation and compounding risk (because the Current Principal Amount resets monthly) and also includes the negative effect of the Accrued Fees and any Redemption Fee. Furthermore, if the Index Closing Level increases during the term of the Securities, the market value of the Securities may not increase by twice the same amount or may even decline due to the amount of the Accrued Fees, any lack of liquidity, the actual or perceived credit of UBS and other potential factors and the effect of leveraged monthly compounding. Neither you nor any other holder or owner of the Securities will have any voting

S-22

Table of Contents

Risk Factors

rights, any right to receive distributions or any other rights with respect to the Index Constituent Securities. The Cash Settlement Amount, Call Settlement Amount, Acceleration Amount or Redemption Amount, if any, will be paid in U.S. dollars, and you will have no right to receive delivery of any interests in the Index Constituents.

**If UBS were to be subject to restructuring proceedings, the market value of the Securities may be adversely affected.**

Under certain circumstances, the Swiss Financial Market Supervisory Authority (FINMA) has the power to open restructuring or liquidation proceedings in respect of, and/or impose protective measures in relation to, UBS, which proceedings or measures may have a material adverse effect on the terms and market value of the Securities and/or the ability of UBS to make payments thereunder. Pursuant to article 25 et seq. of the Swiss Banking Act, FINMA has broad statutory powers to take measures and actions in relation to UBS if it (i) is overindebted, (ii) has serious liquidity problems or (iii) fails to fulfill the applicable capital adequacy provisions after expiration of a deadline set by FINMA. If one of these prerequisites is met, FINMA is authorized to open restructuring proceedings (*Sanierungsverfahren*) or liquidation (bankruptcy) proceedings (*Bankenkonkurs*) in respect of, and/or impose protective measures (*Schutzmassnahmen*) in relation to, UBS. The Swiss Banking Act, as last amended as of January 1, 2013, grants *significant* discretion to FINMA in connection with the aforementioned proceedings and measures. In particular, a broad variety of protective measures may be imposed by FINMA, including a bank moratorium (*Stundung*) or a maturity postponement (*Fälligkeitsaufschub*), which measures may be ordered by FINMA either on a stand-alone basis or in connection with restructuring or liquidation proceedings. In a restructuring proceeding, the resolution plan may, among other things, (a) provide for the transfer of UBS's assets or a portion thereof, together with debts and other liabilities, and contracts of UBS, to another entity, (b) provide for the conversion of UBS's debt and/or other obligations, including its obligations under the notes, into equity, and/or (c) potentially provide for haircuts on obligations of UBS, including its obligations under the Securities. As of the date of this product supplement, there are no precedents as to what impact the revised regime would have on the rights of holders of the Securities or the ability of UBS to make payments thereunder if one or several of the measures under the revised insolvency regime were imposed in connection with a resolution of UBS.

**The market value of the Securities may be influenced by many unpredictable factors.**

The market value of your Securities may fluctuate between the date you purchase them and the last Trading Day in the applicable Measurement Period, when the Calculation Agent will determine your payment at maturity (if they are not subject to a call, early redemption or acceleration). Therefore, you may sustain a significant loss if you sell the Securities in the secondary market. Several factors, many of which are beyond our control, will influence the market value of the Securities. We expect that, generally, the level of the relevant Index will affect the market value of the Securities more than any other factor. Other factors that may influence the market value of the Securities include:

> the volatility of the relevant Index (*i.e.*, the frequency and magnitude of changes in the level of the Index);

> the market prices of the Index Constituent Securities;

> the dividend or distribution rate paid by the Index Constituents;

> the time remaining to the maturity of the Securities;

> supply and demand for the Securities, including to the extent affected by inventory positions with UBS or any market maker;

> the amount of the Accrued Fees;

S-23

Table of Contents

Risk Factors

- ➢ economic, financial, political, regulatory, geographical, judicial or other events that affect the level of the Index or the market prices of the Index Constituent Securities, or that affect markets generally; and
- ➢ the actual and perceived creditworthiness of UBS.

These factors interrelate in complex ways, and the effect of one factor on the market value of your Securities may offset or enhance the effect of another factor in an unpredictable manner, which could negatively affect the market value of the Securities.

**The Securities may trade at a substantial premium to or discount from the intraday indicative value.**

The market value of the Securities is influenced by many unpredictable factors, some of which may cause the price at which the Securities can be sold in the secondary market to vary substantially from the intraday indicative value that is calculated and disseminated throughout trading hours. For example, if UBS were to suspend sales of the Securities for any reason, the liquidity of the market for the Securities could be affected, potentially leading to insufficient supply, causing the market price of the Securities to increase. Such an increase could represent a premium over the intraday indicative value. Conversely, unpredictable factors could cause the Securities to trade at a discount from the intraday indicative value, which may result in a loss of your investment if you sell your Securities in the secondary market.

**The Index Calculation Agent may, in its sole discretion, discontinue the public disclosure of the intraday indicative value of the relevant Index and the end-of-day official closing value of the relevant Index.**

We intend to list each series of the Securities on NYSE Arca. The Index Calculation Agent specified in the applicable pricing supplement will not be under any obligation to continue to calculate the intraday indicative value of the relevant Index and end-of-day official closing value of that Index or required to calculate similar values for any successor index. If the Index Calculation Agent discontinues such public disclosure, we may not be able to provide the intraday indicative values related to the relevant Index required to maintain any listing of that series of the Securities on NYSE Arca. If that series of the Securities later becomes delisted, the liquidity of the market for that series of the Securities may be materially and adversely affected and you may sustain significant losses if you sell your Securities of that series in the secondary market. We are not required to maintain any listing of any series of the Securities on NYSE Arca or any other exchange.

The Index Sponsor of the relevant Index may adjust that Index in a way that affects the Index Closing Level. The Index Sponsor has no obligation to consider your interests as a holder of the Securities.

The Index Calculation Agent specified in the applicable pricing supplement will be responsible for calculating and publishing the Index in consultation with the Index Sponsor. The Index Sponsor can add, delete or substitute the securities underlying the relevant Index or make other methodological changes that could change the Index Closing Level. You should realize that the changing of securities included in the relevant Index may affect that Index, as a newly added security may perform significantly better or worse than the security or securities it replaces. Additionally, the Index Sponsor or the Index Calculation Agent, as applicable, may alter, discontinue or suspend calculation or dissemination of the relevant Index. Any of these actions could adversely affect the value of a series of the Securities. Neither the Index Sponsor nor the Index Calculation Agent will have any obligation to consider your interests as a holder of the Securities in calculating or revising the Index.

S-24

Table of Contents

Risk Factors

**Changes in our credit ratings may affect the market value of the Securities.**

Our credit ratings are an assessment of our ability to pay our obligations, including those on the Securities. Consequently, actual or anticipated changes in our credit ratings may affect the market value of the Securities. However, because the return on the Securities is dependent upon certain factors in addition to our ability to pay our obligations on the Securities, an improvement in our credit ratings will not reduce the other investment risks related to the Securities. Therefore, an improvement in our credit ratings may or may not have a positive effect on the market value of the Securities, and in addition, a deterioration in our credit ratings may have a negative effect on the market value of the Securities.

**The liquidity of the market for the Securities may vary materially over time, and may be limited if you do not hold at least 50,000 Securities of the same series.**

We intend to sell a portion of the Securities of each series on the applicable Initial Trade Date, and the remainder of the Securities of that series may be offered and sold from time to time, through UBS Securities LLC, our affiliate, as agent, to investors and dealers acting as principals. Also, the number of any series of Securities outstanding or held by persons other than our affiliates could be reduced at any time due to early redemptions of the Securities of that series. We may suspend or cease sales of any series of the Securities at any time, at our discretion. Accordingly, the liquidity of the market for any series of the Securities could vary materially over the term of the Securities. While you may elect to redeem your Securities prior to maturity, early redemption is subject to the conditions and procedures described elsewhere in this product supplement, including the condition that you must redeem at least 50,000 Securities of the same series at one time in order to receive payment for your Securities on any Redemption Date. Furthermore, on a Call Settlement Date specified in the applicable pricing supplement, through and including the Maturity Date, we may redeem all, but not less than all, issued and outstanding Securities of any series.

**Changes that affect the composition and calculation of the relevant Index will affect the market value of the Securities and the Cash Settlement Amount, Call Settlement Amount, Acceleration Amount or Redemption Amount.**

The amount payable on the Securities of any series and their market value could be affected if the applicable Index Sponsor, in its sole discretion, discontinues or suspends calculation of the relevant Index, or if the Index is otherwise unavailable, in which case it may become difficult to determine the market value of the Securities of that series. If events such as these occur, or if the Index Valuation Level is not available because of a market disruption event or for any other reason, the Calculation Agent will make a good faith estimate in its sole discretion of the Index Valuation Level that would have prevailed in the absence of the market disruption event. If the Calculation Agent determines that the publication of the relevant Index is discontinued, or is otherwise unavailable, and that there is no successor index on the date when the Index Valuation Level is required to be determined, the Calculation Agent will determine the Index Valuation Level using the closing levels and published share weightings of each Index Constituent Security included in the relevant Index or Successor Index, as applicable, immediately prior to such discontinuation or unavailability, as adjusted for certain corporate actions as described in the description of the relevant Index included in the applicable pricing supplement.

**Estimated historical and historical levels of the relevant Index should not be taken as an indication of future performance during the term of the Securities of any series.**

The actual performance of the relevant Index over the term of the Securities of any series, as well as the amount payable at maturity or call, or upon acceleration or upon early redemption, may bear little relation to the historical performance of that Index, which may be limited as of the date of the applicable pricing supplement, or the past estimated historical performance of that Index. The performance of the

Table of Contents

Risk Factors

relevant Index Constituent Securities will determine the Index Valuation Level on any given Redemption Date, the last Trading Day of the applicable Measurement Period, or the Index Closing Level at other times during the term of the Securities. As a result, it is impossible to predict whether the level of the relevant Index will rise or fall during the term of the Securities.

**There may not be an active trading market in the Securities of any series; sales in the secondary market may result in significant losses.**

We intend to list each series of the Securities on NYSE Arca. However, we are not required to maintain any listing of any series of the Securities on NYSE Arca or any other exchange. Certain affiliates of UBS may engage in limited purchase and resale transactions in the Securities of any series, although they are not required to do so and may stop at any time. As a result, if an active secondary market develops, we expect that investors will purchase and sell the Securities primarily in this secondary market. Even if an active secondary market for the Securities of any series develops, it may not provide significant liquidity or trade at prices advantageous to you. As a result, if you sell your Securities in the secondary market, you may have to do so at a discount from the issue price or the intraday indicative value of the Securities of that series and you may suffer significant losses of any series of Securities.

**Trading and other transactions by UBS or its affiliates in the Index Constituent Securities, futures, options, exchange-traded funds or other derivative products on such securities or the relevant Index may impair the market value of the Securities of that series, could trigger an acceleration upon minimum indicative value and, upon the occurrence of an acceleration upon minimum indicative value, could adversely affect the Acceleration Amount.**

As described below under "Use of Proceeds and Hedging" on page S-46, UBS or its affiliates may hedge their obligations under any series of the Securities by purchasing the relevant Index Constituent Securities, futures or options on those securities or the relevant Index, or exchange-traded funds or other derivative instruments with returns linked or related to changes in the performance of those securities or the relevant Index, and they may adjust these hedges by, among other things, purchasing or selling those Index Constituent Securities, futures, options, or exchange-traded funds or other derivative instruments with returns linked or related to changes in the performance of those securities or the relevant Index at any time. Although they are not expected to, any of these hedging activities may adversely affect the market price of such Index Constituent Securities and/or the level of the relevant Index and, therefore, the market value of the series of the Securities. It is possible that UBS or its affiliates could receive substantial returns from these hedging activities while the market value of the Securities of that series declines.

UBS or its affiliates may also engage in trading in the relevant Index Constituent Securities and other investments relating to those securities or the relevant Index on a regular basis as part of our general broker-dealer and other businesses, for proprietary accounts, for other accounts under management or to facilitate transactions for customers, including block transactions. Any of these activities could adversely affect the market price of those Index Constituent Securities and the level of the relevant Index and, therefore, the market value of the Securities of the affected series. UBS or its affiliates may also issue or underwrite the relevant Index Constituent Securities or other securities or financial or derivative instruments with returns linked or related to changes in the performance of the Index Constituent Securities or the relevant Index. By introducing competing products into the marketplace in this manner, UBS or its affiliates could adversely affect the market value of the Securities of any series.

Any of these activities could adversely affect the level of the relevant Index and, therefore, the indicative value of the Securities of any series, which could trigger an acceleration upon minimum indicative value of that series of Securities. In addition, we would expect to continue to engage in these activities during

S-26

Table of Contents

Risk Factors

the Acceleration Measurement Period; accordingly, these activities could have an adverse effect on the Acceleration Amount for that series of Securities. Furthermore, any of these activities, if occurring during the applicable Measurement Period or on any Redemption Valuation Date, could adversely affect the payment at maturity, call or redemption of any series of the Securities.

**We and our affiliates may publish research, express opinions or provide recommendations that are inconsistent with investing in or holding the Securities of any series. Any such research, opinions or recommendations could affect the level of the Index Constituent Securities, the relevant Index or the market value of the Securities of that series.**

UBS and its affiliates publish research from time to time on stocks or commodities and other matters that may influence the value of any series of the Securities, or express opinions or provide recommendations that are inconsistent with purchasing or holding the Securities of that series. Any research, opinions or recommendations expressed by UBS or its affiliates may not be consistent with each other and may be modified from time to time without notice. Investors should make their own independent investigation of the merits of investing in the Securities and the Index to which that series of the Securities is linked.

**The business activities of UBS or its affiliates may create conflicts of interest.**

As noted above, UBS and its affiliates expect to engage in trading activities related to the relevant Index and the Index Constituent Securities that are not for the account of holders of any series of the Securities or on their behalf. These trading activities may present a conflict between the holders' interest in the Securities and the interests UBS and its affiliates will have in their proprietary accounts, in facilitating transactions, including options and other derivatives transactions, for their customers and in accounts under their management. These trading activities, if they influence the level of the relevant Index, could have an adverse impact on the market value of that series of the Securities.

**There are potential conflicts of interest between you and the Calculation Agent.**

Our affiliate, UBS Securities LLC, will serve as the Calculation Agent. UBS Securities LLC will, among other things, decide the amount of the return paid out to you on the Securities at maturity or call, or upon acceleration or upon early redemption. For a fuller description of the Calculation Agent's role, see "General Terms of the Securities — Calculation Agent" on page S-40. The Calculation Agent will exercise its judgment when performing its functions. For example, the Calculation Agent may have to determine whether a market disruption event affecting the Index Constituent Securities or the relevant Index has occurred or is continuing on a day during the applicable Measurement Period or on the Redemption Valuation Date. This determination may, in turn, depend on the Calculation Agent's judgment whether the event has materially interfered with our ability to unwind our hedge positions. Since these determinations by the Calculation Agent may affect the market value of any series of the Securities, the Calculation Agent may have a conflict of interest if it needs to make any such decision.

**The Calculation Agent can postpone the determination of the Index Valuation Level and thus the applicable Redemption Date, the Call Settlement Date, the Acceleration Settlement Date or the Maturity Date if a market disruption event occurs on the Redemption Valuation Date or during the applicable Measurement Period.**

The determination of the Index Valuation Level may be postponed if the Calculation Agent determines that a market disruption event has occurred or is continuing during the applicable Measurement Period or on the Redemption Valuation Date. If such a postponement occurs, then the Calculation Agent will instead use the Index Closing Level on the first Trading Day after that day on which no market disruption event occurs or is continuing. In no event, however, will the last Trading Day of the applicable

S-27

Table of Contents

**Risk Factors**

Measurement Period or the Redemption Valuation Date, for any series of the Securities be postponed by more than three Trading Days. As a result, the applicable Redemption Date, the Call Settlement Date or the Maturity Date for the Securities could also be postponed, although not by more than three Trading Days. If the last Trading Day of the applicable Measurement Period or the Redemption Valuation Date, is postponed to the last possible day, but a market disruption event occurs or is continuing on such last possible day, that day will nevertheless be the final Trading Day in the applicable Measurement Period or will be the Redemption Valuation Date, as applicable. If a market disruption event is occurring on the last possible day in the applicable Measurement Period or on the Redemption Valuation Date, then the Calculation Agent will make a good faith estimate in its sole discretion of the Index Closing Level that would have prevailed in the absence of the market disruption event. See "General Terms of the Securities — Market Disruption Event" on page S-40.

**The Calculation Agent can postpone the determination of the Index Closing Level and thus the applicable Monthly Valuation Date if a market disruption event occurs on the Monthly Valuation Date.**

The determination of the Index Closing Level may be postponed if the Calculation Agent determines that a market disruption event has occurred or is continuing on any Monthly Valuation Date. If such a postponement occurs, then the Calculation Agent will instead use the Index Closing Level on the first Trading Day on which no Market Disruption Event with respect to the relevant Index occurs or is continuing and the Monthly Reset Date will be the next following Trading Day. In no event, however, will the Monthly Valuation Date for the Securities of any series be postponed by more than three Trading Days. As a result, the applicable Monthly Reset Date for the Securities of that series could also be postponed, although not by more than three Trading Days. If the Monthly Valuation Date is postponed to the last possible day, but a market disruption event occurs or is continuing on such last possible day, that day will nevertheless be the Monthly Valuation Date and the Monthly Reset Date will be the next following Trading Day. If a market disruption event is occurring on the Monthly Valuation Date, then the Calculation Agent will make a good faith estimate in its sole discretion of the Index Closing Level that would have prevailed in the absence of the market disruption event. See "General Terms of the Securities — Market Disruption Event" on page S-40.

**UBS may redeem any series of the Securities prior to the Maturity Date.**

On any Call Settlement Date specified in the applicable pricing supplement, UBS may redeem all, but not less than all, the outstanding Securities of the series offered by that pricing supplement upon not less than eighteen calendar days' prior notice.

If UBS elects to redeem your Securities pursuant to the UBS Call Right, you may not be able to reinvest at comparable terms or returns. If the Securities have increased in value, you may have to invest your proceeds in a lower-return investment.

**Significant aspects of the tax treatment of the Securities are uncertain.**

Significant aspects of the tax treatment of the Securities are uncertain. We do not plan to request a ruling from the IRS regarding the tax treatment of the Securities, and the IRS or a court may not agree with the tax treatment described in this product supplement. Please read carefully the section entitled "What are the tax consequences of owning the Securities?" in the summary section on page S-10, "Material U.S. Federal Income Tax Consequences" on page S-47, and the section "U.S. Tax Considerations" in the accompanying prospectus. You should consult your tax advisor about your own tax situation.

The IRS released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current

Table of Contents

**Risk Factors**

basis, whether additional gain or loss upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Code should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income over the term of an instrument such as the Securities. The outcome of this process is uncertain.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of the Securities despite the fact that there will be no interest payments over the term of the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. We intend to treat your Securities for United States federal income tax purposes in accordance with the treatment described above and under "Material U.S. Federal Income Tax Consequences" on page S-47 unless and until such time as there is a change in law or the Treasury Department or IRS determines that some other treatment is more appropriate.

Table of Contents

# Valuation of the Index and the Securities

**Intraday Index Values**

On each Trading Day, the Index Calculation Agent will calculate and publish the intraday indicative value of the relevant Index every 15 seconds during normal trading hours on Bloomberg L.P. ("Bloomberg") or any other publicly available information provider specified in the applicable pricing supplement under a ticker symbol to be identified in such pricing supplement. The actual relevant Index Closing Level may vary, and on a cumulative basis over the term of any series of the Securities may vary significantly, from the intraday indicative value of the Index.

The intraday indicative calculation of the level of the relevant Index will be provided for reference purposes only. Published calculations of the level of the relevant Index from the Index Calculation Agent may occasionally be subject to delay or postponement. Any such delays or postponements will affect the current level of the relevant Index and therefore the value of the affected series of Securities in the secondary market. The intraday indicative value of the relevant Index published every 15 seconds will be based on the intraday prices of the Index Constituent Securities.

**Intraday Security Values**

An intraday "indicative value" meant to approximate the expected trading value of each series of the Securities in a liquid market, will be calculated by the Index Calculation Agent specified in the applicable pricing supplement and published to Bloomberg (based in part on information provided by such Index Calculation Agent) or any other publicly available information provider specified in the applicable pricing supplement (or a successor) via the facilities on the Consolidated Tape Association under a symbol to be identified in such pricing supplement. In connection with your Securities, we use the term "indicative value" to refer to the value at a given time and date equal to (i) Current Principal Amount multiplied by the Index Factor calculated using the intraday indicative value of the relevant Index as of such time as the Index Valuation Level, minus (ii) the Accrued Fees as of such time and date, assuming such time and date is the Redemption Valuation Date.

The intraday indicative value calculation will be used to determine whether any series of the Securities will be accelerated, as discussed under "General Terms of the Securities — Acceleration Upon Minimum Indicative Value". It is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, or termination of your Securities, nor will it reflect hedging or other transactional costs, credit considerations, market liquidity or bid-offer spreads. The levels of the relevant Index provided by the Index Calculation Agent specified in the applicable pricing supplement will not necessarily reflect the depth and liquidity of the relevant Index Constituent Securities. For this reason and others, the actual trading price of the Securities of any series may be different from their indicative value.

The calculation of the intraday indicative value shall not constitute a recommendation or solicitation to conclude a transaction at the level stated, and should not be treated as giving investment advice.

The publishing of the intraday indicative value of any series of the Securities by Bloomberg or any other publicly available information provider specified in the applicable pricing supplement may occasionally be subject to delay or postponement. The actual trading price of any series of the Securities may be different from their intraday indicative value. The intraday indicative value of any series of the Securities published at least every 15 seconds during the NYSE Arca's Core Trading Session, which is currently from 9:30 a.m. to 4:00 p.m., New York City time, will be based on the intraday indicative values of the relevant Index, and may not be equal to the payment at maturity or call, or upon early redemption or acceleration.

S-30

Table of Contents

Valuation of the Index and the Securities

These intraday indicative value calculations will be prepared as of a particular time and date and will therefore not reflect subsequent changes in market values or prices or in any other factors relevant to their determination.

## Split or Reverse Split of the Securities

Should the Current Principal Amount of any series of Securities on any Trading Day be above $100.00, we may, but are not obligated to, initiate a 4-for-1 split of your Securities. Should the Current Principal Amount on any Trading Day be below $10.00, we may, but are not obligated to, initiate a 1-for-4 reverse split of your Securities. If the Current Principal Amount of a series of Securities is greater than $100.00 or below $10.00 on any Trading Day, and we decide to initiate a split or reverse split, as applicable, such date shall be deemed to be the "announcement date", and we will issue a notice to holders of the relevant Securities and press release announcing the split or reverse split, specifying the effective date of the split or reverse split.

If the Securities undergo a split, we will adjust the terms of the Securities accordingly. If the Securities undergo a 4:1 split, every investor who holds a Security via The Depository Trust Company ("DTC") on the relevant record date will, after the split, hold four Securities, and adjustments will be made as described below. The record date for the split will be the tenth Business Day after the announcement date. The Current Principal Amount on such record date will be divided by four to reflect the 4:1 split of your Securities. Any adjustment of the Current Principal Amount will be rounded to eight decimal places. The split will become effective at the opening of trading of the Securities on the Business Day immediately following the record date.

In the case of a reverse split, we reserve the right to address odd numbers of Securities (commonly referred to as "partials") in a manner determined by us in our sole discretion. If the Securities undergo a 1:4 reverse split, every investor who holds four Securities via DTC on the relevant record date will, after the reverse split, hold only one Security and adjustments will be made as described below. The record date for the reverse split will be on the tenth Business Day after the announcement date. The Current Principal Amount on such record date will be multiplied by four to reflect the 1:4 reverse split of your Securities. Any adjustment of the Current Principal Amount will be rounded to eight decimal places. The reverse split will become effective at the opening of trading of the Securities on the Business Day immediately following the record date.

Holders who own a number of Securities on the record date that is not evenly divisible by four will receive the same treatment as all other holders for the maximum number of Securities they hold which is evenly divisible by four, and we will have the right to compensate holders for their remaining or "partial" Securities in a manner determined by us in our sole discretion. Our current intention is to provide holders with a cash payment for their partials on the 17th Business Day following the announcement date in an amount equal to the appropriate percentage of the closing indicative value of the reverse split-adjusted Securities on the 14th Business Day following the announcement date. For example, a holder who held 23 Securities via DTC on the record date would receive five post-reverse split Securities on the immediately following Business Day, and a cash payment on the 17th Business Day following the announcement date that is equal to 3/4ths of the Current Principal Amount of the reverse split-adjusted Securities on the 14th Business Day following the announcement date.

S-31

**Table of Contents**

# General Terms of the Securities

In this section, references to "holders" mean those who own the Securities registered in their own names, on the books that we or the trustee maintain for this purpose, and not those who own beneficial interests in the Securities registered in street name or in the Securities issued in book-entry form through DTC or another depositary. Owners of beneficial interests in the Securities should read the section entitled "Legal Ownership and Book-Entry Issuance" in the accompanying prospectus.

Each series of Securities offered by this product supplement, the accompanying prospectus and the applicable pricing supplement are part of a series of debt securities entitled "Medium-Term Notes, Series A" that we may issue, from time to time, under the indenture more particularly described in the accompanying prospectus. This product supplement summarizes general financial and other terms that apply to the Securities. Terms that apply generally to all Medium-Term Notes, Series A are described in "Description of Debt Securities We May Offer" in the accompanying prospectus. The terms described here (*i.e.*, in this product supplement) supplement those described in the accompanying prospectus and, if the terms described here are inconsistent with those described there, the terms described here are controlling.

## Information in the Pricing Supplement

The applicable pricing supplement will describe the specific terms of your series of Securities, which will include some or all of the following:

- ➢ the relevant Index, the Index Sponsor and the Index Calculation Agent;
- ➢ the aggregate principal amount and the denomination and principal amount per Security;
- ➢ the price to public, and any related discounts or commissions paid to underwriters;
- ➢ the Initial Trade Date;
- ➢ the Initial Settlement Date;
- ➢ the Maturity Date;
- ➢ the Calculation Date;
- ➢ the first and final Redemption Dates;
- ➢ the first Call Settlement Date;
- ➢ the Monthly Initial Closing Level for the Initial Calendar Month;
- ➢ the Monthly Reset Dates;
- ➢ the Monthly Valuation Dates;
- ➢ the Annual Tracking Rate;
- ➢ the Financing Spread;
- ➢ the number of Trading Days in the applicable Measurement Period, if other than five;
- ➢ the listing symbol;
- ➢ the Index ticker symbol, the intraday Indicative Value ticker symbol and the sources for the Index Closing Level, the intraday indicative value of the Index and the intraday Indicative Value for the Securities;

S-32

Table of Contents

**General Terms of the Securities**

- ➢ the definition of "Trading Day", if different from the definition in this product supplement;
- ➢ CUSIP and ISIN numbers; and
- ➢ any other terms of the Securities, which could be different from those described in this product supplement.

We describe the general terms of the Securities in more detail below.

## Interest or Coupons

We will not pay you any interest or coupons during the term of the Securities.

## Cash Settlement Amount at Maturity

The "Maturity Date" for each series of Securities will be the third Trading Day after the last Trading Day in the applicable Measurement Period, which we refer to in this section "— Cash Settlement Amount at Maturity" as the "Final Measurement Period". The scheduled Maturity Date will be identified in the applicable pricing supplement.

For each Security, unless earlier called, redeemed or accelerated, you will receive at maturity a cash payment equal to:

(a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the Final Measurement Period, minus

(b) the Accrued Fees as of such last Trading Day.

We refer to this cash payment as the "Cash Settlement Amount".

If the amount calculated above is less than zero, the payment at maturity will be zero.

You may lose some or all of your investment at maturity. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees in order for you to receive an aggregate amount over the term of the Securities of any series equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at maturity.

The Accrued Fees will be calculated as of the last Trading Day in the Final Measurement Period as the sum of (i) the Accrued Tracking Fee as of such last Trading Day and (ii) the Accrued Financing Charge as of such last Trading Day.

The "Financing Level" is, as of any date of determination, an amount that equals the Current Principal Amount.

On the Initial Trade Date, the Accrued Financing Charge for each Security will be $0.

The "Accrued Financing Charge" as of the last Trading Day in the Final Measurement Period is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including such last Trading Day *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

S-33

Table of Contents

**General Terms of the Securities**

The "Accrued Tracking Fee" as of the last Trading Day in the Final Measurement Period is an amount equal to the product of (i) the Annual Tracking Fee calculated as of such last Trading Day and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding the immediately preceding Monthly Valuation Date to and including such last Trading Day and the denominator of which is 365.

The "Annual Tracking Fee" is, as of any date of determination, an amount per Security equal to the product of (i) the Annual Tracking Rate and (ii) the Current Indicative Value as of the immediately preceding Trading Day.

The "Annual Tracking Rate" is a per annum rate described in the applicable pricing supplement.

The "Current Indicative Value" is, as determined by the Calculation Agent as of any date of determination, an amount per Security of any series equal to the product of (i) the Current Principal Amount and (ii) the Index Factor as of such date, calculated using the Index Closing Level on such date as the Index Valuation Level.

The "Principal Amount" of each Security is $25.00. Each series of the Securities may be issued and sold over time at then-current market prices, which may be significantly higher or lower than the Principal Amount.

For the Initial Calendar Month, the Current Principal Amount will equal $25.00 per Security of the applicable series. For each subsequent calendar month, the Current Principal Amount for each Security of that series will be reset as follows on the Monthly Reset Date:

> *New* Current Principal Amount = *previous* Current Principal Amount × Index Factor on the applicable Monthly Valuation Date — Accrued Fees on the applicable Monthly Valuation Date

If any series of the Securities undergoes a split or reverse split, the Current Principal Amount of that series will be adjusted accordingly.

For each calendar month, the "Monthly Reset Date" is the first Trading Day of the month specified in the applicable pricing supplement, subject to adjustment as described under "— Market Disruption Event"; provided, however, that no Monthly Reset Date will occur on or after the Call Valuation Date or the Acceleration Date.

For each Monthly Reset Date, the "Monthly Valuation Date" is the last Trading Day of the previous calendar month subject to adjustment as described under "— Market Disruption Event". The Monthly Valuation Date will be specified in the applicable pricing supplement.

The Index Factor will be calculated as follows:

$$1 + (2 \times \text{Index Performance Ratio})$$

The Index Performance Ratio on any Monthly Valuation Date, any Redemption Valuation Date, or as of the last Trading Day in the Final Measurement Period, as applicable, will be:

$$\frac{\text{Index Valuation Level} - \text{Monthly Initial Closing Level}}{\text{Monthly Initial Closing Level}}$$

S-34

Table of Contents

General Terms of the Securities

The "Index Valuation Level" will equal the arithmetic mean of the Index Closing Levels measured on each Trading Day during the Final Measurement Period, or the Index Closing Level on any Monthly Valuation Date or any Redemption Valuation Date, as determined by the Calculation Agent, provided that if the Redemption Valuation Date falls in the Final Measurement Period, for the purposes of calculating the Index Performance Ratio as of the Redemption Valuation Date, the Index Valuation Level on any date of determination during such Measurement Period shall equal (a) 1/t *times* (b) (i) the sum of the Index Closing Levels on each Trading Day from, and including, the Call Valuation Date, Acceleration Date or the Calculation Date, as applicable, to, but excluding, the date of determination, *plus* (ii) the number of Trading Days from and including the date of determination to and including the last Trading Day in such Measurement Period, *times* the Index Closing Level on such date of determination. For purposes of this definition, "t" equals the number of Trading Days in the Final Measurement Period.

The "Monthly Initial Closing Level" for the Initial Calendar Month will be specified in the applicable pricing supplement and will be the Index Closing Level on the applicable Initial Trade Date. For each subsequent calendar month, the Monthly Initial Closing Level on the Monthly Reset Date will equal the Index Closing Level on the Monthly Valuation Date for the previous calendar month.

The "Index Closing Level" is, for any series of the Securities, the closing level of the relevant Index as reported on Bloomberg and any other publicly available information provider specified in the applicable pricing supplement; provided, however, that if the Index Closing Level as reported on Bloomberg (or any successor) differs from the Index Closing Level as reported on such other information provider (or any successor), then the Index Closing Level will be the closing level of the Index as calculated by the Index Calculation Agent.

The "Index Calculation Agent" will be the entity that calculates the level of the relevant Index and will be specified in the applicable pricing supplement.

The "Calculation Date" will be specified in the applicable pricing supplement.

The "Current Indicative Value", as determined by the Calculation Agent as of any date of determination, is an amount per Security equal to the product of (i) the Current Principal Amount and (ii) the Index Factor of such date, using the Index Closing Level of such date as the Index Valuation Level.

Unless specified otherwise in the applicable pricing supplement, "Trading Day" means any day on which (i) the value of the relevant Index is published by Bloomberg or Thomson Reuters, (ii) trading is generally conducted on NYSE Arca and (iii) trading is generally conducted on the markets on which the Index Constituent Securities in the relevant Index are traded, in each case as determined by the Calculation Agent in its sole discretion.

## Early Redemption at the Option of the Holders

You may elect to require UBS to redeem your Securities, subject to a minimum redemption amount of at least 50,000 Securities of the same series. If you elect to have your Securities redeemed and have done so under the redemption procedures described below under "— Redemption Procedures", you will receive payment for your Securities on the Redemption Date. The first and final Redemption Dates will be specified in the applicable pricing supplement. For any early redemption, the applicable "Redemption Valuation Date" means the first Trading Day following the date on which you deliver a redemption notice to UBS in compliance with the redemption procedures. To satisfy the minimum redemption amount, your broker or other financial intermediary may bundle your Securities for redemption with

S-35

Table of Contents

**General Terms of the Securities**

those of other investors to reach this minimum amount of 50,000 Securities of the same series; however, there can be no assurance that they can or will do so. We may from time to time in our sole discretion reduce, in part or in whole, the minimum redemption amount of 50,000 Securities of any series. Any such reduction will be applied on a consistent basis for all holders of the Securities of the affected series at the time the reduction becomes effective.

The Securities will be redeemed and the holders will receive payment for their Securities on the third Business Day following the corresponding Redemption Valuation Date or, if such day is not a Business Day, the next following Business Day (the "Redemption Date"). In addition, if a call notice has been issued or if acceleration has been triggered, in each case with respect to any series of the Securities, the last Redemption Valuation Date for that series of Securities will be the fifth Trading Day prior to the Call Settlement Date or the Acceleration Settlement Date, as applicable. Any applicable Redemption Valuation Date is subject to adjustment as described under "— Market Disruption Event".

If you exercise your right to have us redeem your Securities, subject to your compliance with the procedures described under "— Redemption Procedures", for each applicable Security you will receive a cash payment on the relevant Redemption Date equal to

(a)   the product of

    (i)   the Current Principal Amount and (ii) the Index Factor as of the applicable Redemption Valuation Date, minus

(b)   the Accrued Fees as of such Redemption Valuation Date, minus

(c)   the Redemption Fee.

We refer to this cash payment as the "Redemption Amount".

If the amount calculated above is less than zero, the payment upon early redemption will be zero. We will inform you of such Redemption Amount on the first Business Day following the applicable Redemption Valuation Date.

You may lose some or all of your investment upon early redemption. Because the Accrued Fees and the Redemption Fee reduce your final payment, the monthly compounded leveraged return of the Index will need to be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable, in order for you to receive an aggregate amount over the term of the Securities equal to your initial investment in the Securities. If the monthly compounded leveraged return of the Index is insufficient to offset such a negative effect or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment upon early redemption.

The Accrued Fees will be calculated as of any Redemption Valuation Date as the sum of (i) the Accrued Tracking Fee as of such date and (ii) the Accrued Financing Charge as of such date.

The "Accrued Tracking Fee" as of any Redemption Valuation Date is an amount equal to the product of (i) the Annual Tracking Fee calculated as of such Redemption Valuation Date, and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding the immediately preceding Monthly Valuation Date to and including such Redemption Valuation Date (or if such Redemption Valuation Date occurs prior to the first Monthly Valuation Date, the period from and excluding the Initial Trade Date), and the denominator of which is 365.

The "Accrued Financing Charge" as of any Redemption Valuation Date is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately

S-36

preceding Monthly Valuation Date to, and including such Redemption Valuation Date (or if such Redemption Valuation Date occurs prior to the first Monthly Valuation Date, the period from and excluding the Initial Trade Date), *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

The "Redemption Fee" means, as of any date of determination for a series of Securities, an amount per Security equal to the product of (a) 0.125%, (b) the Current Principal Amount and (c) the Index Factor as of the applicable Redemption Valuation Date.

We discuss these matters in the accompanying prospectus under "Description of Debt Securities We May Offer — Redemption and Repayment".

The Redemption Amount is meant to induce arbitrageurs to counteract any trading of the Securities at a premium or discount to their indicative value, though there can be no assurance that arbitrageurs will employ the redemption feature in this manner. Any series of Securities may trade at, above, or below its indicative value.

## Redemption Procedures

To redeem your Securities, you must instruct your broker or other person through whom you hold your Securities to take the following steps through normal clearing system channels:

- deliver a notice of redemption, a form of which is attached to this product supplement as Annex A, to UBS via email no later than 12:00 noon (New York City time) on the Trading Day immediately preceding the applicable Redemption Valuation Date. If we receive your notice by the time specified in the preceding sentence, we will respond by sending you a confirmation of redemption, a form of which is attached to this product supplement as Annex B;

- deliver the signed confirmation of redemption to us via facsimile in the specified form by 5:00 p.m. (New York City time) on the same day. We or our affiliate must acknowledge receipt in order for your confirmation to be effective;

- instruct your DTC custodian to book a delivery vs. payment trade with respect to your Securities on the applicable Redemption Valuation Date at a price equal to the Redemption Amount; and

- cause your DTC custodian to deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

Different brokerage firms may have different deadlines for accepting instructions from their customers. Accordingly, as a beneficial owner of the Securities, you should consult the brokerage firm through which you own your interest for the relevant deadline. If your broker delivers your notice of redemption after 12:00 noon (New York City time), or your confirmation of redemption after 5:00 p.m. (New York City time), on the Trading Day prior to the applicable Redemption Valuation Date, your notice will not be effective, you will not be able to redeem your Securities until the following Redemption Date and your broker will need to complete all the required steps if you should wish to redeem your Securities on any subsequent Redemption Date. In addition, UBS may request a medallion signature guarantee or such assurances of delivery as it may deem necessary in its sole discretion. All instructions given to participants from beneficial owners of Securities relating to the right to redeem their Securities will be irrevocable.

## UBS's Call Right

We have the right to redeem all, but not less than all, of the Securities of any series upon not less than eighteen calendar days' prior notice to the holders of the Securities of that series, such redemption to

Table of Contents

**General Terms of the Securities**

occur on any Trading Day specified in the applicable pricing supplement through and including the Maturity Date specified in the applicable pricing supplement. Upon early redemption in the event we exercise this right, you will receive a cash payment equal to

(a)    the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the applicable Measurement Period, which we refer to in this section "— UBS's Call Right" as the "Call Measurement Period", minus

(b)    the Accrued Fees as of such last Trading Day.

We refer to this cash payment as the "Call Settlement Amount".

If the amount calculated above is less than zero, the payment upon UBS's exercise of its Call Right will be zero.

If UBS issues a call notice on any Trading Day, the "Call Valuation Date" will be the fifth Trading Day following the Trading Day on which the call notice is issued.

We will inform you of such Call Settlement Amount on the first Business Day following the last Trading Day in the Call Measurement Period.

The holders will receive payment for their Securities on a date that is at least three, but not greater than six, Trading Days following the last Trading Day in the Call Measurement Period (the "Call Settlement Date"). We will inform you of such Call Settlement Date in the call notice. If a Market Disruption Event is continuing or occurs on the scheduled Call Valuation Date with respect to any of the Index Constituent Securities, such Call Valuation Date may be postponed as described under "— Market Disruption Event".

You may lose some or all of your investment at call. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees, in order for you to receive an aggregate amount over the term of the Securities equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at call.

The Accrued Fees will be calculated as of the last Trading Day in the Call Measurement Period as the sum of (i) the Accrued Tracking Fee as of such last Trading Day and (ii) the Accrued Financing Charge as of such last Trading Day.

The "Accrued Tracking Fee" as of the last Trading Day in the Call Measurement Period is an amount equal to the product of (i) the Annual Tracking Fee calculated as of such last Trading Day, and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such last Trading Day, and the denominator of which is 365.

The "Accrued Financing Charge" as of last Trading Day in the Call Measurement Period is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including such last Trading Day, *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

## Acceleration Upon Minimum Indicative Value

If, at any time, the indicative value for any series of the Securities on any Trading Day (1) equals $5.00 or less or (2) decreases 60% in value from the closing indicative value of that series of the Securities on

S-38

Table of Contents

**General Terms of the Securities**

the previous Monthly Valuation Date (each such day, an "Acceleration Date"), all issued and outstanding Securities of that series will be automatically accelerated and mandatorily redeemed by UBS (even if the indicative value of that series would later exceed $5.00 or would increase from the -60% level on such Acceleration Date or any subsequent Trading Day during the applicable Measurement Period, which we refer to in this section "— Acceleration Upon Minimum Indicative Value" as the "Acceleration Measurement Period") for a cash payment equal to

(a)    the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day of the Acceleration Measurement Period, minus

(b)    the Accrued Fees as of such last Trading Day.

We refer to this cash payment as the "Acceleration Amount". If the minimum indicative value threshold of any series of Securities has been breached, you will receive on the Acceleration Settlement Date only the Acceleration Amount in respect of your investment in the that series of Securities.

You may lose some or all of your investment upon an acceleration upon minimum indicative value. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees, in order for you to receive an aggregate amount over the term of the Securities equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment upon an acceleration upon minimum indicative value.

The Accrued Fees will be calculated as of any date of determination for any series of Securities as the sum of (i) the Accrued Tracking Fee as of the last Trading Day of the Acceleration Measurement Period and (ii) the Accrued Financing Charge as of the last Trading Day of the Acceleration Measurement Period.

The "Accrued Tracking Fee" as of the last Trading Day of the Acceleration Measurement Period will be an amount equal to the product of (i) the Annual Tracking Fee calculated as of such last Trading Day, and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such last Trading Day or if the Acceleration occurs prior to the first initial Monthly Valuation Date, the period from but excluding the Initial Trade Date), as applicable, and the denominator of which is 365.

The "Accrued Financing Charge" as of the last Trading Day of the Acceleration Measurement Period is an amount equal to (a) the aggregate sum of (i) the Financing Levels as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such last Trading Day (or if the Acceleration Date occurs prior to the initial Monthly Valuation Date, the period from, and excluding, the Initial Trade Date), *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

The "Acceleration Settlement Date" will be the third Trading Day following the last Trading Day of the Acceleration Measurement Period.

Subject to the prior verification by the Calculation Agent that the indicative value of $5.00 or less was accurately calculated by the Index Calculation Agent or that the decrease of 60% from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date was accurately calculated by the Index Calculation Agent, as applicable, and in each case with respect to a series of Securities, UBS must provide notice to the holders of that series of the Securities that the minimum indicative value threshold has been breached not less than five calendar days prior to the Acceleration Settlement Date. For a detailed description of how the intraday indicative value of the Securities is calculated see "Valuation of the Index and the Securities" on page S-30.

Table of Contents

**General Terms of the Securities**

## Calculation Agent

UBS Securities LLC will act as the Calculation Agent. The Calculation Agent will determine, among other things, the Index Valuation Level, the Index Performance Ratio, the Index Factor, the Current Principal Amount, the Current Indicative Value, the Accrued Fees, the Accrued Financing Charge, the Financing Level, the Financing Rate, the Accrued Tracking Fee, the Annual Tracking Fee, the Redemption Fee, if any, the Cash Settlement Amount, if any, that we will pay you at maturity, the Redemption Amount, if any, that we will pay you upon redemption, the Call Settlement Amount, if any, that we will pay you on the Call Settlement Date, if applicable, or the Acceleration Amount, if any, that we will pay you on the Acceleration Settlement Date, if applicable, based on the relevant Index levels calculated by the Calculation Agent, as adjusted, and whether any day is a Business Day or Trading Day. The Calculation Agent will also be responsible for determining whether a Market Disruption Event has occurred, whether the relevant Index has been discontinued or is otherwise unavailable and whether there has been a material change in the relevant Index. All determinations made by the Calculation Agent will be at the sole discretion of the Calculation Agent for any series of the Securities and will, in the absence of manifest error, be conclusive for all purposes and binding on you and on us. We may appoint a different Calculation Agent for any series of the Securities from time to time after the date of this product supplement without your consent and without notifying you.

The Calculation Agent will provide written notice to the trustee at its New York office, on which notice the trustee may conclusively rely, of the amount to be paid at maturity or call, or upon early redemption or acceleration on or prior to 12:00 p.m., New York City time, on the Business Day immediately preceding the Maturity Date, any Redemption Date, the Call Settlement Date or the Acceleration Settlement Date, as applicable.

All dollar amounts related to determination of the Accrued Fees, the Accrued Tracking Fee, the Accrued Financing Charge, the Redemption Amount and Redemption Fee, if any, per Security for any series of Securities, the Call Settlement Amount, if any, per Security for any series of Securities, the Acceleration Amount, if any, per Security for any series of Securities, and the Cash Settlement Amount, if any, per Security for any series of Securities, will be rounded to the nearest ten-thousandth, with five one hundred-thousandths rounded upward (*e.g.*, .76545 would be rounded up to .7655); and all dollar amounts paid on the aggregate principal amount of such Securities per holder will be rounded to the nearest cent, with one-half cent rounded upward.

## Market Disruption Event

To the extent a Market Disruption Event with respect to the relevant Index has occurred or is continuing on an Averaging Date (as defined below), the Index Closing Level for such Averaging Date will be determined by the Calculation Agent or one of its affiliates on the first succeeding Trading Day on which a Market Disruption Event does not occur or is not continuing (the "Deferred Averaging Date") with respect to the relevant Index irrespective of whether, pursuant to such determination, the Deferred Averaging Date would fall on a date originally scheduled to be an Averaging Date. If the postponement described in the preceding sentence results in the Index Closing Level being calculated on a day originally scheduled to be an Averaging Date, for purposes of determining the Index Closing Level on any Averaging Date, the Calculation Agent or one of its affiliates, as the case may be, will apply the Index Closing Level for such Deferred Averaging Date (i) on the date(s) of the original Market Disruption Event and (ii) such Averaging Date. For example, if the applicable Measurement Period for purposes of calculating the Call Settlement Amount is based on the arithmetic mean of the Index Closing Levels on October 3, October 4, October 5, October 6 and October 7, and there is a Market Disruption Event with respect to the relevant Index on October 3, but no other Market Disruption Event during such Measurement Period, then the Index Closing Level on October 4 will be used twice to calculate the Call

S-40

Table of Contents

**General Terms of the Securities**

Settlement Amount, and the Call Settlement Amount will be determined based on the arithmetic mean of the Index Closing Levels on October 4, October 4, October, 5, October 6 and October 7. The same approach would be applied if there is a Market Disruption Event during any Measurement Period.

If the Redemption Valuation Date, for purposes of calculating a Redemption Amount, is based on the Index Closing Level on October 3 and there is a Market Disruption Event with respect to the Index on October 3, then the Index Closing Level on October 4 will be used to calculate the Redemption Amount. If a Market Disruption Event occurs on any Monthly Valuation Date, the Index Closing Level for such Monthly Valuation Date will be determined by the Calculation Agent or one of its affiliates on the first succeeding Trading Day on which a Market Disruption Event does not occur or is not continuing.

In no event, however, will any postponement pursuant to the two immediately preceding paragraphs result in the final Averaging Date, Monthly Valuation Date or the Redemption Valuation Date, as applicable, occurring more than three Trading Days following the day originally scheduled to be such final Averaging Date, Monthly Valuation Date or Redemption Valuation Date. If the third Trading Day following the date originally scheduled to be the final Averaging Date, Monthly Valuation Date or Redemption Valuation Date, as applicable, is not a Trading Day or a Market Disruption Event has occurred or is continuing with respect to the relevant Index on such third Trading Day, the Calculation Agent or one of its affiliates will determine the Index Closing Level based on its good faith estimate of the Index Closing Level that would have prevailed on such third Trading Day but for such Market Disruption Event. If any Monthly Valuation Date is postponed as described above, the succeeding Monthly Reset Date will occur on the next Trading Day following the postponed Monthly Valuation Date.

An "Averaging Date" means each of the Trading Days during any Measurement Period, subject to adjustment as described herein.

Notwithstanding the occurrence of one or more of the events below, which may, in the Calculation Agent's discretion, constitute a Market Disruption Event with respect to the relevant Index, the Calculation Agent in its discretion may waive its right to postpone the Index Closing Level if it determines that one or more of the below events has not and is not likely to materially impair its ability to determine the Index Closing Level on such date.

Any of the following will be a Market Disruption Event with respect to the relevant Index, in each case as determined by the Calculation Agent in its sole discretion:

(a)  suspension, absence or material limitation of trading in a material number of the Index Constituent Securities for more than two hours or during the one-half hour before the close of trading in the applicable market or markets;

(b)  suspension, absence or material limitation of trading in option or futures contracts relating to the relevant Index or to a material number of Index Constituent equity interests in the primary market or markets for those contracts for more than two hours of trading or during the one-half hour before the close of trading in that market;

(c)  the relevant Index is not published; or

(d)  in any other event, if the Calculation Agent determines in its sole discretion that the event materially interferes with our ability or the ability of any of our affiliates to unwind all or a material portion of a hedge with respect to the Securities that we or our affiliates have effected or may effect as described in the section entitled "Use of Proceeds and Hedging".

S-41

Table of Contents

**General Terms of the Securities**

The following events will not be Market Disruption Events with respect to the relevant Index:

(a)   a limitation on the hours or numbers of days of trading, but only if the limitation results from an announced change in the regular business hours of the relevant market; or

(b)   a decision to permanently discontinue trading in the option or futures contracts relating to the relevant Index or any Index Constituent equity interests.

For this purpose, an "absence of trading" in the primary securities market on which option or futures contracts related to the relevant Index or any Index Constituent equity interests are traded will not include any time when that market is itself closed for trading under ordinary circumstances.

## Discontinuance of or Adjustments to the Relevant Index; Alteration of Method of Calculation

If the Index Calculation Agent or another entity that publishes the Index (such other entity to be named in the applicable pricing supplement) discontinues publication of or otherwise fails to publish the relevant Index, or if our right to use the Index is suspended or terminated, and the Index Calculation Agent or such other entity publishes a successor or substitute index that the Calculation Agent determines to be comparable to the discontinued relevant Index (such index being referred to herein as a "Successor Index"), then the Index Closing Level for such Successor Index will be determined by the Calculation Agent by reference to the Successor Index on the dates and at the times as of which the Index Closing Levels for such Successor Index are to be determined.

Upon any selection by the Calculation Agent of a Successor Index, the Calculation Agent will cause written notice thereof to be furnished to the trustee, to us and to the holders of the Securities.

If the Index Calculation Agent discontinues publication of the relevant Index, or if our right to use the Index is suspended or terminated, prior to, and such discontinuation or unavailability is continuing on, any Monthly Valuation Date, any Averaging Date, any Redemption Valuation Date or any other relevant date on which the Index Closing Level is to be determined and the Calculation Agent determines that no Successor Index is available at such time, or the Calculation Agent has previously selected a Successor Index and publication of such Successor Index is discontinued prior to, and such discontinuation is continuing on, any Monthly Valuation Date, any Averaging Date, any Redemption Valuation Date or any other relevant date on which the Index Closing Level is to be determined, then the Calculation Agent will determine the Index Closing Level using the closing level and published share weighting of each Index Constituent Security included in the relevant Index or Successor Index, as applicable, immediately prior to such discontinuation or unavailability, as adjusted for certain corporate actions as described in the description of the relevant Index included in the applicable pricing supplement. In such event, the Calculation Agent will cause notice thereof to be furnished to the trustee, to us and to the holders of the Securities.

Notwithstanding these alternative arrangements, discontinuation of the publication of the relevant Index or Successor Index, as applicable, may adversely affect the value of the Securities.

If at any time the method of calculating the relevant Index or a Successor Index, or the value thereof, is changed in a material respect, or if the relevant Index or a Successor Index is in any other way modified so that the level of the relevant Index or such Successor Index does not, in the opinion of the Calculation Agent, fairly represent the level of the relevant Index or such Successor Index had such changes or modifications not been made, then the Calculation Agent will make such calculations and adjustments as, in the good faith judgment of the Calculation Agent, may be necessary in order to arrive at a level of an index comparable to the relevant Index or such Successor Index, as the case may be, as if such

S-42

Table of Contents

**General Terms of the Securities**

changes or modifications had not been made, and the Calculation Agent will calculate the levels for the relevant Index or such Successor Index with reference to the relevant Index or such Successor Index, as adjusted. The Calculation Agent will accordingly calculate the Index Performance Ratio, the Index Factor, the Current Principal Amount, the Current Indicative Value, the Accrued Fees, the Financing Level, the Tracking Fee, the Redemption Fee, if any, the Cash Settlement Amount, if any, that we will pay you at maturity, the Redemption Amount, if any, upon redemption, if applicable, the Call Settlement Amount, if any, that we will pay you on the Call Settlement Date, if applicable, or the Acceleration Amount, if any, that we will pay you on the Acceleration Settlement Date, if applicable, based on the relevant index levels calculated by the Calculation Agent, as adjusted. Accordingly, if the method of calculating the relevant Index or a Successor Index is modified so that the level of the relevant Index or such Successor Index is a fraction of what it would have been if there had been no such modification (*e.g.*, due to a split in the relevant Index), which, in turn, causes the level of the relevant Index or such Successor Index to be a fraction of what it would have been if there had been no such modification, then the Calculation Agent will make such calculations and adjustments in order to arrive at a level for the relevant Index or such Successor Index as if it had not been modified (e.g., as if such split had not occurred).

## Redemption Price Upon Optional Tax Redemption

We have the right to redeem any series of the Securities in the circumstances described under "Description of Debt Securities We May Offer — Optional Tax Redemption" in the accompanying prospectus. If we exercise this right, the redemption price of that series of the Securities will be determined by the Calculation Agent in a manner reasonably calculated to preserve your and our relative economic position.

## Default Amount on Acceleration

If an event of default occurs and the maturity of any series of the Securities is accelerated, we will pay the default amount in respect of the principal of the that series of Securities at maturity. We describe the default amount below under "— Default Amount".

For the purpose of determining whether the holders of our Medium-Term Notes, Series A, of which each series of Securities offered under this product supplement, the accompanying prospectus and the applicable pricing supplement are a part, are entitled to take any action under the indenture, we will treat the outstanding principal amount of the Medium-Term Notes, Series A, as constituting the outstanding principal amount of the Securities. Although the terms of the Securities may differ from those of the other Medium-Term Notes, Series A, holders of specified percentages in principal amount of all Medium-Term Notes, Series A, together in some cases with other series of our debt securities, will be able to take action affecting all the Medium-Term Notes, Series A, including the Securities. This action may involve changing some of the terms that apply to the Medium-Term Notes, Series A, accelerating the maturity of the Medium- Term Notes, Series A after a default or waiving some of our obligations under the indenture. We discuss these matters in the attached prospectus under "Description of Debt Securities We May Offer — Default, Remedies and Waiver of Default" and "Description of Debt Securities We May Offer — Modification and Waiver of Covenants".

S-43

Table of Contents

**General Terms of the Securities**

## Default Amount

The default amount for any series of the Securities on any day will be an amount, in U.S. dollars for the principal of the Securities, equal to the cost of having a qualified financial institution, of the kind and selected as described below, expressly assume all our payment and other obligations with respect to the Securities as of that day and as if no default or acceleration had occurred, or to undertake other obligations providing substantially equivalent economic value to you with respect to the Securities of the accelerated series. That cost will equal:

> ➤ the lowest amount that a qualified financial institution would charge to effect this assumption or undertaking, plus

> ➤ the reasonable expenses, including reasonable attorneys' fees, incurred by the holders of the Securities in preparing any documentation necessary for this assumption or undertaking.

During the default quotation period for the Securities of the accelerated series, which we describe below, the holders of that series of the Securities and/or we may request a qualified financial institution to provide a quotation of the amount it would charge to effect this assumption or undertaking. If either party obtains a quotation, it must notify the other party in writing of the quotation. The amount referred to in the first bullet point above will equal the lowest — or, if there is only one, the only — quotation obtained, and as to which notice is so given, during the default quotation period. With respect to any quotation, however, the party not obtaining the quotation may object, on reasonable and significant grounds, to the assumption or undertaking by the qualified financial institution providing the quotation and notify the other party in writing of those grounds within two Business Days after the last day of the default quotation period, in which case that quotation will be disregarded in determining the default amount.

## Default Quotation Period

The default quotation period is the period beginning on the day the default amount first becomes due and ending on the third Business Day after that day, unless:

> ➤ no quotation of the kind referred to above is obtained, or

> ➤ every quotation of that kind obtained is objected to within five Business Days after the due date as described above.

If either of these two events occurs, the default quotation period will continue until the third Business Day after the first Business Day on which prompt notice of a quotation is given as described above. If that quotation is objected to as described above within five Business Days after that first Business Day, however, the default quotation period will continue as described in the prior sentence and this sentence.

In any event, if the default quotation period and the subsequent two Business Day objection period have not ended before the Calculation Date, then the default amount will equal the Principal Amount of the Securities.

## Qualified Financial Institutions

For the purpose of determining the default amount at any time, a qualified financial institution must be a financial institution organized under the laws of any jurisdiction in the United States of America, Europe or Japan, which at that time has outstanding debt obligations with a stated maturity of one year or less from the date of issue and rated either:

> ➤ A-1 or higher by Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., or any successor, or any other comparable rating then used by that rating agency, or

S-44

Table of Contents

General Terms of the Securities

> P-1 or higher by Moody's Investors Service or any successor, or any other comparable rating then used by that rating agency.

## Manner of Payment and Delivery

Any payment on or delivery of the Securities at maturity or call, or upon early redemption or acceleration will be made to accounts designated by you and approved by us, or at the corporate trust office of the trustee in New York City, but only when the Securities are surrendered to the trustee at that office. We also may make any payment or delivery in accordance with the applicable procedures of the depositary.

## Business Day

When we refer to a Business Day with respect to the Securities, we mean a day that is a Business Day of the kind described in "Description of Debt Securities We May Offer — Payment Mechanics for Debt Securities" in the accompanying prospectus.

## Modified Business Day

As described in "Description of Debt Securities We May Offer — Payment Mechanics for Debt Securities — Payment When Offices Are Closed" in the accompanying prospectus, any payment on the Securities that would otherwise be due on a day that is not a Business Day may instead be paid on the next day that is a Business Day, with the same effect as if paid on the original due date.

## Defeasance

Neither full defeasance nor covenant defeasance, as described in the accompanying prospectus under "Description of Debt Securities We May Offer — Defeasance and Covenant Defeasance", will apply to the Securities.

## Reissuances or Reopened Issues

We may, at our sole discretion, "reopen" or reissue any series of the Securities. We intend to issue the Securities initially in an amount having the aggregate offering price specified in the applicable pricing supplement. However, we may issue additional Securities in amounts that exceed the amount specified in the applicable pricing supplement at any time, without your consent and without notifying you. The Securities do not limit our ability to incur other indebtedness or to issue other Securities. Also, we are not subject to financial or similar restrictions by the terms of the Securities. For more information, please refer to "Description of Debt Securities We May Offer — Amounts That We May Issue" in the accompanying prospectus.

These further issuances, if any, will be consolidated to form a single class with the originally issued Securities of any series and will have the same CUSIP number and will trade interchangeably with that series of the Securities immediately upon settlement. Any additional issuances will increase the aggregate Principal Amount of the outstanding Securities of the class, plus the aggregate Principal Amount of any Securities bearing the same CUSIP number that are issued pursuant to any future issuances of Securities bearing the same CUSIP number. The price of any additional offering will be determined at the time of pricing of that offering.

## Booking Branch

The Securities will be booked through UBS AG, London Branch.

## Clearance and Settlement

The DTC participants that hold the Securities through DTC on behalf of investors will follow the settlement practices applicable to equity securities in DTC's settlement system with respect to the primary distribution of the Securities and secondary market trading between DTC participants.

Table of Contents

# Use of Proceeds and Hedging

We will use the net proceeds we receive from the sale of the Securities for the purposes we describe in the attached prospectus under "Use of Proceeds". We or our affiliates may also use those proceeds in transactions intended to hedge our obligations under the Securities as described below.

In anticipation of the sale of the Securities, we or our affiliates expect to enter into hedging transactions involving purchases of securities included in or linked to the relevant Index and/or listed and/or over-the-counter options, futures or exchange-traded funds on the Index Constituent Securities or the relevant Index prior to and/or on the Initial Trade Date. From time to time, we or our affiliates may enter into additional hedging transactions or unwind those we have entered into. In this regard, we or our affiliates may:

➢ acquire or dispose of long or short positions of Index Constituent Securities or other securities of the Index Constituents,

➢ acquire or dispose of long or short positions in listed or over-the-counter options, futures, exchange- traded funds or other instruments based on the level of the relevant Index or the value of the Index Constituent Securities,

➢ acquire or dispose of long or short positions in listed or over-the-counter options, futures, or exchange-traded funds or other instruments based on the level of other similar market indices, or

➢ any combination of the above three.

We or our affiliates may acquire a long or short position in securities similar to any series of the Securities from time to time and may, in our or their sole discretion, hold or resell those securities.

We or our affiliates may close out our or their hedge on or before the last Trading Day in the applicable Measurement Period. That step may involve sales or purchases of any of the Index Constituent Securities, listed or over-the-counter options or futures on the Index Constituent Securities or listed or over-the-counter options, futures, exchange-traded funds or other instruments based on indices designed to track the performance of the Index.

*The hedging activity discussed above may adversely affect the market value of the Securities from time to time. See "Risk Factors" on page S-18 for a discussion of these adverse effects.*

S-46

Table of Contents

# Material U.S. Federal Income Tax Consequences

*The following is a general description of the material United States federal tax considerations relating to the Securities. It does not purport to be a complete analysis of all tax considerations relating to the Securities. Prospective purchasers of the Securities should consult their tax advisers as to the consequences under the tax laws of the country of which they are resident for tax purposes and the tax laws of the United States of acquiring, holding and disposing of the Securities and receiving payments under the Securities. This summary is based upon the law as in effect on the date of this product supplement and is subject to any change in law that may take effect after such date.*

The discussion below supplements and, to the extent inconsistent, replaces the discussion under "U.S. Tax Considerations" in the attached prospectus. This discussion applies to you only if you hold your Securities as capital assets for tax purposes. This section does not apply to you if you are a member of a class of holders subject to special rules, such as:

➢ a dealer in securities,

➢ a trader in securities that elects to use a mark-to-market method of tax accounting for your securities holdings,

➢ a bank,

➢ a life insurance company,

➢ a person subject to alternative minimum tax,

➢ a person that purchases or sells the Securities as part of a wash sale for tax purposes,

➢ a person that owns Securities as part of a straddle or a hedging or conversion transaction for tax purposes, or

➢ a United States holder (as defined below) whose functional currency for tax purposes is not the U.S. dollar.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing and proposed regulations under the Code, published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis.

Except as otherwise described below under "— Unrelated Business Taxable Income," the discussion below does not apply to tax-exempt organizations. If a partnership holds the Securities, the United States federal income tax treatment of a partner will generally depend on the status of the partner and the tax treatment of the partnership. A partner in a partnership holding the Securities should consult its tax advisor with regard to the United States federal income tax treatment of an investment in the Securities.

The tax treatment of your Securities will depend on their terms. Consequently, except to the extent the applicable pricing supplement indicates otherwise, the discussion below (including the tax opinion below) will not necessarily apply to your Securities.

The following discussion assumes that the Index is, and will be, composed solely of equity Securities issued by entities treated as corporations for U.S. federal income tax purposes.

Except as otherwise noted under "— Non-United States Holders" below, this discussion is only applicable to you if you are a United States holder. You are a United States holder if you are a beneficial owner of a Security and you are: (i) a citizen or resident of the United States; (ii) a domestic corporation;

(iii) an estate whose income is subject to United States federal income tax regardless of its source; or (iv) a trust if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized to control all substantial decisions of the trust.

**NO STATUTORY, REGULATORY, JUDICIAL OR ADMINISTRATIVE AUTHORITY DIRECTLY DISCUSSES HOW THE SECURITIES SHOULD BE TREATED FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. AS A RESULT, THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF YOUR INVESTMENT IN THE SECURITIES ARE UNCERTAIN. ACCORDINGLY, WE URGE YOU TO CONSULT YOUR TAX ADVISOR AS TO THE TAX CONSEQUENCES OF HAVING AGREED TO THE REQUIRED TAX TREATMENT OF YOUR SECURITIES DESCRIBED BELOW AND AS TO THE APPLICATION OF STATE, LOCAL, OR OTHER TAX LAWS TO YOUR INVESTMENT IN YOUR SECURITIES.**

In the opinion of our counsel, Sullivan & Cromwell LLP, the Securities should be treated as a pre-paid derivative contract with respect to the Index and the terms of the Securities require you and us (in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary) to treat the Securities for all tax purposes in accordance with such characterization. Under that treatment, you should generally recognize capital gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference between the amount realized and the amount you paid for your Securities. Such gain or loss should generally be long-term capital gain or loss if you held your Securities for more than one year. In general, your tax basis in your Securities will be equal to the price you paid for them. Capital gain of a non-corporate United States holder is generally taxed at preferential rates where the property is held for more than one year. The deductibility of capital losses is subject to limitations. Your holding period for your Securities will generally begin on the date after the issue date (*i.e.*, the settlement date) for your Securities and, if you hold your Securities until maturity, your holding period will generally include the maturity date.

*Alternative Treatments*. The Internal Revenue Service ("IRS") released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current basis, whether additional gain or loss upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Code should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income over the term of an instrument such as the Securities. The outcome of this process is uncertain. Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. UBS intends to treat your Securities for United States federal income tax purposes in accordance with the treatment described above unless and until such time as the Treasury Department and IRS determine that some other treatment is more appropriate.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of the Securities despite the fact that there will be no interest payments over the term of the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Table of Contents

**Material U.S. Federal Income Tax Consequences**

In addition, it is possible that the Securities could be treated as a debt instrument subject to the special tax rules governing contingent debt instruments. If the Securities are so treated, you would be required to accrue interest income over the term of your Securities based upon the yield at which we would issue a non-contingent fixed-rate debt instrument with other terms and conditions similar to your Securities. You would recognize gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference, if any, between the amount you receive at such time and your adjusted basis in your Securities. In general, your adjusted basis in your Securities would be equal to the amount you paid for your Securities, increased by the amount of interest you previously accrued with respect to your Securities and decreased by the projected amount of any contingent payment previously made on your Securities. Any gain you recognize upon the sale, exchange, redemption or maturity of your Securities would be ordinary income and any loss recognized by you at such time would be ordinary loss to the extent of interest you included in income in the current or previous taxable years in respect of your Securities, and thereafter, would be capital loss.

If the Securities are treated as a contingent debt instrument and you purchase your Securities in the secondary market at a price that is at a discount from, or in excess of, the adjusted issue price of the Securities, such excess or discount would not be subject to the generally applicable market discount or amortizable bond premium rules described under "U.S. Tax Considerations — Taxation of Debt Securities — Market Discount" and "U.S. Tax Considerations — Taxation of Debt Securities — Debt Securities Purchased at a Premium" in the accompanying prospectus but rather would be subject to special rules set forth in Treasury Regulations governing contingent debt instruments. Accordingly, if you purchase your Securities in the secondary market, you should consult your tax advisor as to the possible application of such rules to you.

In addition, the IRS could potentially assert that you should be required to treat amounts attributable to the Accrued Fees and the Redemption Fee, if any, as amounts of expense. The deduction of any such deemed expenses would generally be subject to the 2% floor on miscellaneous itemized deductions. Such amounts would correspondingly increase the amount of gain or decrease the amount of loss that you recognize with respect to your Securities.

If the Index Constituent Securities are rebalanced, it is also possible that the Securities could be treated as a series of derivative contracts each of which matures on each rebalancing date. If your Securities were properly characterized in such a manner, you would be treated as disposing of your Securities on each rebalancing date in return for new derivative contracts that mature on the next rebalancing date, and you would accordingly likely recognize capital gain or loss on each rebalancing date equal to the difference between your basis in your Securities (which would be adjusted to take into account any prior recognition of gain or loss) and their fair market value on such date. The amount of loss recognized in this case could be deferred on account of the "wash sale" rules of Section 1091 of the Code.

In addition, the IRS could assert that you should be treated as if you owned the Index Constituent Securities and directly incurred the Accrued Fees and the Redemption Fee, if any, in which case (i) you could recognize gain or loss (subject to the application of the "wash sale" rules of Section 1091 of the Code) with respect to an Index Constituent Security when the amount of any Index Constituent Security referenced by the Index is reduced, (ii) you could be treated as receiving any dividends paid on the Index Constituent Securities during the time you hold your Securities and could be required to take such dividends into account as ordinary income (subject to the possible application of the rules regarding "qualified dividend income"), and (iii) you could be required to treat amounts attributable to the Accrued Fees and the Redemption Fee, if any, in the manner described in the second preceding paragraph.

S-49

Table of Contents

Material U.S. Federal Income Tax Consequences

Because of the absence of authority regarding the appropriate tax characterization of your Securities, it is possible that the IRS could seek to characterize your Securities in a manner that results in tax consequences to you that are different from those described above. For example, the IRS could possibly assert that (i) you should be required to take into account dividends paid on the Index Constituent Securities during the time you hold your Securities as ordinary income (subject to the possible application of the rules regarding "qualified dividend income"), either when such dividends are paid or upon the sale, exchange, redemption or maturity of your Securities, even if you are not treated as if you owned the Index Constituent Securities (as described in the immediately preceding paragraph), (ii) some or all of the gain or loss that you recognize upon the sale, exchange, redemption or maturity of your Securities should be treated as ordinary gain or loss, (iii) you should be required to recognize taxable gain upon the resetting of the Current Principal Amount, or (iv) your Securities should be treated as a notional principal contract for tax purposes. You should consult your tax adviser as to the tax consequences of such characterizations and any possible alternative characterizations of your Securities for U.S. federal income tax purposes.

*Medicare Tax.*   If you are an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, you will be subject to a 3.8% tax on the lesser of (1) your "net investment income"(or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances). Your net investment income will include your net gains upon the sale, exchange, redemption or maturity of your Securities, unless such net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). If you are a United States holder that is an individual, estate or trust, you are urged to consult your tax advisors regarding the applicability of the Medicare tax to your net investment income in respect of your investment in the Securities.

*Information with Respect to Foreign Financial Assets.*   Owners of "specified foreign financial assets" with an aggregate value in excess of $50,000 (and in some circumstances, a higher threshold), may be required to file an information report with respect to such assets with their tax returns. "Specified foreign financial assets" include any financial accounts maintained by foreign financial institutions as well as any of the following (which may include your Securities), but only if they are held for investment and not held in accounts maintained by financial institutions: (i) stocks and securities issued by non-U.S. persons; (ii) financial instruments and contracts that have non-U.S. issuers or counterparties; and (iii) interests in foreign entities. Holders are urged to consult their tax advisors regarding the application of this reporting requirement to their ownership of the Securities.

*Unrelated Business Taxable Income.*   A United States holder that is a tax-exempt organization for U.S. federal income tax purposes and therefore generally exempt from U.S. federal income taxation, will nevertheless be subject to tax to the extent income or gain from the Securities constitutes unrelated business taxable income ("UBTI"). Although the matter is not free from doubt, gain realized upon the sale, exchange, redemption or maturity of the Securities should not constitute UBTI to a United States holder that is a tax-exempt organization unless such holder has incurred "debt-financing" in respect of its acquisition or ownership of the Securities. As noted above, it is possible that the Securities could be treated as other than a forward contract in respect of the Index. Under one such alternative characterization, you could be treated as directly owning the Index Constituent Securities. If your Securities are so treated, a portion of any gain that you recognize with respect to the Securities would likely constitute UBTI.

*Treasury Regulations Requiring Disclosure of Reportable Transactions.*   Treasury regulations require United States taxpayers to report certain transactions ("Reportable Transactions") on IRS Form 8886.

S-50

<u>Table of Contents</u>

Material U.S. Federal Income Tax Consequences

An investment in the Securities or the sale, exchange, redemption or maturity of the Securities should generally not be treated as a Reportable Transaction under current law, but it is possible that future legislation, regulations or administrative rulings could cause your investment in the Securities or the sale, exchange, redemption or maturity of the Securities to be treated as a Reportable Transaction. You should consult with your tax advisor regarding any tax filing and reporting obligations that may apply in connection with acquiring, owning and disposing of the Securities.

*Backup Withholding and Information Reporting.*   Notwithstanding that we do not intend to treat the Securities as debt for tax purposes, we intend to apply the information reporting and backup withholding rules that are described under "U.S. Tax Considerations — Taxation of Debt Securities — Backup Withholding and Information Reporting" in the accompanying prospectus to any payments made on your Securities.

*Non-United States Holders.*   The following section addresses the tax treatment of a non-United States holder of Securities. You are a non-United States holder if you are a beneficial owner of a Security and you are, for United States federal income tax purposes: (i) a nonresident alien individual; (ii) a foreign corporation; or (iii) an estate or trust that in either case is not subject to United States federal income tax on a net income basis on income or gain from a Security.

If your Securities are treated as a pre-paid derivative contract with respect to the Index, and subject to the discussion of backup withholding below, amounts you receive upon the sale, exchange, redemption or maturity of your Securities should not currently be subject to withholding tax.

As noted above, because of the absence of authority regarding the appropriate tax characterization of your Securities, it is possible that the IRS could seek to characterize your Securities in a manner that results in tax consequences to you that are different from those described above. Under one such alternative characterization, you could be treated as if you owned the Index Constituent Securities. If your Securities were to be so treated, you could be treated as receiving any dividends paid on the Index Constituent Securities during the time you hold your Securities and could be subject to tax at a rate of 30% (or lower treaty rate) with respect to such dividends which would be collected via withholding unless such dividends were effectively connected with your trade or business in the United States (or, if certain tax treaties apply, were to be attributable to your permanent establishment in the United States). In such latter case, you could be subject to net income tax with respect to such dividends at the marginal tax rates applicable to United States holders.

You may be subject to otherwise applicable information reporting and backup withholding requirements with respect to payments on your Securities unless you comply with certain certification and identification requirements as to your foreign status.

We will not attempt to ascertain whether any Index Constituent Securities would be treated as a USRPHC. If an Index Constituent Security were so treated, certain adverse U.S. federal income tax consequences could possibly apply to non-U.S. holders. You should refer to information filed with the SEC with respect to each Index Constituent Security and consult your tax advisor regarding the possible consequences to you, if any, if any Index Constituent Security is or becomes a USRPHC.

Prospective non-United States holders are urged to consult their tax advisors with respect to the tax consequences to them of an investment in the Securities, including any possible alternative characterizations and treatments.

Table of Contents

# Benefit Plan Investor Considerations

A fiduciary of a pension, profit-sharing or other employee benefit plan subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") (each, a "Plan"), should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before authorizing an investment in the Securities. Among other factors, the fiduciary should consider whether the investment would satisfy the prudence and diversification requirements of ERISA and would be consistent with the documents and instruments governing the Plan, and whether the investment would involve a prohibited transaction under ERISA or the U.S. Internal Revenue Code (the "Code").

Section 406 of ERISA and Section 4975 of the Code prohibit Plans, as well as individual retirement accounts, Keogh plans any other plans that are subject to Section 4975 of the Code (also "Plans"), from engaging in certain transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to the Plan. A violation of these prohibited transaction rules may result in excise tax or other liabilities under ERISA or the Code for those persons, unless exemptive relief is available under an applicable statutory, regulatory or administrative exemption. Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3(33) of ERISA) and non-U.S. plans (as described in Section 4(b)(4) of ERISA) ("Non-ERISA Arrangements") are not subject to the requirements of Section 406 of ERISA or Section 4975 of the Code but may be subject to similar provisions under applicable federal, state, local, non-U.S. or other laws ("Similar Laws").

The acquisition of the Securities by a Plan or any entity whose underlying assets include "plan assets" by reason of any Plan's investment in the entity (a "Plan Asset Entity") with respect to which we, UBS Securities LLC, UBS Financial Services Inc. and other of our affiliates is or becomes a party in interest or disqualified person may result in a prohibited transaction under ERISA or Section 4975 of the Code, unless the Securities are acquired pursuant to an applicable exemption. The U.S. Department of Labor has issued five prohibited transaction class exemptions, or "PTCEs", that may provide exemptive relief if required for direct or indirect prohibited transactions that may arise from the purchase or holding of the Securities. These exemptions are PTCE 84-14 (for certain transactions determined by independent qualified professional asset managers), PTCE 90-1 (for certain transactions involving insurance company pooled separate accounts), PTCE 91-38 (for certain transactions involving bank collective investment funds), PTCE 95-60 (for transactions involving certain insurance company general accounts), and PTCE 96-23 (for transactions managed by in-house asset managers). In addition, ERISA Section 408(b)(17) and Section 4975(d)(20) of the Code may provide an exemption for the purchase and sale of the Securities, provided that neither the issuer of the Securities nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Plan involved in the transaction, and provided further that the Plan pays no more and receives no less than "adequate consideration" in connection with the transaction (the "service provider exemption"). There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Any purchaser or holder of the Securities or any interest therein will be deemed to have represented by its purchase and holding or conversion of the Securities that it either (1) is not a Plan, a Plan Asset Entity or a Non-ERISA Arrangement and is not purchasing the Securities on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement or (2) the purchase or holding of the Securities will not result in a non-exempt prohibited transaction or a similar violation under any applicable Similar Laws.

Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is important that fiduciaries or other persons considering

Table of Contents

**Benefit Plan Investor Considerations**

purchasing the Securities on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement consult with their counsel regarding the availability of exemptive relief under any of the PTCEs listed above, the service provider exemption or the potential consequences of any purchase or holding under Similar Laws, as applicable. Purchasers of the Securities have exclusive responsibility for ensuring that their purchase and holding of the Securities do not violate the fiduciary or prohibited transaction rules of ERISA or the Code or any similar provisions of Similar Laws. The sale of any of the Securities to a Plan, Plan Asset Entity or Non-ERISA Arrangement is in no respect a representation by us or any of our affiliates or representatives that such an investment meets all relevant legal requirements with respect to investments by any such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement or that such investment is appropriate for such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement.

S-53

**Table of Contents**

# Supplemental Plan of Distribution

The amount of the Securities of any series to be sold on the applicable Initial Trade Date, and any related underwriting commissions or discounts payable to underwriters, will be specified in the applicable pricing supplement. We are not, however, obliged to, and may not, sell the full aggregate principal amount of any series of the Securities. We may suspend or cease sales of any series of the Securities at any time, at our discretion. For more information about the plan of distribution and possible market-making activities, see "Plan of Distribution" in the attached prospectus.

Broker-dealers may make a market in the Securities, although none of them are obligated to do so and any of them may stop doing so at any time without notice. This prospectus (including this product supplement and the accompanying prospectus) may be used by such dealers in connection with market-making transactions. In these transactions, dealers may resell a Security covered by this prospectus that they acquire from other holders after the original offering and sale of the Securities, or they may sell a Security covered by this prospectus in short sale transactions.

As described in more detail under "Use of Proceeds and Hedging" on page S-46, we or one of our affiliates may enter into swap agreements or related hedge transactions with one of our other affiliates or unaffiliated counterparties in connection with the sale of the Securities. UBS and/or its affiliates may earn additional income as a result of payments pursuant to these swap or related hedge transactions.

Broker-dealers and other persons are cautioned that some of their activities may result in their being deemed participants in the distribution of the Securities in a manner that would render them statutory underwriters and subject them to the prospectus delivery and liability provisions of the U.S. Securities Act of 1933. Among other activities, broker-dealers and other persons may make short sales of the Securities and may cover such short positions by borrowing Securities from UBS or its affiliates or by purchasing Securities from UBS or its affiliates subject to its obligation to repurchase such Securities at a later date. As a result of these activities, these market participants may be deemed statutory underwriters. A determination of whether a particular market participant is an underwriter must take into account all the facts and circumstances pertaining to the activities of the participant in the particular case, and the example mentioned above should not be considered a complete description of all the activities that would lead to designation as an underwriter and subject a market participant to the prospectus delivery and liability provisions of the U.S. Securities Act of 1933. This prospectus will be deemed to cover any short sales of Securities by market participants who cover their short positions with Securities borrowed or acquired from us or our affiliates in the manner described above.

UBS reserves the right to pay a portion of the Annual Tracking Fee of any series of Securities to UBS Securities LLC and certain broker-dealers in consideration for services relating to that series of the Securities including, but not limited to, promotion and distribution.

## Conflicts of Interest

UBS Securities LLC is an affiliate of UBS and, as such, has a "conflict of interest" in any potential offering within the meaning of FINRA Rule 5121. In addition, UBS may receive the net proceeds from the offering of the Securities, thus creating an additional conflict of interest within the meaning of Rule 5121. Consequently, any offering will be conducted in compliance with the provisions of Rule 5121. UBS Securities LLC is not permitted to sell Securities in any offering to an account over which it exercises discretionary authority without the prior specific written approval of the account holder.

Table of Contents

ANNEX A

## FORM OF NOTICE OF EARLY REDEMPTION

To: e-tracsredemptions@ubs.com

Subject: ETRACS Notice of Early Redemption, CUSIP No.: [    ]

[BODY OF EMAIL]

Name of broker: [    ]

Name of beneficial holder: [    ]

Number of Securities to be redeemed: [    ]

Applicable Redemption Valuation Date: [    ], 20[    ]*

Broker Contact Name: [    ]

Broker Telephone #: [    ]

Broker DTC # (and any relevant sub-account): [    ]

The undersigned acknowledges that in addition to any other requirements specified in the product supplement relating to the Securities being satisfied, the Securities will not be redeemed unless (i) this notice of redemption is delivered to UBS Securities LLC by 12:00 noon (New York City time) on the Trading Day prior to the applicable Redemption Valuation Date; (ii) the confirmation, as completed and signed by the undersigned is delivered to UBS Securities LLC by 5:00 p.m. (New York City time) on the same day the notice of redemption is delivered; (iii) the undersigned has booked a delivery vs. payment ("DVP") trade on the applicable Redemption Valuation Date, facing UBS Securities LLC DTC 642 and (iv) the undersigned instructs DTC to deliver the DVP trade to UBS Securities LLC as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

The undersigned further acknowledges that the undersigned has read the section "Risk Factors — You will not know the Redemption Amount at the time you elect to request that we redeem your Securities" in the product supplement relating to the Securities and the undersigned understands that it will be exposed to market risk on the Redemption Valuation Date.

---

\*   Subject to adjustment as described in the product supplement relating to the Securities.

A-1

**Table of Contents**

ANNEX B

**FORM OF BROKER'S CONFIRMATION OF REDEMPTION**

[TO BE COMPLETED BY BROKER] Dated:

UBS Securities LLC

UBS Securities LLC, as Calculation Agent

Fax: (203) 719-0943

To Whom It May Concern:

The holder of UBS AG $[        ] Medium-Term Notes, Series A, Exchange Traded Access Securities due [        ], CUSIP No. [        ], redeemable for a cash amount based on the performance of the [        ] Index (the "Securities") hereby irrevocably elects to receive, on the Redemption Date of [holder to specify],* with respect to the number of Securities indicated below, as of the date hereof, the Redemption Amount as described in the product supplement relating to the Securities, as supplemented by the pricing supplement relating to the Securities (as so supplemented, the "Prospectus"). Terms not defined herein have the meanings given to such terms in the Prospectus.

The undersigned certifies to you that it will (i) book a DVP trade on the applicable Redemption Valuation Date with respect to the number of Securities specified below at a price per Security equal to the Redemption Amount, facing UBS Securities LLC DTC 642 and (ii) deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

The undersigned acknowledges that in addition to any other requirements specified in the Prospectus being satisfied, the Securities will not be redeemed unless (i) this confirmation is delivered to UBS Securities LLC by 5:00 p.m. (New York City time) on the same day the notice of redemption is delivered; (ii) the undersigned has booked a DVP trade on the applicable Redemption Valuation Date, facing UBS Securities LLC DTC 642; and (iii) the undersigned will deliver the DVP trade to UBS Securities LLC as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

Very truly yours,
[NAME OF DTC PARTICIPANT HOLDER]

_____

Name:
Title:
Telephone:
Fax:
E-mail:

Number of Securities surrendered for redemption: _____
DTC # (and any relevant sub-account): _____
Contact Name: _____
Telephone: _____
Fax: E-mail: _____

*(At least 50,000 Securities must be redeemed at one time to receive the Redemption Amount on any Redemption Date.)*

_____
* Subject to adjustment as described in the product supplement relating to the Securities.

B-1

**Table of Contents**

You should rely only on the information incorporated by reference or provided in this product supplement or the accompanying prospectus. We have not authorized anyone to provide you with different information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this product supplement is accurate as of any date other than the date on the front of the document.



## TABLE OF CONTENTS

**Product Supplement**

| | |
|---|---|
| Product Supplement Summary | S-1 |
| Hypothetical Examples | S-12 |
| Risk Factors | S-18 |
| Valuation of the Index and the Securities | S-30 |
| General Terms of the Securities | S-32 |
| Use of Proceeds and Hedging | S-46 |
| Material U.S. Federal Income Tax Consequences | S-47 |
| Benefit Plan Investor Considerations | S-52 |
| Supplemental Plan of Distribution | S-54 |
| Conflicts of Interest | S-54 |
| Form of Notice of Early Redemption | A-1 |
| Form of Broker's Confirmation of Redemption | B-1 |

**Prospectus**

| | |
|---|---|
| Introduction | 1 |
| Cautionary Note Regarding Forward-Looking Statements | 3 |
| Incorporation of Information About UBS AG | 4 |
| Where You Can Find More Information | 5 |
| Presentation of Financial Information | 6 |
| Limitations on Enforcement of U.S. Laws Against UBS AG, Its Management and Others | 6 |
| UBS | 7 |
| Swiss Regulatory Powers | 10 |
| Use of Proceeds | 11 |
| Description of Debt Securities We May Offer | 12 |
| Description of Warrants We May Offer | 32 |
| Legal Ownership and Book-Entry Issuance | 47 |
| Considerations Relating to Indexed Securities | 52 |
| Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency | 55 |
| U.S. Tax Considerations | 58 |
| Tax Considerations Under the Laws of Switzerland | 69 |
| Benefit Plan Investor Considerations | 71 |
| Plan of Distribution | 73 |
| Conflicts of Interest | 75 |
| Validity of the Securities | 76 |
| Experts | 76 |

# UBS AG Monthly Rest 2×Leveraged Exchange Traded Access Securities (ETRACS)

Product Supplement dated November 14, 2014
(To Prospectus dated November 14, 2014)

**UBS Investment Bank**

# Exhibit G

# The Clintons and the sordid UE affair

**7,124**

## Just In...

**The American Health Care Act undermines Medicare**

CONGRESS BLOG

**We can't afford to save Venice on the taxpayer dime**

CONTRIBUTORS

**Trump: Portland attacks 'unacceptable'**

ADMINISTRATION

**Perez: Honor the fallen by helping veterans**

NEWS

**Innocents abroad: Trump and Temple Mount**

CONTRIBUTORS

**Watch: House GOP veterans appear in Memorial Day video**

HOUSE

**Five goals for Republicans this summer**

HOUSE

**Top Dem: Trump's refusal to back climate deal a 'striking abdication of American leadership'**

ENERGY & ENVIRONMENT



The story, as originally recounted by James V. Grimaldi and Rebecca Ballhaus of *The Wall Street Journal*, was, of itself, deeply troubling. In March 2009, after meeting with Swiss Foreign Minister Micheline Calmy-Rey, then Secretary of State Hillary Clinton intervened with the U.S. Internal Revenue Service (IRS) on behalf of Switzerland's most powerful banking institution, UBS. The IRS, which at that time was seeking the identity of wealthy Americans who had stashed some $20 billion in 52,000 tax evading UBS accounts, then agreed that the Swiss bank need only turn over information on 4,450 accounts. Afterwards, UBS increased its previous $60,000 in donations to the Clinton Foundation ten-fold. By the end of 2014, UBS donations to the Clinton Foundation totaled $600,000. UBS also "paid former President Bill Clinton $1.5 million to participate in a series of question-and-answer sessions with UBS Wealth Management Chief Executive Bob McCann, making UBS his biggest single corporate source of speech income disclosed since he left the White House."

VIEW ALL

by



Jared Kushner lands on
Mad Magazine cover



White House press corps
cries foul after Spicer...



Contrary to Pelosi's
hyperbole, Trump's...



Advertisers flee Hannity
over debunked Seth...

Those facts, of themselves, raise disturbing questions.  Did a bank that still ranks as "the world's biggest wealth manager" and has at its disposal a bevy of economists and law firms have a legitimate reason for paying Bill Clinton $1.5 million in speaking fees?  Or was the $1.5 million and the tenfold increase in Clinton Foundation donations a reward for the former secretary of State's intervention?  If the latter, that reward would have, under federal law (18 U.S.C. § 201(c)(1)(A)), amounted to an illicit bribe.

But there's a more troubling question that arises.  There can be little doubt that a media firestorm would ensue if a former president were to accept a lucrative speaking fee from the Mafia.  Should the reaction be any different when the speaking fee comes from "banksters" who defrauded the U.S. government?

That's the true context here, according to a Feb. 18, 2009 U.S. Department of Justice (DoJ) press release that discussed the details of an unsealed "criminal information" and a "deferred prosecution agreement."  The DoJ alleges that UBS did much more than permit wealthy Americans to stash billions in tax evading offshore accounts.  In direct violation of a 2000 agreement with the IRS, Swiss bankers traveled to the U.S. 3,800 times to foster the elicit business and "used encrypted laptops and other counter-surveillance techniques to help prevent the detection of their marketing efforts and the identities and offshore assets of their U.S. clients."

"UBS executives knew that UBS's cross-border business violated the law," said R. Alexander Acosta, U.S. Attorney for the Southern District of Florida.  "They refused to stop this activity...and in fact instructed their bankers to grow the business.  The reason was money -- the business was too profitable to give up.  This was not mere compliance oversight, but rather a knowing crime motivated by greed and disrespect for the law."

In exchange for the "deferred prosecution" of criminal fraud charges, UBS paid $780 million in fines and restitution, agreed to cease the illegal cross-border practice and "to immediately provide the United States government with the identities of, and account information for, certain United States customers of UBS's cross-border business," according to the DoJ press release.



## The Highest Paying Card Has Hit The Market

NEXT ADVISOR

SPONSORED CONTENT

When UBS, which could have lost its ability to conduct business in the U.S. if successfully prosecuted, balked at the IRS demand that it turn over information for all 52,000 accounts, the IRS filed a legal action seeking to compel disclosure.  That is when, at the behest of the Swiss government, Hillary Clinton stepped in to negotiate a deal that prevented the IRS from gaining access to more than 91 percent of the illicit, tax-evading offshore accounts.

# Exhibit H

# UBS 2015 Bonus Pool Swells 14%, Ermotti Gets 28% Raise

**Bloomberg**

MAR 18, 2016 - 06:47

(Bloomberg) -- UBS Group AG allocated 14 percent more money for bonuses for 2015, its most profitable year since 2010. Chief Executive Officer Sergio Ermotti received a 28 percent raise.

Ermotti's total take for 2015 was 14.3 million Swiss francs, including 11.5 million francs in performance pay, the bank said in its annual report Friday. The bonus pool swelled to 3.5 billion francs ($3.6 billion) from 3.06 billion francs distributed among employees in 2014.

To contact the reporter on this story: Jeffrey Vögeli in Zurich at jvogeli@bloomberg.net To contact the editors responsible for this story: Simone Meier at smeier@bloomberg.net Cindy Roberts

bloomberg

**Bloomberg**

# Exhibit I

5/29/2017
Case 1:17-cv-04503-JMF   Document 65-2   Filed 01/10/18   Page 156 of 160
Assistant Attorney General Lanny A. Breuer Speaks at the UBS Press Conference | OPA | Department of Justice

## JUSTICE NEWS

**Assistant Attorney General Lanny A. Breuer Speaks at the UBS Press Conference**

Washington, DC ~ Wednesday, December 19, 2012

Thank you, Attorney General Holder.

Today, UBS Japan has agreed to plead guilty in connection with one of the most significant scandals ever to hit the global banking industry. For years, including at the height of the financial crisis, UBS manipulated its submissions to the British Bankers' Association for calculation of the London Interbank Offered Rate, or LIBOR. UBS AG, the banking giant and parent company of UBS Japan, has also entered into a non-prosecution agreement with the Justice Department, agreeing together with UBS Japan to pay $500 million to resolve our allegations related to the bank's manipulation of LIBOR. Together with approximately $1 billion in regulatory penalties and disgorgement, these criminal penalties bring the total amount of today's resolution to $1.5 billion.

The bank's conduct was simply astonishing. Hundreds of trillions of dollars in mortgages, student loans, credit card debt, financial derivatives, and other financial products worldwide are tied to LIBOR, which serves as the premier benchmark for short-term interest rates. In short, the global marketplace depends upon an accurate LIBOR. Yet UBS, like Barclays before it, sought repeatedly to fix LIBOR for its own ends – in this case, so UBS traders could maximize profit on their trading positions, and so the bank wouldn't appear vulnerable to the public during the financial crisis.

In addition to UBS Japan's agreement to plead guilty, two former UBS traders – Tom Alexander William Hayes and Roger Darin – have been charged, in a criminal complaint unsealed today, with conspiracy to manipulate LIBOR. Hayes has also been charged with wire fraud and an antitrust violation. There was nothing subtle about these traders' alleged conduct. In one instance, according to the complaint, Hayes explained to a junior rate submitter that he and Darin "generally coordinate" and "skew the libors a bit." In another instance, according to the complaint, Hayes told a trader at another bank that, "3m libor is too high cause i have kept it artificially high."

The scope of the misconduct admitted to by UBS AG and UBS Japan is far-reaching. For years, traders at UBS sought to manipulate the bank's LIBOR submissions for their own profit. The traders had positions in interest rate swaps that depended on UBS's LIBOR submissions. And, on numerous occasions, they caused UBS to make LIBOR submissions that directly benefited their own trading books. UBS's manipulation was extensive, and covered several currencies and interest rates.

Make no mistake: for UBS traders, the manipulation of LIBOR was about getting rich. As one broker told a UBS derivatives trader, according to the statement of facts appended to our agreement with the bank, "mate yur getting bloody good at this libor game . . . think of me when yur on yur yacht in monaco wont yu."

From 2006 to 2009, according to the complaint unsealed today against Hayes and Darin, Hayes arranged to move UBS's Yen LIBOR submissions in directions that would maximize his profit on the trading positions he took for the bank; and Darin repeatedly made false Yen LIBOR submissions on behalf of Hayes. The complaint also alleges that Hayes contacted brokers to influence them to disseminate false information about LIBOR. Hayes further allegedly made efforts to coordinate with traders at other banks to try to move their banks' LIBOR submissions in directions that would help his trading positions.

Since the government's investigation began, UBS has changed its senior leadership and improved its compliance and training programs. UBS has also cooperated with the Justice Department, and has agreed to continue doing so, as we pursue our ongoing, and active investigation into the manipulation of LIBOR.

We cannot, and we will not, tolerate misconduct on Wall Street of the kind admitted to by UBS today, and by Barclays last June. We will continue to follow the facts and the law wherever they lead us in this matter, as we do in every case.

I want to thank the many tenacious prosecutors in the Criminal Division, as well as the Antitrust Division, who are working on the LIBOR investigation, as well as the many talented agents and analysts at the FBI who have worked so hard on this case. I would also like to thank our colleagues at the Commodity Futures Trading Commission, the United Kingdom Financial Services Authority, and the Securities and Exchange Commission for their important parallel investigations; and the Swiss Financial Market Supervisory Authority, the Japanese Ministry of Justice, and the Japan Financial Services Authority for their valuable assistance.

Thank you.

**Topic(s):**
StopFraud

**Component(s):**
Criminal Division

*Updated September 17, 2014*

Case 1:17-cv-04503-JMF  Document 65-2  Filed 01/10/18  Page 158 of 160

5/29/2017  Assistant Attorney General Leslie R. Caldwell Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation | OPA | Departm…

# JUSTICE NEWS

## Assistant Attorney General Leslie R. Caldwell Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation

Washington, DC ~ Wednesday, May 20, 2015

*Remarks as prepared for delivery*

Thank you, Bill [Baer].

The guilty pleas of five major financial institutions – from the United States and overseas – are truly historic.

The guilty plea to be entered by UBS results from the bank's breach of its non-prosecution agreement with the department through additional criminal conduct. Due to its breach, UBS will plead guilty to felony wire fraud for its LIBOR-related misconduct and pay a $203 million criminal penalty.

In December 2012, UBS admitted that it had engaged in a criminal scheme to manipulate LIBOR and other benchmark interest rates, paid a $500 million criminal penalty and entered into a non-prosecution agreement, which required the bank to commit no additional criminal conduct. Unfortunately, UBS did not sufficiently mend its ways.

UBS's criminal conduct in the benchmark interest rate markets was followed by criminal conduct in the foreign exchange markets. After signing the LIBOR non-prosecution agreement, UBS engaged in fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange market transactions to the detriment of UBS's customers. And UBS colluded with other banks in foreign exchange markets.

Other factors also led to the department's determination that UBS was in breach of its LIBOR agreement. UBS's compliance program and remedial measures following the discovery of LIBOR manipulation did not detect the collusive and deceptive sales-related conduct in the foreign exchange markets. And its conduct in the original LIBOR matter, for which it initially was not prosecuted in part because of its representations about enhancements to its compliance program, was far more serious than that of any other bank.

Perhaps most significantly, UBS has a "rap sheet" that cannot be ignored. Within the past six years, the department has resolved criminal investigations of UBS three times, resulting in non-prosecution or deferred prosecution agreements. UBS also has entered into civil and regulatory settlements on multiple occasions within the past few years. Enough is enough.

Pursuant to the terms of the plea agreement it has signed, UBS must implement an institution-wide compliance program designed to prevent and detect foreign exchange and benchmark rate manipulation and related deceptive sales practices. The department will ask the court to impose a three-year term of probation, and UBS will have to report on its progress with this compliance program. Since the LIBOR resolution, UBS has made some progress in the right direction – but that progress needs to be enhanced and accelerated, and today's resolution will require that.

Now, Barclays, too, was subject to the terms of a LIBOR NPA with the Criminal Division when it engaged in some of the collusive conduct. The department is requiring Barclays to pay a criminal penalty of $60 million – in addition to the $650 million fine that it has agreed to pay for its antitrust violations – for a total of $710 million. For several reasons, the Criminal Division is imposing this penalty but exercising its discretion not to prosecute Barclays for LIBOR-related conduct. Notably, Barclays has agreed to plead guilty – at the parent level – to antitrust violations and pay the accompanying, significant $650 million fine. In addition, Barclays has agreed to specific remediation.

5/29/2017   Assistant Attorney General Leslie R. Caldwell Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation | OPA | Departm…

Case 1:17-cv-04503-JMF   Document 65-2   Filed 01/10/18   Page 159 of 160

The five parent-level guilty pleas that the department is announcing today communicate loud and clear that we will hold financial institutions accountable for criminal misconduct.  And we will enforce the agreements that we enter into with corporations.  If appropriate and proportional to the misconduct and the company's track record, we will tear up an NPA or a DPA and prosecute the offending company based on the admitted statement of facts – as we are doing with UBS.  But we also will exercise our discretion to take other actions, where appropriate, such as assessing additional financial penalties and requiring remedial actions.

NPAs and DPAs are valuable tools, and we will continue to use them in appropriate circumstances.  And we will require that the parties who enter into those agreements live up to their terms.

The department is committed and dedicated to investigating and prosecuting financial fraud and protecting the integrity of the markets.  The resolutions announced today are just the latest in our ongoing and active investigations into the manipulation of the foreign exchange and benchmark interest rates.  To date, we have charged 12 individuals in our ongoing investigation regarding the manipulation of LIBOR and other benchmark interest rates, and three of those individuals already have pleaded guilty.  And our investigations are not over.  The banks pleading guilty today are required to cooperate in ongoing criminal investigations.

I commend the team of attorneys, paralegals and support staff from the Criminal Division's Fraud Section and the Antitrust Division in prosecuting this very sophisticated scheme.  I would like to thank the agents, accountants and financial analysts at the FBI for their excellent work in both the FX and LIBOR-related matters.  I also am grateful to the Criminal Division's Office of International Affairs, the Commodities Futures Trading Commission, the U.K. Financial Conduct Authority, the Securities and Exchange Commission and the U.K. Serious Fraud Office for their assistance as well.

Thank you.


**Component(s):**
Criminal Division

*Updated May 20, 2015*

5/29/2017     Attorney General Lynch Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation | OPA | Department of Justice

Case 1:17-cv-04503-JMF   Document 65-2   Filed 01/10/18   Page 160 of 160

# JUSTICE NEWS

**Attorney General Lynch Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation**

Washington, DC ~ Wednesday, May 20, 2015

*Remarks as prepared for delivery*

Good morning, and thank you all for being here. I am joined today by Assistant Attorney General [Bill] Baer of the Justice Department's Antitrust Division and Assistant Attorney General [Leslie] Caldwell of the Justice Department's Criminal Division, as well as our partners from the FBI and CFTC – Assistant Director in Charge [Andrew] McCabe of the FBI's Washington Field Office, and Director [Aitan] Goelman of the CFTC's Division of Enforcement. We are here to announce a major law enforcement action against international financial institutions that for years participated in a brazen display of collusion and foreign exchange rate market manipulation – and will, as a result, pay a total of nearly $3 billion in fines and penalties. Today's historic resolutions are the latest in our ongoing efforts to investigate and prosecute financial crimes, and they serve as a stark reminder that this Department of Justice intends to vigorously prosecute all those who tilt the economic system in their favor; who subvert our marketplaces; and who enrich themselves at the expense of American consumers.

Starting as early as December 2007, currency traders at several multinational banks formed a group dubbed "The Cartel." It is perhaps fitting that those traders chose that name, as it aptly describes the brazenly illegal behavior they were engaged in on a near-daily basis. For more than five years, traders in "The Cartel" used a private electronic chatroom to manipulate the spot market's exchange rate between euros and dollars using coded language to conceal their collusion. They acted as partners – rather than competitors – in an effort to push the exchange rate in directions favorable to their banks but detrimental to many others. The prices the market sets for those currencies influence virtually every sector of every economy in the world, and their actions inflated the banks' profits while harming countless consumers, investors and institutions around the globe – from pension funds to major corporations, and including the banks' own customers -- who placed their faith in the market and relied on it to produce a competitive exchange rate.

As a result of our investigation, four of the world's largest banks have agreed to plead guilty to felony antitrust violations. They are Citicorp, JPMorgan Chase & Co., Barclays PLC, and The Royal Bank of Scotland PLC. These four banks have acknowledged their role in this conspiracy and committed to changing their corporate cultures starting at the highest levels. They have also agreed to pay criminal fines totaling more than *2.5 billion* – the largest set of antitrust fines ever obtained in the history of the Department of Justice. And the fine that Citicorp alone will pay -- $925 million -- is the largest single fine ever imposed for a violation of the Sherman Act. These unprecedented figures appropriately reflect the conspiracy's breathtaking flagrancy, its systemic reach and its significant impact.

A fifth bank, Switzerland's UBS AG, has agreed to plead guilty and pay a $203 million criminal penalty for breaching the non-prosecution agreement it entered in December 2012 regarding manipulation of the London Interbank Offered Rate, or LIBOR – a benchmark interest rate used worldwide. The breach of the NPA was based in part on UBS's fraudulent and deceptive currency trading and sales practices related to foreign exchange markets, its collusion with other participants in the FX markets and its failure to take adequate action to prevent unlawful conduct after prior civil, criminal and regulatory resolutions. In other words, UBS promised, in other resolutions, not to commit additional crimes -- but it did.