This represents the first time in recent history that the Department of Justice has found that a company breached an NPA over the objection of the company. But I want to be clear: the Department of Justice, under my watch, will not hesitate to file criminal charges for financial institutions that reoffend. And banks that cannot or will not clean up their act need to understand that non-prosecution agreements and deferred-prosecution agreements carry very real consequences and will be enforced.

The penalty all these banks will now pay is fitting considering the long-running and egregious nature of their anticompetitive conduct. It is commensurate with the pervasive harm done. And it should deter competitors in the future from chasing profits without regard to fairness, to the law or to the public welfare.

Today's resolutions are a testament to the tireless efforts of the Antitrust Division's criminal enforcement sections, the Criminal Division's Fraud Section and the FBI's Washington Field Office. I want to thank all of the agents, prosecutors, law enforcement officials and analysts who contributed their time and talents to achieving these remarkable results. I also want to express my deep appreciation for the cooperation and assistance we received from the many agencies who stood with us in our pursuit of justice, including the enforcement bodies I just mentioned – the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency and the Financial Conduct Authority in the United Kingdom – as well as the Securities Exchange Commission and the Federal Reserve Bank. Finally, I would like to acknowledge my predecessor, Eric Holder, who oversaw this investigation from its inception. His relentless work made this resolution possible, and I want to thank him for his commitment to this important effort.

At this time, I'd like to introduce Assistant Attorney General [Bill] Baer, who will provide additional details on today's announcement.

**Speaker:**
Attorney General Loretta E. Lynch

**Component(s):**
Office of the Attorney General

*Updated February 9, 2017*

# Exhibit J

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 9937 / September 30, 2015

SECURITIES EXCHANGE ACT OF 1934
Release No. 76034 / September 30, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16871

| | |
|---|---|
| In the Matter of<br><br>UBS Financial Services Inc.,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against UBS Financial Services Inc. ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that

### Summary

1.        This matter involves violations of an antifraud provision of the federal securities laws in connection with Respondent's underwriting of certain municipal securities offerings. Respondent, a registered broker-dealer, conducted inadequate due diligence in certain offerings and as a result, failed to form a reasonable basis for believing the truthfulness of certain material representations in official statements issued in connection with those offerings. This resulted in Respondent offering and selling municipal securities on the basis of materially misleading disclosure documents. As a result of the conduct described herein, Respondent willfully violated Section 17(a)(2) of the Securities Act.[2]

2.        The violations discussed in this Order were self-reported by Respondent to the Commission pursuant to the Division of Enforcement's (the "Division") Municipalities Continuing Disclosure Cooperation Initiative.[3] Accordingly, this Order and Respondent's Offer are based on the information self-reported by Respondent.

### Respondent

3.        Respondent, incorporated in Delaware and headquartered in Weehawken, New Jersey is registered with the Commission as a broker-dealer and investment adviser.

### Due Diligence Failures

4.        Pursuant to Rule 15c2-12 of the Exchange Act, before purchasing or selling municipal securities in connection with an offering, underwriters are required to obtain executed continuing disclosure agreements from the issuers and/or obligated persons with respect to such municipal securities. In order to comply with the requirements of Rule 15c2-12, the continuing disclosure agreement must include an undertaking by the municipal issuer and/or obligated person, for the benefit of investors, to provide an annual report containing certain financial information and operating data to the Municipal Securities Rulemaking Board's ("MSRB") Electronic Municipal Market Access system,[4] as well as timely notice of certain specified events

---

[1]  The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]  A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'"  Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)).

[3]  See Div. of Enforcement, U.S. Sec. & Exch. Comm'n, Municipalities Continuing Disclosure Cooperation Initiative, http://www.sec.gov/divisions/enforce/municipalities-continuing-disclosure-cooperation-initiative.shtml (last modified Nov. 13, 2014).

[4]  Previously, Rule 15c2-12 required such information to be provided to the appropriate nationally recognized municipal securities information repositories. In December 2008, Rule 15c2-12 was amended to designate the

pertaining to the municipal securities being offered and timely notice of any failure to submit an annual report on or before the date specified in the continuing disclosure agreement.

5.      Rule 15c2-12(f)(3) requires that a final official statement set forth any instances in the previous five years in which an issuer of municipal securities, or obligated person, failed to comply in all material respects with any previous continuing disclosure undertakings.

6.      Respondent acted as either a senior or sole underwriter in a number of municipal securities offerings in which the official statements essentially represented that the issuer or obligated person had not failed to comply in all material respects with any previous continuing disclosure undertakings.  In fact, certain of these statements were materially false and/or misleading because the issuer or obligated person had not complied in all material respects with its previous continuing disclosure undertakings.  Among the offerings in which the official statements contained false or misleading statements about prior compliance were the following:

- A competitive securities offering in 2011 and another in 2012 in which an issuer failed to disclose that it filed annual financial reports and operating data for two fiscal years between 196 and 771 days late, and failed to file required notices of late filings for each of those.  Respondent also acted as underwriter for a prior offering by the issuer;

- A 2011 competitive securities offering in which an issuer failed to disclose that, despite filing timely audited financial statements, it failed to file an annual continuing disclosure report containing certain operating data that it had previously undertaken to file for three of the previous five years, and that it had failed to file the required late filings for each of those.  Respondent also acted as an underwriter for a prior offering by the issuer; and

- A competitive securities offering in 2011 and another in 2013 in which an issuer failed to disclose that it had filed two annual financial reports between 300 and 666 days late, failed to file operating data that it had previously undertaken to provide for any of the previous five years, and failed to file required late filings for each of those.  Respondent also acted as an underwriter for a prior offering by the issuer.

7.      Respondent failed to form a reasonable basis through adequate due diligence for believing the truthfulness of the assertions by these issuers and/or obligors regarding their compliance with previous continuing disclosure undertakings pursuant to Rule 15c2-12.

<u>Legal Discussion</u>

8.      Section 17(a)(2) of the Securities Act makes it unlawful "in the offer or sale of any securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make

---

MSRB's Electronic Municipal Market Access system as the central repository for ongoing disclosures by municipal issuers, effective July 1, 2009.

the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2) (2012). Negligence is sufficient to establish a violation of Section 17(a)(2). See Aaron v. SEC, 446 U.S. 680, 696-97 (1980). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).

9.      An underwriter may violate the antifraud provisions of the federal securities laws if it does not have a reasonable basis for believing the truthfulness of material statements in offering documents in connection with a securities offering, as a result of inadequate due diligence. "By participating in an offering, an underwriter makes an implied recommendation about the securities [that it] . . . has a reasonable basis for belief in the truthfulness and *completeness* of the key representations made in any disclosure documents used in the offerings." Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 641 (D.C. Cir. 2008) (emphasis added) (quoting Municipal Securities Disclosure, Exchange Act Release No. 26100, 53 Fed. Reg. 37778, 37787 (Sept. 28, 1988) ("1988 Proposing Release")); see also City Securities Corp., Exchange Act Release No. 70056, 2013 WL 3874855, at *1-2 (July 29, 2013) (finding underwriter violated anti-fraud provisions by failing to conduct due diligence related to issuer's statements regarding its compliance with previous continuing disclosure undertakings).

10.     An underwriter "occupies a vital position" in a securities offering because investors rely on its reputation, integrity, independence, and expertise. See Dolphin & Bradbury, 512 F.3d at 641 (quoting 1988 Proposing Release, 53 Fed. Reg. at 37787). While broker-dealers must have a reasonable basis for recommending securities to customers, underwriters have a "heightened obligation" to take steps to ensure adequate disclosure. Id. (quoting 1988 Proposing Release, 53 Fed. Reg. at 37787 n.74).

11.     Rule 15c2-12 was adopted in an effort to improve the quality and timeliness of disclosures to investors in municipal securities. In recognition of the fact that the disclosure of sound financial information is critical to the integrity of not just the primary market, but also the secondary markets for municipal securities, Rule 15c2-12 requires an underwriter to obtain a written agreement, for the benefit of the holders of the securities, in which the issuer undertakes (among other things) to annually submit certain financial information. See 17 C.F.R. § 240.15c2-12(b)(5)(i) (2015); see also Municipal Securities Disclosure, Exchange Act Release No. 34961, 59 Fed. Reg. 59590, 59592 (Nov. 17, 1994). Critical to any evaluation of an undertaking to make disclosures is the likelihood that the issuer or obligated person will abide by the undertaking. See id. at 59594. The disclosure requirements of Rule 15c2-12 provide an incentive for issuers and obligated persons to comply with their undertakings, allowing underwriters, investors, and others to assess the reliability of the disclosure representations. See Municipal Securities Disclosure, 59 Fed. Reg. at 59595.

12.     As a result of the conduct described herein, Respondent willfully violated Section 17(a)(2) of the Securities Act.

## Cooperation

13.    In determining to accept Respondent's offer, the Commission considered the cooperation of Respondent in self-reporting the violations.

## Undertakings

14.    Respondent has undertaken to:

a.    Retain an independent consultant (the "Independent Consultant"), not unacceptable to the Commission staff, to conduct a review of Respondent's policies and procedures as they relate to municipal securities underwriting due diligence. The Independent Consultant shall not have provided consulting, legal, auditing or other professional services to, or had any affiliation with, Respondent during the two years prior to the institution of these proceedings. Respondent shall cooperate fully with the Independent Consultant and the Independent Consultant's compensation and expenses shall be borne by Respondent.

b.    Require the Independent Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Division enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement. The agreement will also provide that, within 180 days of the institution of these proceedings, the Independent Consultant shall submit a written report of its findings to Respondent, which shall include the Independent Consultant's recommendations for changes in or improvements to Respondent's policies and procedures.

c.    Adopt all recommendations contained in the Independent Consultant's report within 90 days of the date of that report, provided, however, that within 30 days of the report, Respondent shall advise in writing the Independent Consultant and the Commission staff of any recommendations that Respondent considers to be unduly burdensome, impractical or inappropriate. With respect to any such recommendation, Respondent need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedures or system designed to achieve the same objective or purpose. As to any recommendation on which Respondent and the Independent Consultant do not agree, Respondent and the Independent Consultant shall attempt in good faith to reach an agreement within 60 days after the date of the Report. Within 15 days after the conclusion of the discussion and evaluation by Respondent and the

5

Independent Consultant, Respondent shall require that the Independent Consultant inform Respondent and the Commission staff in writing of the Independent Consultant's final determination concerning any recommendation that Respondent considers to be unduly burdensome, impractical, or inappropriate. Within 10 days of this written communication from the Independent Consultant, Respondent may seek approval from the Commission staff to not adopt recommendations that the Respondent can demonstrate to be unduly burdensome, impractical, or inappropriate. Should the Commission staff agree that any proposed recommendations are unduly burdensome, impractical, or inappropriate, Respondent shall not be required to abide by, adopt, or implement those recommendations.

     d.    Certify, in writing, compliance with the undertakings set forth above in paragraphs 14(a)-(c). The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to LeeAnn Ghazil Gaunt, Chief, Municipal Securities and Public Pensions Unit, with a copy to the Office of Chief Counsel of the Division, no later than the one-year anniversary of the institution of these proceedings.

     e.    Respondent shall cooperate with any subsequent investigation by the Division regarding the subject matter of this Order, including the roles of other parties.

     f.    For good cause shown, the Commission staff may extend any of the procedural dates relating to these undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Section 15(b) of the Exchange Act, it is hereby ORDERED that:

     A.    Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act.

     B.    Respondent shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $480,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury in accordance with Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717. Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at                                      ; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying UBS Financial Services Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to LeeAnn Ghazil Gaunt, Chief, Municipal Securities and Public Pensions Unit, Securities and Exchange Commission, 33 Arch Street, 23rd Floor, Boston, MA 02110-1424.

C.     Respondent shall comply with the undertakings enumerated in Paragraphs 14(a)-(d), above.

By the Commission.


Brent J. Fields
Secretary

# Exhibit K

# Risk Factors

*We issued the Securities initially in an amount having the aggregate Principal Amount of $25,000,000 on December 13, 2013, and issued additional securities having the aggregate Principal Amount of $75,000,000 on January 15, 2014 and additional securities having the aggregate Principal Amount of $400,000,000 on May 19, 2014. The Securities are part of a single series of senior debt securities issued under our indenture dated as of November 21, 2000 between us and U.S. Bank Trust National Association, as trustee, as supplemented by the First Supplemental Indenture thereto, dated as of February 28, 2006. In this pricing supplement, the term "Securities" collectively refers to the original securities we issued beginning on December 13, 2013 and the additional securities we issued on January 15, 2014 and May 19, 2014, respectively, unless the context otherwise requires.*

Your investment in the Securities will involve significant risks. The Securities are not secured debt and are significantly riskier than ordinary unsecured debt securities. Unlike ordinary debt securities, the return on the Securities is linked to the performance of the Index. The Securities are two times leveraged with respect to the Index and, as a result, may benefit from two times any positive, but will be exposed to two times any negative, monthly performance of the Index. As described in more detail below, the trading price of the Securities may vary considerably before the Maturity Date, due to, among other things, fluctuations in the markets to which the Index Constituent Securities are tied and events that are difficult to predict and beyond our control. Investing in the Securities is not equivalent to investing directly in the Index Constituent Securities (as defined in the accompanying product supplement) or in the Index itself.

*As more fully described in the accompanying product supplement, investing in the Securities, a series of Monthly Pay 2xLeveraged Exchange Traded Access Securities (ETRACS), involves significant risks. In addition to the risks relating to the Index and closed-end funds, the structure of the Securities involves the risk of loss of your entire investment, leverage risk, correlation and compounding risk and market risk, among other complex risks. As a result, the Securities may not be a suitable investment for some investors. We urge you to read the more detailed explanation of these risks described under "Risk Factors" in the accompanying product supplement, together with "Considerations Relating to Indexed Securities" in the accompanying prospectus and the other information in this pricing supplement, the accompanying product supplement and the accompanying prospectus, before investing in the Securities.*

## The Index has a limited performance history.

The Index was launched on April 11, 2013, and therefore has no performance history prior to that date. Because the Index has no history prior to April 11, 2013, little or no historical information will be available for you to consider in making an independent investigation of the Index performance, which may make it difficult for you to make an informed decision with respect to an investment in the Securities. In addition, we are unable to provide hypothetical, or "back-tested", Index returns; therefore you will not have any hypothetical data to consider when making an investment decision. The lack of hypothetical data may also make it difficult for you to evaluate the potential future performance of the Index.

## Risks associated with closed-end funds.

Investments in closed-end funds involve certain risks. Because the Securities are linked to the performance of an index comprised solely of closed-end funds, you should carefully consider the following risks associated with investments in closed-end funds generally as well as the strategic risks and sector risks associated with investing in funds with specialized investment strategies, as described below.

### The Index Constituent Securities may trade at fluctuating discounts from or premiums to their net asset values, and this may adversely affect your return.

Shares of closed-end funds typically trade in the open market at discounts from, or premiums to, their net asset value ("NAV"). The levels of such discounts and premiums may fluctuate significantly over time in response to supply and demand, which are influenced by various factors. The level of the Index, and thus the return on the Securities, will be adversely affected if the Index Constituent Securities experience decreases in premiums or increases in discounts, which is a separate risk from the risk of a decline in the value of the Securities due to decreases in the NAVs of the Index Constituent Securities.

### The Index Constituent Securities are subject to market risk.

The prices of shares of closed-end funds are sensitive to general movements in the stock market. A drop in the stock market may depress the prices of shares of closed-end funds. Share prices, like other investments, may move up or down, sometimes rapidly and unpredictably. In addition, market prices of the shares of closed-end funds may be affected by investors' perceptions regarding closed-end funds generally or their underlying investments. Events that have an adverse effect on the stock market as a whole could have a similarly adverse effect on the value of the Securities, and such adverse effects may not be predictable.

### The Index Constituent Securities are subject to management risk.

The success of the strategy of any closed-end fund is subject to the ability of the fund manager to achieve the fund's investment objective. The Index Constituent Securities may not be managed by individuals who are able to achieve their specified investment objectives, and even previously successful fund managers may be unable, due to general financial, economic and political conditions or due to other factors beyond their control, to achieve their investment objectives. Past success in meeting investment objectives does not necessarily indicate that the fund manager will be able to continue to do so. If the fund manager of one or more of the Index Constituents is unable to achieve the relevant fund's investment objective, the NAV of the fund may decrease and the value of the Securities may be adversely affected.

### Shares of closed-end funds do not assure dividend payments.

Closed-end funds do not guarantee the payment of dividends. Dividends are paid only when declared by the boards of directors of closed-end funds, and the level of dividends may vary over time. If an Index Constituent reduces or eliminates the level of its regular dividends, this may cause the market price of its shares, and therefore of the Securities, to fall.

### Certain Index Constituents may be classified as "non-diversified."

Certain closed-end funds, including some of the Index Constituents, may be classified as "non-diversified" under the Investment Company Act of 1940, as amended. A non-diversified fund has the ability to invest more of its assets in securities of a single issuer than if it were classified as a "diversified" fund, which may increase volatility. If the closed-end fund's investment in an issuer represents a relatively significant percentage of the closed-end fund's portfolio, the value of the portfolio will be more impacted by a loss on that investment than if the portfolio were more diversified. If the investments of the Index Constituent Securities are concentrated in a particular issuer or set of issuers that experiences a loss, the value of the Securities could be affected.

### The value of a closed-end fund may not accurately track the value of the securities in which such closed-end fund invests.

Although the trading characteristics and valuations of a closed-end fund will usually mirror the characteristics and valuations of the securities in which such closed-end fund invests, its value may not

accurately track the value of such securities. The value of a closed-end fund will also reflect transaction costs and fees that the closed-end fund constituents do not have. Accordingly, the performance of a closed-end fund may not be equal to the performance of the closed-end fund constituents during the term of the Securities.

**The organizational documents of the closed-end funds underlying the Securities may contain anti-takeover provisions.**

The organizational documents of certain of the Index Constituents may include provisions that could limit the ability of other entities or persons to acquire control of the relevant Index Constituent or to change the composition of its board. These provisions could limit the ability of shareholders to sell their shares at a premium to prevailing market prices by discouraging a third party from seeking to obtain control of the relevant Index Constituent.

**The Index Constituent Securities are subject to portfolio turnover risk.**

A closed-end fund may engage in portfolio trading. There are generally no limits on the rate of portfolio turnover. Higher turnover rates result in correspondingly greater brokerage commissions and other transactional expenses which are borne by the applicable closed-end fund, directly or through its investment in its underlying assets, which may adversely affect the value of the Securities. Higher turnover rates also may be more likely to generate capital gains that must be distributed to holders, either as a result of a closed-end fund's receipt of capital gains from transactions or from other investments.

**Strategic risks associated with closed-end funds.**

Closed-end funds employ various strategies to achieve their investment objectives. The following outlines the key risks of strategies pursued by closed-end funds.

**Risks of leverage strategies.**

The Index Constituents may be leveraged. Leverage magnifies both the potential for gain and the risk of loss. Leverage may result from ordinary borrowings or may be inherent in the structure of certain Index Constituent investments such as derivatives. If the prices of such investments decrease, or if the cost of borrowing exceeds any increase in such prices, the NAV of the relevant Index Constituent Security will decrease faster than if it had not used leverage. To repay borrowings, an Index Constituent may have to sell investments at a time and at a price that is unfavorable. An investment in securities of Index Constituents that use leverage may expose the Securities to higher volatility in the market value of such securities and the possibility that the Securities' long-term returns on such securities will be diminished.

**Risks of covered call writing strategies.**

Many of the closed-end funds included in the Index engage in a strategy known as "covered call option writing," which is designed to produce income from option premiums and offset a portion of a market decline in the underlying security. The writer (seller) of a covered call option forgoes, during the option's life, the opportunity to profit from increases in the market value of the security covering the call option above the sum of the premium and the strike price of the call, but retains the risk of loss should the price of the underlying security decline. The writer of an option has no control over the time at which it may be required to fulfill its obligation as writer of the option. Once an option writer has received an exercise notice, it cannot effect a closing purchase transaction in order to terminate its obligation under the option and must deliver the underlying security at the exercise price. As a result, the Index Constituents that engage in covered call option writing may write options on securities that subsequently increase in value above the sum of the premium and the strike price of the call, which could cause such Index Constituents to receive a lower return on such securities than if they had not written such options.

### Risks of investing in senior loans.

The Index is comprised of closed-end funds that may invest in senior loans. Investments in senior loans typically are below investment grade and are considered speculative because of the credit risk of their issuers. Such companies are more likely to default on their payments of interest and principal owed, and such defaults could reduce the NAV of one or more Index Constituent Securities. In addition, an Index Constituent may have to sell securities at lower prices than it otherwise would to meet cash needs or it may have to maintain a greater portion of its assets in cash equivalents than it otherwise would because of impairments and limited liquidity of the collateral supporting a senior loan, which could negatively affect the Index Constituent's performance and therefore, indirectly, negatively affect the value of the Securities.

### Risks of investing in equity securities.

The Index is comprised of closed-end funds that invest in equities. Common stock holds the lowest priority in the capital structure of a company, and therefore takes the largest share of the company's risk and its accompanying volatility. An adverse event, such as an unfavorable earnings report, may depress the value of a particular common stock. Also, prices of common stocks are sensitive to general market movements. In addition, common stock does not assure dividend payments, and common stockholders have a right to receive dividends only after the company has provided for payment to its creditors, bondholders and preferred stockholders. Dividends are paid only when declared by an issuer's board of directors, and the amount of any dividend may vary over time.

### Risks of investing in small- and medium-capitalization companies.

Some of the Index Constituents invest in small- and medium-capitalization companies. Such companies may be more volatile and more likely than large-capitalization companies to have narrower product lines, fewer financial resources, less management depth and experience and less competitive strength. Returns on investments in securities of these companies could trail the returns on investments in securities of larger companies.

### Risks of investing in fixed income securities.

The Index is comprised of closed-end funds that may invest in fixed income securities, which may include investment grade and high yield municipal bonds, high yield corporate bonds and emerging market sovereign bonds. Investing in the Securities, which are linked to Index Constituents that may invest in fixed income securities, differs significantly from investing directly in bonds themselves and holding them until maturity since the values of the Index Constituent Securities fluctuate, at times significantly, during each Trading Day based upon the current market prices of the underlying bonds. The market prices of these bonds are volatile and significantly influenced by a number of factors, particularly the yields on these bonds as compared to current market interest rates and the actual or perceived credit quality of the issuer of these bonds.

In general, fixed income securities are significantly affected by changes in current market interest rates. As interest rates rise, the price of fixed income securities, including those underlying the Index Constituent Securities, is likely to decrease. Securities with longer durations tend to be more sensitive to interest rate changes, usually making them more volatile than securities with shorter durations. To the extent that the Index Constituents invest in fixed income securities with a longer term remaining to maturity, the risk of price volatility in the underlying securities and, consequently, the volatility in the value of the Index Constituent Securities, will be increased. As a result, rising interest rates may cause the value of the bonds underlying the Index Constituent Securities, the Index Constituent Securities and, therefore, the Securities, to decline.

Interest rates are subject to volatility due to a variety of factors, including:

➤ sentiment regarding underlying strength in the U.S. and global economies;

➤ expectations regarding the level of price inflation;

➤ sentiment regarding credit quality in the U.S. and global credit markets;

➤ central bank policies regarding interest rates; and

➤ the performance of U.S. and foreign capital markets.

In addition, the prices of the Index Constituents that invest in fixed income securities may be significantly influenced by the creditworthiness of the issuers of the bonds. Such Index Constituents may have their credit ratings downgraded, including a downgrade from investment grade to non-investment grade status, or have their credit spreads widen significantly. Following a ratings downgrade or the widening of credit spreads, some or all of the underlying bonds may suffer significant and rapid price declines. These events may affect only a few or a large number of the underlying bonds. For example, during the recent credit crisis in the United States, credit spreads widened significantly as the market demanded very high yields on a variety of bonds and, as a result, the prices of such bonds dropped significantly. There can be no assurance that some or all of the factors that contributed to this credit crisis will not continue or return during the term of the Securities, and, consequently, depress the price, perhaps significantly, of the underlying bonds and therefore the value of the Index Constituent Securities and the Securities.

### Risks of investing in high yield bonds.

The Index is comprised of closed-end funds that may invest in U.S. dollar high yield corporate and municipal bonds and are therefore subject to high yield securities risk, which is the risk that securities that are rated below investment grade (commonly known as "junk bonds," including those bonds rated at BB+ or lower by S&P or Fitch or Ba1 or lower by Moody's) may be more volatile than higher-rated securities of similar maturity. High yield securities may also be subject to greater levels of credit or default risk than higher-rated securities. The value of high yield securities can be adversely affected by overall economic conditions, such as an economic downturn or a period of rising interest rates, and high yield securities may be less liquid and more difficult to sell at an advantageous time or price or to value than higher-rated securities. In particular, high yield securities are often issued by smaller, less creditworthy companies or municipalities or by highly leveraged (indebted) firms or municipalities, which are generally less able than more financially stable firms or municipalities to make scheduled payments of interest and principal.

### Risks of investing in preferred stock.

The Index is comprised of closed-end funds that may invest in preferred stock. Generally, preferred stockholders have no voting rights with respect to the issuing company unless certain events occur. In addition, preferred stock is subordinated to bonds and other debt instruments in a company's capital structure and therefore will be subject to greater credit risk than those debt instruments. Unlike debt securities, dividend payments on preferred stock typically must be declared by the issuer's board of directors. An issuer's board of directors is generally not under any obligation to pay a dividend (even if such dividends have accrued), and may suspend payment of dividends on preferred stock at any time. In the event an issuer of preferred stock experiences economic difficulties, the issuer's preferred stock may lose substantial value due to the reduced likelihood that the issuer's board of directors will declare a dividend and the fact that the preferred stock may be subordinated to other securities of the same issuer. There is a chance that the issuer of preferred stock will default (fail to make scheduled dividend payments on the preferred stock or scheduled interest payments). In addition, because some preferred stock may pay dividends at a fixed rate, the market price can be sensitive to changes in interest rates in a manner similar to bonds — that is, as interest rates rise, the value of the preferred stock is likely to

decline. To the extent that any Index Constituents invest a substantial portion of their assets in fixed rate preferred stock, rising interest rates may cause the value of such Index Constituents' investments to decline significantly.

### Risks of investing in convertible securities.

The Index is comprised of closed-end funds that may invest in convertible securities, which are bonds, debentures, notes, preferred securities or other securities that may be converted or exchanged (by the holder or the issuer) into shares of the underlying common stock (or cash or securities of equivalent value), either at a stated price or stated rate. Convertible securities have characteristics similar to both fixed income and equity securities. Generally, convertible securities are subordinated to other similar but non-convertible securities of the same issuer, although convertible bonds, as corporate debt obligations, are senior in right of payment to all equity securities, and convertible preferred stock is senior to common stock, of the same issuer. Because of the subordination feature, convertible securities are typically considered to be of lower quality than similar non-convertible securities.

### Risks of investing in municipal bonds.

Closed-end funds may invest in municipal bonds. Municipal securities issuers may face local economic or business conditions (including bankruptcy) and litigation, legislation or other political events that could have a significant effect on the ability of the municipality to make payments on the interest or principal of its municipal bonds. In addition, because municipalities issue municipal securities to finance similar types of projects, such as education, healthcare, transportation, infrastructure and utility projects, conditions in those sectors can affect the overall municipal bond market. Furthermore, changes in the financial condition of one municipality may affect the overall municipal bond market.

### Risks of investing in illiquid securities.

Closed-end funds are not limited in their ability to invest in illiquid securities, and as a result, some of the Index Constituents may invest all or a substantial portion of their net assets in illiquid securities. Securities with reduced liquidity involve greater risk than securities with more liquid markets. Market quotations for securities not traded on national exchanges may vary over time, and if the credit quality of a fixed-income security unexpectedly declines, secondary trading of that security may decline for a period of time. If an Index Constituent chooses to (or is forced to) liquidate illiquid portfolio assets during periods of infrequent trading, it may not receive full value for those assets.

### Risk of investing in mortgage-backed and asset-backed securities.

The Index is comprised of closed-end funds that may invest in mortgage- and asset-backed securities. Investments in mortgage- and asset-backed securities are subject to prepayment or call risk, which is the risk that borrowers may prepay their loans at faster than expected rates. Such securities may be prepaid at a price less than the original purchase value. Certain mortgage- and asset-backed securities may be more volatile, less liquid and more difficult to value than traditional debt securities.

Mortgage and asset-backed securities have different risk characteristics from traditional debt securities. Although generally the value of fixed-income securities increases during periods of falling interest rates and decreases during periods of rising rates, this is not always the case with mortgage and asset-backed securities. This is due to the fact that principal may be prepaid at any time as well as other factors. Generally, prepayments will increase during a period of falling interest rates and decrease during a period of rising interest rates. The rate of prepayments also may be influenced by economic and other factors, such as changes in credit use and payment patterns. Mortgage- and asset-backed securities also involve the risk that various federal and state consumer laws and other legal, regulatory and economic factors may result in the collateral backing the securities being insufficient to support payment on the securities.

*Derivatives risk.*

Certain Index Constituents may invest in, or enter into, derivatives such as forward contracts, options, futures contracts, options on futures contracts and swap agreements. A derivative instrument often has risks similar to its underlying instrument and may have additional risks, including imperfect correlation between the value of the derivative and the underlying instrument, risks of default by the counterparty to certain derivative transactions, magnification of losses incurred due to changes in the market value of the securities, instruments, indices or interest rates to which the derivative relates, and risks that the derivative instruments may not be liquid.

Derivatives can be volatile, and may entail investment exposures that are greater than their cost would suggest, meaning that a small investment in derivatives could have a large potential impact on an Index Constituent Security's performance. Changes in liquidity may result in significant, rapid and unpredictable changes in the prices for derivatives. Successful use of derivatives is subject to the ability of the Index Constituent's manager to predict correctly movements in the direction of the relevant market and, to the extent the transaction is entered into for hedging purposes, to ascertain the appropriate correlation between the transaction being hedged and the price movements of the derivatives.

*Risks associated with emerging market issuers.*

Some of the Index Constituents invest in emerging markets, and therefore the Securities are subject to emerging markets risk. Investments in securities linked directly or indirectly to emerging market securities involve many risks, including, but not limited to: economic, social, political, financial and military conditions in the emerging market; regulation by national, provincial, and local governments; less liquidity and smaller market capitalizations than exist in the case of many large U.S. companies; different accounting and disclosure standards; and political uncertainties. Securities of emerging market issuers may be more volatile and may be affected by market developments differently than U.S. issuers. Government interventions to stabilize securities markets and cross-shareholdings may affect prices and volume of trading of the securities of emerging market issuers. Economic, social, political, financial and military factors could, in turn, negatively affect such issuers' value. These factors could include changes in the emerging market government's economic and fiscal policies, possible imposition of, or changes in, currency exchange laws or other laws or restrictions applicable to the emerging market issuers or investments in their securities, and the possibility of fluctuations in the rate of exchange between currencies. Moreover, emerging market economies may differ favorably or unfavorably from the U.S. economy in a variety of ways, including growth of gross national product, rate of inflation, capital reinvestment, resources and self-sufficiency. You should carefully consider the risks related to emerging markets, to which the Securities are susceptible, before making a decision to invest in the Securities.

*Risks associated with foreign securities markets.*

The Index is comprised of closed-end funds that may invest in stocks and bonds issued by foreign issuers. An investment in securities linked directly or indirectly to the value of securities issued by non-U.S. issuers involves particular risks. Generally, non-U.S. securities markets may be more volatile than U.S. securities markets, and market developments may affect non-U.S. securities markets differently from U.S. securities markets. Direct or indirect government intervention to stabilize these non-U.S. securities markets, as well as cross shareholdings in non-U.S. issuers, may affect trading prices and volumes in those markets. There is generally less publicly available information about non-U.S. issuers than about those U.S. issuers that are subject to the reporting requirements of the SEC, and non-U.S. issuers are subject to accounting, auditing and financial reporting standards and requirements that differ from those applicable to U.S. reporting issuers. Securities prices in non-U.S. countries are subject to political, economic, financial and social factors that may be unique to the particular country. These factors, which could negatively affect the non-U.S. securities markets, include the possibility of recent or future changes

in the non-U.S. government's economic and fiscal policies, the possible imposition of, or changes in, currency exchange laws or other non-U.S. laws or restrictions applicable to non-U.S. issuers or investments in non-U.S. securities and the possibility of fluctuations in the rate of exchange between currencies. Moreover, certain aspects of a particular non-U.S. economy may differ favorably or unfavorably from the U.S. economy in important respects, such as growth of gross national product, rate of inflation, capital reinvestment, resources and self-sufficiency. Finally, it will likely be more costly and difficult to enforce the laws or regulations of a non-U.S. country or exchange.

### *Risks of investing in commodities or in securities linked to commodity prices.*

The Securities are linked to closed-end funds that may invest in commodities, which may consist of futures contracts rather than physical commodities, or in securities linked to commodity prices. Unlike equities, which typically entitle the holder to a continuing stake in a corporation, commodity futures contracts normally specify a certain date for delivery of the underlying physical commodity. As the exchange-traded futures contracts that comprise a portion of an Index Constituent's portfolio approach expiration, they may be replaced by contracts that have a later expiration. Thus, for example, a contract purchased and held in August may specify an October expiration. As time passes, the contract expiring in October is replaced by a contract for delivery in December. This process is referred to as "rolling."

If the market for these contracts is in "backwardation," which means the prices are lower in the distant delivery months than in the nearer delivery months, the purchase of the December contract would take place at a price that is lower than the sale price of the October contract. Conversely, if the market for these contracts is in "contango," which means that the prices are higher in the distant delivery months than in the nearer delivery months, the purchase of the December contract would take place at a price that is higher than the sale price of the October contract. The difference between the prices of the two contracts when they are rolled is sometimes referred to as a "roll yield," and the change in price that contracts experience while they are components of the portfolio is sometimes referred to as a "spot return." An investor in the Securities cannot receive either the roll yield or the spot return separately.

The presence of contango in the relevant futures market could result in negative roll yields, which could adversely affect the value of some of the Index Constituent Securities and therefore the Securities. Because of the potential effects of negative roll yields, it is possible for the value of the relevant Index Constituent Securities to decrease significantly over time even when the near-term or spot prices of the relevant commodity are stable or increasing. It is also possible, when near-term or spot prices of the relevant commodity are decreasing, for the value of the relevant Index Constituent Securities to decrease significantly over time even when some or all of the constituent commodities are experiencing backwardation.

In addition, trading in futures contracts is speculative and can be extremely volatile. Market prices may fluctuate rapidly based on numerous factors, including: changes in supply and demand relationships (whether actual, perceived, anticipated, unanticipated, or unrealized); trade; fiscal monetary and exchange control programs; domestic and foreign political and economic events and policies; technological developments; changes in interest rates; and monetary and other governmental policies, action or inaction. These factors may affect the value of some of the Index Constituent Securities and of the Securities in varying ways, and different factors may cause the value of certain commodities, and the volatilities of their prices, to move in inconsistent directions at inconsistent rates.

### *Currency exchange rate risk.*

The Securities are linked to closed-end funds that invest in securities that are traded and quoted in foreign currencies on non-U.S. markets. Therefore, holders of the Securities will be exposed to currency exchange rate risk with respect to the currencies in which such securities trade. The values of the

currencies of the countries in which such closed-end funds may invest may be subject to a high degree of fluctuation due to changes in interest rates, the effects of monetary policies issued by the United States, foreign governments, central banks or supranational entities, the imposition of currency controls or other national or global political or economic developments. An investor's net exposure will depend on the extent to which the relevant non-U.S. securities strengthen or weaken against the U.S. dollar and the relative weight of each non-U.S. security in the portfolios of such closed-end funds. If, taking into account such weighting, the U.S. dollar strengthens against the relevant non-U.S. currencies, the value of the securities in which such closed-end funds invest will be adversely affected and the value of the Securities may decrease.

## Sector and industry concentration risks associated with closed-end funds.

The Securities will be more exposed to losses in a particular industry or sector to the extent that the Index Constituents concentrate their investments in such industry or sector. As a result, the Securities may be subject to loss due to adverse occurrences that affect such industries or sectors, even if general market conditions are favorable. The Index Constituent Securities will vary over time, and thus are not limited to the following particular sector and industries.

### Risks associated with the energy and natural resources industries.

Some of the Index Constituents invest in companies that are engaged in or exposed to the energy and natural resources industries, including the oil and gas sector. Equities in the energy and natural resources sectors are significantly affected by a number of factors including:

➤ worldwide and domestic supplies of, and demand for, crude oil, natural gas, natural gas liquids, hydrocarbon products and refined products;

➤ changes in tax or other laws affecting master limited partnerships generally;

➤ developments relating to energy conservation policies;

➤ regulatory changes affecting pipeline fees and other regulatory fees in the energy and natural resources sectors;

➤ changes in the relative prices of competing energy and natural resources products;

➤ the impact of environmental laws and regulations and technological changes affecting the cost of producing and processing, and the demand for, energy and natural resources products;

➤ decreased supply of products available to be transported, mined, processed, stored or distributed due to fewer discoveries of new reserves, short- or long-term supply disruptions, or otherwise;

➤ risks of regulatory actions and/or litigation, including as a result of leaks, explosions or other accidents relating to energy or natural resources products;

➤ uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or further acts of terrorism in the United States or elsewhere; and

➤ general economic and geopolitical conditions in the United States and worldwide.

These or other factors or the absence of such factors could cause a downturn in the energy and natural resources industries generally or regionally and could cause the value of some or all of the Index Constituent Securities to decline during the term of the Securities.

### Risks of investing in the real estate industry.

The Index is comprised of closed-end funds that may invest, directly or indirectly (such as by investing in REITs), in real estate, which subjects the value of the Index to many of the risks of owning real estate

directly, such as decreases in real estate values, overbuilding, increased competition and other risks related to local or general economic conditions, increases in operating costs and property taxes, changes in zoning laws, casualty or condemnation losses, possible environmental liabilities, regulatory limitations on rent and fluctuations in rental income. Therefore, adverse economic, business or political developments affecting the value of real estate could have an effect on the value of the Securities.

### Risks associated with the financial services sector.

The financial services sector includes companies engaged in banking, commercial and consumer finance, investment banking, brokerage, asset management, custody or insurance. Because the Index includes closed-end funds which may invest in companies that operate in or invest in the financial services sector, the Securities are sensitive to changes in, and its performance may depend on, the overall condition of the financial services sector. Companies in the financial services sector may be subject to extensive government regulation that affects the scope of their activities, the prices they can charge and the amount of capital they must maintain. The profitability of companies in the financial services sector may be adversely affected by increases in interest rates. The profitability of companies in the financial services sector may be adversely affected by loan losses, which usually increase in economic downturns. In addition, the financial services sector is undergoing numerous changes, including continuing consolidations, development of new products and structures and changes to its regulatory framework. Furthermore, increased government involvement in the financial services sector could result in a change of the Index's exposure to financial institutions. Recent developments in the credit markets have caused companies operating in the financial services sector to incur large losses, experience declines in the value of their assets and even cease operations.

### The Index comprises securities chosen based in part on their recent fund yield, fund share price discount from or premium to NAV and fund average daily value of shares traded.

The Index Constituent Securities are included in the Index based in large part on their recent fund yield, fund share price discount from or premium to NAV, and fund average daily value of shares traded, which reflect performance from only the recent past and are no guarantee of future performance. The Index Constituent Securities may not be the securities issued by closed-end funds with the highest yields in the market over the term of the Securities, the lowest discount from NAV or highest liquidity, and thus may not result in relatively higher coupon payments and may result in no coupon payments at all. See " — You are not guaranteed any coupon payments" in the accompanying product supplement. Even if the Index achieves its intended purpose of tracking the returns and income of 30 U.S. closed-end funds as selected by the Index Sponsor, the payment at maturity may be lower than the payment at maturity of securities linked to other indices that are composed of diversified asset classes and may result in a total return that is similar to, or lower than, securities linked to other indices that are composed of diversified asset classes.

### The Index Constituent Securities are not equally weighted and changes in the values of the Index Constituent Securities may offset each other.

Because the Index Constituent Securities are not equally weighted, the same percentage change in two or more Index Constituent Securities will have different effects on the Index Closing Level. For example, because the GAMCO Global Gold Natural Resources & Income Trust (NYSE: GGN) has a weight of 4.51% as of April 14, 2015, any decrease in the value of this closed-end fund will have a significantly greater effect on the Index Closing Level than a comparable percentage increase in the value of lesser weighted Index Constituent Securities. In addition, although the weight of each Index Constituent Security is capped at 4.25% at each annual rebalancing of the Index, the weights of the Index Constituent Securities may vary between annual rebalancings. Unscheduled weight adjustments

may occur between annual reviews if any Index Constituent Security accounts for more than 24% of the weight of the Index. See "The ISE High Income™ Index—Index Maintenance and Governance" below.

## Market disruption events may affect the calculation of the Index.

If at any time during the term of the Securities the Index Calculation Agent determines that there has been an unscheduled market closure for any of the Index Constituent Securities, the intraday and daily levels of the Index will be calculated using the last traded price for the relevant Index Constituent Security. Any such market disruption event may have an adverse impact on the level of the Index and, therefore, may have an adverse effect on the market value of the Securities.

## An Index Constituent Security may be replaced upon the occurrence of certain adverse events.

An exchange may replace or delist an Index Constituent Security included in the Index. Procedures have been established by the Index Sponsor to address such events, which may include, among other things, a market disruption event (as it pertains to the Index) or the replacement or delisting of an Index Constituent Security. There can be no assurance, however, that a market disruption event (as it pertains to the Index), the replacement or delisting of an Index Constituent Security, or any other force majeure event, will not have an adverse or distortive effect on the value of the Index or the manner in which it is calculated and, therefore, may have any adverse impact on the value of the Securities. An Index Constituent Security may also be removed from the Index, as described under "The ISE High Income™ Index."

## The Index Sponsor has broad discretion and is not obligated to consider the interests of holders of the Securities.

The Index methodology allows the Index Sponsor broad discretion in making decisions with respect to the Index. The methodology establishes quantitative criteria for determining the Index Constituent Securities, but the Index Sponsor retains the ability to utilize subjective screening based on factors it deems appropriate if, in its opinion, certain Index Constituent Securities should be included in or excluded from the Index. As a result, the Index Constituent Securities may change in unpredictable ways in the Index Sponsor's sole discretion. Because the Index Sponsor has no obligation to take into consideration the interests of holders of the Securities, there can be no assurance that the Index Sponsor's actions will not cause the Securities to decrease in value.

## The Securities may trade at a substantial premium to or discount from the intraday indicative value.

The market value of the Securities is influenced by many unpredictable factors, some of which may cause the price at which the Securities can be sold in the secondary market to vary substantially from the intraday indicative value that is calculated and disseminated throughout trading hours. For example, if UBS were to suspend sales of the Securities for any reason, the liquidity of the market for the Securities could be affected, potentially leading to insufficient supply, causing the market price of the Securities to increase. Such an increase could represent a premium over the intraday indicative value. Conversely, unpredictable factors could cause the Securities to trade at a discount from the intraday indicative value, which may result in a loss of your investment if you sell your Securities in the secondary market.

## UBS and its affiliates have no affiliation with the Index Sponsor and are not responsible for its public disclosure of information.

We and our affiliates are not affiliated with the Index Sponsor and have no ability to control or predict its actions, including any errors in or discontinuation of public disclosure regarding methods or policies

relating to the calculation of the Index. If the Index Sponsor discontinues or suspends the calculation or publication of the Index, it may become difficult to determine the market value of the Securities and the payment at maturity or call, upon acceleration or upon early redemption. The Calculation Agent may designate a successor index in its sole discretion. If the Calculation Agent determines in its sole discretion that no successor index comparable to the Index exists, the payment you receive at maturity or call, upon acceleration or upon early redemption will be determined by the Calculation Agent in its sole discretion. See "General Terms of the Securities — Market Disruption Event" and " — Calculation Agent" in the accompanying product supplement. The Index Sponsor is not involved in the offer of the Securities in any way and has no obligation to consider your interest as an owner of the Securities in taking any actions that might affect the market value of your Securities.

We have derived the information about the Index Sponsor and the Index from publicly available information, without independent verification. UBS has not conducted any independent review or due diligence of the Index or the Index Sponsor, including the publicly available information with respect to the Index Sponsor or the Index. *You, as an investor in the Securities, should make your own independent investigation into the Index Sponsor and the Index.*

### If UBS were to be subject to restructuring proceedings, the market value of the Securities may be adversely affected.

Under certain circumstances, the Swiss Financial Market Supervisory Authority (FINMA) has the power to open restructuring or liquidation proceedings in respect of, and/or impose protective measures in relation to, UBS, which proceedings or measures may have a material adverse effect on the terms and market value of the Securities and/or the ability of UBS to make payments thereunder. Pursuant to article 25 et seq. of the Swiss Banking Act, FINMA has broad statutory powers to take measures and actions in relation to UBS if it (i) is overindebted, (ii) has serious liquidity problems or (iii) fails to fulfill the applicable capital adequacy provisions after expiration of a deadline set by FINMA. If one of these prerequisites is met, FINMA is authorized to open restructuring proceedings (*Sanierungsverfahren*) or liquidation (bankruptcy) proceedings (*Bankenkonkurs*) in respect of, and/or impose protective measures (*Schutzmassnahmen*) in relation to, UBS. The Swiss Banking Act, as last amended as of January 1, 2013, grants *significant* discretion to FINMA in connection with the aforementioned proceedings and measures. In particular, a broad variety of protective measures may be imposed by FINMA, including a bank moratorium (*Stundung*) or a maturity postponement (*Fälligkeitsaufschub*), which measures may be ordered by FINMA either on a stand-alone basis or in connection with restructuring or liquidation proceedings. In a restructuring proceeding, the resolution plan may, among other things, (a) provide for the transfer of UBS's assets or a portion thereof, together with debts and other liabilities, and contracts of UBS, to another entity, (b) provide for the conversion of UBS's debt and/or other obligations, including its obligations under the notes, into equity, and/or (c) potentially provide for haircuts on obligations of UBS, including its obligations under the Securities. As of the date of this pricing supplement, there are no precedents as to what impact the revised regime would have on the rights of holders of the notes or the ability of UBS to make payments thereunder if one or several of the measures under the revised insolvency regime were imposed in connection with a resolution of UBS.

### Significant aspects of the tax treatment of the Securities are uncertain.

Significant aspects of the tax treatment of the Securities are uncertain. We do not plan to request a ruling from the Internal Revenue Service ("IRS") regarding the tax treatment of the Securities, and the IRS or a court may not agree with the tax treatment described in this pricing supplement. Please read carefully the section entitled "Material U.S. Federal Income Tax Consequences" on page PS-32. You should consult your tax advisor about your own tax situation.

Risk Factors

Pursuant to the terms of the Securities, you and we agree (in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary) to treat the Securities as a coupon-bearing pre-paid derivative contract with respect to the Index. In addition, you and we agree (in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary) to treat the Coupon Amounts (including amounts received upon the sale, exchange, redemption or maturity of the Securities in respect of accrued but unpaid Coupon Amounts) and the Stub Reference Distribution Amount, if any, as amounts that should be included in ordinary income for tax purposes at the time such amounts accrue or are received, in accordance with your regular method of accounting for tax purposes. You will be required to treat such amounts in such a manner despite the fact that (i) a portion of such amounts may be attributable to distributions on the Index Constituent Securities that give rise to long-term capital gain which, in the case of non-corporate taxpayers, is currently subject to tax at rates more favorable than the rates applicable to ordinary income and (ii) there may be other possible treatments of such amounts that would be more advantageous to holders of the Securities. Under that treatment (subject to the discussion below regarding the application of Section 1260 of the Internal Revenue Code of 1986, as amended (the "Code")), you should generally recognize capital gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference between the amount you receive at such time (other than any amount attributable to the Coupon Amount, and the Stub Reference Distribution Amount, if any, which will be treated as ordinary income) and the amount you paid for your Securities. Such gain or loss should generally be long-term capital gain or loss if you held your Securities for more than one year.

It is possible that your Securities could be treated as a "constructive ownership transaction" which would be subject to the constructive ownership rules of Section 1260 of the Code. Under Section 1260 of the Code, special tax rules apply to an investor that enters into a "constructive ownership transaction" with respect to an equity interest in a "pass-thru entity." For this purpose, a constructive ownership transaction includes entering into a forward contract with respect to a pass-thru entity, and a derivative contract of the type represented by the Securities should be treated as a forward contract for this purpose. In addition, a pass-thru entity includes a regulated investment company, and because each of the closed-end funds that comprise the Index as of this date is treated as a regulated investment company, each of the current Index Constituents is treated as a pass-thru entity for this purpose. It is, however, not entirely clear how Section 1260 of the Code applies in the case of an index that is comprised in whole or in part of pass-thru entities, such as the Index. Although the matter is not free from doubt, it is likely that Section 1260 of the Code should apply to an index of pass-thru entities, in which case Section 1260 of the Code would apply to the Securities. If your Securities are subject to Section 1260 of the Code, then any long-term capital gain that you realize upon the sale, exchange, redemption or maturity of your Securities will be recharacterized as ordinary income (and you will be subject to an interest charge on the deferred tax liability with respect to such capital gain) to the extent that such capital gain exceeds the amount of long-term capital gain that you would have realized had you purchased an actual interest in the Index Constituents (in an amount equal to the notional amount of the Index that is represented by the Securities) on the date that you purchased your Securities and sold your interest in the Index Constituents on the date of the sale, exchange, redemption or maturity of the Securities (the "Excess Gain Amount"). If your Securities are subject to these rules, the Excess Gain Amount will be presumed to be equal to all of the gain that you recognized in respect of the Securities (in which case all of such gain would be recharacterized as ordinary income that is subject to an interest charge) unless you provide clear and convincing evidence to the contrary. You should review the discussion of Section 1260 of the Code on page PS-32 and are urged to consult your own tax advisor regarding the potential application of these rules.

**Risk Factors**

The IRS released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current basis (possibly in excess of the Coupon Amounts), whether gain or loss recognized upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Code, should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income (possibly in excess of the Coupon Amounts) over the term of an instrument such as the Securities. The outcome of this process is uncertain.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of the Securities in an amount that could exceed the Coupon Amounts that are paid on the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. We intend to treat your Securities for United States federal income tax purposes in accordance with the treatment described above and under "Material U.S. Federal Income Tax Consequences" on page PS-32 unless and until such time as there is a change in law or the Treasury Department or IRS determines that some other treatment is more appropriate.

# Exhibit L

deterrence, and to protect the public from any further crimes of the defendant.  (§ 3553(a)(2)(A-C)).  The parties submit that the proposed sentence contained in the Plea Agreement—as well as the provisions of the NPA between the Government and UBS AG, which incorporates the Plea Agreement—achieves those objectives.

### 1.    The Nature and Circumstances of the Offense [§ 3553(a)(1)]

The nature and circumstances of the offense are discussed in considerable detail in the agreed-upon factual statements that form part of both the NPA and the Plea Agreement.  (*See* Plea Agmt., Exs. 3 and 4; NPA, App. A).  The PSR also contains a summary of the relevant facts that is fully consistent with those statements.  (PSR at ¶¶ 9-27).  In light of this existing record, the parties will not attempt to include yet another comprehensive recitation of the relevant facts in this submission.

The Plea Agreement provides the following overview of the defendant's offense conduct:

From as early as 2006 through at least June 2010, certain UBSSJ derivatives traders requested and obtained benchmark interest-rate submissions which benefited their trading positions.  This conduct occurred frequently beginning in 2006, in Zurich, Tokyo, and elsewhere, when several UBSSJ employees engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen LIBOR and, to a lesser extent, Euroyen TIBOR, to benefit UBSSJ's trading positions.  This conduct encompassed hundreds of instances in which UBS and UBSSJ employees sought to influence benchmark rates; during some periods, UBS and UBSSJ employees engaged in this activity on nearly a daily basis.  In furtherance of these efforts to manipulate Yen benchmarks, UBS and UBSSJ employees used several principal and interrelated methods, including the following:

    (1)    internal manipulation of UBS's Yen LIBOR and Euroyen TIBOR submissions;

    (2)    use of cash brokers to influence other Contributor Panel banks' Yen LIBOR submissions by disseminating misinformation; and

    (3)    efforts to collude directly with employees at other Contributor Panel banks, either directly or through brokers, in order to influence those banks' Yen LIBOR submissions.

(Plea Agmt., Ex. 4 at ¶ 17).  Various details and examples of such conduct are set forth in attachments to the Plea Agreement and the NPA, and also in the PSR.  As those materials further indicate: "Because of the widespread use of LIBOR in financial markets, this rate plays a fundamentally important role in financial systems around the world." (PSR ¶ 18).  Moreover, "[t]he market for derivatives and other financial products linked to benchmark interest rates for the Yen is global and is one of the largest and most active markets for such products in the world." (*Id.*).  Such products are traded in the U.S. and numerous other locations.  Accordingly, a scheme to manipulate Yen benchmarks has widespread and grave implications.

The parties fully recognize that the offense conduct at issue in this case is extremely serious.  Indeed, that has never been in dispute during either the extensive investigative work or the negotiations that led to the disposition that has now been presented to the Court for its consideration.  But for the nature and seriousness of this conduct, neither side would have entered into the resolution set forth in the NPA, nor would the parties be asking the Court to consider and accept a proposed sentence.  For the Government, this factor represents one of the principal reasons for its decision to bring a criminal charge against the defendant-company.  And for UBS AG and UBSSJ, the acknowledgment of this factor, along with their response to the offense conduct once it became the focus of investigative attention, is at the core of their acceptance of responsibility, as recognized in the PSR.  (PSR ¶ 28).  Both sides also acknowledge the significance of this factor within the Court's sentencing analysis.

2.      **The History and Characteristics of UBSSJ [§ 3553(a)(1)]**

Before the global benchmark rate investigation, neither UBSSJ nor its predecessor

entities had any prior history of criminal or civil adjudications.[4]  (PSR at ¶ 29).  However, as

discussed above, the CFTC and the JFSA imposed sanctions against UBSSJ for the same Yen

LIBOR and Euroyen TIBOR conduct addressed by the Plea Agreement; the Tokyo Financial

Futures Exchange and the Financial Futures Association have similarly imposed monetary

penalties.  (*See supra* Parts I.C & I.F).  Additionally, between 2004 and 2012, UBSSJ and its

predecessor were the subject of various regulatory actions by financial industry regulators,

including the JFSA, Japan Securities Dealers Association, Tokyo Financial Futures Exchange,

and the Financial Futures Association.  These incidents involved non-compliance with industry-

specific regulations and resulted in only modest sanctions, including fines and personnel actions.

(PSR at ¶ 29).

3.      **The Need for the Sentence To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and To Protect the Public from Further Crime [§ 3553(A)(2)]**

The parties submit that the penalty proposed in the Plea Agreement, especially when viewed

within the framework of the NPA, is appropriate in light of the nature and seriousness of the

offense conduct and also serves the purposes outlined in § 3553(a)(2) (A-C).  In support of this

position, and among other features of the NPA and the Plea Agreement, we urge the Court to

consider the following factors.

UBSSJ has been required to plead guilty to a felony violation of U.S. law and therefore has

accepted criminal responsibility for its conduct.  While this point seems obvious in the context of

---

[4]      UBSSJ is the defendant in this case.  Accordingly, the PSR addresses only the prior history of UBSSJ and its predecessors.  However, the Criminal Division considered UBS AG's prior history of misconduct, as mitigated by its recent record of cooperation and compliance, in arriving at the decision to propose a resolution with UBS AG that included both the Plea Agreement and the NPA.  (NPA at 2–3).

# Exhibit M

EDITION: UNITED STATES



| Fri Mar 30, 2012 | 5:42pm EDT

# Schwab considers warnings on controversial exchange-traded products



REUTERS/Brendan McDermid

By Angela Moon and Jessica Toonkel | NEW YORK

Discount brokerage Charles Schwab Corp is reviewing whether to add a warning when a customer is about to trade certain exchange-traded products, in one of the strongest warnings yet for retail investors about these esoteric securities.

The move follows the sudden plunge in an exchange-traded note called VelocityShares Daily 2X VIX Short-Term ETN, or TVIX, which lost 60 percent of its value last week.

"It is under review, primarily because of the risk we saw in things like the TVIX. No one knew that those kind of things were going to happen," said Randy Frederick, managing director of trading and derivatives at the Schwab Center for Financial Research in Austin, Texas.

ADVERTISING

TRENDING STORIES

North Korea test-fires ballistic missile in defiance of world pressure

Russians, in peaceful protest, call for Putin to quit

Exclusive: Trump says he thought being president would be easier than his old life

EU sets Britain tough divorce terms, slams budget veto

Philippine leader says North Korea's Kim "wants to end the world", urges U.S. restraint

The warning would be similar to one that pops up when investors trade options related to volatility, which are more complex than stocks.

The note, which pops up at the final verification stage of a trade, will serve as "a last warning to say, 'Hey, make sure you know what you are doing. If not, call us and we will explain to you,'" Frederick said.

Schwab's review and consideration of a warning for investors is significant because it comes at a moment after federal and state regulators have zeroed in on volatile trading and other activity involving exchange-traded notes.

REGULATORS CIRCLING ETNs

The Financial Industry Regulatory Authority, the U.S. regulator that oversees the sale of investment products to investors, is investigating how companies are marketing exchange-traded notes. A FINRA spokeswoman told Reuters on Thursday that the regulator is "looking at the events and trading" activity surrounding a sharp drop in the price of the TVIX, an exchange-traded note designed to track stock market volatility.

Massachusetts' top securities regulator is also looking into problems with the TVIX, a spokesman for Secretary of the Commonwealth William Galvin said.

The U.S. Securities and Exchange Commission is conducting a preliminary review into the volatile trading of the ETN, The Wall Street Journal reported on Thursday, citing people familiar with the matter.

Credit Suisse, the issuer of TVIX, stopped creating new shares a month ago as investors scrambled into this and other volatility-linked securities to bet on an increase in more market gyrations down the road.

The price of TVIX dropped about 60 percent in just two days last week on news that Credit Suisse would start issuing shares again, bringing it back in line with its expected value.

A Credit Suisse spokeswoman said on Thursday the firm "is cooperating with regulatory authorities."

MAKING RISKS CLEAR

Another major online brokerage Fidelity Investment has had a system for warning investors about the risks of trading ETNs since 2009. An investor who wants to trade an ETN has to sign an investor agreement, and every time an investor makes a trade, a screen pops up warning them of the risks of ETNs.

Fidelity also does not make leveraged and inverse ETNs and ETFs easily accessible when investors use its "ETF Screener."

A spokesperson for discount broker TD Ameritrade said they have not decided to add a warning on trading these products.

A representative from E*Trade Financial, another discount broker, did not respond to a request for comment.

TRENDING **STORIES**

North Korea test-fires ballistic missile in defiance of world pressure

Russians, in peaceful protest, call for Putin to quit

Exclusive: Trump says he thought being president would be easier than his old life

EU sets Britain tough divorce terms, slams budget veto

Philippine leader says North Korea's Kim "wants to end the world", urges U.S. restraint

PICTURES



4/29/2017
Case 1:17-cv-04503-JMF   Document 65-3   Filed 01/10/18   Page 32 of 162
Schwab considers warnings on controversial exchange-traded products | Reuters

exchange-traded-fund cousins. But experts caution that investors need to educate themselves before trading these exchange-traded products, or ETPs.

ETNs have brought in $2.4 billion in net inflows so far this year, a 71 percent increase from 2011, according to Morningstar.

**ALSO IN MONEY**

**U.S. economic growth slower than France, 'terrible': BlackRock's Fink**

**NRG director wins strong shareholder support despite NYC opposition**

"Even as a full-time trader, this is a product that is very hard to understand. You type in TVIX and all you get is that the profit is two to three times the volatility index, so people are thinking 'Oh yeah, this is great.' The problem is, these ETNs are designed to fail. They are broken products," said Jamie Lissette, an independent trader, and also the founder of the Hammerstone Group, a Westport, Connecticut-based operator of online discussion forums for investors.

"Unfortunately, I traded TVIX during the plunge last week, and lost a couple thousand in a short time frame," Lissette said.

Angry investors, some who have lost in the "six-digit figures" trading TVIX are gearing up for a lawsuit against Credit Suisse. They claim Credit Suisse misled investors by not providing sufficient information about the product.

Some are also questioning the timing of the announcement on re-issuing shares, which came just a couple hours after a 30 percent plunge in TVIX on March 22, as investors had started to bet the shares would fall. The product's price fell another 30 percent the following day.

Moulton & Arney, LLP, a boutique law firm based in Houston, is one of a handful of firms gathering investors who have lost money in the product. It is investigating the circumstances surrounding the decline in TVIX, and has received almost 200 calls from investors.

The law firm said on its website that it "has been retained by a client who suffered a six-figure loss in TVIX on March 22 to investigate and pursue potential claims against Credit Suisse to recover his loss."

Some large full-service brokerage firms already restrict their brokers from selling exchange-traded notes. For example, Bank of America Merrill Lynch only allows its more than 17,300 brokers to sell ETNs to clients with at least $10 million in assets - and only if they specifically ask for them.

Raymond James Financial has prohibited its 5,400 brokers from selling 53 ETNs since October 2010, including the volatility ETNs and three-times leveraged ETNs. Clients who want to invest in available ETNs have to sign an affidavit that states they understand the risks inherent in these products.

(Reporting By Angela Moon and Jessica Toonkle; Editing by Jan Paschal)

**TRENDING STORIES**

North Korea test-fires ballistic missile in defiance of world pressure

Russians, in peaceful protest, call for Putin to quit

Exclusive: Trump says he thought being president would be easier than his old life

EU sets Britain tough divorce terms, slams budget veto

Philippine leader says North Korea's Kim "wants to end the world", urges U.S. restraint

NEXT IN MONEY

**BlackRock's Fink a 'big believer' in Wells Fargo CEO**

# Exhibit N

# JUSTICE NEWS

**Department of Justice**

**Office of Public Affairs**

FOR IMMEDIATE RELEASE

Wednesday, February 18, 2009

## UBS Enters into Deferred Prosecution Agreement

### Bank Admits to Helping U.S. Taxpayers Hide Accounts from IRS; Agrees to Identify Customers & Pay $780 Million

WASHINGTON – UBS AG, Switzerland's largest bank, has entered into a deferred prosecution agreement on charges of conspiring to defraud the United States by impeding the Internal Revenue Service (IRS), the Justice Department announced today.

As part of the deferred prosecution agreement and in an unprecedented move, UBS, based on an order by the Swiss Financial Markets Supervisory Authority (FINMA), has agreed to immediately provide the United States government with the identities of, and account information for, certain United States customers of UBS's cross-border business. Under the deferred prosecution agreement, UBS has also agreed to expeditiously exit the business of providing banking services to United States clients with undeclared accounts. As part of the deferred prosecution agreement, UBS has further agreed to pay $780 million in fines, penalties, interest and restitution. Earlier today, the agreement was accepted in Ft. Lauderdale, Fla. by U.S. District Judge James I. Cohn.

A criminal information was unsealed today that charges UBS with conspiring to defraud the United States by impeding the IRS. According to court documents, in 2000, after it purchased the brokerage firm Paine Webber, UBS voluntarily entered into an agreement with the IRS that required UBS to report to the IRS income and other identifying information for its United States clients who held United States securities in a UBS account. Court documents allege that the agreement also required UBS to withhold income taxes from United States clients who directed investment activities in foreign securities from the United States. The information further asserts that, in order to evade those new reporting requirements, employees and managers within the cross-border business, with the knowledge of certain UBS executives, helped United States taxpayers open new UBS accounts in the names of nominees and/or sham entities. According to court documents, the assets of the individual's accounts were then transferred to the newly created accounts, as to which the U.S. taxpayer would not be identified as a beneficiary.

The information asserts that this device was used by UBS to justify evading its reporting obligations and helped United States taxpayers to continue to conceal their identities and assets from the IRS.

The information also alleges that Swiss bankers routinely traveled to the United States to market Swiss bank secrecy to United States clients interested in attempting to evade United States income taxes. Court documents assert that, in 2004 alone, Swiss bankers allegedly traveled to the United States approximately 3,800 times to discuss their clients' Swiss bank accounts. The information further alleges that UBS managers and employees used encrypted laptops and other counter-surveillance techniques to help prevent the detection of their marketing efforts and the identities and offshore assets of their U.S. clients. According to the information, clients of the cross-border business in turn filed false tax returns which omitted the income earned on their Swiss bank accounts and failed to disclose the existence of those accounts to the IRS.

In light of the bank's willingness to acknowledge responsibility for its actions and omissions, its cooperation and remedial actions to date, and its promised continuing cooperation and remedial actions, the government will recommend dismissal of the charge, provided the bank fully carries out its obligations under the agreement.

In November 2008, UBS executive Raoul Weil was indicted by a federal grand jury in Fort Lauderdale and charged with conspiring to defraud the United States for his alleged role in overseeing the United States cross-border business. The district court recently declared him to be a fugitive.

In June 2008, former UBS private banker Bradley Birkenfeld pleaded guilty to a charge of conspiring to defraud the United States for similar conduct. Birkenfeld is scheduled to be sentenced on May 1, 2009. Also, in June 2008, the U.S. District Court in Miami authorized the Internal Revenue Service to serve upon UBS a so-called "John Doe" summons seeking records that would identify United States taxpayers with accounts at UBS in Switzerland who have elected to conceal the existence of their accounts from the IRS.

"Today's agreement is but one milestone in an ongoing law enforcement effort to reassure hard-working and law-abiding taxpayers who pay their fair share of taxes that those who don't will pay a heavy price," said John A. DiCicco, Acting Assistant Attorney General of the Justice Department's Tax Division. "The veil of secrecy has been pulled aside and we will continue to aggressively pursue those who shirk their federal tax obligations or assist others in doing so."

"UBS executives knew that UBS's cross-border business violated the law," said R. Alexander Acosta, U.S. Attorney for the Southern District of Florida. "They refused to stop this activity, however, and in fact instructed their bankers to grow the business. The reason was money -- the business was too profitable to give up. This was not a mere compliance oversight, but rather a knowing crime motivated by greed and disrespect of the law."

Acting Assistant Attorney General DiCicco and U.S. Attorney Acosta commended Tax Division attorneys Kevin Downing and Michael Ben'Ary, and Assistant U.S. Attorney Jeffrey Neiman, along with special agents from the Internal Revenue Service who provided invaluable assistance in investigating this case.

More information about the Justice Department's Tax Division and its enforcement efforts is available at http://www.usdoj.gov/tax/.

**Component(s):**
Tax Division

**Press Release Number:**
09-136

*Updated September 15, 2014*

# Exhibit O



U.S. Department of Justice

Criminal Division

_____

Washington, D.C. 20530

October 20, 2014

VIA E-MAIL
Gary R. Spratling, Esq.                    David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP                Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000             1050 Connecticut Ave NW
San Francisco, CA 94105                    Washington, DC 20036

      Re:   UBS AG

Dear Mr. Spratling and Mr. Burns:

      This letter amends the agreement (the "Agreement") entered into between the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") and UBS AG ("UBS") on December 18, 2012, concerning UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate (known as LIBOR), the Euro Interbank Offered Rate (known as EURIBOR), and the Tokyo InterBank Offered Rate (known as TIBOR), as described in Appendix A to the Agreement. A copy of the Agreement is attached to this letter.

      The Fraud Section and UBS agree to amend the Agreement as follows:

1.  The sixth paragraph of the Agreement is amended to read:

> This Agreement shall have a term of three years from the date of this Agreement, except as specifically provided below. It is understood that for the three-year term of this Agreement, UBS shall: (a) commit no United States crime whatsoever; (b) truthfully and completely disclose non-privileged information with respect to the activities of UBS, its officers and employees, and others concerning all matters about which the Fraud Section inquires of it, which information can be used for any purpose, except as otherwise limited in this Agreement; (c) bring to the Fraud Section's attention all potentially criminal conduct by UBS or any of its employees that relates to violations of U.S. laws (i) concerning fraud or (ii) governing securities and commodities markets; and (d) bring to the Fraud Section's attention all criminal or regulatory investigations, administrative proceedings or civil actions brought by any

governmental authority in the United States against UBS or its employees that alleges fraud or violations of the laws governing securities and commodities markets.

2. The seventh paragraph of the Agreement is amended to read:

Until the date upon which all investigations and prosecutions arising out of the conduct described in this Agreement are concluded, including the investigations of the matters listed in Appendix C, whether or not they are concluded within the three-year term of this Agreement, UBS shall, in connection with any investigation or prosecution arising out of the conduct described in this Agreement: (a) cooperate fully with the Fraud Section, the Federal Bureau of Investigation, and any other law enforcement or government agency designated by the Fraud Section; (b) assist the Fraud Section in any investigation or prosecution by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding; (c) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent or employee at any meeting or interview or before the grand jury or at any trial or other court proceeding; and (d) provide the Fraud Section, upon request, all non-privileged information, documents, records, or other tangible evidence about which the Fraud Section or any designated law enforcement or government agency inquires.

3. With the exceptions of the paragraphs above, all terms of the Agreement remain the same.

Sincerely,

WILLIAM J. STELLMACH
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

By:

Albert B. Stieglitz, Jr., Assistant Chief
Thomas B.W. Hall, Trial Attorney

2

AGREED AND CONSENTED TO:

UBS AG

By: _____     _____
        Markus U. Diethelm                              Date
        Group General Counsel, UBS AG

APPROVED:

By: _____     _____
        Gary R. Spratling, Esq.                         Date
        David P. Burns, Esq.
        Gibson, Dunn & Crutcher LLP
        Attorneys for UBS AG

3

# Exhibit P

**Debevoise
& Plimpton**

Debevoise & Plimpton LLP          Steven J. Slutzky
919 Third Avenue                  Partner
New York, NY 10022                sjslutzky@debevoise.com
+1 212 909 6000                   +1 212 909 6036

May 20, 2015

**VIA FIRST CLASS MAIL AND EMAIL**

Mary Kosterlitz, Esq.
Chief, Office of Enforcement Liaison
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-7553

<strong>United States of America v. UBS AG</strong>

Dear Ms. Kosterlitz:

We submit this letter on behalf of our client, UBS AG, a reporting company registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and the settling defendant in the above-captioned criminal proceeding (the "Settling Firm").

We hereby request a determination by the U.S. Securities and Exchange Commission (the "Commission") or the Division of Corporation Finance (the "Division"), acting pursuant to authority duly delegated by the Commission, that the Settling Firm should not be an "ineligible issuer" as defined under Rule 405 promulgated under the Securities Act of 1933 (the "Securities Act") as a result of the entry of a Guilty Plea against the Settling Firm, which is described below. Relief from the ineligible issuer provisions is appropriate in the circumstances of this case for the reasons set forth below. The Settling Firm requests that this determination be made effective as of the date of the Guilty Plea.

<strong>BACKGROUND</strong>

On December 18, 2012, the United States Department of Justice, Criminal Division, Fraud Section ("DOJ Criminal Division") and the Settling Firm entered into a Non-Prosecution Agreement ("LIBOR NPA") related to the LIBOR Conduct, described and defined below.

www.debevoise.com

Mary Kosterlitz, Esq.                                          May 20, 2015

Following an initial media report in 2013 of widespread irregularities in the foreign exchange ("FX") markets, the Settling Firm immediately commenced an internal review of its FX business (although the article did not identify or implicate the Settling Firm). After identifying certain issues, the Settling Firm notified the Department of Justice that it had identified evidence of potential FX market trading coordination and thereafter provided extensive cooperation to the Department of Justice and other relevant regulators in connection with investigations into FX-related conduct.[1]

As set forth in a Plea Agreement, dated May 20, 2015, entered into by the Settling Firm and the DOJ Criminal Division (the "Plea Agreement"), the DOJ Criminal Division determined that the Settling Firm had breached the LIBOR NPA. Relevant considerations in reaching that determination included certain conduct described in Exhibit 1 the Plea Agreement ("Factual Basis for Breach"), namely certain employees engaged in (i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat, to the detriment of the UBS AG's customers, and (ii) collusion with other participants in certain FX markets (the "FX Conduct").

Further, the Settling Firm agreed to:

(i)     Plead guilty to a one-count Information (the "Information") in the United States District Court, District of Connecticut (the "District Court") charging wire fraud, in violation of Title 18, United States Code Section 1343 and 2. The Information charges that between approximately 2001 and in or about 2010, the Settling Firm devised and engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied (the "LIBOR Conduct").

---

[1]   In November 2014, the Settling Firm reached settlements with the U.K. Financial Conduct Authority ("FCA") and the U.S. Commodity Futures Trading Commission ("CFTC") in connection with their investigations into the FX Conduct, and the Swiss Financial Market Supervisory Authority ("FINMA") issued an order concluding its formal proceedings with respect to the FX Conduct and precious metals ("PM") trading. In addition to paying fines, the Settling Firm has ongoing obligations to cooperate with these authorities and to undertake certain remediation, including actions to improve processes and controls and requirements imposed by FINMA to apply compensation restrictions for certain employees and to automate at least 95% of its global FX trading. In December 2014, the Hong Kong Monetary Authority concluded an investigation of the FX Conduct, and found no evidence of collusion or manipulation but did find internal control deficiencies in the Settling Firm's FX trading operations. In addition, the Settling Firm is currently finalizing settlements with other regulators in connection with the FX Conduct and expects that those will result in the payment of additional fines and the undertaking of additional remedial measures; however, none of these settlements will require relief under 17 CFR § 230.405 or 17 CFR § 200.30-1(a)(10).

UBS WKSI                                                              2

Mary Kosterlitz, Esq.                                                    May 20, 2015

The Information charges that the Settling Firm committed wire fraud in furtherance of that scheme in violation of Title 18, United States Code, Sections 1343 and 2 on or about June 29, 2009 by transmitting or causing the transmission of electronic communications, specifically: (i) an electronic chat between a senior derivatives trader (the "UBS Trader") employed by a subsidiary of the Settling Firm and a London-based interdealer derivatives broker (the "Broker"), in which the UBS Trader requested the Broker submit an increased Yen LIBOR rate favorable to the UBS Trader's position; (ii) a telephone call placed by the Broker at the UBS Trader's request to a Yen LIBOR submitter at another Yen panel bank, in which the Broker requested that the submitter increase the panel bank's Yen LIBOR submission that day; (iii) an electronic chat between the UBS Trader and a junior derivatives trader employed by the Settling Firm, who also served as a Yen LIBOR submitter for the Settling Firm (the "UBS Submitter"), in which the UBS Trader requested that the UBS Submitter increase the Settling Firm's Yen LIBOR submission rate to a rate favorable to the UBS Trader's trading positions; (iv) a subsequent Yen Libor submission from the Settling Firm to Thomson Reuters reflecting an accommodation of the UBS Trader's request to the UBS Submitter; and (v) a subsequent publication of a Yen LIBOR rate.

(ii)     Pay a fine of $203 million in connection with the conduct charged in the Information.

(iii)    A three-year term of probation, in which the Settling Firm would (i) not commit another federal crime during the term of probation; (ii) implement and continue to implement a compliance program designed to prevent and detect misconduct related to the benchmark interest rate and FX markets throughout its operations including those of its affiliates and subsidiaries and to provide annual reports to the probation officer and the DOJ Criminal Division on its progress; (iii) further strengthen its compliance program and internal controls as required by other regulatory and enforcement authorities that have addressed any of the misconduct related to the benchmark interest rate and FX markets; (iv) submit to the DOJ Criminal Division any report drafted by any compliance consultant or monitor imposed by the Board of Governors of the Federal Reserve System; and (v) promptly bring to the attention of the DOJ Criminal Division all credible evidence or allegations of criminal conduct by the Settling Firm or any of its employees that relate to violations of U.S. laws concerning fraud or governing securities and commodities markets.

UBS WKSI                                                                      3

Mary Kosterlitz, Esq.                                                                May 20, 2015

In turn, the DOJ Criminal Division has agreed that it will not file additional criminal charges against the Settling Firm or any of its affiliates or subsidiaries relating to the LIBOR Conduct or the FX Conduct.

The Applicant expects to enter a guilty plea in the District Court (the "Guilty Plea") and expects that the District Court will enter a judgment against the Settling Firm (the "Judgment") that will require remedies that are materially the same as set forth in the Plea Agreement.

## DISCUSSION

Effective on December 1, 2005, the Commission reformed and revised the registration, communications, and offering procedures under the Securities Act.[2] As part of these reforms, the Commission created a new category of issuer defined under Rule 405 as a well-known seasoned issuer ("WKSI"). A WKSI is eligible under the new rules, among other things, to register securities for offer and sale under an "automatic shelf registration statement," as so defined. A WKSI is also eligible for the benefits of a streamlined registration process including the use of free-writing prospectuses in registered offerings pursuant to Rules 164 and 433 under the Securities Act. These benefits, however, are unavailable to issuers defined as "ineligible issuers"[3] under Rule 405.

An issuer is an "ineligible issuer," as defined under Rule 405, if, among other things, "[w]ithin the past three years, the issuer or any entity that at the time was a subsidiary of the issuer was convicted of any felony or misdemeanor described in paragraphs (i) through (iv) of section 15(b)(4)(B) of the Securities Exchange Act of 1934," Rule 405(1)(v). Notwithstanding the foregoing, paragraph (2) of the definition provides that an issuer "shall not be an ineligible issuer if the Commission determines, upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer." The Commission has delegated authority to the Division of Corporation Finance to make such a determination pursuant to 17 CFR § 200.30-1(a)(10).

The Guilty Plea will be deemed to render the Settling Firm an ineligible issuer for a period of three years after the date of the Guilty Plea. This result would preclude the

---

[2]     Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 52,056, Investment Company Act Release No. 26,993, 70 Fed. Reg. 44,722, 44,790 (Aug. 3, 2005).

[3]     This request for relief is not intended to be limited solely for the purpose of continuing to qualify as a WKSI, but for all purposes of the definition of "ineligible issuer" under Rule 405 including but not limited to whatever purpose the definition may now or hereafter be used under the federal securities laws, including Commission rules and regulations.

UBS WKSI                                                                                  4

Mary Kosterlitz, Esq.                                                                May 20, 2015

Settling Firm from qualifying as a WKSI and having the benefits of automatic shelf registration and other provisions of the Securities Offering Reform for three years.

As set forth above, Rule 405 authorizes the Commission to determine for good cause that an issuer shall not be an ineligible issuer, notwithstanding that the issuer or a subsidiary of the issuer becomes subject to an otherwise disqualifying order. The Settling Firm believes that there is good cause for the Commission to make such a determination based on precedent as well as the Division's Statement[4] on granting such waivers, on the following grounds:

       1.   <u>The Persons Responsible for, and the Duration of, the Alleged Misconduct.</u>

       (a)    LIBOR

While the Settling Firm acknowledges that the misconduct alleged in the Information occurred over a prolonged period of time (from 2001 through June 2010), it involved only approximately 14 of UBS' approximately 65,000 total employees; members of senior management of UBS were not implicated in the misconduct; none of the misconduct involved the Settling Firm's filings with the Commission (the "UBS AG Disclosures"); and while some of the individuals involved in the trader-related conduct described in the Exhibit 3 of the Plea Agreement ("LIBOR Statement of Facts") were employees of the Settling Firm, none of these individuals had any responsibility for, or role in, preparing the UBS AG Disclosures. All of the individuals at the Settling Firm who were identified as being responsible for the conduct alleged in the Information have either resigned or have had their employment terminated. Therefore, the misconduct cannot be viewed as pervasive within the Settling Firm.

As none of the members of the Settling Firm's senior management were implicated in the misconduct, the conduct alleged in the Information ended in 2010 and the individuals responsible for the misconduct are no longer employed by the Settling Firm, we believe the foregoing discussion addresses these concerns. Finally, as noted in the discussion concerning remedial actions, the Settling Firm has taken a number of actions to reinforce its commitment to compliance.

---

[4]   Division of Corporation Finance, Revised Statement on Well-Known Seasoned Issuer Waivers (April 24, 2014), available at http://www.sec.gov/divisions/corpfin/guidance/wksi-waivers-interp-031214.htm (the "Division Statement"). We note that the Division Statement relates to the grant of waivers that are necessary as a result of violations of the federal securities laws. While the Judgment does not assert any such violations, we believe that the standards set forth in the Division Statement are relevant to its consideration of the request for a waiver.

Mary Kosterlitz, Esq.                                          May 20, 2015

(b)     FX

The Settling Firm acknowledges that the FX Conduct occurred prior to and continuing after December 18, 2012.  It involved less than 10 of UBS' approximately 65,000 total employees.  Members of senior management of UBS were not implicated in the misconduct.  The Settling Firm has taken appropriate disciplinary action against the individuals responsible for the FX Conduct.  In some cases, UBS has delayed taking final action pending resolution of the DOJ Criminal Division's investigation in order to ensure the ongoing cooperation of relevant individuals.

As none of the members of the Settling Firm's senior management were implicated in the misconduct, the conduct alleged has ended, and UBS has already taken or intends to take appropriate disciplinary action we believe the foregoing discussion addresses these concerns.  Finally, as noted in the discussion concerning remedial actions, the Settling Firm has taken a number of actions to reinforce its commitment to compliance.

2.      Role of Individuals in Preparing UBS AG Disclosures.

In addition, none of the LIBOR or FX Conduct pertains to activities undertaken by the Settling Firm, its affiliates, or its subsidiaries in connection with its filings with the Commission (the "UBS AG Disclosures").  Nor did any of the individuals have any responsibility for preparing the UBS AG Disclosures.  There is no connection between the alleged conduct and the integrity of UBS AG Disclosures made by the Settling Firm or any of its affiliates, with respect to the business or operations of the Settling Form or any of its affiliates as issuers.

The Settling Firm has rigorous procedures relating to the preparation of its filings with the Commission.  Input from functions preparing preliminary drafts of disclosures was and is subject to challenge, comment and revision by a number of functions including investor relations, accounting, legal, risk control and communications under the management of the Group External Reporting team.  The disclosure process subject to the oversight of the Group Disclosure Committee, which reviews material changes in disclosure or new disclosures, disclosure aspects of changes in accounting and reporting requirement and assessing identified areas of particular risk or sensitivity.  The Disclosure Committee is chaired by the Group Chief Financial Officer and includes the Group CEO, Group Chief Risk Officer and Group General Counsel and well as representatives of Group External Reporting, Finance, Investor Relations, Legal and Corporate Communications.

Moreover, neither the Information relating to LIBOR conduct nor the Factual Basis for Breach involves any allegations that the Settling Firm committed scienter-based violations of the Securities Act or the Exchange Act in respect of the conduct.

UBS WKSI                                                            6

Mary Kosterlitz, Esq.                                                May 20, 2015

3.       Remedial Steps Taken.

(a)      LIBOR Conduct

After extensive investigation, the Department of Justice and the Settling Firm have negotiated a settlement reflected in the Plea Agreement.  The Settling Firm has agreed to comply with several undertakings pursuant to the Plea Agreement, including, among other things, the undertakings and payment of the fine described above.

The Settling Firm has previously agreed to various undertakings pursuant to investigations and settlements with the authorities in the United States, the United Kingdom, Japan, Singapore, Hong Kong, and Switzerland related to the LIBOR Conduct. UBS paid fines and disgorgements totaling CHF 1.4 billion to U.S., U.K. and Swiss authorities to resolve investigations related to the LIBOR Conduct, including $500 million to the Department of Justice, GBP 160 million to the FCA, and CHF 59 million to FINMA.

Further, in connection with an Order dated December 19, 2012, issued by the CFTC with respect to the matters described therein, UBS agreed to extensive undertakings to ensure the integrity and reliability of its benchmark interest rate submissions by (i) determining its submissions based on specific factors, adjustments and considerations; (ii) conducting supervisory review of each daily submission; (iii) ensuring minimum qualifications of submitters and supervisors; (iv) implementing firewalls to prevent improper communications and submissions; (v) providing certain documents to the CFTC upon request and without a subpoena; (vi) developing and maintaining monitoring systems and performing periodic internal audits and annual external audits; (vii) developing policies, procedures and controls to comply with the undertakings; and (viii) developing a training program for all submitters and supervisors and traders who deal with the benchmark interest rate; and (ix) making periodic reports to the commission on compliance with the undertakings.  The Settling Firm has complied with these undertakings and submitted a final report to the CFTC on December 18, 2013.  The Settling Firm has also complied with additional undertakings imposed by FINMA.

In addition to the specifics steps taken to fulfill the CFTC undertakings, lessons learned from the LIBOR matter drove the Settling Firm to have much greater focus overall on supervising, monitoring and surveillance of intra-day conduct and behaviors to complement the end-of-day control framework that was then prominent.  The firm-wide Principles and Behaviors program, sponsored by the Group Chief Executive Officer is designed to significantly strengthen three core behaviors across the firm (Integrity,

UBS WKSI                                                                     7

Mary Kosterlitz, Esq.                                                                      May 20, 2015

Collaboration, and Challenge) to strengthen the culture and foster greater alignment to protecting the firm's reputation and ensuring long-term and sustainable performance. In 2013, the Group Chief Executive Officer's decision to integrate the Compliance function with Operational Risk Control was an important step in bringing a risk management approach and control discipline to the Compliance activities in the second line of defense. It has enabled the Settling Firm to clarify the roles, responsibilities and control expectations for the 2nd line of defense and supports the implementation of an industry leading monitoring and surveillance capability.

Based on the lessons learned from the LIBOR investigation itself, the Settling Firm significantly tightened the coordination and governance over high risk legal, regulatory or conduct matters, including establishing a cross-functional investigations sounding board, assigning leadership accountability aligned to the potential tail risk should any allegation or speculation prove to be true, and applying the learnings across the organization. This serves as an important component of the overall compliance program. Fully leveraging this very protocol led to the firm investigating the initial allegations in the media which led to the firm identifying the FX issue and everything that followed.

     (b)    FX Conduct

As noted above, after learning of potentially inappropriate practices in the FX industry in media reports in June of 2013 – none of which specifically mentioned the Settling Firm – a newly formed Investigations Sounding Board launched an internal investigation into potential misconduct in the FX spot markets. From early on in its investigation, the Settling Firm consistently provided the Department of Justice with detailed, real-time reports of its investigation findings and repeatedly solicited the Department's input and approval of changing investigation priorities and altered significantly the investigation plan on different occasions at the request of the Department. The Settling Firm believes that it was the first bank to report FX misconduct to the Department of Justice and other authorities.

While the Settling Firm believes that its control environment for FX rates during the investigation period was proportionate to prevailing industry standards and the systems and controls of peer institutions, the Settling Firm has adopted significant remedial measures to address problems that it identified. In fact, the Settling Firm is making a significant investment in adopting measures to align its FX business with many of the same standards in place for its business in fully regulated markets.

UBS WKSI                                                                                            8

Mary Kosterlitz, Esq.                                                    May 20, 2015

First, since the early stages of the FX investigation, the Settling Firm has been transitioning its FX business to adopt principles, systems, and controls more akin to that of regulated markets. For example, the Settling Firm is introducing continuous transaction monitoring and detailed time stamping of orders to ensure it can conduct additional forensic analysis of trading activity. These initiatives, although requiring significant further investment in overhauling systems and processes, are developed, funded, and in place.

Second, following detection of the FX issues, the Settling Firm conducted an in-depth review of the FX business to identify areas in need of improvement. Since then, the Settling Firm has undertaken actions to significantly improve compliance monitoring, intraday supervision and operational risk management assessment to more swiftly detect inappropriate activity. For instance, the Settling Firm has made the following improvements:

*Strengthened Front Office Processes*

- Standardized the fixing order process
- Closed FX management books
- Instituted a formal process of review and supervision of enhanced conduct risk
- Designed brokerage management information in order to facilitate the identification of possible collusion between FX traders and brokers
- Recalibrated the FX "business owned limits" to align them to market risk appetite and historical utilization
- Reviewed the FX supervisory hierarchy
- Revised guidance on handling client error
- Improved the consistency of disclosing trading conflicts in Terms and Conditions to clients
- Updated chat room standards and controls, which were implemented in November 2013
- Prohibited the use of personal mobile phones on trading floors for all Investment Bank sales and trading staff
- Implemented a series of measures to manage obligations and expectation to clients and markets over potential conflicts of interests

*Strengthened Front Office Systems*

- As of December 2014, implemented an enhanced booking and risk management workflow for all FX prime brokerage cash trades, fully segregating prime brokerage components of trades from FX sales and trading

UBS WKSI                                                                        9

Mary Kosterlitz, Esq.                                                                         May 20, 2015

*Enhanced Guidance and Training*

- Significantly strengthened its "FX, Rates & Credit Global Handbook," which includes new sections covering client and market conduct requirements, behavior, and communication
- Mandatory training (both live and computer-based) linked to these guidelines has been completed for all Investment Bank sales and trading staff globally; this training is mandatory for all Investment Bank staff, including new joiners
- FX management has completed a full review of the content of the "FX, Rates & Credit Global Handbook" against existing Key Procedural Controls, with new controls being implemented where required

The Settling Firm has taken disciplinary actions (including terminations, suspensions and significant penalties related to compensation against these individuals) against employees who were found through the FX investigation to have engaged in misconduct, who failed to effectively execute their supervisory duties, or who uniquely and materially contributed to key control deficiencies.

In addition to the significant remedial measures the Settling Firm has already adopted, the Settling Firm has also agreed to specific remediation undertakings in connection with the November 2014 government resolutions. In connection with the CFTC order described above in footnote 1, the Settling Firm represented that it had already undertaken certain steps intended to make reasonable efforts to ensure the integrity of the FX markets including, but not limited to, the following: (i) strengthening mandatory training requirements for all FX employees, with a heavy focus on appropriate trading behavior; (ii) implementing new procedures regarding the appropriate use of chat rooms as a form of communication, including the prohibition of nearly all participation by Investment Bank staff in multi-bank chat rooms; and (iii) strengthening supervision and surveillance of FX trading desks, including the ongoing introduction of specific trade surveillance systems and enhancements to electronic communication monitoring.

In connection with the FCA settlement, the Settling Firm must conduct an audit of the following areas to ensure its culture, governance arrangements, policies, procedures, systems, and controls are appropriate and adequate to effectively manage specific risks with respect to the FX business: (i) front office culture; (ii) the adequacy of the first line of defense (i.e. the risk and control environment relating to daily operations, including monitoring of traders' activity and conduct); (iii) the adequacy of the second and third lines of defense (e.g. compliance, audit, risk); (iv) the adequacy of the challenge of risk management by the second and third lines of defense; (v) the role and appropriateness of financial incentives and performance management; (vi) the adequacy of training for the specific relevant business area; (vii) the adequacy of communications monitoring and

UBS WKSI                                                                                        10

Mary Kosterlitz, Esq.                                                    May 20, 2015

surveillance; (viii) the adequacy of the management of conflicts of interest; and (ix) benchmarks, whether trading, judgment, or submissions based, which fall within any of these business areas. If this audit identifies any areas requiring improvement, the Settling Firm must implement appropriate remedial action.

In connection with the FINMA order, the Settling Firm must (i) automate at least 95% of global FX and PM trading by December 31, 2016; (ii) implement and improve controls with respect to the remaining FX voice trading; (iii) implement adequate monitoring, supervision, and analysis instruments with respect to market abusive conduct in the Investment Bank; (iv) implement and improve control measures to avoid conflicts of interest between client trading and the active proprietary trading (i.e., the trading of traders' own positions on behalf of the bank, independent of risk management/hedging in connection with client orders), including the organizational and personnel separation of client and active proprietary trading; (v) clarify guidelines on personal account dealing, expand controls and oversight of personal account dealing, and enhance sanctions for violations of these guidelines; (vi) conduct an annual review of the compensation process within the Investment Bank through an internal audit regarding the impact of the compliance and risk conduct of employees on their compensation, as well as on the adequacy of senior management decisions made during the process, for a period of two years from fiscal year 2014;(vii) implement a maximum annual variable salary component of twice the fixed annual income (2:1) for the FX and PM trading business for a period of two years from fiscal year 2014; (viii) implement of a maximum annual variable salary component of twice the fixed annual income (2:1) for persons with a total salary of over CHF 1 million in the Investment Bank for a period of two years from fiscal year 2014 (although there may be exceptions based on adequate consideration of employee conduct and the adherence to compliance objectives); and (ix) strengthen the whistleblower process.

In addition, in connection with other settlements currently being finalized with other regulators, the Settling Firm expects to make a number of significant undertakings that address its internal controls and compliance program and its compliance risk management program.

Also in connection with these resolutions, the Settling Firm has paid a total of CHF 774 million, including GBP 234 million in fines to the FCA, $290 million in fines to the CFTC, and CHF 134 million to FINMA representing confiscation of costs avoided and profits.

(c)       Additional Firmwide Reform

UBS WKSI                                                                  11

Mary Kosterlitz, Esq.                                                May 20, 2015

The work undertaken in relation to FX is part of a much broader program focused on strengthening front office processes and systems, and enhanced guidance and training. This includes (i) transactional monitoring to cover all asset classes and client and proprietary flows; (ii) enhanced monitoring of electronic communications to cover all e-mail flow and chat channels in all jurisdictions; (iii) preliminary monitoring of audio communications; (iv) trader surveillance to monitor and detect rogue trading; (v) monitoring and assessment of employee behavioral indicators to identify outliers; (vi) expanded cross border monitoring that goes beyond the traditional control-based monitoring; and (vii) improved processes associated with the firm's whistleblowing policy.

In addition, the Settling Firm's incentive and compensation structure has been reformed to ensure that inappropriate behavior is not incentivized and that there are consequences for misconduct. The Settling Firm believes that it was the first in the industry to implement longer compensation deferral periods and greater clawback powers. For employees whose compensation exceeds a certain level, a significant portion of their performance award is deferred up to five years and includes forfeiture provisions for material misconduct. In addition, the Settling Firm considers compliance related violations, for example failure to complete mandatory training on time or failure to comply with personal account dealing policy, in an individual's performance review, and repeat violations can lead to sanctions.

(d)      Past Waivers from Being Considered an Ineligible Issuer

The Commission has previously granted the Settling Firm and its affiliates six waivers from being considered an ineligible issuer, five of which, as discussed in the bullets below, were in connection with conduct wholly unrelated to the conduct alleged in the Information. The waiver in connection with United States of America v. UBS Securities Japan Co. Ltd., related to the same facts that are alleged in the Information and was granted by the Commission to an affiliate of the Settling Firm on September 13, 2013, more than two years after the Settling Firm had ceased the conduct alleged in the Information.

Four of the other waivers were granted by the Commission after the Settling Firm had ceased the conduct alleged in the Information. Only the waiver granted on December 9, 2008 (the "2008 Waiver") was granted while the conduct alleged in the Information was occurring, but as it related to conduct unrelated to the conduct alleged in the Information, the remedial measures put in place by the Settling Firm as a result of the 2008 Waiver could not have prevented, led to an earlier discovery of, or raised red flags about the conduct alleged in the Information.

UBS WKSI                                                                    12

Mary Kosterlitz, Esq.                                                            May 20, 2015

- In the Matter of Auction Rate Securities Liquidity Issues (File No. HO-10915-A) (Dec. 9, 2008) related to alleged conduct by UBS Financial Services Inc. ("UBSFS") and UBS Securities LLC ("UBSS") in connection with the underwriting, marketing and sale of auction rate securities. This matter alleged that UBSS and UBSFS misled investors into believing that auction rate securities were safe, highly liquid investments that were equivalent to cash or money-market funds.

- SEC v. UBS Financial Services Inc. (P-01118) (May 6, 2011) related to the activity of former employees of UBSFS with respect to the temporary investment of proceeds of municipal securities in reinvestment products such as guaranteed investment contracts, repurchase agreements, and forward purchase agreements. The otherwise disqualifying order alleged that former employees of UBSFS engaged in bidding practices that affected the prices for certain of the reinvestment products at issue and the certifications required under applicable regulations. The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- In the Matter of UBS Financial Services Inc. of Puerto Rico (FL-3491) (May 10, 2012) related to conduct by UBS Financial Services Inc. of Puerto Rico ("UBSPR") in connection with secondary market sales of mutual funds to residents of Puerto Rico. The order alleged that UBSPR made misrepresentations and omissions concerning market prices and liquidity of certain non-exchange traded closed-end mutual funds.

- In the Matter of UBS Securities LLC (NY-8353) (Aug. 6, 2013) related to the alleged failure to disclose retention of certain upfront premiums in connection with credit default swaps referenced as collateral in a collateralized debt offering that was sold to accredited investors. The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- United States of America v. UBS Securities Japan Co. Ltd. (Sep. 13, 2013) involved the manipulation of benchmark interest rates by UBS Securities Japan Co. Ltd. ("UBSJC"). The conduct was limited to approximately fourteen employees, none of whom was responsible for preparing the UBS AG Disclosures and all of whom resigned or had their employment terminated. UBSJC implemented extensive remedial measures to enhance its compliance environment and risk monitoring, including a comprehensive microlevel review of its business divisions and processes, installation of a

UBS WKSI                                                                                        13

Mary Kosterlitz, Esq.                                                          May 20, 2015

dedicated communications monitoring team, adoption of amended employment rules and supervisory procedures, and enhanced training regarding, among other things, full compliance with UBSJC's Code of Conduct and obligation to report inappropriate activities. As a result of an order entered by the U.S. Commodity Futures Trading Commission in December 2012, the Settling Firm also agreed to comply with significant audit and monitoring conditions of its interest-rate benchmark submissions.

- In the Matter of UBS (NY-8692) (January 15, 2015) related to the failure by an affiliate of the Settling Firm to timely disclose to all subscribers of an automated trading system (the "ATS") two new features of the ATS.

As demonstrated above, none of the conduct alleged in the six otherwise disqualifying orders related to the Settling Firm's conduct or the conduct of its affiliates as an issuer of securities and does not call into question the Settling Firm's ability to make accurate disclosures about its future offerings. Accordingly, the conduct alleged in the Information does not call into question the effectiveness of the Settling Firm's prior remedial measures.

4.     Impact on the Settling Firm if the Waiver Request is Denied.

The loss of the Settling Firm's status as an eligible issuer could, as described in more detail below, affect the Settling Firm's ability to conduct its structured products businesses, which could potentially harm investors and the market as a whole. This would be an unduly severe consequence, particularly in light of the fact that the conduct charged in the Information does not involve the issuance of UBS securities.

The Settling Firm is a global financial institution that relies on the benefits afforded to well-known seasoned issuers in its day-to-day operations. Being a well-known seasoned issuer provides two primary benefits: (1) additional flexibility over a Form F-3 when issuing from a shelf registration; and (2) the ability to communicate more freely with investors using free-writing prospectuses ("FWPs").

The Settling Firm regularly relies on its eligible issuer status to offer securities using its shelf registration. Losing its status as a well-known seasoned issuer would impose additional restrictions on the Settling Firm's use of a shelf registration statement. Among other things, the Settling Firm would be required to pay all fees upfront at the time of registration and include additional information in its registration statements. Further, the Settling Firm's registration statements would be subject to a review period. All of these consequences would impose additional administrative burdens on the Settling Firm.

UBS WKSI                                                                              14

Mary Kosterlitz, Esq.                                                    May 20, 2015

Another impact of being considered an ineligible issuer, however, would be the limitations on the Settling Firm's ability to communicate with investors using free-writing prospectuses ("FWPs"), which convey targeted and relevant information to customers in a user-friendly format that is often easier to understand than the typically dense statutory prospectus. The SEC has recognized that investors and the securities markets benefit from the use of FWPs, which among other things facilitate greater transparency to investors.[5]

The Settling Firm currently employs user-friendly FWPs to offer securities on an almost daily basis. In 2014, the Settling Firm issued securities in 2,986 offerings, only 31 of which did not use an FWP. The aggregate principal amount of the 2,955 offerings in which the Settling Firm used some form of FWP was approximately $2.865 billion. In each of these offerings, UBS used at least one document that was filed as an FWP. While some of these documents could be reformatted to comply with the requirement of Section 10(b), the loss of its eligible issuer status would limit the Settling Firm's ability to market the products offered by its exchange-traded note ("ETN") and structured product businesses.

(a)     Exchange-Traded Notes.

The Settling Firm is an active issuer of ETNs, which are fixed term debt securities indexed to the performance of a reference index. The Settling Firm currently offers 33 ETNs and regularly produces written materials in FWP format to provide investors with summary information regarding those ETNs. The Settling Firm relies on its ability to post fact sheets, press releases and email distributions on its website to provide transparency to ETN investors regarding performance and income payments. Each of these forms of communication is a permitted form of FWP that is filed with the SEC. These documents are primarily communicated to investors through the Settling Firm's E-TRACS website. Other than the fact sheets, these FWPs would no longer be eligible to use as FWPs if the Settling Firm is deemed an ineligible issuer, requiring the Settling Firm to implement changes to its communications and E-TRACS systems. Among other things, the Settling Firm anticipates that ineligible issuer status would require it to modify its informational E-TRACS website. Inability to use FWPs also could result in redemptions of the Settling Firm's ETNs by investors who prefer to invest in ETNs issued by companies that can provide user-friendly, summary information in FWP format.

---

[5]     Securities Offering Reform, Securities Act Release No. 8501 (Nov. 3, 2004)

UBS WKSI                                                                    15

Mary Kosterlitz, Esq.                                          May 20, 2015

      (b)      UBS Equity Investor System.

Loss of WKSI status would also require the Settling Firm to modify the FWPs used in its structured products business to either cause such documents to conform to the requirements of Section 10, or to otherwise cause them not to be FWPs. Most of the FWPs for the Settling Firm's structured products are generated by its Equity Investor System ("EQI"), which is an automated system used to price and issue multiple structured product offerings daily based on input from investors. EQI uses embedded risk management parameters and documentation templates to automatically generate pricing terms and preliminary and final offering documentation. FWPs and prospectus supplements generated by EQI are automatically filed with EDGAR upon use. The Settling Firm would have to modify and recode certain FWP templates to enable it to make such documents into Section 10-compliant prospectuses. In the case of educational materials such as product guides, these modifications would result in a less user-friendly format than is currently available as FWPs.

EQI-generated offerings represent a majority of the Settling Firm's structured product business by number of offerings. Of the 2,986 offerings by the Settling Firm in 2014, 2,425, or approximately 81 percent, were generated using EQI. EQI allows the Settling Firm to meet investor demand by creating offerings smaller than $1 million, allowing greater, customized investor access to structured notes. The average EQI offering has a principal amount of around $250,000. These small-denomination offerings provide investors with customized investment opportunities.

      (c)      Other Structured Products.

The Settling Firm also utilizes FWPs to market structured products outside of the EQI system. In 2014, the Settling Firm offered 561 structured products with an aggregate principal amount of approximately $2.492 billion in registered non-EQI offerings, and utilized FWPs in approximately 94% of these offerings. All of these offerings use, among other things, a preliminary prospectus filed as an FWP, which would require reformatting to conform to statutory prospectus requirements.

The Settling Firm believes that an inability to utilize most documents as FWPs could trigger its removal from the competitive bidding process for certain third-party distributors due to its inability to produce FWPs. Third-party distributors frequently request that the Settling Firm provide a one-to-two-page FWP as part of the investor package. As an ineligible issuer, the Settling Firm could be unable to participate in the bidding for these offerings to the extent any such FWP cannot be reformatted to comply with the requirements of Rule 164(e).

Mary Kosterlitz, Esq.                                                        May 20, 2015

Accordingly, for the Settling Firm, the shelf registration process and the ability to utilize FWP's provides an important means of access to the U.S. capital markets. Consequently, the ability to avail itself of automatic shelf registration and the other benefits available to a WKSI is extremely important to the Settling Firm's ability to raise capital and conduct its operations. In this regard, denying this waiver request would be unduly and disproportionately severe given that if the requested relief is not granted, the Settling Firm would incur substantial additional regulatory burdens and costs for conduct that has been discontinued and remedied.

In light of the foregoing, subjecting the Settling Firm to ineligible issuer status is not necessary under the circumstances, either in the public interest or for the protection of investors, and good cause exists for the grant of the requested relief. Accordingly, we respectfully request that the Commission, or the Division of Corporation Finance, acting pursuant to authority duly delegated by the Commission and pursuant to paragraph (2) of the definition of "ineligible issuer" in Rule 405, determine that under the circumstances the Settling Firm will not be considered an "ineligible issuer" within the meaning of Rule 405 as a result of the Guilty Plea and the entry of the Judgment.[6] We further request that this determination be made (i) as of the date of the Guilty Plea and (ii) for all purposes of the definition of "ineligible issuer," however it may now or hereafter be used under the federal securities laws and the rules thereunder.

---

[6]   We note in support of this request that the Division of Corporation Finance, acting pursuant to authority duly delegated by the Commission, has in other instances granted relief under Rule 405 for similar reasons. *See, e.g.,* Waiver Requests of Ineligible Issuer Status under Rule 405 of the Securities Act were granted for: Deutsche Bank AG (May 1, 2015); Deutsche Bank AG (April 23, 2015); UBS AG (January 15, 2015); Citigroup Inc. (September 26, 2014); Barclays PLC (September 23, 2014); Morgan Stanley (July 24, 2014); AEGON N.V. (June 24, 2014); The Royal Bank of Scotland Group plc (April 25, 2014); Nomura Holdings Inc. (January 2, 2014); Bank of America Corporation (December 12, 2013); Fifth Third Bankcorp (December 4, 2013); The Royal Bank of Scotland Group plc (November 26, 2013); UBS AG (September 19, 2013); UBS AG (August 6, 2013); Oppenheimer Holdings, Inc. (March 26, 2013); JPMorgan Chase & Co. (January 8, 2013); Credit Suisse AG (November 16, 2012); Wells Fargo & Company (August 14, 2012); UBS AG (May 10, 2012); JPMorgan Chase & Co. (July 11, 2011); UBS AG (May 6, 2011); Wells Fargo Securities, LLC (April 7, 2011); Goldman Sachs Group, Inc. (July 23, 2010); Deutsche Bank Securities, Inc. (June 16, 2009); Royal Bank of Canada (June 11, 2009); UBS Financial Services Inc. (December 23, 2008); Bank of America (May 1, 2008); Morgan Stanley (May 11, 2007); Banc of America Securities LLC (March 14, 2007); Bank of New York (January 9, 2007); and Deutsche Bank, AG (January 9, 2007).

Mary Kosterlitz, Esq.                                      May 20, 2015

      If you have any questions regarding this request, please contact me at (212) 909-6036.

                     Sincerely yours,

                     Steven J. Slutzky



**Katten**

KattenMuchinRosenman LLP

525 W. Monroe Street
Chicago, IL  60661-3693
312.902.5200 tel
312.902.1061 fax
www.kattenlaw.com
DAVID C. BOHAN
david.bohan@kattenlaw.com
312.902.5566 direct

January 14, 2015

<u>**Via Electronic Mail**</u>

Mary J. Kosterlitz, Esq.
Chief of the Office of Enforcement Liaison
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Re:    <u>In the Matter of UBS (File No. NY-8692)</u>

Dear Ms. Kosterlitz:

I write on behalf of this firm's client UBS AG in connection with the anticipated settlement of an administrative proceeding (the "Proceeding") brought against UBS AG's indirect wholly-owned subsidiary UBS Securities LLC ("UBSS") by the U.S. Securities and Exchange Commission (the "Commission").   The Proceeding arises out of UBSS' operation of a registered alternative trading system (the "UBS ATS").

UBS AG is a financial services company and foreign private issuer under Rule 3b-4(c) of the Securities Exchange Act of 1934.   UBS AG qualifies as a "well-known seasoned issuer" as defined in Rule 405 of the Securities Act of 1933 (the "Securities Act").   UBS AG respectfully requests that the Division of Corporate Finance (the "Division"), acting under delegated authority on behalf of the Commission, determine that UBS AG shall not be considered an "ineligible issuer" as defined in Rule 405 as a result of the cease-and-desist order to be entered in the Proceeding (the "Order"), which is described below.   Consistent with the framework outlined in the Division's Revised Statement on Well-Known Seasoned Issuer Waivers issued on April 24, 2014 (the "Revised Statement"), good cause exists to grant the requested waiver, in that the conduct alleged in the Order does not relate in any way to UBS AG's filings with the Commission or its financial statements and the alleged violations giving rise to this request were remedied more than two years ago.

UBS AG requests that the Division's determination that UBS AG shall not be considered an ineligible issuer be made effective upon entry of the Order.   Based upon discussions with



Mary Kosterlitz, Esq.
January 14, 2015
Page 2

attorneys in the Division of Enforcement, we understand that the Division of Enforcement will not object to this request.

## BACKGROUND

The Order alleges that prior to March 2011 and July 2012, respectively, UBSS failed to timely disclose to all subscribers to the UBS ATS two new features of the ATS: (i) a new order type known as Primary Peg Plus ("PPP") and (ii) a crossing restriction referred to as the "natural-only" restriction. The PPP order type permitted subscribers to the UBS ATS to tie or "peg" the price of their orders to the national best bid (or national best offer) plus (or minus) a specified percentage of the difference between the two. The natural-only crossing restriction enabled certain clients of UBSS to prevent their orders from executing in the UBS ATS against order flow that UBSS determined was short term and opportunistic in nature.

The PPP order type was launched in June 2010 and discontinued in March 2011. During that period, the Order alleges, UBSS failed to notify approximately nine of thirty-five subscribers that the order type was available. The natural-only crossing restriction was rolled out beginning in March 2010 but, the Order alleges, was not fully disclosed to all subscribers until July 2012.

UBSS has reached an agreement in principle with the Division of Enforcement by which UBSS, without admitting or denying the matters set forth in the Order, except as to the jurisdiction of the Commission, will be found to have violated Section 17(a)(2) of the Securities Act. UBSS will also be found to have violated Rule 612 of Reg NMS (the "Sub-Penny Rule"), Reg ATS Rules 301(b)(5) (the "Fair Access Rule"), 301(b)(10) (restricting access to confidential subscriber information), and 301(b)(2) (requiring timely and accurate amendments to Form ATS), and Section 17(a) of the Exchange Act and Rule 17a-4 thereunder (maintenance of specified books and records). Under the Order, UBSS will be censured, ordered to cease and desist from further violations of those statutes, rules and regulations, and required to disgorge approximately $2.24 million in commission revenue and approximately $235,000 in prejudgment interest, and pay a civil monetary penalty in the amount of $12 million.

## DISCUSSION

Under a number of Securities Act rules that became effective on December 1, 2005, a company that qualifies as a "well-known seasoned issuer" as defined in Rule 405 is eligible, among other things, to register securities for offer and sale under an "automatic shelf registration statement," as so defined, and to have the benefits of a streamlined registration process under the Securities Act. Companies that qualify as well-known seasoned issuers are entitled to conduct registered offerings with substantially fewer restrictions, which facilitates their raising of capital. Pursuant to Rule 405, however, a company does not qualify as a well-known seasoned issuer if it is an



Mary Kosterlitz, Esq.
January 14, 2015
Page 3

"ineligible issuer." Similarly, the Securities Act rules permit an issuer and other offering participants to communicate more freely during registered offerings by using free-writing prospectuses, but only if the issuer is not an "ineligible issuer."[1]

Rule 405 under the Securities Act makes an issuer an "ineligible issuer" if, during the past three years, the issuer or any entity that at the time was a subsidiary of the issuer "was made the subject of any judicial or administrative decree or order arising out of a governmental action" that, among other things, "(A) prohibits certain conduct or activities regarding, including future violations of, the anti-fraud provisions of the federal securities laws" or "(B) requires that the person cease and desist from violating the anti-fraud provisions of the federal securities laws."[2] Rule 405 also authorizes the Commission to determine, "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer."[3] The Commission has delegated authority to the Division to grant waivers from any of the ineligibility provisions of this definition.[4]

Based upon the factors set forth earlier this year in the Division's Revised Statement, we respectfully submit that there is good cause for the Division to determine that it is not necessary in the public interest or for the protection of investors for UBS AG to be deemed an "ineligible issuer," notwithstanding that UBS AG will become subject to an otherwise disqualifying order arising out of government action against its subsidiary UBSS in connection with UBSS' operation of the UBS ATS.

A.      **The Nature of the Alleged Violation and Whether the Violation Casts Doubt on the Ability of the Issuer to Produce Reliable Disclosures to Investors**

As discussed above, the Proceeding and the Order do not arise out of UBS AG's activities as an issuer of securities and do not call into question the reliability of UBS AG's public disclosures or UBS AG's continuing ability to produce reliable disclosures in the future. Rather, insofar as they relate to this request, the Proceeding and the Order involve the alleged failure by UBSS to make uniform and timely disclosure to the subscribers of the UBS ATS, all of whom are

---

[1] Being an ineligible issuer will disqualify an issuer under the definition of "well-known seasoned issuer," thereby preventing the issuer from using an automatic shelf registration statement (*see* Rule 405) and limiting its ability to communicate with the market prior to filing a registration statement (*see* Rule 163). In addition, being an ineligible issuer will disqualify an issuer, whether or not it is a well-known seasoned issuer, under Rules 164 and 433 under the Securities Act, thereby preventing the issuer and other offering participants from using free-writing prospectuses during registered offerings of its securities.

[2] *See* 17 C.F.R. § 230.405.

[3] *Id.*

[4] *See* 17 C.F.R. § 200.30-1. *See also* note 215 in Release No. 33-8591 (July 9, 2005).



Mary Kosterlitz, Esq.
January 14, 2015
Page 4

sophisticated electronic broker-dealers, of a new and short-lived order type and a crossing restriction that was available to certain clients of UBSS.

Significantly, the Order does not allege that UBSS acted with scienter in failing to notify all subscribers of the PPP order type or the natural-only crossing restriction. Rather, it alleges that UBSS violated Section 17(a)(2) of the Securities Act, which requires a mental state no more culpable than negligence. UBSS' alleged failure to timely and uniformly notify subscribers to the UBS ATS of a new order type and a new crossing restriction do not implicate the reliability of UBS AG's current financial statements or other public disclosures by UBS AG or the continuing ability of UBS AG to produce reliable disclosures in the future.

**B.      The Persons Responsible for, and the Duration of, the Alleged Violations**

The individuals who allegedly failed to disclose the PPP order type and natural-only crossing restriction promptly to all subscribers were employees of UBSS who supervised or supported the UBS ATS desk.[5] They had no duties or responsibilities regarding the preparation or dissemination of UBS AG's financial statements or public disclosures by UBS AG as an issuer of securities. Indeed, no UBS AG employee participated in, knew or should have known about the misconduct alleged in the Order.

The alleged failure by UBSS to notify certain subscribers to the UBS ATS that the PPP order type was available for their use lasted between approximately June 2010 and March 2011, and the alleged failure to notify all subscribers concerning the natural-only crossing restriction lasted between approximately March 2010 and July 2012.

**C.      Remedial Measures**

In July 2012, UBSS adopted the policy and practice of promptly updating the UBS ATS "Rules of Engagement" whenever a new order type, crossing restriction or other feature or function is added to the UBS ATS. UBSS then sends updated versions of the Rules of Engagement promptly to all subscribers by electronic mail. UBSS' policy of notifying every subscriber of material changes to the operation of the UBS ATS has been codified in UBSS' Written Supervisory Procedures. Since July 2012, UBSS has also taken steps to remediate the other, more technical statutory and regulatory issues alleged in the Order, through means that include new order surveillance and blocking mechanisms, enhancements to the firm's supervisory and compliance policies and procedures, and improved oversight of all aspects of the operation of the UBS ATS.

---

[5] Importantly, these employees are not alleged to have acted with scienter or an intent to defraud.


**Katten**
KattenMuchinRosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 5

While UBSS believes that its remedial measures have succeeded over the two years they have been in place, UBSS also engaged outside counsel to administer two formal training sessions that address the issues underlying the Order to the key operational, legal and compliance personnel who support the UBS ATS. In addition, we note that the UBS ATS desk has been under new management since March 2014 and has been supported by a new head of Equities Legal since August 2012.

The past instances in which the Commission has granted UBS AG a waiver from being considered an ineligible issuer related to wholly different conduct by business units unrelated to the UBS ATS.

- *In the Matter of Auction Rate Securities Liquidity Issues* (File No. HO-10915-A) (Dec. 9, 2008) related to alleged conduct by UBS Financial Services Inc. ("UBSFS") and UBSS in connection with the underwriting, marketing and sale of auction rate securities. This matter alleged that UBSS and UBSFS misled investors into believing that auction rate securities were safe, highly liquid investments that were equivalent to cash or money-market funds.

- *SEC v. UBS Financial Services Inc.* (P-01118) (May 6, 2011) related to the activity of former employees of UBSFS with respect to the temporary investment of proceeds of municipal securities in reinvestment products such as guaranteed investment contracts, repurchase agreements, and forward purchase agreements. The otherwise disqualifying order alleged that former employees of UBSFS engaged in bidding practices that affected the prices for certain of the reinvestment products at issue and the certifications required under applicable regulations. The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- *In the Matter of UBS Financial Services Inc. of Puerto Rico* (FL-3491) (May 10, 2012) related to conduct by UBS Financial Services Inc. of Puerto Rico ("UBSPR") in connection with secondary market sales of mutual funds to residents of Puerto Rico. The order alleged that UBSPR made misrepresentations and omissions concerning market prices and liquidity of certain non-exchange traded closed-end mutual funds.

- *In the Matter of UBS Securities LLC* (NY-8353) (Aug. 6, 2013) related to the alleged failure to disclose retention of certain upfront premiums in connection with credit default swaps referenced as collateral in a collateralized debt offering that was sold to accredited investors. The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- *United States of America v. UBS Securities Japan Co. Ltd.* (Sep. 13, 2013) involved the manipulation of benchmark interest rates by UBS Securities Japan Co. Ltd. ("UBSJC").



**Katten**
KattenMuchinRosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 6

The conduct was limited to approximately fourteen employees, none of whom was responsible for preparing UBS AG's disclosures and all of whom resigned or had their employment terminated. UBSJC implemented extensive remedial measures to enhance its compliance environment and risk monitoring, including a comprehensive microlevel review of its business divisions and processes, installation of a dedicated communications monitoring team, adoption of amended employment rules and supervisory procedures, and enhanced training regarding, among other things, full compliance with UBSJC's Code of Conduct and obligation to report inappropriate activities. As a result of an order entered by the U.S. Commodity Futures Trading Commission in December 2012, UBS AG also agreed to comply with significant audit and monitoring conditions of its interest-rate benchmark submissions.

As demonstrated above, none of the conduct alleged in the five otherwise disqualifying orders related to UBS AG's conduct as an issuer of securities and does not call into question UBS AG's ability to make accurate disclosures about its future offerings. Moreover, the orders were wholly unrelated to the UBS ATS or the employees responsible for supervising or supporting the UBS ATS. Accordingly, the conduct alleged in the Order does not call into question the effectiveness of UBS AG's prior remedial measures.

**D.      Potential Impact of a Denial**

UBS AG would suffer severe adverse consequences if it were to become an "ineligible issuer" as a result of the Order. The loss of its status as an eligible issuer could, as described in more detail below, cause UBS AG to lose a significant source of revenue and substantially limit its structured products businesses, which in turn could potentially harm investors and the market as a whole. This would be an unduly severe consequence in light of the conduct at issue in the Order by UBS AG's subsidiary, UBSS.

UBS AG is a global financial institution that relies on the benefits afforded to well-known seasoned issuers in its day-to-day operations. Being a well-known seasoned issuer provides two primary benefits: (1) additional flexibility over a Form F-3 when issuing from a shelf registration; and (2) the ability to communicate more freely with investors using free-writing prospectuses ("FWPs").

UBS AG regularly relies on its eligible issuer status to offer securities using its shelf registration. Losing its status as a well-known seasoned issuer would impose additional restrictions on UBS AG's use of a shelf registration. Among other things, UBS AG would be required to pay all fees upfront at the time of registration and include additional information in its registration statements. Further, UBS AG's registration statements would be subject to a review period. All of these consequences would impose additional administrative burdens on UBS AG.



Mary Kosterlitz, Esq.
January 14, 2015
Page 7

The more serious impact of being considered an ineligible issuer, however, would be the limitations on UBS AG's ability to communicate with investors using free-writing prospectuses, which convey targeted and relevant information to customers in a user-friendly format that is often easier to understand than the typically more dense statutory prospectus. The SEC has recognized that investors and the securities markets benefit from the use of FWPs, which among other things facilitate greater transparency to investors.[6]

UBS AG employs user-friendly FWPs to offer securities on an almost daily basis. For the twelve-month period beginning August 1, 2013, and ending July 31, 2014, UBS AG issued securities in 2,630 offerings, only 17 of which did not utilize an FWP. The aggregate principal amount of the 2,613 offerings in which UBS used some form of FWP was approximately $3.5 billion. As described below, the loss of its eligible issuer status would limit the amount of relevant information available to investors and force UBS AG to significantly alter or eliminate its exchange-traded note ("ETN") and structured product businesses, which could result in a loss of nearly $70 million in revenue per year.

    **1.    Exchange-Traded Notes.**

UBS AG is an active issuer of ETNs, which are fixed term debt securities indexed to the performance of a reference index. UBS AG currently offers twenty ETNs and regularly produces written materials in FWP format to provide investors with summary information regarding those ETNs. UBS AG relies on its ability to post fact sheets, press releases and email distributions on its website to provide transparency to ETN investors regarding performance and income payments. Each of these forms of communication is a permitted form of FWP that is filed with the SEC. These documents are primarily communicated to investors through UBS AG's E-TRACS website. As an ineligible issuer, UBS AG would be unable to use these methods of communicating with investors. Among other things, UBS AG anticipates that ineligible issuer status would require it to shut down or severely limit its informational E-TRACS website and significantly reduce product transparency for investors.

The inability to use FWPs could result in significant redemptions of UBS AG's ETNs for two reasons. First, we expect that investors would prefer to invest in ETNs issued by companies that can provide the kind of user-friendly, summary information contained in FWPs. Second, limiting the flow of information regarding ETNs by eliminating FWPs could also reduce market maker participation in ETNs, which would cause wider spreads and potential dislocation of the ETN's market prices from their intrinsic value. Redemption of all of UBS AG's outstanding ETNs would result in an annual revenue loss by UBS AG of approximately $45 million.

---

[6] Securities Offering Reform, Securities Act Release No. 8501 (Nov. 3, 2004).



**Katten**
KattenMuchinRosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 8

2.      **UBS Equity Investor System.**

UBS AG would also be required to eliminate or substantially overhaul its structured products business, which also relies heavily on FWPs.  Most of the FWPs for UBS AG's structured products are generated from its Equity Investor System ("EQI"), which is an automated system used to price and issue multiple structured product offerings daily based on input from investors. EQI uses embedded risk management parameters and documentation templates to automatically generate pricing terms and preliminary and final offering documentation.  All FWPs and prospectus supplements generated by EQI are automatically filed with EDGAR upon use.

EQI-generated offerings represent a majority of UBS AG's structured product business by number of offerings.  Of the 2,630 offerings by UBS AG between August 2013 and July 2014, 2,223, or approximately 84%, were generated using EQI.  EQI allows UBS AG to meet investor demand by creating offerings smaller than $1 million, allowing greater, customized investor access to structured notes.  The average EQI offering has a principal amount of around $250,000. These small-denomination offerings provide investors with customized investment opportunities. The magnitude of this demand is illustrated by the number of UBS AG's structured note offerings relative to its competitors.  According to a recent Bloomberg Brief, UBS AG had issued more than twice as many structured products as the next largest issuer.[7]  Being an ineligible issuer would render UBS AG unable to utilize the current EQI system.  As a result, UBS AG would be required to reprogram and reformat the entire EQI system, which would require the immediate shutdown of the EQI platform.  We estimate that an immediate shutdown of the EQI system would result in an estimated revenue loss to UBS AG of $1.5 to $2 million per month ($18 million to $24 million per year).

While the cost to replace or reprogram EQI is uncertain, it is worth noting that UBS AG has spent in excess of 1,100 hours of outside counsel time, hundreds hours of internal time and approximately $1.8 million in combined IT and outside legal costs over a period of 12 months to develop additional products that could make use of EQI, which would have to be modified or abandoned if UBS AG were to lose its status as an eligible issuer.

3.      **Other Structured Products.**

UBS AG also utilizes FWPs to market structured products outside of the EQI system.  To date, in 2014, UBS AG has offered structured products with an aggregate principal amount of approximately $2.3 billion in 300 registered non-EQI offerings.  An FWP was used in nearly 95% of these offerings.

Loss of eligible issuer status would impose a significant, immediate hardship on UBS AG's structured product businesses.  Not only would UBS AG be unable to utilize the current EQI system, but it would also be removed from the competitive bidding process for certain third-

---

[7] See Bloomberg Brief: Structured Notes, Sept. 18, 2014, "Rankings by Asset Class: U.S.", p. 8 (citing "deal count" based on SEC Filings through September 12, 2014).



**Katten**
KattenMuchinRosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 9

party distributors due to its inability to produce FWPs.  Third-party distributors occasionally request that UBS AG provide a one-to-two-page FWP as part of the investor package.  As an ineligible issuer, UBS AG could be unable to participate in the bidding for these offerings, which could have repercussions for the entire market if distributors are unable to deliver the potentially superior terms that UBS AG could have offered.

Again, UBS AG's structured products business and its ETN business are wholly separate from the ATS desk of UBS AG's subsidiary.  Limiting UBS AG from making use of FWPs would be an unduly and disproportionately severe outcome for alleged conduct by UBSS that UBSS voluntarily discontinued and remedied more than two years ago.

For the foregoing reasons, UBS AG submits that it is not necessary, either in the public interest or for the protection of investors, for UBS AG to be deemed an "ineligible issuer" and that good cause exists for the relief requested herein.  We therefore request that the Division, acting pursuant to authority duly delegated by the Commission and pursuant to paragraph (2) of the definition of "ineligible issuer" in Rule 405, determine that under the circumstances UBS AG will not be considered an "ineligible issuer" within the meaning of Rule 405 as a result of the Order.

Please call me at your earliest convenience if you have any questions regarding this request or require any additional information.

Sincerely,

David C. Bohan

cc:    Stephen A. Larson, Enforcement Division, U.S. Securities and Exchange Commission
       Charles D. Riely, Enforcement Division, U.S. Securities and Exchange Commission

**Debevoise
&Plimpton**

Debevoise & Plimpton LLP
555 Thirteenth Street, NW
Washington, DC 20004
+1 202 383 8000

Kenneth J. Berman
Partner
kjberman@debevoise.com
+1 202 383 8050

May 20, 2015

<u>VIA FIRST CLASS MAIL AND EMAIL</u>

Sebastian Gomez Abero, Esq.
Chief, Office of Small Business Policy
Division of Corporate Finance
U.S. Securities and Exchange Commission
100 F Street, N.E., 3rd Floor
Washington, D.C.  20549-3628

**United States of America v. UBS AG**

Dear Mr. Abero:

We submit this letter on behalf of our client, UBS AG, the settling defendant in the above-captioned criminal proceeding (the "Settling Firm"), in connection with a criminal Information brought by the United States Department of Justice, Criminal Division, Fraud Section ("Department of Justice"), Plea Agreement, Guilty Plea, and Judgment, which are described more fully below.

The Settling Firm hereby requests, pursuant to 506(d)(2)(ii) of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act"), waivers of any disqualifications from relying on the exemption under Rule 506 of Regulation D that will arise with respect to the Settling Firm or any other person as a result of the entry of a Guilty Plea by the Settling Firm, which is described below.

**BACKGROUND**

On December 18, 2012, the United States Department of Justice, Criminal Division, Fraud Section ("DOJ Criminal Division") and the Settling Firm entered into a Non-Prosecution Agreement ("LIBOR NPA") related to the LIBOR Conduct, described and defined below.

Following an initial media report in June 2013 of widespread irregularities in the foreign exchange ("FX") markets, the Settling Firm immediately commenced an internal review of its FX business (although the article did not implicate the Settling Firm).  After identifying certain issues, the Settling Firm notified the DOJ Criminal Division (as well as

Sebastian Gomez Abero, Esq.                                      Page 2

the Antitrust Division of the Department of Justice and other authorities) that it had identified evidence of potential FX market trading coordination and thereafter provided extensive cooperation to the Department of Justice and other relevant authorities in connection with investigations into FX-related conduct.[1]

    As set forth in a Plea Agreement, dated May 20, 2015, entered into by the Settling Firm and the DOJ Criminal Division (the "Plea Agreement"), the DOJ Criminal Division determined that the Settling Firm had breached the LIBOR NPA. Relevant considerations in reaching that determination included certain conduct described in Exhibit 1 the Plea Agreement ("Factual Basis for Breach"), namely certain employees engaged in (i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat, to the detriment of the UBS AG's customers, and (ii) collusion with other participants in certain FX markets (the "FX Conduct").

    Further, the Settling Firm agreed to:

1.    Plead guilty to a one-count Information (the "Information") in the United States District Court, District of Connecticut (the "District Court") charging wire fraud, in violation of Title 18, United States Code Section 1343 and 2. The Information charges that between approximately 2001 and in or about 2010, the Settling Firm devised and engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied (the "LIBOR Conduct").

---

[1]    In November 2014, the Settling Firm reached settlements with the U.K. Financial Conduct Authority ("FCA") and the U.S. Commodity Futures Trading Commission ("CFTC") in connection with their investigations into the FX Conduct, and the Swiss Financial Market Supervisory Authority ("FINMA") issued an order concluding its formal proceedings with respect to the FX Conduct and precious metals ("PM") trading. In addition to paying fines, the Settling Firm has ongoing obligations to cooperate with these authorities and to undertake certain remediation, including actions to improve processes and controls and requirements imposed by FINMA to apply compensation restrictions for certain employees and to automate at least 95% of its global FX trading. In December 2014, the Hong Kong Monetary Authority concluded an investigation of the FX Conduct, and found no evidence of collusion or manipulation but did find internal control deficiencies in the Settling Firm's FX trading operations. On May 20, 2015, the Board of Governors of the Federal Reserve System ("Federal Reserve") and the State of Connecticut Department of Banking ("CT DOB") issued a cease and desist order and imposed a civil money penalty upon consent of the Settling Firm related to the FX Conduct (the "Fed-CTDOB Order"). However, none of these settlements will require relief under 17 C.F.R. § 230.506(d)(2)(ii).

UBS 506(d)

Sebastian Gomez Abero, Esq.                                                      Page 3

The Information charges that the Settling Firm committed wire fraud in furtherance
of that scheme in violation of Title 18, United States Code, Sections 1343 and 2 on
or about June 29, 2009 by transmitting or causing the transmission of electronic
communications, specifically:  (i) an electronic chat between a senior derivatives
trader (the "UBS Trader") employed by a subsidiary of the Settling Firm and a
London-based interdealer derivatives broker (the "Broker"), in which the UBS
Trader requested the Broker submit an increased Yen LIBOR rate favorable to the
UBS Trader's position; (ii) a telephone call placed by the Broker at the UBS
Trader's request to a Yen LIBOR submitter at another Yen panel bank, in which the
Broker requested that the submitter increase the panel bank's Yen LIBOR
submission that day; (iii) an electronic chat between the UBS Trader and a junior
derivatives trader employed by the Settling Firm, who also served as a Yen LIBOR
submitter for the Settling Firm (the "UBS Submitter"), in which the UBS Trader
requested that the UBS Submitter increase the Settling Firm's Yen LIBOR
submission rate to a rate favorable to the UBS Trader's trading positions; (iv) a
subsequent Yen Libor submission from the Settling Firm to Thomson Reuters
reflecting an accommodation of the UBS Trader's request to the UBS Submitter;
and (v) a subsequent publication of a Yen LIBOR rate.

2.      Pay a fine of $203 million in connection with the conduct charged in the
        Information.

3.      A three-year term of probation, in which the Settling Firm, among other things,
        would (i) not commit another federal crime during the term of probation; (ii)
        cooperate fully with the DOJ Criminal Division and other authorities in any
        investigation of the Settling Firm or its affiliates in matters relating to the (a)
        manipulation of benchmark interest rates, (b) manipulation of, or fraud in, the FX
        spot and precious metals ("PM") markets, or (c) in connection with UBS's V10
        Currency Indices ("V10"); (iii) implement and continue to implement a compliance
        program designed to prevent and detect misconduct related to the benchmark
        interest rate and FX markets throughout its operations including those of its
        affiliates and subsidiaries and to provide annual reports to the probation officer and
        the DOJ Criminal Division on its progress; (iv) further strengthen its compliance
        program and internal controls as required by other regulatory and enforcement
        authorities that have addressed any of the misconduct related to the benchmark
        interest rate and FX markets; (v) submit to the DOJ Criminal Division any report
        drafted by any compliance consultant or monitor imposed by the Board of
        Governors of the Federal Reserve System; and (vi) promptly bring to the attention
        of the DOJ Criminal Division all credible information regarding a violation of U.S.
        criminal law (a) concerning fraud or (b) governing the securities or commodities
        markets.

In turn, the DOJ Criminal Division has agreed that it will not file additional
criminal charges against the Settling Firm or any of its affiliates or subsidiaries relating to
the LIBOR Conduct, the FX Conduct, and information disclosed to the DOJ Criminal
Division prior to the date of the Plea Agreement relating to PM trading markets or relating
to V10.

UBS 506(d)

Sebastian Gomez Abero, Esq.                                        Page 4

The Applicant expects to enter a guilty plea in the District Court (the "Guilty Plea") and expects that the District Court will enter a judgment against the Settling Firm (the "Judgment") that will require remedies that are materially the same as set forth in the Plea Agreement.

## DISCUSSION

The Settling Firm understands that the entry of the Guilty Plea will disqualify the Settling Firm and certain issuers associated in one of the capacities listed below from relying on the exemption under Rule 506 of Regulation D promulgated under the Securities Act. The Settling Firm is concerned that, should it be deemed to be the issuer, a predecessor of the issuer, an affiliated issuer, a general partner or managing member of the issuer, a beneficial owner of 20 percent or more of the issuer's outstanding voting equity securities, a promoter connected with the issuer in any capacity at the time of the filing, offer or sale, an investment manager of the issuer, a person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of securities of the issuer (a "solicitor"), a general partner or managing member of an investment manager or solicitor of the issuer, or deemed to act in any other capacity described in Securities Act Rule 506 for the purposes of Securities Act Rule 506(d)(l)(i), the Settling Firm as well as the other issuers with which the Settling Firm is associated in one of those listed capacities and which rely upon or may rely upon these offering exemptions when issuing securities would be prohibited from doing so. The U.S. Securities and Exchange Commission (the "Commission") has the authority to waive the Regulation D exemption disqualifications upon a showing of good cause that such disqualifications are not necessary under the circumstances. *See* 17 C.F.R. § 230.506(d)(2)(ii).

The Settling Firm requests that the Commission waive any disqualifying effects that entry of the Guilty Plea and Judgment against the Settling Firm will have under Rule 506 of Regulation D on the following grounds:

1.     The Settling Firm's Conduct charged in the Information does not relate to the offer or sale of a security.

The conduct of the Settling Firm as addressed in the Judgment involved a violations relating to interest rate derivatives. Furthermore, we note that the individuals at the Settling Firm who were identified as being responsible for the LIBOR Conduct have either resigned or have been terminated and that the Settling Firm has taken disciplinary actions (including terminations, suspensions and significant penalties related to compensation) against employees who were found through the FX investigation, as discussed in 4.B., below.

2.     The Persons Responsible for, and the Duration of, the Alleged Misconduct.

The duration of the alleged misconduct and the persons responsible for the alleged misconduct do not warrant disqualification.

UBS 506(d)

Sebastian Gomez Abero, Esq.                                              Page 5

A.      LIBOR

While the Settling Firm acknowledges that the misconduct alleged in the Information occurred over a prolonged period of time (from 2001 through June 2010), it involved only approximately 14 of UBS' approximately 65,000 total employees; members of senior management of UBS were not implicated in the misconduct; none of the misconduct involved the securities offerings relying on Rule 506 of Regulation D ("Rule 506 Offerings"); and while some of the individuals involved in the trader-related conduct described in the Exhibit 3 of the Plea Agreement ("LIBOR Statement of Facts") were employees of the Settling Firm, none of these individuals had any responsibility for, or role in, Rule 506 Offerings.  All of the individuals at the Settling Firm who were identified as being responsible for the conduct alleged in the Information have either resigned or have had their employment terminated.  Therefore, the misconduct cannot be viewed as pervasive within the Settling Firm.

As none of the members of the Settling Firm's senior management were implicated in the misconduct, the conduct alleged in the Information ended in 2010 and the individuals responsible for the misconduct are no longer employed by the Settling Firm, we believe the foregoing discussion addresses these concerns.  Finally, as noted in the discussion concerning remedial actions, the Settling Firm has taken a number of actions to reinforce its commitment to compliance.

B.      FX

The Settling Firm acknowledges that the FX Conduct occurred prior to and continuing after December 18, 2012. It involved less than 10 of UBS' approximately 65,000 total employees. Members of senior management of UBS were not implicated in the misconduct. The Settling Firm has taken appropriate disciplinary action against the individuals responsible for the FX Conduct. In some cases, UBS has delayed taking final action pending resolution of the DOJ Criminal Division's investigation in order to ensure the ongoing cooperation of relevant individuals.

As none of the members of the Settling Firm's senior management were implicated in the misconduct, the conduct alleged has ended, and UBS has already taken or intends to take appropriate disciplinary action we believe the foregoing discussion addresses these concerns. Finally, as noted in the discussion concerning remedial actions, the Settling Firm has taken a number of actions to reinforce its commitment to compliance.

3.      Role of Individuals in Rule 506 Offerings.

In addition, none of the LIBOR or FX Conduct pertains to activities undertaken by the Settling Firm, its affiliates, or its subsidiaries in connection with Rule 506 Offerings. There is no connection between the alleged conduct and Rule 506 Offerings.

Moreover, neither the Information relating to LIBOR conduct nor the Factual Basis for Breach involves any allegations that the Settling Firm committed scienter-based violations of the Securities Act or the Exchange Act with respect to the conduct.

UBS 506(d)

Sebastian Gomez Abero, Esq.                                          Page 6

4.       Remedial Steps Taken to Address the LIBOR Conduct and FX Conduct.

          The Settling Firm has cooperated with the Department of Justice in the
investigation of this matter, and has agreed to continue to cooperate fully with the
Department of Justice, and foreign law enforcement authorities and agencies, and to
truthfully disclose all factual information related to violations of laws concerning fraud or
governing securities or commodities markets of which the Settling Firm is aware to the
Department of Justice.

          A.       LIBOR

          After extensive investigation, the Department of Justice and the Settling Firm have
negotiated a settlement reflected in the Plea Agreement.  The Settling Firm has agreed to
comply with several undertakings pursuant to the Plea Agreement, including, among other
things, the undertakings and payment of the fine described above.

          The Settling Firm has previously agreed to various undertakings pursuant to
investigations and settlements with the authorities in the United States, the United
Kingdom, Japan, Singapore, Hong Kong, and Switzerland related to the LIBOR Conduct.
UBS paid fines and disgorgements totaling CHF 1.4 billion to U.S., U.K. and Swiss
authorities to resolve investigations related to the LIBOR Conduct, including $500 million
to the Department of Justice, GBP 160 million to the FCA, and CHF 59 million to FINMA.

          Further, in connection with an Order dated December 19, 2012, issued by the CFTC
with respect to the matters described therein, UBS agreed to extensive undertakings to
ensure the integrity and reliability of its benchmark interest rate submissions by
(i) determining its submissions based on specific factors, adjustments and considerations;
(ii) conducting supervisory review of each daily submission; (iii) ensuring minimum
qualifications of submitters and supervisors; (iv) implementing firewalls to prevent
improper communications and submissions; (v) providing certain documents to the CFTC
upon request and without a subpoena; (vi) developing and maintaining monitoring systems
and performing periodic internal audits and annual external audits; (vii) developing
policies, procedures and controls to comply with the undertakings; and (viii) developing a
training program for all submitters and supervisors and traders who deal with the
benchmark interest rate; and (ix) making periodic reports to the commission on compliance
with the undertakings.  The Settling Firm has complied with these undertakings and
submitted a final report to the CFTC on December 18, 2013. The Settling Firm has also
complied with additional undertakings imposed by FINMA.

          In addition to the specifics steps taken to fulfill the CFTC undertakings, lessons
learned from the LIBOR matter drove the Settling Firm to have much greater focus overall
on supervising, monitoring and surveillance of intra-day conduct and behaviors to
complement the end-of-day control framework that was then prominent. The firm-wide
Principles and Behaviors program, sponsored by the Group Chief Executive Officer is
designed to significantly strengthen three core behaviors across the firm (Integrity,
Collaboration, and Challenge) to strengthen the culture and foster greater alignment to
protecting the firm's reputation and ensuring long-term and sustainable performance.  In

UBS 506(d)

2013, the Group Chief Executive Officer's decision to integrate the Compliance function with Operational Risk Control was an important step in bringing a risk management approach and control discipline to the Compliance activities in the second line of defense. It has enabled the Settling Firm to clarify the roles, responsibilities and control expectations for the 2nd line of defense and supports the implementation of an industry leading monitoring and surveillance capability.

Based on the lessons learned from the LIBOR investigation itself, the Settling Firm significantly tightened the coordination and governance over high risk legal, regulatory or conduct matters, including establishing a cross-functional investigations sounding board, assigning leadership accountability aligned to the potential tail risk should any allegation or speculation prove to be true, and applying the learnings across the organization. This serves as an important component of the overall compliance program. Fully leveraging this very protocol led to the firm investigating the initial allegations in the media which led to the firm identifying the FX issue and everything that followed.

      B.       FX

As noted above, after learning of potentially inappropriate practices in the FX industry in a media report in June of 2013—which did not specifically implicate UBS AG—a newly formed Investigations Sounding Board launched an internal investigation into potential misconduct in the FX spot markets. From early on in its investigation, UBS AG consistently provided the Department of Justice with detailed, real-time reports of its investigation findings and repeatedly solicited the Department's input and approval of changing investigation priorities and altered significantly the investigation plan on different occasions at the request of the Department. UBS AG believes that it was the first bank to report FX misconduct to the Department of Justice and other authorities.

While the Settling Firm believes that its control environment for FX rates during the investigation period was proportionate to prevailing industry standards and the systems and controls of peer institutions, the Settling Firm has adopted significant remedial measures to address problems that it identified. In fact, the Settling Firm is making a significant investment in adopting measures to align its unregulated FX business with many of the same standards in place for its business in regulated markets.

First, since the early stages of the FX investigation, the Settling Firm has been transitioning its FX business to adopt principles, systems, and controls more akin to that of regulated markets. For example, the Settling Firm is introducing continuous transaction monitoring and detailed time stamping of orders to ensure it can conduct additional forensic analysis of trading activity. These initiatives, although requiring significant further investment in overhauling systems and processes, are developed, funded, and in place.

Second, following detection of the FX issues, the Settling Firm conducted an in-depth review of the FX business to identify areas in need of improvement. Since then, the Settling Firm has undertaken actions to significantly improve compliance monitoring, intraday supervision and operational risk management assessment to more swiftly detect

Sebastian Gomez Abero, Esq.                                    Page 8

inappropriate activity. For instance, the Settling Firm has made the following
improvements:

*Strengthened Front Office Processes*
- Standardized the fixing order process
- Closed FX management books
- Instituted a formal process of review and supervision of enhanced conduct
  risk
- Designed brokerage management information in order to facilitate the
  identification of possible collusion between FX traders and brokers
- Recalibrated the FX "business owned limits" to align them to market risk
  appetite and historical utilization
- Reviewed the FX supervisory hierarchy
- Revised guidance on handling client error
- Improved the consistency of disclosing trading conflicts in Terms and
  Conditions to clients
- Updated chat room standards and controls, which were implemented in
  November 2013
- Prohibited the use of personal mobile phones on trading floors for all
  Investment Bank sales and trading staff
- Implemented a series of measures to manage obligations and expectation to
  clients and markets over potential conflicts of interests

*Strengthened Front Office Systems*
- As of December 2014, implemented an enhanced booking and risk
  management workflow for all FX prime brokerage cash trades, fully
  segregating prime brokerage components of trades from FX sales and trading

*Enhanced Guidance and Training*
- Significantly strengthened its "FX, Rates & Credit Global Handbook," which
  includes new sections covering client and market conduct requirements,
  behavior, and communication
- Mandatory training (both live and computer-based) linked to these guidelines
  has been completed for all Investment Bank sales and trading staff globally;
  this training is mandatory for all Investment Bank staff, including new joiners
- FX management has completed a full review of the content of the "FX, Rates
  & Credit Global Handbook" against existing Key Procedural Controls, with
  new controls being implemented where required

UBS has already terminated or will terminate any employees who made knowing
misrepresentations or engaged in collusive conduct as described in the Factual Basis for
Breach. In certain cases, UBS has delayed taking final action to terminate such employees
in order to ensure their ongoing cooperation with governmental investigations and/or to
comply with applicable foreign labor laws. Subject to these issues, UBS commits to
terminating these employees within eight months of the entry of the Plea Agreement. UBS
has already terminated or suspended several employees of the Settling Firm who engaged

UBS 506(d)

Sebastian Gomez Abero, Esq.                                                                                     Page 9

in misconduct relating to the FX business, including two employees who engaged in collusive conduct at other institutions.

In addition to the significant remedial measures the Settling Firm has already adopted, the Settling Firm has also agreed to specific remediation undertakings in connection with the November 2014 government resolutions. In connection with the CFTC order described above in footnote 1, the Settling Firm represented that it had already undertaken certain steps intended to make reasonable efforts to ensure the integrity of the FX markets including, but not limited to, the following: (i) strengthening mandatory training requirements for all FX employees, with a heavy focus on appropriate trading behavior; (ii) implementing new procedures regarding the appropriate use of chat rooms as a form of communication, including the prohibition of nearly all participation by Investment Bank staff in multi-bank chat rooms; and (iii) strengthening supervision and surveillance of FX trading desks, including the ongoing introduction of specific trade surveillance systems and enhancements to electronic communication monitoring.

In connection with the FCA settlement, the Settling Firm must conduct an audit of the following areas to ensure its culture, governance arrangements, policies, procedures, systems, and controls are appropriate and adequate to effectively manage specific risks with respect to the FX business: (i) front office culture; (ii) the adequacy of the first line of defense (i.e. the risk and control environment relating to daily operations, including monitoring of traders' activity and conduct); (iii) the adequacy of the second and third lines of defense (e.g. compliance, audit, risk); (iv) the adequacy of the challenge of risk management by the second and third lines of defense; (v) the role and appropriateness of financial incentives and performance management; (vi) the adequacy of training for the specific relevant business area; (vii) the adequacy of communications monitoring and surveillance; (viii) the adequacy of the management of conflicts of interest; and (ix) benchmarks, whether trading, judgment, or submissions based, which fall within any of these business areas. If this audit identifies any areas requiring improvement, the Settling Firm must implement appropriate remedial action.

In connection with the FINMA order, the Settling Firm must (i) automate at least 95% of global FX and PM trading by December 31, 2016; (ii) implement and improve controls with respect to the remaining FX voice trading; (iii) implement adequate monitoring, supervision, and analysis instruments with respect to market abusive conduct in the Investment Bank; (iv) implement and improve control measures to avoid conflicts of interest between client trading and the active proprietary trading (i.e., the trading of traders' own positions on behalf of the bank, independent of risk management/hedging in connection with client orders), including the organizational and personnel separation of client and active proprietary trading; (v) clarify guidelines on personal account dealing, expand controls and oversight of personal account dealing, and enhance sanctions for violations of these guidelines; (vi) conduct an annual review of the compensation process within the Investment Bank through an internal audit regarding the impact of the compliance and risk conduct of employees on their compensation, as well as on the adequacy of senior management decisions made during the process, for a period of two years from fiscal year 2014;(vii) implement a maximum annual variable salary component of twice the fixed annual income (2:1) for the FX and PM trading business for a period of

UBS 506(d)

Sebastian Gomez Abero, Esq.                                                    Page 10

two years from fiscal year 2014; (viii) implement of a maximum annual variable salary component of twice the fixed annual income (2:1) for persons with a total salary of over CHF 1 million in the Investment Bank for a period of two years from fiscal year 2014 (although there may be exceptions based on adequate consideration of employee conduct and the adherence to compliance objectives); and (ix) strengthen the whistleblower process.

In addition, in the Fed-CTDOB Order, the Settling Firm made a number of significant undertakings that address its internal controls and compliance program and its compliance risk management program. They include the following: (i) submission of enhanced written internal controls and compliance program acceptable to the Federal Reserve and the CT DOB to comply with applicable U.S. federal and state laws and regulations with respect to the Settling Firm's "Designated Market Activities" (as such term is defined in the Fed-CTDOB Order); (ii) submission of a written plan acceptable to the Federal Reserve and the CT DOB to improve the Settling Firm's compliance risk management program with regard to compliance by the firm with applicable U.S. federal and state laws and regulations with respect to Designated Market Activities; (iii) during the term of the Fed-CT DOB Order, the Settling Firm would, utilizing personnel who are independent of the business line and acceptable to the Reserve Bank and the CT DOB, conduct on an annual basis: (1) a review of compliance policies and procedures applicable to the Settling Firm's Designated Market Activities and their implementation, and (2) an appropriate risk-focused sampling of other key controls for the Settling Firm's Designated Market Activities (the "Controls Review"), and (3) submit the results of each Controls Review to the Reserve Bank and the CT DOB within 90 days of the relevant anniversary date of this Order; and (iv) submission of an enhanced written internal audit program acceptable to the Reserve Bank and the CT DOB with respect to the Settling Firm's compliance with U.S. federal and state laws and regulations in its Designated Market Activities. In addition, in connection with other settlements currently being finalized with other regulators, the Settling Firm expects to make a number of significant undertakings that address its internal controls and compliance program and its compliance risk management program.

Also in connection with these resolutions, the Settling Firm and its affiliates paid a total of CHF 774 million, including GBP 234 million in fines to the FCA, $290 million in fines to the CFTC, $342 million in fines related to the Fed-CTDOB Order, and CHF 134 million to FINMA representing confiscation of costs avoided and profits.

C.     Additional Firmwide Reform

The work undertaken in relation to FX is part of a much broader program focused on strengthening front office processes and systems, and enhanced guidance and training. This includes (i) transactional monitoring to cover all asset classes and client and proprietary flows; (ii) enhanced monitoring of electronic communications to cover all e-mail flow and chat channels in all jurisdictions; (iii) preliminary monitoring of audio communications; (iv) trader surveillance to monitor and detect rogue trading; (v) monitoring and assessment of employee behavioral indicators to identify outliers; (vi) expanded cross border monitoring that goes beyond the traditional control-based monitoring; and (vii) improved processes associated with the firm's whistleblowing policy.

UBS 506(d)

Sebastian Gomez Abero, Esq.                                                      Page 11

In addition, the Settling Firm's incentive and compensation structure has been reformed to ensure that inappropriate behavior is not incentivized and that there are consequences for misconduct.  The Settling Firm believes that it was the first in the industry to implement longer compensation deferral periods and greater clawback powers. For employees whose compensation exceeds a certain level, a significant portion of their performance award is deferred up to five years and includes forfeiture provisions for material misconduct.  In addition, the Settling Firm considers compliance related violations, for example failure to complete mandatory training on time or failure to comply with personal account dealing policy, in an individual's performance review, and repeat violations can lead to sanctions.

5.      Impact on the Settling Firm and Third Parties

The disqualification from using (or participating in transactions using) the exemptions under Rule 506 of Regulation D would, we believe, have an adverse impact on the third parties that have retained, or may retain in the future, the Settling Firm and other entities with which the Settling Firm is associated in one of the listed capacities in connection with transactions that rely on those exemptions.

The Settling Firm's wholly-owned subsidiaries, UBS Global Asset Management (Americas) Inc., UBS O'Connor LLC, UBS Alternative and Quantitative Investments LLC and UBS Realty Investors LLC (the "UBS Advisers"), are currently acting as investment manager, general partner and/or managing member to approximately 60 private funds that are currently relying on Rule 506 of Regulation D for securities offerings. These funds are "open end" funds that continuously offer their securities.  The Settling Firm and its affiliates do not own 20% of the voting securities of any of these funds.

The UBS Advisers intend to continue to act as investment manager, general partner and/or managing member to private funds that will rely on Rule 506 of Regulation D for future offerings.  The UBS Advisers and other affiliates of the Settling Firm also acted as promoters and solicitors for private funds in the last three years that relied on Rule 506 for their offerings that raised approximately $7.4 billion, and it is likely that the UBS Advisers and other affiliates of the Settling Firm will in the future engage in activities that may cause the Settling Firm to be deemed a promoter or a solicitor in Rule 506 offerings.

Under Securities Exchange Act Rule 13d-3, the Settling Firm may be deemed to be the beneficial owner of securities owned by its wholly-owned subsidiaries.  At the present time, UBS Global Asset Management (Americas) Inc. owns more than 20 percent of three private funds that are currently relying on or will in the future rely on Rule 506 of Regulation D. We have been advised that the UBS Advisers, the Settling Firm or their affiliates as a matter of business practice provide seed capital to funds that the UBS Advisers are planning to market and manages them for a period of time before bringing them to market.  Thus, it is likely that the Settling Firm or an affiliate would own 20 percent or more of private funds that it plans to market in the future.

A disqualification of the Settling Firm pursuant to Rule 506 of Regulation D would have an adverse impact on the Settling Firm, on the other issuers described above that

UBS 506(d)

Sebastian Gomez Abero, Esq.                                                    Page 12

engage in, or plan to engage in, Rule 506 Offerings for which the Settling Firm serves in the above-specified roles, and on investors in the affected offerings. A disqualification of the Settling Firm would cause it and its covered affiliates to lose their current and future business acting as investment advisers, solicitors and promoters for the issuers raising millions of dollars described above. Issuers would be unable to offer their securities in reliance on Rule 506 of Regulation D, and would be required to either offer securities under an alternative exemption from registration or seek to replace the Settling Firm or a covered affiliate as investment adviser, solicitor or promoter or otherwise terminate their relationship with the Settling Firm or a covered affiliate in the other roles described above. This would place a burden on such issuers, causing them to delay, restrict, or even abandon their offering activities. Investors in such offerings may face the burden of having to find alternative investments if such offerings are delayed, restricted, or abandoned as a result of the disqualification. Investors' returns may also be negatively impacted by the disqualification due to the issuer's impaired ability to raise capital.

If all of the offering activities currently being conducted under Rule 506 of Regulation D were to cease upon the disqualification of the Settling Firm because it could no longer create new funds that could offer securities in reliance on Rule 506, the Settling Firm would be precluded from developing this business further. However, it is difficult to estimate the financial impact of such a development on the Settling Firm.

6.      Disclosure to Investors

For a period of five years from the date of the Judgment, the Settling Firm will furnish (or cause to be furnished) to each purchaser in a Rule 506 Offering that would otherwise be subject to the disqualification under Rule 506(d) as a result of the Judgment arising from the Plea Agreement, a description in writing of the Plea Agreement, a reasonable time prior to sale.

In light of the grounds for relief discussed above, we believe that disqualification is not necessary, in the public interest, or for the protection of investors, and that the Settling Firm has shown good cause that relief should be granted. Accordingly, we respectfully request the Commission to waive the disqualification provisions in Rule 506 of Regulation D to the extent that it may be applicable as a result of the entry of the Guilty Plea.[2]

---

The Commission has in other instances granted relief under Rule 506(d) for similar conduct. *See, e.g.*, *In re Credit Suisse AG*, Securities Act Rel. No. 9589 (May 19, 2014).

UBS 506(d)

Sebastian Gomez Abero, Esq.                                    Page 13

     Please do not hesitate to call the undersigned at (202) 383-8050 regarding this request.

Very truly yours,

Kenneth J. Berman

# Exhibit Q

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Robert Zimmerman,                                          Civil Action No: 17CV4503

                Petitioner

                            **AFFIDAVIT OF SERVICE**

       -against-

UBS Americas, Robert McCann,

                Defendant.

------------------------------------------------------------X

STATE OF NEW YORK, COUNTY OF QUEENS, ss.

      CHRISTOPHER BAEZ being duly sworn, says:

1. I am not a party to this action, am over 18 years of age and reside at:
   33-40 149 PL FLUSHING NY 11354

2. On October 10, 2017, at approximately 12:00 P.M., at 1285 Avenue of the Americas, New York, NY 10019.  I served the within Summons in a Civil Action on UBS Americas, Robert McCann by delivering a true copy on Marina Valle, Lit. Paralegal personally.

      3. Deponent describes the individual served as follows:

<u>Sex:</u> [] Male  [X] Female
<u>Height:</u> [] Under 5'  [X] 5'0"-5'3"  [] 5'4"-5'8"  [] 5'9"-6'0"  [] Over 6'
<u>Weight:</u> [] Under 100 Lbs  [X] 100-130 Lbs  [] 131-160 Lbs  [] 161-200 Lbs  [] Over 200 Lbs
<u>Age:</u> [] 14-20 Yrs  [] 21-35  [X] 36-50 Yrs  [] 51-65 Yrs  [] Over 65
<u>Hair Color:</u> [] Black  [X] Brown  [] Blond  [] Grey  [] Red  [] White  [] Balding  [] Bald
<u>Color of Skin</u> - describe color: Hispanic light brown
<u>Other identifying features</u>, if any:

Name: CHRISTOPHER BAEZ

Subscribed and sworn to before me
on       11/07/2017

Notary Public
My commission expires on     16, 2020

MICHAEL A CARDONA
Notary Public - State of New York
NO. 01CA6342074
Qualified in Queens County
My Commission Expires May 16, 2020

# Exhibit R



**TAX YEAR 2015**
**FORM 1099 COMPOSITE**

Date Prepared: February 19, 2016

Form 1099-B

Copy B for Recipient (OMB No. 1545-0715)

Schwab One® Account of
**BOB ZIMMERMAN**

Account Number
1826-6041

Taxpayer ID Number: ***-**-9230

## Proceeds from Broker Transactions— 2015 (continued)

Department of the Treasury-Internal Revenue Service

LONG-TERM TRANSACTIONS FOR WHICH BASIS IS REPORTED TO THE IRS - Report on Form 8949, Part II, with Box D checked.

| 1b-Description of property Example 100 sh. XYZ Co.) CUSIP Number / Symbol ** | 1b-Date acquired | 1c-Date sold or disposed | 1d-Proceeds 6-Reported to IRS: Gross Proceeds (except where indicated) | 1e-Cost or other basis | 1g-Adjustments 1f-Code, if any | Realized Gain or (Loss) | 4-Federal Income tax withheld |
|---|---|---|---|---|---|---|---|
| 50 UBS ETRACS MONTH PAY 2XLEV CE $ J270L842 / CEFL | 06/13/14 | 10/23/15 | $ 4,342.97 | 7,131.47 | -- $ | (2,788.50) $ | 0.00 |
| 50 UBS ETRACS MONTH PAY 2XLEV CE $ J270L842 / CEFL | 06/16/14 | 10/30/15 | $ 4,342.97 | 7,099.95 | -- $ | (2,756.98) $ | 0.00 |
| 000 UBS ETRACS MONTH PAY 2XLEV C $ J270L842 / CEFL | VARIOUS | 11/05/15 | $ 17,522.73 | 29,511.95 | -- $ | (11,989.22) $ | 0.00 |
| Security Subtotal | | | $ 120,230.38 | 211,302.51 | -- $ | (91,072.13) $ | 0.00 |
| Total Long-Term (Cost basis is reported to the IRS) | | | $ 120,230.38 | 211,302.51 | | | |
| Total Long-Term Sales Price of Stocks, Bonds, etc. | | | $ 120,230.38 | 211,302.51 | | | |
| Total Sales Price of Stocks, Bonds, etc. | | | $ 120,230.38 | | | | |
| Total Federal Income Tax Withheld | | | $ 0.00 | | | | |

Please see the "Notes for Your Form 1099-B" section for additional explanation of this Form 1099-B report.

© 2016 Charles Schwab & Co., Inc. All rights reserved. Member SIPC. (0116-0233)

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

Schwab One® Account of
**BOB ZIMMERMAN**

Account Number
1826-6041

**TAX YEAR 2016**
**FORM 1099 COMPOSITE**

Date Prepared: February 10, 2017

**Form 1099-B**

Copy B for Recipient (OMB No. 1545-0715)

Taxpayer ID Number: ***-**-9230

**Proceeds from Broker Transactions — 2016 (continued)**

Department of the Treasury-Internal Revenue Service

**LONG-TERM TRANSACTIONS FOR WHICH BASIS IS REPORTED TO THE IRS** - Report on Form 8949, Part II, with Box D checked.

| 1a-Description of property Example 100 sh. XYZ Co. CUSIP Number / Symbol | 1b-Date acquired 1c-Date sold or disposed | 1d-Proceeds 6-Reported to IRS: Gross Proceeds (except where indicated) | 1e-Cost or other basis | 1f-Accrued Market Discount 1g-Wash Sale Loss Disallowed | 4-Federal Income tax withheld Realized Gain or (Loss) |
|---|---|---|---|---|---|
| 569 ETRACS 2LEVERAGED END FUND  **** CUSIP 2270L842 / CEFL | VARIOUS $ 04/06/16 | 24,454.73 | $ 41,196.77 | $ — — | $ (16,742.04) $ 0.00 |
| Security Subtotal | | $ 134,881.84 | $ 237,172.62 | $ 13,853.40 | $ (88,437.38) $ 0.00 |
| Total Long-Term (Cost basis is reported to the IRS) | | $ 134,881.84 | $ 237,172.62 | 13,853.40 | |
| Total Long-Term Sales Price of Stocks, Bonds, etc. | | $ 134,881.84 | $ 237,172.62 | 13,853.40 | |
| Total Sales Price of Stocks, Bonds, etc. | | $ 191,523.49 | | | |
| Total Federal Income Tax Withheld | | $ 0.00 | | | |

FATCA Filing Requirement ☐

Please see the "Notes for Your Form 1099-B" section for additional explanation of this Form 1099-B report.

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if this income is taxable and the IRS determines that it has not been reported.

© 2017 Charles Schwab & Co., Inc. All rights reserved. Member SIPC. (1216-PBU2)

# Exhibit S

EDITION: UNITED STATES

| Tue Oct 18, 2016 | 12:40pm EDT

# U.S. says Ernst & Young to pay $11.8 million to settle audit charges



REUTERS/Lucas Jackson

By Suzanne Barlyn

Ernst & Young will pay $11.8 million to settle charges over "failed audits" of oil services company Weatherford International Plc <WFT.N >, the U.S. Securities and Exchange Commission said on Tuesday.

An Ernst & Young partner who coordinated the audits and a former tax partner who was part of the audit team were also charged in the SEC's order, the agency said in a statement.

Under the settlement, both agreed to suspensions from working as accountants in SEC-related matters. The two "disregarded significant red flags during the audits and reviews," the SEC said.

The charges followed a $140 million penalty on Weatherford announced last month to settle charges it inflated earnings in its 2007-2010 financial statements. Weatherford, which had been promoting its favorable tax rate to analysts, restated its earnings in 2011.

Ernst & Young neither admitted nor denied the SEC findings.

"Audit quality is central to EY and all of our stakeholders," said Ernst & Young spokeswoman Amy Call Well in a statement. "Since the time of the Weatherford audits, and as referenced in the SEC Order, EY has taken significant steps in improving audit

## TRENDING STORIES

North Korea fires Scud-class ballistic missile, Japan protests

'Convinced Atlanticist' Merkel being honest with U.S., spokesman says

British Airways battles third day of disruption, image blow after IT meltdown

Oil slips as more U.S. drilling outweighs OPEC-led cuts

Trump attacks 'fake news' following Kushner reports

5/29/2017

(http://goingconcern.com/)

# Ernst & Young Admits That Some of Its Partners Were Running a Tax Shelter Factory

By          (http://goingconcern.com/author/caleb-newquist/) | 4 years ago

 

What a fine thing for the Manhattan U.S. Attorney to announce on a Friday afternoon that it had (http://www.bloomberg.com/news/2013-03-01/ernst-young-to-pay-123-million-to-end-tax-fraud-probe.html) over its tax sheltering activities:

> Ernst & Young LLP will pay $123 million to settle a U.S. tax-fraud probe as part of a non- prosecution agreement, according to a statement from the Manhattan U.S. Attorney's Office. The accounting firm "admitted wrongful conduct" by its partners and employees in connection with four tax shelters, from 1999 to 2004, according to today's statement. About 200 Ernst & Young clients used the shelters to try to avoid more than $2 billion in taxes, it said. In addition to the money and the admissions, Ernst & Young agreed to a series of permanent restrictions on its tax practice and will continue to cooperate with the government's tax-shelter investigation. The firm's cooperation began in 2003, according to the statement.

Those restrictions include not doing things that the IRS considers to be a "tax avoidance transaction." But what about the rest of the statement? Well, (http://www.justice.gov/usao/nys/pressreleases/March13/EYNPAPR.php) and it has all the interesting details that the

## In Print 48 Weeks A Year

# Ernst & Young to Pay $9.3 Million Neither Admit Nor Deny SEC Charges

By Editor Filed in      September 19th, 2016 @ 10:56 am

Ernst & Young will pay $9.3 million to settle charges that two of the firm's audit partners got too close to their clients on a personal level and violated rules that ensure firms maintain their objectivity and impartiality during audits.

Ernst & Young was represented by William McLucas of WilmerHale in Washington, D.C.

The Securities and Exchange Commission's investigations found that the senior partner on an engagement team for the audit of a New York-based public company maintained an improperly close friendship with its chief financial officer, and a different partner serving on an engagement team for the audit of another public company was romantically involved with its chief accounting officer.

Ernst & Young misrepresented in audit reports issued with the companies' financial statements that it maintained its independence throughout these audits.

"These are the first SEC enforcement actions for auditor independence failures due to close personal relationships between auditors and client personnel," said Andrew J. Ceresney, Director of the SEC's Division of Enforcement.  "Ernst & Young did not do enough to detect or prevent these partners from getting too close to their clients and compromising their roles as independent auditors."

According to              finding that Gregory S. Bednar caused auditor independence rule violations at Ernst & Young from January 2012 to March 2015, he was specifically tasked by the firm to improve its relationship with the New York-based audit client because it was a "troubled account."

Bednar and the company's CFO stayed overnight at each other's homes on multiple occasions and traveled together with family members on overnight trips with no valid business purpose, and they exchanged hundreds of personal text messages, emails, and voicemails during the auditing periods.

Bednar also became friends with the CFO's son and often treated them to sporting events and other gifts.

Certain Ernst & Young partners became aware of Bednar's excessive entertainment spending but took no action to confirm that Bednar was complying with his independence obligations.

Bednar and Ernst & Young consented to the SEC's order without admitting or denying the findings.

The firm will pay $4.975 million in monetary sanctions for these violations.

Bednar must pay a $45,000 penalty and is suspended from appearing and practicing before the SEC as an accountant, which includes not participating in the financial reporting or audits of public companies.

The SEC's order permits Bednar to apply for reinstatement after three years.

Bednar no longer works at Ernst & Young.

According to . . .                                              . . .  caused auditor independence rule violations at Ernst & Young from March 2012 to June 2014, she maintained a romantic relationship with financial executive Robert Brehl while she served on the engagement team auditing his company.

Meanwhile another Ernst & Young partner named Michael Kamienski, who supervised Hartford on the audit, became aware of facts suggesting the improper relationship yet failed to perform a reasonable inquiry or raise concerns internally to Ernst & Young's U.S. independence group.

According to the SEC's order, Ernst & Young required audit engagement teams to follow certain procedures to assess their independence, and employees were asked whether they had familial, employment, or financial relationships with audit clients that could raise independence concerns.

But these procedures did not specifically inquire about non-familial close personal relationships that could impair the firm's independence.

Ernst & Young, Hartford, Kamienski, and Brehl consented to the SEC's order without admitting or denying the findings.

The firm agreed to pay $4.366 million in monetary sanctions for these violations, and Hartford and Brehl agreed to pay penalties of $25,000 each.

Hartford, Kamienski, and Brehl are suspended from appearing and practicing before the SEC as accountants, which includes not participating in the financial reporting or audits of public companies.

The SEC's order permits Brehl to apply for reinstatement after one year, and Hartford and Kamienski can apply after three years.  Hartford and Kamienski no longer work at Ernst & Young.

- **Print Weekly Newsletter**

    o
    o
    o

5/29/2017

Case 1:17-cv-04503-JMF  Document 65-3  Filed 01/10/18  Page 91 of 162

Four Current Or Former Ernst & Young Partners Found Guilty On Criminal Tax Shelter Charges | TAX | Department of Justice

## JUSTICE NEWS

### Department of Justice

#### Tax Division

FOR IMMEDIATE RELEASE

## Four Current Or Former Ernst & Young Partners Found Guilty On Criminal Tax Shelter Charges

Lev L. Dassin, the Acting United States Attorney for the Southern District of New York, Linda Stiff, the Deputy Commissioner for Services and Enforcement of the Internal Revenue Service, and John A. DiCicco, the Acting Assistant Attorney General for the Tax Division of the Department of Justice, announced today that Robert Coplan, Martin Nissenbaum, Richard Shapiro, and Brian Vaughn, each a current or former partner of the accounting firm Ernst & Young, were found guilty following a ten-week jury trial in Manhattan federal court on all counts, including conspiracy, tax evasion and other charges relating to the design, marketing and implementation of tax shelters sold by Ernst & Young (E&Y).

According to the evidence at trial:

Coplan, Nissenbaum, Shapiro and Vaughn, as members of E&Y's national individual tax shelter group, led an effort to design and market tax shelter transactions used by wealthy individuals to eliminate, reduce or defer tax liabilities on annual income that generally exceeded $10 or $20 million. Between 1999 and 2002, tax shelter transactions implemented by the defendants and their co-conspirators generated billions of dollars in non-economic or paper tax losses that were used to offset actual income or gain recognized by the firm's clients.

The defendants and their co-conspirators – which included tax, accounting and financial industry professionals, and law firms – worked to design, implement and defend the tax shelter transactions in ways intended to conceal the true facts and circumstances of the transactions from the IRS.

All four defendants were found guilty of one count of conspiracy relating to four tax shelters, and two counts of tax evasion relating to clients who used a tax shelter transaction known as "CDS Add-On." In addition, Coplan was found guilty of one count of obstructing the IRS and one count of making false statements to the IRS; Nissenbaum was found guilty of one count of obstructing the IRS; and Vaughn was found guilty of one count of making false statements to the IRS. Each of the conspiracy, tax evasion, and false statements counts carries a maximum sentence of five years in prison and three years of supervised release. Each obstruction count carries a maximum sentence of three years in prison and one year of supervised release. In addition, the defendants face on each count a maximum fine of the greatest of $250,000 or twice the gross gain or loss derived from the offense.

Robert Coplan, 57, of Plano, Texas, is a former E&Y tax partner who was the leader of the individual tax shelter group, and the former National Director of E&Y's Center for Wealth Planning. Coplan, a lawyer, was at one time a Branch Chief in the IRS's Legislation and Regulations Division.

Martin Nissenbaum, 54, of Brooklyn, N.Y., also a lawyer, is an E&Y partner who was a member of the tax shelter group and the National Director of E&Y's Personal Income Tax and Retirement Planning practice.

Richard Shapiro, 59, of Rye Brook, N.Y., also a lawyer, is an E&Y tax partner and was a member of the tax shelter group.

Brian Vaughn, 41, of Calhoun, La., a Certified Public Accountant, is a former member of the tax shelter group and a former E&Y tax partner.

In related matters, Charles Bolton, who was initially charged as a co-defendant with Coplan, Nissenbaum, Shapiro, and Vaughn, pleaded guilty on Jan. 22, 2009, to conspiracy to impede and impair the IRS. David L. Smith, the remaining defendant charged in the indictment, has not been apprehended; and as to him the charges in the indictment remain merely accusations and he is presumed innocent unless and until found guilty. In addition, Peter Cinquegrani, a former Arnold & Porter partner who provided opinion letters on E&Y tax shelters, pleaded guilty on Sept. 11, 2008, to conspiracy to commit tax fraud, aiding and abetting tax evasion, and aiding in

5/29/2017

Case 1:17-cv-04503-JMF   Document 65-3   Filed 01/10/18   Page 92 of 162

Four Current Or Former Ernst & Young Partners Found Guilty On Criminal Tax Shelter Charges | TAX | Department of Justice

the submission of false and fraudulent documents to the IRS. And on June 14, 2007, Belle Six, a former E&Y employee who was involved primarily in sales and marketing, and later went to work for entities that implemented shelters for E&Y clients, pleaded guilty to conspiracy to commit tax fraud.

Mr. Dassin praised the work of the Criminal Investigation Division of the Internal Revenue Service and the Department of Justice Tax Division in assisting in the investigation and prosecution of the case.

Coplan, Nissenbaum, Shapiro, and Vaughn are scheduled to be sentenced on Sept. 10, 2009, before United States District Judge Sidney H. Stein, who presided over the trial.

Assistant United States Attorneys Lauren Goldberg and Marshall A. Camp, and Special Assistant United States Attorney John E. Sullivan, from the Tax Division of the Department of Justice, are in charge of the prosecution.

*Updated April 6, 2015*

- Site Menu
  -
  -
  -
  -
  -
  -
  -
  -

Make sure you don't miss any Law360 breaking news.

# Charles Schwab Settles Financial Consultants' OT Suit

By

Law360, New York (April 21, 2014, 2:30 PM EDT) -- Financial services company Charles Schwab & Co. Inc. on Friday said that it had settled a proposed collective and class action in New York accusing it of failing to pay legally required overtime.

Plaintiffs Dana Aboud, William Hicks, Michael Porowski and Albert Schweizer brought the action last Wednesday in New York federal court on behalf of two collectives comprised of financial consultants and other employees accusing Charles Schwab of violating the Fair Labor Standards Act, and Aboud alone brought proposed class action claims accusing the company...
To view the full article, register now.

Already a subscriber?

- 
- 
- 
- 

## Documents

- 

## Related

· *Portal*   *Litigation*   *Litigation Blog*   *Schwab Announces $200 Million Settlement Of Securities Class Action Lawsuit*

*04-20-2010 | 03:21 PM    Author: Timothy Raub*

## Schwab Announces $200 Million Settlement Of Securities Class Action Lawsuit

SAN FRANCISCO — (Mealey's) The Charles Schwab Corp. has agreed to a $200 million settlement of a securities class action lawsuit brought against it and certain of its executive officers and directors by investors alleging that the defendants misrepresented and concealed the investment company's exposure to the subprime mortgage lending crisis in the offering documents for Schwab's YieldPlus Fund, according to a press release issued by Schwab April 20 (*In re Schwab Corp. Securities Litigation*, No. 08-1510, N.D. Calif.).

According to the press release, under the terms of the settlement agreement, which is subject to court approval, Schwab admits no guilt.

Claims for violation of California Business and Professions Code Section 17200, violation of Section 13(A) of the Investment Company Act of 1944, breach of contract, intentional interference with contractual relations and breach of fiduciary duty are not covered under the settlement agreement, according to the press release.

Investors Robert Levin and Karl Kyzer filed their second amended complaint in the U.S. District Court for the Northern District of California on behalf of all those who purchased shares of the Schwab YieldPlus Fund, which was sold in two classes of shares: investor shares and select shares.

The investors allege that in addition to the claims not covered under the settlement agreement, Schwab, subsidiaries Charles Schwab & Co. Inc., Charles Schwab Investment Management Inc. and Schwab Investments violated Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 by issuing a series of false and misleading statements concealing Schwab's business and financial condition in connection with its subprime exposure.

[Editor's Note:  Full coverage will be in the April issue of the LexisNexis Financial Services Litigation Report.  For all of your legal news needs, please visit www.lexisnexis.com/mealeys.]

For more information, call editor Timothy J. Raub at 610-205-1127, or e-mail him at timothy.raub@lexisnexis.com.

Tags:  *lawsuit*   *litigation*   *In re Schwab Corp. Securities Litigation*   *Robert Levin*   *mortgage lending*   *Schwab*   *Karl Kyzer*   *Charles Schwab Corp.*
*securities*   *YieldPlus Fund*   *class action*   *subprime*

**The New York Times**

# Schwab to Pay $119 Million to Settle Bond Fund Case

**By Eric Dash**    January 11, 2011 7:40 pm

The Charles Schwab Corporation agreed on Tuesday to pay $119 million to settle federal and state lawsuits in which regulators accused the company of misleading investors in a bond mutual fund that contained risky mortgage-backed securities.

The Securities and Exchange Commission also filed civil complaints against two senior Schwab executives who oversaw the fund. Those lawsuits continue despite the settlement by the company.

In documents filed in federal court in San Francisco, the commission accused Schwab of making "misleading statements" about the riskiness of its YieldPlus fund, which it held out as equivalent to an ultrasafe money market investment.

In reality, according to the complaint, the fund contained risky mortgage-backed securities. When the housing market collapsed, the fund suffered big losses.

The Schwab executives — Kimon Daifotis, former chief investment officer for fixed-income products, and Randall Merk, an executive vice president who was trustee of the YieldPlus fund — were accused of "fraudulent and deceptive conduct" for making a series of misrepresentations and omissions in marketing documents for the fund.

**Related Links**
     S.E.C. statement
     Charles Schwab statement

Regulators also contend that the executives violated federal securities laws as well as Schwab's own policies by failing to obtain shareholder approval when more

than 25 percent of its assets came from a single industry.

Mortgage-related investments made up roughly 50 percent of the assets in the YieldPlus fund. Both executives are planning to contest the agency's charges, according to Schwab.

In its settlement with the S.E.C. and a separate one with the Financial Industry Regulatory Authority, Schwab agreed to pay $110 million in penalties and interest into a federal fund set up to compensate harmed shareholders, with another $9 million going to regulators in Illinois. Schwab also agreed to have an independent consultant review its fund marketing practices.

The settlements bring to $350 million the amount Schwab has agreed to pay to resolve litigation involving YieldPlus. Last fall, the company said it would pay more than $235 million to resolve two private class-action lawsuits brought by shareholders. That settlement deal awaits approval, which is expected next month.

In a statement, Schwab called the S.E.C. settlement a "constructive conclusion" but, as it had in the past, shifted the bulk of the blame to the crisis in the housing market.

"We regret shareholders lost money," it said. "The decline in the YieldPlus fund was the result of an unprecedented and unforeseeable credit crisis and market collapse."

The regulatory suits against Schwab are the latest in a series of enforcement actions taken against banks and brokerage firms in the wake of the financial crisis.

Besides the Schwab case, the S.E.C. has brought civil charges against retail-oriented mutual funds run by Evergreen Investments, Morgan Keegan and the State Street Corporation.

Federal investigators are looking into the practices of similar bond funds at Bank of America and Citigroup that were aimed at institutional clients, according to people with knowledge of the investigations.

S.E.C. officials said the Schwab case sent a message that retail investors needed to be fully informed of the risks being taken with their money. "All financial firms and professionals — including large mutual fund providers — must be vigilant in accurately describing the risks of the products they sell to the public," Robert Khuzami, the director of enforcement, said in a statement.

In October 2009, Schwab acknowledged that it had received a Wells notice from the S.E.C. saying the commission might file civil charges against the company and at least one senior executive.

At its peak, YieldPlus was the industry's largest short-term bond fund, with more than $13.5 billion in assets and 200,000 accounts. But as the housing market started to collapse in late 2007, the fund's value plummeted. Many investors redeemed their holdings, putting the fund under enormous pressure to raise cash.

In an effort to dissuade YieldPlus customers from redeeming their investments, regulators say, Mr. Daifotis told a group of brokers who were to communicate with Schwab investors that "we've got very, very, very slight negative flows" out of the fund. In reality, the complaint says, Mr. Daifotis knew that investors were seeking redemptions totaling more than $1.2 billion.

In a statement, Susan Brune, a lawyer for Mr. Merk, said that the S.E.C.'s claims were "infected by hindsight bias and not supported by the actual evidence."

David Bayless, a lawyer for Mr. Daifotis, could not be reached for comment.

© 2017 The New York Times Company

| Tue Feb 17, 2015 | 3:39pm EST

# Schwab settles NY lawsuit over auction-rate debt

Feb 17 Charles Schwab Corp has agreed to settle a 2009 lawsuit in which New York's attorney general accused the discount brokerage of fraud in the sale and marketing to investors of auction-rate securities that became illiquid.

Terms were not disclosed in a settlement between Schwab and Attorney General Eric Schneiderman, which was made public in a Feb. 13 filing with the state Supreme Court in Manhattan.

Schwab spokesman Greg Gable said the San Francisco-based company is pleased to settle. Liz DeBold, a spokeswoman for Schneiderman, confirmed the settlement.

Auction-rate securities had interest payments that reset at periodic auctions.

Many brokerages marketed the securities as being as safe as cash, but much of the debt became illiquid in February 2008 when dealers stopped supporting the market.

The lawsuit against Schwab was initially filed in August 2009 by Andrew Cuomo, then New York's attorney general and now its governor.

## ALSO IN BONDS NEWS

UPDATE 1-Italian yields soar on possibility of early autumn election

Ivory Coast to issue $1 bln Eurobond next month -FinMin

Cuomo sued after having persuaded financial companies that sold or underwrote auction-rate securities to buy back more than $61 billion of the debt. Other brokerages to settle included Fidelity Investments and TD Ameritrade Holding Corp.

Schwab had in October 2011 won the dismissal of Cuomo's lawsuit, which Schneiderman inherited by that time. A state appeals court revived two claims brought under the state's Martin Act, a powerful securities law, in August 2013.

The case is New York v. Charles Schwab & Co, New York State Supreme Court, New York County, No. 453388/2009. (Reporting by Jonathan Stempel and Karen Freifeld in New York; Editing by Cynthia Osterman)

## TRENDING STORIES

'Convinced Atlanticist' Merkel being honest with U.S., spokesman says

North Korea fires Scud-class ballistic missile, Japan protests

British Airways battles third day of disruption, image blow after IT meltdown

Oil slips as more U.S. drilling outweighs OPEC-led cuts

Trump attacks 'fake news' following Kushner reports

NEXT IN BONDS NEWS

**BUSINESS**  05/21/2014 04:31 pm ET | Updated Jul 21, 2014

# Merrill Lynch, Charles Schwab Accounts Linked To Mexican Drug Cartels: SEC



SHUTTERSTOCK

By Emily Flitter and Jed Horowitz

NEW YORK (Reuters) - U.S. regulators are investigating Charles Schwab Corp and Bank of America Corp's Merrill Lynch brokerage over whether they are doing enough to police their clients' identities, sources said, the latest sign a crackdown on money laundering is expanding.

Specifically, the regulator is looking into whether the brokerages missed red flags that could indicate attempts to move money illicitly or to feed proceeds from illegal activities into the financial system, the sources said.

The U.S. Securities and Exchange Commission is probing Charles Schwab and Merrill Lynch for violations of anti-money laundering rules that require the brokerages to know their customers, the sources said.

Schwab is conducting an internal investigation, one of the sources said.

A spokesman for the SEC declined to comment. Representatives of Schwab and Merrill did not immediately respond to requests for comment.

# Exhibit T



**U.S. Department of Justice**

Criminal Division

*Washington, D.C. 20530*

December 18, 2012

Gary R. Spratling, Esq.
Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105

David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave NW
Washington, DC 20036

   Re: **UBS AG**

Dear Mr. Spratling and Mr. Burns:

   On the understandings specified below, the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") will not criminally prosecute UBS AG and its subsidiaries and affiliates (collectively, "UBS"), with the exception of UBS Securities Japan Co., Ltd. ("UBS Securities Japan"), for any crimes (except for criminal tax violations, as to which the Fraud Section cannot and does not make any agreement) related to UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate (known as LIBOR), the Euro Interbank Offered Rate (known as EURIBOR), and the Tokyo InterBank Offered Rate (known as TIBOR), as described in the attached Appendix A, which is incorporated in this Non-Prosecution Agreement ("Agreement").[1]

   It is understood that UBS admits, accepts, and acknowledges responsibility for the conduct set forth in Appendix A and agrees not to make any public statement contradicting Appendix A.

   The Fraud Section and UBS further agree that as a term and condition of this Agreement, UBS Securities Japan will plead guilty to one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, in accordance with the Plea Agreement that is attached as Appendix B, which is incorporated in this Agreement.

   The Fraud Section enters into this Agreement based, in part, on its consideration of the following factors:

---

   [1] Although not addressed in Appendix A, this Agreement also encompasses UBS's submissions for the additional benchmark rates listed in Appendix C, which is also incorporated in this Agreement. The rates listed in Appendix C are the focus of an ongoing investigation and, for that reason, Appendix C will be held in confidence by the parties to this Agreement and will not be made available to the public until the Department of Justice, in its sole discretion, determines that such information can and should be disclosed.

# Exhibit U



**EY**
Building a better
working world

Ernst & Young LLP
5 Times Square
New York, NY 10036-6530

Tel: +1 212 773 3000
Fax: +1 212 773 6350

### Report of Independent Registered Public Accounting Firm

The Members of
UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2014. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2014, in conformity with U.S. generally accepted accounting principles.

The accompanying information contained in Schedules I, II, III, IV, V, VI, VII and VIII has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statement. Such information is the responsibility of the Company's management. Our audit procedures included determining whether the information reconciles to the financial statement or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information. In forming our opinion on the information, we evaluated whether such information, including its form and content, is presented in conformity with Rule 17a-5 under the Securities Exchange Act of 1934 and Regulation 1.10 under the Commodity Exchange Act. In our opinion, the information is fairly stated, in all material respects, in relation to the financial statement as a whole.

*Ernst & Young LLP*

February 27, 2015

Report of Independent Registered Public Accounting Firm

The Members of
      UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2015. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2015, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

February 27, 2016

**Report of Independent Registered Public Accounting Firm**

The Members of
        UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2013, and the related notes to the statement of financial condition.

**Management's Responsibility for the Financial Statement**

Management is responsible for the preparation and fair presentation of the statement of financial condition in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of a statement of financial condition that is free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the statement of financial condition based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statement. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statement, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the statement of financial condition in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the statement of financial condition.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2013, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

February 28, 2014

Report of Independent Registered Public Accounting Firm

The Members of
    UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2015. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2015, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

February 27, 2016

# Exhibit V

**Barry D. Estell**
ATTORNEY AT LAW
**6140 Hodges Drive**
Telephone (913) 722-5416      **Mission, Kansas 66205**      E-mail: bestell@kc.rr.com

_____

August 24, 2010

File No. SR-FINRA-2010-035

    I am a lawyer who has represented investors in NASD and FINRA arbitration since 1993. Prior to that, I spent 13 years in the securities industry as a registered representative and compliance officer. I was a registered principal in most areas including Series 4, Registered Options Principal; Series 24, General Securities Principal; Series 27, Financial & Operations Principal; and Series 53, Municipal Securities Principal. I have been a seldom used NASD/FINRA arbitrator since 1990.

## INTRODUCTION

    As FINRA once again applies lipstick to the pig that is arbitration it really needs to be said that there is no way that FINRA will ever offer investors an unbiased forum. The financial interest and job security of the FINRA staff rests on customers seldom receiving a level playing field. It is not the American Association of Individual Investors; it's a trade association of people who make their living defrauding individuals and the fraud has spiraled upward since the advent of forced industry arbitration.

    FINRA discovery is one-sided, biased, and intended to favor the member firms. The small crumbs thrown investor's way are routinely ignored. I attach a 2004 study of objections by Morgan Stanley to the current Discovery Guide lists in a sample of 25 arbitration proceedings. My favorite is that the Discovery Guide is "unintelligible." The Discovery Guide had been in existence for five years and Morgan Stanley had conceded nothing as "presumptively" discoverable. Everything was subject to objection on general, vague, and frivolous grounds. Nothing has changed. Regardless of the changes proposed, public customers will still have to spend a year with multiple discovery motions and hearings (at significant cost) to receive even the most basic Discovery Guide items deemed "presumptively discoverable." That is the optimistic view. It's just as likely they will never receive the basic documents.

    I repeat the statistical information in the PIABA comment letter on the 2008 proposal. A defrauded customer has a less than 40% chance of recovering 30% of the damages he or she would be entitled to as a matter of law in a courtroom and has a less than 50% chance of collecting even that.[1] This is a seriously flawed forum. Discovery abuse is only one of the factors denying customers a fair hearing. Investors, lacking any chance of a fair hearing, usually accept low-ball settlement offers to recoup what small percentage of their losses that they can. There is no reason to believe that

_____

[1] All the information needed to quantify damages, awards, settlement amounts and collectability are in the possession of FINRA which has steadfastly refused to make it available to academic researchers or the public in general. A secret forum is a corrupt forum.

member firms will not ignore the proposed lists just as they have the 1999 lists. They have absolutely no incentive to comply. Giving arbitrators the authority to levy sanctions is a bad joke on investors. Arbitrators know what happens to those that do so. They disappear from the arbitration panels.

## OVERT BIAS OF DISCOVERY GUIDE LISTS

**General Objections:** Almost every response to Discovery Guide document production contains "General Objections" under which a Respondent firm may withhold each and every document required by Lists.[2] This is a direct violation of Code Section 12508. Objecting to Discovery; Waiver of Objection

(a) If a party objects to producing any document described in Document Production Lists 1 or 2, any other applicable Document Production List, or any document or information requested under                    , it must specifically identify which document or requested information it is objecting to and why.

Three years after the above section became effective, it is uniformly ignored. Why? Because arbitrators know that the rules are for show only and not to be enforced against a major Wall Street firm. Did Bernie Madoff have to worry about ignoring a few NASD/FINRA rules concerning discretionary accounts?

The net effect is that member firms feel comfortable entering general objections and relying upon them to withhold whatever documents do not bolster their defense. Claimant, not knowing what is being withheld can not request it. The Discovery Guide should unequivocally state that no general objection may be entered nor relied upon to withhold any documents required by the Discovery Guide. Automatic sanctions should apply, including the striking of any response which includes general objections. Otherwise, customers must file a motion demanding that the member abide by Code Section 12508 and be charged $400 to $1,000 for the arbitrators to decide if the firm will be ordered to comply. That's a 4-6 month project and combined with the multiple other motions necessary to force (hopefully) compliance with the Code, becomes very expensive for a customer.

**"Know Your Arbitration Claimant" Rule:** Also known as the financial colonoscopy procedure or post-claim suitability determinations. The Guide requires customers to produce years of sensitive financial information that has no relevance to the case at issue. It is one-sided: Where's the broker's tax return? It is meant to harass and embarrass claimants so that they will not pursue claims. It has no relevance to the issues in the arbitration which limit most member discovery obligations, and can be financially dangerous when dealing with 3rd and 4th tier FINRA bucket shops.

It is a really bad idea for FINRA or anyone else to order solid citizens who have been victimized by a boiler room to give those firms even more personal documents concerning bank accounts, insurance policies, real estate transactions and loan documentation. Many of these are criminal enterprises and the principals sometimes

---

[2] See attached compilation of objections by Morgan Stanley in 2004 including 34 general objections.

(although not often enough) go to jail.  To give them increasing amounts of personal financial information entirely unrelated to the original transactions is an invitation for identity theft and a second criminal career if FINRA finally gets around to barring them from the securities industry.

If this information were relevant, the brokerage firm could request it prior to opening the account or making the recommendation.  Try that one out.  Instead, FINRA seeks to reinforce arbitrator training that if a client is wealthy, or traded a speculative security at another firm years ago, anything the broker does to him is per se "suitable" because the customer is "sophisticated" or engaged in speculation in the past.  Many arbitrators consider it a complete defense even if the customer transferred to the current Respondent broker to get away from speculative investments.  It takes nine years (the six year rule plus three) before a customer who has speculated, knowingly or not, can regain the alleged protection of FINRA regulations.  Arbitrators are trained to ignore state law entirely.

An especially pernicious recent example is a customer who received less than 10% of the shares of a closely held corporation from his employer for services rendered.  The business prospered beyond his wildest dreams but upon losing a substantial amount of money to FINRA bucket shops he was ordered to produce all of the business records and tax returns of the corporation.  It was a gross violation of the privacy of the entrepreneur who made him wealthy and who had no connection to the case.  He had the choice of betraying his employer and benefactor or dropping his case.  That is what the financial colonoscopy is all about; intimidation and coercion, not the issues in the Statement of Claim or Answer.

Another true war story from years past concerns fraudulent Prudential limited partnerships:  A retired client was sold a real estate partnership that the SEC found to be fraudulently marketed.  No matter.  His tax returns showed that for several years he had a rental house.  The broker testified that the client had bragged about his private rental real estate and had demanded that he invest his IRA in Prudential real estate partnerships on an unsolicited basis.  The truth was that the customer had inherited the house from his mother and rented it to his nephew who he was forced to evict for non-payment.  He was humiliated that he had evicted a relative, but had no choice.  He was so embarrassed that he never told anyone.  It is such tax return information that members use to structure post-claim suitability arguments around facts that they did not know when the recommendation was made.  It is sleazy and dishonest and FINRA should not collude in such conduct.

Realizing that FINRA arbitration is not and never will be fair, a less offensive way to handle this issue is for member firms to plead the customer's annual income, net worth and other financial information in the Answer.  Only if the customer contests the financial information should (s)he be required to produce specific documents refuting the misinformation in the Answer which is presumably obtained from the account documents they are required to produce later.  Otherwise, there is no relevance to the issues in dispute.  It is merely a FINRA supported fishing expedition meant to harass customers, discourage claims and improperly influence arbitrators.  The production of tax records of partners, business associates and other non-parties is never proper.  It is

the equivalent of the member firms being required to produce the tax returns of other customers and non-parties.

Similarly, only if a member firm's Answer contains specific statements asserting that a "recommendation" was based on a customer's similar conduct or investments at another firm would the customer be required to produce the records of all other accounts for the prior nine years.   As it is, FINRA encourages brokers to perjure themselves based on the discovery of previously unknown information.

Under both the current and proposed Discovery Guide Lists, FINRA encourages bad conduct by its members.   They can provide general, vague, and evasive Answers to a Statement of Claim and then do a financial colonoscopy on the customer, courtesy of FINRA and present a completely different defense at hearing based on previously unknown information around which they structure their perjured testimony.   Only if the member firm is aware of the information prior to the claim, states that information in the Answer, and the customer disputes the information does it have any relevance to the issues in an arbitration proceeding.

**Uniform Time Periods:**   Customers are generally required to produce documents as much as nine years old (six year rule plus three years). List 2, Item 15 has an unlimited time period for any and all documents from any source, for any "investment" for ever. Member firms discovery obligations, in contrast to this wildly overly broad requirement, are limited to much more narrow time periods as well as scope of information; i.e. List 1, #12 during the time period at issue, #13(b) and #14 not earlier than one year before or after, #17 one year before through filing of the claim (vs. Claimant's requirement that do not end with the filing of the claim), #20 three months before and after the trades at issue.

If the period of three years prior to the period in the complaint is relevant for the customer, it should also be relevant for the member firm.   A broker's commission runs and income for the three years prior to abusing his customer often speak volumes about motive and method of operation in parting customers from their savings.

**Excuses Not to Produce:**   While almost all of the customer's obligations are broad and all encompassing, member firms are given an excuse to withhold documents in most instances.   Along with the general objections, customers never know what highly relevant documents are being withheld.   Specific examples on proposed List 1 are as follows:

#2 requires correspondence "specifically relating" to the accounts or transactions at issue allowing the omission of any document relating generally instead of specifically or transactions not yet at issue because the customer has no idea what happened and few or no records prior to discovery. Also covered is advertising "sent" to customers of the firm, but not the advertising and sales literature and marketing material merely used by the RR to formulate his pitch but not "sent" to the customer.

A greater concern is the removal of the monthly statements unless separately requested.   At many firms the broker copy of the statement contains a lot more information than the customer copy.   If that is the case, those statements should be

4

produced in every case. I recently reviewed broker copies from a major firm and was surprised to learn that the RR was charging both a flat fee and commissions equaling 30% of the income in an income account. It would take months to discover this if the usual practice of limiting commission runs continues. All broker account statements that differ from the statements that customers receive should be mandatory.

#5 requires (a) All materials "prepared or used" and/or provided to the customer . . . but not relevant materials prepared or used and not provided to the customer or not prepared or used but provided to the customer (such as copies of news articles or outside research).

#6 requires all notes relating to the customer and/or accounts or transactions, but not concerning the securities in the transactions. Merrill Lynch analysts' reference to top rated securities as POS comes to mind. FINRA should not be complicit in that type cover-up.

#7 requires production of all notes of the compliance review of customers' accounts or trades, but not of the broker himself who may be doing the same thing to thirty-seven other customers at the same time.

#9 requires production of all communications between the broker and compliance relating to the specific securities and/or customer, but not the twenty-eight other customers being defrauded by the same RR in similar securities.

#11 requires all sections of the compliance manuals relating to the claims alleged in the Statement of Claim which rules out anything the customer has not yet discovered. Full copies of all compliance manuals in every case without confidentiality requirements are absolutely necessary in every case in order for the customer to have any chance of a fair hearing. FINRA knows enough about compliance manuals to know that they are not qualified for any confidentiality protection. They are required regulatory documents the disclosure of which could convey no competitive advantage to any other firm. They are kept confidential only from defrauded customers.

For an industry that is constantly whining about the burden of production, the hours spent tearing apart and redacting manuals in order to prevent a customer from being able to logically review and use them is completely hypocritical. FINRA should require its members to produce all manuals in every case without abusive confidentiality agreements or orders meant only to prevent other defrauded customers from comparing notes. As it now stands, the firm objects to producing any compliance document without a draconian confidentiality agreement causing immediate delay. In 2009 I received a manual five months after it was first due after the panel granted a confidentiality motion because Respondents claimed it to be proprietary. The manual at issue was an off-the-shelf copy from a third-party consulting firm which retained all rights. It was not proprietary to the member under any definition, but arbitrators have been trained to believe all compliance material is "proprietary" or "secret" or "confidential" or something that requires a protective order.

Even if the customers sign the agreement they will seldom receive all the documents because they can not compare it to another case or with another customer.

Even after receiving confidentiality agreement by order of panels that have been trained to always give members confidentiality orders, the next round of motions is over what is related to the claim. Members always take a minimalist view. When a member gets a confidentiality order on compliance documents, or other "required" documents, the odds of the customer getting the real documents or all of them is substantially reduced. A compliance manual is a must have document and it normally takes two or three rounds of motions to receive some version of it. FINRA knows it and is complicit in its member's misconduct in this area.

#12 requires analysis only during the period at issue and gives members a pass for other accounts, transactions and securities of the same customer during another time period. Those analyses will be presented at hearing if they favor the member, but disappear forever if they show a pattern of misconduct.

#13(a) requires all exception reports to review activity in the customer's account "related" to the allegations in the Statement of Claim or for the transactions at issue. It omits exception reports for the sixty-two other customer accounts being abused at the same time.

(B) is broader, covering other accounts, but only if "related" to the allegations in the Statement of Claim. That means you are back at (a) because no other claims will ever be "related" in the opinion of member counsel.

Brokers keep records of activity reports. Again, an industry always whining about the burden of production could just print them off and send them instead of spending hours redacting and separating reports. But that might provide customers useful information about similar, but not "related" misconduct.

#14 requires internal audit reports only if "focused" on the associated person or the accounts or discussing "similar" improper conduct by other individuals in the branch. Those qualifications will never be met. What does "focus" mean anyway, let alone similar? This was a retired 75 year old man that was a retired 79 year old woman; no similarity there and neither were ever put under a microscope for "focus." That was a Fannie Mae preferred; this was a Freddie Mac preferred, completely different. Once again, send the internal audits. They'll show up if they are favorable to the member firm, they should be produced when they are not.

#15 requires records of disciplinary action for conduct "similar" to that alleged in the Claim. Again, it will never be similar and the customer will never see it unless all disciplinary action is disclosed. Customers have to produce records of all other accounts for the last nine years, not just the "similar" ones.

#16 requires regulatory investigations for "similar" improper behavior which like the investigations and reports above will never occur. There will always be a difference that makes the investigation dissimilar. FINRA knows that and is completely disingenuous in pretending that they don't.

#17 is a repeat of #16 except for "examination reports" that are "similar." A farce; they will never be similar. Members should be ordered to produce all reports and if they

have no relevance the panel can disregard them.  FINRA's effort to limit all evidence of a firm's pattern of misconduct and lack of supervision is outrageous.   Put the information out there and let the arbitrators determine its relevance rather than giving member counsel the discretion to determine it for them.  The panel is going to see the customer's tax returns, loan applications, insurance policies, their partner's tax returns and financial information and yet FINRA wants to deny the panel most information about the conduct of the offending office and firm.

#19 limits commission information to the transaction at issue and allow members to hide the nineteen other commissions for the exact same transaction in other accounts while the broker swears under oath that the trade was unsolicited and (s)he'd never heard of the security before.

#20 deals with "solicited" trades.  It is a phony distinction because the parties will never agree whether a trade was solicited or not and FINRA has no definition of the term.  How can you have a rule on a trade for which there is no definition?  Does solicited mean "recommended?"  Is there a definition for recommended?  The fact is that members will go to great lengths to avoid providing a complete commission run showing all trades by a broker for all accounts.   As an allegedly neutral administrator, FINRA should not be allowed to assist that effort to suppress relevant substantive information.

Without the full commission run in every case, the customer can not get a fair hearing.  Brokers will deny a trade was recommended or solicited.  Neither statements nor confirmations say if an order is solicited.  They only say if an order was "unsolicited" and that is a term that is almost never explained to the customer.  Many believe unsolicited means they didn't ask (solicit) the broker to buy the security for them.  Even when the confirmation is blank, meaning solicited, the broker will invariably deny it at hearing swearing that it was a mere technicality and (s)he never recommended the trade to the customer and never solicited anything.

Making the production of commission runs dependent on a moving target for which there is no definition may be the most cynical part of this amendment.  FINRA knows it will lead to endless arguments and multiple motions and hearings for the issue to be decided in every case and will further needlessly run up expenses for customers in a spending contest with major firms.

Complete commission runs should be required in every case.  Sometimes it is defensive for the customer.  Without them the RR is free to perjure him or herself about the customer directing all activity in the account on a completely unsolicited basis because there is no evidence of the other customers doing the same thing.  Sometimes it's offense to affirmatively prove that the client was treated differently than all the other customers.  But it's always necessary and without full commission runs in every case customers can not get a fair hearing. They were normally required prior to the Discovery Guide. The proposal appears to be a pretext to seemingly require commission runs but discourage actual production with an endless motion practice about whether trading was "solicited," an issue of fact which can not be determined without an evidentiary hearing.  There is no doubt which party benefits from that and it is not the customer. More time, more costs, more forum fees.

**Confidentiality Agreements:** I mentioned this before concerning compliance manuals, but it is worth restating that the use of abusive confidentiality orders and agreements is pervasive and prejudicial to customers. It's too late to tell arbitrators to consider the facts in the Neutral Corner. They have been trained to give them in every case and even if that weren't true the third bullet point about "proprietary confidential business plans and procedures" subsumes all other arguments. Defense lawyers use the "P" word (proprietary) and panels are trained to fall in line.

FINRA knows and should definitively state that there are no documents required by the Discovery Guide that are "proprietary' or "confidential." It already instructs as to what personal information may be redacted so it is not a great leap. That's why the Lists are presumptively discoverable. If they are required by SEC Rule 17a-3 they are required regulatory records that can not be "proprietary" and must be automatically produced without frivolous objection. The original Discovery Guide was to eliminate this kind of abusive posturing and it has only made it worse by encouraging issuance of confidentiality orders without any justification other than members shouting the "P" word. Alternately, if FINRA believes there are documents on the Lists that should be "presumptively confidential" it should state as much and put that out for comment instead of trying to back-door the issue.

## A BETTER GUIDE

There is already a list of documents essential in every case where a broker's conduct is in question. The essential documents are mandated by SEC Rule 17a-3. Broker/dealers are required to keep and maintain most relevant records at the branch office or be able to promptly produce the records at the branch.[3] The following records are deemed by state securities commissioners as absolutely necessary to conduct a routine examination; they should in all cases be available to defrauded customers who have suffered ascertainable losses. The mandatory nature and maintenance of these records should belie objections of overly broad and burdensome.

Instead of a Discovery Guide intended to limit customer discovery while providing member firms with wide ranging fishing exhibitions meant to intimidate customers and discourage complaints, the Discovery Guide should mandate that all mandatory records be made available to every customer in every arbitration. They are required. They are maintained. They are available. FINRA should not attempt to keep defrauded customers from receiving those documents with an ambiguous, contradictory and confusing Discovery Guide where the "exceptions" swamp the rule to its member firms advantage. Regulatory records are required for a purpose and part of that purpose should be to allow defrauded investors to obtain adequate discovery in arbitration. It would not increase member's record keeping obligations one bit. FINRA Enforcement is generally not interested in enforcing its rules; customers should be given the opportunity.

---

[3] See NASD publication New and Amended Recordkeeping Requirements Checklist, Frequently Asked Questions About the Amendments to Broker/Dealer Books and Records Rules under the Securities Exchange Act of 1934 which is attached.

- 04-00415:   Subject to the general objections and limited to the specific trade complained about, otherwise object as vague, ambiguous, overly broad, unduly burdensome and improperly requires speculation as to which documents are sought.
- 04-01650:   Limits to customer activity reports that reference Claimant's accounts; otherwise objects as vague, ambiguous, overly broad, unduly burdensome, not related to matter in controversy
- 04-03003:   Limit to copies of customer activity reports that reference Claimant's account only.   Beyond that, object that the request is vague and ambiguous, overly broad, unduly burdensome and not related to matter in controversy.
- 04-03747:   Limit to reports that reference Claimant's accounts; otherwise object as vague and ambiguous, overly broad, unduly burdensome and not related to the matter in controversy.
- 04-03685:   Limit to reports that reference Claimant's accounts; otherwise object as vague and ambiguous, overly broad, unduly burdensome and not related to the matter in controversy.

**COMMENT:**   Morgan Stanley limits its production to a limited number of reports restricted to the customer accounts in preparation for List 5, #2 which requires the production of all activity reviews and exception reports concerning the Financial Advisor.   It is a preemptory objection because Morgan Stanley will go to extraordinary lengths to avoid producing documents detailing other (often many other)  red flags being generated by the typical rogue broker involved in multiple arbitrations.

12) Records of disciplinary action taken against the Associated Person(s) by any regulator or employer for all sales practices or conduct similar to the conduct alleged to be at issue.
- 02-04998:  Objects as overly broad and not related to the matter in controversy.
- 02-07298: Objects as overly broad and not related to the matter in controversy
- 03-00123:  Limited to disciplinary action in connection with Claimant's account only and objects that any additional request is "a desperate fishing expedition" and overly broad, unduly burdensome, irrelevant, not specific and do not relate to the matter in controversy.
- 03-04130:  In addition to general objections and limitations Respondents specifically object to this request as overly broad and not relevant.
- 03-04984:  Object that the request is vague, overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence.
- 03-07840:  Limited to extent "available"
- 03-08275:  Subject to foregoing general objections and further objections of not relevant, vague and ambiguous, and overbroad, there are not responsive documents.
- 04-01650:  Objects as overly broad and not related to the matter in controversy
- 04-00415:  Subject to the general objections will produce documents related to the single customer incident only and objects to any other documents as vague and ambiguous, overly broad, unduly burdensome and improperly requires Respondents to speculate as to which documents are sought.
- 04-00415:  Object as vague, ambiguous, overly broad, unduly burdensome and improperly requiring speculation as to which documents are sought.

**COMMENT:**   Morgan Stanley consistently claims to have no idea what this request means and insists on limiting the response to claimant.   Even when ordered to produce the

documents, it can choose to interpret the request as for similar conduct as an alternative to "all" sales practices (its an either or request) and find none of the other disciplinary action is similar, there being a difference in age, gender, state of residence, karma, or something.

LIST 3 : **CHURNING**

1) All commission runs relating to the customer's account(s) at issue or, in the alternative, a consolidated commission report relating to the customer's account(s) at issue.

- 02-02593:  Objects not relevant, proprietary, confidential Claimant's commissions only.
- 03-08275:  Subject to foregoing general objections.
- 04-01650:  Limits to Claimant commissions, otherwise objects as vague, overly broad and unduly burdensome.
- 04-03685:  Object as confidential and subject to a confidentiality agreement.

   **COMMENT:**  See List 5, Request #1.

2) All documents reflecting compensation of any kind, including commissions, from all sources generated by the Associated Person(s) assigned to the customer's account(s) for the two months preceding through the two months following the transaction(s) at issue, or up to 12 months, whichever is longer. The firm may redact all information identifying customers who are not parties to the action, except that the firm/Associated Person(s) shall provide at least the last four digits of the non-party customer account number for each transaction.

- 02-02593:  Objects as not relevant, over broad, burdensome, oppressive, proprietary, confidential.
- 03-00123:   Object that the request is overly broad, unduly burdensome and harassing, irrelevant, vague, not specific and do not relate to the matter in controversy.
- 03-08275:   Subject to foregoing general objections and further object that the request is not related to the subject matter of this action nor reasonably calculated to lead to discovery of admissible evidence and is **unintelligible** in that claimant has never identified the "transactions at issue" in this action.
- 04-01650:  Objects as vague and ambiguous, overly broad, unduly burdensome, not related to the matter in controversy.
- 04-00415:  Subject to the general objections and additionally as overly broad and unduly burdensome.
- 04-03685:   Object as violating Financial Advisor's privacy rights and subject to confidentiality agreement will produce records only as they pertain to Claimant's account.

   **COMMENT:**       This is another request where Morgan Stanley professes not to understand, going so far as to call it "unintelligible."  One wonders how the SEC could have understood it.    It is also a preemptive objection to List 5, #1 which requires compensation of any kind which Morgan Stanley routinely refuses to produce.

3) Documents sufficient to describe or set forth the basis upon which the Associated Person(s) was compensated during the years in which the transaction(s) or occurrence(s) in question occurred, including: a) any bonus or incentive program; and b) all compensation

# Exhibit W

FINANCIAL MANAGEMENT

# Why Good Accountants Do Bad Audits

by Max H. Bazerman, George Loewenstein, and Don Moore

On July 30, at a ceremony in the East Room of the White House attended by congressional leaders of both parties, President George W. Bush signed into law the Sarbanes-Oxley Act of 2002 addressing corporate accountability. A response to recent financial scandals that had begun to undermine citizens' confidence in U.S. business, the wide-ranging act flew through the House of Representatives and Senate in record time and passed in both chambers by overwhelming majorities. The act places new legal constraints on executives and gives expanded protections to whistle-blowers. Perhaps most important, though, it puts the accounting industry under tightened federal oversight. It creates a regulatory board—with broad powers to punish corruption—to monitor accounting firms, and it establishes stiff criminal penalties, including long jail terms, for accounting fraud. "The era of low standards and false profits is over." Bush proclaimed.

If only it were that easy.

Given the vast scale of recent accounting scandals and their devastating effects on workers and investors, it's not surprising that the government and the public assume that the underlying problems are corruption and criminality—unethical accountants falsifying numbers to protect equally unethical clients. But that's only a small part of the story. Serious accounting problems have long plagued corporate audits, routinely leading to substantial fines for accounting firms. Some of the errors, no doubt, are the result of fraud. But to attribute most errors to deliberate corruption

has worked with accountants knows is untrue. The deeper, more pernicious problem with corporate auditing, as it's currently practiced, is its vulnerability to unconscious bias. Because of the often subjective nature of accounting and the tight relationships between accounting firms and their clients, even the most honest and meticulous of auditors can unintentionally distort the numbers in ways that mask a company's true financial status, thereby misleading investors, regulators, and sometimes management. Indeed, even seemingly egregious accounting scandals, such as Andersen's audits of Enron, may have at their core a series of unconsciously biased judgments rather than a deliberate program of criminality.

> The real problem isn't conscious corruption. *It's unconscious bias.*

Unlike conscious corruption, unconscious bias cannot be deterred by threats of jail time. Rooting out bias, or at least tempering its effects, will require more fundamental changes to the way accounting firms and their clients operate. If we are really going to restore trust in the U.S. system of auditing, we will need to go well beyond the provisions of the Sarbanes-Oxley Act. We will need to embrace practices and regulations that recognize the existence of bias and moderate its ill effects. Only then can we be assured of the reliability of the financial reports issued by public companies and ratified by professional accountants.

## The Roots of Bias

Psychological research shows that our desires powerfully influence the way we interpret information, even when we're trying to be objective and impartial. When we are motivated to reach a particular conclusion, we usually do. That's why most of us think we are better than average drivers, have smarter than average children, and choose stocks or funds that will outperform the market—even if there's clear evidence to the contrary. Without knowing it, we tend to critically scrutinize and then discount facts that contradict the conclusions we want to reach, and we uncritically embrace evidence that supports our positions. Unaware of our skewed information processing, we erroneously conclude that our judgments are free of bias.

and other materials from a lawsuit involving a collision between a motorcycle and a car and were assigned to the role of either the motor-cyclist plaintiff or the car-driving defendant. They were given the task of negotiating a settlement and were told that if they couldn't reach one, a judge would decide the award amount, and both parties would pay substantial penalties. Finally, before starting the negotiation, each participant was asked to predict the amount the judge would award the plaintiff if negotiations stalled. To further eliminate bias, each member of the pair was assured that the other party wouldn't see his or her estimate and that the estimates would not influence the judge's decision.

The results were striking. Participants playing the motorcyclist plaintiff tended to predict that they'd receive dramatically larger awards than the defendants predicted. This is an example of self-serving bias: Armed with the same information, different people reach different conclusions—ones that favor their own interests. In addition, the degree to which the two hypothetical awards differed was an excellent predictor of the likelihood that the pair would negotiate a settlement. The greater the difference in the negotiators' beliefs, the harder it was for them to come to agreement.

How can such an impulse toward self-serving bias be moderated? In follow-up experiments, the same researchers tried to reduce participants' bias by paying them to accurately predict the amount of the judge's award and having them write essays arguing the other side's point of view. Neither strategy reduced bias; participants consistently thought that the judge would award damages that favored their side. And what about educating the subjects, alerting them that they were likely to reach biased conclusions? That didn't work, either. After teaching participants about bias and testing them to make sure they understood the concept, the researchers found that the participants concluded that their negotiating opponents would be highly biased but refused to believe that they themselves would be.

In yet another of these experiments, participants were presented with 16 arguments—eight favoring the side they had been assigned (plaintiff or defendant) and eight favoring the other—and were asked to predict how a neutral third party would rate the quality of the arguments. In general, study participants found arguments that favored their own positions more convincing than those that supported the other side. But when participants were assigned to the role of plaintiff or defendant

only after they'd seen the case materials—and so were unbiased in their evaluation of the data—their degree of bias was significantly less. Taken together, these findings suggest that unconscious bias works by distorting how people interpret information.

## Accounting for Bad Accounting

Professional accountants might seem immune to such biases (after all, they work with hard numbers and are guided by clear-cut standards). But the corporate auditing arena is a particularly fertile ground for self-serving biases. Three structural aspects of accounting create substantial opportunities for bias to influence judgment.

### Ambiguity.

Bias thrives wherever there is the possibility of interpreting information in different ways. As we saw in the study involving the collision, people tend to reach self-serving conclusions whenever ambiguity surrounds a piece of evidence. While it's true that many accounting decisions are cut-and-dried—establishing a proper conversion rate for British pounds, for instance, entails merely consulting daily foreign exchange rates—many others require interpretations of ambiguous information. Auditors and their clients have considerable leeway, for example, in answering some of the most basic financial questions: What's an investment? What's an expense? When should revenue be recognized? The interpretation and weighting of various types of information are rarely straightforward. As Joseph Berardino, Arthur Andersen's former chief executive, said in his congressional testimony on the Enron collapse, "Many people think accounting is a science, where one number, namely earnings per share, is *the* number, and it's such a precise number that it couldn't be two pennies higher or two pennies lower. I come from a school that says it really is much more of an art." (See the sidebar "Ambiguity in Accounting and Auditing.")

### Ambiguity in Accounting and Auditing

Each year, *Money* magazine sends the financial records of a hypothetical family to 30 to 50 professional tax preparers and asks, "How much does this family owe in taxes for the year?" No two preparers ever

### Attachment.

Auditors have strong business reasons to remain in clients' good graces and are thus highly motivated to approve their clients' accounts. Under the current system, auditors are hired and fired by the companies they audit, and it is well known that client companies fire accounting firms

$68,912, a difference of 83%. However, these tax professionals could be proud that they agreed far more than did their colleagues who performed a similar exercise in 1990: That group's results ranged from $6,807 to $73,247, a 976% difference.

How could experts disagree so vastly on something that seems as objective as accounting? It turns out that deciding what is income, what is deductible, and what is an appropriate depreciation schedule is subjective. Judgment calls are part of a tax preparer's work. Similarly, at a corporate level, a myriad of ambiguous accounting questions, such as when to recognize revenue and which items to expense, opens the door for self-serving interpretations. An item such as late-stage R&D that one auditor might regard as an investment can be seen by another as an expense. With executives deciding how to state earnings, the two treatments can significantly affect the bottom line reported to the public.

Another indication of ambiguity in accounting is the common practice of negotiating about accounting rules. In one study by Michael Gibbins, Steven Salterio, and Alan Webb of 93 audit partners working for international accounting firms, 67% reported that they commonly negotiated with 50% or more of their clients. These negotiations, for example, might involve the timing of revenue and expenses recognition. Executives are often in a hurry to recognize revenue but prefer to delay recognizing an expense. If there were such a thing as "correct" timing, these negotiations wouldn't take place. Another indication of auditing ambiguity is

accounting firm is large enough to absorb the loss of one client, individual auditors' jobs and careers may depend on success with specific clients. Moreover, in recent decades, accounting firms have increasingly treated audits as ways to build relationships that allow them to sell their more lucrative consulting services. Thus, from the executive team down to individual accountants, an auditing firm's motivation to provide favorable audits runs deep. As the collision case also showed, once people equate their own interests with another party's, they interpret data to favor that party. Attachment breeds bias.

## Approval.

An audit ultimately endorses or rejects the client's accounting—in other words, it assesses the judgments that someone in the client firm has already made. Research shows that self-serving biases become even stronger when people are endorsing others' biased judgments—provided those judgments align with their own biases—than when they are making original judgments themselves.[2] In one series of studies, researchers found that people were more willing to endorse an overly generous outcome that favored them than they were to make that judgment themselves. For example, if someone says that you deserve a higher raise than facts might suggest, you are more likely to come to agree with this view than you are to decide on your own that you deserve a higher raise. This kind of thinking

interpret specific accounting problems before deciding whom to hire. Because no "right" conclusion exists, different auditing firms can have different opinions.

Finally, in the current political discussion about expensing options, opponents of expensing often argue that an option's value is too ambiguous to assess. They proffer ambiguity as a justification for ignoring the value of options executives receive.

implies that an auditor is likely to accept more aggressive accounting from her client than what she might suggest independently.

In addition to these structural elements that promote bias, three aspects of human nature can amplify unconscious biases.

### Familiarity.

People are more willing to harm strangers than individuals they know, especially when those individuals are paying clients with whom they have ongoing relationships. An auditor who suspects questionable accounting must thus choose, unconsciously perhaps, between potentially harming his client (and himself) by challenging a company's accounts or harming faceless investors by failing to object to the possibly skewed numbers. Given this tension, auditors may unconsciously lean toward approving the dubious accounting. And their biases will grow stronger as their personal ties deepen. The longer an accounting partner serves a particular client, the more biased his judgments will tend to be.

### Discounting.

People tend to be far more responsive to immediate consequences than delayed ones, especially when the delayed outcomes are uncertain. Many human vices spring from this reflex. We postpone routine dental checkups because of the cost and inconvenience and the largely invisible long-term gain. In the same way, auditors may hesitate to issue critical audit reports because of the adverse immediate consequences—damage to the relationship, potential loss of the contract, and possible unemployment. But the costs of a positive report when a negative report is called for—protecting the accounting firm's reputation or avoiding a lawsuit, for example—are likely to be distant and uncertain.

### Escalation.

It's natural for people to conceal or explain away minor indiscretions or oversights, sometimes without even realizing that they're doing it. Think of the manager who misses a family dinner and blames the traffic, though he simply lost track of time. Likewise, an auditor's biases may lead her to

though, the sum of these small judgments may become large and she may recognize the long-standing bias. But at that point, correcting the bias may require admitting prior errors. Rather than expose the unwitting mistakes, she may decide to conceal the problem. Thus, unconscious bias may evolve into conscious corruption—corruption representing the most visible end of a situation that may have been deteriorating for some time. It's our belief that some of the recent financial disasters we've witnessed began as minor errors of judgment and escalated into corruption. As Charles Niemeier, chief accountant for the SEC's enforcement division, put it: "People who never intend to do something wrong end up finding themselves in situations where they are almost forced to continue to commit fraud once they have started doing this. Otherwise, it will be revealed that they had used improper accounting in the earlier periods."

## Putting Theory to The Test

Bias, by its very nature, is typically invisible: You can't review a corporate audit and pick out errors attributable to bias. Often, we can't tell whether an error in auditing is due to bias or corruption. But you can design experiments that reveal how bias can distort accounting decisions. We recently did just that, with telling results.

We gave undergraduate and business students a complex set of information about the potential sale of a fictional company and asked them to estimate the company's value. Participants were assigned different roles: buyer, seller, buyer's auditor, or seller's auditor. All subjects read the same information about the company. As we expected, those who hoped to sell the firm thought the company was worth more than the prospective buyers did. More interesting were the opinions offered by the auditors: Their judgments were strongly biased toward the interests of their clients.

These auditors displayed role-conferred biases in two ways. First, their valuations (judgments) were biased in the clients' favor: The sellers' auditors publicly concluded that the firm was worth more than the buyers' auditors said it was. Second, and more tellingly, their private judgments about the company's value were also biased in their clients' favor: At the end of the experiment, the auditors were asked to estimate the company's true value and were told that they would be rewarded according to how close their private judgments were to those of impartial experts. Despite this incentive for accuracy, the estimates of the sellers' auditors averaged 30% higher than those of the

buyers' auditors. This exemplifies the persistent influence of self-serving biases: Once participants interpreted information about the target company in a biased way, they were unable to undo the bias later.

Earlier this year, we ran a study with Lloyd Tanlu that focused on professional auditors themselves. The study, of 139 auditors employed full time by one of the big U.S. accounting firms, illuminated the professionals' vulnerability to bias and their tendency to be influenced by clients' biases. Each participant was given five ambiguous auditing vignettes and asked to judge the accounting for each. Half the participants were asked to suppose that they had been hired by the company they were auditing; the rest were asked to suppose they had been hired by a different company, one that was conducting business with the company that had created the financial statements. In addition, half the participants in each of those two groups generated their own auditing numbers first, then stated whether they believed that the firm's financial reports complied with generally accepted accounting principles (GAAP), while the other half did the two tasks in the reverse order.

For all five vignettes, the auditors were on average 30% more likely to find that the accounting behind a company's financial reports complied with GAAP if they were playing the role of auditor for that firm. Furthermore, the participants who generated their own auditing numbers after first passing judgment on the company's financial reports tended to come up with numbers that were closer than the other participants' to the client's numbers. The study showed both that experienced auditors are not immune from bias and that they are more likely to accede to a client's biased accounting numbers than to generate such numbers themselves.

These experiments show that even the suggestion of a hypothetical relationship with a client distorts an auditor's judgments. Imagine the degree of distortion that must exist in a long-standing relationship involving millions of dollars in ongoing revenues.

## Problems with Proposed Reforms

Because the reforms in the Sarbanes-Oxley Act and those proposed by others do not address the fundamental problem of bias, they will not solve the crisis in accounting in the United States. Some of the reforms, in fact, may well make it worse.

Consider the provisions dealing with disclosure. They require individual auditors or their firms to reveal conflicts of interest to investors. But to counteract bias, such disclosure must either inhibit bias outright or allow investors to adjust for it. Neither is likely. With regard to inhibiting bias, we saw earlier that a person's conscious efforts to reduce bias have limited effect. And the latter idea, that disclosure would help investors interpret auditors' reports, would be of little benefit unless investors knew *how* a disclosed conflict of interest biased an auditor's judgment. Imagine an investor who reads a positive audit report containing the caveat that the auditor receives $60 million in annual fees from the audited company. By how much should the investor adjust the company's self-reported earnings per share? Without specific guidance, people cannot accurately factor conflict of interest into their investment decisions.

More worrisome is evidence that disclosure could actually increase bias. If auditors suspect that disclosure will lead investors to discount or make adjustments for the auditors' public statements, they may feel less duty bound to be impartial and may make judgments more closely aligned with their personal interests. Research by Daylian Cain, Don Moore, and George Loewenstein paired participants and assigned one member of each pair to the role of estimator and the other to that of adviser. The estimator viewed several jars of coins from a distance, estimated the value of the money in them, and was paid according to how close the estimates were to the jars' true values. The adviser, who could study the jars up close, gave the estimator advice. The adviser, however, was not paid according to the estimator's accuracy but according to how high the estimator's guesses were. In other words, advisers had an incentive to mislead the estimators so that they would guess high.

In addition, we told half of the estimators about the advisers' pay arrangement; we said nothing about it to the rest. Disclosure had two effects. First, advisers whose motives were disclosed provided much more biased guesses (i.e., high estimates of coin jar values) than did advisers whose motives were not disclosed; second, disclosure did *not* cause estimators to substantially discount their advisers' advice. As a result, disclosure led advisers to make much more money and estimators to make much less. Applied to auditing, this finding suggests that auditors who are forced to disclose conflicts might exhibit greater self-serving bias.

One other proposed policy warrants mention: the move to impose stricter accounting standards. This remedy, too, is unlikely to improve the situation. Research shows that it takes very little

that they had worked seven hours on a task and that another person had worked ten hours on the same task. Other participants were asked to imagine the opposite scenario: They'd worked ten hours on the project while the other person worked seven. In each case, it was specified that the person who had worked seven hours would be paid $25; the question was how much the person who worked ten hours should be paid. Ten-hour participants, on average, thought that they should be paid about $35 for their ten hours of work, while those who had worked seven hours thought that the 10-hour person should receive less—about $30. Here, all it took was a tiny bit of ambiguity— whether the fair solution was equal hourly pay (as the ten-hour people thought) or equal total pay (as the seven-hour people thought)—to produce different self-serving assessments of fairness. Note, too, that the incentives for being biased in this study were awfully weak because the question was hypothetical; in the real world, incentives for bias are far stronger. It seems implausible that stricter accounting rules could eliminate ambiguity—and thus they are unlikely to reduce self-serving bias.

## Radical Remedies

The key to improving audits, clearly, is not to threaten or cajole. It must be to eliminate incentives that create self-serving biases. This means that new policies must reduce an auditor's interest in whether a client is pleased by the results of an audit.

One provision of the Sarbanes-Oxley Act prohibits accounting firms from providing certain consulting services to companies they audit. This is a step in the right direction, but it doesn't go far enough. Clearly, accounting firms that advise their clients on how to boost profits, while at the same time trying to impartially judge their books, face an impossible conflict of interest. This reform both reduces this conflict and eases the pressure on auditors to act as salespeople for their firm's other services. Unfortunately, while the new law limits the consulting services auditing firms can provide, it doesn't prohibit them entirely, and it gives the new oversight board created by the Sarbanes-Oxley Act the option of overriding this provision.

True auditor independence requires, as a start, full divestiture of consulting and tax services. And even then, a fundamental problem will remain: Because auditors are hired and fired by the companies they audit, they are in the position of possibly casting negative judgments on those who hired them—and who can cut them loose. Therefore, even with the elimination of consulting, the fundamental structure of the auditing system virtually ensures biased auditing. To eliminate this

Auditors must have fixed, limited contract periods during which they cannot be terminated. All fees and other contractual details should be specified at the beginning of the contract and must be unchangeable. In addition, the client must be prohibited from re-hiring the auditing firm at the end of the contract; instead, the major accounting firms would be required to rotate clients. Current legislation requires auditor rotation; however, this is defined as a change in the lead partner within an auditing firm. There is no provision to rotate the firms conducting the audit, and there is no provision to prevent a client from firing an auditor. Thus, auditors will continue to have powerful incentives to keep their clients happy.

Audit clients must also be prohibited from hiring individual accountants away from their audit firms. As the Enron scandal unfolded, the common practice of Arthur Andersen employees taking positions with Enron, and vice versa, came to light. Clearly, an auditor can't be impartial when he or she hopes to please a client in order to develop job options. We believe that auditors should be barred from taking positions with the firms they audit for at least five years.

Less tangibly, auditors must come to appreciate the profound impact of self-serving biases on judgment. Professional schools have begun to take ethics seriously in recent years, but teaching auditors about ethics will not have an impact on bias. What's needed is education that helps auditors understand the unconscious errors they make and the reasons they make them. That knowledge alone won't solve the problem, but once members of the auditing profession understand the role of bias in their work, honest and visionary leaders in the profession can help change the conduct of accounting to prevent the conflicts of interest that promote bias. And audit leaders who say that so-called professionalism is a sufficient safeguard against audit error—a claim that's inconsistent with the weight of empirical evidence on human judgment—might abandon that claim if they truly understood the role of bias in auditing.

Our proposals are not perfect. Indeed, it's hard to imagine any practical system that could eliminate all bias. Even with our remedies, for instance, it's still possible that auditors' social contact with clients could introduce subtle biases. But we envision a system in which clients regard auditors as more like tax collectors than partners or advisers—a system that could be expected to at least ameliorate bias. Devising a more robust separation of auditor and client, one that might go further to reduce bias, would require approaches—such as turning over the auditing function to government—

that could create problems as serious as those they solve. We see our proposals as both realistic and effective. In the absence of radical and innovative reform, we believe, further accounting disasters are inevitable.

1. This and subsequent studies about the collision mentioned in this article were conducted by Linda Babcock, Colin Camerer, Sam Issacharoff, and George Loewenstein and are summarized in L. Babcock and G. Loewenstein, "Explaining Bargaining Impasse: The Role of Self-Serving Biases," *Journal of Economic Perspectives,* winter 1997.

2. K. A. Diekmann, S. M. Samuels, L. Ross, and M. H. Bazerman, "Self-Interest and Fairness in Problems of Resource Allocation: Allocators Versus Recipients," *Journal of Personality and Social Psychology,* May 1997.

3. D. M. Messick and K. P. Sentis, "Fairness and Preference," *Journal of Experimental Social Psychology,* July 1979.

A version of this article appeared in the November 2002 issue of *Harvard Business Review*.

Max H. Bazerman is the Jesse Isidor Straus Professor of Business Administration at Harvard Business School and a codirector of the Center for Public Leadership at Harvard Kennedy School.

George Loewenstein is a professor of economics and psychology at Carnegie Mellon University in Pittsburgh.

Don A. Moore holds the Lorraine Tyson Mitchell Chair in Leadership at the Haas School of Business at the University of California at Berkeley.

**This article is about FINANCIAL MANAGEMENT**

⊕ FOLLOW THIS TOPIC

ACCOUNTING      AUDITING      CORPORATE GOVERNANCE      ETHICS      CONSULTING

PROFESSIONAL SERVICES

POST

1

## John Doe    a year ago

I really like the part about damaging a client relationship. Too often will you see a firm overlook bad accounting to keep revenue coming in if the future. Don't bite the hand that feeds you! This is why we need random audits of auditing firms. This is kinda like an appeal process in law. When someone disagrees with audit findings, we need an agency that we can appeal to that will conduct an audit. However, why not require firms to fork over a random clients books. The best way to root out bias is to use math to back up your audits. I'll see auditors cry about grammar all day but miss actual values or base their opinions on some broken version of PPS sampling. Who cares about there, their, they're when your whole audit is based off a horrible assumption.

REPLY                                                                    0 👍 0 👎

∨  JOIN THE CONVERSATION

We hope the conversations that take place on HBR.org will be energetic, constructive, and thought-provoking. To comment, readers must sign in or register. And to ensure the quality of the discussion, our moderating team will review all comments and may edit them for clarity, length, and relevance. Comments that are overly promotional, mean-spirited, or off-topic may be deleted per the moderators' judgment. All postings become the property of Harvard Business Publishing.

# Exhibit X

The aggregate amount provisioned for litigation, regulatory and similar matters as a class is disclosed in Note 20a above. It is not practicable to provide an aggregate estimate of liability for our litigation, regulatory and similar matters as a class of contingent liabilities. Doing so would require us to provide speculative legal assessments as to claims and proceedings that involve unique fact patterns or novel legal theories, that have not yet been initiated or are at early stages of adjudication, or as to which alleged damages have not been quantified by the claimants. Although we therefore cannot provide a numerical estimate of the future losses that could arise from litigation, regulatory and similar matters, we believe that the aggregate amount of possible future losses from this class that are more than remote substantially exceeds the level of current provisions. Litigation, regulatory and similar matters may also result in non- monetary penalties and consequences. For example, the Non- Prosecution Agreement (NPA) described in item 5 of this Note, which we entered into with the US Department of Justice (DOJ), Criminal Division, Fraud Section in connection with our submissions of benchmark interest rates, including, among others, the British Bankers' Association London Interbank Offered Rate (LIBOR), was terminated by the DOJ based on its determination that we had committed a US crime in relation to foreign exchange matters. As a consequence, UBS AG pleaded guilty to one count of wire fraud for conduct in the LIBOR matter, paid a USD 203 million fine and is subject to a three-year term of probation. A guilty plea to, or conviction of, a crime (including as a result of termination of the NPA) could have material consequences for UBS. Resolution of regulatory proceedings may require us to obtain waivers of regulatory disqualifications to maintain certain operations, may entitle regulatory authorities to limit, suspend or terminate licenses and regulatory authorizations and may permit financial market utilities to limit, suspend or terminate our participation in such utilities. Failure to obtain such waivers, or any limitation, suspension or termination of licenses, authorizations or participations, could have material consequences for UBS.

The risk of loss associated with litigation, regulatory and similar matters is a component of operational risk for purposes of determining our capital requirements. Information concerning our capital requirements and

the calculation of operational risk for this purpose is included in the "Capital management" section of this report.

Tax and regulatory authorities in a number of countries have made inquiries, served requests for information or examined employees located in their respective jurisdictions relating to the cross-border wealth management services provided by UBS and other financial institutions. It is possible that implementation of automatic tax information exchange and other measures relating to cross-border provision of financial services could give rise to further inquiries in the future. UBS has received disclosure orders from the Swiss Federal Tax Administration (FTA) to transfer information based on requests for international administrative assistance in tax matters. The requests concern a number of UBS account numbers pertaining to current and former clients and are based on data from 2006 and 2008. UBS has taken steps to inform affected clients about the administrative assistance proceedings and their procedural rights, including the right to appeal. The requests are based on data received from the German authorities, who seized certain data related to UBS clients booked in Switzerland during their investigations and have apparently shared this data with other European countries. UBS expects additional countries to file similar requests. In addition, the Swiss Federal Supreme Court ruled in September 2016 that the double taxation agreement between the Netherlands and Switzerland provides a sufficient legal basis for an administrative assistance group request without specifying the names of the targeted taxpayers, which makes it more likely that similar requests for administrative assistance will be granted by the FTA.

In 2013, as a result of investigations in France, UBS (France) S.A. and UBS AG were put under formal examination ("mise en examen") for complicity in having illicitly solicited clients on French territory and were declared witness with legal assistance ("témoin assisté") regarding the laundering of proceeds of tax fraud and of banking and financial solicitation by unauthorized persons. In 2014, UBS AG was placed under formal examination with respect to the potential charges of laundering of proceeds of tax fraud, and the

investigating judges ordered UBS AG to provide bail ("caution") of EUR 1.1 billion. UBS AG appealed the determination of the bail amount, but both the appeal court ("Cour d'Appel") and the French Supreme Court ("Cour de Cassation") upheld the bail amount and rejected the appeal in full in late 2014. UBS AG filed an application to the European Court of Human Rights (ECHR) to challenge various aspects of the French court's decision. In January 2017, the ECHR denied UBS's application. The Swiss Federal Administrative Court ruled in October 2016 that in the administrative assistance proceedings related to the French bulk request, UBS has the right to appeal all final FTA client data disclosure orders. In September 2015, the former CEO of UBS Wealth Management was placed under formal examination in connection with these proceedings. In addition, the investigating judges have sought to issue arrest warrants against three Swiss-based former employees of UBS AG who did not appear when summoned by the investigating judge.

In 2015, UBS (France) S.A. was placed under formal examination for complicity regarding the laundering of proceeds of tax fraud and of banking and financial solicitation by unauthorized persons for the years 2004 until 2008 and declared witness with legal assistance for the years 2009 to 2012. A bail of EUR 40 million was imposed and subsequently reduced by the Court of Appeals to EUR 10 million.

In February 2016, the investigating judge notified UBS AG and UBS (France) S.A. that he has closed his investigation. In July 2016, UBS AG and UBS (France) S.A. received the National Financial Prosecutor's recommendation ("réquisitoire"). As permitted, the parties have commented on the recommendation. The next procedural step will be for the judge to issue his final decree ("ordonnance de renvoi en correctionnelle"), which would set out any charges for which UBS AG and UBS (France) S.A. will be tried, both legally and factually, and transfer the case to court.

UBS has been notified by the Belgian investigating judge that it is under formal investigation ("inculpé") regarding the laundering of proceeds of tax fraud and of banking, financial solicitation by unauthorized persons and serious tax fraud.

In 2015, UBS received inquiries from the US Attorney's Office for the Eastern District of New York and from the US Securities and Exchange Commission (SEC), which are investigating potential sales to US persons of bearer bonds and other unregistered securities in possible violation of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) and the registration requirements of the US securities laws. UBS is cooperating with the authorities in these investigations.

UBS has, and reportedly numerous other financial institutions have, received inquiries from authorities concerning accounts relating to the Fédération Internationale de Football Association (FIFA) and other constituent soccer associations and related persons and entities. UBS is cooperating with authorities in these inquiries.

Our balance sheet at 31 December 2016 reflected provisions with respect to matters described in this item 1 in an amount that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized. Claims related to sales of residential mortgage-backed securities and mortgages

From 2002 through 2007, prior to the crisis in the US residential loan market, UBS was a substantial issuer and underwriter of US residential mortgage-backed securities (RMBS) and was a purchaser and seller of US residential mortgages. A subsidiary of UBS, UBS Real Estate Securities Inc. (UBS RESI), acquired pools of residential mortgage loans from originators and (through an affiliate) deposited them into securitization

trusts. In this manner, from 2004 through 2007, UBS RESI sponsored approximately USD 80 billion in RMBS, based on the original principal balances of the securities issued.

UBS RESI also sold pools of loans acquired from originators to third-party purchasers. These whole loan sales during the period 2004 through 2007 totaled approximately USD 19 billion in original principal balance.

We were not a significant originator of US residential loans. A subsidiary of UBS originated approximately USD 1.5 billion in US residential mortgage loans during the period in which it was active from 2006 to 2008 and securitized less than half of these loans.

RMBS-related lawsuits concerning disclosures:  UBS is named as a defendant relating to its role as underwriter and issuer of RMBS in lawsuits related to approximately USD 2.5 billion in original face amount of RMBS underwritten or issued by UBS. Of the USD 2.5 billion in original face amount of RMBS that remains at issue in these cases, approximately USD 1.2 billion was issued in offerings in which a UBS subsidiary transferred underlying loans (the majority of which were purchased from third-party originators) into a securitization trust and made representations and warranties about those loans (UBS- sponsored RMBS). The remaining USD 1.3 billion of RMBS to which these cases relate was issued by third parties in securitizations in which UBS acted as underwriter (third-party RMBS).

In connection with certain of these lawsuits, UBS has indemnification rights against surviving third-party issuers or originators for losses or liabilities incurred by UBS, but UBS cannot predict the extent to which it will succeed in enforcing those rights.

UBS is a defendant in a lawsuit brought by the National Credit Union Administration (NCUA) as conservator for certain failed credit unions, asserting misstatements and omissions in the offering documents for RMBS purchased by the credit unions. The lawsuit was filed in the US District Court for the District of

Kansas. The original principal balance at issue in the case is approximately USD 1.15 billion. In March 2017, UBS and NCUA reached an agreement in principle to resolve this matter. In the second quarter of 2016, UBS resolved a similar case brought by the NCUA in the US District Court for the Southern District of New York (SDNY) relating to RMBS with an original principal balance of approximately USD 400 million, for a total of approximately USD 69.8 million, in addition to reasonable attorneys' fees incurred by NCUA.

Lawsuits related to contractual representations and warranties concerning mortgages and RMBS: When UBS acted as an RMBS sponsor or mortgage seller, we generally made certain representations relating to the characteristics of the underlying loans. In the event of a material breach of these representations, we were in certain circumstances contractually obligated to repurchase the loans to which the representations related or to indemnify certain parties against losses. UBS has received demands to repurchase US residential mortgage loans as to which UBS made certain representations at the time the loans were transferred to the securitization trust aggregating approximately USD 4.1 billion in original principal balance. Of this amount, UBS considers claims relating to approximately USD 2 billion in original principal balance to be resolved, including claims barred by the statute of limitations. Substantially all of the remaining claims are in litigation, including the matters described in the next paragraph. UBS believes that new demands to repurchase US residential mortgage loans are time- barred under a decision rendered by the New York Court of Appeals.

In 2012, certain RMBS trusts filed an action (Trustee Suit) in the SDNY seeking to enforce UBS RESI's obligation to repurchase loans in the collateral pools for three RMBS securitizations with an original principal balance of approximately USD 2 billion, for which Assured Guaranty Municipal Corp., a financial guaranty insurance company, had previously demanded repurchase. A bench trial in the SDNY adjourned in May 2016. Approximately 9,000 loans were at issue in the trial. In September 2016, the court issued an order

6

ruling on numerous legal and factual issues and applying those rulings to 20 exemplar loans. The court further ordered that a lead master be appointed to apply the court's rulings to the loans that remain at issue following the trial. With respect to the loans subject to the Trustee Suit that were originated by institutions still in existence, UBS intends to enforce its indemnity rights against those institutions.

We also have tolling agreements with certain institutional purchasers of RMBS concerning their potential claims related to substantial purchases of UBS-sponsored or third-party RMBS. Mortgage-related regulatory matters: In 2014, UBS received a subpoena from the US Attorney's Office for the Eastern District of New York issued pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), which seeks documents and information related to UBS's RMBS business from 2005 through 2007. In 2015, the Eastern District of New York identified a number of transactions that are the focus of their inquiry, and has subsequently provided a revised list of transactions. We have provided and continue to provide information. UBS continues to respond to the FIRREA subpoena and to subpoenas from the New York State Attorney General and other state attorneys general relating to its RMBS business. In addition, UBS has also been responding to inquiries from both the Special Inspector General for the Troubled Asset Relief Program (SIGTARP) (who is working in conjunction with the US Attorney's Office for Connecticut and the DOJ) and the SEC relating to trading practices in connection with purchases and sales of mortgage-backed securities in the secondary market from 2009 through 2014. We are cooperating with the authorities in these matters.

As reflected in the table "Provision for claims related to sales of residential mortgage-backed securities and mortgages," our balance sheet at 31 December 2016 reflected a provision of USD 1,500 million with respect to matters described in this item 2. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of this matter cannot be determined with certainty based on

currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Madoff

In relation to the Bernard L. Madoff Investment Securities LLC (BMIS) investment fraud, UBS AG, UBS (Luxembourg) S.A. and certain other UBS subsidiaries have been subject to inquiries by a number of regulators, including the Swiss Financial Market Supervisory Authority (FINMA) and the Luxembourg Commission de Surveillance du Secteur Financier (CSSF). Those inquiries concerned two third-party funds established under Luxembourg law, substantially all assets of which were with BMIS, as well as certain funds established in offshore jurisdictions with either direct or indirect exposure to BMIS. These funds now face severe losses, and the Luxembourg funds are in liquidation. The last reported net asset value of the two Luxembourg funds before revelation of the Madoff scheme was approximately USD 1.7 billion in the aggregate although that figure likely includes fictitious profit reported by BMIS. The documentation establishing both funds identifies UBS entities in various roles, including custodian, administrator, manager, distributor and promoter, and indicates that UBS employees serve as board members. UBS (Luxembourg) S.A. and certain other UBS subsidiaries are responding to inquiries by Luxembourg investigating authorities, without, however, being named as parties in those investigations. In 2009 and 2010, the liquidators of the two Luxembourg funds filed claims on behalf of the funds against UBS entities, non-UBS entities and certain individuals, including current and former UBS employees. The amounts claimed are approximately EUR 890 million and EUR 305 million, respectively. The liquidators have filed supplementary claims for amounts that the funds may possibly be held liable to pay the BMIS Trustee. These amounts claimed by the liquidator are approximately EUR 564 million and EUR 370 million, respectively. In addition, a large number of alleged beneficiaries have filed claims against UBS entities (and non-UBS entities) for purported losses relating to the Madoff scheme. The majority of these cases are pending in Luxembourg, where appeals

were filed by the claimants against the 2010 decisions of the court in which the claims in a number of test cases were held to be inadmissible.

In 2014, the Luxembourg Court of Appeal dismissed one test case appeal in its entirety, which decision was appealed by the investor. In 2015, the Luxembourg Supreme Court found in favor of UBS and dismissed the investor's appeal. In June 2016, the Luxembourg Court of Appeal dismissed the remaining test cases in their entirety. In the US, the BMIS Trustee filed claims in 2010 against UBS entities, among others, in relation to the two Luxembourg funds and one of the offshore funds. The total amount claimed against all defendants in these actions was not less than USD 2 billion. Following a motion by UBS, in 2011, the SDNY dismissed all of the BMIS Trustee's claims other than claims for recovery of fraudulent conveyances and preference payments that were allegedly transferred to UBS on the ground that the BMIS Trustee lacks standing to bring such claims. In 2013, the Second Circuit affirmed the District Court's decision and, in 2014, the US Supreme Court denied the BMIS Trustee's petition seeking review of the Second Circuit ruling. In November 2016, the bankruptcy court issued an opinion dismissing the remaining claims for recovery of subsequent transfers of fraudulent conveyances and preference payments on the ground that the US Bankruptcy Code does not apply to transfers that occurred outside the US. The BMIS Trustee has indicated that he will appeal. In 2014, several claims, including a purported class action, were filed in the US by BMIS customers against UBS entities, asserting claims similar to the ones made by the BMIS Trustee, seeking unspecified damages. One claim was voluntarily withdrawn by the plaintiff. In 2015, following a motion by UBS, the SDNY dismissed the two remaining claims on the basis that the New York courts did not have jurisdiction to hear the claims against the UBS entities. The plaintiff in one of those claims has appealed the dismissal. In Germany, certain clients of UBS are exposed to Madoff- managed positions through third-party funds and funds administered by UBS entities in Germany. A small number of claims have been filed with respect to such funds. In 2015, a court of appeal ordered UBS to pay EUR 49 million, plus interest of approximately EUR 15.3 million.

Puerto Rico

Declines since August 2013 in the market prices of Puerto Rico municipal bonds and of closed-end funds (the funds) that are sole-managed and co-managed by UBS Trust Company of Puerto Rico and distributed by UBS Financial Services Incorporated of Puerto Rico (UBS PR) have led to multiple regulatory inquiries, as well as customer complaints and arbitrations with aggregate claimed damages of approximately USD 2.0 billion, of which claims with aggregate claimed damages of approximately USD 861 million have been resolved through settlements, arbitration or withdrawal of the claim. The claims are filed by clients in Puerto Rico who own the funds or Puerto Rico municipal bonds and / or who used their UBS account assets as collateral for UBS non-purpose loans; customer complaint and arbitration allegations include fraud, misrepresentation and unsuitability of the funds and of the loans. A shareholder derivative action was filed in 2014 against various UBS entities and current and certain former directors of the funds, alleging hundreds of millions of US dollars in losses in the funds. In 2015, defendants' motion to dismiss was denied. Defendants' requests for permission to appeal that ruling were denied by the Puerto Rico Court of Appeals and the Puerto Rico Supreme Court. In 2014, a federal class action complaint also was filed against various UBS entities, certain members of UBS PR senior management, and the co-manager of certain of the funds seeking damages for investor losses in the funds during the period from May 2008 through May 2014. Defendants had moved to dismiss that complaint, and in December 2016, defendants' motion to dismiss was granted in part and denied in part. In 2015, a class action was filed in Puerto Rico state court against UBS PR seeking equitable relief in the form of a stay of any effort by UBS PR to collect on non-purpose loans it acquired from UBS Bank USA in December 2013 based on plaintiffs' allegation that the loans are not valid. The trial court denied defendants' motion to dismiss the action based on a forum selection clause in the loan

agreements; the Puerto Rico Supreme Court has stayed the action pending its review of defendants' appeal from that ruling.

In 2014, UBS reached a settlement with the Office of the Commissioner of Financial Institutions for the Commonwealth of Puerto Rico (OCFI) in connection with OCFI's examination of UBS's operations from January 2006 through September 2013, pursuant to which UBS is paying up to an aggregate of USD 7.7 million in investor education contributions and restitution.

In 2015, the SEC and the Financial Industry Regulatory Authority (FINRA) announced settlements with UBS PR of their separate investigations stemming from the 2013 market events. Without admitting or denying the findings in either matter, UBS PR agreed in the SEC settlement to pay USD 15 million and USD 18.5 million in the FINRA matter. We also understand that the DOJ is conducting a criminal inquiry into the impermissible reinvestment of non-purpose loan proceeds. We are cooperating with the authorities in this inquiry.

In 2011, a purported derivative action was filed on behalf of the Employee Retirement System of the Commonwealth of Puerto Rico (System) against over 40 defendants, including UBS PR, which was named in connection with its underwriting and consulting services. Plaintiffs alleged that defendants violated their purported fiduciary duties and contractual obligations in connection with the issuance and underwriting of approximately USD 3 billion of bonds by the System in 2008 and sought damages of over USD 800 million. Defendants' motion to dismiss is pending. In September 2016, the System announced its intention to join the action as a plaintiff, and the court has since ordered that plaintiffs must file an amended complaint.

Also, in 2013, an SEC Administrative Law Judge dismissed a case brought by the SEC against two UBS executives, finding no violations. The charges had stemmed from the SEC's investigation of UBS's sale of closed-end funds in 2008 and 2009, which UBS settled in 2012.

Beginning in 2012, two federal class action complaints, which were subsequently consolidated, were filed against various UBS entities, certain of the funds, and certain members of UBS PR senior management, seeking damages for investor losses in the funds during the period from January 2008 through May 2012 based on allegations similar to those in the SEC action. In September 2016, the court denied plaintiffs' motion for class certification. In October 2016, plaintiffs filed a petition with the US Court of Appeals for the First Circuit seeking permission to bring an interlocutory appeal challenging the denial of their motion for class certification. Defendants have filed an opposition to plaintiffs' petition.

Beginning in 2015, agencies and public corporations of the Commonwealth have defaulted on certain interest payments, and in July 2016, the Commonwealth defaulted on payments on its general obligation debt. Executive orders of the Governor that have diverted funds to pay for essential services instead of debt payments and stayed any action to enforce creditors' rights on the Puerto Rico bonds continue to be in effect. In June 2016, US federal legislation created an oversight board with power to oversee Puerto Rico's finances and to restructure its debt. The oversight board is authorized to impose, and has imposed, a stay on exercise of creditors' rights. These events, further defaults, any further legislative action to create a legal means of restructuring Commonwealth obligations or to impose additional oversight on the Commonwealth's finances, or any restructuring of the Commonwealth's obligations, may increase the number of claims against UBS concerning Puerto Rico securities, as well as potential damages sought.

Our balance sheet at 31 December 2016 reflected provisions with respect to matters described in this item 4 in amounts that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provisions that we have recognized.

Foreign exchange, LIBOR, and benchmark rates, and other trading practices

Foreign exchange-related regulatory matters: Following an initial media report in 2013 of widespread irregularities in the foreign exchange markets, UBS immediately commenced an internal review of its foreign exchange business, which includes our precious metals and related structured products businesses. Since then, various authorities have commenced investigations concerning possible manipulation of foreign exchange markets, including FINMA, the Swiss Competition Commission (WEKO), the DOJ, the SEC, the US Commodity Futures Trading Commission (CFTC), the Board of Governors of the Federal Reserve System (Federal Reserve Board), the California State Attorney General, the UK Financial Conduct Authority (FCA) (to which certain responsibilities of the UK Financial Services Authority (FSA) have passed), the UK Serious Fraud Office (SFO), the Australian Securities and Investments Commission (ASIC), the Hong Kong Monetary Authority (HKMA), the Korea Fair Trade Commission (KFTC) and the Brazil Competition Authority (CADE). In addition, WEKO is, and a number of other authorities reportedly are, investigating potential manipulation of precious metals prices. UBS has taken and will continue to take appropriate action with respect to certain personnel as a result of its ongoing review.

In 2014, UBS reached settlements with the FCA and the CFTC in connection with their foreign exchange investigations, and FINMA issued an order concluding its formal proceedings with respect to UBS relating to its foreign exchange and precious metals businesses. UBS has paid a total of approximately CHF 774 million to these authorities, including GBP 234 million in fines to the FCA, USD 290 million in fines to the CFTC, and CHF 134 million to FINMA representing confiscation of costs avoided and profits. In 2015, the Federal Reserve Board and the Connecticut Department of Banking issued an Order to Cease and Desist and Order of Assessment of a Civil Monetary Penalty Issued upon Consent (Federal Reserve Order) to UBS AG. As part of the Federal Reserve Order, UBS AG paid a USD 342 million civil monetary penalty.

In 2015, the DOJ's Criminal Division (Criminal Division) terminated the December 2012 Non-Prosecution Agreement (NPA) with UBS AG related to UBS's submissions of benchmark interest rates. As a result, UBS AG entered into a plea agreement with the Criminal Division pursuant to which UBS AG pleaded guilty to a one-count criminal information filed in the US District Court for the District of Connecticut charging UBS AG with one count of wire fraud in violation of 18 USC Sections 1343 and 2. Sentencing occurred on 5 January 2017. Under the plea agreement, UBS AG has paid a USD 203 million fine and is subject to a three-year term of probation starting on the sentencing date. The criminal information charges that, between approximately 2001 and 2010, UBS AG engaged in a scheme to defraud counterparties to interest rate derivatives transactions by manipulating benchmark interest rates, including Yen LIBOR. The Criminal Division terminated the NPA based on its determination, in its sole discretion, that certain UBS AG employees committed criminal conduct that violated the NPA, including fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange market transactions with clients and collusion with other participants in certain foreign exchange markets.

We have ongoing obligations to cooperate with these authorities and to undertake certain remediation, including actions to improve UBS's processes and controls.

UBS has been granted conditional leniency or conditional immunity by the Antitrust Division of the DOJ (Antitrust Division) from prosecution for EUR / USD collusion and entered into a non-prosecution agreement covering other currency pairs. As a result, UBS AG will not be subject to prosecutions, fines or other sanctions for antitrust law violations by the Antitrust Division, subject to UBS AG's continuing cooperation. However, the conditional leniency and conditional immunity grant does not bar government agencies from asserting other claims and imposing sanctions against UBS AG, as evidenced by the settlements and ongoing investigations referred to above. UBS has also been granted conditional immunity by authorities in certain jurisdictions, including WEKO, in connection with potential competition law

14

violations relating to foreign exchange and precious metals businesses and, as a result, will not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in those jurisdictions, subject to UBS AG's continuing cooperation as the leniency applicant.

Investigations relating to foreign exchange and precious metals matters by numerous authorities, including the CFTC, remain ongoing notwithstanding these resolutions.

Foreign exchange-related civil litigation: Putative class actions have been filed since November 2013 in US federal courts and in other jurisdictions against UBS and other banks on behalf of putative classes of persons who engaged in foreign currency transactions with any of the defendant banks. They allege collusion by the defendants and assert claims under the antitrust laws and for unjust enrichment. In 2015, additional putative class actions were filed in federal court in New York against UBS and other banks on behalf of a putative class of persons who entered into or held any foreign exchange futures contracts and options on foreign exchange futures contracts since 1 January 2003. The complaints assert claims under the Commodity Exchange Act (CEA) and the US antitrust laws. In 2015, a consolidated complaint was filed on behalf of both putative classes of persons covered by the US federal court class actions described above. UBS has entered into a settlement agreement that would resolve all of these US federal court class actions. The agreement, which has been preliminarily approved by the court and is subject to final court approval, requires, among other things, that UBS pay an aggregate of USD 141 million and provide cooperation to the settlement classes.

A putative class action has been filed in federal court in New York against UBS and other banks on behalf of participants, beneficiaries, and named fiduciaries of plans qualified under the Employee Retirement Income Security Act of 1974 (ERISA) for whom a defendant bank provided foreign currency exchange transactional services, exercised discretionary authority or discretionary control over management of such ERISA plan, or authorized or permitted the execution of any foreign currency exchange transactional services involving such

plan's assets. The complaint asserts claims under ERISA. The parties filed a stipulation to dismiss the case with prejudice. The plaintiffs have appealed the dismissal.

In 2015, a putative class action was filed in federal court against UBS and numerous other banks on behalf of a putative class of persons and businesses in the US who directly purchased foreign currency from the defendants and their co-conspirators for their own end use. That action has been transferred to federal court in New York. Motions to dismiss are pending.

In 2016, a putative class action was filed in federal court in New York against UBS and numerous other banks on behalf of a putative class of persons and entities who had indirectly purchased FX instruments from a defendant or co-conspirator in the US. The complaint asserts claims under federal and state antitrust laws. Motions to dismiss will be filed.

In 2015, UBS was added to putative class actions pending against other banks in federal court in New York and other jurisdictions on behalf of putative classes of persons who had bought or sold physical precious metals and various precious metal products and derivatives. The complaints in these lawsuits assert claims under the antitrust laws and the CEA, and other claims. In October 2016, the court in New York granted UBS's motions to dismiss the putative class actions relating to gold and silver. Plaintiffs in those cases are seeking to amend their complaints to add new allegations about UBS. UBS's motion to dismiss the putative class action relating to platinum and palladium remains pending.

LIBOR and other benchmark-related regulatory matters: Numerous government agencies, including the SEC, the CFTC, the DOJ, the FCA, the SFO, the Monetary Authority of Singapore (MAS), the HKMA, FINMA, the various state attorneys general in the US and competition authorities in various jurisdictions have conducted or are continuing to conduct investigations regarding submissions with respect to LIBOR and other benchmark rates. These investigations focus on whether there were improper attempts by UBS,

among others, either acting on our own or together with others, to manipulate LIBOR and other benchmark rates at certain times.

In 2012, UBS reached settlements with the FSA, the CFTC and the Criminal Division of the DOJ in connection with their investigations of benchmark interest rates. At the same time, FINMA issued an order concluding its formal proceedings with respect to UBS relating to benchmark interest rates. UBS has paid a total of approximately CHF 1.4 billion in fines and disgorgement, including GBP 160 million in fines to the FSA, USD 700 million in fines to the CFTC, USD 500 million in fines to the DOJ, and CHF 59 million in disgorgement to FINMA. UBS Securities Japan Co. Ltd. (UBSSJ) entered into a plea agreement with the DOJ under which it entered a plea to one count of wire fraud relating to the manipulation of certain benchmark interest rates, including Yen LIBOR. UBS entered into an NPA with the DOJ, which (along with the plea agreement) covered conduct beyond the scope of the conditional leniency / immunity grants described below, required UBS to pay the USD 500 million fine to the DOJ after the sentencing of UBSSJ and provided that any criminal penalties imposed on UBSSJ at sentencing be deducted from the USD 500 million fine. Under the NPA, we agreed, among other things, that for two years from 18 December 2012 UBS would not commit any US crime and we would advise DOJ of any potentially criminal conduct by UBS or any of its employees relating to violations of US laws concerning fraud or securities and commodities markets. The term of the NPA was extended by one year to 18 December 2015. In 2015, the Criminal Division terminated the NPA based on its determination, in its sole discretion, that certain UBS AG employees committed criminal conduct that violated the NPA.

In 2014, UBS reached a settlement with the European Commission (EC) regarding its investigation of bid-ask spreads in connection with Swiss franc interest rate derivatives and paid a EUR 12.7 million fine, which was reduced to this level based in part on UBS's cooperation with the EC. In December 2016, UBS reached a settlement with WEKO regarding its investigation of bid-ask spreads in connection with Swiss franc

interest rate derivatives and received full immunity from fines. The MAS, HKMA and the Japan Financial Services Agency have also resolved investigations of UBS (and in some cases, other banks). We have ongoing obligations to cooperate with the authorities with whom we have reached resolutions and to undertake certain remediation with respect to benchmark interest rate submissions.

Investigations by the CFTC, ASIC and other governmental authorities remain ongoing notwithstanding these resolutions. UBS has been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ and WEKO, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR. As a result of these conditional grants, UBS will not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in the jurisdictions where we have conditional immunity in connection with the matters covered by the conditional grants, subject to our continuing cooperation as leniency applicant. However, since the Secretariat of WEKO has asserted that UBS does not qualify for full immunity, UBS has been unable to reach a settlement with WEKO, and therefore the investigation will continue. Furthermore, the conditional leniency and conditional immunity grants we have received do not bar government agencies from asserting other claims and imposing sanctions against us, as evidenced by the settlements and ongoing investigations referred to above. In addition, as a result of the conditional leniency agreement with the DOJ, we are eligible for a limit on liability to actual rather than treble damages were damages to be awarded in any civil antitrust action under US law based on conduct covered by the agreement and for relief from potential joint and several liability in connection with such civil antitrust action, subject to our satisfying the DOJ and the court presiding over the civil litigation of our cooperation. The conditional leniency and conditional immunity grants do not otherwise affect the ability of private parties to assert civil claims against us.

LIBOR and other benchmark-related civil litigation: A number of putative class actions and other actions are pending in the federal courts in New York against UBS and numerous other banks on behalf of parties who

transacted in certain interest rate benchmark-based derivatives. Also pending in the US and in other jurisdictions are actions asserting losses related to various products whose interest rates were linked to LIBOR and other benchmarks, including adjustable rate mortgages, preferred and debt securities, bonds pledged as collateral, loans, depository accounts, investments and other interest-bearing instruments. All of the complaints allege manipulation, through various means, of various benchmark interest rates, including USD LIBOR, Euroyen TIBOR, Yen LIBOR, EURIBOR, CHF LIBOR, GBP LIBOR, USD ISDAFIX rates, other benchmark rates, and seek unspecified compensatory and other damages under varying legal theories.

In 2013, the US district court in the USD LIBOR action dismissed the federal antitrust and racketeering claims of certain USD LIBOR plaintiffs and a portion of their claims brought under the CEA and state common law. Certain plaintiffs appealed the decision to the Second Circuit, which, in May 2016, vacated the district court's ruling finding no antitrust injury and remanded the case back to the district court for a further determination on whether plaintiffs have antitrust standing.

In December 2016, the district court again dismissed plaintiffs' antitrust claims, this time for lack of personal jurisdiction over UBS and other foreign banks. In 2014, the court in one of the Euroyen TIBOR lawsuits dismissed certain of the plaintiff's claims, including federal antitrust claims. In 2015, the same court dismissed plaintiff's federal racketeering claims and affirmed its previous dismissal of plaintiff's antitrust claims. UBS and other defendants in other lawsuits including those related to EURIBOR, CHF LIBOR, GBP LIBOR and SIBOR have filed motions to dismiss. UBS has entered into an agreement with representatives of a class of bondholders to settle their USD LIBOR class action. The agreement is subject to court approval.

Since September 2014, putative class actions have been filed in federal court in New York and New Jersey against UBS and other financial institutions, among others, on behalf of parties who entered into interest rate derivative transactions linked to ISDAFIX. The complaints, which have since been consolidated into an amended complaint, allege that the defendants conspired to manipulate ISDAFIX rates from 1 January 2006

through January 2014, in violation of US antitrust laws and certain state laws, and seek unspecified compensatory damages, including treble damages. In March 2016, the court in the ISDAFIX action denied in substantial part defendants' motion to dismiss, holding that plaintiffs have stated Sherman Act, breach- of- contract and unjust-enrichment claims against defendants, including UBS AG.

Government bonds: Putative class actions have been filed in US federal courts against UBS and other banks on behalf of persons who participated in markets for US Treasury securities since 2007. The complaints generally allege that the banks colluded with respect to, and manipulated prices of, US Treasury securities sold at auction. They assert claims under the antitrust laws and the CEA and for unjust enrichment. The cases have been consolidated in the SDNY. Following filing of these complaints, UBS and reportedly other banks are responding to investigations and requests for information from various authorities regarding US Treasury securities and other government bond trading practices. As a result of its review to date, UBS has taken appropriate action.

With respect to additional matters and jurisdictions not encompassed by the settlements and order referred to above, our balance sheet at 31 December 2016 reflected a provision in an amount that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

20

Swiss retrocessions

The Federal Supreme Court of Switzerland ruled in 2012, in a test case against UBS, that distribution fees paid to a firm for distributing third-party and intra-group investment funds and structured products must be disclosed and surrendered to clients who have entered into a discretionary mandate agreement with the firm, absent a valid waiver.

FINMA has issued a supervisory note to all Swiss banks in response to the Supreme Court decision. UBS has met the FINMA requirements and has notified all potentially affected clients.

The Supreme Court decision has resulted, and may continue to result, in a number of client requests for UBS to disclose and potentially surrender retrocessions. Client requests are assessed on a case-by-case basis. Considerations taken into account when assessing these cases include, among others, the existence of a discretionary mandate and whether or not the client documentation contained a valid waiver with respect to distribution fees.

Our balance sheet at 31 December 2016 reflected a provision with respect to matters described in this item 6 in an amount that UBS believes to be appropriate under the applicable accounting standard. The ultimate exposure will depend on client requests and the resolution thereof, factors that are difficult to predict and assess. Hence, as in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently

available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Banco UBS Pactual tax indemnity

Pursuant to the 2009 sale of Banco UBS Pactual S.A. (Pactual) by UBS to BTG Investments, LP (BTG), BTG has submitted contractual indemnification claims that UBS estimates amount to approximately BRL 2.6 billion, including interest and penalties, which is net of liabilities retained by BTG. The claims pertain principally to several tax assessments issued by the Brazilian tax authorities against Pactual relating to the period from December 2006 through March 2009, when UBS owned Pactual. These assessments are being challenged in administrative and judicial proceedings. The majority of these assessments relate to the deductibility of goodwill amortization in connection with UBS's 2006 acquisition of Pactual and payments made to Pactual employees through various profit-sharing plans. In 2015, an intermediate administrative court issued a decision that was largely in favor of the tax authority with respect to the goodwill amortization assessment. In May 2016, the highest level of the administrative court agreed to review this decision on a number of the significant issues.

Investigation of UBS's role in initial public offerings in Hong Kong

The Hong Kong Securities and Futures Commission (SFC) has been conducting investigations into UBS's role as a sponsor of certain initial public offerings listed on the Hong Kong Stock Exchange. In October 2016, the SFC informed UBS that it intends to commence action against UBS and certain UBS employees with respect to sponsorship work in those offerings. If such action is taken, there may be financial ramifications for

UBS, including fines and obligations to pay investor compensation, and suspension of UBS's ability to provide corporate finance advisory services in Hong Kong for a period of time. On 16 January 2017, a writ was filed by the SFC with Hong Kong's High Court in which UBS is named as one of six defendants from whom the SFC is seeking compensation in an unspecified amount for losses incurred by certain shareholders of China Forestry Holdings Company Limited, for whom UBS acted as a sponsor in connection with their 2009 listing application.

# Exhibit Y

Judge Slams FINRA Arbitration

By Dan Solin

Until March 12, 2012, Deborah Gale Evans, a partner in the Boston law firm of Michaels, Ward & Rabinovitz, was enjoying great professional success. The Michaels Ward firm is well known for its expertise in securities litigation and regulation. According to its website, the firm represents banks, broker dealers and others in court and arbitration proceedings. Ms. Evans specializes in representing broker-dealers in arbitrations before the Financial Industry Regulatory Authority (FINRA).

If you have an account with a retail broker, or are employed by one, you signed an agreement requiring you to submit all disputes to mandatory arbitration administered by FINRA. The idea of requiring investors and employees to arbitrate disputes before a tribunal appointed by the very industry being sued is deeply troubling. Because it deprives American citizens of their constitutional rights to access to the courtroom and trial by a jury of their peers, it has neither the appearance nor the reality of impartiality. Among others, I testified before Congress and urged it to enact legislation prohibiting mandatory arbitration clauses as being fundamentally unfair.

A study I co-authored of more than 14,000 FINRA arbitration awards over a ten-year period found that investors with significant claims suing major brokerage firms could expect to recover only 12 percent of the amount claimed. It is not surprising that many investors required to submit to this process perceive it to be biased against them.

Ms. Evans represented Wells Fargo Advisors in a dispute with a former financial adviser, Clifford J. Watts, III. Watts had signed a promissory note in favor of his former employer, Wachovia, which was later bought by Wells Fargo. The note provided for

payment of the unpaid principal, plus interest upon termination. Watts quit Wells Fargo but refused to pay the balance due on the note, claiming that it was really a bonus and that the terms of his employment were materially changed after the acquisition, forcing his termination.

The FINRA panel decided in favor of Wells Fargo and ordered Watts to pay the principal, interest and to reimburse Wells Fargo for its attorney's fees in the amount of $60,480.25. Stung by this defeat, Watts filed a motion in the United States District Court for the Western District of North Carolina to overturn the award (case # 5:11cv 48, reported at 2012 LEXIS U.S. Dist. LEXIS 32244). Wells Fargo asked the Court to enforce it. Normally, efforts to overturn an arbitration award are unsuccessful because the legal grounds for doing so are very narrow. Motions to enforce an award are almost always granted.

That's where it got interesting.

The U.S. District Judge assigned to decide the case was Max O. Cogburn Jr. He joined the Court in 2011, after being appointed by President Obama.

Judge Cogburn heard oral argument on the motions to vacate and confirm. Ms. Evans argued for Wells Fargo.

In a stinging rebuke to both Ms. Evans and (more importantly) to the FINRA arbitration process, Judge Cogburn has some choice words for both. When he asked Ms. Evans if the Court has the power to vacate an award if it found the underlying agreement was illegal (which it clearly does), Ms. Evans "... immediately challenged the Court's statement." Apparently not sensing Judge Cogburn's concerns, Ms. Evans told him that Wells Fargo "... handles hundreds of arbitrations a year" and that she handles 30 or 40 of them as

counsel. She then uttered these words, which I am sure she now regrets: "I've never lost one and I've never not gotten attorney's fees. I always win these cases."

Judge Cogburn was not impressed with this track record, noting: "Now there's a level playing field."

Either Ms. Evans is a combination of Clarence Darrow and F. Lee Bailey or the process is rigged in favor of the securities industry. Judge Cogburn made it clear how he came out on this issue.

The Court noted that the securities industry's "constant and prolific participation" in these arbitrations gave it "a clear advantage over the individual employee or customer" because the industry knows which arbitrators will favor its position. That fact, coupled with the limited review permitted by the Courts, results in a "... process in which, as in this case, counsel for the bank can remain undefeated 30 or 40 times a year."

Ms. Evans lectured the Judge on the "voluntary" nature of arbitration and its cost savings benefits. Judge Cogburn rejected these arguments as "disingenuous," correctly noting that employees and customers have no recourse other than to sign these agreements. He turned the "saving money" argument on its head, noting that "... since the individuals seldom win and are forced to reimburse costs and attorneys fees, the only ones saving money are large institutions like the claimant."

Nevertheless, and with obvious misgivings, the Court confirmed that part of the arbitration award requiring repayment of principal and interest of the note. However, it vacated the award of attorney's fees, finding that the amount of those fees was pulled "out of thin air" and was "completely arbitrary."

To date, congressional efforts to ban mandatory arbitration have met with formidable and highly effective resistance from the securities industry and business lobbies. Maybe Judge Cogburn's decision will spur renewed interest in this legislation, which is long overdue. In the interim, attorneys like Ms. Evans should ask themselves whether their stunning success is attributable to their legal skill or the lack of impartiality of FINRA arbitration panels.

I called Ms. Evans and sent her several e-mails asking for her comments on this decision. I received no response.

Dan Solin is a senior vice president of Index Funds Advisors.



FROM:        (910) 208-9401
Gayle Detwiler
ShipOnSite - Surf City
201 Alston Blvd Suite C

HAMPSTEAD NC 28443
US

SHIP DATE: 08JAN18
ACTWGT: 6.00 LB
CAD: 112040233/WSXI3300
DIMMED: 13 X 10 X 6 IN

BILL SENDER

TO **Daniel Patrick Moynihan**
**US District Court for Southern Dist**
**500 PEARL ST RM 200**
**PROSE INTAKE SECTION**
**NEW YORK NY 10007**                **(US)**

(555) 000-0000         REF: ROBERT ZIMMERMAN
INV: PKG ID: 98231
PO:                        DEPT:

**FedEx**
Ground

**G**

TRK# **7892 5930 0937**

**10007**

9622 0019 0 (000 000 0000) 0 00 7892 5930 0937