IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Civil Action No:  1:17-CV-04503-JMF

| | |
|---|---|
| Robert Zimmerman,<br>    Plaintiff,<br><br>  v.<br><br>UBS AG,<br>UBS GROUP AG,<br>UBS Securities, LLC,<br>UBS Financial Services, Inc.,<br>UBS Americas Holding LLC,<br>Charles Schwab & Co., Inc.,<br>EY Global LLP,<br>Ernst & Young LLP and Ltd., and<br>Individual Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION OF PLAINTIFF ROBERT ZIMMERMAN IN SUPPORT OF PLAINTIFF'S FIRST AMENDED COMPLAINT AND OPPOSITION TO DEFENDANT'S MOTIONS TO DISMISS</u>

1.  Pro se Plaintiff Robert Zimmerman makes the following Declaration based upon my own personal knowledge and belief.

2.  The following exhibits A through Y were also submitted with Plaintiff's First Amended Complaint and referenced in Plaintiff's Opposition to Defendant's Motions to Dismiss.

3.  Attached as Exhibit A is a true and correct copy of UBS employees calling UBS securities "Crap and Vomit" 1 page.

4.  Attached as Exhibit B is a true and correct copy of one of UBS's DOJ Non-Prosecution Agreements....6 pages.

5.      Attached as Exhibit C is a true and correct copy of the UBS AG Shelf Registration Statement under which CEFL was issued…79 pages.

6.      Attached as Exhibit D is a true and correct copy of Ernst & Young Ltd.'s unqualified opinion letters for UBS AG for 2013 to 2016.

7.      Attached as Exhibit E is a true and correct copy of Page 67 and Note 22 to UBS AG's 2015 Annual Report, 13 pages.

8.      Attached as Exhibit F is a true and correct copy of UBS's Product Supplement for CEFL…62 pages.

9.      Attached as Exhibit G is a true and correct copy of the Clintons sordid UBS affair…2 pages.

10.     Attached as Exhibit H is a true and correct copy of UBS CEO's pay raise…1 page.

11.     Attached as Exhibit I is a true and correct copy of Attorney General remarks re: UBS crimes from 2012 to 2015…6 pages.

12.     Attached as Exhibit J is a true and correct copy of an SEC Cease and Desist Order…7 pages.

13.     Attached as Exhibit K is a true and correct copy of the "Risk Factors" section of the UBS Product Supplement for CEFL…14 pages.

14.     Attached as Exhibit L is a true and correct copy of pages 11-13 of the DOJ/UBS Joint Sentencing Memorandum…3 pages.

15.     Attached as Exhibit M is a true and correct copy of Schwab's failure to alert their customers to the dangers inherent in investing in CEFL…3 pages.

16.     Attached as Exhibit N is a true and correct copy of UBS's guilty plea to aiding and abetting U.S. tax evaders…2 pages.

17.     Attached as Exhibit O is a true and correct copy of a DOJ amendment to DOJ/UBS NPA…3 pages.

18.     Attached as Exhibit P is a true and correct copy of three UBS letters to the SEC imploring them for leniency…39 pages.

19.     Attached as Exhibit Q is a true and correct copy of an Affidavit of Service for Robert McCann…1 page.

20.     Attached as Exhibit R is a true and correct copy of Schwab's account pages showing Plaintiff's financial loss…2 pages.

21.     Attached as Exhibit S is a true and correct copy of a partial rendering of EY and Schwab crimes…15pages.

22.     Attached as Exhibit T is a true and correct copy of UBS's breach of the 2012 DOJ NPA and guilty plea…1 page.

23.     Attached as Exhibit U is a true and correct copy of EY LLC's unqualified audit opinion letters for UBS Securities LLC…5 pages.

24.     Attached as Exhibit V is a true and correct copy of a letter criticizing FINRA written by a FINRA arbitrator and attorney…10 pages.

25.     Attached as Exhibit W is a true and correct copy of *Why Good Accountants Do Bad Audits*…10 pages.

26.     Attached as Exhibit X is a true and correct copy of UBS's crimes from Note 20 to UBS's Annual Report for 2016…23 pages.

27.     Attached as Exhibit Y is a true and correct copy of a Federal Judge Slamming FINRA Arbitration…4 pages.

I, Robert Zimmerman, declare under penalty of perjury under the laws of the United States that the foregoing, to the best of my ability, is true and correct.

Dated: March 29, 2018.


Robert Zimmerman

# Exhibit A

# BUSINESS INSIDER

# UBS just settled with a hedge fund over deals its staff called 'crap' and 'vomit'



JONATHAN MARINO
SEP. 1, 2015, 1:26 PM

Investment bank UBS has settled with a hedge fund that accused it of selling securities it knew were on the precipice of a downfall, just hours before a potentially damaging trial for the bank was set to begin.

A source confirmed to Business Insider that UBS settled with Pursuit Partners, a Connecticut hedge fund, but declined to provide specifics.

In emails sent between bank employees, staff conducting 2007 collateralized-debt-obligation trades between UBS and hedge fund Pursuit Partners refer to securities being dealt as "crap" and "vomit," according to court documents.

Men hold their noses on a boat traveling down a polluted waterway.

*REUTERS*

From July through August 2007, UBS sold about $45 million in CDOs to Pursuit Partners. Initially, Pursuit Partners ................................. from the suit.

"UBS knew, at least as early as July 2007, based upon private communications by and between UBS and Moody's, that Moody's no longer believed that CDO notes of the type that UBS later sold to Pursuit deserved an 'investment-grade' rating," the suit alleges.

But the suit also cites emails between UBS staffers that really drive the point home.

"Kewl," wrote UBS trader Evan Malik to Hugh Corcoran in an August 2007 email that began with the bankers talking over company email about wine purchases. "Sold some more crap to pursuit."

In another email, UBS employee Tim Goodell said to Jared Menzel that the securities were "vomit" — this in September 2007.

# Exhibit B



**U.S. Department of Justice**

Criminal Division

*Washington, D.C.  20530*

December 18, 2012

Gary R. Spratling, Esq.                    David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP                Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000             1050 Connecticut Ave NW
San Francisco, CA  94105                   Washington, DC  20036

     **Re:**    **UBS AG**

Dear Mr. Spratling and Mr. Burns:

On the understandings specified below, the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") will not criminally prosecute UBS AG and its subsidiaries and affiliates (collectively, "UBS"), with the exception of UBS Securities Japan Co., Ltd. ("UBS Securities Japan"), for any crimes (except for criminal tax violations, as to which the Fraud Section cannot and does not make any agreement) related to UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate (known as LIBOR), the Euro Interbank Offered Rate (known as EURIBOR), and the Tokyo InterBank Offered Rate (known as TIBOR), as described in the attached Appendix A, which is incorporated in this Non-Prosecution Agreement ("Agreement").[1]

It is understood that UBS admits, accepts, and acknowledges responsibility for the conduct set forth in Appendix A and agrees not to make any public statement contradicting Appendix A.

The Fraud Section and UBS further agree that as a term and condition of this Agreement, UBS Securities Japan will plead guilty to one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, in accordance with the Plea Agreement that is attached as Appendix B, which is incorporated in this Agreement.

The Fraud Section enters into this Agreement based, in part, on its consideration of the following factors:

---

     [1]     Although not addressed in Appendix A, this Agreement also encompasses UBS's submissions for the additional benchmark rates listed in Appendix C, which is also incorporated in this Agreement.  The rates listed in Appendix C are the focus of an ongoing investigation and, for that reason, Appendix C will be held in confidence by the parties to this Agreement and will not be made available to the public until the Department of Justice, in its sole discretion, determines that such information can and should be disclosed.

(a)    UBS has made a timely, voluntary, and complete disclosure of the facts described in Appendix A.

(b)    UBS conducted a thorough internal investigation of the misconduct described in Appendix A, reported all of its findings to the Fraud Section, cooperated fully with the Fraud Section's investigation of this matter, and sought to effectively remediate any problems it discovered.

1.    Although UBS was not the first bank to provide the Fraud Section with helpful information, and its self-disclosure and cooperation commenced after the Fraud Section had obtained certain evidence implicating UBS and, in particular, efforts to manipulate Yen benchmarks, UBS made its self-disclosure before the Fraud Section had contacted UBS regarding the criminal investigation.

2.    UBS provided highly valuable information that significantly expanded and advanced the criminal investigation. UBS's cooperation has been exceptional in many important respects. Through its internal investigation, UBS has sought to uncover and disclose evidence of misconduct without restricting the focus of its investigation to issues the government had already identified. Over the past two years, it has made substantial efforts to assist the government in obtaining access to sources of evidence located abroad, including documents and witnesses. UBS's extensive cooperation is a particularly significant and favorable consideration in the Fraud Section's decision to enter into this Agreement.

3.    The Fraud Section received compelling information from UBS, as well as from regulatory agencies, demonstrating that in recent years, under its new senior leadership, UBS has made important and positive changes in its compliance, training, and overall approach to ensuring its adherence to the law. Moreover, UBS appears to have substantially improved the manner in which it responds to regulatory and criminal investigations and to its discovery of potential misconduct, as the Department of Justice has observed in this matter.

a.    In order to ensure that misconduct of this nature does not recur, UBS has implemented a modified and significantly enhanced control framework for its LIBOR submission process and has expanded that program to encompass all other benchmark interest rate submissions. UBS has also implemented significant remedial measures in response to the misconduct discovered during this investigation.

2

b.    The Fraud Section has also received favorable reports from the Swiss Financial Market Supervisory Authority ("FINMA") and the Japan Financial Services Authority (the "JFSA") describing, respectively, (1) positive progress that UBS has made in its approach to compliance and enforcement, and (2) UBS Securities Japan's effective implementation of the remedial measures previously imposed by the JFSA based on its findings relating to the attempted manipulation of Yen benchmarks.

This recent record is commendable, and partially mitigates the adverse implications of UBS's prior history of misconduct.

This Agreement does not provide any protection against prosecution for any crimes except as set forth above, and applies only to UBS and not to any other entities or to any individuals, including but not limited to employees or officers of UBS.  The protections provided to UBS shall not apply to any acquirer or successor entities unless and until such acquirer or successor formally adopts and executes this Agreement.

This Agreement shall have a term of two years from the date of this Agreement, except as specifically provided below.  It is understood that for the two-year term of this Agreement, UBS shall: (a) commit no United States crime whatsoever; (b) truthfully and completely disclose non-privileged information with respect to the activities of UBS, its officers and employees, and others concerning all matters about which the Fraud Section inquires of it, which information can be used for any purpose, except as otherwise limited in this Agreement; (c) bring to the Fraud Section's attention all potentially criminal conduct by UBS or any of its employees that relates to violations of U.S. laws (i) concerning fraud or (ii) governing securities and commodities markets; and (d) bring to the Fraud Section's attention all criminal or regulatory investigations, administrative proceedings or civil actions brought by any governmental authority in the United States against UBS or its employees that alleges fraud or violations of the laws governing securities and commodities markets.

Until the date upon which all investigations and prosecutions arising out of the conduct described in this Agreement are concluded, including the investigations of the matters listed in Appendix C, whether or not they are concluded within the two-year term specified in the preceding paragraph, UBS shall, in connection with any investigation or prosecution arising out of the conduct described in this Agreement: (a) cooperate fully with the Fraud Section, the Federal Bureau of Investigation, and any other law enforcement or government agency designated by the Fraud Section; (b) assist the Fraud Section in any investigation or prosecution by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding; (c) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent or employee at any meeting or interview or before the grand jury or at any trial or other court proceeding; and (d) provide the Fraud Section, upon request, all non-privileged information, documents, records, or other tangible evidence about which the Fraud Section or any designated law enforcement or

3

government agency inquires.

It is understood that, if the Fraud Section determines in its sole discretion that UBS has committed any United States crime subsequent to the date of this Agreement, or that UBS has given false, incomplete, or misleading testimony or information at any time, or that UBS has otherwise violated any provision of this Agreement, UBS shall thereafter be subject to prosecution for any federal violation of which the Fraud Section has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against UBS, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the expiration of the term of the Agreement plus one year. Thus, by signing this Agreement, UBS agrees that the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed shall be tolled for the term of this Agreement plus one year.

It is understood that, if the Fraud Section determines in its sole discretion that UBS has committed any United States crime after signing this Agreement, or that UBS has given false, incomplete, or misleading testimony or information at any time, or that UBS has otherwise violated any provision of this Agreement: (a) all statements made by UBS or any of its employees to the Fraud Section or other designated law enforcement agents, including Appendix A, and any testimony given by UBS or any of its employees before a grand jury or other tribunal, whether prior or subsequent to the signing of this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any criminal proceeding brought against UBS; and (b) UBS shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads derived therefrom are inadmissible or should be suppressed. By signing this Agreement, UBS waives all rights in the foregoing respects.

The decision whether any public statement contradicts Appendix A and whether it shall be imputed to UBS for the purpose of determining whether UBS has breached this Agreement shall be in the sole discretion of the Fraud Section. If the Fraud Section determines that a public statement contradicts in whole or in part a statement contained in Appendix A, the Fraud Section shall so notify UBS, and UBS may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. This paragraph is not intended to apply to any statement made by any former UBS officers, directors, or employees. Further, nothing in this paragraph precludes UBS from taking good-faith positions in litigation involving a private party that are not inconsistent with Appendix A. In the event that the Fraud Section determines that UBS has breached this Agreement in any other way, the Fraud Section agrees to provide UBS with written notice of such breach prior to instituting any prosecution resulting from such breach. UBS shall, within 30 days of receipt of such notice, have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions UBS has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to institute a prosecution.

It is understood that UBS, by a branch or agency located in Connecticut, agrees to pay a monetary penalty of $500,000,000. UBS must pay this sum to the United States Treasury within ten days of the sentencing of UBS Securities Japan, in connection with its guilty plea and plea agreement attached as Appendix B. The parties agree that any criminal penalties that might be imposed by the Court on UBS Securities Japan in connection with its guilty plea and plea agreement will be deducted from the $500,000,000 penalty agreed to under this Agreement. UBS acknowledges that no tax deduction may be sought in connection with this payment.

It is further understood that, as noted above, UBS has strengthened its compliance and internal controls standards and procedures, and that it will further strengthen them as required by FINMA, the U.S. Commodity Futures Trading Commission, the JFSA, the United Kingdom Financial Services Authority, and any other regulatory or enforcement agencies that have addressed the misconduct set forth in Appendix A. In addition, in light of active investigations by various regulators of the conduct described in Appendix A and the role that regulators such as those listed above will continue to play in reviewing UBS's compliance standards, the Fraud Section has determined that adequate compliance measures have been and will be established. It is further understood that UBS will report to the Fraud Section, upon request, regarding its remediation and implementation of any compliance program and internal controls, policies, and procedures that relate to its submission of benchmark interest rates. Moreover, UBS agrees that it has no objection to any regulatory agencies providing to the Fraud Section any information or reports generated by such agencies or UBS relating to the submissions of benchmark interest rates. Such information and reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the information and reports could discourage cooperation, impede pending or potential government investigations, and thus undermine the objectives of the reporting requirement. For these reasons, among others, the information and reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

It is further understood that this Agreement does not bind any federal, state, local, or foreign prosecuting authority other than the Fraud Section. The Fraud Section will, however, bring the cooperation of UBS to the attention of other prosecuting and investigative authorities, if requested by UBS.

It is further understood that UBS and the Fraud Section may disclose this Agreement to the public, except with respect to Appendix C as set forth above.

With respect to this matter, from the date of execution of this Agreement forward, this Agreement supersedes all prior, if any, understandings, promises and/or conditions between the Fraud Section and UBS. No additional promises, agreements, and conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

Fraud Section and UBS. No additional promises, agreements, and conditions have been entered into other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

Sincerely,

DENIS J. McINERNEY
Chief, Fraud Section
Criminal Division
United States Department of Justice

By: _____
Daniel A. Braun, Deputy Chief
Luke B. Marsh, Trial Attorney

AGREED AND CONSENTED TO:

UBS AG

By: _____      December 18, 2012
Markus U. Diethelm                        Date
Group General Counsel, UBS AG

APPROVED:

By: _____
Gary R. Spratling, Esq.                   Date
David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP
Attorneys for UBS AG

6

# Exhibit C

424B3 1 d816529d424b3.htm DEBT AND WARRANTS PROSPECTUS DATED NOVEMBER 14, 2014

Table of Contents

**Filed Pursuant to Rule 424(b)(3)**
**Registration Statement Nos. 333-200212**
**333-200212-04**

PROSPECTUS

# UBS AG
## DEBT SECURITIES AND WARRANTS

### UBS Americas Inc.
Debt Securities
## Fully and Unconditionally Guaranteed by UBS AG

UBS AG from time to time may offer to sell debt securities and warrants.

UBS AG may offer and sell these securities to or through one or more underwriters, dealers and agents, including the firms named below, or directly to purchasers, on a delayed or continuous basis.

This prospectus describes some of the general terms that may apply to these securities and the general manner in which they may be offered. The specific terms of any securities to be offered, and the specific manner in which they may be offered, will be described in the applicable prospectus supplement.

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The securities are not deposit liabilities of UBS AG and are not insured by the United States Federal Deposit Insurance Corporation or any other governmental agency of the United States, Switzerland or any other jurisdiction.

UBS AG may use this prospectus in the initial sale of the securities. In addition, UBS AG, UBS Securities LLC, UBS Financial Services Inc. or any other affiliate of UBS AG may use this prospectus in market-making transactions involving the securities or similar securities after their initial sale, including debt securities of UBS Americas Inc. guaranteed by UBS AG. Unless UBS AG or its agent informs the purchaser otherwise in the confirmation of sale, this prospectus is being used in a market-making transaction.

**UBS Investment Bank**                    **UBS Financial Services Inc.**

The date of this Prospectus is November 14, 2014

**Table of Contents**

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| Introduction | 1 | Legal Ownership and Book-Entry Issuance | 47 |
| Cautionary Note Regarding Forward-Looking Statements | 3 | Considerations Relating to Indexed Securities | 52 |
| Incorporation of Information About UBS AG | 4 | Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency | 55 |
| Where You Can Find More Information | 5 | | |
| Presentation of Financial Information | 6 | U.S. Tax Considerations | 58 |
| Limitations on Enforcement of U.S. Laws Against UBS AG. Its Management and Others | 6 | Tax Considerations Under the Laws of Switzerland | 69 |
| | | Benefit Plan Investor Considerations | 71 |
| UBS | 7 | Plan of Distribution | 73 |
| Swiss Regulatory Powers | 10 | Conflicts of Interest | 75 |
| Use of Proceeds | 11 | Validity of the Securities | 76 |
| Description of Debt Securities We May Offer | 12 | Experts | 76 |
| Description of Warrants We May Offer | 32 | | |

## CERTAIN TERMS

In this prospectus:

- when we refer to "UBS AG," we mean UBS AG on a parent only basis.

- when we refer to "UBS" or "UBS Group," we mean UBS AG and its consolidated subsidiaries.

- when we refer to "USD," we mean United States dollars.

- when we refer to "CHF," we mean Swiss francs.

i

Calendar Month, the Initial Trade Date) to, and including, such last Trading Day in such Measurement Period, or such Redemption Valuation Date, as applicable, *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

*The Accrued Financing Charge seeks to compensate UBS for providing investors with the potential to receive a leveraged participation in movements in the Index Closing Level and is intended to approximate the financing costs that investors may have otherwise incurred had they sought to borrow funds at a similar rate from a third party to invest in the Securities. These charges accrue on a daily basis during the applicable period.*

| | |
|---|---|
| Financing Level: | As of any date of determination, the Financing Level will equal the Current Principal Amount. |
| Financing Rate: | The Financing Rate will equal the sum of (a) the "Financing Spread" to be specified in the applicable pricing supplement and (b) the London interbank offered rate (British Banker's Association) for three-month deposits in U.S. Dollars, which is displayed on Reuters page LIBOR01 (or any successor service or page for the purpose of displaying the London interbank offered rates of major banks, as determined by the Calculation Agent), as of 11:00 a.m., London time, on the day that is two London business days prior to the immediately preceding Monthly Valuation Date. "London business day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in London generally are authorized or obligated by law, regulation or executive order to close and is also a day on which dealings in U.S. dollars are transacted in the London interbank market. |

**Selected Risk Considerations**

An investment in the Securities involves risks. Selected risks are summarized here, but we urge you to read the more detailed explanation of risks described under "Risk Factors" beginning on page S-18 and in the "Risk Factors" section of the applicable pricing supplement.

➢ **You may lose some or all of your investment** — The Securities are exposed to two times any monthly decline in the level of the Index. The monthly compounded leveraged return of the Index will need to be sufficient to offset the negative effect of the Accrued Fees and Redemption Fee, if applicable, in order for you to receive an aggregate amount over the term of the Securities equal to your initial investment in the Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the fees, or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at maturity or call, or upon early redemption or acceleration.

➢ **Correlation and compounding risk** — A number of factors may affect the Security's ability to achieve a high degree of correlation with the performance of the Index, and there can be no guarantee that the Security will achieve a high degree of correlation. Because the Current Principal Amount is reset monthly, you will be exposed to compounding of monthly returns. As a result, the performance of the Securities for periods greater than one month is likely to be either greater than or less than the Index performance times the leverage factor of two, before accounting for Accrued Fees and the Redemption Fee, if any. In particular, significant adverse monthly performances of your Securities may not be offset by subsequent beneficial monthly performances of equal magnitude.

➢ **Leverage risk** — The Securities are two times leveraged long with respect to the Index, which means that you may benefit two times from any positive, but will be exposed to two times any negative, monthly performance of the Index, before accounting for the Accrued Fees and Redemption Fee, if any.

Table of Contents

> **No interest or coupon payments on the Securities** — You will not receive any interest payments or coupon payments during the term of the Securities.

> **Market risk** — The return on the Securities, which may be positive or negative, is linked to the monthly compounded leveraged return on the Index as measured by the Index Factor, and which, in turn, is affected by a variety of market and economic factors, interest rates in the markets and economic, financial, political, regulatory, judicial or other events that affect the Index Constituent Securities or the markets generally.

> **Credit of issuer** — The Securities are senior unsecured debt obligations of the issuer, UBS, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. Any payment to be made on the Securities, including any payment at maturity or call, or upon acceleration or upon early redemption, depends on the ability of UBS to satisfy its obligations as they come due. As a result, the actual and perceived creditworthiness of UBS will affect the market value, if any, of the Securities prior to maturity or call, or upon acceleration or upon early redemption. In addition, in the event UBS were to default on its obligations, you may not receive any amounts owed to you under the terms of the Securities.

> **A trading market for the Securities may not develop** — Although we intend to list each series of the Securities on NYSE Arca, a trading market for the Securities may not develop. Certain affiliates of UBS may engage in limited purchase and resale transactions in the Securities of any series, although they are not required to and may stop at any time. We are not required to maintain any listing of any series of the Securities on NYSE Arca or any other exchange. In addition, we are not obliged to, and may not, sell the full aggregate principal amount of any series of the Securities shown on the cover of the applicable pricing supplement. We may suspend or cease sales of the Securities at any time, at our discretion. Therefore, the liquidity of any series of the Securities may be limited.

> **The Securities may not provide a hedge against price and/or value decreases or increases** — The Securities may not provide a hedge against a decrease or increase in the price and/or value of any asset, sector or index.

> **Minimum redemption amount** — You must elect to redeem at least 50,000 of the same series of the Securities for UBS to repurchase your Securities, unless we determine otherwise or your broker or other financial intermediary bundles your Securities for redemption with those of other investors (and of the same series) to reach this minimum requirement and there can be no assurance that they can or will do so. Therefore, the liquidity of the Securities may be limited.

> **Your redemption election is irrevocable** — You will not be able to rescind your election to redeem your Securities after your redemption notice is received by UBS. Accordingly, you will be exposed to market risk in the event market conditions change after UBS receives your offer and the Redemption Amount is determined on the Redemption Valuation Date.

> **Potential automatic acceleration** — In the event the indicative value of any series of the Securities is equal to $5.00 or less on any Trading Day or decreases 60% in value from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date, the Securities of that series will be automatically accelerated and mandatorily redeemed by UBS and you will receive a cash payment equal to the Acceleration Amount as determined during the applicable Measurement Period. The Acceleration Amount you receive on the Acceleration Settlement Date may be significantly less than $5.00 per Security and may be zero if the price of the Securities continues to decrease during trading on one or more Trading Days during such Measurement Period.

> **Uncertain tax treatment** — Significant aspects of the tax treatment of the Securities are uncertain. You should consult your own tax advisor about your own tax situation.

> **UBS's Call Right** — UBS may redeem all outstanding Securities at any time on or after the date specified in the applicable pricing supplement, as described under "General Terms of the Securities — UBS's Call Right" beginning on page S-37.

**Table of Contents**

The Securities may be a suitable investment for you if:

➢ You seek an investment with a return linked to a monthly compounded two times leveraged long performance of the relevant Index.

➢ You understand (i) leverage risk, including the risks inherent in maintaining a constant two times leverage on a monthly basis, and (ii) the consequences of seeking monthly leveraged investment results generally, and you intend to actively monitor and manage your investment.

➢ You believe the monthly compounded two times leveraged long performance of the Index will be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable.

➢ You are willing to accept the risk that you may lose some or all of your investment.

➢ You are willing to hold securities that may be redeemed early by UBS, pursuant to the UBS Call Right.

➢ You are willing to hold securities that have a long-term maturity (30 years).

➢ You are willing to hold securities that do not pay periodic interest or coupons.

➢ You are willing to accept the risk that the price at which you are able to sell the Securities in the secondary market may be significantly less than the amount you invested.

➢ You understand and accept the risks associated with the fact that significant aspects of the tax treatment of the Securities are uncertain.

➢ You are not seeking an investment for which there will be an active secondary market.

➢ You are willing to be exposed to the credit risk of UBS, as issuer of the Securities.

The Securities may *not* be a suitable investment for you if:

➢ You seek a guaranteed return of principal and you are not willing to accept the risk that you may lose some or all of your investment.

➢ You do not seek an investment with a return linked to a monthly compounded two times leveraged long performance of the relevant Index.

➢ You do not understand (i) leverage risk, including the risks inherent in maintaining a constant two times leverage on a monthly basis, and (ii) the consequences of seeking monthly leveraged investment results generally, and you do not intend to actively monitor and manage your investment.

➢ You do not believe the monthly compounded two times leveraged long performance of the Index will be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable.

➢ You are not willing to hold securities that may be redeemed early by UBS, pursuant to the UBS Call Right.

➢ You are not willing to hold securities that have a long-term maturity (30 years).

➢ You are not willing to accept the risk that the price at which you are able to sell the Securities in the secondary market may be significantly less than the amount you invested.

➢ You do not understand and do not accept the risks associated with the fact that significant aspects of the tax treatment of the Securities are uncertain.

➢ You seek an investment that will pay periodic interest or coupons.

➢ You seek an investment for which there will be an active secondary market.

➢ You are not willing to be exposed to the credit risk of UBS, as issuer of the Securities.

S-9

Table of Contents

### Who calculates and publishes the relevant Index?

The "Index Calculation Agent" will calculate the level of the relevant Index and will be named in the applicable pricing supplement. Levels of the relevant Index will be published approximately every 15 seconds (assuming that the level of such Index has changed within such 15-second interval) from 9:30 a.m. to 4:00 p.m., New York City time, and a daily Index Closing Level will be published at approximately 4:00 p.m., New York City time, on each Trading Day. The relevant Index information providers and relevant Index symbol will be specified in the applicable pricing supplement.

### What are the tax consequences of owning the Securities?

**The United States federal income tax consequences of your investment in the Securities are uncertain. Some of these tax consequences are summarized below, but we urge you to read the more detailed discussion under "Material U.S. Federal Income Tax Consequences" on page S-47.**

The tax treatment of your Securities will depend on their terms. Consequently, except to the extent the applicable pricing supplement indicates otherwise, the discussion below (including the tax opinion below) will not necessarily apply to your Securities. The summary below is subject to the assumptions, limitations and exceptions set forth under "Material U.S. Federal Income Tax Consequences" on page S-47.

Pursuant to the terms of the Securities, you and we agree, in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary, to characterize the Securities as a pre-paid derivative contract with respect to the Index. Under that treatment, you should generally recognize capital gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference between the amount realized and the amount you paid for your Securities. Such gain or loss should generally be long-term capital gain or loss if you held your Securities for more than one year. The deductibility of capital losses is subject to limitations.

**In the opinion of our counsel, Sullivan & Cromwell LLP, the Securities should be treated in the manner described above. However, because there is no authority that specifically addresses the tax treatment of the Securities, it is possible that the Securities could be treated for tax purposes in an alternative manner described under "Material U.S. Federal Income Tax Consequences — Alternative Treatments" on page S-48.**

The Internal Revenue Service ("IRS") released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current basis, whether additional gain or loss upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Internal Revenue Code of 1986, as amended (the "Code"), should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income over the term of an instrument such as the Securities. The outcome of this process is uncertain.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of

Table of Contents

the Securities despite the fact that there will be no interest payments over the term of the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. Except to the extent otherwise required by law, we intend to treat your Securities for United States federal income tax purposes in accordance with the treatment described above and under "Material U.S. Federal Income Tax Consequences" on page S-47 unless and until such time as the Treasury Department and IRS determine that some other treatment is more appropriate.

**Conflicts of Interest**

UBS Securities LLC is an affiliate of UBS and, as such, has a "conflict of interest" in any potential offering within the meaning of FINRA Rule 5121. In addition, UBS may receive the net proceeds from the offering of the Securities, thus creating an additional conflict of interest within the meaning of Rule 5121. Consequently, any offering will be conducted in compliance with the provisions of Rule 5121. UBS Securities LLC is not permitted to sell Securities in any offering to an account over which it exercises discretionary authority without the prior specific written approval of the account holder.

S-11

Table of Contents

# Hypothetical Examples

The following four examples illustrate how a hypothetical series of the Securities would perform at maturity or call, or upon early redemption, in hypothetical circumstances. We have included an example in which the Index Closing Level increases at a constant rate of 3.00% per month for twelve months (Example 1), as well as an example in which the Index Closing Level decreases at a constant rate of 3.00% per month for twelve months (Example 2). In addition, Example 3 shows the Index Closing Level increasing by 3.00% per month for the first six months and then decreasing by 3.00% per month for the next 6 months, whereas Example 4 shows the reverse scenario of the Index Closing Level decreasing by 3.00% per month for the first six months, and then increasing by 3.00% per month for the next six months. For ease of analysis and presentation, **the following four examples assume that the term of the Securities is twelve months, the last Trading Day of the Call Measurement Period, or the Redemption Valuation Date, occurs on the month end and that no acceleration upon minimum indicative value has occurred.**

The following assumptions are used in each of the four examples:

➢ the initial level for the relevant Index is 2500;

➢ the Redemption Fee Rate is 0.125%;

➢ the Financing Rate is 0.90%;

➢ the Current Principal Amount on the first day is $25.00; and

➢ the Annual Tracking Rate is 0.60%.

The examples highlight the effect of two times leverage and monthly compounding, and the impact of the Accrued Fees on the payment at maturity or call, or upon early redemption, under different circumstances. The assumed Financing Rate is not an indication of the Financing Rate throughout the term of any series of the Securities. The Financing Rate will change during the term of any series of the Securities, which will affect the performance of the Securities of that series.

Because the Accrued Fees take into account the monthly performance of the relevant Index, as measured by the Index Closing Level, the absolute level of the Accrued Fees are dependent on the path taken by the Index Closing Level to arrive at its ending level. The figures in these examples have been rounded for convenience. The Cash Settlement Amount figures for month twelve are as of the hypothetical Calculation Date, and given the indicated assumptions, a holder will receive payment at maturity in the indicated amount, according to the indicated formula.

S-12

Table of Contents

**Hypothetical Examples**

**Example 1: The Index Closing Level increases at a constant rate of 3.00% per month for twelve months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| | | ((Index Closing Level - Monthly Initial Closing Level)/Monthly Initial Closing Level) | (1 +(2 x C)) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2575.00 | 0.0300 | 1.060 | 0.0188 | $ 26.50 | $ 0.0131 | $ 0.0318 | $ 26.47 | $ 26.4369 |
| 2 | 2652.25 | 0.0300 | 1.060 | 0.0199 | $ 28.06 | $ 0.0138 | $ 0.0337 | $ 28.02 | $ 27.9895 |
| 3 | 2731.82 | 0.0300 | 1.060 | 0.0210 | $ 29.70 | $ 0.0146 | $ 0.0357 | $ 29.67 | $ 29.6332 |
| 4 | 2813.77 | 0.0300 | 1.060 | 0.0223 | $ 31.45 | $ 0.0155 | $ 0.0378 | $ 31.41 | $ 31.3735 |
| 5 | 2898.19 | 0.0300 | 1.060 | 0.0236 | $ 33.30 | $ 0.0164 | $ 0.0400 | $ 33.26 | $ 33.2160 |
| 6 | 2985.13 | 0.0300 | 1.060 | 0.0249 | $ 35.25 | $ 0.0174 | $ 0.0423 | $ 35.21 | $ 35.1667 |
| 7 | 3074.68 | 0.0300 | 1.060 | 0.0264 | $ 37.32 | $ 0.0184 | $ 0.0448 | $ 37.28 | $ 37.2319 |
| 8 | 3166.93 | 0.0300 | 1.060 | 0.0280 | $ 39.51 | $ 0.0195 | $ 0.0474 | $ 39.47 | $ 39.4185 |
| 9 | 3261.93 | 0.0300 | 1.060 | 0.0296 | $ 41.83 | $ 0.0206 | $ 0.0502 | $ 41.78 | $ 41.7334 |
| 10 | 3359.79 | 0.0300 | 1.060 | 0.0313 | $ 44.29 | $ 0.0218 | $ 0.0532 | $ 44.24 | $ 44.1843 |
| 11 | 3460.58 | 0.0300 | 1.060 | 0.0332 | $ 46.89 | $ 0.0231 | $ 0.0563 | $ 46.83 | $ 46.7791 |
| 12 | 3564.40 | 0.0300 | 1.060 | 0.0351 | $ 49.64 | $ 0.0245 | $ 0.0596 | $ 49.58 | $ 49.5263 |

**Cumulative Index Return:** 42.58%

**Return on Securities (assumes no early redemption):** 98.34%

---

\*     The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount

\*\*    Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations)

\*\*\*   Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations)

\*\*\*\*  *Previous* Current Principal Amount is also the Financing Level

\#     This is also the Call Settlement Amount

^     For month twelve, this is also the Cash Settlement Amount

Table of Contents

**Hypothetical Examples**

**Example 2: The Index Closing Level decreases at a constant rate of 3.00% per month for twelve months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| | | ((Index Closing Level - Monthly Initial Closing Level)/Monthly Initial Closing Level) | (1 + (2 x C )) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2425.00 | -0.0300 | 0.940 | 0.0188 | $ 23.50 | $ 0.0116 | $ 0.0303 | $ 23.47 | $ 23.4384 |
| 2 | 2352.25 | -0.0300 | 0.940 | 0.0176 | $ 22.06 | $ 0.0109 | $ 0.0285 | $ 22.03 | $ 22.0037 |
| 3 | 2281.68 | -0.0300 | 0.940 | 0.0165 | $ 20.71 | $ 0.0102 | $ 0.0267 | $ 20.68 | $ 20.6567 |
| 4 | 2213.23 | -0.0300 | 0.940 | 0.0155 | $ 19.44 | $ 0.0096 | $ 0.0251 | $ 19.42 | $ 19.3923 |
| 5 | 2146.84 | -0.0300 | 0.940 | 0.0146 | $ 18.25 | $ 0.0090 | $ 0.0236 | $ 18.23 | $ 18.2052 |
| 6 | 2082.43 | -0.0300 | 0.940 | 0.0137 | $ 17.14 | $ 0.0085 | $ 0.0221 | $ 17.11 | $ 17.0908 |
| 7 | 2019.96 | -0.0300 | 0.940 | 0.0128 | $ 16.09 | $ 0.0079 | $ 0.0208 | $ 16.07 | $ 16.0446 |
| 8 | 1959.36 | -0.0300 | 0.940 | 0.0120 | $ 15.10 | $ 0.0074 | $ 0.0195 | $ 15.08 | $ 15.0625 |
| 9 | 1900.58 | -0.0300 | 0.940 | 0.0113 | $ 14.18 | $ 0.0070 | $ 0.0183 | $ 14.16 | $ 14.1404 |
| 10 | 1843.56 | -0.0300 | 0.940 | 0.0106 | $ 13.31 | $ 0.0066 | $ 0.0172 | $ 13.29 | $ 13.2748 |
| 11 | 1788.25 | -0.0300 | 0.940 | 0.0100 | $ 12.49 | $ 0.0062 | $ 0.0161 | $ 12.48 | $ 12.4622 |
| 12 | 1734.61 | -0.0300 | 0.940 | 0.0094 | $ 11.73 | $ 0.0058 | $ 0.0151 | $ 11.71 | $ 11.6994 |

**Cumulative Index Return:**                                           -30.62%
**Return on Securities (assumes no early redemption):**    -53.14%

\*    The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount

\*\*    Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations)

\*\*\*    Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations)

\*\*\*\*    *Previous* Current Principal Amount is also the Financing Level

\#    This is also the Call Settlement Amount

^    For month twelve, this is also the Cash Settlement Amount

S-14

Table of Contents

Hypothetical Examples

**Example 3: The Index Closing Level increases by 3.00% per month for the first six months and then decreases by 3.00% per month for the next six months.**

| Month End | Index Closing Level* | Index Performance Ratio | Index Factor | Accrued Financing Charge for the Applicable Month** | Current Indicative Value | Accrued Tracking Fee for the Applicable Month*** | Accrued Fees for the Applicable Month | Current Principal Amount#^**** | Redemption Amount |
|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J |
| | | ((Index Closing Level - Monthly Initial Closing Level)/Monthly Initial Closing Level) | (1 + (2 x C )) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2575.00 | 0.0300 | 1.060 | 0.0188 | $ 26.50 | $ 0.0131 | $ 0.0318 | $ 26.47 | $ 26.4369 |
| 2 | 2652.25 | 0.0300 | 1.060 | 0.0199 | $ 28.06 | $ 0.0138 | $ 0.0337 | $ 28.02 | $ 27.9895 |
| 3 | 2731.82 | 0.0300 | 1.060 | 0.0210 | $ 29.70 | $ 0.0146 | $ 0.0357 | $ 29.67 | $ 29.6332 |
| 4 | 2813.77 | 0.0300 | 1.060 | 0.0223 | $ 31.45 | $ 0.0155 | $ 0.0378 | $ 31.41 | $ 31.3735 |
| 5 | 2898.19 | 0.0300 | 1.060 | 0.0236 | $ 33.30 | $ 0.0164 | $ 0.0400 | $ 33.26 | $ 33.2160 |
| 6 | 2985.13 | 0.0300 | 1.060 | 0.0249 | $ 35.25 | $ 0.0174 | $ 0.0423 | $ 35.21 | $ 35.1667 |
| 7 | 2895.58 | -0.0300 | 0.940 | 0.0264 | $ 33.10 | $ 0.0163 | $ 0.0427 | $ 33.05 | $ 33.0090 |
| 8 | 2808.71 | -0.0300 | 0.940 | 0.0248 | $ 31.07 | $ 0.0153 | $ 0.0401 | $ 31.03 | $ 30.9884 |
| 9 | 2724.45 | -0.0300 | 0.940 | 0.0233 | $ 29.17 | $ 0.0144 | $ 0.0377 | $ 29.13 | $ 29.0915 |
| 10 | 2642.71 | -0.0300 | 0.940 | 0.0218 | $ 27.38 | $ 0.0135 | $ 0.0354 | $ 27.35 | $ 27.3107 |
| 11 | 2563.43 | -0.0300 | 0.940 | 0.0205 | $ 25.71 | $ 0.0127 | $ 0.0332 | $ 25.67 | $ 25.6389 |
| 12 | 2486.53 | -0.0300 | 0.940 | 0.0193 | $ 24.13 | $ 0.0119 | $ 0.0312 | $ 24.10 | $ 24.0695 |

**Cumulative Index Return:**                                   -0.54%
**Return on Securities (assumes no early redemption):**        -3.59%

---

\*      The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount

\*\*     Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations)

\*\*\*   Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations)

\*\*\*\* *Previous* Current Principal Amount is also the Financing Level

\#      This is also the Call Settlement Amount

^      For month twelve, this is also the Cash Settlement Amount

S-15

Table of Contents

Hypothetical Examples

**Example 4: The Index Closing Level decreases by 3.00% per month for the first six months, and then increases by 3.00% per month for the next six months.**

| Month End A | Index Closing Level* B | Index Performance Ratio C | Index Factor D | Accrued Financing Charge for the Applicable Month** E | Current Indicative Value F | Accrued Tracking Fee for the Applicable Month*** G | Accrued Fees for the Applicable Month H | Current Principal Amount#^**** I | Redemption Amount J |
|---|---|---|---|---|---|---|---|---|---|
| | | ((Index Closing Level - Monthly Initial Closing Level )/Monthly Initial Closing Level) | (1 + (2 x C)) | (Previous Current Principal Amount x Financing Rate x Act/360) | (Previous Current Principal Amount x D)* | (Annual Tracking Rate x F x Act/365) | (E + G) | ((Previous Current Principal Amount x D) - H) | (I - Redemption Fee) |
| 1 | 2425.00 | -0.0300 | 0.940 | 0.0188 | $ 23.50 | $ 0.0116 | $ 0.0303 | $ 23.47 | $ 23.4384 |
| 2 | 2352.25 | -0.0300 | 0.940 | 0.0176 | $ 22.06 | $ 0.0109 | $ 0.0285 | $ 22.03 | $ 22.0037 |
| 3 | 2281.68 | -0.0300 | 0.940 | 0.0165 | $ 20.71 | $ 0.0102 | $ 0.0267 | $ 20.68 | $ 20.6567 |
| 4 | 2213.23 | -0.0300 | 0.940 | 0.0155 | $ 19.44 | $ 0.0096 | $ 0.0251 | $ 19.42 | $ 19.3923 |
| 5 | 2146.84 | -0.0300 | 0.940 | 0.0146 | $ 18.25 | $ 0.0090 | $ 0.0236 | $ 18.23 | $ 18.2052 |
| 6 | 2082.43 | -0.0300 | 0.940 | 0.0137 | $ 17.14 | $ 0.0085 | $ 0.0221 | $ 17.11 | $ 17.0908 |
| 7 | 2144.90 | 0.0300 | 1.060 | 0.0128 | $ 18.14 | $ 0.0089 | $ 0.0218 | $ 18.12 | $ 18.0972 |
| 8 | 2209.25 | 0.0300 | 1.060 | 0.0136 | $ 19.21 | $ 0.0095 | $ 0.0231 | $ 19.18 | $ 19.1600 |
| 9 | 2275.53 | 0.0300 | 1.060 | 0.0144 | $ 20.33 | $ 0.0100 | $ 0.0244 | $ 20.31 | $ 20.2852 |
| 10 | 2343.79 | 0.0300 | 1.060 | 0.0152 | $ 21.53 | $ 0.0106 | $ 0.0258 | $ 21.50 | $ 21.4765 |
| 11 | 2414.11 | 0.0300 | 1.060 | 0.0161 | $ 22.79 | $ 0.0112 | $ 0.0274 | $ 22.76 | $ 22.7378 |
| 12 | 2486.53 | 0.0300 | 1.060 | 0.0171 | $ 24.13 | $ 0.0119 | $ 0.0290 | $ 24.10 | $ 24.0731 |

| | |
|---|---|
| **Cumulative Index Return:** | **-0.54%** |
| **Return on Securities (assumes no early redemption):** | **-3.59%** |

\*      The Index Closing Level is also: (i) the Monthly Initial Closing Level for the following month; and (ii) the Index Valuation Level for calculating the Call Settlement Amount, the Redemption Amount and the Cash Settlement Amount

\*\*     Accrued Financing Charge are calculated on an act/360 basis (30-day months are assumed for the above calculations)

\*\*\*    Accrued Tracking Fee is calculated on an act/365 basis (30-day months are assumed for the above calculations)

\*\*\*\*   *Previous* Current Principal Amount is also the Financing Level

\#      This is also the Call Settlement Amount

^      For month twelve, this is also the Cash Settlement Amount

S-16

<u>Table of Contents</u>

**Hypothetical Examples**

*We cannot predict the actual Index Closing Level on any Trading Day or the market value of your Securities, nor can we predict the relationship between the Index Closing Level and the market value of your Securities at any time prior to the Maturity Date. The actual amount that a holder of the Securities will receive at maturity or call, upon acceleration or upon early redemption, as the case may be, and the rate of return on the Securities, will depend on the monthly compounded leveraged return of the relevant Index, and if positive, whether it will be sufficient to offset the negative effect of the Accrued Fees over the relevant period and, if applicable, the Redemption Fee. Moreover, the assumptions on which the hypothetical returns are based are purely for illustrative purposes. Consequently, the amount, in cash, to be paid in respect of your Securities, if any, on the Maturity Date, Call Settlement Date, Acceleration Settlement Date or the relevant Redemption Date, as applicable, may be very different from the information reflected in the tables above.*

**The hypothetical examples above are provided for purposes of information only. The hypothetical examples are not indicative of the future performance of the relevant Index on any Trading Day, the Index Valuation Level, or what the value of your Securities may be. Fluctuations in the hypothetical examples may be greater or less than fluctuations experienced by the holders of the Securities. The performance data shown above is for illustrative purposes only and does not represent the actual or expected future performance of the Securities.**

Table of Contents

# Risk Factors

Your investment in the Securities will involve significant risks. The Securities are not secured debt and are significantly riskier than ordinary unsecured debt securities. Unlike ordinary debt securities, the return on the Securities is linked to the performance of the relevant Index. The Securities are two times leveraged with respect to the relevant Index and, as a result, may benefit from two times any positive, but will be exposed to two times any negative, monthly performance of the relevant Index. As described in more detail below, the trading price of the Securities may vary considerably before the Maturity Date, due to events that are difficult to predict and beyond our control. Investing in the Securities is not equivalent to investing directly in the Index Constituent Securities or the Index itself. This section describes the most significant risks relating to an investment in the Securities. *We urge you to read the following information about these risks as well as the risks described under "Risk Factors" in the applicable pricing supplement and "Considerations Relating to Indexed Securities" in the accompanying prospectus, together with the other information in this product supplement and the accompanying prospectus, before investing in the Securities.*

**Even if the Index Valuation Level at maturity or call, or upon early redemption or acceleration, has increased relative to the Index Closing Level at the time you purchased the Securities, or the applicable Index Valuation Level is greater than the Index Closing Level on the Initial Trade Date, you may receive less than your initial investment in the Securities.**

Because the return on your Securities at maturity or call, or upon acceleration or upon early redemption, is dependent upon the month over month performance of the Index prior to the Maturity Date, Call Settlement Date, Acceleration Settlement Date or Redemption Date, and is also subject to Accrued Fees, even if the Index Valuation Level at maturity or call, or upon acceleration or upon early redemption, has increased relative to the Index Closing Level at the time you purchased the Securities, or the applicable Index Valuation Level is greater than the Index Closing level on the Initial Trade Date, there is no guarantee that you will receive a positive return on, or a full return of, your initial investment. The Accrued Fees will also reduce the Current Principal Amount. In addition, if you redeem your Securities prior to maturity, you will be charged a Redemption Fee equal to 0.125% of the product of the Current Principal Amount and the Index Factor as of the applicable Redemption Valuation Date. Further, the increase of the applicable Index Valuation Level relative to the Index Closing Level at the time you purchased the Securities may not be enough to offset prior months of adverse monthly performance, which could have reduced the Current Principal Amount below its value at the time you purchased the Securities. Similarly, any beneficial movement of the Index Closing Level during a month will not be reflected in the Current Principal Amount unless that beneficial movement is sustained at the end of the month.

**The Securities are not suitable for all investors. In particular, the Securities should be purchased only by investors who understand leverage risk and the consequences of seeking monthly compounded leveraged investment results, and who intend to actively monitor and manage their investments.**

The Securities are not suitable for all investors. In particular, the Securities entail leverage risk and should be purchased only by investors who understand leverage risk, including the risks inherent in maintaining a constant two times leverage on a monthly basis, and the consequences of seeking monthly compounded leveraged investment results generally. Investing in the Securities is not equivalent to a direct investment in the Index because the Current Principal Amount is reset each month, resulting in the compounding of monthly returns.

S-18

Table of Contents

Risk Factors

The Securities are designed to achieve their stated investment objective on a monthly basis, but their performance can differ significantly from their stated monthly objective because the relationship between the level of the Index and the Current Principal Amount of the Securities will begin to break down as the length of an investor's holding period increases. The Securities are not long term substitutes for long positions in the Index Constituent Securities.

Investors should carefully consider whether the Securities are appropriate for their investment portfolio. As discussed above, because the Securities are meant to provide leveraged exposure to changes in the monthly Index Closing Level, their performance over days, months or years can differ significantly from the performance of the Index during the same period of time. **Therefore, it is possible that you will suffer significant losses even if the long-term performance of the Index is positive. It is possible for the level of the Index to increase over time while the market value of the Securities declines over time. You should proceed with caution in considering an investment in the Securities.**

The Securities seek to provide a leveraged return based on the performance of the Index (as adjusted for the Accrued Fees). The Securities do not attempt to, and should not be expected to, provide returns that reflect leverage on the return of the Index for periods longer than a single month. The Securities rebalance their theoretical exposure on a monthly basis, increasing exposure in response to that month's gains or reducing exposure in response to that month's losses.

Monthly rebalancing will impair the performance of the Securities if the Index experiences volatility from month to month and such performance will be dependent on the path of monthly returns during the holder's holding period. At higher ranges of volatility, there is a significant chance of a complete loss of the value of the Securities even if the performance of the Index is flat.

The amount you receive at maturity or call, or upon acceleration or upon early redemption, will be contingent upon the monthly compounded leveraged performance of the Index during the term of the Securities. There is no guarantee that you will receive at maturity, call, or upon acceleration or upon early redemption, your initial investment back or any return on that investment. Significant adverse monthly performances for your Securities may not be offset by any beneficial monthly performances of the same magnitude.

**Due to the effect of compounding, if the Current Principal Amount increases, any subsequent adverse monthly performance will result in a larger dollar reduction from the Current Principal Amount than if the Current Principal Amount remained constant.**

If the Current Principal Amount increases, the dollar amount which you can lose in any single month from an adverse monthly performance will increase correspondingly so that the dollar amount lost will be greater than if the Current Principal Amount were maintained at a constant level. The compounding effect is magnified because the Accrued Fees are calculated and subtracted from the Current Principal Amount on a monthly basis, causing the net negative effect of the Accrued Fees to accumulate over time. This means that if you invest in the Securities, you could lose more than 2% of your initial investment for each 1% of adverse monthly performance of the Index.

**Due to the effect of compounding, if the Current Principal Amount decreases, any subsequent beneficial monthly performance will result in a smaller dollar increase on the Current Principal Amount than if the Current Principal Amount remained constant.**

If the Current Principal Amount decreases, the dollar amount which you can gain in any single month from a beneficial monthly performance will decrease correspondingly. This is because the Index Factor will be applied to a smaller Current Principal Amount. As such, the dollar amount which you can gain

S-19

Table of Contents

Risk Factors

from any beneficial monthly performance will be less than if the Current Principal Amount were maintained at a constant level. This means that if the Current Principal Amount decreases, it will take larger beneficial monthly performances to restore the value of your investment back to the amount of your initial investment than would have been the case if the Current Principal Amount were maintained at a constant level. The compounding effect is magnified because the Accrued Fees are calculated and subtracted from the Current Principal Amount on a monthly basis, causing the net negative effect of the Accrued Fees to accumulate over time. Further, if you invest in the Securities, you could gain less than 2% of your initial investment for each 1% of beneficial monthly performance.

**Investors in the Securities are unlikely to be exposed to exactly two times the performance of the Index (before accounting for the Accrued Fees) during the period of time that they hold the Securities.**

After the Current Principal Amount is reset on each Monthly Reset Date, the leverage to which investors will be exposed is unlikely to be exactly two times the performance of the Index. As the level of the Index increases or decreases after the Current Principal Amount is reset, the leverage exposure will vary. If an investor purchases the Securities at a point in time when the level of the Index has increased as compared to the Index Closing Level on the preceding Monthly Valuation Date, such investor will be exposed to *less* than two times the performance of the Index (before accounting for the Accrued Fees). If the level of the index decreases as compared to the Closing Index Level on the Monthly Valuation Date, such investor will be exposed to *more* than two times the performance of the Index (before accounting for the Accrued Fees). Such increased or decreased exposure will last until the next Monthly Reset Date when the Current Principal Amount of the Securities is reset again.

**The Accrued Financing Charge may be greater than financing costs that you would incur if you borrowed funds from a third party.**

The Accrued Financing Charge seeks to compensate UBS for providing investors with the potential to receive a leveraged participation in movements in the level of the Index, and is intended to approximate the financing costs that investors may have otherwise incurred had they sought to borrow funds at a similar rate from a third party to invest in the Securities. However, there is no guarantee that the Accrued Financing Charge will correspond to the lowest level of financing costs that may be available to you. If the Accrued Financing Charge is greater than the financing costs you may otherwise incur or accrue from borrowing available funds from a third party for the same time period, your return on the Securities may be less than your return on an investment in a different instrument linked to the performance of the Index where you used funds borrowed on more favorable terms from the third party to leverage your investment in such instrument.

**Changes in the LIBOR rate may affect the value of your Securities.**

Your payment at maturity or call, or upon acceleration or upon early redemption, will be reduced, in part, by the Accrued Financing Charge over the relevant period, which is linked, in part, to the three-month U.S. Dollar LIBOR rate increased by the Financing Spread. As a result, if the three-month U.S. Dollar LIBOR rate increases during the term of the Securities, the Accrued Financing Charge will increase at a faster rate, which will reduce the amount payable on your Securities at maturity or call, or upon acceleration or redemption, and may adversely affect the market value of your Securities.

In addition, concerns about the under-reporting and manipulation of interbank lending rates, which are used to calculate LIBOR, have existed since 2008. Final rules for the regulation and supervision of LIBOR by the Financial Conduct Authority (the "FCA") were published and came into effect on April 2, 2013 (the "FCA Rules"). In particular, the FCA Rules include requirements that (1) an independent LIBOR administrator monitor and survey LIBOR submissions to identify breaches of practice standards and/or potentially manipulative behavior, and (2) firms submitting data to LIBOR establish and maintain

Table of Contents

Risk Factors

a clear conflicts of interest policy and appropriate systems and controls. In addition, ICE Benchmark Rate Administration Ltd. (the "ICE Administration") has been appointed as the independent LIBOR administrator, effective February 1, 2014.

It is not possible to predict the effect of the FCA Rules, any changes in the methods pursuant to which the LIBOR rates are determined and any other reforms to LIBOR that will be enacted in the U.K. and elsewhere, which may adversely affect the trading market for LIBOR-based securities. Any such changes or reforms to LIBOR may result in a sudden or prolonged increase or decrease in reported LIBOR rates, which could have an adverse impact on the value of your Securities. In addition, any changes announced by the FCA, the ICE Administration or any other successor governance or oversight body, or future changes adopted by such body, in the method pursuant to which the LIBOR rates are determined may result in a sudden or prolonged increase or decrease in the reported LIBOR rates. If that were to occur, the Accrued Financing Charges and the value of your Securities may be affected.

## Credit of UBS.

The Securities are senior unsecured debt obligations of the issuer, UBS, and are not, either directly or indirectly, an obligation of or guaranteed by any third party. Any payment to be made on the Securities, including any payment at maturity or call, or upon acceleration or upon early redemption, depends on the ability of UBS to satisfy its obligations as they come due. As a result, the actual and perceived creditworthiness of UBS will affect the market value, if any, of the Securities prior to maturity or call, or upon acceleration or upon early redemption. In addition, in the event UBS were to default on its obligations, you may not receive any amounts owed to you under the terms of the Securities.

### You will not receive interest payments or coupon payments on the Securities.

You will not receive any periodic interest payments, coupon payments or other distributions on the Securities. No payments will be made on your notes prior to the Stated Maturity Date, Call Settlement Date, Redemption Date or Acceleration Settlement Date, as applicable. Further, as described above, there is no guarantee that you will receive at maturity, call, or upon acceleration or upon early redemption, your initial investment back or any return on that investment.

### The Index Valuation Level as of the last Trading Day of the applicable Measurement Period may be less than the Index Closing Level on the Maturity Date, Call Settlement Date or Acceleration Settlement Date, or at other times during the term of the Securities.

The Index Closing Level on the Maturity Date, Call Settlement Date or Acceleration Settlement Date, or at other times during the term of the Securities, including dates near the applicable Measurement Period could be higher than the Index Valuation Level as of the last Trading Day of such Measurement Period because such Index Valuation Level is calculated based on the Index Closing Levels measured on each Trading Day in such Measurement Period. This difference could be particularly large if there is a significant decrease in the Index Closing Levels during the applicable Measurement Period or if there is significant volatility in the Index Closing Levels during the term of the Securities.

### The Securities may be automatically accelerated and mandatorily redeemed, resulting in a loss of some or all of your investment.

In the event the indicative value for any series of the Securities on any Trading Day equals $5.00 or less or decreases 60% in value from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date, all issued and outstanding Securities of that series will be automatically accelerated and mandatorily redeemed by UBS and holders of that series of Securities will receive the Acceleration Amount as determined by the Calculation Agent as described herein. The Acceleration Amount you receive on the Acceleration Settlement Date may be significantly less than $5.00 per Security

Table of Contents

Risk Factors

and may be zero if the level of the Index continues to decrease during one or more Trading Days during the applicable Measurement Period. As a result, depending on the level of the Index on such Trading Day, you may lose some or all of your investment. The Securities of any series will be automatically accelerated and redeemed even if the indicative value on that Trading Day or any subsequent Trading Day would exceed $5.00 or increases from the -60% level, as compared to the previous Monthly Valuation Date. High volatility and/or unexpected market conditions could result in significant movements in the level of the relevant Index, which, in turn, may trigger the automatic acceleration and mandatory redemption of the Securities.

### There are restrictions on the minimum number of Securities you may redeem and on the procedures and timing for early redemption.

You must redeem at least 50,000 Securities of the same series of Securities at one time in order to receive payment for your Securities on any Redemption Date. You may only receive payment for your Securities on a Redemption Date if we receive a notice of redemption from your broker by no later than 12:00 noon (New York City time) and a confirmation of redemption by no later than 5:00 p.m. (New York City time) on the Trading Day prior to the applicable Redemption Valuation Date. If we do not receive your notice of redemption by 12:00 noon (New York City time), or the confirmation of redemption by 5:00 p.m. (New York City time) on the Trading Day prior to the applicable Redemption Valuation Date, your notice will not be effective and you will not receive payment for your Securities on the applicable Redemption Date. Your notice of redemption will not be effective until we confirm receipt. In addition, we may request a medallion signature guarantee or such assurances of delivery as we may deem necessary in our sole discretion. See "General Terms of the Securities — Early Redemption at the Option of the Holders" on page S-35 for more information.

### You will not know the Redemption Amount at the time you elect to request that we redeem your Securities.

You will not know the Redemption Amount you will receive at the time you elect to request that we redeem your Securities. Your notice to us to redeem your Securities is irrevocable and must be received by us no later than 12:00 noon, New York City time, on the Trading Day immediately preceding the applicable Redemption Valuation Date and a completed and signed confirmation of such redemption must be received by us no later than 5:00 p.m., New York City time, on the same date. The Redemption Valuation Date is the first Trading Day following the date on which such notice and confirmation are received by us. You will not know the Redemption Amount until after the Redemption Valuation Date, and we will pay you the Redemption Amount, if any, on the Redemption Date, which is the third Business Day following the Redemption Valuation Date. As a result, you will be exposed to market risk in the event the market fluctuates after we confirm the validity of your notice of election to exercise your rights to have us redeem your Securities, and prior to the relevant Redemption Date.

### Owning the Securities is not the same as owning interests in the Index Constituents or a security directly linked to the performance of the Index.

The return on your Securities will not reflect the return you would have realized if you had actually owned interests in the Index Constituents or a security directly linked to the leveraged performance of the Index, and held such investment for a similar period. Any return on your Securities is subject to correlation and compounding risk (because the Current Principal Amount resets monthly) and also includes the negative effect of the Accrued Fees and any Redemption Fee. Furthermore, if the Index Closing Level increases during the term of the Securities, the market value of the Securities may not increase by twice the same amount or may even decline due to the amount of the Accrued Fees, any lack of liquidity, the actual or perceived credit of UBS and other potential factors and the effect of leveraged monthly compounding. Neither you nor any other holder or owner of the Securities will have any voting

S-22

Table of Contents

Risk Factors

rights, any right to receive distributions or any other rights with respect to the Index Constituent Securities. The Cash Settlement Amount, Call Settlement Amount, Acceleration Amount or Redemption Amount, if any, will be paid in U.S. dollars, and you will have no right to receive delivery of any interests in the Index Constituents.

**If UBS were to be subject to restructuring proceedings, the market value of the Securities may be adversely affected.**

Under certain circumstances, the Swiss Financial Market Supervisory Authority (FINMA) has the power to open restructuring or liquidation proceedings in respect of, and/or impose protective measures in relation to, UBS, which proceedings or measures may have a material adverse effect on the terms and market value of the Securities and/or the ability of UBS to make payments thereunder. Pursuant to article 25 et seq. of the Swiss Banking Act, FINMA has broad statutory powers to take measures and actions in relation to UBS if it (i) is overindebted, (ii) has serious liquidity problems or (iii) fails to fulfill the applicable capital adequacy provisions after expiration of a deadline set by FINMA. If one of these prerequisites is met, FINMA is authorized to open restructuring proceedings (*Sanierungsverfahren*) or liquidation (bankruptcy) proceedings (*Bankenkonkurs*) in respect of, and/or impose protective measures (*Schutzmassnahmen*) in relation to, UBS. The Swiss Banking Act, as last amended as of January 1, 2013, grants *significant* discretion to FINMA in connection with the aforementioned proceedings and measures. In particular, a broad variety of protective measures may be imposed by FINMA, including a bank moratorium (*Stundung*) or a maturity postponement (*Fälligkeitsaufschub*), which measures may be ordered by FINMA either on a stand-alone basis or in connection with restructuring or liquidation proceedings. In a restructuring proceeding, the resolution plan may, among other things, (a) provide for the transfer of UBS's assets or a portion thereof, together with debts and other liabilities, and contracts of UBS, to another entity, (b) provide for the conversion of UBS's debt and/or other obligations, including its obligations under the notes, into equity, and/or (c) potentially provide for haircuts on obligations of UBS, including its obligations under the Securities. As of the date of this product supplement, there are no precedents as to what impact the revised regime would have on the rights of holders of the Securities or the ability of UBS to make payments thereunder if one or several of the measures under the revised insolvency regime were imposed in connection with a resolution of UBS.

**The market value of the Securities may be influenced by many unpredictable factors.**

The market value of your Securities may fluctuate between the date you purchase them and the last Trading Day in the applicable Measurement Period, when the Calculation Agent will determine your payment at maturity (if they are not subject to a call, early redemption or acceleration). Therefore, you may sustain a significant loss if you sell the Securities in the secondary market. Several factors, many of which are beyond our control, will influence the market value of the Securities. We expect that, generally, the level of the relevant Index will affect the market value of the Securities more than any other factor. Other factors that may influence the market value of the Securities include:

> ➢ the volatility of the relevant Index (*i.e.*, the frequency and magnitude of changes in the level of the Index);

> ➢ the market prices of the Index Constituent Securities;

> ➢ the dividend or distribution rate paid by the Index Constituents;

> ➢ the time remaining to the maturity of the Securities;

> ➢ supply and demand for the Securities, including to the extent affected by inventory positions with UBS or any market maker;

> ➢ the amount of the Accrued Fees;

Table of Contents

Risk Factors

- ➢ economic, financial, political, regulatory, geographical, judicial or other events that affect the level of the Index or the market prices of the Index Constituent Securities, or that affect markets generally; and

- ➢ the actual and perceived creditworthiness of UBS.

These factors interrelate in complex ways, and the effect of one factor on the market value of your Securities may offset or enhance the effect of another factor in an unpredictable manner, which could negatively affect the market value of the Securities.

**The Securities may trade at a substantial premium to or discount from the intraday indicative value.**

The market value of the Securities is influenced by many unpredictable factors, some of which may cause the price at which the Securities can be sold in the secondary market to vary substantially from the intraday indicative value that is calculated and disseminated throughout trading hours. For example, if UBS were to suspend sales of the Securities for any reason, the liquidity of the market for the Securities could be affected, potentially leading to insufficient supply, causing the market price of the Securities to increase. Such an increase could represent a premium over the intraday indicative value. Conversely, unpredictable factors could cause the Securities to trade at a discount from the intraday indicative value, which may result in a loss of your investment if you sell your Securities in the secondary market.

**The Index Calculation Agent may, in its sole discretion, discontinue the public disclosure of the intraday indicative value of the relevant Index and the end-of-day official closing value of the relevant Index.**

We intend to list each series of the Securities on NYSE Arca. The Index Calculation Agent specified in the applicable pricing supplement will not be under any obligation to continue to calculate the intraday indicative value of the relevant Index and end-of-day official closing value of that Index or required to calculate similar values for any successor index. If the Index Calculation Agent discontinues such public disclosure, we may not be able to provide the intraday indicative values related to the relevant Index required to maintain any listing of that series of the Securities on NYSE Arca. If that series of the Securities later becomes delisted, the liquidity of the market for that series of the Securities may be materially and adversely affected and you may sustain significant losses if you sell your Securities of that series in the secondary market. We are not required to maintain any listing of any series of the Securities on NYSE Arca or any other exchange.

The Index Sponsor of the relevant Index may adjust that Index in a way that affects the Index Closing Level. The Index Sponsor has no obligation to consider your interests as a holder of the Securities.

The Index Calculation Agent specified in the applicable pricing supplement will be responsible for calculating and publishing the Index in consultation with the Index Sponsor. The Index Sponsor can add, delete or substitute the securities underlying the relevant Index or make other methodological changes that could change the Index Closing Level. You should realize that the changing of securities included in the relevant Index may affect that Index, as a newly added security may perform significantly better or worse than the security or securities it replaces. Additionally, the Index Sponsor or the Index Calculation Agent, as applicable, may alter, discontinue or suspend calculation or dissemination of the relevant Index. Any of these actions could adversely affect the value of a series of the Securities. Neither the Index Sponsor nor the Index Calculation Agent will have any obligation to consider your interests as a holder of the Securities in calculating or revising the Index.

S-24

Table of Contents

Risk Factors

## Changes in our credit ratings may affect the market value of the Securities.

Our credit ratings are an assessment of our ability to pay our obligations, including those on the Securities. Consequently, actual or anticipated changes in our credit ratings may affect the market value of the Securities. However, because the return on the Securities is dependent upon certain factors in addition to our ability to pay our obligations on the Securities, an improvement in our credit ratings will not reduce the other investment risks related to the Securities. Therefore, an improvement in our credit ratings may or may not have a positive effect on the market value of the Securities, and in addition, a deterioration in our credit ratings may have a negative effect on the market value of the Securities.

## The liquidity of the market for the Securities may vary materially over time, and may be limited if you do not hold at least 50,000 Securities of the same series.

We intend to sell a portion of the Securities of each series on the applicable Initial Trade Date, and the remainder of the Securities of that series may be offered and sold from time to time, through UBS Securities LLC, our affiliate, as agent, to investors and dealers acting as principals. Also, the number of any series of Securities outstanding or held by persons other than our affiliates could be reduced at any time due to early redemptions of the Securities of that series. We may suspend or cease sales of any series of the Securities at any time, at our discretion. Accordingly, the liquidity of the market for any series of the Securities could vary materially over the term of the Securities. While you may elect to redeem your Securities prior to maturity, early redemption is subject to the conditions and procedures described elsewhere in this product supplement, including the condition that you must redeem at least 50,000 Securities of the same series at one time in order to receive payment for your Securities on any Redemption Date. Furthermore, on a Call Settlement Date specified in the applicable pricing supplement, through and including the Maturity Date, we may redeem all, but not less than all, issued and outstanding Securities of any series.

## Changes that affect the composition and calculation of the relevant Index will affect the market value of the Securities and the Cash Settlement Amount, Call Settlement Amount, Acceleration Amount or Redemption Amount.

The amount payable on the Securities of any series and their market value could be affected if the applicable Index Sponsor, in its sole discretion, discontinues or suspends calculation of the relevant Index, or if the Index is otherwise unavailable, in which case it may become difficult to determine the market value of the Securities of that series. If events such as these occur, or if the Index Valuation Level is not available because of a market disruption event or for any other reason, the Calculation Agent will make a good faith estimate in its sole discretion of the Index Valuation Level that would have prevailed in the absence of the market disruption event. If the Calculation Agent determines that the publication of the relevant Index is discontinued, or is otherwise unavailable, and that there is no successor index on the date when the Index Valuation Level is required to be determined, the Calculation Agent will determine the Index Valuation Level using the closing levels and published share weightings of each Index Constituent Security included in the relevant Index or Successor Index, as applicable, immediately prior to such discontinuation or unavailability, as adjusted for certain corporate actions as described in the description of the relevant Index included in the applicable pricing supplement.

## Estimated historical and historical levels of the relevant Index should not be taken as an indication of future performance during the term of the Securities of any series.

The actual performance of the relevant Index over the term of the Securities of any series, as well as the amount payable at maturity or call, or upon acceleration or upon early redemption, may bear little relation to the historical performance of that Index, which may be limited as of the date of the applicable pricing supplement, or the past estimated historical performance of that Index. The performance of the

**Table of Contents**

Risk Factors
_____

relevant Index Constituent Securities will determine the Index Valuation Level on any given Redemption Date, the last Trading Day of the applicable Measurement Period, or the Index Closing Level at other times during the term of the Securities. As a result, it is impossible to predict whether the level of the relevant Index will rise or fall during the term of the Securities.

**There may not be an active trading market in the Securities of any series; sales in the secondary market may result in significant losses.**

We intend to list each series of the Securities on NYSE Arca. However, we are not required to maintain any listing of any series of the Securities on NYSE Arca or any other exchange. Certain affiliates of UBS may engage in limited purchase and resale transactions in the Securities of any series, although they are not required to do so and may stop at any time. As a result, if an active secondary market develops, we expect that investors will purchase and sell the Securities primarily in this secondary market. Even if an active secondary market for the Securities of any series develops, it may not provide significant liquidity or trade at prices advantageous to you. As a result, if you sell your Securities in the secondary market, you may have to do so at a discount from the issue price or the intraday indicative value of the Securities of that series and you may suffer significant losses of any series of Securities.

**Trading and other transactions by UBS or its affiliates in the Index Constituent Securities, futures, options, exchange-traded funds or other derivative products on such securities or the relevant Index may impair the market value of the Securities of that series, could trigger an acceleration upon minimum indicative value and, upon the occurrence of an acceleration upon minimum indicative value, could adversely affect the Acceleration Amount.**

As described below under "Use of Proceeds and Hedging" on page S-46, UBS or its affiliates may hedge their obligations under any series of the Securities by purchasing the relevant Index Constituent Securities, futures or options on those securities or the relevant Index, or exchange-traded funds or other derivative instruments with returns linked or related to changes in the performance of those securities or the relevant Index, and they may adjust these hedges by, among other things, purchasing or selling those Index Constituent Securities, futures, options, or exchange-traded funds or other derivative instruments with returns linked or related to changes in the performance of those securities or the relevant Index at any time. Although they are not expected to, any of these hedging activities may adversely affect the market price of such Index Constituent Securities and/or the level of the relevant Index and, therefore, the market value of the series of the Securities. It is possible that UBS or its affiliates could receive substantial returns from these hedging activities while the market value of the Securities of that series declines.

UBS or its affiliates may also engage in trading in the relevant Index Constituent Securities and other investments relating to those securities or the relevant Index on a regular basis as part of our general broker-dealer and other businesses, for proprietary accounts, for other accounts under management or to facilitate transactions for customers, including block transactions. Any of these activities could adversely affect the market price of those Index Constituent Securities and the level of the relevant Index and, therefore, the market value of the Securities of the affected series. UBS or its affiliates may also issue or underwrite the relevant Index Constituent Securities or other securities or financial or derivative instruments with returns linked or related to changes in the performance of the Index Constituent Securities or the relevant Index. By introducing competing products into the marketplace in this manner, UBS or its affiliates could adversely affect the market value of the Securities of any series.

Any of these activities could adversely affect the level of the relevant Index and, therefore, the indicative value of the Securities of any series, which could trigger an acceleration upon minimum indicative value of that series of Securities. In addition, we would expect to continue to engage in these activities during

S-26

Table of Contents

Risk Factors
_____

the Acceleration Measurement Period; accordingly, these activities could have an adverse effect on the Acceleration Amount for that series of Securities. Furthermore, any of these activities, if occurring during the applicable Measurement Period or on any Redemption Valuation Date, could adversely affect the payment at maturity, call or redemption of any series of the Securities.

**We and our affiliates may publish research, express opinions or provide recommendations that are inconsistent with investing in or holding the Securities of any series. Any such research, opinions or recommendations could affect the level of the Index Constituent Securities, the relevant Index or the market value of the Securities of that series.**

UBS and its affiliates publish research from time to time on stocks or commodities and other matters that may influence the value of any series of the Securities, or express opinions or provide recommendations that are inconsistent with purchasing or holding the Securities of that series. Any research, opinions or recommendations expressed by UBS or its affiliates may not be consistent with each other and may be modified from time to time without notice. Investors should make their own independent investigation of the merits of investing in the Securities and the Index to which that series of the Securities is linked.

**The business activities of UBS or its affiliates may create conflicts of interest.**

As noted above, UBS and its affiliates expect to engage in trading activities related to the relevant Index and the Index Constituent Securities that are not for the account of holders of any series of the Securities or on their behalf. These trading activities may present a conflict between the holders' interest in the Securities and the interests UBS and its affiliates will have in their proprietary accounts, in facilitating transactions, including options and other derivatives transactions, for their customers and in accounts under their management. These trading activities, if they influence the level of the relevant Index, could have an adverse impact on the market value of that series of the Securities.

**There are potential conflicts of interest between you and the Calculation Agent.**

Our affiliate, UBS Securities LLC, will serve as the Calculation Agent. UBS Securities LLC will, among other things, decide the amount of the return paid out to you on the Securities at maturity or call, or upon acceleration or upon early redemption. For a fuller description of the Calculation Agent's role, see "General Terms of the Securities — Calculation Agent" on page S-40. The Calculation Agent will exercise its judgment when performing its functions. For example, the Calculation Agent may have to determine whether a market disruption event affecting the Index Constituent Securities or the relevant Index has occurred or is continuing on a day during the applicable Measurement Period or on the Redemption Valuation Date. This determination may, in turn, depend on the Calculation Agent's judgment whether the event has materially interfered with our ability to unwind our hedge positions. Since these determinations by the Calculation Agent may affect the market value of any series of the Securities, the Calculation Agent may have a conflict of interest if it needs to make any such decision.

**The Calculation Agent can postpone the determination of the Index Valuation Level and thus the applicable Redemption Date, the Call Settlement Date, the Acceleration Settlement Date or the Maturity Date if a market disruption event occurs on the Redemption Valuation Date or during the applicable Measurement Period.**

The determination of the Index Valuation Level may be postponed if the Calculation Agent determines that a market disruption event has occurred or is continuing during the applicable Measurement Period or on the Redemption Valuation Date. If such a postponement occurs, then the Calculation Agent will instead use the Index Closing Level on the first Trading Day after that day on which no market disruption event occurs or is continuing. In no event, however, will the last Trading Day of the applicable

S-27

Table of Contents

Risk Factors

Measurement Period or the Redemption Valuation Date, for any series of the Securities be postponed by more than three Trading Days. As a result, the applicable Redemption Date, the Call Settlement Date or the Maturity Date for the Securities could also be postponed, although not by more than three Trading Days. If the last Trading Day of the applicable Measurement Period or the Redemption Valuation Date, is postponed to the last possible day, but a market disruption event occurs or is continuing on such last possible day, that day will nevertheless be the final Trading Day in the applicable Measurement Period or will be the Redemption Valuation Date, as applicable. If a market disruption event is occurring on the last possible day in the applicable Measurement Period or on the Redemption Valuation Date, then the Calculation Agent will make a good faith estimate in its sole discretion of the Index Closing Level that would have prevailed in the absence of the market disruption event. See "General Terms of the Securities — Market Disruption Event" on page S-40.

**The Calculation Agent can postpone the determination of the Index Closing Level and thus the applicable Monthly Valuation Date if a market disruption event occurs on the Monthly Valuation Date.**

The determination of the Index Closing Level may be postponed if the Calculation Agent determines that a market disruption event has occurred or is continuing on any Monthly Valuation Date. If such a postponement occurs, then the Calculation Agent will instead use the Index Closing Level on the first Trading Day on which no Market Disruption Event with respect to the relevant Index occurs or is continuing and the Monthly Reset Date will be the next following Trading Day. In no event, however, will the Monthly Valuation Date for the Securities of any series be postponed by more than three Trading Days. As a result, the applicable Monthly Reset Date for the Securities of that series could also be postponed, although not by more than three Trading Days. If the Monthly Valuation Date is postponed to the last possible day, but a market disruption event occurs or is continuing on such last possible day, that day will nevertheless be the Monthly Valuation Date and the Monthly Reset Date will be the next following Trading Day. If a market disruption event is occurring on the Monthly Valuation Date, then the Calculation Agent will make a good faith estimate in its sole discretion of the Index Closing Level that would have prevailed in the absence of the market disruption event. See "General Terms of the Securities — Market Disruption Event" on page S-40.

**UBS may redeem any series of the Securities prior to the Maturity Date.**

On any Call Settlement Date specified in the applicable pricing supplement, UBS may redeem all, but not less than all, the outstanding Securities of the series offered by that pricing supplement upon not less than eighteen calendar days' prior notice.

If UBS elects to redeem your Securities pursuant to the UBS Call Right, you may not be able to reinvest at comparable terms or returns. If the Securities have increased in value, you may have to invest your proceeds in a lower-return investment.

**Significant aspects of the tax treatment of the Securities are uncertain.**

Significant aspects of the tax treatment of the Securities are uncertain. We do not plan to request a ruling from the IRS regarding the tax treatment of the Securities, and the IRS or a court may not agree with the tax treatment described in this product supplement. Please read carefully the section entitled "What are the tax consequences of owning the Securities?" in the summary section on page S-10, "Material U.S. Federal Income Tax Consequences" on page S-47, and the section "U.S. Tax Considerations" in the accompanying prospectus. You should consult your tax advisor about your own tax situation.

The IRS released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current

S-28

Table of Contents

**Risk Factors**

basis, whether additional gain or loss upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Code should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income over the term of an instrument such as the Securities. The outcome of this process is uncertain.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of the Securities despite the fact that there will be no interest payments over the term of the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. We intend to treat your Securities for United States federal income tax purposes in accordance with the treatment described above and under "Material U.S. Federal Income Tax Consequences" on page S-47 unless and until such time as there is a change in law or the Treasury Department or IRS determines that some other treatment is more appropriate.

S-29

Table of Contents

# Valuation of the Index and the Securities

**Intraday Index Values**

On each Trading Day, the Index Calculation Agent will calculate and publish the intraday indicative value of the relevant Index every 15 seconds during normal trading hours on Bloomberg L.P. ("Bloomberg") or any other publicly available information provider specified in the applicable pricing supplement under a ticker symbol to be identified in such pricing supplement. The actual relevant Index Closing Level may vary, and on a cumulative basis over the term of any series of the Securities may vary significantly, from the intraday indicative value of the Index.

The intraday indicative calculation of the level of the relevant Index will be provided for reference purposes only. Published calculations of the level of the relevant Index from the Index Calculation Agent may occasionally be subject to delay or postponement. Any such delays or postponements will affect the current level of the relevant Index and therefore the value of the affected series of Securities in the secondary market. The intraday indicative value of the relevant Index published every 15 seconds will be based on the intraday prices of the Index Constituent Securities.

**Intraday Security Values**

An intraday "indicative value" meant to approximate the expected trading value of each series of the Securities in a liquid market, will be calculated by the Index Calculation Agent specified in the applicable pricing supplement and published to Bloomberg (based in part on information provided by such Index Calculation Agent) or any other publicly available information provider specified in the applicable pricing supplement (or a successor) via the facilities on the Consolidated Tape Association under a symbol to be identified in such pricing supplement. In connection with your Securities, we use the term "indicative value" to refer to the value at a given time and date equal to (i) Current Principal Amount multiplied by the Index Factor calculated using the intraday indicative value of the relevant Index as of such time as the Index Valuation Level, minus (ii) the Accrued Fees as of such time and date, assuming such time and date is the Redemption Valuation Date.

The intraday indicative value calculation will be used to determine whether any series of the Securities will be accelerated, as discussed under "General Terms of the Securities — Acceleration Upon Minimum Indicative Value". It is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, or termination of your Securities, nor will it reflect hedging or other transactional costs, credit considerations, market liquidity or bid-offer spreads. The levels of the relevant Index provided by the Index Calculation Agent specified in the applicable pricing supplement will not necessarily reflect the depth and liquidity of the relevant Index Constituent Securities. For this reason and others, the actual trading price of the Securities of any series may be different from their indicative value.

The calculation of the intraday indicative value shall not constitute a recommendation or solicitation to conclude a transaction at the level stated, and should not be treated as giving investment advice.

The publishing of the intraday indicative value of any series of the Securities by Bloomberg or any other publicly available information provider specified in the applicable pricing supplement may occasionally be subject to delay or postponement. The actual trading price of any series of the Securities may be different from their intraday indicative value. The intraday indicative value of any series of the Securities published at least every 15 seconds during the NYSE Arca's Core Trading Session, which is currently from 9:30 a.m. to 4:00 p.m., New York City time, will be based on the intraday indicative values of the relevant Index, and may not be equal to the payment at maturity or call, or upon early redemption or acceleration.

S-30

Table of Contents

**Valuation of the Index and the Securities**

These intraday indicative value calculations will be prepared as of a particular time and date and will therefore not reflect subsequent changes in market values or prices or in any other factors relevant to their determination.

## Split or Reverse Split of the Securities

Should the Current Principal Amount of any series of Securities on any Trading Day be above $100.00, we may, but are not obligated to, initiate a 4-for-1 split of your Securities. Should the Current Principal Amount on any Trading Day be below $10.00, we may, but are not obligated to, initiate a 1-for-4 reverse split of your Securities. If the Current Principal Amount of a series of Securities is greater than $100.00 or below $10.00 on any Trading Day, and we decide to initiate a split or reverse split, as applicable, such date shall be deemed to be the "announcement date", and we will issue a notice to holders of the relevant Securities and press release announcing the split or reverse split, specifying the effective date of the split or reverse split.

If the Securities undergo a split, we will adjust the terms of the Securities accordingly. If the Securities undergo a 4:1 split, every investor who holds a Security via The Depository Trust Company ("DTC") on the relevant record date will, after the split, hold four Securities, and adjustments will be made as described below. The record date for the split will be the tenth Business Day after the announcement date. The Current Principal Amount on such record date will be divided by four to reflect the 4:1 split of your Securities. Any adjustment of the Current Principal Amount will be rounded to eight decimal places. The split will become effective at the opening of trading of the Securities on the Business Day immediately following the record date.

In the case of a reverse split, we reserve the right to address odd numbers of Securities (commonly referred to as "partials") in a manner determined by us in our sole discretion. If the Securities undergo a 1:4 reverse split, every investor who holds four Securities via DTC on the relevant record date will, after the reverse split, hold only one Security and adjustments will be made as described below. The record date for the reverse split will be on the tenth Business Day after the announcement date. The Current Principal Amount on such record date will be multiplied by four to reflect the 1:4 reverse split of your Securities. Any adjustment of the Current Principal Amount will be rounded to eight decimal places. The reverse split will become effective at the opening of trading of the Securities on the Business Day immediately following the record date.

Holders who own a number of Securities on the record date that is not evenly divisible by four will receive the same treatment as all other holders for the maximum number of Securities they hold which is evenly divisible by four, and we will have the right to compensate holders for their remaining or "partial" Securities in a manner determined by us in our sole discretion. Our current intention is to provide holders with a cash payment for their partials on the 17th Business Day following the announcement date in an amount equal to the appropriate percentage of the closing indicative value of the reverse split-adjusted Securities on the 14th Business Day following the announcement date. For example, a holder who held 23 Securities via DTC on the record date would receive five post-reverse split Securities on the immediately following Business Day, and a cash payment on the 17th Business Day following the announcement date that is equal to 3/4ths of the Current Principal Amount of the reverse split-adjusted Securities on the 14th Business Day following the announcement date.

S-31

Table of Contents

# General Terms of the Securities

In this section, references to "holders" mean those who own the Securities registered in their own names, on the books that we or the trustee maintain for this purpose, and not those who own beneficial interests in the Securities registered in street name or in the Securities issued in book-entry form through DTC or another depositary. Owners of beneficial interests in the Securities should read the section entitled "Legal Ownership and Book-Entry Issuance" in the accompanying prospectus.

Each series of Securities offered by this product supplement, the accompanying prospectus and the applicable pricing supplement are part of a series of debt securities entitled "Medium-Term Notes, Series A" that we may issue, from time to time, under the indenture more particularly described in the accompanying prospectus. This product supplement summarizes general financial and other terms that apply to the Securities. Terms that apply generally to all Medium-Term Notes, Series A are described in "Description of Debt Securities We May Offer" in the accompanying prospectus. The terms described here (*i.e.*, in this product supplement) supplement those described in the accompanying prospectus and, if the terms described here are inconsistent with those described there, the terms described here are controlling.

## Information in the Pricing Supplement

The applicable pricing supplement will describe the specific terms of your series of Securities, which will include some or all of the following:

➢  the relevant Index, the Index Sponsor and the Index Calculation Agent;

➢  the aggregate principal amount and the denomination and principal amount per Security;

➢  the price to public, and any related discounts or commissions paid to underwriters;

➢  the Initial Trade Date;

➢  the Initial Settlement Date;

➢  the Maturity Date;

➢  the Calculation Date;

➢  the first and final Redemption Dates;

➢  the first Call Settlement Date;

➢  the Monthly Initial Closing Level for the Initial Calendar Month;

➢  the Monthly Reset Dates;

➢  the Monthly Valuation Dates;

➢  the Annual Tracking Rate;

➢  the Financing Spread;

➢  the number of Trading Days in the applicable Measurement Period, if other than five;

➢  the listing symbol;

➢  the Index ticker symbol, the intraday Indicative Value ticker symbol and the sources for the Index Closing Level, the intraday indicative value of the Index and the intraday Indicative Value for the Securities;

S-32

Table of Contents

General Terms of the Securities

➢ the definition of "Trading Day", if different from the definition in this product supplement;

➢ CUSIP and ISIN numbers; and

➢ any other terms of the Securities, which could be different from those described in this product supplement.

We describe the general terms of the Securities in more detail below.

## Interest or Coupons

We will not pay you any interest or coupons during the term of the Securities.

## Cash Settlement Amount at Maturity

The "Maturity Date" for each series of Securities will be the third Trading Day after the last Trading Day in the applicable Measurement Period, which we refer to in this section "— Cash Settlement Amount at Maturity" as the "Final Measurement Period". The scheduled Maturity Date will be identified in the applicable pricing supplement.

For each Security, unless earlier called, redeemed or accelerated, you will receive at maturity a cash payment equal to:

(a) the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the Final Measurement Period, minus

(b) the Accrued Fees as of such last Trading Day.

We refer to this cash payment as the "Cash Settlement Amount".

If the amount calculated above is less than zero, the payment at maturity will be zero.

You may lose some or all of your investment at maturity. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees in order for you to receive an aggregate amount over the term of the Securities of any series equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at maturity.

The Accrued Fees will be calculated as of the last Trading Day in the Final Measurement Period as the sum of (i) the Accrued Tracking Fee as of such last Trading Day and (ii) the Accrued Financing Charge as of such last Trading Day.

The "Financing Level" is, as of any date of determination, an amount that equals the Current Principal Amount.

On the Initial Trade Date, the Accrued Financing Charge for each Security will be $0.

The "Accrued Financing Charge" as of the last Trading Day in the Final Measurement Period is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including such last Trading Day *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

**Table of Contents**

**General Terms of the Securities**

The "Accrued Tracking Fee" as of the last Trading Day in the Final Measurement Period is an amount equal to the product of (i) the Annual Tracking Fee calculated as of such last Trading Day and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding the immediately preceding Monthly Valuation Date to and including such last Trading Day and the denominator of which is 365.

The "Annual Tracking Fee" is, as of any date of determination, an amount per Security equal to the product of (i) the Annual Tracking Rate and (ii) the Current Indicative Value as of the immediately preceding Trading Day.

The "Annual Tracking Rate" is a per annum rate described in the applicable pricing supplement.

The "Current Indicative Value" is, as determined by the Calculation Agent as of any date of determination, an amount per Security of any series equal to the product of (i) the Current Principal Amount and (ii) the Index Factor as of such date, calculated using the Index Closing Level on such date as the Index Valuation Level.

The "Principal Amount" of each Security is $25.00. Each series of the Securities may be issued and sold over time at then-current market prices, which may be significantly higher or lower than the Principal Amount.

For the Initial Calendar Month, the Current Principal Amount will equal $25.00 per Security of the applicable series. For each subsequent calendar month, the Current Principal Amount for each Security of that series will be reset as follows on the Monthly Reset Date:

*New* Current Principal Amount = *previous* Current Principal Amount × Index Factor on the applicable Monthly Valuation Date — Accrued Fees on the applicable Monthly Valuation Date

If any series of the Securities undergoes a split or reverse split, the Current Principal Amount of that series will be adjusted accordingly.

For each calendar month, the "Monthly Reset Date" is the first Trading Day of the month specified in the applicable pricing supplement, subject to adjustment as described under "— Market Disruption Event"; provided, however, that no Monthly Reset Date will occur on or after the Call Valuation Date or the Acceleration Date.

For each Monthly Reset Date, the "Monthly Valuation Date" is the last Trading Day of the previous calendar month subject to adjustment as described under "— Market Disruption Event". The Monthly Valuation Date will be specified in the applicable pricing supplement.

The Index Factor will be calculated as follows:

$$1 + (2 \times \text{Index Performance Ratio})$$

The Index Performance Ratio on any Monthly Valuation Date, any Redemption Valuation Date, or as of the last Trading Day in the Final Measurement Period, as applicable, will be:

$$\frac{\text{Index Valuation Level — Monthly Initial Closing Level}}{\text{Monthly Initial Closing Level}}$$

S-34

Table of Contents

**General Terms of the Securities**

The "Index Valuation Level" will equal the arithmetic mean of the Index Closing Levels measured on each Trading Day during the Final Measurement Period, or the Index Closing Level on any Monthly Valuation Date or any Redemption Valuation Date, as determined by the Calculation Agent, provided that if the Redemption Valuation Date falls in the Final Measurement Period, for the purposes of calculating the Index Performance Ratio as of the Redemption Valuation Date, the Index Valuation Level on any date of determination during such Measurement Period shall equal (a) $1/t$ *times* (b) (i) the sum of the Index Closing Levels on each Trading Day from, and including, the Call Valuation Date, Acceleration Date or the Calculation Date, as applicable, to, but excluding, the date of determination, *plus* (ii) the number of Trading Days from and including the date of determination to and including the last Trading Day in such Measurement Period, *times* the Index Closing Level on such date of determination. For purposes of this definition, "t" equals the number of Trading Days in the Final Measurement Period.

The "Monthly Initial Closing Level" for the Initial Calendar Month will be specified in the applicable pricing supplement and will be the Index Closing Level on the applicable Initial Trade Date. For each subsequent calendar month, the Monthly Initial Closing Level on the Monthly Reset Date will equal the Index Closing Level on the Monthly Valuation Date for the previous calendar month.

The "Index Closing Level" is, for any series of the Securities, the closing level of the relevant Index as reported on Bloomberg and any other publicly available information provider specified in the applicable pricing supplement; provided, however, that if the Index Closing Level as reported on Bloomberg (or any successor) differs from the Index Closing Level as reported on such other information provider (or any successor), then the Index Closing Level will be the closing level of the Index as calculated by the Index Calculation Agent.

The "Index Calculation Agent" will be the entity that calculates the level of the relevant Index and will be specified in the applicable pricing supplement.

The "Calculation Date" will be specified in the applicable pricing supplement.

The "Current Indicative Value", as determined by the Calculation Agent as of any date of determination, is an amount per Security equal to the product of (i) the Current Principal Amount and (ii) the Index Factor of such date, using the Index Closing Level of such date as the Index Valuation Level.

Unless specified otherwise in the applicable pricing supplement, "Trading Day" means any day on which (i) the value of the relevant Index is published by Bloomberg or Thomson Reuters, (ii) trading is generally conducted on NYSE Arca and (iii) trading is generally conducted on the markets on which the Index Constituent Securities in the relevant Index are traded, in each case as determined by the Calculation Agent in its sole discretion.

**Early Redemption at the Option of the Holders**

You may elect to require UBS to redeem your Securities, subject to a minimum redemption amount of at least 50,000 Securities of the same series. If you elect to have your Securities redeemed and have done so under the redemption procedures described below under "— Redemption Procedures", you will receive payment for your Securities on the Redemption Date. The first and final Redemption Dates will be specified in the applicable pricing supplement. For any early redemption, the applicable "Redemption Valuation Date" means the first Trading Day following the date on which you deliver a redemption notice to UBS in compliance with the redemption procedures. To satisfy the minimum redemption amount, your broker or other financial intermediary may bundle your Securities for redemption with

**General Terms of the Securities**

those of other investors to reach this minimum amount of 50,000 Securities of the same series; however, there can be no assurance that they can or will do so. We may from time to time in our sole discretion reduce, in part or in whole, the minimum redemption amount of 50,000 Securities of any series. Any such reduction will be applied on a consistent basis for all holders of the Securities of the affected series at the time the reduction becomes effective.

The Securities will be redeemed and the holders will receive payment for their Securities on the third Business Day following the corresponding Redemption Valuation Date or, if such day is not a Business Day, the next following Business Day (the "Redemption Date"). In addition, if a call notice has been issued or if acceleration has been triggered, in each case with respect to any series of the Securities, the last Redemption Valuation Date for that series of Securities will be the fifth Trading Day prior to the Call Settlement Date or the Acceleration Settlement Date, as applicable. Any applicable Redemption Valuation Date is subject to adjustment as described under "— Market Disruption Event".

If you exercise your right to have us redeem your Securities, subject to your compliance with the procedures described under "— Redemption Procedures", for each applicable Security you will receive a cash payment on the relevant Redemption Date equal to

(a)   the product of

   (i)   the Current Principal Amount and (ii) the Index Factor as of the applicable Redemption Valuation Date, minus

(b)   the Accrued Fees as of such Redemption Valuation Date, minus

(c)   the Redemption Fee.

We refer to this cash payment as the "Redemption Amount".

If the amount calculated above is less than zero, the payment upon early redemption will be zero. We will inform you of such Redemption Amount on the first Business Day following the applicable Redemption Valuation Date.

You may lose some or all of your investment upon early redemption. Because the Accrued Fees and the Redemption Fee reduce your final payment, the monthly compounded leveraged return of the Index will need to be sufficient to offset the negative effect of the Accrued Fees and the Redemption Fee, if applicable, in order for you to receive an aggregate amount over the term of the Securities equal to your initial investment in the Securities. If the monthly compounded leveraged return of the Index is insufficient to offset such a negative effect or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment upon early redemption.

The Accrued Fees will be calculated as of any Redemption Valuation Date as the sum of (i) the Accrued Tracking Fee as of such date and (ii) the Accrued Financing Charge as of such date.

The "Accrued Tracking Fee" as of any Redemption Valuation Date is an amount equal to the product of (i) the Annual Tracking Fee calculated as of such Redemption Valuation Date, and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding the immediately preceding Monthly Valuation Date to and including such Redemption Valuation Date (or if such Redemption Valuation Date occurs prior to the first Monthly Valuation Date, the period from and excluding the Initial Trade Date), and the denominator of which is 365.

The "Accrued Financing Charge" as of any Redemption Valuation Date is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately

S-36

Table of Contents

General Terms of the Securities

preceding Monthly Valuation Date to, and including such Redemption Valuation Date (or if such Redemption Valuation Date occurs prior to the first Monthly Valuation Date, the period from and excluding the Initial Trade Date), *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

The "Redemption Fee" means, as of any date of determination for a series of Securities, an amount per Security equal to the product of (a) 0.125%, (b) the Current Principal Amount and (c) the Index Factor as of the applicable Redemption Valuation Date.

We discuss these matters in the accompanying prospectus under "Description of Debt Securities We May Offer — Redemption and Repayment".

The Redemption Amount is meant to induce arbitrageurs to counteract any trading of the Securities at a premium or discount to their indicative value, though there can be no assurance that arbitrageurs will employ the redemption feature in this manner. Any series of Securities may trade at, above, or below its indicative value.

## Redemption Procedures

To redeem your Securities, you must instruct your broker or other person through whom you hold your Securities to take the following steps through normal clearing system channels:

> - deliver a notice of redemption, a form of which is attached to this product supplement as Annex A, to UBS via email no later than 12:00 noon (New York City time) on the Trading Day immediately preceding the applicable Redemption Valuation Date. If we receive your notice by the time specified in the preceding sentence, we will respond by sending you a confirmation of redemption, a form of which is attached to this product supplement as Annex B;
> - deliver the signed confirmation of redemption to us via facsimile in the specified form by 5:00 p.m. (New York City time) on the same day. We or our affiliate must acknowledge receipt in order for your confirmation to be effective;
> - instruct your DTC custodian to book a delivery vs. payment trade with respect to your Securities on the applicable Redemption Valuation Date at a price equal to the Redemption Amount; and
> - cause your DTC custodian to deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

Different brokerage firms may have different deadlines for accepting instructions from their customers. Accordingly, as a beneficial owner of the Securities, you should consult the brokerage firm through which you own your interest for the relevant deadline. If your broker delivers your notice of redemption after 12:00 noon (New York City time), or your confirmation of redemption after 5:00 p.m. (New York City time), on the Trading Day prior to the applicable Redemption Valuation Date, your notice will not be effective, you will not be able to redeem your Securities until the following Redemption Date and your broker will need to complete all the required steps if you should wish to redeem your Securities on any subsequent Redemption Date. In addition, UBS may request a medallion signature guarantee or such assurances of delivery as it may deem necessary in its sole discretion. All instructions given to participants from beneficial owners of Securities relating to the right to redeem their Securities will be irrevocable.

## UBS's Call Right

We have the right to redeem all, but not less than all, of the Securities of any series upon not less than eighteen calendar days' prior notice to the holders of the Securities of that series, such redemption to

S-37

Table of Contents

**General Terms of the Securities**

occur on any Trading Day specified in the applicable pricing supplement through and including the Maturity Date specified in the applicable pricing supplement. Upon early redemption in the event we exercise this right, you will receive a cash payment equal to

(a)   the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day in the applicable Measurement Period, which we refer to in this section "— UBS's Call Right" as the "Call Measurement Period", minus

(b)   the Accrued Fees as of such last Trading Day.

We refer to this cash payment as the "Call Settlement Amount".

If the amount calculated above is less than zero, the payment upon UBS's exercise of its Call Right will be zero.

If UBS issues a call notice on any Trading Day, the "Call Valuation Date" will be the fifth Trading Day following the Trading Day on which the call notice is issued.

We will inform you of such Call Settlement Amount on the first Business Day following the last Trading Day in the Call Measurement Period.

The holders will receive payment for their Securities on a date that is at least three, but not greater than six, Trading Days following the last Trading Day in the Call Measurement Period (the "Call Settlement Date"). We will inform you of such Call Settlement Date in the call notice. If a Market Disruption Event is continuing or occurs on the scheduled Call Valuation Date with respect to any of the Index Constituent Securities, such Call Valuation Date may be postponed as described under "— Market Disruption Event".

You may lose some or all of your investment at call. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees, in order for you to receive an aggregate amount over the term of the Securities equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment at call.

The Accrued Fees will be calculated as of the last Trading Day in the Call Measurement Period as the sum of (i) the Accrued Tracking Fee as of such last Trading Day and (ii) the Accrued Financing Charge as of such last Trading Day.

The "Accrued Tracking Fee" as of the last Trading Day in the Call Measurement Period is an amount equal to the product of (i) the Annual Tracking Fee calculated as of such last Trading Day, and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such last Trading Day, and the denominator of which is 365.

The "Accrued Financing Charge" as of last Trading Day in the Call Measurement Period is an amount equal to (a) the aggregate sum of (i) the Financing Level as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including such last Trading Day, *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

**Acceleration Upon Minimum Indicative Value**

If, at any time, the indicative value for any series of the Securities on any Trading Day (1) equals $5.00 or less or (2) decreases 60% in value from the closing indicative value of that series of the Securities on

S-38

**General Terms of the Securities**

the previous Monthly Valuation Date (each such day, an "Acceleration Date"), all issued and outstanding Securities of that series will be automatically accelerated and mandatorily redeemed by UBS (even if the indicative value of that series would later exceed $5.00 or would increase from the -60% level on such Acceleration Date or any subsequent Trading Day during the applicable Measurement Period, which we refer to in this section "— Acceleration Upon Minimum Indicative Value" as the "Acceleration Measurement Period") for a cash payment equal to

(a)    the product of (i) the Current Principal Amount and (ii) the Index Factor as of the last Trading Day of the Acceleration Measurement Period, minus

(b)    the Accrued Fees as of such last Trading Day.

We refer to this cash payment as the "Acceleration Amount". If the minimum indicative value threshold of any series of Securities has been breached, you will receive on the Acceleration Settlement Date only the Acceleration Amount in respect of your investment in the that series of Securities.

You may lose some or all of your investment upon an acceleration upon minimum indicative value. Because the Accrued Fees reduce your final payment, the monthly compounded leveraged return of the Index will need to offset the negative effect of the Accrued Fees, in order for you to receive an aggregate amount over the term of the Securities equal to at least the Principal Amount of your Securities. If the monthly compounded leveraged return of the Index is insufficient to offset the negative effect of the Accrued Fees or if the monthly compounded leveraged return of the Index is negative, you will lose some or all of your investment upon an acceleration upon minimum indicative value.

The Accrued Fees will be calculated as of any date of determination for any series of Securities as the sum of (i) the Accrued Tracking Fee as of the last Trading Day of the Acceleration Measurement Period and (ii) the Accrued Financing Charge as of the last Trading Day of the Acceleration Measurement Period.

The "Accrued Tracking Fee" as of the last Trading Day of the Acceleration Measurement Period will be an amount equal to the product of (i) the Annual Tracking Fee calculated as of such last Trading Day, and (ii) a fraction, the numerator of which is the total number of calendar days from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such last Trading Day or if the Acceleration occurs prior to the first initial Monthly Valuation Date, the period from but excluding the Initial Trade Date), as applicable, and the denominator of which is 365.

The "Accrued Financing Charge" as of the last Trading Day of the Acceleration Measurement Period is an amount equal to (a) the aggregate sum of (i) the Financing Levels as of each date starting from, but excluding, the immediately preceding Monthly Valuation Date to, and including, such last Trading Day (or if the Acceleration Date occurs prior to the initial Monthly Valuation Date, the period from, and excluding, the Initial Trade Date), *times* (ii) the Financing Rate as of such date, *divided by* (b) 360.

The "Acceleration Settlement Date" will be the third Trading Day following the last Trading Day of the Acceleration Measurement Period.

Subject to the prior verification by the Calculation Agent that the indicative value of $5.00 or less was accurately calculated by the Index Calculation Agent or that the decrease of 60% from the closing indicative value of that series of the Securities on the previous Monthly Valuation Date was accurately calculated by the Index Calculation Agent, as applicable, and in each case with respect to a series of Securities, UBS must provide notice to the holders of that series of the Securities that the minimum indicative value threshold has been breached not less than five calendar days prior to the Acceleration Settlement Date. For a detailed description of how the intraday indicative value of the Securities is calculated see "Valuation of the Index and the Securities" on page S-30.

**General Terms of the Securities**

## Calculation Agent

UBS Securities LLC will act as the Calculation Agent. The Calculation Agent will determine, among other things, the Index Valuation Level, the Index Performance Ratio, the Index Factor, the Current Principal Amount, the Current Indicative Value, the Accrued Fees, the Accrued Financing Charge, the Financing Level, the Financing Rate, the Accrued Tracking Fee, the Annual Tracking Fee, the Redemption Fee, if any, the Cash Settlement Amount, if any, that we will pay you at maturity, the Redemption Amount, if any, that we will pay you upon redemption, the Call Settlement Amount, if any, that we will pay you on the Call Settlement Date, if applicable, or the Acceleration Amount, if any, that we will pay you on the Acceleration Settlement Date, if applicable, based on the relevant Index levels calculated by the Calculation Agent, as adjusted, and whether any day is a Business Day or Trading Day. The Calculation Agent will also be responsible for determining whether a Market Disruption Event has occurred, whether the relevant Index has been discontinued or is otherwise unavailable and whether there has been a material change in the relevant Index. All determinations made by the Calculation Agent will be at the sole discretion of the Calculation Agent for any series of the Securities and will, in the absence of manifest error, be conclusive for all purposes and binding on you and on us. We may appoint a different Calculation Agent for any series of the Securities from time to time after the date of this product supplement without your consent and without notifying you.

The Calculation Agent will provide written notice to the trustee at its New York office, on which notice the trustee may conclusively rely, of the amount to be paid at maturity or call, or upon early redemption or acceleration on or prior to 12:00 p.m., New York City time, on the Business Day immediately preceding the Maturity Date, any Redemption Date, the Call Settlement Date or the Acceleration Settlement Date, as applicable.

All dollar amounts related to determination of the Accrued Fees, the Accrued Tracking Fee, the Accrued Financing Charge, the Redemption Amount and Redemption Fee, if any, per Security for any series of Securities, the Call Settlement Amount, if any, per Security for any series of Securities, the Acceleration Amount, if any, per Security for any series of Securities, and the Cash Settlement Amount, if any, per Security for any series of Securities, will be rounded to the nearest ten-thousandth, with five one hundred-thousandths rounded upward (*e.g.*, .76545 would be rounded up to .7655); and all dollar amounts paid on the aggregate principal amount of such Securities per holder will be rounded to the nearest cent, with one-half cent rounded upward.

## Market Disruption Event

To the extent a Market Disruption Event with respect to the relevant Index has occurred or is continuing on an Averaging Date (as defined below), the Index Closing Level for such Averaging Date will be determined by the Calculation Agent or one of its affiliates on the first succeeding Trading Day on which a Market Disruption Event does not occur or is not continuing (the "Deferred Averaging Date") with respect to the relevant Index irrespective of whether, pursuant to such determination, the Deferred Averaging Date would fall on a date originally scheduled to be an Averaging Date. If the postponement described in the preceding sentence results in the Index Closing Level being calculated on a day originally scheduled to be an Averaging Date, for purposes of determining the Index Closing Level on any Averaging Date, the Calculation Agent or one of its affiliates, as the case may be, will apply the Index Closing Level for such Deferred Averaging Date (i) on the date(s) of the original Market Disruption Event and (ii) such Averaging Date. For example, if the applicable Measurement Period for purposes of calculating the Call Settlement Amount is based on the arithmetic mean of the Index Closing Levels on October 3, October 4, October 5, October 6 and October 7, and there is a Market Disruption Event with respect to the relevant Index on October 3, but no other Market Disruption Event during such Measurement Period, then the Index Closing Level on October 4 will be used twice to calculate the Call

Table of Contents

**General Terms of the Securities**

Settlement Amount, and the Call Settlement Amount will be determined based on the arithmetic mean of the Index Closing Levels on October 4, October, 4, October, 5, October 6 and October 7. The same approach would be applied if there is a Market Disruption Event during any Measurement Period.

If the Redemption Valuation Date, for purposes of calculating a Redemption Amount, is based on the Index Closing Level on October 3 and there is a Market Disruption Event with respect to the Index on October 3, then the Index Closing Level on October 4 will be used to calculate the Redemption Amount. If a Market Disruption Event occurs on any Monthly Valuation Date, the Index Closing Level for such Monthly Valuation Date will be determined by the Calculation Agent or one of its affiliates on the first succeeding Trading Day on which a Market Disruption Event does not occur or is not continuing.

In no event, however, will any postponement pursuant to the two immediately preceding paragraphs result in the final Averaging Date, Monthly Valuation Date or the Redemption Valuation Date, as applicable, occurring more than three Trading Days following the day originally scheduled to be such final Averaging Date, Monthly Valuation Date or Redemption Valuation Date. If the third Trading Day following the date originally scheduled to be the final Averaging Date, Monthly Valuation Date or Redemption Valuation Date, as applicable, is not a Trading Day or a Market Disruption Event has occurred or is continuing with respect to the relevant Index on such third Trading Day, the Calculation Agent or one of its affiliates will determine the Index Closing Level based on its good faith estimate of the Index Closing Level that would have prevailed on such third Trading Day but for such Market Disruption Event. If any Monthly Valuation Date is postponed as described above, the succeeding Monthly Reset Date will occur on the next Trading Day following the postponed Monthly Valuation Date.

An "Averaging Date" means each of the Trading Days during any Measurement Period, subject to adjustment as described herein.

Notwithstanding the occurrence of one or more of the events below, which may, in the Calculation Agent's discretion, constitute a Market Disruption Event with respect to the relevant Index, the Calculation Agent in its discretion may waive its right to postpone the Index Closing Level if it determines that one or more of the below events has not and is not likely to materially impair its ability to determine the Index Closing Level on such date.

Any of the following will be a Market Disruption Event with respect to the relevant Index, in each case as determined by the Calculation Agent in its sole discretion:

(a)   suspension, absence or material limitation of trading in a material number of the Index Constituent Securities for more than two hours or during the one-half hour before the close of trading in the applicable market or markets;

(b)   suspension, absence or material limitation of trading in option or futures contracts relating to the relevant Index or to a material number of Index Constituent equity interests in the primary market or markets for those contracts for more than two hours of trading or during the one-half hour before the close of trading in that market;

(c)   the relevant Index is not published; or

(d)   in any other event, if the Calculation Agent determines in its sole discretion that the event materially interferes with our ability or the ability of any of our affiliates to unwind all or a material portion of a hedge with respect to the Securities that we or our affiliates have effected or may effect as described in the section entitled "Use of Proceeds and Hedging".

Table of Contents

General Terms of the Securities

The following events will not be Market Disruption Events with respect to the relevant Index:

(a)   a limitation on the hours or numbers of days of trading, but only if the limitation results from an announced change in the regular business hours of the relevant market; or

(b)   a decision to permanently discontinue trading in the option or futures contracts relating to the relevant Index or any Index Constituent equity interests.

For this purpose, an "absence of trading" in the primary securities market on which option or futures contracts related to the relevant Index or any Index Constituent equity interests are traded will not include any time when that market is itself closed for trading under ordinary circumstances.

## Discontinuance of or Adjustments to the Relevant Index; Alteration of Method of Calculation

If the Index Calculation Agent or another entity that publishes the Index (such other entity to be named in the applicable pricing supplement) discontinues publication of or otherwise fails to publish the relevant Index, or if our right to use the Index is suspended or terminated, and the Index Calculation Agent or such other entity publishes a successor or substitute index that the Calculation Agent determines to be comparable to the discontinued relevant Index (such index being referred to herein as a "Successor Index"), then the Index Closing Level for such Successor Index will be determined by the Calculation Agent by reference to the Successor Index on the dates and at the times as of which the Index Closing Levels for such Successor Index are to be determined.

Upon any selection by the Calculation Agent of a Successor Index, the Calculation Agent will cause written notice thereof to be furnished to the trustee, to us and to the holders of the Securities.

If the Index Calculation Agent discontinues publication of the relevant Index, or if our right to use the Index is suspended or terminated, prior to, and such discontinuation or unavailability is continuing on, any Monthly Valuation Date, any Averaging Date, any Redemption Valuation Date or any other relevant date on which the Index Closing Level is to be determined and the Calculation Agent determines that no Successor Index is available at such time, or the Calculation Agent has previously selected a Successor Index and publication of such Successor Index is discontinued prior to, and such discontinuation is continuing on, any Monthly Valuation Date, any Averaging Date, any Redemption Valuation Date or any other relevant date on which the Index Closing Level is to be determined, then the Calculation Agent will determine the Index Closing Level using the closing level and published share weighting of each Index Constituent Security included in the relevant Index or Successor Index, as applicable, immediately prior to such discontinuation or unavailability, as adjusted for certain corporate actions as described in the description of the relevant Index included in the applicable pricing supplement. In such event, the Calculation Agent will cause notice thereof to be furnished to the trustee, to us and to the holders of the Securities.

Notwithstanding these alternative arrangements, discontinuation of the publication of the relevant Index or Successor Index, as applicable, may adversely affect the value of the Securities.

If at any time the method of calculating the relevant Index or a Successor Index, or the value thereof, is changed in a material respect, or if the relevant Index or a Successor Index is in any other way modified so that the level of the relevant Index or such Successor Index does not, in the opinion of the Calculation Agent, fairly represent the level of the relevant Index or such Successor Index had such changes or modifications not been made, then the Calculation Agent will make such calculations and adjustments as, in the good faith judgment of the Calculation Agent, may be necessary in order to arrive at a level of an index comparable to the relevant Index or such Successor Index, as the case may be, as if such

S-42

<u>**Table of Contents**</u>

**General Terms of the Securities**

changes or modifications had not been made, and the Calculation Agent will calculate the levels for the relevant Index or such Successor Index with reference to the relevant Index or such Successor Index, as adjusted. The Calculation Agent will accordingly calculate the Index Performance Ratio, the Index Factor, the Current Principal Amount, the Current Indicative Value, the Accrued Fees, the Financing Level, the Tracking Fee, the Redemption Fee, if any, the Cash Settlement Amount, if any, that we will pay you at maturity, the Redemption Amount, if any, upon redemption, if applicable, the Call Settlement Amount, if any, that we will pay you on the Call Settlement Date, if applicable, or the Acceleration Amount, if any, that we will pay you on the Acceleration Settlement Date, if applicable, based on the relevant index levels calculated by the Calculation Agent, as adjusted. Accordingly, if the method of calculating the relevant Index or a Successor Index is modified so that the level of the relevant Index or such Successor Index is a fraction of what it would have been if there had been no such modification (*e.g.*, due to a split in the relevant Index), which, in turn, causes the level of the relevant Index or such Successor Index to be a fraction of what it would have been if there had been no such modification, then the Calculation Agent will make such calculations and adjustments in order to arrive at a level for the relevant Index or such Successor Index as if it had not been modified (e.g., as if such split had not occurred).

**Redemption Price Upon Optional Tax Redemption**

We have the right to redeem any series of the Securities in the circumstances described under "Description of Debt Securities We May Offer — Optional Tax Redemption" in the accompanying prospectus. If we exercise this right, the redemption price of that series of the Securities will be determined by the Calculation Agent in a manner reasonably calculated to preserve your and our relative economic position.

**Default Amount on Acceleration**

If an event of default occurs and the maturity of any series of the Securities is accelerated, we will pay the default amount in respect of the principal of the that series of Securities at maturity. We describe the default amount below under "— Default Amount".

For the purpose of determining whether the holders of our Medium-Term Notes, Series A, of which each series of Securities offered under this product supplement, the accompanying prospectus and the applicable pricing supplement are a part, are entitled to take any action under the indenture, we will treat the outstanding principal amount of the Medium-Term Notes, Series A, as constituting the outstanding principal amount of the Securities. Although the terms of the Securities may differ from those of the other Medium-Term Notes, Series A, holders of specified percentages in principal amount of all Medium-Term Notes, Series A, together in some cases with other series of our debt securities, will be able to take action affecting all the Medium-Term Notes, Series A, including the Securities. This action may involve changing some of the terms that apply to the Medium-Term Notes, Series A, accelerating the maturity of the Medium- Term Notes, Series A after a default or waiving some of our obligations under the indenture. We discuss these matters in the attached prospectus under "Description of Debt Securities We May Offer — Default, Remedies and Waiver of Default" and "Description of Debt Securities We May Offer — Modification and Waiver of Covenants".

**Table of Contents**

**General Terms of the Securities**

## Default Amount

The default amount for any series of the Securities on any day will be an amount, in U.S. dollars for the principal of the Securities, equal to the cost of having a qualified financial institution, of the kind and selected as described below, expressly assume all our payment and other obligations with respect to the Securities as of that day and as if no default or acceleration had occurred, or to undertake other obligations providing substantially equivalent economic value to you with respect to the Securities of the accelerated series. That cost will equal:

> ➢ the lowest amount that a qualified financial institution would charge to effect this assumption or undertaking, plus

> ➢ the reasonable expenses, including reasonable attorneys' fees, incurred by the holders of the Securities in preparing any documentation necessary for this assumption or undertaking.

During the default quotation period for the Securities of the accelerated series, which we describe below, the holders of that series of the Securities and/or we may request a qualified financial institution to provide a quotation of the amount it would charge to effect this assumption or undertaking. If either party obtains a quotation, it must notify the other party in writing of the quotation. The amount referred to in the first bullet point above will equal the lowest — or, if there is only one, the only — quotation obtained, and as to which notice is so given, during the default quotation period. With respect to any quotation, however, the party not obtaining the quotation may object, on reasonable and significant grounds, to the assumption or undertaking by the qualified financial institution providing the quotation and notify the other party in writing of those grounds within two Business Days after the last day of the default quotation period, in which case that quotation will be disregarded in determining the default amount.

## Default Quotation Period

The default quotation period is the period beginning on the day the default amount first becomes due and ending on the third Business Day after that day, unless:

> ➢ no quotation of the kind referred to above is obtained, or

> ➢ every quotation of that kind obtained is objected to within five Business Days after the due date as described above.

If either of these two events occurs, the default quotation period will continue until the third Business Day after the first Business Day on which prompt notice of a quotation is given as described above. If that quotation is objected to as described above within five Business Days after that first Business Day, however, the default quotation period will continue as described in the prior sentence and this sentence.

In any event, if the default quotation period and the subsequent two Business Day objection period have not ended before the Calculation Date, then the default amount will equal the Principal Amount of the Securities.

## Qualified Financial Institutions

For the purpose of determining the default amount at any time, a qualified financial institution must be a financial institution organized under the laws of any jurisdiction in the United States of America, Europe or Japan, which at that time has outstanding debt obligations with a stated maturity of one year or less from the date of issue and rated either:

> ➢ A-1 or higher by Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., or any successor, or any other comparable rating then used by that rating agency, or

S-44

Table of Contents

**General Terms of the Securities**

---

  ➢ P-1 or higher by Moody's Investors Service or any successor, or any other comparable rating then used by that rating agency.

## Manner of Payment and Delivery

Any payment on or delivery of the Securities at maturity or call, or upon early redemption or acceleration will be made to accounts designated by you and approved by us, or at the corporate trust office of the trustee in New York City, but only when the Securities are surrendered to the trustee at that office. We also may make any payment or delivery in accordance with the applicable procedures of the depositary.

## Business Day

When we refer to a Business Day with respect to the Securities, we mean a day that is a Business Day of the kind described in "Description of Debt Securities We May Offer — Payment Mechanics for Debt Securities" in the accompanying prospectus.

## Modified Business Day

As described in "Description of Debt Securities We May Offer — Payment Mechanics for Debt Securities — Payment When Offices Are Closed" in the accompanying prospectus, any payment on the Securities that would otherwise be due on a day that is not a Business Day may instead be paid on the next day that is a Business Day, with the same effect as if paid on the original due date.

## Defeasance

Neither full defeasance nor covenant defeasance, as described in the accompanying prospectus under "Description of Debt Securities We May Offer — Defeasance and Covenant Defeasance", will apply to the Securities.

## Reissuances or Reopened Issues

We may, at our sole discretion, "reopen" or reissue any series of the Securities. We intend to issue the Securities initially in an amount having the aggregate offering price specified in the applicable pricing supplement. However, we may issue additional Securities in amounts that exceed the amount specified in the applicable pricing supplement at any time, without your consent and without notifying you. The Securities do not limit our ability to incur other indebtedness or to issue other Securities. Also, we are not subject to financial or similar restrictions by the terms of the Securities. For more information, please refer to "Description of Debt Securities We May Offer — Amounts That We May Issue" in the accompanying prospectus.

These further issuances, if any, will be consolidated to form a single class with the originally issued Securities of any series and will have the same CUSIP number and will trade interchangeably with that series of the Securities immediately upon settlement. Any additional issuances will increase the aggregate Principal Amount of the outstanding Securities of the class, plus the aggregate Principal Amount of any Securities bearing the same CUSIP number that are issued pursuant to any future issuances of Securities bearing the same CUSIP number. The price of any additional offering will be determined at the time of pricing of that offering.

## Booking Branch

The Securities will be booked through UBS AG, London Branch.

## Clearance and Settlement

The DTC participants that hold the Securities through DTC on behalf of investors will follow the settlement practices applicable to equity securities in DTC's settlement system with respect to the primary distribution of the Securities and secondary market trading between DTC participants.

Table of Contents

# Use of Proceeds and Hedging

We will use the net proceeds we receive from the sale of the Securities for the purposes we describe in the attached prospectus under "Use of Proceeds". We or our affiliates may also use those proceeds in transactions intended to hedge our obligations under the Securities as described below.

In anticipation of the sale of the Securities, we or our affiliates expect to enter into hedging transactions involving purchases of securities included in or linked to the relevant Index and/or listed and/or over-the-counter options, futures or exchange-traded funds on the Index Constituent Securities or the relevant Index prior to and/or on the Initial Trade Date. From time to time, we or our affiliates may enter into additional hedging transactions or unwind those we have entered into. In this regard, we or our affiliates may:

➢ acquire or dispose of long or short positions of Index Constituent Securities or other securities of the Index Constituents,

➢ acquire or dispose of long or short positions in listed or over-the-counter options, futures, exchange- traded funds or other instruments based on the level of the relevant Index or the value of the Index Constituent Securities,

➢ acquire or dispose of long or short positions in listed or over-the-counter options, futures, or exchange-traded funds or other instruments based on the level of other similar market indices, or

➢ any combination of the above three.

We or our affiliates may acquire a long or short position in securities similar to any series of the Securities from time to time and may, in our or their sole discretion, hold or resell those securities.

We or our affiliates may close out our or their hedge on or before the last Trading Day in the applicable Measurement Period. That step may involve sales or purchases of any of the Index Constituent Securities, listed or over-the-counter options or futures on the Index Constituent Securities or listed or over-the-counter options, futures, exchange-traded funds or other instruments based on indices designed to track the performance of the Index.

*The hedging activity discussed above may adversely affect the market value of the Securities from time to time. See "Risk Factors" on page S-18 for a discussion of these adverse effects.*

S-46

**Table of Contents**

# Material U.S. Federal Income Tax Consequences

*The following is a general description of the material United States federal tax considerations relating to the Securities. It does not purport to be a complete analysis of all tax considerations relating to the Securities. Prospective purchasers of the Securities should consult their tax advisers as to the consequences under the tax laws of the country of which they are resident for tax purposes and the tax laws of the United States of acquiring, holding and disposing of the Securities and receiving payments under the Securities. This summary is based upon the law as in effect on the date of this product supplement and is subject to any change in law that may take effect after such date.*

The discussion below supplements and, to the extent inconsistent, replaces the discussion under "U.S. Tax Considerations" in the attached prospectus. This discussion applies to you only if you hold your Securities as capital assets for tax purposes. This section does not apply to you if you are a member of a class of holders subject to special rules, such as:

➢ a dealer in securities,

➢ a trader in securities that elects to use a mark-to-market method of tax accounting for your securities holdings,

➢ a bank,

➢ a life insurance company,

➢ a person subject to alternative minimum tax,

➢ a person that purchases or sells the Securities as part of a wash sale for tax purposes,

➢ a person that owns Securities as part of a straddle or a hedging or conversion transaction for tax purposes, or

➢ a United States holder (as defined below) whose functional currency for tax purposes is not the U.S. dollar.

This discussion is based on the Internal Revenue Code of 1986, as amended (the "Code"), its legislative history, existing and proposed regulations under the Code, published rulings and court decisions, all as currently in effect. These laws are subject to change, possibly on a retroactive basis.

Except as otherwise described below under "— Unrelated Business Taxable Income," the discussion below does not apply to tax-exempt organizations. If a partnership holds the Securities, the United States federal income tax treatment of a partner will generally depend on the status of the partner and the tax treatment of the partnership. A partner in a partnership holding the Securities should consult its tax advisor with regard to the United States federal income tax treatment of an investment in the Securities.

The tax treatment of your Securities will depend on their terms. Consequently, except to the extent the applicable pricing supplement indicates otherwise, the discussion below (including the tax opinion below) will not necessarily apply to your Securities.

The following discussion assumes that the Index is, and will be, composed solely of equity Securities issued by entities treated as corporations for U.S. federal income tax purposes.

Except as otherwise noted under "— Non-United States Holders" below, this discussion is only applicable to you if you are a United States holder. You are a United States holder if you are a beneficial owner of a Security and you are: (i) a citizen or resident of the United States; (ii) a domestic corporation;

S-47

Table of Contents

**Material U.S. Federal Income Tax Consequences**

(iii) an estate whose income is subject to United States federal income tax regardless of its source; or (iv) a trust if a United States court can exercise primary supervision over the trust's administration and one or more United States persons are authorized to control all substantial decisions of the trust.

**NO STATUTORY, REGULATORY, JUDICIAL OR ADMINISTRATIVE AUTHORITY DIRECTLY DISCUSSES HOW THE SECURITIES SHOULD BE TREATED FOR UNITED STATES FEDERAL INCOME TAX PURPOSES. AS A RESULT, THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF YOUR INVESTMENT IN THE SECURITIES ARE UNCERTAIN. ACCORDINGLY, WE URGE YOU TO CONSULT YOUR TAX ADVISOR AS TO THE TAX CONSEQUENCES OF HAVING AGREED TO THE REQUIRED TAX TREATMENT OF YOUR SECURITIES DESCRIBED BELOW AND AS TO THE APPLICATION OF STATE, LOCAL, OR OTHER TAX LAWS TO YOUR INVESTMENT IN YOUR SECURITIES.**

In the opinion of our counsel, Sullivan & Cromwell LLP, the Securities should be treated as a pre-paid derivative contract with respect to the Index and the terms of the Securities require you and us (in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary) to treat the Securities for all tax purposes in accordance with such characterization. Under that treatment, you should generally recognize capital gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference between the amount realized and the amount you paid for your Securities. Such gain or loss should generally be long-term capital gain or loss if you held your Securities for more than one year. In general, your tax basis in your Securities will be equal to the price you paid for them. Capital gain of a non-corporate United States holder is generally taxed at preferential rates where the property is held for more than one year. The deductibility of capital losses is subject to limitations. Your holding period for your Securities will generally begin on the date after the issue date (*i.e.*, the settlement date) for your Securities and, if you hold your Securities until maturity, your holding period will generally include the maturity date.

*Alternative Treatments.* The Internal Revenue Service ("IRS") released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current basis, whether additional gain or loss upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Code should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income over the term of an instrument such as the Securities. The outcome of this process is uncertain. Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. UBS intends to treat your Securities for United States federal income tax purposes in accordance with the treatment described above unless and until such time as the Treasury Department and IRS determine that some other treatment is more appropriate.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of the Securities despite the fact that there will be no interest payments over the term of the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

S-48

Table of Contents

**Material U.S. Federal Income Tax Consequences**

In addition, it is possible that the Securities could be treated as a debt instrument subject to the special tax rules governing contingent debt instruments. If the Securities are so treated, you would be required to accrue interest income over the term of your Securities based upon the yield at which we would issue a non-contingent fixed-rate debt instrument with other terms and conditions similar to your Securities. You would recognize gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference, if any, between the amount you receive at such time and your adjusted basis in your Securities. In general, your adjusted basis in your Securities would be equal to the amount you paid for your Securities, increased by the amount of interest you previously accrued with respect to your Securities and decreased by the projected amount of any contingent payment previously made on your Securities. Any gain you recognize upon the sale, exchange, redemption or maturity of your Securities would be ordinary income and any loss recognized by you at such time would be ordinary loss to the extent of interest you included in income in the current or previous taxable years in respect of your Securities, and thereafter, would be capital loss.

If the Securities are treated as a contingent debt instrument and you purchase your Securities in the secondary market at a price that is at a discount from, or in excess of, the adjusted issue price of the Securities, such excess or discount would not be subject to the generally applicable market discount or amortizable bond premium rules described under "U.S. Tax Considerations — Taxation of Debt Securities — Market Discount" and "U.S. Tax Considerations — Taxation of Debt Securities — Debt Securities Purchased at a Premium" in the accompanying prospectus but rather would be subject to special rules set forth in Treasury Regulations governing contingent debt instruments. Accordingly, if you purchase your Securities in the secondary market, you should consult your tax advisor as to the possible application of such rules to you.

In addition, the IRS could potentially assert that you should be required to treat amounts attributable to the Accrued Fees and the Redemption Fee, if any, as amounts of expense. The deduction of any such deemed expenses would generally be subject to the 2% floor on miscellaneous itemized deductions. Such amounts would correspondingly increase the amount of gain or decrease the amount of loss that you recognize with respect to your Securities.

If the Index Constituent Securities are rebalanced, it is also possible that the Securities could be treated as a series of derivative contracts each of which matures on each rebalancing date. If your Securities were properly characterized in such a manner, you would be treated as disposing of your Securities on each rebalancing date in return for new derivative contracts that mature on the next rebalancing date, and you would accordingly likely recognize capital gain or loss on each rebalancing date equal to the difference between your basis in your Securities (which would be adjusted to take into account any prior recognition of gain or loss) and their fair market value on such date. The amount of loss recognized in this case could be deferred on account of the "wash sale" rules of Section 1091 of the Code.

In addition, the IRS could assert that you should be treated as if you owned the Index Constituent Securities and directly incurred the Accrued Fees and the Redemption Fee, if any, in which case (i) you could recognize gain or loss (subject to the application of the "wash sale" rules of Section 1091 of the Code) with respect to an Index Constituent Security when the amount of any Index Constituent Security referenced by the Index is reduced, (ii) you could be treated as receiving any dividends paid on the Index Constituent Securities during the time you hold your Securities and could be required to take such dividends into account as ordinary income (subject to the possible application of the rules regarding "qualified dividend income"), and (iii) you could be required to treat amounts attributable to the Accrued Fees and the Redemption Fee, if any, in the manner described in the second preceding paragraph.

Table of Contents

**Material U.S. Federal Income Tax Consequences**

Because of the absence of authority regarding the appropriate tax characterization of your Securities, it is possible that the IRS could seek to characterize your Securities in a manner that results in tax consequences to you that are different from those described above. For example, the IRS could possibly assert that (i) you should be required to take into account dividends paid on the Index Constituent Securities during the time you hold your Securities as ordinary income (subject to the possible application of the rules regarding "qualified dividend income"), either when such dividends are paid or upon the sale, exchange, redemption or maturity of your Securities, even if you are not treated as if you owned the Index Constituent Securities (as described in the immediately preceding paragraph), (ii) some or all of the gain or loss that you recognize upon the sale, exchange, redemption or maturity of your Securities should be treated as ordinary gain or loss, (iii) you should be required to recognize taxable gain upon the resetting of the Current Principal Amount, or (iv) your Securities should be treated as a notional principal contract for tax purposes. You should consult your tax adviser as to the tax consequences of such characterizations and any possible alternative characterizations of your Securities for U.S. federal income tax purposes.

*Medicare Tax*.   If you are an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, you will be subject to a 3.8% tax on the lesser of (1) your "net investment income"(or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year and (2) the excess of your modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances). Your net investment income will include your net gains upon the sale, exchange, redemption or maturity of your Securities, unless such net gains are derived in the ordinary course of the conduct of a trade or business (other than a trade or business that consists of certain passive or trading activities). If you are a United States holder that is an individual, estate or trust, you are urged to consult your tax advisors regarding the applicability of the Medicare tax to your net investment income in respect of your investment in the Securities.

*Information with Respect to Foreign Financial Assets*.   Owners of "specified foreign financial assets" with an aggregate value in excess of $50,000 (and in some circumstances, a higher threshold), may be required to file an information report with respect to such assets with their tax returns. "Specified foreign financial assets" include any financial accounts maintained by foreign financial institutions as well as any of the following (which may include your Securities), but only if they are held for investment and not held in accounts maintained by financial institutions: (i) stocks and securities issued by non-U.S. persons; (ii) financial instruments and contracts that have non-U.S. issuers or counterparties; and (iii) interests in foreign entities. Holders are urged to consult their tax advisors regarding the application of this reporting requirement to their ownership of the Securities.

*Unrelated Business Taxable Income*.   A United States holder that is a tax-exempt organization for U.S. federal income tax purposes and therefore generally exempt from U.S. federal income taxation, will nevertheless be subject to tax to the extent income or gain from the Securities constitutes unrelated business taxable income ("UBTI"). Although the matter is not free from doubt, gain realized upon the sale, exchange, redemption or maturity of the Securities should not constitute UBTI to a United States holder that is a tax-exempt organization unless such holder has incurred "debt-financing" in respect of its acquisition or ownership of the Securities. As noted above, it is possible that the Securities could be treated as other than a forward contract in respect of the Index. Under one such alternative characterization, you could be treated as directly owning the Index Constituent Securities. If your Securities are so treated, a portion of any gain that you recognize with respect to the Securities would likely constitute UBTI.

*Treasury Regulations Requiring Disclosure of Reportable Transactions*.   Treasury regulations require United States taxpayers to report certain transactions ("Reportable Transactions") on IRS Form 8886.

S-50

Table of Contents

**Material U.S. Federal Income Tax Consequences**

An investment in the Securities or the sale, exchange, redemption or maturity of the Securities should generally not be treated as a Reportable Transaction under current law, but it is possible that future legislation, regulations or administrative rulings could cause your investment in the Securities or the sale, exchange, redemption or maturity of the Securities to be treated as a Reportable Transaction. You should consult with your tax advisor regarding any tax filing and reporting obligations that may apply in connection with acquiring, owning and disposing of the Securities.

*Backup Withholding and Information Reporting.*    Notwithstanding that we do not intend to treat the Securities as debt for tax purposes, we intend to apply the information reporting and backup withholding rules that are described under "U.S. Tax Considerations — Taxation of Debt Securities — Backup Withholding and Information Reporting" in the accompanying prospectus to any payments made on your Securities.

*Non-United States Holders.*    The following section addresses the tax treatment of a non-United States holder of Securities. You are a non-United States holder if you are a beneficial owner of a Security and you are, for United States federal income tax purposes: (i) a nonresident alien individual; (ii) a foreign corporation; or (iii) an estate or trust that in either case is not subject to United States federal income tax on a net income basis on income or gain from a Security.

If your Securities are treated as a pre-paid derivative contract with respect to the Index, and subject to the discussion of backup withholding below, amounts you receive upon the sale, exchange, redemption or maturity of your Securities should not currently be subject to withholding tax.

As noted above, because of the absence of authority regarding the appropriate tax characterization of your Securities, it is possible that the IRS could seek to characterize your Securities in a manner that results in tax consequences to you that are different from those described above. Under one such alternative characterization, you could be treated as if you owned the Index Constituent Securities. If your Securities were to be so treated, you could be treated as receiving any dividends paid on the Index Constituent Securities during the time you hold your Securities and could be subject to tax at a rate of 30% (or lower treaty rate) with respect to such dividends which would be collected via withholding unless such dividends were effectively connected with your trade or business in the United States (or, if certain tax treaties apply, were to be attributable to your permanent establishment in the United States). In such latter case, you could be subject to net income tax with respect to such dividends at the marginal tax rates applicable to United States holders.

You may be subject to otherwise applicable information reporting and backup withholding requirements with respect to payments on your Securities unless you comply with certain certification and identification requirements as to your foreign status.

We will not attempt to ascertain whether any Index Constituent Securities would be treated as a USRPHC. If an Index Constituent Security were so treated, certain adverse U.S. federal income tax consequences could possibly apply to non-U.S. holders. You should refer to information filed with the SEC with respect to each Index Constituent Security and consult your tax advisor regarding the possible consequences to you, if any, if any Index Constituent Security is or becomes a USRPHC.

Prospective non-United States holders are urged to consult their tax advisors with respect to the tax consequences to them of an investment in the Securities, including any possible alternative characterizations and treatments.

Table of Contents

# Benefit Plan Investor Considerations

A fiduciary of a pension, profit-sharing or other employee benefit plan subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") (each, a "Plan"), should consider the fiduciary standards of ERISA in the context of the Plan's particular circumstances before authorizing an investment in the Securities. Among other factors, the fiduciary should consider whether the investment would satisfy the prudence and diversification requirements of ERISA and would be consistent with the documents and instruments governing the Plan, and whether the investment would involve a prohibited transaction under ERISA or the U.S. Internal Revenue Code (the "Code").

Section 406 of ERISA and Section 4975 of the Code prohibit Plans, as well as individual retirement accounts, Keogh plans any other plans that are subject to Section 4975 of the Code (also "Plans"), from engaging in certain transactions involving "plan assets" with persons who are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to the Plan. A violation of these prohibited transaction rules may result in excise tax or other liabilities under ERISA or the Code for those persons, unless exemptive relief is available under an applicable statutory, regulatory or administrative exemption. Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA), certain church plans (as defined in Section 3(33) of ERISA) and non-U.S. plans (as described in Section 4(b)(4) of ERISA) ("Non-ERISA Arrangements") are not subject to the requirements of Section 406 of ERISA or Section 4975 of the Code but may be subject to similar provisions under applicable federal, state, local, non-U.S. or other laws ("Similar Laws").

The acquisition of the Securities by a Plan or any entity whose underlying assets include "plan assets" by reason of any Plan's investment in the entity (a "Plan Asset Entity") with respect to which we, UBS Securities LLC, UBS Financial Services Inc. and other of our affiliates is or becomes a party in interest or disqualified person may result in a prohibited transaction under ERISA or Section 4975 of the Code, unless the Securities are acquired pursuant to an applicable exemption. The U.S. Department of Labor has issued five prohibited transaction class exemptions, or "PTCEs", that may provide exemptive relief if required for direct or indirect prohibited transactions that may arise from the purchase or holding of the Securities. These exemptions are PTCE 84-14 (for certain transactions determined by independent qualified professional asset managers), PTCE 90-1 (for certain transactions involving insurance company pooled separate accounts), PTCE 91-38 (for certain transactions involving bank collective investment funds), PTCE 95-60 (for transactions involving certain insurance company general accounts), and PTCE 96-23 (for transactions managed by in-house asset managers). In addition, ERISA Section 408(b)(17) and Section 4975(d)(20) of the Code may provide an exemption for the purchase and sale of the Securities, provided that neither the issuer of the Securities nor any of its affiliates have or exercise any discretionary authority or control or render any investment advice with respect to the assets of any Plan involved in the transaction, and provided further that the Plan pays no more and receives no less than "adequate consideration" in connection with the transaction (the "service provider exemption"). There can be no assurance that all of the conditions of any such exemptions will be satisfied.

Any purchaser or holder of the Securities or any interest therein will be deemed to have represented by its purchase and holding or conversion of the Securities that it either (1) is not a Plan, a Plan Asset Entity or a Non-ERISA Arrangement and is not purchasing the Securities on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement or (2) the purchase or holding of the Securities will not result in a non-exempt prohibited transaction or a similar violation under any applicable Similar Laws.

Due to the complexity of these rules and the penalties that may be imposed upon persons involved in non-exempt prohibited transactions, it is important that fiduciaries or other persons considering

S-52

Table of Contents

**Benefit Plan Investor Considerations**

purchasing the Securities on behalf of or with the assets of any Plan, a Plan Asset Entity or Non-ERISA Arrangement consult with their counsel regarding the availability of exemptive relief under any of the PTCEs listed above, the service provider exemption or the potential consequences of any purchase or holding under Similar Laws, as applicable. Purchasers of the Securities have exclusive responsibility for ensuring that their purchase and holding of the Securities do not violate the fiduciary or prohibited transaction rules of ERISA or the Code or any similar provisions of Similar Laws. The sale of any of the Securities to a Plan, Plan Asset Entity or Non-ERISA Arrangement is in no respect a representation by us or any of our affiliates or representatives that such an investment meets all relevant legal requirements with respect to investments by any such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement or that such investment is appropriate for such Plans, Plan Asset Entities or Non-ERISA Arrangements generally or any particular Plan, Plan Asset Entity or Non-ERISA Arrangement.

**S-53**

Table of Contents

# Supplemental Plan of Distribution

The amount of the Securities of any series to be sold on the applicable Initial Trade Date, and any related underwriting commissions or discounts payable to underwriters, will be specified in the applicable pricing supplement. We are not, however, obliged to, and may not, sell the full aggregate principal amount of any series of the Securities. We may suspend or cease sales of any series of the Securities at any time, at our discretion. For more information about the plan of distribution and possible market-making activities, see "Plan of Distribution" in the attached prospectus.

Broker-dealers may make a market in the Securities, although none of them are obligated to do so and any of them may stop doing so at any time without notice. This prospectus (including this product supplement and the accompanying prospectus) may be used by such dealers in connection with market-making transactions. In these transactions, dealers may resell a Security covered by this prospectus that they acquire from other holders after the original offering and sale of the Securities, or they may sell a Security covered by this prospectus in short sale transactions.

As described in more detail under "Use of Proceeds and Hedging" on page S-46, we or one of our affiliates may enter into swap agreements or related hedge transactions with one of our other affiliates or unaffiliated counterparties in connection with the sale of the Securities. UBS and/or its affiliates may earn additional income as a result of payments pursuant to these swap or related hedge transactions.

Broker-dealers and other persons are cautioned that some of their activities may result in their being deemed participants in the distribution of the Securities in a manner that would render them statutory underwriters and subject to the prospectus delivery and liability provisions of the U.S. Securities Act of 1933. Among other activities, broker-dealers and other persons may make short sales of the Securities and may cover such short positions by borrowing Securities from UBS or its affiliates or by purchasing Securities from UBS or its affiliates subject to its obligation to repurchase such Securities at a later date. As a result of these activities, these market participants may be deemed statutory underwriters. A determination of whether a particular market participant is an underwriter must take into account all the facts and circumstances pertaining to the activities of the participant in the particular case, and the example mentioned above should not be considered a complete description of all the activities that would lead to designation as an underwriter and subject a market participant to the prospectus delivery and liability provisions of the U.S. Securities Act of 1933. This prospectus will be deemed to cover any short sales of Securities by market participants who cover their short positions with Securities borrowed or acquired from us or our affiliates in the manner described above.

UBS reserves the right to pay a portion of the Annual Tracking Fee of any series of Securities to UBS Securities LLC and certain broker-dealers in consideration for services relating to that series of the Securities including, but not limited to, promotion and distribution.

## Conflicts of Interest

UBS Securities LLC is an affiliate of UBS and, as such, has a "conflict of interest" in any potential offering within the meaning of FINRA Rule 5121. In addition, UBS may receive the net proceeds from the offering of the Securities, thus creating an additional conflict of interest within the meaning of Rule 5121. Consequently, any offering will be conducted in compliance with the provisions of Rule 5121. UBS Securities LLC is not permitted to sell Securities in any offering to an account over which it exercises discretionary authority without the prior specific written approval of the account holder.

S-54

**Table of Contents**

ANNEX A

### FORM OF NOTICE OF EARLY REDEMPTION

To: e-tracsredemptions@ubs.com

Subject: ETRACS Notice of Early Redemption, CUSIP No.: [    ]

[BODY OF EMAIL]

Name of broker: [    ]

Name of beneficial holder: [    ]

Number of Securities to be redeemed: [    ]

Applicable Redemption Valuation Date: [    ], 20[    ]*

Broker Contact Name: [    ]

Broker Telephone #: [    ]

Broker DTC # (and any relevant sub-account): [    ]

The undersigned acknowledges that in addition to any other requirements specified in the product supplement relating to the Securities being satisfied, the Securities will not be redeemed unless (i) this notice of redemption is delivered to UBS Securities LLC by 12:00 noon (New York City time) on the Trading Day prior to the applicable Redemption Valuation Date; (ii) the confirmation, as completed and signed by the undersigned is delivered to UBS Securities LLC by 5:00 p.m. (New York City time) on the same day the notice of redemption is delivered; (iii) the undersigned has booked a delivery vs. payment ("DVP") trade on the applicable Redemption Valuation Date, facing UBS Securities LLC DTC 642 and (iv) the undersigned instructs DTC to deliver the DVP trade to UBS Securities LLC as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

The undersigned further acknowledges that the undersigned has read the section "Risk Factors — You will not know the Redemption Amount at the time you elect to request that we redeem your Securities" in the product supplement relating to the Securities and the undersigned understands that it will be exposed to market risk on the Redemption Valuation Date.

---

\*      Subject to adjustment as described in the product supplement relating to the Securities.

A-1

Table of Contents

**ANNEX B**

## FORM OF BROKER'S CONFIRMATION OF REDEMPTION

[TO BE COMPLETED BY BROKER] Dated:

UBS Securities LLC

UBS Securities LLC, as Calculation Agent

Fax: (203) 719-0943

To Whom It May Concern:

The holder of UBS AG $[          ] Medium-Term Notes, Series A, Exchange Traded Access Securities due [          ], CUSIP No. [          ], redeemable for a cash amount based on the performance of the [          ] Index (the "Securities") hereby irrevocably elects to receive, on the Redemption Date of [holder to specify],* with respect to the number of Securities indicated below, as of the date hereof, the Redemption Amount as described in the product supplement relating to the Securities, as supplemented by the pricing supplement relating to the Securities (as so supplemented, the "Prospectus"). Terms not defined herein have the meanings given to such terms in the Prospectus.

The undersigned certifies to you that it will (i) book a DVP trade on the applicable Redemption Valuation Date with respect to the number of Securities specified below at a price per Security equal to the Redemption Amount, facing UBS Securities LLC DTC 642 and (ii) deliver the trade as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

The undersigned acknowledges that in addition to any other requirements specified in the Prospectus being satisfied, the Securities will not be redeemed unless (i) this confirmation is delivered to UBS Securities LLC by 5:00 p.m. (New York City time) on the same day the notice of redemption is delivered; (ii) the undersigned has booked a DVP trade on the applicable Redemption Valuation Date, facing UBS Securities LLC DTC 642; and (iii) the undersigned will deliver the DVP trade to UBS Securities LLC as booked for settlement via DTC at or prior to 10:00 a.m. (New York City time) on the applicable Redemption Date.

Very truly yours,
[NAME OF DTC PARTICIPANT HOLDER]

_____

Name:
Title:
Telephone:
Fax:
E-mail:

Number of Securities surrendered for redemption: _____
DTC # (and any relevant sub-account): _____
Contact Name: _____
Telephone: _____
Fax: E-mail: _____

*(At least 50,000 Securities must be redeemed at one time to receive the Redemption Amount on any Redemption Date.)*

_____
\*       Subject to adjustment as described in the product supplement relating to the Securities.

**Table of Contents**

You should rely only on the information incorporated by reference or provided in this product supplement or the accompanying prospectus. We have not authorized anyone to provide you with different information. We are not making an offer of these securities in any state where the offer is not permitted. You should not assume that the information in this product supplement is accurate as of any date other than the date on the front of the document.



## TABLE OF CONTENTS

**Product Supplement**

| | |
|---|---|
| Product Supplement Summary | S-1 |
| Hypothetical Examples | S-12 |
| Risk Factors | S-18 |
| Valuation of the Index and the Securities | S-30 |
| General Terms of the Securities | S-32 |
| Use of Proceeds and Hedging | S-46 |
| Material U.S. Federal Income Tax Consequences | S-47 |
| Benefit Plan Investor Considerations | S-52 |
| Supplemental Plan of Distribution | S-54 |
|    Conflicts of Interest | S-54 |
| Form of Notice of Early Redemption | A-1 |
| Form of Broker's Confirmation of Redemption | B-1 |

**Prospectus**

| | |
|---|---|
| Introduction | 1 |
| Cautionary Note Regarding Forward-Looking Statements | 3 |
| Incorporation of Information About UBS AG | 4 |
| Where You Can Find More Information | 5 |
| Presentation of Financial Information | 6 |
| Limitations on Enforcement of U.S. Laws Against UBS AG, Its Management and Others | 6 |
| UBS | 7 |
| Swiss Regulatory Powers | 10 |
| Use of Proceeds | 11 |
| Description of Debt Securities We May Offer | 12 |
| Description of Warrants We May Offer | 32 |
| Legal Ownership and Book-Entry Issuance | 47 |
| Considerations Relating to Indexed Securities | 52 |
| Considerations Relating to Securities Denominated or Payable in or Linked to a Non-U.S. Dollar Currency | 55 |
| U.S. Tax Considerations | 58 |
| Tax Considerations Under the Laws of Switzerland | 69 |
| Benefit Plan Investor Considerations | 71 |
| Plan of Distribution | 73 |
|    Conflicts of Interest | 75 |
| Validity of the Securities | 76 |
| Experts | 76 |

# UBS AG Monthly Rest 2×Leveraged Exchange Traded Access Securities (ETRACS)

Product Supplement dated November 14, 2014
(To Prospectus dated November 14, 2014)

**UBS Investment Bank**

# Exhibit G

# The Clintons and the sordid UE affair

**7,124**

## Just In...

**The American Health Care Act undermines Medicare**
CONGRESS BLOG

**We can't afford to save Venice on the taxpayer dime**
CONTRIBUTORS

**Trump: Portland attacks 'unacceptable'**
ADMINISTRATION

**Perez: Honor the fallen by helping veterans**
NEWS

**Innocents abroad: Trump and Temple Mount**
CONTRIBUTORS

**Watch: House GOP veterans appear in Memorial Day video**
HOUSE

**Five goals for Republicans this summer**
HOUSE

**Top Dem: Trump's refusal to back climate deal a 'striking abdication of American leadership'**
ENERGY & ENVIRONMENT



The story, as originally recounted by James V. Grimaldi and Rebecca Ballhaus of *The Wall Street Journal*, was, of itself, deeply troubling. In March 2009, after meeting with Swiss Foreign Minister Micheline Calmy-Rey, then Secretary of State Hillary Clinton intervened with the U.S. Internal Revenue Service (IRS) on behalf of Switzerland's most powerful banking institution, UBS. The IRS, which at that time was seeking the identity of wealthy Americans who had stashed some $20 billion in 52,000 tax evading UBS accounts, then agreed that the Swiss bank need only turn over information on 4,450 accounts. Afterwards, UBS increased its previous $60,000 in donations to the Clinton Foundation ten-fold. By the end of 2014, UBS donations to the Clinton Foundation totaled $600,000. UBS also "paid former President Bill Clinton $1.5 million to participate in a series of question-and-answer sessions with UBS Wealth Management Chief Executive Bob McCann, making UBS his biggest single corporate source of speech income disclosed since he left the White House."

**VIEW ALL**

Those facts, of themselves, raise disturbing questions. Did a bank that still ranks as "the world's biggest wealth manager" and has at its disposal a bevy of economists and law firms have a legitimate reason for paying Bill Clinton $1.5 million in speaking fees? Or was the $1.5 million and the tenfold increase in Clinton Foundation donations a reward for the former secretary of State's intervention? If the latter, that reward would have, under federal law (18 U.S.C. § 201(c)(1)(A)), amounted to an illicit bribe.

But there's a more troubling question that arises. There can be little doubt that a media firestorm would ensue if a former president were to accept a lucrative speaking fee from the Mafia. Should the reaction be any different when the speaking fee comes from "banksters" who defrauded the U.S. government?

That's the true context here, according to a Feb. 18, 2009 U.S. Department of Justice (DoJ) press release that discussed the details of an unsealed "criminal information" and a "deferred prosecution agreement." The DoJ alleges that UBS did much more than permit wealthy Americans to stash billions in tax evading offshore accounts. In direct violation of a 2000 agreement with the IRS, Swiss bankers traveled to the U.S. 3,800 times to foster the elicit business and "used encrypted laptops and other counter-surveillance techniques to help prevent the detection of their marketing efforts and the identities and offshore assets of their U.S. clients."

"UBS executives knew that UBS's cross-border business violated the law," said R. Alexander Acosta, U.S. Attorney for the Southern District of Florida. "They refused to stop this activity...and in fact instructed their bankers to grow the business. The reason was money -- the business was too profitable to give up. This was not mere compliance oversight, but rather a knowing crime motivated by greed and disrespect for the law."

In exchange for the "deferred prosecution" of criminal fraud charges, UBS paid $780 million in fines and restitution, agreed to cease the illegal cross-border practice and "to immediately provide the United States government with the identities of, and account information for, certain United States customers of UBS's cross-border business," according to the DoJ press release.


Jared Kushner lands on
Mad Magazine cover


White House press corps
cries foul after Spicer...


Contrary to Pelosi's
hyperbole, Trump's...


Advertisers flee Hannity
over debunked Seth...



**The Highest Paying Card Has Hit The Market**

**NEXT ADVISOR**

**SPONSORED CONTENT**

When UBS, which could have lost its ability to conduct business in the U.S. if successfully prosecuted, balked at the IRS demand that it turn over information for all 52,000 accounts, the IRS filed a legal action seeking to compel disclosure. That is when, at the behest of the Swiss government, Hillary Clinton stepped in to negotiate a deal that prevented the IRS from gaining access to more than 91 percent of the illicit, tax-evading offshore accounts.

# Exhibit H

# UBS 2015 Bonus Pool Swells 14%, Ermotti Gets 28% Raise

**Bloomberg**

MAR 18, 2016 - 06:47

(Bloomberg) -- UBS Group AG allocated 14 percent more money for bonuses for 2015, its most profitable year since 2010. Chief Executive Officer Sergio Ermotti received a 28 percent raise.

Ermotti's total take for 2015 was 14.3 million Swiss francs, including 11.5 million francs in performance pay, the bank said in its annual report Friday. The bonus pool swelled to 3.5 billion francs ($3.6 billion) from 3.06 billion francs distributed among employees in 2014.

To contact the reporter on this story: Jeffrey Vögeli in Zurich at jvogeli@bloomberg.net To contact the editors responsible for this story: Simone Meier at smeier@bloomberg.net Cindy Roberts

bloomberg

**Bloomberg**

# Exhibit I

5/29/2017        Attorney General Lynch Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation | OPA | Department of Justice

Case 1:17-cv-04503-JMF   Document 91   Filed 04/03/18   Page 73 of 144

# JUSTICE NEWS

**Attorney General Lynch Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation**

Washington, DC ~ Wednesday, May 20, 2015

*Remarks as prepared for delivery*

Good morning, and thank you all for being here.  I am joined today by Assistant Attorney General [Bill] Baer of the Justice Department's Antitrust Division and Assistant Attorney General [Leslie] Caldwell of the Justice Department's Criminal Division, as well as our partners from the FBI and CFTC – Assistant Director in Charge [Andrew] McCabe of the FBI's Washington Field Office, and Director [Aitan] Goelman of the CFTC's Division of Enforcement.  We are here to announce a major law enforcement action against international financial institutions that for years participated in a brazen display of collusion and foreign exchange rate market manipulation – and will, as a result, pay a total of nearly $3 billion in fines and penalties.  Today's historic resolutions are the latest in our ongoing efforts to investigate and prosecute financial crimes, and they serve as a stark reminder that this Department of Justice intends to vigorously prosecute all those who tilt the economic system in their favor; who subvert our marketplaces; and who enrich themselves at the expense of American consumers.

Starting as early as December 2007, currency traders at several multinational banks formed a group dubbed "The Cartel."  It is perhaps fitting that those traders chose that name, as it aptly describes the brazenly illegal behavior they were engaged in on a near-daily basis.  For more than five years, traders in "The Cartel" used a private electronic chatroom to manipulate the spot market's exchange rate between euros and dollars using coded language to conceal their collusion.  They acted as partners – rather than competitors – in an effort to push the exchange rate in directions favorable to their banks but detrimental to many others.  The prices the market sets for those currencies influence virtually every sector of every economy in the world, and their actions inflated the banks' profits while harming countless consumers, investors and institutions around the globe – from pension funds to major corporations, and including the banks' own customers – who placed their faith in the market and relied on it to produce a competitive exchange rate.

As a result of our investigation, four of the world's largest banks have agreed to plead guilty to felony antitrust violations.  They are Citicorp, JPMorgan Chase & Co., Barclays PLC, and The Royal Bank of Scotland PLC.  These four banks have acknowledged their role in this conspiracy and committed to changing their corporate cultures starting at the highest levels.  They have also agreed to pay criminal fines totaling more than *$2.5 billion* – the largest set of antitrust fines ever obtained in the history of the Department of Justice.  And the fine that Citicorp alone will pay – $925 million – is the largest single fine ever imposed for a violation of the Sherman Act.  These unprecedented figures appropriately reflect the conspiracy's breathtaking flagrancy, its systemic reach and its significant impact.

A fifth bank, Switzerland's UBS AG, has agreed to plead guilty and pay a $203 million criminal penalty for breaching the non-prosecution agreement it entered in December 2012  regarding manipulation of the London Interbank Offered Rate, or LIBOR – a benchmark interest rate used worldwide.  The breach of the NPA was based in part on UBS's fraudulent and deceptive currency trading and sales practices related to foreign exchange markets, its collusion with other participants in the FX markets and its failure to take adequate action to prevent unlawful conduct after prior civil, criminal and regulatory resolutions.  In other words, UBS promised, in other resolutions, not to commit additional crimes – but it did.

Case 1:17-cv-04503-JMF    Document 91    Filed 04/03/18    Page 74 of 144

This represents the first time in recent history that the Department of Justice has found that a company breached an NPA over the objection of the company. But I want to be clear: the Department of Justice, under my watch, will not hesitate to file criminal charges for financial institutions that reoffend. And banks that cannot or will not clean up their act need to understand that non-prosecution agreements and deferred-prosecution agreements carry very real consequences and will be enforced.

The penalty all these banks will now pay is fitting considering the long-running and egregious nature of their anticompetitive conduct. It is commensurate with the pervasive harm done. And it should deter competitors in the future from chasing profits without regard to fairness, to the law or to the public welfare.

Today's resolutions are a testament to the tireless efforts of the Antitrust Division's criminal enforcement sections, the Criminal Division's Fraud Section and the FBI's Washington Field Office. I want to thank all of the agents, prosecutors, law enforcement officials and analysts who contributed their time and talents to achieving these remarkable results. I also want to express my deep appreciation for the cooperation and assistance we received from the many agencies who stood with us in our pursuit of justice, including the enforcement bodies I just mentioned – the Commodity Futures Trading Commission, the Office of the Comptroller of the Currency and the Financial Conduct Authority in the United Kingdom – as well as the Securities Exchange Commission and the Federal Reserve Bank. Finally, I would like to acknowledge my predecessor, Eric Holder, who oversaw this investigation from its inception. His relentless work made this resolution possible, and I want to thank him for his commitment to this important effort.

At this time, I'd like to introduce Assistant Attorney General [Bill] Baer, who will provide additional details on today's announcement.


**Speaker:**
Attorney General Loretta E. Lynch

**Component(s):**
Office of the Attorney General

*Updated February 9, 2017*

Case 1:17-cv-04503-LMF   Document 91   Filed 04/03/18   Page 75 of 144

# JUSTICE NEWS

**Assistant Attorney General Lanny A. Breuer Speaks at the UBS Press Conference**

Washington, DC ~ Wednesday, December 19, 2012

Thank you, Attorney General Holder.

Today, UBS Japan has agreed to plead guilty in connection with one of the most significant scandals ever to hit the global banking industry. For years, including at the height of the financial crisis, UBS manipulated its submissions to the British Bankers' Association for calculation of the London Interbank Offered Rate, or LIBOR. UBS AG, the banking giant and parent company of UBS Japan, has also entered into a non-prosecution agreement with the Justice Department, agreeing together with UBS Japan to pay $500 million to resolve our allegations related to the bank's manipulation of LIBOR. Together with approximately $1 billion in regulatory penalties and disgorgement, these criminal penalties bring the total amount of today's resolution to $1.5 billion.

The bank's conduct was simply astonishing. Hundreds of trillions of dollars in mortgages, student loans, credit card debt, financial derivatives, and other financial products worldwide are tied to LIBOR, which serves as the premier benchmark for short-term interest rates. In short, the global marketplace depends upon an accurate LIBOR. Yet UBS, like Barclays before it, sought repeatedly to fix LIBOR for its own ends – in this case, so UBS traders could maximize profit on their trading positions, and so the bank wouldn't appear vulnerable to the public during the financial crisis.

In addition to UBS Japan's agreement to plead guilty, two former UBS traders – Tom Alexander William Hayes and Roger Darin – have been charged, in a criminal complaint unsealed today, with conspiracy to manipulate LIBOR. Hayes has also been charged with wire fraud and an antitrust violation. There was nothing subtle about these traders' alleged conduct. In one instance, according to the complaint, Hayes explained to a junior rate submitter that he and Darin "generally coordinate" and "skew the libors a bit." In another instance, according to the complaint, Hayes told a trader at another bank that, "3m libor is too high cause i have kept it artificially high."

The scope of the misconduct admitted to by UBS AG and UBS Japan is far-reaching. For years, traders at UBS sought to manipulate the bank's LIBOR submissions for their own profit. The traders had positions in interest rate swaps that depended on UBS's LIBOR submissions. And, on numerous occasions, they caused UBS to make LIBOR submissions that directly benefited their own trading books. UBS's manipulation was extensive, and covered several currencies and interest rates.

Make no mistake: for UBS traders, the manipulation of LIBOR was about getting rich. As one broker told a UBS derivatives trader, according to the statement of facts appended to our agreement with the bank, "mate yur getting bloody good at this libor game . . . think of me when yur on yur yacht in monaco wont yu."

From 2006 to 2009, according to the complaint unsealed today against Hayes and Darin, Hayes arranged to move UBS's Yen LIBOR submissions in directions that would maximize his profit on the trading positions he took for the bank; and Darin repeatedly made false Yen LIBOR submissions on behalf of Hayes. The complaint also alleges that Hayes contacted brokers to influence them to disseminate false information about LIBOR. Hayes further allegedly made efforts to coordinate with traders at other banks to try to move their banks' LIBOR submissions in directions that would help his trading positions.

Since the government's investigation began, UBS has changed its senior leadership and improved its compliance and training programs. UBS has also cooperated with the Justice Department, and has agreed to continue doing so, as we pursue our ongoing, and active investigation into the manipulation of LIBOR.

We cannot, and we will not, tolerate misconduct on Wall Street of the kind admitted to by UBS today, and by Barclays last June. We will continue to follow the facts and the law wherever they lead us in this matter, as we do in every case.

I want to thank the many tenacious prosecutors in the Criminal Division, as well as the Antitrust Division, who are working on the LIBOR investigation, as well as the many talented agents and analysts at the FBI who have worked so hard on this case. I would also like to thank our colleagues at the Commodity Futures Trading Commission, the United Kingdom Financial Services Authority, and the Securities and Exchange Commission for their important parallel investigations; and the Swiss Financial Market Supervisory Authority, the Japanese Ministry of Justice, and the Japan Financial Services Authority for their valuable assistance.

Thank you.


**Topic(s):**
StopFraud

**Component(s):**
Criminal Division

*Updated September 17, 2014*

5/29/2017    Assistant Attorney General Leslie R. Caldwell Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation | OPA | Departm…

Case 1:17-cv-04503-JMF   Document 91   Filed 04/03/18   Page 7 of 144

JUSTICE NEWS

**Assistant Attorney General Leslie R. Caldwell Delivers Remarks at a Press Conference on Foreign Exchange Spot Market Manipulation**

Washington, DC ~ Wednesday, May 20, 2015

*Remarks as prepared for delivery*

Thank you, Bill [Baer].

The guilty pleas of five major financial institutions – from the United States and overseas – are truly historic.

The guilty plea to be entered by UBS results from the bank's breach of its non-prosecution agreement with the department through additional criminal conduct.  Due to its breach, UBS will plead guilty to felony wire fraud for its LIBOR-related misconduct and pay a $203 million criminal penalty.

In December 2012, UBS admitted that it had engaged in a criminal scheme to manipulate LIBOR and other benchmark interest rates, paid a $500 million criminal penalty and entered into a non-prosecution agreement, which required the bank to commit no additional criminal conduct.  Unfortunately, UBS did not sufficiently mend its ways.

UBS's criminal conduct in the benchmark interest rate markets was followed by criminal conduct in the foreign exchange markets.  After signing the LIBOR non-prosecution agreement, UBS engaged in fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange market transactions to the detriment of UBS's customers.  And UBS colluded with other banks in foreign exchange markets.

Other factors also led to the department's determination that UBS was in breach of its LIBOR agreement.  UBS's compliance program and remedial measures following the discovery of LIBOR manipulation did not detect the collusive and deceptive sales-related conduct in the foreign exchange markets.  And its conduct in the original LIBOR matter, for which it initially was not prosecuted in part because of its representations about enhancements to its compliance program, was far more serious than that of any other bank.

Perhaps most significantly, UBS has a "rap sheet" that cannot be ignored.  Within the past six years, the department has resolved criminal investigations of UBS three times, resulting in non-prosecution or deferred prosecution agreements.  UBS also has entered into civil and regulatory settlements on multiple occasions within the past few years.  Enough is enough.

Pursuant to the terms of the plea agreement it has signed, UBS must implement an institution-wide compliance program designed to prevent and detect foreign exchange and benchmark rate manipulation and related deceptive sales practices.  The department will ask the court to impose a three-year term of probation, and UBS will have to report on its progress with this compliance program.  Since the LIBOR resolution, UBS has made some progress in the right direction – but that progress needs to be enhanced and accelerated, and today's resolution will require that.

Now, Barclays, too, was subject to the terms of a LIBOR NPA with the Criminal Division when it engaged in some of the collusive conduct.  The department is requiring Barclays to pay a criminal penalty of $60 million – in addition to the $650 million fine that it has agreed to pay for its antitrust violations – for a total of $710 million.  For several reasons, the Criminal Division is imposing this penalty but exercising its discretion not to prosecute Barclays for LIBOR-related conduct.  Notably, Barclays has agreed to plead guilty – at the parent level – to antitrust violations and pay the accompanying, significant $650 million fine.  In addition, Barclays has agreed to specific remediation.

The five parent-level guilty pleas that the department is announcing today communicate loud and clear that we will hold financial institutions accountable for criminal misconduct.  And we will enforce the agreements that we enter into with corporations.  If appropriate and proportional to the misconduct and the company's track record, we will tear up an NPA or a DPA and prosecute the offending company based on the admitted statement of facts – as we are doing with UBS.  But we also will exercise our discretion to take other actions, where appropriate, such as assessing additional financial penalties and requiring remedial actions.

NPAs and DPAs are valuable tools, and we will continue to use them in appropriate circumstances.  And we will require that the parties who enter into those agreements live up to their terms.

The department is committed and dedicated to investigating and prosecuting financial fraud and protecting the integrity of the markets.  The resolutions announced today are just the latest in our ongoing and active investigations into the manipulation of the foreign exchange and benchmark interest rates.  To date, we have charged 12 individuals in our ongoing investigation regarding the manipulation of LIBOR and other benchmark interest rates, and three of those individuals already have pleaded guilty.  And our investigations are not over.  The banks pleading guilty today are required to cooperate in ongoing criminal investigations.

I commend the team of attorneys, paralegals and support staff from the Criminal Division's Fraud Section and the Antitrust Division in prosecuting this very sophisticated scheme.  I would like to thank the agents, accountants and financial analysts at the FBI for their excellent work in both the FX and LIBOR-related matters.  I also am grateful to the Criminal Division's Office of International Affairs, the Commodities Futures Trading Commission, the U.K. Financial Conduct Authority, the Securities and Exchange Commission and the U.K. Serious Fraud Office for their assistance as well.

Thank you.


**Component(s):**
Criminal Division

*Updated May 20, 2015*

# Exhibit J

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 9937 / September 30, 2015

SECURITIES EXCHANGE ACT OF 1934
Release No. 76034 / September 30, 2015

ADMINISTRATIVE PROCEEDING
File No. 3-16871

| | |
|---|---|
| In the Matter of<br><br>**UBS Financial Services Inc.,**<br><br>Respondent. | **ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against UBS Financial Services Inc. ("Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that

### Summary

1.      This matter involves violations of an antifraud provision of the federal securities laws in connection with Respondent's underwriting of certain municipal securities offerings. Respondent, a registered broker-dealer, conducted inadequate due diligence in certain offerings and as a result, failed to form a reasonable basis for believing the truthfulness of certain material representations in official statements issued in connection with those offerings. This resulted in Respondent offering and selling municipal securities on the basis of materially misleading disclosure documents. As a result of the conduct described herein, Respondent willfully violated Section 17(a)(2) of the Securities Act.[2]

2.      The violations discussed in this Order were self-reported by Respondent to the Commission pursuant to the Division of Enforcement's (the "Division") Municipalities Continuing Disclosure Cooperation Initiative.[3] Accordingly, this Order and Respondent's Offer are based on the information self-reported by Respondent.

### Respondent

3.      Respondent, incorporated in Delaware and headquartered in Weehawken, New Jersey is registered with the Commission as a broker-dealer and investment adviser.

### Due Diligence Failures

4.      Pursuant to Rule 15c2-12 of the Exchange Act, before purchasing or selling municipal securities in connection with an offering, underwriters are required to obtain executed continuing disclosure agreements from the issuers and/or obligated persons with respect to such municipal securities. In order to comply with the requirements of Rule 15c2-12, the continuing disclosure agreement must include an undertaking by the municipal issuer and/or obligated person, for the benefit of investors, to provide an annual report containing certain financial information and operating data to the Municipal Securities Rulemaking Board's ("MSRB") Electronic Municipal Market Access system,[4] as well as timely notice of certain specified events

---

[1]  The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]  A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)).

[3]  See Div. of Enforcement, U.S. Sec. & Exch. Comm'n, Municipalities Continuing Disclosure Cooperation Initiative, http://www.sec.gov/divisions/enforce/municipalities-continuing-disclosure-cooperation-initiative.shtml (last modified Nov. 13, 2014).

[4]  Previously, Rule 15c2-12 required such information to be provided to the appropriate nationally recognized municipal securities information repositories. In December 2008, Rule 15c2-12 was amended to designate the

pertaining to the municipal securities being offered and timely notice of any failure to submit an annual report on or before the date specified in the continuing disclosure agreement.

5.      Rule 15c2-12(f)(3) requires that a final official statement set forth any instances in the previous five years in which an issuer of municipal securities, or obligated person, failed to comply in all material respects with any previous continuing disclosure undertakings.

6.      Respondent acted as either a senior or sole underwriter in a number of municipal securities offerings in which the official statements essentially represented that the issuer or obligated person had not failed to comply in all material respects with any previous continuing disclosure undertakings.  In fact, certain of these statements were materially false and/or misleading because the issuer or obligated person had not complied in all material respects with its previous continuing disclosure undertakings.  Among the offerings in which the official statements contained false or misleading statements about prior compliance were the following:

- A competitive securities offering in 2011 and another in 2012 in which an issuer failed to disclose that it filed annual financial reports and operating data for two fiscal years between 196 and 771 days late, and failed to file required notices of late filings for each of those.  Respondent also acted as underwriter for a prior offering by the issuer;

- A 2011 competitive securities offering in which an issuer failed to disclose that, despite filing timely audited financial statements, it failed to file an annual continuing disclosure report containing certain operating data that it had previously undertaken to file for three of the previous five years, and that it had failed to file the required late filings for each of those.  Respondent also acted as an underwriter for a prior offering by the issuer; and

- A competitive securities offering in 2011 and another in 2013 in which an issuer failed to disclose that it had filed two annual financial reports between 300 and 666 days late, failed to file operating data that it had previously undertaken to provide for any of the previous five years, and failed to file required late filings for each of those.  Respondent also acted as an underwriter for a prior offering by the issuer.

7.      Respondent failed to form a reasonable basis through adequate due diligence for believing the truthfulness of the assertions by these issuers and/or obligors regarding their compliance with previous continuing disclosure undertakings pursuant to Rule 15c2-12.

## Legal Discussion

8.      Section 17(a)(2) of the Securities Act makes it unlawful "in the offer or sale of any securities . . . directly or indirectly . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make

---

MSRB's Electronic Municipal Market Access system as the central repository for ongoing disclosures by municipal issuers, effective July 1, 2009.

the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2) (2012). Negligence is sufficient to establish a violation of Section 17(a)(2). See Aaron v. SEC, 446 U.S. 680, 696-97 (1980). A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).

9.      An underwriter may violate the antifraud provisions of the federal securities laws if it does not have a reasonable basis for believing the truthfulness of material statements in offering documents in connection with a securities offering, as a result of inadequate due diligence. "By participating in an offering, an underwriter makes an implied recommendation about the securities [that it] . . . has a reasonable basis for belief in the truthfulness and *completeness* of the key representations made in any disclosure documents used in the offerings." Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 641 (D.C. Cir. 2008) (emphasis added) (quoting Municipal Securities Disclosure, Exchange Act Release No. 26100, 53 Fed. Reg. 37778, 37787 (Sept. 28, 1988) ("1988 Proposing Release")); see also City Securities Corp., Exchange Act Release No. 70056, 2013 WL 3874855, at *1-2 (July 29, 2013) (finding underwriter violated anti-fraud provisions by failing to conduct due diligence related to issuer's statements regarding its compliance with previous continuing disclosure undertakings).

10.     An underwriter "occupies a vital position" in a securities offering because investors rely on its reputation, integrity, independence, and expertise. See Dolphin & Bradbury, 512 F.3d at 641 (quoting 1988 Proposing Release, 53 Fed. Reg. at 37787). While broker-dealers must have a reasonable basis for recommending securities to customers, underwriters have a "heightened obligation" to take steps to ensure adequate disclosure. Id. (quoting 1988 Proposing Release, 53 Fed. Reg. at 37787 n.74).

11.     Rule 15c2-12 was adopted in an effort to improve the quality and timeliness of disclosures to investors in municipal securities. In recognition of the fact that the disclosure of sound financial information is critical to the integrity of not just the primary market, but also the secondary markets for municipal securities, Rule 15c2-12 requires an underwriter to obtain a written agreement, for the benefit of the holders of the securities, in which the issuer undertakes (among other things) to annually submit certain financial information. See 17 C.F.R. § 240.15c2-12(b)(5)(i) (2015); see also Municipal Securities Disclosure, Exchange Act Release No. 34961, 59 Fed. Reg. 59590, 59592 (Nov. 17, 1994). Critical to any evaluation of an undertaking to make disclosures is the likelihood that the issuer or obligated person will abide by the undertaking. See id. at 59594. The disclosure requirements of Rule 15c2-12 provide an incentive for issuers and obligated persons to comply with their undertakings, allowing underwriters, investors, and others to assess the reliability of the disclosure representations. See Municipal Securities Disclosure, 59 Fed. Reg. at 59595.

12.     As a result of the conduct described herein, Respondent willfully violated Section 17(a)(2) of the Securities Act.

## Cooperation

13.     In determining to accept Respondent's offer, the Commission considered the cooperation of Respondent in self-reporting the violations.

## Undertakings

14.     Respondent has undertaken to:

a.     Retain an independent consultant (the "Independent Consultant"), not unacceptable to the Commission staff, to conduct a review of Respondent's policies and procedures as they relate to municipal securities underwriting due diligence.  The Independent Consultant shall not have provided consulting, legal, auditing or other professional services to, or had any affiliation with, Respondent during the two years prior to the institution of these proceedings.  Respondent shall cooperate fully with the Independent Consultant and the Independent Consultant's compensation and expenses shall be borne by Respondent.

b.     Require the Independent Consultant to enter into an agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  The agreement will also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in performance of his/her duties under this Order shall not, without prior written consent of the Division enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondent, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.  The agreement will also provide that, within 180 days of the institution of these proceedings, the Independent Consultant shall submit a written report of its findings to Respondent, which shall include the Independent Consultant's recommendations for changes in or improvements to Respondent's policies and procedures.

c.     Adopt all recommendations contained in the Independent Consultant's report within 90 days of the date of that report, provided, however, that within 30 days of the report, Respondent shall advise in writing the Independent Consultant and the Commission staff of any recommendations that Respondent considers to be unduly burdensome, impractical or inappropriate.  With respect to any such recommendation, Respondent need not adopt that recommendation at that time but shall propose in writing an alternative policy, procedures or system designed to achieve the same objective or purpose.  As to any recommendation on which Respondent and the Independent Consultant do not agree, Respondent and the Independent Consultant shall attempt in good faith to reach an agreement within 60 days after the date of the Report.  Within 15 days after the conclusion of the discussion and evaluation by Respondent and the

Independent Consultant, Respondent shall require that the Independent Consultant inform Respondent and the Commission staff in writing of the Independent Consultant's final determination concerning any recommendation that Respondent considers to be unduly burdensome, impractical, or inappropriate. Within 10 days of this written communication from the Independent Consultant, Respondent may seek approval from the Commission staff to not adopt recommendations that the Respondent can demonstrate to be unduly burdensome, impractical, or inappropriate. Should the Commission staff agree that any proposed recommendations are unduly burdensome, impractical, or inappropriate, Respondent shall not be required to abide by, adopt, or implement those recommendations.

      d.     Certify, in writing, compliance with the undertakings set forth above in paragraphs 14(a)-(c). The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to LeeAnn Ghazil Gaunt, Chief, Municipal Securities and Public Pensions Unit, with a copy to the Office of Chief Counsel of the Division, no later than the one-year anniversary of the institution of these proceedings.

      e.     Respondent shall cooperate with any subsequent investigation by the Division regarding the subject matter of this Order, including the roles of other parties.

      f.     For good cause shown, the Commission staff may extend any of the procedural dates relating to these undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered the last day.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Section 8A of the Securities Act and Section 15(b) of the Exchange Act, it is hereby ORDERED that:

      A.     Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act.

      B.     Respondent shall, within ten (10) days of the entry of this Order, pay a civil money penalty in the amount of $480,000 to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury in accordance with Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717. Payment must be made in one of the following ways:

(1)      Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      Respondent may make direct payment from a bank account via Pay.gov through the SEC website at               ; or

(3)      Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying UBS Financial Services Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to LeeAnn Ghazil Gaunt, Chief, Municipal Securities and Public Pensions Unit, Securities and Exchange Commission, 33 Arch Street, 23rd Floor, Boston, MA 02110-1424.

     C.      Respondent shall comply with the undertakings enumerated in Paragraphs 14(a)-(d), above.

By the Commission.

Brent J. Fields
Secretary

# Exhibit K

## Risk Factors

*We issued the Securities initially in an amount having the aggregate Principal Amount of $25,000,000 on December 13, 2013, and issued additional securities having the aggregate Principal Amount of $75,000,000 on January 15, 2014 and additional securities having the aggregate Principal Amount of $400,000,000 on May 19, 2014. The Securities are part of a single series of senior debt securities issued under our indenture dated as of November 21, 2000 between us and U.S. Bank Trust National Association, as trustee, as supplemented by the First Supplemental Indenture thereto, dated as of February 28, 2006. In this pricing supplement, the term "Securities" collectively refers to the original securities we issued beginning on December 13, 2013 and the additional securities we issued on January 15, 2014 and May 19, 2014, respectively, unless the context otherwise requires.*

Your investment in the Securities will involve significant risks. The Securities are not secured debt and are significantly riskier than ordinary unsecured debt securities. Unlike ordinary debt securities, the return on the Securities is linked to the performance of the Index. The Securities are two times leveraged with respect to the Index and, as a result, may benefit from two times any positive, but will be exposed to two times any negative, monthly performance of the Index. As described in more detail below, the trading price of the Securities may vary considerably before the Maturity Date, due to, among other things, fluctuations in the markets to which the Index Constituent Securities are tied and events that are difficult to predict and beyond our control. Investing in the Securities is not equivalent to investing directly in the Index Constituent Securities (as defined in the accompanying product supplement) or in the Index itself.

*As more fully described in the accompanying product supplement, investing in the Securities, a series of Monthly Pay 2xLeveraged Exchange Traded Access Securities (ETRACS), involves significant risks. In addition to the risks relating to the Index and closed-end funds, the structure of the Securities involves the risk of loss of your entire investment, leverage risk, correlation and compounding risk and market risk, among other complex risks. As a result, the Securities may not be a suitable investment for some investors. We urge you to read the more detailed explanation of these risks described under "Risk Factors" in the accompanying product supplement, together with "Considerations Relating to Indexed Securities" in the accompanying prospectus and the other information in this pricing supplement, the accompanying product supplement and the accompanying prospectus, before investing in the Securities.*

### The Index has a limited performance history.

The Index was launched on April 11, 2013, and therefore has no performance history prior to that date. Because the Index has no history prior to April 11, 2013, little or no historical information will be available for you to consider in making an independent investigation of the Index performance, which may make it difficult for you to make an informed decision with respect to an investment in the Securities. In addition, we are unable to provide hypothetical, or "back-tested", Index returns; therefore you will not have any hypothetical data to consider when making an investment decision. The lack of hypothetical data may also make it difficult for you to evaluate the potential future performance of the Index.

### Risks associated with closed-end funds.

Investments in closed-end funds involve certain risks. Because the Securities are linked to the performance of an index comprised solely of closed-end funds, you should carefully consider the following risks associated with investments in closed-end funds generally as well as the strategic risks and sector risks associated with investing in funds with specialized investment strategies, as described below.

***The Index Constituent Securities may trade at fluctuating discounts from or premiums to their net asset values, and this may adversely affect your return.***

Shares of closed-end funds typically trade in the open market at discounts from, or premiums to, their net asset value ("NAV"). The levels of such discounts and premiums may fluctuate significantly over time in response to supply and demand, which are influenced by various factors. The level of the Index, and thus the return on the Securities, will be adversely affected if the Index Constituent Securities experience decreases in premiums or increases in discounts, which is a separate risk from the risk of a decline in the value of the Securities due to decreases in the NAVs of the Index Constituent Securities.

***The Index Constituent Securities are subject to market risk.***

The prices of shares of closed-end funds are sensitive to general movements in the stock market. A drop in the stock market may depress the prices of shares of closed-end funds. Share prices, like other investments, may move up or down, sometimes rapidly and unpredictably. In addition, market prices of the shares of closed-end funds may be affected by investors' perceptions regarding closed-end funds generally or their underlying investments. Events that have an adverse effect on the stock market as a whole could have a similarly adverse effect on the value of the Securities, and such adverse effects may not be predictable.

***The Index Constituent Securities are subject to management risk.***

The success of the strategy of any closed-end fund is subject to the ability of the fund manager to achieve the fund's investment objective. The Index Constituent Securities may not be managed by individuals who are able to achieve their specified investment objectives, and even previously successful fund managers may be unable, due to general financial, economic and political conditions or due to other factors beyond their control, to achieve their investment objectives. Past success in meeting investment objectives does not necessarily indicate that the fund manager will be able to continue to do so. If the fund manager of one or more of the Index Constituents is unable to achieve the relevant fund's investment objective, the NAV of the fund may decrease and the value of the Securities may be adversely affected.

***Shares of closed-end funds do not assure dividend payments.***

Closed-end funds do not guarantee the payment of dividends. Dividends are paid only when declared by the boards of directors of closed-end funds, and the level of dividends may vary over time. If an Index Constituent reduces or eliminates the level of its regular dividends, this may cause the market price of its shares, and therefore of the Securities, to fall.

***Certain Index Constituents may be classified as "non-diversified."***

Certain closed-end funds, including some of the Index Constituents, may be classified as "non-diversified" under the Investment Company Act of 1940, as amended. A non-diversified fund has the ability to invest more of its assets in securities of a single issuer than if it were classified as a "diversified" fund, which may increase volatility. If the closed-end fund's investment in an issuer represents a relatively significant percentage of the closed-end fund's portfolio, the value of the portfolio will be more impacted by a loss on that investment than if the portfolio were more diversified. If the investments of the Index Constituent Securities are concentrated in a particular issuer or set of issuers that experiences a loss, the value of the Securities could be affected.

***The value of a closed-end fund may not accurately track the value of the securities in which such closed-end fund invests.***

Although the trading characteristics and valuations of a closed-end fund will usually mirror the characteristics and valuations of the securities in which such closed-end fund invests, its value may not

accurately track the value of such securities. The value of a closed-end fund will also reflect transaction costs and fees that the closed-end fund constituents do not have. Accordingly, the performance of a closed-end fund may not be equal to the performance of the closed-end fund constituents during the term of the Securities.

### The organizational documents of the closed-end funds underlying the Securities may contain anti-takeover provisions.

The organizational documents of certain of the Index Constituents may include provisions that could limit the ability of other entities or persons to acquire control of the relevant Index Constituent or to change the composition of its board. These provisions could limit the ability of shareholders to sell their shares at a premium to prevailing market prices by discouraging a third party from seeking to obtain control of the relevant Index Constituent.

### The Index Constituent Securities are subject to portfolio turnover risk.

A closed-end fund may engage in portfolio trading. There are generally no limits on the rate of portfolio turnover. Higher turnover rates result in correspondingly greater brokerage commissions and other transactional expenses which are borne by the applicable closed-end fund, directly or through its investment in its underlying assets, which may adversely affect the value of the Securities. Higher turnover rates also may be more likely to generate capital gains that must be distributed to holders, either as a result of a closed-end fund's receipt of capital gains from transactions or from other investments.

## Strategic risks associated with closed-end funds.

Closed-end funds employ various strategies to achieve their investment objectives. The following outlines the key risks of strategies pursued by closed-end funds.

### Risks of leverage strategies.

The Index Constituents may be leveraged. Leverage magnifies both the potential for gain and the risk of loss. Leverage may result from ordinary borrowings or may be inherent in the structure of certain Index Constituent investments such as derivatives. If the prices of such investments decrease, or if the cost of borrowing exceeds any increase in such prices, the NAV of the relevant Index Constituent Security will decrease faster than if it had not used leverage. To repay borrowings, an Index Constituent may have to sell investments at a time and at a price that is unfavorable. An investment in securities of Index Constituents that use leverage may expose the Securities to higher volatility in the market value of such securities and the possibility that the Securities' long-term returns on such securities will be diminished.

### Risks of covered call writing strategies.

Many of the closed-end funds included in the Index engage in a strategy known as "covered call option writing," which is designed to produce income from option premiums and offset a portion of a market decline in the underlying security. The writer (seller) of a covered call option forgoes, during the option's life, the opportunity to profit from increases in the market value of the security covering the call option above the sum of the premium and the strike price of the call, but retains the risk of loss should the price of the underlying security decline. The writer of an option has no control over the time at which it may be required to fulfill its obligation as writer of the option. Once an option writer has received an exercise notice, it cannot effect a closing purchase transaction in order to terminate its obligation under the option and must deliver the underlying security at the exercise price. As a result, the Index Constituents that engage in covered call option writing may write options on securities that subsequently increase in value above the sum of the premium and the strike price of the call, which could cause such Index Constituents to receive a lower return on such securities than if they had not written such options.

### Risks of investing in senior loans.

The Index is comprised of closed-end funds that may invest in senior loans. Investments in senior loans typically are below investment grade and are considered speculative because of the credit risk of their issuers. Such companies are more likely to default on their payments of interest and principal owed, and such defaults could reduce the NAV of one or more Index Constituent Securities. In addition, an Index Constituent may have to sell securities at lower prices than it otherwise would to meet cash needs or it may have to maintain a greater portion of its assets in cash equivalents than it otherwise would because of impairments and limited liquidity of the collateral supporting a senior loan, which could negatively affect the Index Constituent's performance and therefore, indirectly, negatively affect the value of the Securities.

### Risks of investing in equity securities.

The Index is comprised of closed-end funds that invest in equities. Common stock holds the lowest priority in the capital structure of a company, and therefore takes the largest share of the company's risk and its accompanying volatility. An adverse event, such as an unfavorable earnings report, may depress the value of a particular common stock. Also, prices of common stocks are sensitive to general market movements. In addition, common stock does not assure dividend payments, and common stockholders have a right to receive dividends only after the company has provided for payment to its creditors, bondholders and preferred stockholders. Dividends are paid only when declared by an issuer's board of directors, and the amount of any dividend may vary over time.

### Risks of investing in small- and medium-capitalization companies.

Some of the Index Constituents invest in small- and medium-capitalization companies. Such companies may be more volatile and more likely than large-capitalization companies to have narrower product lines, fewer financial resources, less management depth and experience and less competitive strength. Returns on investments in securities of these companies could trail the returns on investments in securities of larger companies.

### Risks of investing in fixed income securities.

The Index is comprised of closed-end funds that may invest in fixed income securities, which may include investment grade and high yield municipal bonds, high yield corporate bonds and emerging market sovereign bonds. Investing in the Securities, which are linked to Index Constituents that may invest in fixed income securities, differs significantly from investing directly in bonds themselves and holding them until maturity since the values of the Index Constituent Securities fluctuate, at times significantly, during each Trading Day based upon the current market prices of the underlying bonds. The market prices of these bonds are volatile and significantly influenced by a number of factors, particularly the yields on these bonds as compared to current market interest rates and the actual or perceived credit quality of the issuer of these bonds.

In general, fixed income securities are significantly affected by changes in current market interest rates. As interest rates rise, the price of fixed income securities, including those underlying the Index Constituent Securities, is likely to decrease. Securities with longer durations tend to be more sensitive to interest rate changes, usually making them more volatile than securities with shorter durations. To the extent that the Index Constituents invest in fixed income securities with a longer term remaining to maturity, the risk of price volatility in the underlying securities and, consequently, the volatility in the value of the Index Constituent Securities, will be increased. As a result, rising interest rates may cause the value of the bonds underlying the Index Constituent Securities, the Index Constituent Securities and, therefore, the Securities, to decline.

Interest rates are subject to volatility due to a variety of factors, including:

➤ sentiment regarding underlying strength in the U.S. and global economies;

➤ expectations regarding the level of price inflation;

➤ sentiment regarding credit quality in the U.S. and global credit markets;

➤ central bank policies regarding interest rates; and

➤ the performance of U.S. and foreign capital markets.

In addition, the prices of the Index Constituents that invest in fixed income securities may be significantly influenced by the creditworthiness of the issuers of the bonds. Such Index Constituents may have their credit ratings downgraded, including a downgrade from investment grade to non-investment grade status, or have their credit spreads widen significantly. Following a ratings downgrade or the widening of credit spreads, some or all of the underlying bonds may suffer significant and rapid price declines. These events may affect only a few or a large number of the underlying bonds. For example, during the recent credit crisis in the United States, credit spreads widened significantly as the market demanded very high yields on a variety of bonds and, as a result, the prices of such bonds dropped significantly. There can be no assurance that some or all of the factors that contributed to this credit crisis will not continue or return during the term of the Securities, and, consequently, depress the price, perhaps significantly, of the underlying bonds and therefore the value of the Index Constituent Securities and the Securities.

### Risks of investing in high yield bonds.

The Index is comprised of closed-end funds that may invest in U.S. dollar high yield corporate and municipal bonds and are therefore subject to high yield securities risk, which is the risk that securities that are rated below investment grade (commonly known as "junk bonds," including those bonds rated at BB+ or lower by S&P or Fitch or Ba1 or lower by Moody's) may be more volatile than higher-rated securities of similar maturity. High yield securities may also be subject to greater levels of credit or default risk than higher-rated securities. The value of high yield securities can be adversely affected by overall economic conditions, such as an economic downturn or a period of rising interest rates, and high yield securities may be less liquid and more difficult to sell at an advantageous time or price or to value than higher-rated securities. In particular, high yield securities are often issued by smaller, less creditworthy companies or municipalities or by highly leveraged (indebted) firms or municipalities, which are generally less able than more financially stable firms or municipalities to make scheduled payments of interest and principal.

### Risks of investing in preferred stock.

The Index is comprised of closed-end funds that may invest in preferred stock. Generally, preferred stockholders have no voting rights with respect to the issuing company unless certain events occur. In addition, preferred stock is subordinated to bonds and other debt instruments in a company's capital structure and therefore will be subject to greater credit risk than those debt instruments. Unlike debt securities, dividend payments on preferred stock typically must be declared by the issuer's board of directors. An issuer's board of directors is generally not under any obligation to pay a dividend (even if such dividends have accrued), and may suspend payment of dividends on preferred stock at any time. In the event an issuer of preferred stock experiences economic difficulties, the issuer's preferred stock may lose substantial value due to the reduced likelihood that the issuer's board of directors will declare a dividend and the fact that the preferred stock may be subordinated to other securities of the same issuer. There is a chance that the issuer of preferred stock will default (fail to make scheduled dividend payments on the preferred stock or scheduled interest payments). In addition, because some preferred stock may pay dividends at a fixed rate, the market price can be sensitive to changes in interest rates in a manner similar to bonds — that is, as interest rates rise, the value of the preferred stock is likely to

decline. To the extent that any Index Constituents invest a substantial portion of their assets in fixed rate preferred stock, rising interest rates may cause the value of such Index Constituents' investments to decline significantly.

### Risks of investing in convertible securities.

The Index is comprised of closed-end funds that may invest in convertible securities, which are bonds, debentures, notes, preferred securities or other securities that may be converted or exchanged (by the holder or the issuer) into shares of the underlying common stock (or cash or securities of equivalent value), either at a stated price or stated rate. Convertible securities have characteristics similar to both fixed income and equity securities. Generally, convertible securities are subordinated to other similar but non-convertible securities of the same issuer, although convertible bonds, as corporate debt obligations, are senior in right of payment to all equity securities, and convertible preferred stock is senior to common stock, of the same issuer. Because of the subordination feature, convertible securities are typically considered to be of lower quality than similar non-convertible securities.

### Risks of investing in municipal bonds.

Closed-end funds may invest in municipal bonds. Municipal securities issuers may face local economic or business conditions (including bankruptcy) and litigation, legislation or other political events that could have a significant effect on the ability of the municipality to make payments on the interest or principal of its municipal bonds. In addition, because municipalities issue municipal securities to finance similar types of projects, such as education, healthcare, transportation, infrastructure and utility projects, conditions in those sectors can affect the overall municipal bond market. Furthermore, changes in the financial condition of one municipality may affect the overall municipal bond market.

### Risks of investing in illiquid securities.

Closed-end funds are not limited in their ability to invest in illiquid securities, and as a result, some of the Index Constituents may invest all or a substantial portion of their net assets in illiquid securities. Securities with reduced liquidity involve greater risk than securities with more liquid markets. Market quotations for securities not traded on national exchanges may vary over time, and if the credit quality of a fixed-income security unexpectedly declines, secondary trading of that security may decline for a period of time. If an Index Constituent chooses to (or is forced to) liquidate illiquid portfolio assets during periods of infrequent trading, it may not receive full value for those assets.

### Risk of investing in mortgage-backed and asset-backed securities.

The Index is comprised of closed-end funds that may invest in mortgage- and asset-backed securities. Investments in mortgage- and asset-backed securities are subject to prepayment or call risk, which is the risk that borrowers may prepay their loans at faster than expected rates. Such securities may be prepaid at a price less than the original purchase value. Certain mortgage- and asset-backed securities may be more volatile, less liquid and more difficult to value than traditional debt securities.

Mortgage and asset-backed securities have different risk characteristics from traditional debt securities. Although generally the value of fixed-income securities increases during periods of falling interest rates and decreases during periods of rising rates, this is not always the case with mortgage and asset-backed securities. This is due to the fact that principal may be prepaid at any time as well as other factors. Generally, prepayments will increase during a period of falling interest rates and decrease during a period of rising interest rates. The rate of prepayments also may be influenced by economic and other factors, such as changes in credit use and payment patterns. Mortgage- and asset-backed securities also involve the risk that various federal and state consumer laws and other legal, regulatory and economic factors may result in the collateral backing the securities being insufficient to support payment on the securities.

### Derivatives risk.

Certain Index Constituents may invest in, or enter into, derivatives such as forward contracts, options, futures contracts, options on futures contracts and swap agreements. A derivative instrument often has risks similar to its underlying instrument and may have additional risks, including imperfect correlation between the value of the derivative and the underlying instrument, risks of default by the counterparty to certain derivative transactions, magnification of losses incurred due to changes in the market value of the securities, instruments, indices or interest rates to which the derivative relates, and risks that the derivative instruments may not be liquid.

Derivatives can be volatile, and may entail investment exposures that are greater than their cost would suggest, meaning that a small investment in derivatives could have a large potential impact on an Index Constituent Security's performance. Changes in liquidity may result in significant, rapid and unpredictable changes in the prices for derivatives. Successful use of derivatives is subject to the ability of the Index Constituent's manager to predict correctly movements in the direction of the relevant market and, to the extent the transaction is entered into for hedging purposes, to ascertain the appropriate correlation between the transaction being hedged and the price movements of the derivatives.

### Risks associated with emerging market issuers.

Some of the Index Constituents invest in emerging markets, and therefore the Securities are subject to emerging markets risk. Investments in securities linked directly or indirectly to emerging market securities involve many risks, including, but not limited to: economic, social, political, financial and military conditions in the emerging market; regulation by national, provincial, and local governments; less liquidity and smaller market capitalizations than exist in the case of many large U.S. companies; different accounting and disclosure standards; and political uncertainties. Securities of emerging market issuers may be more volatile and may be affected by market developments differently than U.S. issuers. Government interventions to stabilize securities markets and cross-shareholdings may affect prices and volume of trading of the securities of emerging market issuers. Economic, social, political, financial and military factors could, in turn, negatively affect such issuers' value. These factors could include changes in the emerging market government's economic and fiscal policies, possible imposition of, or changes in, currency exchange laws or other laws or restrictions applicable to the emerging market issuers or investments in their securities, and the possibility of fluctuations in the rate of exchange between currencies. Moreover, emerging market economies may differ favorably or unfavorably from the U.S. economy in a variety of ways, including growth of gross national product, rate of inflation, capital reinvestment, resources and self-sufficiency. You should carefully consider the risks related to emerging markets, to which the Securities are susceptible, before making a decision to invest in the Securities.

### Risks associated with foreign securities markets.

The Index is comprised of closed-end funds that may invest in stocks and bonds issued by foreign issuers. An investment in securities linked directly or indirectly to the value of securities issued by non-U.S. issuers involves particular risks. Generally, non-U.S. securities markets may be more volatile than U.S. securities markets, and market developments may affect non-U.S. securities markets differently from U.S. securities markets. Direct or indirect government intervention to stabilize these non-U.S. securities markets, as well as cross shareholdings in non-U.S. issuers, may affect trading prices and volumes in those markets. There is generally less publicly available information about non-U.S. issuers than about those U.S. issuers that are subject to the reporting requirements of the SEC, and non-U.S. issuers are subject to accounting, auditing and financial reporting standards and requirements that differ from those applicable to U.S. reporting issuers. Securities prices in non-U.S. countries are subject to political, economic, financial and social factors that may be unique to the particular country. These factors, which could negatively affect the non-U.S. securities markets, include the possibility of recent or future changes

in the non-U.S. government's economic and fiscal policies, the possible imposition of, or changes in, currency exchange laws or other non-U.S. laws or restrictions applicable to non-U.S. issuers or investments in non-U.S. securities and the possibility of fluctuations in the rate of exchange between currencies. Moreover, certain aspects of a particular non-U.S. economy may differ favorably or unfavorably from the U.S. economy in important respects, such as growth of gross national product, rate of inflation, capital reinvestment, resources and self-sufficiency. Finally, it will likely be more costly and difficult to enforce the laws or regulations of a non-U.S. country or exchange.

### *Risks of investing in commodities or in securities linked to commodity prices.*

The Securities are linked to closed-end funds that may invest in commodities, which may consist of futures contracts rather than physical commodities, or in securities linked to commodity prices. Unlike equities, which typically entitle the holder to a continuing stake in a corporation, commodity futures contracts normally specify a certain date for delivery of the underlying physical commodity. As the exchange-traded futures contracts that comprise a portion of an Index Constituent's portfolio approach expiration, they may be replaced by contracts that have a later expiration. Thus, for example, a contract purchased and held in August may specify an October expiration. As time passes, the contract expiring in October is replaced by a contract for delivery in December. This process is referred to as "rolling."

If the market for these contracts is in "backwardation," which means the prices are lower in the distant delivery months than in the nearer delivery months, the purchase of the December contract would take place at a price that is lower than the sale price of the October contract. Conversely, if the market for these contracts is in "contango," which means that the prices are higher in the distant delivery months than in the nearer delivery months, the purchase of the December contract would take place at a price that is higher than the sale price of the October contract. The difference between the prices of the two contracts when they are rolled is sometimes referred to as a "roll yield," and the change in price that contracts experience while they are components of the portfolio is sometimes referred to as a "spot return." An investor in the Securities cannot receive either the roll yield or the spot return separately.

The presence of contango in the relevant futures market could result in negative roll yields, which could adversely affect the value of some of the Index Constituent Securities and therefore the Securities. Because of the potential effects of negative roll yields, it is possible for the value of the relevant Index Constituent Securities to decrease significantly over time even when the near-term or spot prices of the relevant commodity are stable or increasing. It is also possible, when near-term or spot prices of the relevant commodity are decreasing, for the value of the relevant Index Constituent Securities to decrease significantly over time even when some or all of the constituent commodities are experiencing backwardation.

In addition, trading in futures contracts is speculative and can be extremely volatile. Market prices may fluctuate rapidly based on numerous factors, including: changes in supply and demand relationships (whether actual, perceived, anticipated, unanticipated, or unrealized); trade; fiscal monetary and exchange control programs; domestic and foreign political and economic events and policies; technological developments; changes in interest rates; and monetary and other governmental policies, action or inaction. These factors may affect the value of some of the Index Constituent Securities and of the Securities in varying ways, and different factors may cause the value of certain commodities, and the volatilities of their prices, to move in inconsistent directions at inconsistent rates.

### *Currency exchange rate risk.*

The Securities are linked to closed-end funds that invest in securities that are traded and quoted in foreign currencies on non-U.S. markets. Therefore, holders of the Securities will be exposed to currency exchange rate risk with respect to the currencies in which such securities trade. The values of the

currencies of the countries in which such closed-end funds may invest may be subject to a high degree of fluctuation due to changes in interest rates, the effects of monetary policies issued by the United States, foreign governments, central banks or supranational entities, the imposition of currency controls or other national or global political or economic developments. An investor's net exposure will depend on the extent to which the relevant non-U.S. securities strengthen or weaken against the U.S. dollar and the relative weight of each non-U.S. security in the portfolios of such closed-end funds. If, taking into account such weighting, the U.S. dollar strengthens against the relevant non-U.S. currencies, the value of the securities in which such closed-end funds invest will be adversely affected and the value of the Securities may decrease.

## Sector and industry concentration risks associated with closed-end funds.

The Securities will be more exposed to losses in a particular industry or sector to the extent that the Index Constituents concentrate their investments in such industry or sector. As a result, the Securities may be subject to loss due to adverse occurrences that affect such industries or sectors, even if general market conditions are favorable. The Index Constituent Securities will vary over time, and thus are not limited to the following particular sector and industries.

### Risks associated with the energy and natural resources industries.

Some of the Index Constituents invest in companies that are engaged in or exposed to the energy and natural resources industries, including the oil and gas sector. Equities in the energy and natural resources sectors are significantly affected by a number of factors including:

➤ worldwide and domestic supplies of, and demand for, crude oil, natural gas, natural gas liquids, hydrocarbon products and refined products;

➤ changes in tax or other laws affecting master limited partnerships generally;

➤ developments relating to energy conservation policies;

➤ regulatory changes affecting pipeline fees and other regulatory fees in the energy and natural resources sectors;

➤ changes in the relative prices of competing energy and natural resources products;

➤ the impact of environmental laws and regulations and technological changes affecting the cost of producing and processing, and the demand for, energy and natural resources products;

➤ decreased supply of products available to be transported, mined, processed, stored or distributed due to fewer discoveries of new reserves, short- or long-term supply disruptions, or otherwise;

➤ risks of regulatory actions and/or litigation, including as a result of leaks, explosions or other accidents relating to energy or natural resources products;

➤ uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities or further acts of terrorism in the United States or elsewhere; and

➤ general economic and geopolitical conditions in the United States and worldwide.

These or other factors or the absence of such factors could cause a downturn in the energy and natural resources industries generally or regionally and could cause the value of some or all of the Index Constituent Securities to decline during the term of the Securities.

### Risks of investing in the real estate industry.

The Index is comprised of closed-end funds that may invest, directly or indirectly (such as by investing in REITs), in real estate, which subjects the value of the Index to many of the risks of owning real estate

directly, such as decreases in real estate values, overbuilding, increased competition and other risks related to local or general economic conditions, increases in operating costs and property taxes, changes in zoning laws, casualty or condemnation losses, possible environmental liabilities, regulatory limitations on rent and fluctuations in rental income. Therefore, adverse economic, business or political developments affecting the value of real estate could have an effect on the value of the Securities.

### Risks associated with the financial services sector.

The financial services sector includes companies engaged in banking, commercial and consumer finance, investment banking, brokerage, asset management, custody or insurance. Because the Index includes closed-end funds which may invest in companies that operate in or invest in the financial services sector, the Securities are sensitive to changes in, and its performance may depend on, the overall condition of the financial services sector. Companies in the financial services sector may be subject to extensive government regulation that affects the scope of their activities, the prices they can charge and the amount of capital they must maintain. The profitability of companies in the financial services sector may be adversely affected by increases in interest rates. The profitability of companies in the financial services sector may be adversely affected by loan losses, which usually increase in economic downturns. In addition, the financial services sector is undergoing numerous changes, including continuing consolidations, development of new products and structures and changes to its regulatory framework. Furthermore, increased government involvement in the financial services sector could result in a change of the Index's exposure to financial institutions. Recent developments in the credit markets have caused companies operating in the financial services sector to incur large losses, experience declines in the value of their assets and even cease operations.

### The Index comprises securities chosen based in part on their recent fund yield, fund share price discount from or premium to NAV and fund average daily value of shares traded.

The Index Constituent Securities are included in the Index based in large part on their recent fund yield, fund share price discount from or premium to NAV, and fund average daily value of shares traded, which reflect performance from only the recent past and are no guarantee of future performance. The Index Constituent Securities may not be the securities issued by closed-end funds with the highest yields in the market over the term of the Securities, the lowest discount from NAV or highest liquidity, and thus may not result in relatively higher coupon payments and may result in no coupon payments at all. See " — You are not guaranteed any coupon payments" in the accompanying product supplement. Even if the Index achieves its intended purpose of tracking the returns and income of 30 U.S. closed-end funds as selected by the Index Sponsor, the payment at maturity may be lower than the payment at maturity of securities linked to other indices that are composed of diversified asset classes and may result in a total return that is similar to, or lower than, securities linked to other indices that are composed of diversified asset classes.

### The Index Constituent Securities are not equally weighted and changes in the values of the Index Constituent Securities may offset each other.

Because the Index Constituent Securities are not equally weighted, the same percentage change in two or more Index Constituent Securities will have different effects on the Index Closing Level. For example, because the GAMCO Global Gold Natural Resources & Income Trust (NYSE: GGN) has a weight of 4.51% as of April 14, 2015, any decrease in the value of this closed-end fund will have a significantly greater effect on the Index Closing Level than a comparable percentage increase in the value of lesser weighted Index Constituent Securities. In addition, although the weight of each Index Constituent Security is capped at 4.25% at each annual rebalancing of the Index, the weights of the Index Constituent Securities may vary between annual rebalancings. Unscheduled weight adjustments

may occur between annual reviews if any Index Constituent Security accounts for more than 24% of the weight of the Index. See "The ISE High Income™ Index—Index Maintenance and Governance" below.

**Market disruption events may affect the calculation of the Index.**

If at any time during the term of the Securities the Index Calculation Agent determines that there has been an unscheduled market closure for any of the Index Constituent Securities, the intraday and daily levels of the Index will be calculated using the last traded price for the relevant Index Constituent Security. Any such market disruption event may have an adverse impact on the level of the Index and, therefore, may have an adverse effect on the market value of the Securities.

**An Index Constituent Security may be replaced upon the occurrence of certain adverse events.**

An exchange may replace or delist an Index Constituent Security included in the Index. Procedures have been established by the Index Sponsor to address such events, which may include, among other things, a market disruption event (as it pertains to the Index) or the replacement or delisting of an Index Constituent Security. There can be no assurance, however, that a market disruption event (as it pertains to the Index), the replacement or delisting of an Index Constituent Security, or any other force majeure event, will not have an adverse or distortive effect on the value of the Index or the manner in which it is calculated and, therefore, may have any adverse impact on the value of the Securities. An Index Constituent Security may also be removed from the Index, as described under "The ISE High Income™ Index."

**The Index Sponsor has broad discretion and is not obligated to consider the interests of holders of the Securities.**

The Index methodology allows the Index Sponsor broad discretion in making decisions with respect to the Index. The methodology establishes quantitative criteria for determining the Index Constituent Securities, but the Index Sponsor retains the ability to utilize subjective screening based on factors it deems appropriate if, in its opinion, certain Index Constituent Securities should be included in or excluded from the Index. As a result, the Index Constituent Securities may change in unpredictable ways in the Index Sponsor's sole discretion. Because the Index Sponsor has no obligation to take into consideration the interests of holders of the Securities, there can be no assurance that the Index Sponsor's actions will not cause the Securities to decrease in value.

**The Securities may trade at a substantial premium to or discount from the intraday indicative value.**

The market value of the Securities is influenced by many unpredictable factors, some of which may cause the price at which the Securities can be sold in the secondary market to vary substantially from the intraday indicative value that is calculated and disseminated throughout trading hours. For example, if UBS were to suspend sales of the Securities for any reason, the liquidity of the market for the Securities could be affected, potentially leading to insufficient supply, causing the market price of the Securities to increase. Such an increase could represent a premium over the intraday indicative value. Conversely, unpredictable factors could cause the Securities to trade at a discount from the intraday indicative value, which may result in a loss of your investment if you sell your Securities in the secondary market.

**UBS and its affiliates have no affiliation with the Index Sponsor and are not responsible for its public disclosure of information.**

We and our affiliates are not affiliated with the Index Sponsor and have no ability to control or predict its actions, including any errors in or discontinuation of public disclosure regarding methods or policies

relating to the calculation of the Index. If the Index Sponsor discontinues or suspends the calculation or publication of the Index, it may become difficult to determine the market value of the Securities and the payment at maturity or call, upon acceleration or upon early redemption. The Calculation Agent may designate a successor index in its sole discretion. If the Calculation Agent determines in its sole discretion that no successor index comparable to the Index exists, the payment you receive at maturity or call, upon acceleration or upon early redemption will be determined by the Calculation Agent in its sole discretion. See "General Terms of the Securities — Market Disruption Event" and " — Calculation Agent" in the accompanying product supplement. The Index Sponsor is not involved in the offer of the Securities in any way and has no obligation to consider your interest as an owner of the Securities in taking any actions that might affect the market value of your Securities.

We have derived the information about the Index Sponsor and the Index from publicly available information, without independent verification. UBS has not conducted any independent review or due diligence of the Index or the Index Sponsor, including the publicly available information with respect to the Index Sponsor or the Index. *You, as an investor in the Securities, should make your own independent investigation into the Index Sponsor and the Index.*

## If UBS were to be subject to restructuring proceedings, the market value of the Securities may be adversely affected.

Under certain circumstances, the Swiss Financial Market Supervisory Authority (FINMA) has the power to open restructuring or liquidation proceedings in respect of, and/or impose protective measures in relation to, UBS, which proceedings or measures may have a material adverse effect on the terms and market value of the Securities and/or the ability of UBS to make payments thereunder. Pursuant to article 25 et seq. of the Swiss Banking Act, FINMA has broad statutory powers to take measures and actions in relation to UBS if it (i) is overindebted, (ii) has serious liquidity problems or (iii) fails to fulfill the applicable capital adequacy provisions after expiration of a deadline set by FINMA. If one of these prerequisites is met, FINMA is authorized to open restructuring proceedings (*Sanierungsverfahren*) or liquidation (bankruptcy) proceedings (*Bankenkonkurs*) in respect of, and/or impose protective measures (*Schutzmassnahmen*) in relation to, UBS. The Swiss Banking Act, as last amended as of January 1, 2013, grants *significant* discretion to FINMA in connection with the aforementioned proceedings and measures. In particular, a broad variety of protective measures may be imposed by FINMA, including a bank moratorium (*Stundung*) or a maturity postponement (*Fälligkeitsaufschub*), which measures may be ordered by FINMA either on a stand-alone basis or in connection with restructuring or liquidation proceedings. In a restructuring proceeding, the resolution plan may, among other things, (a) provide for the transfer of UBS's assets or a portion thereof, together with debts and other liabilities, and contracts of UBS, to another entity, (b) provide for the conversion of UBS's debt and/or other obligations, including its obligations under the notes, into equity, and/or (c) potentially provide for haircuts on obligations of UBS, including its obligations under the Securities. As of the date of this pricing supplement, there are no precedents as to what impact the revised regime would have on the rights of holders of the notes or the ability of UBS to make payments thereunder if one or several of the measures under the revised insolvency regime were imposed in connection with a resolution of UBS.

## Significant aspects of the tax treatment of the Securities are uncertain.

Significant aspects of the tax treatment of the Securities are uncertain. We do not plan to request a ruling from the Internal Revenue Service ("IRS") regarding the tax treatment of the Securities, and the IRS or a court may not agree with the tax treatment described in this pricing supplement. Please read carefully the section entitled "Material U.S. Federal Income Tax Consequences" on page PS-32. You should consult your tax advisor about your own tax situation.

Pursuant to the terms of the Securities, you and we agree (in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary) to treat the Securities as a coupon-bearing pre-paid derivative contract with respect to the Index. In addition, you and we agree (in the absence of a statutory, regulatory, administrative or judicial ruling to the contrary) to treat the Coupon Amounts (including amounts received upon the sale, exchange, redemption or maturity of the Securities in respect of accrued but unpaid Coupon Amounts) and the Stub Reference Distribution Amount, if any, as amounts that should be included in ordinary income for tax purposes at the time such amounts accrue or are received, in accordance with your regular method of accounting for tax purposes. You will be required to treat such amounts in such a manner despite the fact that (i) a portion of such amounts may be attributable to distributions on the Index Constituent Securities that give rise to long-term capital gain which, in the case of non-corporate taxpayers, is currently subject to tax at rates more favorable than the rates applicable to ordinary income and (ii) there may be other possible treatments of such amounts that would be more advantageous to holders of the Securities. Under that treatment (subject to the discussion below regarding the application of Section 1260 of the Internal Revenue Code of 1986, as amended (the "Code")), you should generally recognize capital gain or loss upon the sale, exchange, redemption or maturity of your Securities in an amount equal to the difference between the amount you receive at such time (other than any amount attributable to the Coupon Amount, and the Stub Reference Distribution Amount, if any, which will be treated as ordinary income) and the amount you paid for your Securities. Such gain or loss should generally be long-term capital gain or loss if you held your Securities for more than one year.

It is possible that your Securities could be treated as a "constructive ownership transaction" which would be subject to the constructive ownership rules of Section 1260 of the Code. Under Section 1260 of the Code, special tax rules apply to an investor that enters into a "constructive ownership transaction" with respect to an equity interest in a "pass-thru entity." For this purpose, a constructive ownership transaction includes entering into a forward contract with respect to a pass-thru entity, and a derivative contract of the type represented by the Securities should be treated as a forward contract for this purpose. In addition, a pass-thru entity includes a regulated investment company, and because each of the closed-end funds that comprise the Index as of this date is treated as a regulated investment company, each of the current Index Constituents is treated as a pass-thru entity for this purpose. It is, however, not entirely clear how Section 1260 of the Code applies in the case of an index that is comprised in whole or in part of pass-thru entities, such as the Index. Although the matter is not free from doubt, it is likely that Section 1260 of the Code should apply to an index of pass-thru entities, in which case Section 1260 of the Code would apply to the Securities. If your Securities are subject to Section 1260 of the Code, then any long-term capital gain that you realize upon the sale, exchange, redemption or maturity of your Securities will be recharacterized as ordinary income (and you will be subject to an interest charge on the deferred tax liability with respect to such capital gain) to the extent that such capital gain exceeds the amount of long-term capital gain that you would have realized had you purchased an actual interest in the Index Constituents (in an amount equal to the notional amount of the Index that is represented by the Securities) on the date that you purchased your Securities and sold your interest in the Index Constituents on the date of the sale, exchange, redemption or maturity of the Securities (the "Excess Gain Amount"). If your Securities are subject to these rules, the Excess Gain Amount will be presumed to be equal to all of the gain that you recognized in respect of the Securities (in which case all of such gain would be recharacterized as ordinary income that is subject to an interest charge) unless you provide clear and convincing evidence to the contrary. You should review the discussion of Section 1260 of the Code on page PS-32 and are urged to consult your own tax advisor regarding the potential application of these rules.

**Risk Factors**

The IRS released a notice in 2007 that may affect the taxation of holders of the Securities. According to the notice, the IRS and the Treasury Department are actively considering, among other things, whether holders of instruments such as the Securities should be required to accrue ordinary income on a current basis (possibly in excess of the Coupon Amounts), whether gain or loss recognized upon the sale, exchange, redemption or maturity of such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, and whether the special "constructive ownership rules" of Section 1260 of the Code, should be applied to such instruments. Similarly, the IRS and the Treasury Department have current projects open with regard to the tax treatment of pre-paid forward contracts and contingent notional principal contracts. While it is impossible to anticipate how any ultimate guidance would affect the tax treatment of instruments such as the Securities (and while any such guidance may be issued on a prospective basis only), such guidance could be applied retroactively and could in any case increase the likelihood that you will be required to accrue income (possibly in excess of the Coupon Amounts) over the term of an instrument such as the Securities. The outcome of this process is uncertain.

Furthermore, in 2007, legislation was introduced in Congress that, if enacted, would have required holders of the Securities purchased after the bill was enacted to accrue interest income over the term of the Securities in an amount that could exceed the Coupon Amounts that are paid on the Securities. It is not possible to predict whether a similar or identical bill will be enacted in the future and whether any such bill would affect the tax treatment of your Securities.

Holders are urged to consult their tax advisors concerning the significance and the potential impact of the above considerations. We intend to treat your Securities for United States federal income tax purposes in accordance with the treatment described above and under "Material U.S. Federal Income Tax Consequences" on page PS-32 unless and until such time as there is a change in law or the Treasury Department or IRS determines that some other treatment is more appropriate.

# Exhibit L

deterrence, and to protect the public from any further crimes of the defendant.  (§ 3553(a)(2)(A-C)).  The parties submit that the proposed sentence contained in the Plea Agreement—as well as the provisions of the NPA between the Government and UBS AG, which incorporates the Plea Agreement—achieves those objectives.

1.      **The Nature and Circumstances of the Offense [§ 3553(a)(1)]**

The nature and circumstances of the offense are discussed in considerable detail in the agreed-upon factual statements that form part of both the NPA and the Plea Agreement.  (*See* Plea Agmt., Exs. 3 and 4; NPA, App. A).  The PSR also contains a summary of the relevant facts that is fully consistent with those statements.  (PSR at ¶¶ 9-27).  In light of this existing record, the parties will not attempt to include yet another comprehensive recitation of the relevant facts in this submission.

The Plea Agreement provides the following overview of the defendant's offense conduct:

> From as early as 2006 through at least June 2010, certain UBSSJ derivatives traders requested and obtained benchmark interest-rate submissions which benefited their trading positions.  This conduct occurred frequently beginning in 2006, in Zurich, Tokyo, and elsewhere, when several UBSSJ employees engaged in sustained, wide-ranging, and systematic efforts to manipulate Yen LIBOR and, to a lesser extent, Euroyen TIBOR, to benefit UBSSJ's trading positions.  This conduct encompassed hundreds of instances in which UBS and UBSSJ employees sought to influence benchmark rates; during some periods, UBS and UBSSJ employees engaged in this activity on nearly a daily basis.  In furtherance of these efforts to manipulate Yen benchmarks, UBS and UBSSJ employees used several principal and interrelated methods, including the following:
>
> (1)      internal manipulation of UBS's Yen LIBOR and Euroyen TIBOR submissions;
>
> (2)      use of cash brokers to influence other Contributor Panel banks' Yen LIBOR submissions by disseminating misinformation; and
>
> (3)      efforts to collude directly with employees at other Contributor Panel banks, either directly or through brokers, in order to influence those banks' Yen LIBOR submissions.

(Plea Agmt., Ex. 4 at ¶ 17).  Various details and examples of such conduct are set forth in attachments to the Plea Agreement and the NPA, and also in the PSR.  As those materials further indicate: "Because of the widespread use of LIBOR in financial markets, this rate plays a fundamentally important role in financial systems around the world." (PSR ¶ 18).  Moreover, "[t]he market for derivatives and other financial products linked to benchmark interest rates for the Yen is global and is one of the largest and most active markets for such products in the world." (*Id.*).  Such products are traded in the U.S. and numerous other locations.  Accordingly, a scheme to manipulate Yen benchmarks has widespread and grave implications.

The parties fully recognize that the offense conduct at issue in this case is extremely serious.  Indeed, that has never been in dispute during either the extensive investigative work or the negotiations that led to the disposition that has now been presented to the Court for its consideration.  But for the nature and seriousness of this conduct, neither side would have entered into the resolution set forth in the NPA, nor would the parties be asking the Court to consider and accept a proposed sentence.  For the Government, this factor represents one of the principal reasons for its decision to bring a criminal charge against the defendant-company.  And for UBS AG and UBSSJ, the acknowledgment of this factor, along with their response to the offense conduct once it became the focus of investigative attention, is at the core of their acceptance of responsibility, as recognized in the PSR.  (PSR ¶ 28).  Both sides also acknowledge the significance of this factor within the Court's sentencing analysis.

2.      **The History and Characteristics of UBSSJ [§ 3553(a)(1)]**

Before the global benchmark rate investigation, neither UBSSJ nor its predecessor entities had any prior history of criminal or civil adjudications.[4]  (PSR at ¶ 29).  However, as discussed above, the CFTC and the JFSA imposed sanctions against UBSSJ for the same Yen LIBOR and Euroyen TIBOR conduct addressed by the Plea Agreement; the Tokyo Financial Futures Exchange and the Financial Futures Association have similarly imposed monetary penalties.  (*See supra* Parts I.C & I.F).  Additionally, between 2004 and 2012, UBSSJ and its predecessor were the subject of various regulatory actions by financial industry regulators, including the JFSA, Japan Securities Dealers Association, Tokyo Financial Futures Exchange, and the Financial Futures Association.  These incidents involved non-compliance with industry-specific regulations and resulted in only modest sanctions, including fines and personnel actions.  (PSR at ¶ 29).

3.      **The Need for the Sentence To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment, To Afford Adequate Deterrence, and To Protect the Public from Further Crime [§ 3553(A)(2)]**

The parties submit that the penalty proposed in the Plea Agreement, especially when viewed within the framework of the NPA, is appropriate in light of the nature and seriousness of the offense conduct and also serves the purposes outlined in § 3553(a)(2) (A-C).  In support of this position, and among other features of the NPA and the Plea Agreement, we urge the Court to consider the following factors.

UBSSJ has been required to plead guilty to a felony violation of U.S. law and therefore has accepted criminal responsibility for its conduct.  While this point seems obvious in the context of

---

[4]      UBSSJ is the defendant in this case.  Accordingly, the PSR addresses only the prior history of UBSSJ and its predecessors.  However, the Criminal Division considered UBS AG's prior history of misconduct, as mitigated by its recent record of cooperation and compliance, in arriving at the decision to propose a resolution with UBS AG that included both the Plea Agreement and the NPA.  (NPA at 2–3).

# Exhibit M

EDITION: UNITED STATES



| Fri Mar 30, 2012 | 5:42pm EDT

# Schwab considers warnings on controversial exchange-traded products



REUTERS/Brendan McDermid

## TRENDING STORIES

**North Korea test-fires ballistic missile in defiance of world pressure**

**Russians, in peaceful protest, call for Putin to quit**

**Exclusive: Trump says he thought being president would be easier than his old life**

**EU sets Britain tough divorce terms, slams budget veto**

**Philippine leader says North Korea's Kim "wants to end the world", urges U.S. restraint**

By **Angela Moon** and **Jessica Toonkel** | NEW YORK

Discount brokerage Charles Schwab Corp is reviewing whether to add a warning when a customer is about to trade certain exchange-traded products, in one of the strongest warnings yet for retail investors about these esoteric securities.

The move follows the sudden plunge in an exchange-traded note called VelocityShares Daily 2X VIX Short-Term ETN, or TVIX, which lost 60 percent of its value last week.

"It is under review, primarily because of the risk we saw in things like the TVIX. No one knew that those kind of things were going to happen," said Randy Frederick, managing director of trading and derivatives at the Schwab Center for Financial Research in Austin, Texas.

ADVERTISING

The warning would be similar to one that pops up when investors trade options related to volatility, which are more complex than stocks.

The note, which pops up at the final verification stage of a trade, will serve as "a last warning to say, 'Hey, make sure you know what you are doing. If not, call us and we will explain to you,'" Frederick said.

Schwab's review and consideration of a warning for investors is significant because it comes at a moment after federal and state regulators have zeroed in on volatile trading and other activity involving exchange-traded notes.

REGULATORS CIRCLING ETNs

The Financial Industry Regulatory Authority, the U.S. regulator that oversees the sale of investment products to investors, is investigating how companies are marketing exchange-traded notes. A FINRA spokeswoman told Reuters on Thursday that the regulator is "looking at the events and trading" activity surrounding a sharp drop in the price of the TVIX, an exchange-traded note designed to track stock market volatility.

Massachusetts' top securities regulator is also looking into problems with the TVIX, a spokesman for Secretary of the Commonwealth William Galvin said.

The U.S. Securities and Exchange Commission is conducting a preliminary review into the volatile trading of the ETN, The Wall Street Journal reported on Thursday, citing people familiar with the matter.

Credit Suisse, the issuer of TVIX, stopped creating new shares a month ago as investors scrambled into this and other volatility-linked securities to bet on an increase in more market gyrations down the road.

The price of TVIX dropped about 60 percent in just two days last week on news that Credit Suisse would start issuing shares again, bringing it back in line with its expected value.

A Credit Suisse spokeswoman said on Thursday the firm "is cooperating with regulatory authorities."

MAKING RISKS CLEAR

Another major online brokerage Fidelity Investment has had a system for warning investors about the risks of trading ETNs since 2009. An investor who wants to trade an ETN has to sign an investor agreement, and every time an investor makes a trade, a screen pops up warning them of the risks of ETNs.

Fidelity also does not make leveraged and inverse ETNs and ETFs easily accessible when investors use its "ETF Screener."

A spokesperson for discount broker TD Ameritrade said they have not decided to add a warning on trading these products.

A representative from E*Trade Financial, another discount broker, did not respond to a request for comment.

TRENDING **STORIES**

**North Korea test-fires ballistic missile in defiance of world pressure**

**Russians, in peaceful protest, call for Putin to quit**

**Exclusive: Trump says he thought being president would be easier than his old life**

**EU sets Britain tough divorce terms, slams budget veto**

**Philippine leader says North Korea's Kim "wants to end the world", urges U.S. restraint**

**PICTURES**



exchange-traded-fund cousins. But experts caution that investors need to educate themselves before trading these exchange-traded products, or ETPs.

ETNs have brought in $2.4 billion in net inflows so far this year, a 71 percent increase from 2011, according to Morningstar.

**ALSO IN MONEY**

**U.S. economic growth slower than France, 'terrible': BlackRock's Fink**

**NRG director wins strong shareholder support despite NYC opposition**

"Even as a full-time trader, this is a product that is very hard to understand. You type in TVIX and all you get is that the profit is two to three times the volatility index, so people are thinking 'Oh yeah, this is great.' The problem is, these ETNs are designed to fail. They are broken products," said Jamie Lissette, an independent trader, and also the founder of the Hammerstone Group, a Westport, Connecticut-based operator of online discussion forums for investors.

"Unfortunately, I traded TVIX during the plunge last week, and lost a couple thousand in a short time frame," Lissette said.

Angry investors, some who have lost in the "six-digit figures" trading TVIX are gearing up for a lawsuit against Credit Suisse. They claim Credit Suisse misled investors by not providing sufficient information about the product.

Some are also questioning the timing of the announcement on re-issuing shares, which came just a couple hours after a 30 percent plunge in TVIX on March 22, as investors had started to bet the shares would fall. The product's price fell another 30 percent the following day.

Moulton & Arney, LLP, a boutique law firm based in Houston, is one of a handful of firms gathering investors who have lost money in the product. It is investigating the circumstances surrounding the decline in TVIX, and has received almost 200 calls from investors.

The law firm said on its website that it "has been retained by a client who suffered a six-figure loss in TVIX on March 22 to investigate and pursue potential claims against Credit Suisse to recover his loss."

Some large full-service brokerage firms already restrict their brokers from selling exchange-traded notes. For example, Bank of America Merrill Lynch only allows its more than 17,300 brokers to sell ETNs to clients with at least $10 million in assets - and only if they specifically ask for them.

Raymond James Financial has prohibited its 5,400 brokers from selling 53 ETNs since October 2010, including the volatility ETNs and three-times leveraged ETNs. Clients who want to invest in available ETNs have to sign an affidavit that states they understand the risks inherent in these products.

(Reporting By Angela Moon and Jessica Toonkle; Editing by Jan Paschal)

**TRENDING STORIES**

**North Korea test-fires ballistic missile in defiance of world pressure**

**Russians, in peaceful protest, call for Putin to quit**

**Exclusive: Trump says he thought being president would be easier than his old life**

**EU sets Britain tough divorce terms, slams budget veto**

**Philippine leader says North Korea's Kim "wants to end the world", urges U.S. restraint**

**NEXT IN MONEY**

**BlackRock's Fink a 'big believer' in Wells Fargo CEO**

# Exhibit N

JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                    Wednesday, February 18, 2009

## UBS Enters into Deferred Prosecution Agreement

### Bank Admits to Helping U.S. Taxpayers Hide Accounts from IRS; Agrees to Identify Customers & Pay $780 Million

WASHINGTON – UBS AG, Switzerland's largest bank, has entered into a deferred prosecution agreement on charges of conspiring to defraud the United States by impeding the Internal Revenue Service (IRS), the Justice Department announced today.

As part of the deferred prosecution agreement and in an unprecedented move, UBS, based on an order by the Swiss Financial Markets Supervisory Authority (FINMA), has agreed to immediately provide the United States government with the identities of, and account information for, certain United States customers of UBS's cross-border business. Under the deferred prosecution agreement, UBS has also agreed to expeditiously exit the business of providing banking services to United States clients with undeclared accounts. As part of the deferred prosecution agreement, UBS has further agreed to pay $780 million in fines, penalties, interest and restitution. Earlier today, the agreement was accepted in Ft. Lauderdale, Fla. by U.S. District Judge James I. Cohn.

A criminal information was unsealed today that charges UBS with conspiring to defraud the United States by impeding the IRS. According to court documents, in 2000, after it purchased the brokerage firm Paine Webber, UBS voluntarily entered into an agreement with the IRS that required UBS to report to the IRS income and other identifying information for its United States clients who held United States securities in a UBS account. Court documents allege that the agreement also required UBS to withhold income taxes from United States clients who directed investment activities in foreign securities from the United States. The information further asserts that, in order to evade those new reporting requirements, employees and managers within the cross-border business, with the knowledge of certain UBS executives, helped United States taxpayers open new UBS accounts in the names of nominees and/or sham entities. According to court documents, the assets of the individual's accounts were then transferred to the newly created accounts, as to which the U.S. taxpayer would not be identified as a beneficiary.

The information asserts that this device was used by UBS to justify evading its reporting obligations and helped United States taxpayers to continue to conceal their identities and assets from the IRS.

The information also alleges that Swiss bankers routinely traveled to the United States to market Swiss bank secrecy to United States clients interested in attempting to evade United States income taxes. Court documents assert that, in 2004 alone, Swiss bankers allegedly traveled to the United States approximately 3,800 times to discuss their clients' Swiss bank accounts. The information further alleges that UBS managers and employees used encrypted laptops and other counter-surveillance techniques to help prevent the detection of their marketing efforts and the identities and offshore assets of their U.S. clients. According to the information, clients of the cross-border business in turn filed false tax returns which omitted the income earned on their Swiss bank accounts and failed to disclose the existence of those accounts to the IRS.

In light of the bank's willingness to acknowledge responsibility for its actions and omissions, its cooperation and remedial actions to date, and its promised continuing cooperation and remedial actions, the government will recommend dismissal of the charge, provided the bank fully carries out its obligations under the agreement.

In November 2008, UBS executive Raoul Weil was <u>indicted</u> by a federal grand jury in Fort Lauderdale and charged with conspiring to defraud the United States for his alleged role in overseeing the United States cross-border business. The district court recently declared him to be a fugitive.

In June 2008, former UBS private banker Bradley Birkenfeld <u>pleaded guilty</u> to a charge of conspiring to defraud the United States for similar conduct. Birkenfeld is scheduled to be sentenced on May 1, 2009. Also, in June 2008, the U.S. District Court in Miami <u>authorized</u> the Internal Revenue Service to serve upon UBS a so-called "John Doe" summons seeking records that would identify United States taxpayers with accounts at UBS in Switzerland who have elected to conceal the existence of their accounts from the IRS.

"Today's agreement is but one milestone in an ongoing law enforcement effort to reassure hard-working and law-abiding taxpayers who pay their fair share of taxes that those who don't will pay a heavy price," said John A. DiCicco, Acting Assistant Attorney General of the Justice Department's Tax Division. "The veil of secrecy has been pulled aside and we will continue to aggressively pursue those who shirk their federal tax obligations or assist others in doing so."

"UBS executives knew that UBS's cross-border business violated the law," said R. Alexander Acosta, U.S. Attorney for the Southern District of Florida. "They refused to stop this activity, however, and in fact instructed their bankers to grow the business. The reason was money -- the business was too profitable to give up. This was not a mere compliance oversight, but rather a knowing crime motivated by greed and disrespect of the law."

Acting Assistant Attorney General DiCicco and U.S. Attorney Acosta commended Tax Division attorneys Kevin Downing and Michael Ben'Ary, and Assistant U.S. Attorney Jeffrey Neiman, along with special agents from the Internal Revenue Service who provided invaluable assistance in investigating this case.

More information about the Justice Department's Tax Division and its enforcement efforts is available at http://www.usdoj.gov/tax/.

**Component(s):**
<u>Tax Division</u>

**Press Release Number:**
09-136

*Updated September 15, 2014*

# Exhibit O



**U.S. Department of Justice**

Criminal Division

_Washington, D.C. 20530_

October 20, 2014

VIA E-MAIL
Gary R. Spratling, Esq.                        David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP                    Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000                 1050 Connecticut Ave NW
San Francisco, CA 94105                        Washington, DC 20036

     Re:   UBS AG

Dear Mr. Spratling and Mr. Burns:

     This letter amends the agreement (the "Agreement") entered into between the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") and UBS AG ("UBS") on December 18, 2012, concerning UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate (known as LIBOR), the Euro Interbank Offered Rate (known as EURIBOR), and the Tokyo InterBank Offered Rate (known as TIBOR), as described in Appendix A to the Agreement. A copy of the Agreement is attached to this letter.

     The Fraud Section and UBS agree to amend the Agreement as follows:

    1. The sixth paragraph of the Agreement is amended to read:

> This Agreement shall have a term of three years from the date of this Agreement, except as specifically provided below. It is understood that for the three-year term of this Agreement, UBS shall: (a) commit no United States crime whatsoever; (b) truthfully and completely disclose non-privileged information with respect to the activities of UBS, its officers and employees, and others concerning all matters about which the Fraud Section inquires of it, which information can be used for any purpose, except as otherwise limited in this Agreement; (c) bring to the Fraud Section's attention all potentially criminal conduct by UBS or any of its employees that relates to violations of U.S. laws (i) concerning fraud or (ii) governing securities and commodities markets; and (d) bring to the Fraud Section's attention all criminal or regulatory investigations, administrative proceedings or civil actions brought by any

governmental authority in the United States against UBS or its employees that alleges fraud or violations of the laws governing securities and commodities markets.

2. The seventh paragraph of the Agreement is amended to read:

Until the date upon which all investigations and prosecutions arising out of the conduct described in this Agreement are concluded, including the investigations of the matters listed in Appendix C, whether or not they are concluded within the three-year term of this Agreement, UBS shall, in connection with any investigation or prosecution arising out of the conduct described in this Agreement: (a) cooperate fully with the Fraud Section, the Federal Bureau of Investigation, and any other law enforcement or government agency designated by the Fraud Section; (b) assist the Fraud Section in any investigation or prosecution by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding; (c) use its best efforts promptly to secure the attendance and truthful statements or testimony of any officer, agent or employee at any meeting or interview or before the grand jury or at any trial or other court proceeding; and (d) provide the Fraud Section, upon request, all non-privileged information, documents, records, or other tangible evidence about which the Fraud Section or any designated law enforcement or government agency inquires.

3. With the exceptions of the paragraphs above, all terms of the Agreement remain the same.

Sincerely,

WILLIAM J. STELLMACH
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

By:

Albert B. Stieglitz, Jr., Assistant Chief
Thomas B.W. Hall, Trial Attorney

AGREED AND CONSENTED TO:

UBS AG

By: _____   _____
Markus U. Diethelm                     Date
Group General Counsel, UBS AG

APPROVED:

By: _____   _____
Gary R. Spratling, Esq.                Date
David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP
Attorneys for UBS AG

3

# Exhibit P

**Debevoise
&Plimpton**

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

Steven J. Slutzky
Partner
sjslutzky@debevoise.com
+1 212 909 6036

May 20, 2015

**VIA FIRST CLASS MAIL AND EMAIL**

Mary Kosterlitz, Esq.
Chief, Office of Enforcement Liaison
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-7553

**United States of America v. UBS AG**

Dear Ms. Kosterlitz:

    We submit this letter on behalf of our client, UBS AG, a reporting company registered under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act") and the settling defendant in the above-captioned criminal proceeding (the "Settling Firm").

    We hereby request a determination by the U.S. Securities and Exchange Commission (the "Commission") or the Division of Corporation Finance (the "Division"), acting pursuant to authority duly delegated by the Commission, that the Settling Firm should not be an "ineligible issuer" as defined under Rule 405 promulgated under the Securities Act of 1933 (the "Securities Act") as a result of the entry of a Guilty Plea against the Settling Firm, which is described below.  Relief from the ineligible issuer provisions is appropriate in the circumstances of this case for the reasons set forth below. The Settling Firm requests that this determination be made effective as of the date of the Guilty Plea.

**BACKGROUND**

    On December 18, 2012, the United States Department of Justice, Criminal Division, Fraud Section ("DOJ Criminal Division") and the Settling Firm entered into a Non-Prosecution Agreement ("LIBOR NPA") related to the LIBOR Conduct, described and defined below.

Mary Kosterlitz, Esq.                                                                                   May 20, 2015

        Following an initial media report in 2013 of widespread irregularities in the foreign exchange ("FX") markets, the Settling Firm immediately commenced an internal review of its FX business (although the article did not identify or implicate the Settling Firm).  After identifying certain issues, the Settling Firm notified the Department of Justice that it had identified evidence of potential FX market trading coordination and thereafter provided extensive cooperation to the Department of Justice and other relevant regulators in connection with investigations into FX-related conduct.[1]

        As set forth in a Plea Agreement, dated May 20, 2015, entered into by the Settling Firm and the DOJ Criminal Division (the "Plea Agreement"), the DOJ Criminal Division determined that the Settling Firm had breached the LIBOR NPA.  Relevant considerations in reaching that determination included certain conduct described in Exhibit 1 the Plea Agreement ("Factual Basis for Breach"), namely certain employees engaged in (i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat, to the detriment of the UBS AG's customers, and (ii) collusion with other participants in certain FX markets (the "FX Conduct").

        Further, the Settling Firm agreed to:

        (i)        Plead guilty to a one-count Information (the "Information") in the United States District Court, District of Connecticut (the "District Court") charging wire fraud, in violation of  Title 18, United States Code Section 1343 and 2.  The Information charges that between approximately 2001 and in or about 2010, the Settling Firm devised and engaged in a scheme to defraud counterparties to interest rate derivatives transactions by secretly manipulating benchmark interest rates to which the profitability of those transactions was tied (the "LIBOR Conduct").

---

[1]    In November 2014, the Settling Firm reached settlements with the U.K. Financial Conduct Authority ("FCA") and the U.S. Commodity Futures Trading Commission ("CFTC") in connection with their investigations into the FX Conduct, and the Swiss Financial Market Supervisory Authority ("FINMA") issued an order concluding its formal proceedings with respect to the FX Conduct and precious metals ("PM") trading.  In addition to paying fines, the Settling Firm has ongoing obligations to cooperate with these authorities and to undertake certain remediation, including actions to improve processes and controls and requirements imposed by FINMA to apply compensation restrictions for certain employees and to automate at least 95% of its global FX trading.  In December 2014, the Hong Kong Monetary Authority concluded an investigation of the FX Conduct, and found no evidence of collusion or manipulation but did find internal control deficiencies in the Settling Firm's FX trading operations.  In addition, the Settling Firm is currently finalizing settlements with other regulators in connection with the FX Conduct and expects that those will result in the payment of additional fines and the undertaking of additional remedial measures; however, none of these settlements will require relief under 17 CFR § 230.405 or17 CFR § 200.30-1(a)(10).

UBS WKSI                                                                                                          2

Mary Kosterlitz, Esq.                                                    May 20, 2015

The Information charges that the Settling Firm committed wire fraud in furtherance of that scheme in violation of Title 18, United States Code, Sections 1343 and 2 on or about June 29, 2009 by transmitting or causing the transmission of electronic communications, specifically: (i) an electronic chat between a senior derivatives trader (the "UBS Trader") employed by a subsidiary of the Settling Firm and a London-based interdealer derivatives broker (the "Broker"), in which the UBS Trader requested the Broker submit an increased Yen LIBOR rate favorable to the UBS Trader's position; (ii) a telephone call placed by the Broker at the UBS Trader's request to a Yen LIBOR submitter at another Yen panel bank, in which the Broker requested that the submitter increase the panel bank's Yen LIBOR submission that day; (iii) an electronic chat between the UBS Trader and a junior derivatives trader employed by the Settling Firm, who also served as a Yen LIBOR submitter for the Settling Firm (the "UBS Submitter"), in which the UBS Trader requested that the UBS Submitter increase the Settling Firm's Yen LIBOR submission rate to a rate favorable to the UBS Trader's trading positions; (iv) a subsequent Yen Libor submission from the Settling Firm to Thomson Reuters reflecting an accommodation of the UBS Trader's request to the UBS Submitter; and (v) a subsequent publication of a Yen LIBOR rate.

(ii)    Pay a fine of $203 million in connection with the conduct charged in the Information.

(iii)   A three-year term of probation, in which the Settling Firm would (i) not commit another federal crime during the term of probation; (ii) implement and continue to implement a compliance program designed to prevent and detect misconduct related to the benchmark interest rate and FX markets throughout its operations including those of its affiliates and subsidiaries and to provide annual reports to the probation officer and the DOJ Criminal Division on its progress; (iii) further strengthen its compliance program and internal controls as required by other regulatory and enforcement authorities that have addressed any of the misconduct related to the benchmark interest rate and FX markets; (iv) submit to the DOJ Criminal Division any report drafted by any compliance consultant or monitor imposed by the Board of Governors of the Federal Reserve System; and (v) promptly bring to the attention of the DOJ Criminal Division all credible evidence or allegations of criminal conduct by the Settling Firm or any of its employees that relate to violations of U.S. laws concerning fraud or governing securities and commodities markets.

Mary Kosterlitz, Esq.                                          May 20, 2015

In turn, the DOJ Criminal Division has agreed that it will not file additional criminal charges against the Settling Firm or any of its affiliates or subsidiaries relating to the LIBOR Conduct or the FX Conduct.

The Applicant expects to enter a guilty plea in the District Court (the "Guilty Plea") and expects that the District Court will enter a judgment against the Settling Firm (the "Judgment") that will require remedies that are materially the same as set forth in the Plea Agreement.

## DISCUSSION

Effective on December 1, 2005, the Commission reformed and revised the registration, communications, and offering procedures under the Securities Act.[2] As part of these reforms, the Commission created a new category of issuer defined under Rule 405 as a well-known seasoned issuer ("WKSI"). A WKSI is eligible under the new rules, among other things, to register securities for offer and sale under an "automatic shelf registration statement," as so defined. A WKSI is also eligible for the benefits of a streamlined registration process including the use of free-writing prospectuses in registered offerings pursuant to Rules 164 and 433 under the Securities Act. These benefits, however, are unavailable to issuers defined as "ineligible issuers"[3] under Rule 405.

An issuer is an "ineligible issuer," as defined under Rule 405, if, among other things, "[w]ithin the past three years, the issuer or any entity that at the time was a subsidiary of the issuer was convicted of any felony or misdemeanor described in paragraphs (i) through (iv) of section 15(b)(4)(B) of the Securities Exchange Act of 1934," Rule 405(1)(v). Notwithstanding the foregoing, paragraph (2) of the definition provides that an issuer "shall not be an ineligible issuer if the Commission determines, upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer." The Commission has delegated authority to the Division of Corporation Finance to make such a determination pursuant to 17 CFR § 200.30-1(a)(10).

The Guilty Plea will be deemed to render the Settling Firm an ineligible issuer for a period of three years after the date of the Guilty Plea. This result would preclude the

---

[2]   Securities Offering Reform, Securities Act Release No. 8591, Exchange Act Release No. 52,056, Investment Company Act Release No. 26,993, 70 Fed. Reg. 44,722, 44,790 (Aug. 3, 2005).

[3]   This request for relief is not intended to be limited solely for the purpose of continuing to qualify as a WKSI, but for all purposes of the definition of "ineligible issuer" under Rule 405 including but not limited to whatever purpose the definition may now or hereafter be used under the federal securities laws, including Commission rules and regulations.

Mary Kosterlitz, Esq.                                                    May 20, 2015

Settling Firm from qualifying as a WKSI and having the benefits of automatic shelf registration and other provisions of the Securities Offering Reform for three years.

As set forth above, Rule 405 authorizes the Commission to determine for good cause that an issuer shall not be an ineligible issuer, notwithstanding that the issuer or a subsidiary of the issuer becomes subject to an otherwise disqualifying order. The Settling Firm believes that there is good cause for the Commission to make such a determination based on precedent as well as the Division's Statement[4] on granting such waivers, on the following grounds:

     1.    <u>The Persons Responsible for, and the Duration of, the Alleged Misconduct</u>.

     (a)    LIBOR

While the Settling Firm acknowledges that the misconduct alleged in the Information occurred over a prolonged period of time (from 2001 through June 2010), it involved only approximately 14 of UBS' approximately 65,000 total employees; members of senior management of UBS were not implicated in the misconduct; none of the misconduct involved the Settling Firm's filings with the Commission (the "UBS AG Disclosures"); and while some of the individuals involved in the trader-related conduct described in the Exhibit 3 of the Plea Agreement ("LIBOR Statement of Facts") were employees of the Settling Firm, none of these individuals had any responsibility for, or role in, preparing the UBS AG Disclosures. All of the individuals at the Settling Firm who were identified as being responsible for the conduct alleged in the Information have either resigned or have had their employment terminated. Therefore, the misconduct cannot be viewed as pervasive within the Settling Firm.

As none of the members of the Settling Firm's senior management were implicated in the misconduct, the conduct alleged in the Information ended in 2010 and the individuals responsible for the misconduct are no longer employed by the Settling Firm, we believe the foregoing discussion addresses these concerns. Finally, as noted in the discussion concerning remedial actions, the Settling Firm has taken a number of actions to reinforce its commitment to compliance.

---

[4]    Division of Corporation Finance, Revised Statement on Well-Known Seasoned Issuer Waivers (April 24, 2014), available at http://www.sec.gov/divisions/corpfin/guidance/wksi-waivers-interp-031214.htm (the "Division Statement"). We note that the Division Statement relates to the grant of waivers that are necessary as a result of violations of the federal securities laws. While the Judgment does not assert any such violations, we believe that the standards set forth in the Division Statement are relevant to its consideration of the request for a waiver.

Mary Kosterlitz, Esq.                                                                    May 20, 2015

(b)      FX

The Settling Firm acknowledges that the FX Conduct occurred prior to and continuing after December 18, 2012. It involved less than 10 of UBS' approximately 65,000 total employees. Members of senior management of UBS were not implicated in the misconduct. The Settling Firm has taken appropriate disciplinary action against the individuals responsible for the FX Conduct. In some cases, UBS has delayed taking final action pending resolution of the DOJ Criminal Division's investigation in order to ensure the ongoing cooperation of relevant individuals.

As none of the members of the Settling Firm's senior management were implicated in the misconduct, the conduct alleged has ended, and UBS has already taken or intends to take appropriate disciplinary action we believe the foregoing discussion addresses these concerns. Finally, as noted in the discussion concerning remedial actions, the Settling Firm has taken a number of actions to reinforce its commitment to compliance.

2.      Role of Individuals in Preparing UBS AG Disclosures.

In addition, none of the LIBOR or FX Conduct pertains to activities undertaken by the Settling Firm, its affiliates, or its subsidiaries in connection with its filings with the Commission (the "UBS AG Disclosures"). Nor did any of the individuals have any responsibility for preparing the UBS AG Disclosures. There is no connection between the alleged conduct and the integrity of UBS AG Disclosures made by the Settling Firm or any of its affiliates, with respect to the business or operations of the Settling Form or any of its affiliates as issuers.

The Settling Firm has rigorous procedures relating to the preparation of its filings with the Commission. Input from functions preparing preliminary drafts of disclosures was and is subject to challenge, comment and revision by a number of functions including investor relations, accounting, legal, risk control and communications under the management of the Group External Reporting team. The disclosure process subject to the oversight of the Group Disclosure Committee, which reviews material changes in disclosure or new disclosures, disclosure aspects of changes in accounting and reporting requirement and assessing identified areas of particular risk or sensitivity. The Disclosure Committee is chaired by the Group Chief Financial Officer and includes the Group CEO, Group Chief Risk Officer and Group General Counsel and well as representatives of Group External Reporting, Finance, Investor Relations, Legal and Corporate Communications.

Moreover, neither the Information relating to LIBOR conduct nor the Factual Basis for Breach involves any allegations that the Settling Firm committed scienter-based violations of the Securities Act or the Exchange Act in respect of the conduct.

UBS WKSI                                                                                           6

Mary Kosterlitz, Esq.                                                                    May 20, 2015

3.       Remedial Steps Taken.

(a)      LIBOR Conduct

After extensive investigation, the Department of Justice and the Settling Firm have negotiated a settlement reflected in the Plea Agreement.  The Settling Firm has agreed to comply with several undertakings pursuant to the Plea Agreement, including, among other things, the undertakings and payment of the fine described above.

The Settling Firm has previously agreed to various undertakings pursuant to investigations and settlements with the authorities in the United States, the United Kingdom, Japan, Singapore, Hong Kong, and Switzerland related to the LIBOR Conduct. UBS paid fines and disgorgements totaling CHF 1.4 billion to U.S., U.K. and Swiss authorities to resolve investigations related to the LIBOR Conduct, including $500 million to the Department of Justice, GBP 160 million to the FCA, and CHF 59 million to FINMA.

Further, in connection with an Order dated December 19, 2012, issued by the CFTC with respect to the matters described therein, UBS agreed to extensive undertakings to ensure the integrity and reliability of its benchmark interest rate submissions by (i) determining its submissions based on specific factors, adjustments and considerations; (ii) conducting supervisory review of each daily submission; (iii) ensuring minimum qualifications of submitters and supervisors; (iv) implementing firewalls to prevent improper communications and submissions; (v) providing certain documents to the CFTC upon request and without a subpoena; (vi) developing and maintaining monitoring systems and performing periodic internal audits and annual external audits; (vii) developing policies, procedures and controls to comply with the undertakings; and (viii) developing a training program for all submitters and supervisors and traders who deal with the benchmark interest rate; and (ix) making periodic reports to the commission on compliance with the undertakings.  The Settling Firm has complied with these undertakings and submitted a final report to the CFTC on December 18, 2013.  The Settling Firm has also complied with additional undertakings imposed by FINMA.

In addition to the specifics steps taken to fulfill the CFTC undertakings, lessons learned from the LIBOR matter drove the Settling Firm to have much greater focus overall on supervising, monitoring and surveillance of intra-day conduct and behaviors to complement the end-of-day control framework that was then prominent.  The firm-wide Principles and Behaviors program, sponsored by the Group Chief Executive Officer is designed to significantly strengthen three core behaviors across the firm (Integrity,

Mary Kosterlitz, Esq.                                                        May 20, 2015

Collaboration, and Challenge) to strengthen the culture and foster greater alignment to protecting the firm's reputation and ensuring long-term and sustainable performance. In 2013, the Group Chief Executive Officer's decision to integrate the Compliance function with Operational Risk Control was an important step in bringing a risk management approach and control discipline to the Compliance activities in the second line of defense. It has enabled the Settling Firm to clarify the roles, responsibilities and control expectations for the 2nd line of defense and supports the implementation of an industry leading monitoring and surveillance capability.

Based on the lessons learned from the LIBOR investigation itself, the Settling Firm significantly tightened the coordination and governance over high risk legal, regulatory or conduct matters, including establishing a cross-functional investigations sounding board, assigning leadership accountability aligned to the potential tail risk should any allegation or speculation prove to be true, and applying the learnings across the organization. This serves as an important component of the overall compliance program. Fully leveraging this very protocol led to the firm investigating the initial allegations in the media which led to the firm identifying the FX issue and everything that followed.

      (b)     FX Conduct

As noted above, after learning of potentially inappropriate practices in the FX industry in media reports in June of 2013 – none of which specifically mentioned the Settling Firm – a newly formed Investigations Sounding Board launched an internal investigation into potential misconduct in the FX spot markets. From early on in its investigation, the Settling Firm consistently provided the Department of Justice with detailed, real-time reports of its investigation findings and repeatedly solicited the Department's input and approval of changing investigation priorities and altered significantly the investigation plan on different occasions at the request of the Department. The Settling Firm believes that it was the first bank to report FX misconduct to the Department of Justice and other authorities.

While the Settling Firm believes that its control environment for FX rates during the investigation period was proportionate to prevailing industry standards and the systems and controls of peer institutions, the Settling Firm has adopted significant remedial measures to address problems that it identified. In fact, the Settling Firm is making a significant investment in adopting measures to align its FX business with many of the same standards in place for its business in fully regulated markets.

Mary Kosterlitz, Esq.                                                      May 20, 2015

First, since the early stages of the FX investigation, the Settling Firm has been transitioning its FX business to adopt principles, systems, and controls more akin to that of regulated markets. For example, the Settling Firm is introducing continuous transaction monitoring and detailed time stamping of orders to ensure it can conduct additional forensic analysis of trading activity. These initiatives, although requiring significant further investment in overhauling systems and processes, are developed, funded, and in place.

Second, following detection of the FX issues, the Settling Firm conducted an in-depth review of the FX business to identify areas in need of improvement. Since then, the Settling Firm has undertaken actions to significantly improve compliance monitoring, intraday supervision and operational risk management assessment to more swiftly detect inappropriate activity. For instance, the Settling Firm has made the following improvements:

*Strengthened Front Office Processes*

- Standardized the fixing order process
- Closed FX management books
- Instituted a formal process of review and supervision of enhanced conduct risk
- Designed brokerage management information in order to facilitate the identification of possible collusion between FX traders and brokers
- Recalibrated the FX "business owned limits" to align them to market risk appetite and historical utilization
- Reviewed the FX supervisory hierarchy
- Revised guidance on handling client error
- Improved the consistency of disclosing trading conflicts in Terms and Conditions to clients
- Updated chat room standards and controls, which were implemented in November 2013
- Prohibited the use of personal mobile phones on trading floors for all Investment Bank sales and trading staff
- Implemented a series of measures to manage obligations and expectation to clients and markets over potential conflicts of interests

*Strengthened Front Office Systems*

- As of December 2014, implemented an enhanced booking and risk management workflow for all FX prime brokerage cash trades, fully segregating prime brokerage components of trades from FX sales and trading

UBS WKSI                                                                          9

Mary Kosterlitz, Esq.                                                    May 20, 2015

*Enhanced Guidance and Training*

- Significantly strengthened its "FX, Rates & Credit Global Handbook," which includes new sections covering client and market conduct requirements, behavior, and communication
- Mandatory training (both live and computer-based) linked to these guidelines has been completed for all Investment Bank sales and trading staff globally; this training is mandatory for all Investment Bank staff, including new joiners
- FX management has completed a full review of the content of the "FX, Rates & Credit Global Handbook" against existing Key Procedural Controls, with new controls being implemented where required

The Settling Firm has taken disciplinary actions (including terminations, suspensions and significant penalties related to compensation against these individuals) against employees who were found through the FX investigation to have engaged in misconduct, who failed to effectively execute their supervisory duties, or who uniquely and materially contributed to key control deficiencies.

In addition to the significant remedial measures the Settling Firm has already adopted, the Settling Firm has also agreed to specific remediation undertakings in connection with the November 2014 government resolutions. In connection with the CFTC order described above in footnote 1, the Settling Firm represented that it had already undertaken certain steps intended to make reasonable efforts to ensure the integrity of the FX markets including, but not limited to, the following: (i) strengthening mandatory training requirements for all FX employees, with a heavy focus on appropriate trading behavior; (ii) implementing new procedures regarding the appropriate use of chat rooms as a form of communication, including the prohibition of nearly all participation by Investment Bank staff in multi-bank chat rooms; and (iii) strengthening supervision and surveillance of FX trading desks, including the ongoing introduction of specific trade surveillance systems and enhancements to electronic communication monitoring.

In connection with the FCA settlement, the Settling Firm must conduct an audit of the following areas to ensure its culture, governance arrangements, policies, procedures, systems, and controls are appropriate and adequate to effectively manage specific risks with respect to the FX business: (i) front office culture; (ii) the adequacy of the first line of defense (i.e. the risk and control environment relating to daily operations, including monitoring of traders' activity and conduct); (iii) the adequacy of the second and third lines of defense (e.g. compliance, audit, risk); (iv) the adequacy of the challenge of risk management by the second and third lines of defense; (v) the role and appropriateness of financial incentives and performance management; (vi) the adequacy of training for the specific relevant business area; (vii) the adequacy of communications monitoring and

UBS WKSI                                                                      10

surveillance; (viii) the adequacy of the management of conflicts of interest; and (ix) benchmarks, whether trading, judgment, or submissions based, which fall within any of these business areas. If this audit identifies any areas requiring improvement, the Settling Firm must implement appropriate remedial action.

In connection with the FINMA order, the Settling Firm must (i) automate at least 95% of global FX and PM trading by December 31, 2016; (ii) implement and improve controls with respect to the remaining FX voice trading; (iii) implement adequate monitoring, supervision, and analysis instruments with respect to market abusive conduct in the Investment Bank; (iv) implement and improve control measures to avoid conflicts of interest between client trading and the active proprietary trading (i.e., the trading of traders' own positions on behalf of the bank, independent of risk management/hedging in connection with client orders), including the organizational and personnel separation of client and active proprietary trading; (v) clarify guidelines on personal account dealing, expand controls and oversight of personal account dealing, and enhance sanctions for violations of these guidelines; (vi) conduct an annual review of the compensation process within the Investment Bank through an internal audit regarding the impact of the compliance and risk conduct of employees on their compensation, as well as on the adequacy of senior management decisions made during the process, for a period of two years from fiscal year 2014;(vii) implement a maximum annual variable salary component of twice the fixed annual income (2:1) for the FX and PM trading business for a period of two years from fiscal year 2014; (viii) implement of a maximum annual variable salary component of twice the fixed annual income (2:1) for persons with a total salary of over CHF 1 million in the Investment Bank for a period of two years from fiscal year 2014 (although there may be exceptions based on adequate consideration of employee conduct and the adherence to compliance objectives); and (ix) strengthen the whistleblower process.

In addition, in connection with other settlements currently being finalized with other regulators, the Settling Firm expects to make a number of significant undertakings that address its internal controls and compliance program and its compliance risk management program.

Also in connection with these resolutions, the Settling Firm has paid a total of CHF 774 million, including GBP 234 million in fines to the FCA, $290 million in fines to the CFTC, and CHF 134 million to FINMA representing confiscation of costs avoided and profits.

(c)     Additional Firmwide Reform

Mary Kosterlitz, Esq.                                                May 20, 2015

The work undertaken in relation to FX is part of a much broader program focused on strengthening front office processes and systems, and enhanced guidance and training. This includes (i) transactional monitoring to cover all asset classes and client and proprietary flows; (ii) enhanced monitoring of electronic communications to cover all e-mail flow and chat channels in all jurisdictions; (iii) preliminary monitoring of audio communications; (iv) trader surveillance to monitor and detect rogue trading; (v) monitoring and assessment of employee behavioral indicators to identify outliers; (vi) expanded cross border monitoring that goes beyond the traditional control-based monitoring; and (vii) improved processes associated with the firm's whistleblowing policy.

In addition, the Settling Firm's incentive and compensation structure has been reformed to ensure that inappropriate behavior is not incentivized and that there are consequences for misconduct.  The Settling Firm believes that it was the first in the industry to implement longer compensation deferral periods and greater clawback powers.  For employees whose compensation exceeds a certain level, a significant portion of their performance award is deferred up to five years and includes forfeiture provisions for material misconduct.  In addition, the Settling Firm considers compliance related violations, for example failure to complete mandatory training on time or failure to comply with personal account dealing policy, in an individual's performance review, and repeat violations can lead to sanctions.

    (d)      Past Waivers from Being Considered an Ineligible Issuer

The Commission has previously granted the Settling Firm and its affiliates six waivers from being considered an ineligible issuer, five of which, as discussed in the bullets below, were in connection with conduct wholly unrelated to the conduct alleged in the Information.  The waiver in connection with United States of America v. UBS Securities Japan Co. Ltd., related to the same facts that are alleged in the Information and was granted by the Commission to an affiliate of the Settling Firm on September 13, 2013, more than two years after the Settling Firm had ceased the conduct alleged in the Information.

Four of the other waivers were granted by the Commission after the Settling Firm had ceased the conduct alleged in the Information.  Only the waiver granted on December 9, 2008 (the "2008 Waiver") was granted while the conduct alleged in the Information was occurring, but as it related to conduct unrelated to the conduct alleged in the Information, the remedial measures put in place by the Settling Firm as a result of the 2008 Waiver could not have prevented, led to an earlier discovery of, or raised red flags about the conduct alleged in the Information.

Mary Kosterlitz, Esq.                                                   May 20, 2015

- In the Matter of Auction Rate Securities Liquidity Issues (File No. HO-10915-A) (Dec. 9, 2008) related to alleged conduct by UBS Financial Services Inc. ("UBSFS") and UBS Securities LLC ("UBSS") in connection with the underwriting, marketing and sale of auction rate securities. This matter alleged that UBSS and UBSFS misled investors into believing that auction rate securities were safe, highly liquid investments that were equivalent to cash or money-market funds.

- SEC v. UBS Financial Services Inc. (P-01118) (May 6, 2011) related to the activity of former employees of UBSFS with respect to the temporary investment of proceeds of municipal securities in reinvestment products such as guaranteed investment contracts, repurchase agreements, and forward purchase agreements. The otherwise disqualifying order alleged that former employees of UBSFS engaged in bidding practices that affected the prices for certain of the reinvestment products at issue and the certifications required under applicable regulations. The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- In the Matter of UBS Financial Services Inc. of Puerto Rico (FL-3491) (May 10, 2012) related to conduct by UBS Financial Services Inc. of Puerto Rico ("UBSPR") in connection with secondary market sales of mutual funds to residents of Puerto Rico. The order alleged that UBSPR made misrepresentations and omissions concerning market prices and liquidity of certain non-exchange traded closed-end mutual funds.

- In the Matter of UBS Securities LLC (NY-8353) (Aug. 6, 2013) related to the alleged failure to disclose retention of certain upfront premiums in connection with credit default swaps referenced as collateral in a collateralized debt offering that was sold to accredited investors. The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- United States of America v. UBS Securities Japan Co. Ltd. (Sep. 13, 2013) involved the manipulation of benchmark interest rates by UBS Securities Japan Co. Ltd. ("UBSJC"). The conduct was limited to approximately fourteen employees, none of whom was responsible for preparing the UBS AG Disclosures and all of whom resigned or had their employment terminated. UBSJC implemented extensive remedial measures to enhance its compliance environment and risk monitoring, including a comprehensive microlevel review of its business divisions and processes, installation of a

UBS WKSI                                                                    13

dedicated communications monitoring team, adoption of amended employment rules and supervisory procedures, and enhanced training regarding, among other things, full compliance with UBSJC's Code of Conduct and obligation to report inappropriate activities. As a result of an order entered by the U.S. Commodity Futures Trading Commission in December 2012, the Settling Firm also agreed to comply with significant audit and monitoring conditions of its interest-rate benchmark submissions.

- In the Matter of UBS (NY-8692) (January 15, 2015) related to the failure by an affiliate of the Settling Firm to timely disclose to all subscribers of an automated trading system (the "ATS") two new features of the ATS.

As demonstrated above, none of the conduct alleged in the six otherwise disqualifying orders related to the Settling Firm's conduct or the conduct of its affiliates as an issuer of securities and does not call into question the Settling Firm's ability to make accurate disclosures about its future offerings. Accordingly, the conduct alleged in the Information does not call into question the effectiveness of the Settling Firm's prior remedial measures.

    4.    <u>Impact on the Settling Firm if the Waiver Request is Denied.</u>

The loss of the Settling Firm's status as an eligible issuer could, as described in more detail below, affect the Settling Firm's ability to conduct its structured products businesses, which could potentially harm investors and the market as a whole. This would be an unduly severe consequence, particularly in light of the fact that the conduct charged in the Information does not involve the issuance of UBS securities.

The Settling Firm is a global financial institution that relies on the benefits afforded to well-known seasoned issuers in its day-to-day operations. Being a well-known seasoned issuer provides two primary benefits: (1) additional flexibility over a Form F-3 when issuing from a shelf registration; and (2) the ability to communicate more freely with investors using free-writing prospectuses ("FWPs").

The Settling Firm regularly relies on its eligible issuer status to offer securities using its shelf registration. Losing its status as a well-known seasoned issuer would impose additional restrictions on the Settling Firm's use of a shelf registration statement. Among other things, the Settling Firm would be required to pay all fees upfront at the time of registration and include additional information in its registration statements. Further, the Settling Firm's registration statements would be subject to a review period. All of these consequences would impose additional administrative burdens on the Settling Firm.

Mary Kosterlitz, Esq.                                              May 20, 2015

Another impact of being considered an ineligible issuer, however, would be the limitations on the Settling Firm's ability to communicate with investors using free-writing prospectuses ("FWPs"), which convey targeted and relevant information to customers in a user-friendly format that is often easier to understand than the typically dense statutory prospectus. The SEC has recognized that investors and the securities markets benefit from the use of FWPs, which among other things facilitate greater transparency to investors.[5]

The Settling Firm currently employs user-friendly FWPs to offer securities on an almost daily basis. In 2014, the Settling Firm issued securities in 2,986 offerings, only 31 of which did not use an FWP. The aggregate principal amount of the 2,955 offerings in which the Settling Firm used some form of FWP was approximately $2.865 billion. In each of these offerings, UBS used at least one document that was filed as an FWP. While some of these documents could be reformatted to comply with the requirement of Section 10(b), the loss of its eligible issuer status would limit the Settling Firm's ability to market the products offered by its exchange-traded note ("ETN") and structured product businesses.

(a)      Exchange-Traded Notes.

The Settling Firm is an active issuer of ETNs, which are fixed term debt securities indexed to the performance of a reference index. The Settling Firm currently offers 33 ETNs and regularly produces written materials in FWP format to provide investors with summary information regarding those ETNs. The Settling Firm relies on its ability to post fact sheets, press releases and email distributions on its website to provide transparency to ETN investors regarding performance and income payments. Each of these forms of communication is a permitted form of FWP that is filed with the SEC. These documents are primarily communicated to investors through the Settling Firm's E-TRACS website. Other than the fact sheets, these FWPs would no longer be eligible to use as FWPs if the Settling Firm is deemed an ineligible issuer, requiring the Settling Firm to implement changes to its communications and E-TRACS systems. Among other things, the Settling Firm anticipates that ineligible issuer status would require it to modify its informational E-TRACS website. Inability to use FWPs also could result in redemptions of the Settling Firm's ETNs by investors who prefer to invest in ETNs issued by companies that can provide user-friendly, summary information in FWP format.

---

[5]      Securities Offering Reform, Securities Act Release No. 8501 (Nov. 3, 2004)

Mary Kosterlitz, Esq.                                            May 20, 2015

     (b)     UBS Equity Investor System.

     Loss of WKSI status would also require the Settling Firm to modify the FWPs used in its structured products business to either cause such documents to conform to the requirements of Section 10, or to otherwise cause them not to be FWPs. Most of the FWPs for the Settling Firm's structured products are generated by its Equity Investor System ("EQI"), which is an automated system used to price and issue multiple structured product offerings daily based on input from investors. EQI uses embedded risk management parameters and documentation templates to automatically generate pricing terms and preliminary and final offering documentation. FWPs and prospectus supplements generated by EQI are automatically filed with EDGAR upon use. The Settling Firm would have to modify and recode certain FWP templates to enable it to make such documents into Section 10-compliant prospectuses. In the case of educational materials such as product guides, these modifications would result in a less user-friendly format than is currently available as FWPs.

     EQI-generated offerings represent a majority of the Settling Firm's structured product business by number of offerings. Of the 2,986 offerings by the Settling Firm in 2014, 2,425, or approximately 81 percent, were generated using EQI. EQI allows the Settling Firm to meet investor demand by creating offerings smaller than $1 million, allowing greater, customized investor access to structured notes. The average EQI offering has a principal amount of around $250,000. These small-denomination offerings provide investors with customized investment opportunities.

     (c)     Other Structured Products.

     The Settling Firm also utilizes FWPs to market structured products outside of the EQI system. In 2014, the Settling Firm offered 561 structured products with an aggregate principal amount of approximately $2.492 billion in registered non-EQI offerings, and utilized FWPs in approximately 94% of these offerings. All of these offerings use, among other things, a preliminary prospectus filed as an FWP, which would require reformatting to conform to statutory prospectus requirements.

     The Settling Firm believes that an inability to utilize most documents as FWPs could trigger its removal from the competitive bidding process for certain third-party distributors due to its inability to produce FWPs. Third-party distributors frequently request that the Settling Firm provide a one-to-two-page FWP as part of the investor package. As an ineligible issuer, the Settling Firm could be unable to participate in the bidding for these offerings to the extent any such FWP cannot be reformatted to comply with the requirements of Rule 164(e).

Mary Kosterlitz, Esq.                                                      May 20, 2015

Accordingly, for the Settling Firm, the shelf registration process and the ability to utilize FWP's provides an important means of access to the U.S. capital markets. Consequently, the ability to avail itself of automatic shelf registration and the other benefits available to a WKSI is extremely important to the Settling Firm's ability to raise capital and conduct its operations.  In this regard, denying this waiver request would be unduly and disproportionately severe given that if the requested relief is not granted, the Settling Firm would incur substantial additional regulatory burdens and costs for conduct that has been discontinued and remedied.

In light of the foregoing, subjecting the Settling Firm to ineligible issuer status is not necessary under the circumstances, either in the public interest or for the protection of investors, and good cause exists for the grant of the requested relief.  Accordingly, we respectfully request that the Commission, or the Division of Corporation Finance, acting pursuant to authority duly delegated by the Commission and pursuant to paragraph (2) of the definition of "ineligible issuer" in Rule 405, determine that under the circumstances the Settling Firm will not be considered an "ineligible issuer" within the meaning of Rule 405 as a result of the Guilty Plea and the entry of the Judgment.[6]  We further request that this determination be made (i) as of the date of the Guilty Plea and (ii) for all purposes of the definition of "ineligible issuer," however it may now or hereafter be used under the federal securities laws and the rules thereunder.

---

[6]   We note in support of this request that the Division of Corporation Finance, acting pursuant to authority duly delegated by the Commission, has in other instances granted relief under Rule 405 for similar reasons. *See, e.g.*, Waiver Requests of Ineligible Issuer Status under Rule 405 of the Securities Act were granted for: Deutsche Bank AG (May 1, 2015); Deutsche Bank AG (April 23, 2015); UBS AG (January 15, 2015); Citigroup Inc. (September 26, 2014); Barclays PLC (September 23, 2014); Morgan Stanley (July 24, 2014); AEGON N.V. (June 24, 2014); The Royal Bank of Scotland Group plc (April 25, 2014); Nomura Holdings Inc. (January 2, 2014); Bank of America Corporation (December 12, 2013); Fifth Third Bankcorp (December 4, 2013); The Royal Bank of Scotland Group plc (November 26, 2013); UBS AG (September 19, 2013); UBS AG (August 6, 2013); Oppenheimer Holdings, Inc. (March 26, 2013); JPMorgan Chase & Co. (January 8, 2013); Credit Suisse AG (November 16, 2012); Wells Fargo & Company (August 14, 2012); UBS AG (May 10, 2012); JPMorgan Chase & Co. (July 11, 2011); UBS AG (May 6, 2011); Wells Fargo Securities, LLC (April 7, 2011); Goldman Sachs Group, Inc. (July 23, 2010); Deutsche Bank Securities, Inc. (June 16, 2009); Royal Bank of Canada (June 11, 2009); UBS Financial Services Inc. (December 23, 2008); Bank of America (May 1, 2008); Morgan Stanley (May 11, 2007); Banc of America Securities LLC (March 14, 2007); Bank of New York (January 9, 2007); and Deutsche Bank, AG (January 9, 2007).

UBS WKSI                                                                        17

Mary Kosterlitz, Esq.                                              May 20, 2015

      If you have any questions regarding this request, please contact me at (212) 909-6036.

Sincerely yours,

Steven J. Slutzky



**Katten**

KattenMuchinRosenman LLP

525 W. Monroe Street
Chicago, IL  60661-3693
312.902.5200 tel
312.902.1061 fax
www.kattenlaw.com
DAVID C. BOHAN
david.bohan@kattenlaw.com
312.902.5566 direct

January 14, 2015

<u>**Via Electronic Mail**</u>

Mary J. Kosterlitz, Esq.
Chief of the Office of Enforcement Liaison
Division of Corporation Finance
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Re:     <u>In the Matter of UBS (File No. NY-8692)</u>

Dear Ms. Kosterlitz:

I write on behalf of this firm's client UBS AG in connection with the anticipated settlement of an administrative proceeding (the "Proceeding") brought against UBS AG's indirect wholly-owned subsidiary UBS Securities LLC ("UBSS") by the U.S. Securities and Exchange Commission (the "Commission"). The Proceeding arises out of UBSS' operation of a registered alternative trading system (the "UBS ATS").

UBS AG is a financial services company and foreign private issuer under Rule 3b-4(c) of the Securities Exchange Act of 1934. UBS AG qualifies as a "well-known seasoned issuer" as defined in Rule 405 of the Securities Act of 1933 (the "Securities Act"). UBS AG respectfully requests that the Division of Corporate Finance (the "Division"), acting under delegated authority on behalf of the Commission, determine that UBS AG shall not be considered an "ineligible issuer" as defined in Rule 405 as a result of the cease-and-desist order to be entered in the Proceeding (the "Order"), which is described below. Consistent with the framework outlined in the Division's Revised Statement on Well-Known Seasoned Issuer Waivers issued on April 24, 2014 (the "Revised Statement"), good cause exists to grant the requested waiver, in that the conduct alleged in the Order does not relate in any way to UBS AG's filings with the Commission or its financial statements and the alleged violations giving rise to this request were remedied more than two years ago.

UBS AG requests that the Division's determination that UBS AG shall not be considered an ineligible issuer be made effective upon entry of the Order. Based upon discussions with



Mary Kosterlitz, Esq.
January 14, 2015
Page 2

attorneys in the Division of Enforcement, we understand that the Division of Enforcement will not object to this request.

## BACKGROUND

The Order alleges that prior to March 2011 and July 2012, respectively, UBSS failed to timely disclose to all subscribers to the UBS ATS two new features of the ATS: (i) a new order type known as Primary Peg Plus ("PPP") and (ii) a crossing restriction referred to as the "natural-only" restriction. The PPP order type permitted subscribers to the UBS ATS to tie or "peg" the price of their orders to the national best bid (or national best offer) plus (or minus) a specified percentage of the difference between the two. The natural-only crossing restriction enabled certain clients of UBSS to prevent their orders from executing in the UBS ATS against order flow that UBSS determined was short term and opportunistic in nature.

The PPP order type was launched in June 2010 and discontinued in March 2011. During that period, the Order alleges, UBSS failed to notify approximately nine of thirty-five subscribers that the order type was available. The natural-only crossing restriction was rolled out beginning in March 2010 but, the Order alleges, was not fully disclosed to all subscribers until July 2012.

UBSS has reached an agreement in principle with the Division of Enforcement by which UBSS, without admitting or denying the matters set forth in the Order, except as to the jurisdiction of the Commission, will be found to have violated Section 17(a)(2) of the Securities Act. UBSS will also be found to have violated Rule 612 of Reg NMS (the "Sub-Penny Rule"), Reg ATS Rules 301(b)(5) (the "Fair Access Rule"), 301(b)(10) (restricting access to confidential subscriber information), and 301(b)(2) (requiring timely and accurate amendments to Form ATS), and Section 17(a) of the Exchange Act and Rule 17a-4 thereunder (maintenance of specified books and records). Under the Order, UBSS will be censured, ordered to cease and desist from further violations of those statutes, rules and regulations, and required to disgorge approximately $2.24 million in commission revenue and approximately $235,000 in prejudgment interest, and pay a civil monetary penalty in the amount of $12 million.

## DISCUSSION

Under a number of Securities Act rules that became effective on December 1, 2005, a company that qualifies as a "well-known seasoned issuer" as defined in Rule 405 is eligible, among other things, to register securities for offer and sale under an "automatic shelf registration statement," as so defined, and to have the benefits of a streamlined registration process under the Securities Act. Companies that qualify as well-known seasoned issuers are entitled to conduct registered offerings with substantially fewer restrictions, which facilitates their raising of capital. Pursuant to Rule 405, however, a company does not qualify as a well-known seasoned issuer if it is an



Mary Kosterlitz, Esq.
January 14, 2015
Page 3

"ineligible issuer." Similarly, the Securities Act rules permit an issuer and other offering participants to communicate more freely during registered offerings by using free-writing prospectuses, but only if the issuer is not an "ineligible issuer."[1]

Rule 405 under the Securities Act makes an issuer an "ineligible issuer" if, during the past three years, the issuer or any entity that at the time was a subsidiary of the issuer "was made the subject of any judicial or administrative decree or order arising out of a governmental action" that, among other things, "(A) prohibits certain conduct or activities regarding, including future violations of, the anti-fraud provisions of the federal securities laws" or "(B) requires that the person cease and desist from violating the anti-fraud provisions of the federal securities laws."[2] Rule 405 also authorizes the Commission to determine, "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer."[3] The Commission has delegated authority to the Division to grant waivers from any of the ineligibility provisions of this definition.[4]

Based upon the factors set forth earlier this year in the Division's Revised Statement, we respectfully submit that there is good cause for the Division to determine that it is not necessary in the public interest or for the protection of investors for UBS AG to be deemed an "ineligible issuer," notwithstanding that UBS AG will become subject to an otherwise disqualifying order arising out of government action against its subsidiary UBSS in connection with UBSS' operation of the UBS ATS.

A.    The Nature of the Alleged Violation and Whether the Violation Casts Doubt on the Ability of the Issuer to Produce Reliable Disclosures to Investors

As discussed above, the Proceeding and the Order do not arise out of UBS AG's activities as an issuer of securities and do not call into question the reliability of UBS AG's public disclosures or UBS AG's continuing ability to produce reliable disclosures in the future. Rather, insofar as they relate to this request, the Proceeding and the Order involve the alleged failure by UBSS to make uniform and timely disclosure to the subscribers of the UBS ATS, all of whom are

---

[1] Being an ineligible issuer will disqualify an issuer under the definition of "well-known seasoned issuer," thereby preventing the issuer from using an automatic shelf registration statement (*see* Rule 405) and limiting its ability to communicate with the market prior to filing a registration statement (*see* Rule 163). In addition, being an ineligible issuer will disqualify an issuer, whether or not it is a well-known seasoned issuer, under Rules 164 and 433 under the Securities Act, thereby preventing the issuer and other offering participants from using free-writing prospectuses during registered offerings of its securities.

[2] *See* 17 C.F.R. § 230.405.

[3] *Id.*

[4] *See* 17 C.F.R. § 200.30-1. *See also* note 215 in Release No. 33-8591 (July 9, 2005).



**Katten**
KattenMuchinRosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 4

sophisticated electronic broker-dealers, of a new and short-lived order type and a crossing restriction that was available to certain clients of UBSS.

Significantly, the Order does not allege that UBSS acted with scienter in failing to notify all subscribers of the PPP order type or the natural-only crossing restriction. Rather, it alleges that UBSS violated Section 17(a)(2) of the Securities Act, which requires a mental state no more culpable than negligence. UBSS' alleged failure to timely and uniformly notify subscribers to the UBS ATS of a new order type and a new crossing restriction do not implicate the reliability of UBS AG's current financial statements or other public disclosures by UBS AG or the continuing ability of UBS AG to produce reliable disclosures in the future.

**B.     The Persons Responsible for, and the Duration of, the Alleged Violations**

The individuals who allegedly failed to disclose the PPP order type and natural-only crossing restriction promptly to all subscribers were employees of UBSS who supervised or supported the UBS ATS desk.[5] They had no duties or responsibilities regarding the preparation or dissemination of UBS AG's financial statements or public disclosures by UBS AG as an issuer of securities. Indeed, no UBS AG employee participated in, knew or should have known about the misconduct alleged in the Order.

The alleged failure by UBSS to notify certain subscribers to the UBS ATS that the PPP order type was available for their use lasted between approximately June 2010 and March 2011, and the alleged failure to notify all subscribers concerning the natural-only crossing restriction lasted between approximately March 2010 and July 2012.

**C.     Remedial Measures**

In July 2012, UBSS adopted the policy and practice of promptly updating the UBS ATS "Rules of Engagement" whenever a new order type, crossing restriction or other feature or function is added to the UBS ATS. UBSS then sends updated versions of the Rules of Engagement promptly to all subscribers by electronic mail. UBSS' policy of notifying every subscriber of material changes to the operation of the UBS ATS has been codified in UBSS' Written Supervisory Procedures. Since July 2012, UBSS has also taken steps to remediate the other, more technical statutory and regulatory issues alleged in the Order, through means that include new order surveillance and blocking mechanisms, enhancements to the firm's supervisory and compliance policies and procedures, and improved oversight of all aspects of the operation of the UBS ATS.

---

[5] Importantly, these employees are not alleged to have acted with scienter or an intent to defraud.



**Katten**
Katten Muchin Rosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 5

While UBSS believes that its remedial measures have succeeded over the two years they have been in place, UBSS also engaged outside counsel to administer two formal training sessions that address the issues underlying the Order to the key operational, legal and compliance personnel who support the UBS ATS.  In addition, we note that the UBS ATS desk has been under new management since March 2014 and has been supported by a new head of Equities Legal since August 2012.

The past instances in which the Commission has granted UBS AG a waiver from being considered an ineligible issuer related to wholly different conduct by business units unrelated to the UBS ATS.

- *In the Matter of Auction Rate Securities Liquidity Issues* (File No. HO-10915-A) (Dec. 9, 2008) related to alleged conduct by UBS Financial Services Inc. ("UBSFS") and UBSS in connection with the underwriting, marketing and sale of auction rate securities.  This matter alleged that UBSS and UBSFS misled investors into believing that auction rate securities were safe, highly liquid investments that were equivalent to cash or money-market funds.

- *SEC v. UBS Financial Services Inc.* (P-01118) (May 6, 2011) related to the activity of former employees of UBSFS with respect to the temporary investment of proceeds of municipal securities in reinvestment products such as guaranteed investment contracts, repurchase agreements, and forward purchase agreements.  The otherwise disqualifying order alleged that former employees of UBSFS engaged in bidding practices that affected the prices for certain of the reinvestment products at issue and the certifications required under applicable regulations.  The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- *In the Matter of UBS Financial Services Inc. of Puerto Rico* (FL-3491) (May 10, 2012) related to conduct by UBS Financial Services Inc. of Puerto Rico ("UBSPR") in connection with secondary market sales of mutual funds to residents of Puerto Rico.  The order alleged that UBSPR made misrepresentations and omissions concerning market prices and liquidity of certain non-exchange traded closed-end mutual funds.

- *In the Matter of UBS Securities LLC* (NY-8353) (Aug. 6, 2013) related to the alleged failure to disclose retention of certain upfront premiums in connection with credit default swaps referenced as collateral in a collateralized debt offering that was sold to accredited investors.  The employees of UBSS involved in the activity described in the order did not have any role with respect to the UBS ATS.

- *United States of America v. UBS Securities Japan Co. Ltd.* (Sep. 13, 2013) involved the manipulation of benchmark interest rates by UBS Securities Japan Co. Ltd. ("UBSJC").



Mary Kosterlitz, Esq.
January 14, 2015
Page 6

The conduct was limited to approximately fourteen employees, none of whom was responsible for preparing UBS AG's disclosures and all of whom resigned or had their employment terminated. UBSJC implemented extensive remedial measures to enhance its compliance environment and risk monitoring, including a comprehensive microlevel review of its business divisions and processes, installation of a dedicated communications monitoring team, adoption of amended employment rules and supervisory procedures, and enhanced training regarding, among other things, full compliance with UBSJC's Code of Conduct and obligation to report inappropriate activities. As a result of an order entered by the U.S. Commodity Futures Trading Commission in December 2012, UBS AG also agreed to comply with significant audit and monitoring conditions of its interest-rate benchmark submissions.

As demonstrated above, none of the conduct alleged in the five otherwise disqualifying orders related to UBS AG's conduct as an issuer of securities and does not call into question UBS AG's ability to make accurate disclosures about its future offerings. Moreover, the orders were wholly unrelated to the UBS ATS or the employees responsible for supervising or supporting the UBS ATS. Accordingly, the conduct alleged in the Order does not call into question the effectiveness of UBS AG's prior remedial measures.

**D.     Potential Impact of a Denial**

UBS AG would suffer severe adverse consequences if it were to become an "ineligible issuer" as a result of the Order. The loss of its status as an eligible issuer could, as described in more detail below, cause UBS AG to lose a significant source of revenue and substantially limit its structured products businesses, which in turn could potentially harm investors and the market as a whole. This would be an unduly severe consequence in light of the conduct at issue in the Order by UBS AG's subsidiary, UBSS.

UBS AG is a global financial institution that relies on the benefits afforded to well-known seasoned issuers in its day-to-day operations. Being a well-known seasoned issuer provides two primary benefits: (1) additional flexibility over a Form F-3 when issuing from a shelf registration; and (2) the ability to communicate more freely with investors using free-writing prospectuses ("FWPs").

UBS AG regularly relies on its eligible issuer status to offer securities using its shelf registration. Losing its status as a well-known seasoned issuer would impose additional restrictions on UBS AG's use of a shelf registration. Among other things, UBS AG would be required to pay all fees upfront at the time of registration and include additional information in its registration statements. Further, UBS AG's registration statements would be subject to a review period. All of these consequences would impose additional administrative burdens on UBS AG.



Mary Kosterlitz, Esq.
January 14, 2015
Page 7

The more serious impact of being considered an ineligible issuer, however, would be the limitations on UBS AG's ability to communicate with investors using free-writing prospectuses, which convey targeted and relevant information to customers in a user-friendly format that is often easier to understand than the typically more dense statutory prospectus. The SEC has recognized that investors and the securities markets benefit from the use of FWPs, which among other things facilitate greater transparency to investors.[6]

UBS AG employs user-friendly FWPs to offer securities on an almost daily basis. For the twelve-month period beginning August 1, 2013, and ending July 31, 2014, UBS AG issued securities in 2,630 offerings, only 17 of which did not utilize an FWP. The aggregate principal amount of the 2,613 offerings in which UBS used some form of FWP was approximately $3.5 billion. As described below, the loss of its eligible issuer status would limit the amount of relevant information available to investors and force UBS AG to significantly alter or eliminate its exchange-traded note ("ETN") and structured product businesses, which could result in a loss of nearly $70 million in revenue per year.

1.    **Exchange-Traded Notes.**

UBS AG is an active issuer of ETNs, which are fixed term debt securities indexed to the performance of a reference index. UBS AG currently offers twenty ETNs and regularly produces written materials in FWP format to provide investors with summary information regarding those ETNs. UBS AG relies on its ability to post fact sheets, press releases and email distributions on its website to provide transparency to ETN investors regarding performance and income payments. Each of these forms of communication is a permitted form of FWP that is filed with the SEC. These documents are primarily communicated to investors through UBS AG's E-TRACS website. As an ineligible issuer, UBS AG would be unable to use these methods of communicating with investors. Among other things, UBS AG anticipates that ineligible issuer status would require it to shut down or severely limit its informational E-TRACS website and significantly reduce product transparency for investors.

The inability to use FWPs could result in significant redemptions of UBS AG's ETNs for two reasons. First, we expect that investors would prefer to invest in ETNs issued by companies that can provide the kind of user-friendly, summary information contained in FWPs. Second, limiting the flow of information regarding ETNs by eliminating FWPs could also reduce market maker participation in ETNs, which would cause wider spreads and potential dislocation of the ETN's market prices from their intrinsic value. Redemption of all of UBS AG's outstanding ETNs would result in an annual revenue loss by UBS AG of approximately $45 million.

---

[6] Securities Offering Reform, Securities Act Release No. 8501 (Nov. 3, 2004).



Mary Kosterlitz, Esq.
January 14, 2015
Page 8

2.    **UBS Equity Investor System.**

UBS AG would also be required to eliminate or substantially overhaul its structured products business, which also relies heavily on FWPs.  Most of the FWPs for UBS AG's structured products are generated from its Equity Investor System ("EQI"), which is an automated system used to price and issue multiple structured product offerings daily based on input from investors. EQI uses embedded risk management parameters and documentation templates to automatically generate pricing terms and preliminary and final offering documentation.  All FWPs and prospectus supplements generated by EQI are automatically filed with EDGAR upon use.

EQI-generated offerings represent a majority of UBS AG's structured product business by number of offerings.  Of the 2,630 offerings by UBS AG between August 2013 and July 2014, 2,223, or approximately 84%, were generated using EQI.  EQI allows UBS AG to meet investor demand by creating offerings smaller than $1 million, allowing greater, customized investor access to structured notes.  The average EQI offering has a principal amount of around $250,000. These small-denomination offerings provide investors with customized investment opportunities. The magnitude of this demand is illustrated by the number of UBS AG's structured note offerings relative to its competitors.  According to a recent Bloomberg Brief, UBS AG had issued more than twice as many structured products as the next largest issuer.[7]  Being an ineligible issuer would render UBS AG unable to utilize the current EQI system.  As a result, UBS AG would be required to reprogram and reformat the entire EQI system, which would require the immediate shutdown of the EQI platform.  We estimate that an immediate shutdown of the EQI system would result in an estimated revenue loss to UBS AG of $1.5 to $2 million per month ($18 million to $24 million per year).

While the cost to replace or reprogram EQI is uncertain, it is worth noting that UBS AG has spent in excess of 1,100 hours of outside counsel time, hundreds hours of internal time and approximately $1.8 million in combined IT and outside legal costs over a period of 12 months to develop additional products that could make use of EQI, which would have to be modified or abandoned if UBS AG were to lose its status as an eligible issuer.

3.    **Other Structured Products.**

UBS AG also utilizes FWPs to market structured products outside of the EQI system.  To date, in 2014, UBS AG has offered structured products with an aggregate principal amount of approximately $2.3 billion in 300 registered non-EQI offerings.  An FWP was used in nearly 95% of these offerings.

Loss of eligible issuer status would impose a significant, immediate hardship on UBS AG's structured product businesses.  Not only would UBS AG be unable to utilize the current EQI system, but it would also be removed from the competitive bidding process for certain third-

---

[7] See Bloomberg Brief: Structured Notes, Sept. 18, 2014, "Rankings by Asset Class: U.S.", p. 8  (citing "deal count" based on SEC Filings through September 12, 2014).



**Katten**
Katten Muchin Rosenman LLP

Mary Kosterlitz, Esq.
January 14, 2015
Page 9

party distributors due to its inability to produce FWPs.  Third-party distributors occasionally request that UBS AG provide a one-to-two-page FWP as part of the investor package.  As an ineligible issuer, UBS AG could be unable to participate in the bidding for these offerings, which could have repercussions for the entire market if distributors are unable to deliver the potentially superior terms that UBS AG could have offered.

Again, UBS AG's structured products business and its ETN business are wholly separate from the ATS desk of UBS AG's subsidiary.  Limiting UBS AG from making use of FWPs would be an unduly and disproportionately severe outcome for alleged conduct by UBSS that UBSS voluntarily discontinued and remedied more than two years ago.

For the foregoing reasons, UBS AG submits that it is not necessary, either in the public interest or for the protection of investors, for UBS AG to be deemed an "ineligible issuer" and that good cause exists for the relief requested herein.  We therefore request that the Division, acting pursuant to authority duly delegated by the Commission and pursuant to paragraph (2) of the definition of "ineligible issuer" in Rule 405, determine that under the circumstances UBS AG will not be considered an "ineligible issuer" within the meaning of Rule 405 as a result of the Order.

Please call me at your earliest convenience if you have any questions regarding this request or require any additional information.

Sincerely,

David C. Bohan

cc:     Stephen A. Larson, Enforcement Division, U.S. Securities and Exchange Commission
        Charles D. Riely, Enforcement Division, U.S. Securities and Exchange Commission