(http://goingconcern.com/)

# Ernst & Young Admits That Some of Its Partners Were Running a Tax Shelter Factory

By    (http://goingconcern.com/author/caleb-newquist/) | 4 years ago



What a fine thing for the Manhattan U.S. Attorney to announce on a Friday afternoon that it had (http://www.bloomberg.com/news/2013-03-01/ernst-young-to-pay-123-million-to-end-tax-fraud-probe.html) over its tax sheltering activities:

> Ernst & Young LLP will pay $123 million to settle a U.S. tax-fraud probe as part of a non- prosecution agreement, according to a statement from the Manhattan U.S. Attorney's Office. The accounting firm "admitted wrongful conduct" by its partners and employees in connection with four tax shelters, from 1999 to 2004, according to today's statement. About 200 Ernst & Young clients used the shelters to try to avoid more than $2 billion in taxes, it said. In addition to the money and the admissions, Ernst & Young agreed to a series of permanent restrictions on its tax practice and will continue to cooperate with the government's tax-shelter investigation. The firm's cooperation began in 2003, according to the statement.

Those restrictions include not doing things that the IRS considers to be a "tax avoidance transaction." But what about the rest of the statement? Well, (http://www.justice.gov/usao/nys/pressreleases/March13/EYNPAPR.php) and it has all the interesting details that the

# In Print 48 Weeks A Year

# Ernst & Young to Pay $9.3 Million Neither Admit Nor Deny SEC Charges

By Editor Filed in          September 19th, 2016 @ 10:56 am

Ernst & Young will pay $9.3 million to settle charges that two of the firm's audit partners got too close to their clients on a personal level and violated rules that ensure firms maintain their objectivity and impartiality during audits.

Ernst & Young was represented by William McLucas of WilmerHale in Washington, D.C.

The Securities and Exchange Commission's investigations found that the senior partner on an engagement team for the audit of a New York-based public company maintained an improperly close friendship with its chief financial officer, and a different partner serving on an engagement team for the audit of another public company was romantically involved with its chief accounting officer.

Ernst & Young misrepresented in audit reports issued with the companies' financial statements that it maintained its independence throughout these audits.

"These are the first SEC enforcement actions for auditor independence failures due to close personal relationships between auditors and client personnel," said Andrew J. Ceresney, Director of the SEC's Division of Enforcement.  "Ernst & Young did not do enough to detect or prevent these partners from getting too close to their clients and compromising their roles as independent auditors."

According to                    finding that Gregory S. Bednar caused auditor independence rule violations at Ernst & Young from January 2012 to March 2015, he was specifically tasked by the firm to improve its relationship with the New York-based audit client because it was a "troubled account."

Bednar and the company's CFO stayed overnight at each other's homes on multiple occasions and traveled together with family members on overnight trips with no valid business purpose, and they exchanged hundreds of personal text messages, emails, and voicemails during the auditing periods.

Bednar also became friends with the CFO's son and often treated them to sporting events and other gifts.

Certain Ernst & Young partners became aware of Bednar's excessive entertainment spending but took no action to confirm that Bednar was complying with his independence obligations.

Bednar and Ernst & Young consented to the SEC's order without admitting or denying the findings.

The firm will pay $4.975 million in monetary sanctions for these violations.

Bednar must pay a $45,000 penalty and is suspended from appearing and practicing before the SEC as an accountant, which includes not participating in the financial reporting or audits of public companies.

The SEC's order permits Bednar to apply for reinstatement after three years.

Bednar no longer works at Ernst & Young.

According to ................................................. caused auditor independence rule violations at Ernst & Young from March 2012 to June 2014, she maintained a romantic relationship with financial executive Robert Brehl while she served on the engagement team auditing his company.

Meanwhile another Ernst & Young partner named Michael Kamienski, who supervised Hartford on the audit, became aware of facts suggesting the improper relationship yet failed to perform a reasonable inquiry or raise concerns internally to Ernst & Young's U.S. independence group.

According to the SEC's order, Ernst & Young required audit engagement teams to follow certain procedures to assess their independence, and employees were asked whether they had familial, employment, or financial relationships with audit clients that could raise independence concerns.

But these procedures did not specifically inquire about non-familial close personal relationships that could impair the firm's independence.

Ernst & Young, Hartford, Kamienski, and Brehl consented to the SEC's order without admitting or denying the findings.

The firm agreed to pay $4.366 million in monetary sanctions for these violations, and Hartford and Brehl agreed to pay penalties of $25,000 each.

Hartford, Kamienski, and Brehl are suspended from appearing and practicing before the SEC as accountants, which includes not participating in the financial reporting or audits of public companies.

The SEC's order permits Brehl to apply for reinstatement after one year, and Hartford and Kamienski can apply after three years.  Hartford and Kamienski no longer work at Ernst & Young.

- **Print Weekly Newsletter**

  - o
  - o
  - o

5/29/2017
Four Current Or Former Ernst & Young Partners Found Guilty On Criminal Tax Shelter Charges | TAX | Department of Justice

Case 1:17-cv-04503-JMF   Document 91-2   Filed 04/03/18   Page 4 of 74

## JUSTICE NEWS

**Department of Justice**

Tax Division

FOR IMMEDIATE RELEASE

## Four Current Or Former Ernst & Young Partners Found Guilty On Criminal Tax Shelter Charges

Lev L. Dassin, the Acting United States Attorney for the Southern District of New York, Linda Stiff, the Deputy Commissioner for Services and Enforcement of the Internal Revenue Service, and John A. DiCicco, the Acting Assistant Attorney General for the Tax Division of the Department of Justice, announced today that Robert Coplan, Martin Nissenbaum, Richard Shapiro, and Brian Vaughn, each a current or former partner of the accounting firm Ernst & Young, were found guilty following a ten-week jury trial in Manhattan federal court on all counts, including conspiracy, tax evasion and other charges relating to the design, marketing and implementation of tax shelters sold by Ernst & Young (E&Y).

According to the evidence at trial:

Coplan, Nissenbaum, Shapiro and Vaughn, as members of E&Y's national individual tax shelter group, led an effort to design and market tax shelter transactions used by wealthy individuals to eliminate, reduce or defer tax liabilities on annual income that generally exceeded $10 or $20 million. Between 1999 and 2002, tax shelter transactions implemented by the defendants and their co-conspirators generated billions of dollars in non-economic or paper tax losses that were used to offset actual income or gain recognized by the firm's clients.

The defendants and their co-conspirators – which included tax, accounting and financial industry professionals, and law firms – worked to design, implement and defend the tax shelter transactions in ways intended to conceal the true facts and circumstances of the transactions from the IRS.

All four defendants were found guilty of one count of conspiracy relating to four tax shelters, and two counts of tax evasion relating to clients who used a tax shelter transaction known as "CDS Add-On." In addition, Coplan was found guilty of one count of obstructing the IRS and one count of making false statements to the IRS; Nissenbaum was found guilty of one count of obstructing the IRS; and Vaughn was found guilty of one count of making false statements to the IRS. Each of the conspiracy, tax evasion, and false statements counts carries a maximum sentence of five years in prison and three years of supervised release. Each obstruction count carries a maximum sentence of three years in prison and one year of supervised release. In addition, the defendants face on each count a maximum fine of the greatest of $250,000 or twice the gross gain or loss derived from the offense.

Robert Coplan, 57, of Plano, Texas, is a former E&Y tax partner who was the leader of the individual tax shelter group, and the former National Director of E&Y's Center for Wealth Planning. Coplan, a lawyer, was at one time a Branch Chief in the IRS's Legislation and Regulations Division.

Martin Nissenbaum, 54, of Brooklyn, N.Y., also a lawyer, is an E&Y partner who was a member of the tax shelter group and the National Director of E&Y's Personal Income Tax and Retirement Planning practice.

Richard Shapiro, 59, of Rye Brook, N.Y., also a lawyer, is an E&Y tax partner and was a member of the tax shelter group.

Brian Vaughn, 41, of Calhoun, La., a Certified Public Accountant, is a former member of the tax shelter group and a former E&Y tax partner.

In related matters, Charles Bolton, who was initially charged as a co-defendant with Coplan, Nissenbaum, Shapiro, and Vaughn, pleaded guilty on Jan. 22, 2009, to conspiracy to impede and impair the IRS. David L. Smith, the remaining defendant charged in the indictment, has not been apprehended; and as to him the charges in the indictment remain merely accusations and he is presumed innocent unless and until found guilty. In addition, Peter Cinquegrani, a former Arnold & Porter partner who provided opinion letters on E&Y tax shelters, pleaded guilty on Sept. 11, 2008, to conspiracy to commit tax fraud, aiding and abetting tax evasion, and aiding in

the submission of false and fraudulent documents to the IRS. And on June 14, 2007, Belle Six, a former E&Y employee who was involved primarily in sales and marketing, and later went to work for entities that implemented shelters for E&Y clients, pleaded guilty to conspiracy to commit tax fraud.

Mr. Dassin praised the work of the Criminal Investigation Division of the Internal Revenue Service and the Department of Justice Tax Division in assisting in the investigation and prosecution of the case.

Coplan, Nissenbaum, Shapiro, and Vaughn are scheduled to be sentenced on Sept. 10, 2009, before United States District Judge Sidney H. Stein, who presided over the trial.

Assistant United States Attorneys Lauren Goldberg and Marshall A. Camp, and Special Assistant United States Attorney John E. Sullivan, from the Tax Division of the Department of Justice, are in charge of the prosecution.

*Updated April 6, 2015*

- - Site Menu
  -
  -
  -
  -
  -
  -
  -

Make sure you don't miss any Law360 breaking news.

# Charles Schwab Settles Financial Consultants' OT Suit

By

Law360, New York (April 21, 2014, 2:30 PM EDT) -- Financial services company Charles Schwab & Co. Inc. on Friday said that it had settled a proposed collective and class action in New York accusing it of failing to pay legally required overtime.

Plaintiffs Dana Aboud, William Hicks, Michael Porowski and Albert Schweizer brought the action last Wednesday in New York federal court on behalf of two collectives comprised of financial consultants and other employees accusing Charles Schwab of violating the Fair Labor Standards Act, and Aboud alone brought proposed class action claims accusing the company...
To view the full article, register now.

Already a subscriber?

- -
- -
- -
- -

## Documents

- -

## Related

*04-20-2010 | 03:21 PM*    Author: *Timothy Raub*

## Schwab Announces $200 Million Settlement Of Securities Class Action Lawsuit

SAN FRANCISCO — (Mealey's) The Charles Schwab Corp. has agreed to a $200 million settlement of a securities class action lawsuit brought against it and certain of its executive officers and directors by investors alleging that the defendants misrepresented and concealed the investment company's exposure to the subprime mortgage lending crisis in the offering documents for Schwab's YieldPlus Fund, according to a press release issued by Schwab April 20 (In re Schwab Corp. Securities Litigation, No. 08-1510, N.D. Calif.).

According to the press release, under the terms of the settlement agreement, which is subject to court approval, Schwab admits no guilt.

Claims for violation of California Business and Professions Code Section 17200, violation of Section 13(A) of the Investment Company Act of 1944, breach of contract, intentional interference with contractual relations and breach of fiduciary duty are not covered under the settlement agreement, according to the press release.

Investors Robert Levin and Karl Kyzer filed their second amended complaint in the U.S. District Court for the Northern District of California on behalf of all those who purchased shares of the Schwab YieldPlus Fund, which was sold in two classes of shares: investor shares and select shares.

The investors allege that in addition to the claims not covered under the settlement agreement, Schwab, subsidiaries Charles Schwab & Co. Inc., Charles Schwab Investment Management Inc. and Schwab Investments violated Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 by issuing a series of false and misleading statements concealing Schwab's business and financial condition in connection with its subprime exposure.

[Editor's Note: Full coverage will be in the April issue of the LexisNexis Financial Services Litigation Report. For all of your legal news needs, please visit www.lexisnexis.com/mealeys.]

For more information, call editor Timothy J. Raub at 610-205-1127, or e-mail him at timothy.raub@lexisnexis.com.

Tags:  _lawsuit_    _litigation_    _In re Schwab Corp. Securities Litigation_    _Robert Levin_    _mortgage lending_    _Schwab_    _Karl Kyzer_    _Charles Schwab Corp._
_securities_    _YieldPlus Fund_    _class action_    _subprime_

# The New York Times

# Schwab to Pay $119 Million to Settle Bond Fund Case

**By Eric Dash**    January 11, 2011 7:40 pm

The Charles Schwab Corporation agreed on Tuesday to pay $119 million to settle federal and state lawsuits in which regulators accused the company of misleading investors in a bond mutual fund that contained risky mortgage-backed securities.

The Securities and Exchange Commission also filed civil complaints against two senior Schwab executives who oversaw the fund. Those lawsuits continue despite the settlement by the company.

In documents filed in federal court in San Francisco, the commission accused Schwab of making "misleading statements" about the riskiness of its YieldPlus fund, which it held out as equivalent to an ultrasafe money market investment.

In reality, according to the complaint, the fund contained risky mortgage-backed securities. When the housing market collapsed, the fund suffered big losses.

The Schwab executives — Kimon Daifotis, former chief investment officer for fixed-income products, and Randall Merk, an executive vice president who was trustee of the YieldPlus fund — were accused of "fraudulent and deceptive conduct" for making a series of misrepresentations and omissions in marketing documents for the fund.

**Related Links**
S.E.C. statement
Charles Schwab statement

Regulators also contend that the executives violated federal securities laws as well as Schwab's own policies by failing to obtain shareholder approval when more

than 25 percent of its assets came from a single industry.

Mortgage-related investments made up roughly 50 percent of the assets in the YieldPlus fund. Both executives are planning to contest the agency's charges, according to Schwab.

In its settlement with the S.E.C. and a separate one with the Financial Industry Regulatory Authority, Schwab agreed to pay $110 million in penalties and interest into a federal fund set up to compensate harmed shareholders, with another $9 million going to regulators in Illinois. Schwab also agreed to have an independent consultant review its fund marketing practices.

The settlements bring to $350 million the amount Schwab has agreed to pay to resolve litigation involving YieldPlus. Last fall, the company said it would pay more than $235 million to resolve two private class-action lawsuits brought by shareholders. That settlement deal awaits approval, which is expected next month.

In a statement, Schwab called the S.E.C. settlement a "constructive conclusion" but, as it had in the past, shifted the bulk of the blame to the crisis in the housing market.

"We regret shareholders lost money," it said. "The decline in the YieldPlus fund was the result of an unprecedented and unforeseeable credit crisis and market collapse."

The regulatory suits against Schwab are the latest in a series of enforcement actions taken against banks and brokerage firms in the wake of the financial crisis.

Besides the Schwab case, the S.E.C. has brought civil charges against retail-oriented mutual funds run by Evergreen Investments, Morgan Keegan and the State Street Corporation.

Federal investigators are looking into the practices of similar bond funds at Bank of America and Citigroup that were aimed at institutional clients, according to people with knowledge of the investigations.

S.E.C. officials said the Schwab case sent a message that retail investors needed to be fully informed of the risks being taken with their money. "All financial firms and professionals — including large mutual fund providers — must be vigilant in accurately describing the risks of the products they sell to the public," Robert Khuzami, the director of enforcement, said in a statement.

In October 2009, Schwab acknowledged that it had received a Wells notice from the S.E.C. saying the commission might file civil charges against the company and at least one senior executive.

At its peak, YieldPlus was the industry's largest short-term bond fund, with more than $13.5 billion in assets and 200,000 accounts. But as the housing market started to collapse in late 2007, the fund's value plummeted. Many investors redeemed their holdings, putting the fund under enormous pressure to raise cash.

In an effort to dissuade YieldPlus customers from redeeming their investments, regulators say, Mr. Daifotis told a group of brokers who were to communicate with Schwab investors that "we've got very, very, very slight negative flows" out of the fund. In reality, the complaint says, Mr. Daifotis knew that investors were seeking redemptions totaling more than $1.2 billion.

In a statement, Susan Brune, a lawyer for Mr. Merk, said that the S.E.C.'s claims were "infected by hindsight bias and not supported by the actual evidence."

David Bayless, a lawyer for Mr. Daifotis, could not be reached for comment.

---

© 2017 The New York Times Company

EDITION: UNITED STATES

| Tue Feb 17, 2015 | 3:39pm EST

# Schwab settles NY lawsuit over auction-rate debt

Feb 17 Charles Schwab Corp has agreed to settle a 2009 lawsuit in which New York's attorney general accused the discount brokerage of fraud in the sale and marketing to investors of auction-rate securities that became illiquid.

Terms were not disclosed in a settlement between Schwab and Attorney General Eric Schneiderman, which was made public in a Feb. 13 filing with the state Supreme Court in Manhattan.

Schwab spokesman Greg Gable said the San Francisco-based company is pleased to settle. Liz DeBold, a spokeswoman for Schneiderman, confirmed the settlement.

Auction-rate securities had interest payments that reset at periodic auctions.

Many brokerages marketed the securities as being as safe as cash, but much of the debt became illiquid in February 2008 when dealers stopped supporting the market.

The lawsuit against Schwab was initially filed in August 2009 by Andrew Cuomo, then New York's attorney general and now its governor.

Cuomo sued after having persuaded financial companies that sold or underwrote auction-rate securities to buy back more than $61 billion of the debt. Other brokerages to settle included Fidelity Investments and TD Ameritrade Holding Corp.

Schwab had in October 2011 won the dismissal of Cuomo's lawsuit, which Schneiderman inherited by that time. A state appeals court revived two claims brought under the state's Martin Act, a powerful securities law, in August 2013.

The case is New York v. Charles Schwab & Co, New York State Supreme Court, New York County, No. 453388/2009. (Reporting by Jonathan Stempel and Karen Freifeld in New York; Editing by Cynthia Osterman)

**ALSO IN BONDS NEWS**

UPDATE 1-Italian yields soar on possibility of early autumn election

Ivory Coast to issue $1 bln Eurobond next month -FinMin

TRENDING STORIES

'Convinced Atlanticist' Merkel being honest with U.S., spokesman says

North Korea fires Scud-class ballistic missile, Japan protests

British Airways battles third day of disruption, image blow after IT meltdown

Oil slips as more U.S. drilling outweighs OPEC-led cuts

Trump attacks 'fake news' following Kushner reports

NEXT IN BONDS NEWS

6/8/2017

Merrill Lynch, Charles Schwab Accounts Linked To Mexican Drug Cartels: SEC | HuffPost

AdChoices

**BUSINESS**   05/21/2014 04:31 pm ET | Updated Jul 21, 2014

# Merrill Lynch, Charles Schwab Accounts Linked To Mexican Drug Cartels: SEC



SHUTTERSTOCK

By Emily Flitter and Jed Horowitz

NEW YORK (Reuters) - U.S. regulators are investigating Charles Schwab Corp and Bank of America Corp's Merrill Lynch brokerage over whether they are doing enough to police their clients' identities, sources said, the latest sign a crackdown on money laundering is expanding.

Specifically, the regulator is looking into whether the brokerages missed red flags that could indicate attempts to move money illicitly or to feed proceeds from illegal activities into the financial system, the sources said.

The U.S. Securities and Exchange Commission is probing Charles Schwab and Merrill Lynch for violations of anti-money laundering rules that require the brokerages to know their customers, the sources said.

Schwab is conducting an internal investigation, one of the sources said.

A spokesman for the SEC declined to comment. Representatives of Schwab and Merrill did not immediately respond to requests for comment.

# Exhibit T



**U.S. Department of Justice**

Criminal Division

---

*Washington, D.C.  20530*

December 18, 2012

Gary R. Spratling, Esq.                     David P. Burns, Esq.
Gibson, Dunn & Crutcher LLP              Gibson, Dunn & Crutcher LLP
555 Mission Street, Suite 3000            1050 Connecticut Ave NW
San Francisco, CA  94105                    Washington, DC  20036

      **Re:   UBS AG**

Dear Mr. Spratling and Mr. Burns:

      On the understandings specified below, the United States Department of Justice, Criminal Division, Fraud Section ("Fraud Section") will not criminally prosecute UBS AG and its subsidiaries and affiliates (collectively, "UBS"), with the exception of UBS Securities Japan Co., Ltd. ("UBS Securities Japan"), for any crimes (except for criminal tax violations, as to which the Fraud Section cannot and does not make any agreement) related to UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate (known as LIBOR), the Euro Interbank Offered Rate (known as EURIBOR), and the Tokyo InterBank Offered Rate (known as TIBOR), as described in the attached Appendix A, which is incorporated in this Non-Prosecution Agreement ("Agreement").[1]

      It is understood that UBS admits, accepts, and acknowledges responsibility for the conduct set forth in Appendix A and agrees not to make any public statement contradicting Appendix A.

      The Fraud Section and UBS further agree that as a term and condition of this Agreement, UBS Securities Japan will plead guilty to one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, in accordance with the Plea Agreement that is attached as Appendix B, which is incorporated in this Agreement.

      The Fraud Section enters into this Agreement based, in part, on its consideration of the following factors:

---

      [1]     Although not addressed in Appendix A, this Agreement also encompasses UBS's submissions for the additional benchmark rates listed in Appendix C, which is also incorporated in this Agreement.  The rates listed in Appendix C are the focus of an ongoing investigation and, for that reason, Appendix C will be held in confidence by the parties to this Agreement and will not be made available to the public until the Department of Justice, in its sole discretion, determines that such information can and should be disclosed.

# Exhibit U

**Report of Independent Registered Public Accounting Firm**

The Members of
UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2013, and the related notes to the statement of financial condition.

**Management's Responsibility for the Financial Statement**

Management is responsible for the preparation and fair presentation of the statement of financial condition in conformity with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of a statement of financial condition that is free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on the statement of financial condition based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statement. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statement, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the Company's preparation and fair presentation of the statement of financial condition in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the statement of financial condition.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2013, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

February 28, 2014



**Building a better working world**

Ernst & Young LLP
5 Times Square
New York, NY 10036-6530

Tel: +1 212 773 3000
Fax: +1 212 773 6350

## Report of Independent Registered Public Accounting Firm

The Members of
    UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2014. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statement. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2014, in conformity with U.S. generally accepted accounting principles.

The accompanying information contained in Schedules I, II, III, IV, V, VI, VII and VIII has been subjected to audit procedures performed in conjunction with the audit of the Company's financial statement. Such information is the responsibility of the Company's management. Our audit procedures included determining whether the information reconciles to the financial statement or the underlying accounting and other records, as applicable, and performing procedures to test the completeness and accuracy of the information. In forming our opinion on the information, we evaluated whether such information, including its form and content, is presented in conformity with Rule 17a-5 under the Securities Exchange Act of 1934 and Regulation 1.10 under the Commodity Exchange Act. In our opinion, the information is fairly stated, in all material respects, in relation to the financial statement as a whole.

*Ernst + Young LLP*

February 27, 2015

Report of Independent Registered Public Accounting Firm

The Members of
    UBS Securities LLC

We have audited the accompanying statement of financial condition of UBS Securities LLC (the Company) as of December 31, 2015. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the statement of financial condition is free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the statement of financial condition referred to above presents fairly, in all material respects, the financial position of UBS Securities LLC at December 31, 2015, in conformity with U.S. generally accepted accounting principles.

*Ernst & Young LLP*

February 27, 2016

# Exhibit V

**Barry D. Estell**
ATTORNEY AT LAW
6140 Hodges Drive
Telephone (913) 722-5416　　　Mission, Kansas 66205　　　E-mail: bestell@kc.rr.com

August 24, 2010

File No. SR-FINRA-2010-035

I am a lawyer who has represented investors in NASD and FINRA arbitration since 1993. Prior to that, I spent 13 years in the securities industry as a registered representative and compliance officer. I was a registered principal in most areas including Series 4, Registered Options Principal; Series 24, General Securities Principal; Series 27, Financial & Operations Principal; and Series 53, Municipal Securities Principal. I have been a seldom used NASD/FINRA arbitrator since 1990.

## INTRODUCTION

As FINRA once again applies lipstick to the pig that is arbitration it really needs to be said that there is no way that FINRA will ever offer investors an unbiased forum. The financial interest and job security of the FINRA staff rests on customers seldom receiving a level playing field. It is not the American Association of Individual Investors; it's a trade association of people who make their living defrauding individuals and the fraud has spiraled upward since the advent of forced industry arbitration.

FINRA discovery is one-sided, biased, and intended to favor the member firms. The small crumbs thrown investor's way are routinely ignored. I attach a 2004 study of objections by Morgan Stanley to the current Discovery Guide lists in a sample of 25 arbitration proceedings. My favorite is that the Discovery Guide is "unintelligible." The Discovery Guide had been in existence for five years and Morgan Stanley had conceded nothing as "presumptively" discoverable. Everything was subject to objection on general, vague, and frivolous grounds. Nothing has changed. Regardless of the changes proposed, public customers will still have to spend a year with multiple discovery motions and hearings (at significant cost) to receive even the most basic Discovery Guide items deemed "presumptively discoverable." That is the optimistic view. It's just as likely they will never receive the basic documents.

I repeat the statistical information in the PIABA comment letter on the 2008 proposal. A defrauded customer has a less than 40% chance of recovering 30% of the damages he or she would be entitled to as a matter of law in a courtroom and has a less than 50% chance of collecting even that.[1] This is a seriously flawed forum. Discovery abuse is only one of the factors denying customers a fair hearing. Investors, lacking any chance of a fair hearing, usually accept low-ball settlement offers to recoup what small percentage of their losses that they can. There is no reason to believe that

---

[1] All the information needed to quantify damages, awards, settlement amounts and collectability are in the possession of FINRA which has steadfastly refused to make it available to academic researchers or the public in general. A secret forum is a corrupt forum.

member firms will not ignore the proposed lists just as they have the 1999 lists. They have absolutely no incentive to comply. Giving arbitrators the authority to levy sanctions is a bad joke on investors. Arbitrators know what happens to those that do so. They disappear from the arbitration panels.

## OVERT BIAS OF DISCOVERY GUIDE LISTS

**General Objections:** Almost every response to Discovery Guide document production contains "General Objections" under which a Respondent firm may withhold each and every document required by Lists.[2] This is a direct violation of Code Section 12508. Objecting to Discovery; Waiver of Objection

(a) If a party objects to producing any document described in Document Production Lists 1 or 2, any other applicable Document Production List, or any document or information requested under            , it must specifically identify which document or requested information it is objecting to and why.

Three years after the above section became effective, it is uniformly ignored. Why? Because arbitrators know that the rules are for show only and not to be enforced against a major Wall Street firm. Did Bernie Madoff have to worry about ignoring a few NASD/FINRA rules concerning discretionary accounts?

The net effect is that member firms feel comfortable entering general objections and relying upon them to withhold whatever documents do not bolster their defense. Claimant, not knowing what is being withheld can not request it. The Discovery Guide should unequivocally state that no general objection may be entered nor relied upon to withhold any documents required by the Discovery Guide. Automatic sanctions should apply, including the striking of any response which includes general objections. Otherwise, customers must file a motion demanding that the member abide by Code Section 12508 and be charged $400 to $1,000 for the arbitrators to decide if the firm will be ordered to comply. That's a 4-6 month project and combined with the multiple other motions necessary to force (hopefully) compliance with the Code, becomes very expensive for a customer.

**"Know Your Arbitration Claimant" Rule:** Also known as the financial colonoscopy procedure or post-claim suitability determinations. The Guide requires customers to produce years of sensitive financial information that has no relevance to the case at issue. It is one-sided: Where's the broker's tax return? It is meant to harass and embarrass claimants so that they will not pursue claims. It has no relevance to the issues in the arbitration which limit most member discovery obligations, and can be financially dangerous when dealing with 3rd and 4th tier FINRA bucket shops.

It is a really bad idea for FINRA or anyone else to order solid citizens who have been victimized by a boiler room to give those firms even more personal documents concerning bank accounts, insurance policies, real estate transactions and loan documentation. Many of these are criminal enterprises and the principals sometimes

---

[2] See attached compilation of objections by Morgan Stanley in 2004 including 34 general objections.

(although not often enough) go to jail.  To give them increasing amounts of personal financial information entirely unrelated to the original transactions is an invitation for identity theft and a second criminal career if FINRA finally gets around to barring them from the securities industry.

If this information were relevant, the brokerage firm could request it prior to opening the account or making the recommendation.  Try that one out.  Instead, FINRA seeks to reinforce arbitrator training that if a client is wealthy, or traded a speculative security at another firm years ago, anything the broker does to him is per se "suitable" because the customer is "sophisticated" or engaged in speculation in the past.  Many arbitrators consider it a complete defense even if the customer transferred to the current Respondent broker to get away from speculative investments.  It takes nine years (the six year rule plus three) before a customer who has speculated, knowingly or not, can regain the alleged protection of FINRA regulations.  Arbitrators are trained to ignore state law entirely.

An especially pernicious recent example is a customer who received less than 10% of the shares of a closely held corporation from his employer for services rendered.  The business prospered beyond his wildest dreams but upon losing a substantial amount of money to FINRA bucket shops he was ordered to produce all of the business records and tax returns of the corporation.  It was a gross violation of the privacy of the entrepreneur who made him wealthy and who had no connection to the case.  He had the choice of betraying his employer and benefactor or dropping his case.  That is what the financial colonoscopy is all about; intimidation and coercion, not the issues in the Statement of Claim or Answer.

Another true war story from years past concerns fraudulent Prudential limited partnerships:  A retired client was sold a real estate partnership that the SEC found to be fraudulently marketed.  No matter.  His tax returns showed that for several years he had a rental house.  The broker testified that the client had bragged about his private rental real estate and had demanded that he invest his IRA in Prudential real estate partnerships on an unsolicited basis.  The truth was that the customer had inherited the house from his mother and rented it to his nephew who he was forced to evict for non-payment.  He was humiliated that he had evicted a relative, but had no choice.  He was so embarrassed that he never told anyone.   It is such tax return information that members use to structure post-claim suitability arguments around facts that they did not know when the recommendation was made.  It is sleazy and dishonest and FINRA should not collude in such conduct.

Realizing that FINRA arbitration is not and never will be fair, a less offensive way to handle this issue is for member firms to plead the customer's annual income, net worth and other financial information in the Answer.  Only if the customer contests the financial information should (s)he be required to produce specific documents refuting the misinformation in the Answer which is presumably obtained from the account documents they are required to produce later.  Otherwise, there is no relevance to the issues in dispute.  It is merely a FINRA supported fishing expedition meant to harass customers, discourage claims and improperly influence arbitrators.   The production of tax records of partners, business associates and other non-parties is never proper.  It is

3

the equivalent of the member firms being required to produce the tax returns of other customers and non-parties.

Similarly, only if a member firm's Answer contains specific statements asserting that a "recommendation" was based on a customer's similar conduct or investments at another firm would the customer be required to produce the records of all other accounts for the prior nine years.   As it is, FINRA encourages brokers to perjure themselves based on the discovery of previously unknown information.

Under both the current and proposed Discovery Guide Lists, FINRA encourages bad conduct by its members.  They can provide general, vague, and evasive Answers to a Statement of Claim and then do a financial colonoscopy on the customer, courtesy of FINRA and present a completely different defense at hearing based on previously unknown information around which they structure their perjured testimony.  Only if the member firm is aware of the information prior to the claim, states that information in the Answer, and the customer disputes the information does it have any relevance to the issues in an arbitration proceeding.

**Uniform Time Periods:**   Customers are generally required to produce documents as much as nine years old (six year rule plus three years). List 2, Item 15 has an unlimited time period for any and all documents from any source, for any "investment" for ever. Member firms discovery obligations, in contrast to this wildly overly broad requirement, are limited to much more narrow time periods as well as scope of information; i.e. List 1, #12 during the time period at issue, #13(b) and #14 not earlier than one year before or after, #17 one year before through filing of the claim (vs. Claimant's requirement that do not end with the filing of the claim), #20 three months before and after the trades at issue.

If the period of three years prior to the period in the complaint is relevant for the customer, it should also be relevant for the member firm.  A broker's commission runs and income for the three years prior to abusing his customer often speak volumes about motive and method of operation in parting customers from their savings.

**Excuses Not to Produce:**  While almost all of the customer's obligations are broad and all encompassing, member firms are given an excuse to withhold documents in most instances.   Along with the general objections, customers never know what highly relevant documents are being withheld.   Specific examples on proposed List 1 are as follows:

#2 requires correspondence "specifically relating" to the accounts or transactions at issue allowing the omission of any document relating generally instead of specifically or transactions not yet at issue because the customer has no idea what happened and few or no records prior to discovery. Also covered is advertising "sent" to customers of the firm, but not the advertising and sales literature and marketing material merely used by the RR to formulate his pitch but not "sent" to the customer.

A greater concern is the removal of the monthly statements unless separately requested.   At many firms the broker copy of the statement contains a lot more information than the customer copy.  If that is the case, those statements should be

produced in every case. I recently reviewed broker copies from a major firm and was surprised to learn that the RR was charging both a flat fee and commissions equaling 30% of the income in an income account. It would take months to discover this if the usual practice of limiting commission runs continues. All broker account statements that differ from the statements that customers receive should be mandatory.

#5 requires (a) All materials "prepared or used" and/or provided to the customer . . . but not relevant materials prepared or used and not provided to the customer or not prepared or used but provided to the customer (such as copies of news articles or outside research).

#6 requires all notes relating to the customer and/or accounts or transactions, but not concerning the securities in the transactions. Merrill Lynch analysts' reference to top rated securities as POS comes to mind. FINRA should not be complicit in that type cover-up.

#7 requires production of all notes of the compliance review of customers' accounts or trades, but not of the broker himself who may be doing the same thing to thirty-seven other customers at the same time.

#9 requires production of all communications between the broker and compliance relating to the specific securities and/or customer, but not the twenty-eight other customers being defrauded by the same RR in similar securities.

#11 requires all sections of the compliance manuals relating to the claims alleged in the Statement of Claim which rules out anything the customer has not yet discovered. Full copies of all compliance manuals in every case without confidentiality requirements are absolutely necessary in every case in order for the customer to have any chance of a fair hearing. FINRA knows enough about compliance manuals to know that they are not qualified for any confidentiality protection. They are required regulatory documents the disclosure of which could convey no competitive advantage to any other firm. They are kept confidential only from defrauded customers.

For an industry that is constantly whining about the burden of production, the hours spent tearing apart and redacting manuals in order to prevent a customer from being able to logically review and use them is completely hypocritical. FINRA should require its members to produce all manuals in every case without abusive confidentiality agreements or orders meant only to prevent other defrauded customers from comparing notes. As it now stands, the firm objects to producing any compliance document without a draconian confidentiality agreement causing immediate delay. In 2009 I received a manual five months after it was first due after the panel granted a confidentiality motion because Respondents claimed it to be proprietary. The manual at issue was an off-the-shelf copy from a third-party consulting firm which retained all rights. It was not proprietary to the member under any definition, but arbitrators have been trained to believe all compliance material is "proprietary" or "secret" or "confidential" or something that requires a protective order.

Even if the customers sign the agreement they will seldom receive all the documents because they can not compare it to another case or with another customer.

Even after receiving confidentiality agreement by order of panels that have been trained to always give members confidentiality orders, the next round of motions is over what is related to the claim.  Members always take a minimalist view.  When a member gets a confidentiality order on compliance documents, or other "required" documents, the odds of the customer getting the real documents or all of them is substantially reduced. A compliance manual is a must have document and it normally takes two or three rounds of motions to receive some version of it.   FINRA knows it and is complicit in its member's misconduct in this area.

#12 requires analysis only during the period at issue and gives members a pass for other accounts, transactions and securities of the same customer during another time period.  Those analyses will be presented at hearing if they favor the member, but disappear forever if they show a pattern of misconduct.

#13(a) requires all exception reports to review activity in the customer's account "related" to the allegations in the Statement of Claim or for the transactions at issue.  It omits exception reports for the sixty-two other customer accounts being abused at the same time.

(B) is broader, covering other accounts, but only if "related" to the allegations in the Statement of Claim.  That means you are back at (a) because no other claims will ever be "related" in the opinion of member counsel.

Brokers keep records of activity reports.  Again, an industry always whining about the burden of production could just print them off and send them instead of spending hours redacting and separating reports.   But that might provide customers useful information about similar, but not "related" misconduct.

#14 requires internal audit reports only if "focused" on the associated person or the accounts or discussing "similar" improper conduct by other individuals in the branch.  Those qualifications will never be met.  What does "focus" mean anyway, let alone similar?   This was a retired 75 year old man that was a retired 79 year old woman; no similarity there and neither were ever put under a microscope for "focus." That was a Fannie Mae preferred; this was a Freddie Mac preferred, completely different.   Once again, send the internal audits.   They'll show up if they are favorable to the member firm, they should be produced when they are not.

#15 requires records of disciplinary action for conduct "similar" to that alleged in the Claim.  Again, it will never be similar and the customer will never see it unless all disciplinary action is disclosed.   Customers have to produce records of all other accounts for the last nine years, not just the "similar" ones.

#16 requires regulatory investigations for "similar" improper behavior which like the investigations and reports above will never occur.  There will always be a difference that makes the investigation dissimilar.   FINRA knows that and is completely disingenuous in pretending that they don't.

#17 is a repeat of #16 except for "examination reports" that are "similar."  A farce; they will never be similar.  Members should be ordered to produce all reports and if they

have no relevance the panel can disregard them.  FINRA's effort to limit all evidence of a firm's pattern of misconduct and lack of supervision is outrageous.  Put the information out there and let the arbitrators determine its relevance rather than giving member counsel the discretion to determine it for them.  The panel is going to see the customer's tax returns, loan applications, insurance policies, their partner's tax returns and financial information and yet FINRA wants to deny the panel most information about the conduct of the offending office and firm.

#19 limits commission information to the transaction at issue and allow members to hide the nineteen other commissions for the exact same transaction in other accounts while the broker swears under oath that the trade was unsolicited and (s)he'd never heard of the security before.

#20 deals with "solicited" trades.  It is a phony distinction because the parties will never agree whether a trade was solicited or not and FINRA has no definition of the term.  How can you have a rule on a trade for which there is no definition?  Does solicited mean "recommended?"  Is there a definition for recommended?  The fact is that members will go to great lengths to avoid providing a complete commission run showing all trades by a broker for all accounts.  As an allegedly neutral administrator, FINRA should not be allowed to assist that effort to suppress relevant substantive information.

Without the full commission run in every case, the customer can not get a fair hearing.  Brokers will deny a trade was recommended or solicited.  Neither statements nor confirmations say if an order is solicited.  They only say if an order was "unsolicited" and that is a term that is almost never explained to the customer.  Many believe unsolicited means they didn't ask (solicit) the broker to buy the security for them.  Even when the confirmation is blank, meaning solicited, the broker will invariably deny it at hearing swearing that it was a mere technicality and (s)he never recommended the trade to the customer and never solicited anything.

Making the production of commission runs dependent on a moving target for which there is no definition may be the most cynical part of this amendment.  FINRA knows it will lead to endless arguments and multiple motions and hearings for the issue to be decided in every case and will further needlessly run up expenses for customers in a spending contest with major firms.

Complete commission runs should be required in every case.  Sometimes it is defensive for the customer.  Without them the RR is free to perjure him or herself about the customer directing all activity in the account on a completely unsolicited basis because there is no evidence of the other customers doing the same thing.  Sometimes it's offense to affirmatively prove that the client was treated differently than all the other customers.  But it's always necessary and without full commission runs in every case customers can not get a fair hearing.  They were normally required prior to the Discovery Guide.  The proposal appears to be a pretext to seemingly require commission runs but discourage actual production with an endless motion practice about whether trading was "solicited," an issue of fact which can not be determined without an evidentiary hearing.  There is no doubt which party benefits from that and it is not the customer.  More time, more costs, more forum fees.

**Confidentiality Agreements:** I mentioned this before concerning compliance manuals, but it is worth restating that the use of abusive confidentiality orders and agreements is pervasive and prejudicial to customers. It's too late to tell arbitrators to consider the facts in the Neutral Corner. They have been trained to give them in every case and even if that weren't true the third bullet point about "proprietary confidential business plans and procedures" subsumes all other arguments. Defense lawyers use the "P" word (proprietary) and panels are trained to fall in line.

FINRA knows and should definitively state that there are no documents required by the Discovery Guide that are "proprietary' or "confidential." It already instructs as to what personal information may be redacted so it is not a great leap. That's why the Lists are presumptively discoverable. If they are required by SEC Rule 17a-3 they are required regulatory records that can not be "proprietary" and must be automatically produced without frivolous objection. The original Discovery Guide was to eliminate this kind of abusive posturing and it has only made it worse by encouraging issuance of confidentiality orders without any justification other than members shouting the "P" word. Alternately, if FINRA believes there are documents on the Lists that should be "presumptively confidential" it should state as much and put that out for comment instead of trying to back-door the issue.

## A BETTER GUIDE

There is already a list of documents essential in every case where a broker's conduct is in question. The essential documents are mandated by SEC Rule 17a-3. Broker/dealers are required to keep and maintain most relevant records at the branch office or be able to promptly produce the records at the branch.[3] The following records are deemed by state securities commissioners as absolutely necessary to conduct a routine examination; they should in all cases be available to defrauded customers who have suffered ascertainable losses. The mandatory nature and maintenance of these records should belie objections of overly broad and burdensome.

Instead of a Discovery Guide intended to limit customer discovery while providing member firms with wide ranging fishing exhibitions meant to intimidate customers and discourage complaints, the Discovery Guide should mandate that all mandatory records be made available to every customer in every arbitration. They are required. They are maintained. They are available. FINRA should not attempt to keep defrauded customers from receiving those documents with an ambiguous, contradictory and confusing Discovery Guide where the "exceptions" swamp the rule to its member firms advantage. Regulatory records are required for a purpose and part of that purpose should be to allow defrauded investors to obtain adequate discovery in arbitration. It would not increase member's record keeping obligations one bit. FINRA Enforcement is generally not interested in enforcing its rules; customers should be given the opportunity.

---

[3] See NASD publication New and Amended Recordkeeping Requirements Checklist, Frequently Asked Questions About the Amendments to Broker/Dealer Books and Records Rules under the Securities Exchange Act of 1934 which is attached.

- 04-00415: Subject to the general objections and limited to the specific trade complained about, otherwise object as vague, ambiguous, overly broad, unduly burdensome and improperly requires speculation as to which documents are sought.
- 04-01650: Limits to customer activity reports that reference Claimant's accounts; otherwise objects as vague, ambiguous, overly broad, unduly burdensome, not related to matter in controversy
- 04-03003: Limit to copies of customer activity reports that reference Claimant's account only. Beyond that, object that the request is vague and ambiguous, overly broad, unduly burdensome and not related to matter in controversy.
- 04-03747: Limit to reports that reference Claimant's accounts; otherwise object as vague and ambiguous, overly broad, unduly burdensome and not related to the matter in controversy.
- 04-03685: Limit to reports that reference Claimant's accounts; otherwise object as vague and ambiguous, overly broad, unduly burdensome and not related to the matter in controversy.

**COMMENT:**   Morgan Stanley limits its production to a limited number of reports restricted to the customer accounts in preparation for List 5, #2 which requires the production of all activity reviews and exception reports concerning the Financial Advisor. It is a preemptory objection because Morgan Stanley will go to extraordinary lengths to avoid producing documents detailing other (often many other) red flags being generated by the typical rogue broker involved in multiple arbitrations.

12) Records of disciplinary action taken against the Associated Person(s) by any regulator or employer for all sales practices or conduct similar to the conduct alleged to be at issue.
- 02-04998: Objects as overly broad and not related to the matter in controversy.
- 02-07298: Objects as overly broad and not related to the matter in controversy
- 03-00123: Limited to disciplinary action in connection with Claimant's account only and objects that any additional request is "a desperate fishing expedition" and overly broad, unduly burdensome, irrelevant, not specific and do not relate to the matter in controversy.
- 03-04130: In addition to general objections and limitations Respondents specifically object to this request as overly broad and not relevant.
- 03-04984: Object that the request is vague, overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence.
- 03-07840: Limited to extent "available"
- 03-08275: Subject to foregoing general objections and further objections of not relevant, vague and ambiguous, and overbroad, there are not responsive documents.
- 04-01650: Objects as overly broad and not related to the matter in controversy
- 04-00415: Subject to the general objections will produce documents related to the single customer incident only and objects to any other documents as vague and ambiguous, overly broad, unduly burdensome and improperly requires Respondents to speculate as to which documents are sought.
- 04-00415: Object as vague, ambiguous, overly broad, unduly burdensome and improperly requiring speculation as to which documents are sought.

**COMMENT:**   Morgan Stanley consistently claims to have no idea what this request means and insists on limiting the response to claimant.   Even when ordered to produce the

9

documents, it can choose to interpret the request as for similar conduct as an alternative to "all" sales practices (its an either or request) and find none of the other disciplinary action is similar, there being a difference in age, gender, state of residence, karma, or something.

LIST 3 : **CHURNING**

1) All commission runs relating to the customer's account(s) at issue or, in the alternative, a consolidated commission report relating to the customer's account(s) at issue.

- 02-02593:  Objects not relevant, proprietary, confidential Claimant's commissions only.
- 03-08275:  Subject to foregoing general objections.
- 04-01650:  Limits to Claimant commissions, otherwise objects as vague, overly broad and unduly burdensome.
- 04-03685:  Object as confidential and subject to a confidentiality agreement.

   **COMMENT:**  See List 5, Request #1.

2) All documents reflecting compensation of any kind, including commissions, from all sources generated by the Associated Person(s) assigned to the customer's account(s) for the two months preceding through the two months following the transaction(s) at issue, or up to 12 months, whichever is longer. The firm may redact all information identifying customers who are not parties to the action, except that the firm/Associated Person(s) shall provide at least the last four digits of the non-party customer account number for each transaction.

- 02-02593:  Objects as not relevant, over broad, burdensome, oppressive, proprietary, confidential.
- 03-00123:  Object that the request is overly broad, unduly burdensome and harassing, irrelevant, vague, not specific and do not relate to the matter in controversy.
- 03-08275:  Subject to foregoing general objections and further object that the request is not related to the subject matter of this action nor reasonably calculated to lead to discovery of admissible evidence and is **unintelligible** in that claimant has never identified the "transactions at issue" in this action.
- 04-01650:  Objects as vague and ambiguous, overly broad, unduly burdensome, not related to the matter in controversy.
- 04-00415:  Subject to the general objections and additionally as overly broad and unduly burdensome.
- 04-03685:  Object as violating Financial Advisor's privacy rights and subject to confidentiality agreement will produce records only as they pertain to Claimant's account.

   **COMMENT:**      This is another request where Morgan Stanley professes not to understand, going so far as to call it "unintelligible." One wonders how the SEC could have understood it.   It is also a preemptive objection to List 5, #1 which requires compensation of any kind which Morgan Stanley routinely refuses to produce.

3) Documents sufficient to describe or set forth the basis upon which the Associated Person(s) was compensated during the years in which the transaction(s) or occurrence(s) in question occurred, including: a) any bonus or incentive program; and b) all compensation

# Exhibit W

FINANCIAL MANAGEMENT

# Why Good Accountants Do Bad Audits

by Max H. Bazerman, George Loewenstein, and Don Moore

On July 30, at a ceremony in the East Room of the White House attended by congressional leaders of both parties, President George W. Bush signed into law the Sarbanes-Oxley Act of 2002 addressing corporate accountability. A response to recent financial scandals that had begun to undermine citizens' confidence in U.S. business, the wide-ranging act flew through the House of Representatives and Senate in record time and passed in both chambers by overwhelming majorities. The act places new legal constraints on executives and gives expanded protections to whistle-blowers. Perhaps most important, though, it puts the accounting industry under tightened federal oversight. It creates a regulatory board—with broad powers to punish corruption—to monitor accounting firms, and it establishes stiff criminal penalties, including long jail terms, for accounting fraud. "The era of low standards and false profits is over," Bush proclaimed.

If only it were that easy.

Given the vast scale of recent accounting scandals and their devastating effects on workers and investors, it's not surprising that the government and the public assume that the underlying problems are corruption and criminality—unethical accountants falsifying numbers to protect equally unethical clients. But that's only a small part of the story. Serious accounting problems have long plagued corporate audits, routinely leading to substantial fines for accounting firms. Some of the errors, no doubt, are the result of fraud. But to attribute most errors to deliberate corruption

has worked with accountants knows is untrue. The deeper, more pernicious problem with corporate auditing, as it's currently practiced, is its vulnerability to unconscious bias. Because of the often subjective nature of accounting and the tight relationships between accounting firms and their clients, even the most honest and meticulous of auditors can unintentionally distort the numbers in ways that mask a company's true financial status, thereby misleading investors, regulators, and sometimes management. Indeed, even seemingly egregious accounting scandals, such as Andersen's audits of Enron, may have at their core a series of unconsciously biased judgments rather than a deliberate program of criminality.

## The real problem isn't conscious corruption. It's unconscious bias.

Unlike conscious corruption, unconscious bias cannot be deterred by threats of jail time. Rooting out bias, or at least tempering its effects, will require more fundamental changes to the way accounting firms and their clients operate. If we are really going to restore trust in the U.S. system of auditing, we will need to go well beyond the provisions of the Sarbanes-Oxley Act. We will need to embrace practices and regulations that recognize the existence of bias and moderate its ill effects. Only then can we be assured of the reliability of the financial reports issued by public companies and ratified by professional accountants.

## The Roots of Bias

Psychological research shows that our desires powerfully influence the way we interpret information, even when we're trying to be objective and impartial. When we are motivated to reach a particular conclusion, we usually do. That's why most of us think we are better than average drivers, have smarter than average children, and choose stocks or funds that will outperform the market—even if there's clear evidence to the contrary. Without knowing it, we tend to critically scrutinize and then discount facts that contradict the conclusions we want to reach, and we uncritically embrace evidence that supports our positions. Unaware of our skewed information processing, we erroneously conclude that our judgments are free of bias.

and other materials from a lawsuit involving a collision between a motorcycle and a car and were assigned to the role of either the motor-cyclist plaintiff or the car-driving defendant. They were given the task of negotiating a settlement and were told that if they couldn't reach one, a judge would decide the award amount, and both parties would pay substantial penalties. Finally, before starting the negotiation, each participant was asked to predict the amount the judge would award the plaintiff if negotiations stalled. To further eliminate bias, each member of the pair was assured that the other party wouldn't see his or her estimate and that the estimates would not influence the judge's decision.

The results were striking. Participants playing the motorcyclist plaintiff tended to predict that they'd receive dramatically larger awards than the defendants predicted. This is an example of self-serving bias: Armed with the same information, different people reach different conclusions—ones that favor their own interests. In addition, the degree to which the two hypothetical awards differed was an excellent predictor of the likelihood that the pair would negotiate a settlement. The greater the difference in the negotiators' beliefs, the harder it was for them to come to agreement.

How can such an impulse toward self-serving bias be moderated? In follow-up experiments, the same researchers tried to reduce participants' bias by paying them to accurately predict the amount of the judge's award and having them write essays arguing the other side's point of view. Neither strategy reduced bias; participants consistently thought that the judge would award damages that favored their side. And what about educating the subjects, alerting them that they were likely to reach biased conclusions? That didn't work, either. After teaching participants about bias and testing them to make sure they understood the concept, the researchers found that the participants concluded that their negotiating opponents would be highly biased but refused to believe that they themselves would be.

In yet another of these experiments, participants were presented with 16 arguments--eight favoring the side they had been assigned (plaintiff or defendant) and eight favoring the other—and were asked to predict how a neutral third party would rate the quality of the arguments. In general, study participants found arguments that favored their own positions more convincing than those that supported the other side. But when participants were assigned to the role of plaintiff or defendant

only after they'd seen the case materials—and so were unbiased in their evaluation of the data—their degree of bias was significantly less. Taken together, these findings suggest that unconscious bias works by distorting how people interpret information.

## Accounting for Bad Accounting

Professional accountants might seem immune to such biases (after all, they work with hard numbers and are guided by clear-cut standards). But the corporate auditing arena is a particularly fertile ground for self-serving biases. Three structural aspects of accounting create substantial opportunities for bias to influence judgment.

### Ambiguity.

Bias thrives wherever there is the possibility of interpreting information in different ways. As we saw in the study involving the collision, people tend to reach self-serving conclusions whenever ambiguity surrounds a piece of evidence. While it's true that many accounting decisions are cut-and-dried—establishing a proper conversion rate for British pounds, for instance, entails merely consulting daily foreign exchange rates—many others require interpretations of ambiguous information. Auditors and their clients have considerable leeway, for example, in answering some of the most basic financial questions: What's an investment? What's an expense? When should revenue be recognized? The interpretation and weighting of various types of information are rarely straightforward. As Joseph Berardino, Arthur Andersen's former chief executive, said in his congressional testimony on the Enron collapse, "Many people think accounting is a science, where one number, namely earnings per share, is *the* number, and it's such a precise number that it couldn't be two pennies higher or two pennies lower. I come from a school that says it really is much more of an art." (See the sidebar "Ambiguity in Accounting and Auditing.")

### Ambiguity in Accounting and Auditing

Each year, *Money* magazine sends the financial records of a hypothetical family to 30 to 50 professional tax preparers and asks, "How much does this family owe in taxes for the year?" No two preparers ever

### Attachment.

Auditors have strong business reasons to remain in clients' good graces and are thus highly motivated to approve their clients' accounts. Under the current system, auditors are hired and fired by the companies they audit, and it is well known that client companies fire accounting firms

$68,912, a difference of 83%. Although even if these tax professionals could be proud that they agreed far more than did their colleagues who performed a similar exercise in 1990: That group's results ranged from $6,807 to $73,247, a 976% difference.

How could experts disagree so vastly on something that seems as objective as accounting? It turns out that deciding what is income, what is deductible, and what is an appropriate depreciation schedule is subjective. Judgment calls are part of a tax preparer's work. Similarly, at a corporate level, a myriad of ambiguous accounting questions, such as when to recognize revenue and which items to expense, opens the door for self-serving interpretations. An item such as late-stage R&D that one auditor might regard as an investment can be seen by another as an expense. With executives deciding how to state earnings, the two treatments can significantly affect the bottom line reported to the public.

Another indication of ambiguity in accounting is the common practice of negotiating about accounting rules. In one study by Michael Gibbins, Steven Salterio, and Alan Webb of 93 audit partners working for international accounting firms, 67% reported that they commonly negotiated with 50% or more of their clients. These negotiations, for example, might involve the timing of revenue and expenses recognition. Executives are often in a hurry to recognize revenue but prefer to delay recognizing an expense. If there were such a thing as "correct" timing, these negotiations wouldn't take place. Another indication of auditing ambiguity is

accounting firm is large enough to absorb the loss of one client, individual auditors' jobs and careers may depend on success with specific clients. Moreover, in recent decades, accounting firms have increasingly treated audits as ways to build relationships that allow them to sell their more lucrative consulting services. Thus, from the executive team down to individual accountants, an auditing firm's motivation to provide favorable audits runs deep. As the collision case also showed, once people equate their own interests with another party's, they interpret data to favor that party. Attachment breeds bias.

## Approval.

An audit ultimately endorses or rejects the client's accounting—in other words, it assesses the judgments that someone in the client firm has already made. Research shows that self-serving biases become even stronger when people are endorsing others' biased judgments—provided those judgments align with their own biases—than when they are making original judgments themselves.[2] In one series of studies, researchers found that people were more willing to endorse an overly generous outcome that favored them than they were to make that judgment themselves. For example, if someone says that you deserve a higher raise than facts might suggest, you are more likely to come to agree with this view than you are to decide on your own that you deserve a higher raise. This kind of thinking

interpret specific accounting problems before deciding whom to hire. Because no "right" conclusion exists, different auditing firms can have different opinions.

Finally, in the current political discussion about expensing options, opponents of expensing often argue that an option's value is too ambiguous to assess. They proffer ambiguity as a justification for ignoring the value of options executives receive.

implies that an auditor is likely to accept more aggressive accounting from her client than what she might suggest independently.

In addition to these structural elements that promote bias, three aspects of human nature can amplify unconscious biases.

### Familiarity.

People are more willing to harm strangers than individuals they know, especially when those individuals are paying clients with whom they have ongoing relationships. An auditor who suspects questionable accounting must thus choose, unconsciously perhaps, between potentially harming his client (and himself) by challenging a company's accounts or harming faceless investors by failing to object to the possibly skewed numbers. Given this tension, auditors may unconsciously lean toward approving the dubious accounting. And their biases will grow stronger as their personal ties deepen. The longer an accounting partner serves a particular client, the more biased his judgments will tend to be.

### Discounting.

People tend to be far more responsive to immediate consequences than delayed ones, especially when the delayed outcomes are uncertain. Many human vices spring from this reflex. We postpone routine dental checkups because of the cost and inconvenience and the largely invisible long-term gain. In the same way, auditors may hesitate to issue critical audit reports because of the adverse immediate consequences—damage to the relationship, potential loss of the contract, and possible unemployment. But the costs of a positive report when a negative report is called for—protecting the accounting firm's reputation or avoiding a lawsuit, for example—are likely to be distant and uncertain.

### Escalation.

It's natural for people to conceal or explain away minor indiscretions or oversights, sometimes without even realizing that they're doing it. Think of the manager who misses a family dinner and blames the traffic, though he simply lost track of time. Likewise, an auditor's biases may lead her to

though, the sum of these small judgments may become large and she may recognize the long-standing bias. But at that point, correcting the bias may require admitting prior errors. Rather than expose the unwitting mistakes, she may decide to conceal the problem. Thus, unconscious bias may evolve into conscious corruption—corruption representing the most visible end of a situation that may have been deteriorating for some time. It's our belief that some of the recent financial disasters we've witnessed began as minor errors of judgment and escalated into corruption. As Charles Niemeier, chief accountant for the SEC's enforcement division, put it: "People who never intend to do something wrong end up finding themselves in situations where they are almost forced to continue to commit fraud once they have started doing this. Otherwise, it will be revealed that they had used improper accounting in the earlier periods."

## Putting Theory to The Test

Bias, by its very nature, is typically invisible: You can't review a corporate audit and pick out errors attributable to bias. Often, we can't tell whether an error in auditing is due to bias or corruption. But you can design experiments that reveal how bias can distort accounting decisions. We recently did just that, with telling results.

We gave undergraduate and business students a complex set of information about the potential sale of a fictional company and asked them to estimate the company's value. Participants were assigned different roles: buyer, seller, buyer's auditor, or seller's auditor. All subjects read the same information about the company. As we expected, those who hoped to sell the firm thought the company was worth more than the prospective buyers did. More interesting were the opinions offered by the auditors: Their judgments were strongly biased toward the interests of their clients.

These auditors displayed role-conferred biases in two ways. First, their valuations (judgments) were biased in the clients' favor: The sellers' auditors publicly concluded that the firm was worth more than the buyers' auditors said it was. Second, and more tellingly, their private judgments about the company's value were also biased in their clients' favor: At the end of the experiment, the auditors were asked to estimate the company's true value and were told that they would be rewarded according to how close their private judgments were to those of impartial experts. Despite this incentive for accuracy, the estimates of the sellers' auditors averaged 30% higher than those of the

buyers' auditors. This exemplifies the persistent influence of self-serving biases. Once participants interpreted information about the target company in a biased way, they were unable to undo the bias later.

Earlier this year, we ran a study with Lloyd Tanlu that focused on professional auditors themselves. The study, of 139 auditors employed full time by one of the big U.S. accounting firms, illuminated the professionals' vulnerability to bias and their tendency to be influenced by clients' biases. Each participant was given five ambiguous auditing vignettes and asked to judge the accounting for each. Half the participants were asked to suppose that they had been hired by the company they were auditing; the rest were asked to suppose they had been hired by a different company, one that was conducting business with the company that had created the financial statements. In addition, half the participants in each of those two groups generated their own auditing numbers first, then stated whether they believed that the firm's financial reports complied with generally accepted accounting principles (GAAP), while the other half did the two tasks in the reverse order.

For all five vignettes, the auditors were on average 30% more likely to find that the accounting behind a company's financial reports complied with GAAP if they were playing the role of auditor for that firm. Furthermore, the participants who generated their own auditing numbers after first passing judgment on the company's financial reports tended to come up with numbers that were closer than the other participants' to the client's numbers. The study showed both that experienced auditors are not immune from bias and that they are more likely to accede to a client's biased accounting numbers than to generate such numbers themselves.

These experiments show that even the suggestion of a hypothetical relationship with a client distorts an auditor's judgments. Imagine the degree of distortion that must exist in a long-standing relationship involving millions of dollars in ongoing revenues.

## Problems with Proposed Reforms

Because the reforms in the Sarbanes-Oxley Act and those proposed by others do not address the fundamental problem of bias, they will not solve the crisis in accounting in the United States. Some of the reforms, in fact, may well make it worse.

Consider the provisions dealing with disclosure. They require individual auditors or their firms to reveal conflicts of interest to investors. But to counteract bias, such disclosure must either inhibit bias outright or allow investors to adjust for it. Neither is likely. With regard to inhibiting bias, we saw earlier that a person's conscious efforts to reduce bias have limited effect. And the latter idea, that disclosure would help investors interpret auditors' reports, would be of little benefit unless investors knew *how* a disclosed conflict of interest biased an auditor's judgment. Imagine an investor who reads a positive audit report containing the caveat that the auditor receives $60 million in annual fees from the audited company. By how much should the investor adjust the company's self-reported earnings per share? Without specific guidance, people cannot accurately factor conflict of interest into their investment decisions.

More worrisome is evidence that disclosure could actually increase bias. If auditors suspect that disclosure will lead investors to discount or make adjustments for the auditors' public statements, they may feel less duty bound to be impartial and may make judgments more closely aligned with their personal interests. Research by Daylian Cain, Don Moore, and George Loewenstein paired participants and assigned one member of each pair to the role of estimator and the other to that of adviser. The estimator viewed several jars of coins from a distance, estimated the value of the money in them, and was paid according to how close the estimates were to the jars' true values. The adviser, who could study the jars up close, gave the estimator advice. The adviser, however, was not paid according to the estimator's accuracy but according to how high the estimator's guesses were. In other words, advisers had an incentive to mislead the estimators so that they would guess high.

In addition, we told half of the estimators about the advisers' pay arrangement; we said nothing about it to the rest. Disclosure had two effects. First, advisers whose motives were disclosed provided much more biased guesses (i.e., high estimates of coin jar values) than did advisers whose motives were not disclosed; second, disclosure did *not* cause estimators to substantially discount their advisers' advice. As a result, disclosure led advisers to make much more money and estimators to make much less. Applied to auditing, this finding suggests that auditors who are forced to disclose conflicts might exhibit greater self-serving bias.

One other proposed policy warrants mention: the move to impose stricter accounting standards. This remedy, too, is unlikely to improve the situation. Research shows that it takes very little

that they had worked seven hours on a task and that another person had worked ten hours on the same task. Other participants were asked to imagine the opposite scenario: They'd worked ten hours on the project while the other person worked seven. In each case, it was specified that the person who had worked seven hours would be paid $25; the question was how much the person who had worked ten hours should be paid. Ten-hour participants, on average, thought that they should be paid about $35 for their ten hours of work, while those who had worked seven hours thought that the 10-hour person should receive less—about $30. Here, all it took was a tiny bit of ambiguity—whether the fair solution was equal hourly pay (as the ten-hour people thought) or equal total pay (as the seven-hour people thought)—to produce different self-serving assessments of fairness. Note, too, that the incentives for being biased in this study were awfully weak because the question was hypothetical; in the real world, incentives for bias are far stronger. It seems implausible that stricter accounting rules could eliminate ambiguity—and thus they are unlikely to reduce self-serving bias.

## Radical Remedies

The key to improving audits, clearly, is not to threaten or cajole. It must be to eliminate incentives that create self-serving biases. This means that new policies must reduce an auditor's interest in whether a client is pleased by the results of an audit.

One provision of the Sarbanes-Oxley Act prohibits accounting firms from providing certain consulting services to companies they audit. This is a step in the right direction, but it doesn't go far enough. Clearly, accounting firms that advise their clients on how to boost profits, while at the same time trying to impartially judge their books, face an impossible conflict of interest. This reform both reduces this conflict and eases the pressure on auditors to act as salespeople for their firm's other services. Unfortunately, while the new law limits the consulting services auditing firms can provide, it doesn't prohibit them entirely, and it gives the new oversight board created by the Sarbanes-Oxley Act the option of overriding this provision.

True auditor independence requires, as a start, full divestiture of consulting and tax services. And even then, a fundamental problem will remain: Because auditors are hired and fired by the companies they audit, they are in the position of possibly casting negative judgments on those who hired them—and who can cut them loose. Therefore, even with the elimination of consulting, the fundamental structure of the auditing system virtually ensures biased auditing. To eliminate this

Auditors must have fixed, limited contract periods during which they cannot be terminated. All fees and other contractual details should be specified at the beginning of the contract and must be unchangeable. In addition, the client must be prohibited from re-hiring the auditing firm at the end of the contract; instead, the major accounting firms would be required to rotate clients. Current legislation requires auditor rotation; however, this is defined as a change in the lead partner within an auditing firm. There is no provision to rotate the firms conducting the audit, and there is no provision to prevent a client from firing an auditor. Thus, auditors will continue to have powerful incentives to keep their clients happy.

Audit clients must also be prohibited from hiring individual accountants away from their audit firms. As the Enron scandal unfolded, the common practice of Arthur Andersen employees taking positions with Enron, and vice versa, came to light. Clearly, an auditor can't be impartial when he or she hopes to please a client in order to develop job options. We believe that auditors should be barred from taking positions with the firms they audit for at least five years.

Less tangibly, auditors must come to appreciate the profound impact of self-serving biases on judgment. Professional schools have begun to take ethics seriously in recent years, but teaching auditors about ethics will not have an impact on bias. What's needed is education that helps auditors understand the unconscious errors they make and the reasons they make them. That knowledge alone won't solve the problem, but once members of the auditing profession understand the role of bias in their work, honest and visionary leaders in the profession can help change the conduct of accounting to prevent the conflicts of interest that promote bias. And audit leaders who say that so-called professionalism is a sufficient safeguard against audit error—a claim that's inconsistent with the weight of empirical evidence on human judgment—might abandon that claim if they truly understood the role of bias in auditing.

Our proposals are not perfect. Indeed, it's hard to imagine any practical system that could eliminate all bias. Even with our remedies, for instance, it's still possible that auditors' social contact with clients could introduce subtle biases. But we envision a system in which clients regard auditors as more like tax collectors than partners or advisers—a system that could be expected to at least ameliorate bias. Devising a more robust separation of auditor and client, one that might go further to reduce bias, would require approaches—such as turning over the auditing function to government—

that could create problems as serious as those they solve. We see our proposals as both realistic and effective. In the absence of radical and innovative reform, we believe, further accounting disasters are inevitable.

1. This and subsequent studies about the collision mentioned in this article were conducted by Linda Babcock, Colin Camerer, Sam Issacharoff, and George Loewenstein and are summarized in L. Babcock and G. Loewenstein, "Explaining Bargaining Impasse: The Role of Self-Serving Biases," *Journal of Economic Perspectives,* winter 1997.

2. K. A. Diekmann, S. M. Samuels, L. Ross, and M. H. Bazerman, "Self-Interest and Fairness in Problems of Resource Allocation: Allocators Versus Recipients," *Journal of Personality and Social Psychology,* May 1997.

3. D. M. Messick and K. P. Sentis, "Fairness and Preference," *Journal of Experimental Social Psychology,* July 1979.

A version of this article appeared in the November 2002 issue of *Harvard Business Review.*

Max H. Bazerman is the Jesse Isidor Straus Professor of Business Administration at Harvard Business School and a codirector of the Center for Public Leadership at Harvard Kennedy School.

George Loewenstein is a professor of economics and psychology at Carnegie Mellon University in Pittsburgh.

Don A. Moore holds the Lorraine Tyson Mitchell Chair in Leadership at the Haas School of Business at the University of California at Berkeley.

**This article is about FINANCIAL MANAGEMENT**

⊕ **FOLLOW THIS TOPIC**

ACCOUNTING      AUDITING      CORPORATE GOVERNANCE      ETHICS      CONSULTING

PROFESSIONAL SERVICES

POST

1

## John Doe   a year ago

I really like the part about damaging a client relationship. Too often will you see a firm overlook bad accounting to keep revenue coming in if the future. Don't bite the hand that feeds you! This is why we need random audits of auditing firms. This is kinda like an appeal process in law. When someone disagrees with audit findings, we need an agency that we can appeal to that will conduct an audit. However, why not require firms to fork over a random clients books. The best way to root out bias is to use math to back up your audits. I'll see auditors cry about grammar all day but miss actual values or base their opinions on some broken version of PPS sampling. Who cares about there, their, they're when your whole audit is based off a horrible assumption.

REPLY                                                      0 👍 0 👎

## ∨ JOIN THE CONVERSATION

We hope the conversations that take place on HBR.org will be energetic, constructive, and thought-provoking. To comment, readers must sign in or register. And to ensure the quality of the discussion, our moderating team will review all comments and may edit them for clarity, length, and relevance. Comments that are overly promotional, mean-spirited, or off-topic may be deleted per the moderators' judgment. All postings become the property of Harvard Business Publishing.

# Exhibit X

The aggregate amount provisioned for litigation, regulatory and similar matters as a class is disclosed in Note 20a above. It is not practicable to provide an aggregate estimate of liability for our litigation, regulatory and similar matters as a class of contingent liabilities. Doing so would require us to provide speculative legal assessments as to claims and proceedings that involve unique fact patterns or novel legal theories, that have not yet been initiated or are at early stages of adjudication, or as to which alleged damages have not been quantified by the claimants. Although we therefore cannot provide a numerical estimate of the future losses that could arise from litigation, regulatory and similar matters, we believe that the aggregate amount of possible future losses from this class that are more than remote substantially exceeds the level of current provisions. Litigation, regulatory and similar matters may also result in non- monetary penalties and consequences. For example, the Non- Prosecution Agreement (NPA) described in item 5 of this Note, which we entered into with the US Department of Justice (DOJ), Criminal Division, Fraud Section in connection with our submissions of benchmark interest rates, including, among others, the British Bankers' Association London Interbank Offered Rate (LIBOR), was terminated by the DOJ based on its determination that we had committed a US crime in relation to foreign exchange matters. As a consequence, UBS AG pleaded guilty to one count of wire fraud for conduct in the LIBOR matter, paid a USD 203 million fine and is subject to a three-year term of probation. A guilty plea to, or conviction of, a crime (including as a result of termination of the NPA) could have material consequences for UBS. Resolution of regulatory proceedings may require us to obtain waivers of regulatory disqualifications to maintain certain operations, may entitle regulatory authorities to limit, suspend or terminate licenses and regulatory authorizations and may permit financial market utilities to limit, suspend or terminate our participation in such utilities. Failure to obtain such waivers, or any limitation, suspension or termination of licenses, authorizations or participations, could have material consequences for UBS.

The risk of loss associated with litigation, regulatory and similar matters is a component of operational risk for purposes of determining our capital requirements. Information concerning our capital requirements and

i

the calculation of operational risk for this purpose is included in the "Capital management" section of this report.

Tax and regulatory authorities in a number of countries have made inquiries, served requests for information or examined employees located in their respective jurisdictions relating to the cross-border wealth management services provided by UBS and other financial institutions. It is possible that implementation of automatic tax information exchange and other measures relating to cross-border provision of financial services could give rise to further inquiries in the future. UBS has received disclosure orders from the Swiss Federal Tax Administration (FTA) to transfer information based on requests for international administrative assistance in tax matters. The requests concern a number of UBS account numbers pertaining to current and former clients and are based on data from 2006 and 2008. UBS has taken steps to inform affected clients about the administrative assistance proceedings and their procedural rights, including the right to appeal. The requests are based on data received from the German authorities, who seized certain data related to UBS clients booked in Switzerland during their investigations and have apparently shared this data with other European countries. UBS expects additional countries to file similar requests. In addition, the Swiss Federal Supreme Court ruled in September 2016 that the double taxation agreement between the Netherlands and Switzerland provides a sufficient legal basis for an administrative assistance group request without specifying the names of the targeted taxpayers, which makes it more likely that similar requests for administrative assistance will be granted by the FTA.

In 2013, as a result of investigations in France, UBS (France) S.A. and UBS AG were put under formal examination ("mise en examen") for complicity in having illicitly solicited clients on French territory and were declared witness with legal assistance ("témoin assisté") regarding the laundering of proceeds of tax fraud and of banking and financial solicitation by unauthorized persons. In 2014, UBS AG was placed under formal examination with respect to the potential charges of laundering of proceeds of tax fraud, and the

investigating judges ordered UBS AG to provide bail ("caution") of EUR 1.1 billion. UBS AG appealed the determination of the bail amount, but both the appeal court ("Cour d'Appel") and the French Supreme Court ("Cour de Cassation") upheld the bail amount and rejected the appeal in full in late 2014. UBS AG filed an application to the European Court of Human Rights (ECHR) to challenge various aspects of the French court's decision. In January 2017, the ECHR denied UBS's application. The Swiss Federal Administrative Court ruled in October 2016 that in the administrative assistance proceedings related to the French bulk request, UBS has the right to appeal all final FTA client data disclosure orders. In September 2015, the former CEO of UBS Wealth Management was placed under formal examination in connection with these proceedings. In addition, the investigating judges have sought to issue arrest warrants against three Swiss-based former employees of UBS AG who did not appear when summoned by the investigating judge.

In 2015, UBS (France) S.A. was placed under formal examination for complicity regarding the laundering of proceeds of tax fraud and of banking and financial solicitation by unauthorized persons for the years 2004 until 2008 and declared witness with legal assistance for the years 2009 to 2012. A bail of EUR 40 million was imposed and subsequently reduced by the Court of Appeals to EUR 10 million.

In February 2016, the investigating judge notified UBS AG and UBS (France) S.A. that he has closed his investigation. In July 2016, UBS AG and UBS (France) S.A. received the National Financial Prosecutor's recommendation ("réquisitoire"). As permitted, the parties have commented on the recommendation. The next procedural step will be for the judge to issue his final decree ("ordonnance de renvoi en correctionnelle"), which would set out any charges for which UBS AG and UBS (France) S.A. will be tried, both legally and factually, and transfer the case to court.

UBS has been notified by the Belgian investigating judge that it is under formal investigation ("inculpé") regarding the laundering of proceeds of tax fraud and of banking, financial solicitation by unauthorized persons and serious tax fraud.

In 2015, UBS received inquiries from the US Attorney's Office for the Eastern District of New York and from the US Securities and Exchange Commission (SEC), which are investigating potential sales to US persons of bearer bonds and other unregistered securities in possible violation of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) and the registration requirements of the US securities laws. UBS is cooperating with the authorities in these investigations.

UBS has, and reportedly numerous other financial institutions have, received inquiries from authorities concerning accounts relating to the Fédération Internationale de Football Association (FIFA) and other constituent soccer associations and related persons and entities. UBS is cooperating with authorities in these inquiries.

Our balance sheet at 31 December 2016 reflected provisions with respect to matters described in this item 1 in an amount that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Claims related to sales of residential mortgage-backed securities and mortgages

From 2002 through 2007, prior to the crisis in the US residential loan market, UBS was a substantial issuer and underwriter of US residential mortgage-backed securities (RMBS) and was a purchaser and seller of US residential mortgages. A subsidiary of UBS, UBS Real Estate Securities Inc. (UBS RESI), acquired pools of residential mortgage loans from originators and (through an affiliate) deposited them into securitization

4

trusts. In this manner, from 2004 through 2007, UBS RESI sponsored approximately USD 80 billion in RMBS, based on the original principal balances of the securities issued.

UBS RESI also sold pools of loans acquired from originators to third-party purchasers. These whole loan sales during the period 2004 through 2007 totaled approximately USD 19 billion in original principal balance.

We were not a significant originator of US residential loans. A subsidiary of UBS originated approximately USD 1.5 billion in US residential mortgage loans during the period in which it was active from 2006 to 2008 and securitized less than half of these loans.

RMBS-related lawsuits concerning disclosures: UBS is named as a defendant relating to its role as underwriter and issuer of RMBS in lawsuits related to approximately USD 2.5 billion in original face amount of RMBS underwritten or issued by UBS. Of the USD 2.5 billion in original face amount of RMBS that remains at issue in these cases, approximately USD 1.2 billion was issued in offerings in which a UBS subsidiary transferred underlying loans (the majority of which were purchased from third-party originators) into a securitization trust and made representations and warranties about those loans (UBS- sponsored RMBS). The remaining USD 1.3 billion of RMBS to which these cases relate was issued by third parties in securitizations in which UBS acted as underwriter (third-party RMBS).

In connection with certain of these lawsuits, UBS has indemnification rights against surviving third-party issuers or originators for losses or liabilities incurred by UBS, but UBS cannot predict the extent to which it will succeed in enforcing those rights.

UBS is a defendant in a lawsuit brought by the National Credit Union Administration (NCUA) as conservator for certain failed credit unions, asserting misstatements and omissions in the offering documents for RMBS purchased by the credit unions. The lawsuit was filed in the US District Court for the District of

Kansas. The original principal balance at issue in the case is approximately USD 1.15 billion. In March 2017, UBS and NCUA reached an agreement in principle to resolve this matter. In the second quarter of 2016, UBS resolved a similar case brought by the NCUA in the US District Court for the Southern District of New York (SDNY) relating to RMBS with an original principal balance of approximately USD 400 million, for a total of approximately USD 69.8 million, in addition to reasonable attorneys' fees incurred by NCUA.

Lawsuits related to contractual representations and warranties concerning mortgages and RMBS: When UBS acted as an RMBS sponsor or mortgage seller, we generally made certain representations relating to the characteristics of the underlying loans. In the event of a material breach of these representations, we were in certain circumstances contractually obligated to repurchase the loans to which the representations related or to indemnify certain parties against losses. UBS has received demands to repurchase US residential mortgage loans as to which UBS made certain representations at the time the loans were transferred to the securitization trust aggregating approximately USD 4.1 billion in original principal balance. Of this amount, UBS considers claims relating to approximately USD 2 billion in original principal balance to be resolved, including claims barred by the statute of limitations. Substantially all of the remaining claims are in litigation, including the matters described in the next paragraph. UBS believes that new demands to repurchase US residential mortgage loans are time- barred under a decision rendered by the New York Court of Appeals.

In 2012, certain RMBS trusts filed an action (Trustee Suit) in the SDNY seeking to enforce UBS RESI's obligation to repurchase loans in the collateral pools for three RMBS securitizations with an original principal balance of approximately USD 2 billion, for which Assured Guaranty Municipal Corp., a financial guaranty insurance company, had previously demanded repurchase. A bench trial in the SDNY adjourned in May 2016. Approximately 9,000 loans were at issue in the trial. In September 2016, the court issued an order

ruling on numerous legal and factual issues and applying those rulings to 20 exemplar loans. The court further ordered that a lead master be appointed to apply the court's rulings to the loans that remain at issue following the trial. With respect to the loans subject to the Trustee Suit that were originated by institutions still in existence, UBS intends to enforce its indemnity rights against those institutions.

We also have tolling agreements with certain institutional purchasers of RMBS concerning their potential claims related to substantial purchases of UBS-sponsored or third-party RMBS. Mortgage-related regulatory matters: In 2014, UBS received a subpoena from the US Attorney's Office for the Eastern District of New York issued pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), which seeks documents and information related to UBS's RMBS business from 2005 through 2007. In 2015, the Eastern District of New York identified a number of transactions that are the focus of their inquiry, and has subsequently provided a revised list of transactions. We have provided and continue to provide information. UBS continues to respond to the FIRREA subpoena and to subpoenas from the New York State Attorney General and other state attorneys general relating to its RMBS business. In addition, UBS has also been responding to inquiries from both the Special Inspector General for the Troubled Asset Relief Program (SIGTARP) (who is working in conjunction with the US Attorney's Office for Connecticut and the DOJ) and the SEC relating to trading practices in connection with purchases and sales of mortgage-backed securities in the secondary market from 2009 through 2014. We are cooperating with the authorities in these matters.

As reflected in the table "Provision for claims related to sales of residential mortgage-backed securities and mortgages," our balance sheet at 31 December 2016 reflected a provision of USD 1,500 million with respect to matters described in this item 2. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of this matter cannot be determined with certainty based on

currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Madoff

In relation to the Bernard L. Madoff Investment Securities LLC (BMIS) investment fraud, UBS AG, UBS (Luxembourg) S.A. and certain other UBS subsidiaries have been subject to inquiries by a number of regulators, including the Swiss Financial Market Supervisory Authority (FINMA) and the Luxembourg Commission de Surveillance du Secteur Financier (CSSF). Those inquiries concerned two third-party funds established under Luxembourg law, substantially all assets of which were with BMIS, as well as certain funds established in offshore jurisdictions with either direct or indirect exposure to BMIS. These funds now face severe losses, and the Luxembourg funds are in liquidation. The last reported net asset value of the two Luxembourg funds before revelation of the Madoff scheme was approximately USD 1.7 billion in the aggregate although that figure likely includes fictitious profit reported by BMIS. The documentation establishing both funds identifies UBS entities in various roles, including custodian, administrator, manager, distributor and promoter, and indicates that UBS employees serve as board members. UBS (Luxembourg) S.A. and certain other UBS subsidiaries are responding to inquiries by Luxembourg investigating authorities, without, however, being named as parties in those investigations. In 2009 and 2010, the liquidators of the two Luxembourg funds filed claims on behalf of the funds against UBS entities, non-UBS entities and certain individuals, including current and former UBS employees. The amounts claimed are approximately EUR 890 million and EUR 305 million, respectively. The liquidators have filed supplementary claims for amounts that the funds may possibly be held liable to pay the BMIS Trustee. These amounts claimed by the liquidator are approximately EUR 564 million and EUR 370 million, respectively. In addition, a large number of alleged beneficiaries have filed claims against UBS entities (and non-UBS entities) for purported losses relating to the Madoff scheme. The majority of these cases are pending in Luxembourg, where appeals

were filed by the claimants against the 2010 decisions of the court in which the claims in a number of test cases were held to be inadmissible.

In 2014, the Luxembourg Court of Appeal dismissed one test case appeal in its entirety, which decision was appealed by the investor. In 2015, the Luxembourg Supreme Court found in favor of UBS and dismissed the investor's appeal. In June 2016, the Luxembourg Court of Appeal dismissed the remaining test cases in their entirety. In the US, the BMIS Trustee filed claims in 2010 against UBS entities, among others, in relation to the two Luxembourg funds and one of the offshore funds. The total amount claimed against all defendants in these actions was not less than USD 2 billion. Following a motion by UBS, in 2011, the SDNY dismissed all of the BMIS Trustee's claims other than claims for recovery of fraudulent conveyances and preference payments that were allegedly transferred to UBS on the ground that the BMIS Trustee lacks standing to bring such claims. In 2013, the Second Circuit affirmed the District Court's decision and, in 2014, the US Supreme Court denied the BMIS Trustee's petition seeking review of the Second Circuit ruling. In November 2016, the bankruptcy court issued an opinion dismissing the remaining claims for recovery of subsequent transfers of fraudulent conveyances and preference payments on the ground that the US Bankruptcy Code does not apply to transfers that occurred outside the US. The BMIS Trustee has indicated that he will appeal. In 2014, several claims, including a purported class action, were filed in the US by BMIS customers against UBS entities, asserting claims similar to the ones made by the BMIS Trustee, seeking unspecified damages. One claim was voluntarily withdrawn by the plaintiff. In 2015, following a motion by UBS, the SDNY dismissed the two remaining claims on the basis that the New York courts did not have jurisdiction to hear the claims against the UBS entities. The plaintiff in one of those claims has appealed the dismissal. In Germany, certain clients of UBS are exposed to Madoff- managed positions through third-party funds and funds administered by UBS entities in Germany. A small number of claims have been filed with respect to such funds. In 2015, a court of appeal ordered UBS to pay EUR 49 million, plus interest of approximately EUR 15.3 million.

9

Puerto Rico

Declines since August 2013 in the market prices of Puerto Rico municipal bonds and of closed-end funds (the funds) that are sole-managed and co-managed by UBS Trust Company of Puerto Rico and distributed by UBS Financial Services Incorporated of Puerto Rico (UBS PR) have led to multiple regulatory inquiries, as well as customer complaints and arbitrations with aggregate claimed damages of approximately USD 2.0 billion, of which claims with aggregate claimed damages of approximately USD 861 million have been resolved through settlements, arbitration or withdrawal of the claim. The claims are filed by clients in Puerto Rico who own the funds or Puerto Rico municipal bonds and / or who used their UBS account assets as collateral for UBS non-purpose loans; customer complaint and arbitration allegations include fraud, misrepresentation and unsuitability of the funds and of the loans. A shareholder derivative action was filed in 2014 against various UBS entities and current and certain former directors of the funds, alleging hundreds of millions of US dollars in losses in the funds. In 2015, defendants' motion to dismiss was denied. Defendants' requests for permission to appeal that ruling were denied by the Puerto Rico Court of Appeals and the Puerto Rico Supreme Court. In 2014, a federal class action complaint also was filed against various UBS entities, certain members of UBS PR senior management, and the co-manager of certain of the funds seeking damages for investor losses in the funds during the period from May 2008 through May 2014. Defendants had moved to dismiss that complaint, and in December 2016, defendants' motion to dismiss was granted in part and denied in part. In 2015, a class action was filed in Puerto Rico state court against UBS PR seeking equitable relief in the form of a stay of any effort by UBS PR to collect on non-purpose loans it acquired from UBS Bank USA in December 2013 based on plaintiffs' allegation that the loans are not valid. The trial court denied defendants' motion to dismiss the action based on a forum selection clause in the loan

agreements; the Puerto Rico Supreme Court has stayed the action pending its review of defendants' appeal from that ruling.

In 2014, UBS reached a settlement with the Office of the Commissioner of Financial Institutions for the Commonwealth of Puerto Rico (OCFI) in connection with OCFI's examination of UBS's operations from January 2006 through September 2013, pursuant to which UBS is paying up to an aggregate of USD 7.7 million in investor education contributions and restitution.

In 2015, the SEC and the Financial Industry Regulatory Authority (FINRA) announced settlements with UBS PR of their separate investigations stemming from the 2013 market events. Without admitting or denying the findings in either matter, UBS PR agreed in the SEC settlement to pay USD 15 million and USD 18.5 million in the FINRA matter. We also understand that the DOJ is conducting a criminal inquiry into the impermissible reinvestment of non-purpose loan proceeds. We are cooperating with the authorities in this inquiry.

In 2011, a purported derivative action was filed on behalf of the Employee Retirement System of the Commonwealth of Puerto Rico (System) against over 40 defendants, including UBS PR, which was named in connection with its underwriting and consulting services. Plaintiffs alleged that defendants violated their purported fiduciary duties and contractual obligations in connection with the issuance and underwriting of approximately USD 3 billion of bonds by the System in 2008 and sought damages of over USD 800 million. Defendants' motion to dismiss is pending. In September 2016, the System announced its intention to join the action as a plaintiff, and the court has since ordered that plaintiffs must file an amended complaint.

Also, in 2013, an SEC Administrative Law Judge dismissed a case brought by the SEC against two UBS executives, finding no violations. The charges had stemmed from the SEC's investigation of UBS's sale of closed-end funds in 2008 and 2009, which UBS settled in 2012.

Beginning in 2012, two federal class action complaints, which were subsequently consolidated, were filed against various UBS entities, certain of the funds, and certain members of UBS PR senior management, seeking damages for investor losses in the funds during the period from January 2008 through May 2012 based on allegations similar to those in the SEC action. In September 2016, the court denied plaintiffs' motion for class certification. In October 2016, plaintiffs filed a petition with the US Court of Appeals for the First Circuit seeking permission to bring an interlocutory appeal challenging the denial of their motion for class certification. Defendants have filed an opposition to plaintiffs' petition.

Beginning in 2015, agencies and public corporations of the Commonwealth have defaulted on certain interest payments, and in July 2016, the Commonwealth defaulted on payments on its general obligation debt. Executive orders of the Governor that have diverted funds to pay for essential services instead of debt payments and stayed any action to enforce creditors' rights on the Puerto Rico bonds continue to be in effect. In June 2016, US federal legislation created an oversight board with power to oversee Puerto Rico's finances and to restructure its debt. The oversight board is authorized to impose, and has imposed, a stay on exercise of creditors' rights. These events, further defaults, any further legislative action to create a legal means of restructuring Commonwealth obligations or to impose additional oversight on the Commonwealth's finances, or any restructuring of the Commonwealth's obligations, may increase the number of claims against UBS concerning Puerto Rico securities, as well as potential damages sought.

Our balance sheet at 31 December 2016 reflected provisions with respect to matters described in this item 4 in amounts that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provisions that we have recognized.

Foreign exchange, LIBOR, and benchmark rates, and other trading practices

Foreign exchange-related regulatory matters: Following an initial media report in 2013 of widespread irregularities in the foreign exchange markets, UBS immediately commenced an internal review of its foreign exchange business, which includes our precious metals and related structured products businesses. Since then, various authorities have commenced investigations concerning possible manipulation of foreign exchange markets, including FINMA, the Swiss Competition Commission (WEKO), the DOJ, the SEC, the US Commodity Futures Trading Commission (CFTC), the Board of Governors of the Federal Reserve System (Federal Reserve Board), the California State Attorney General, the UK Financial Conduct Authority (FCA) (to which certain responsibilities of the UK Financial Services Authority (FSA) have passed), the UK Serious Fraud Office (SFO), the Australian Securities and Investments Commission (ASIC), the Hong Kong Monetary Authority (HKMA), the Korea Fair Trade Commission (KFTC) and the Brazil Competition Authority (CADE). In addition, WEKO is, and a number of other authorities reportedly are, investigating potential manipulation of precious metals prices. UBS has taken and will continue to take appropriate action with respect to certain personnel as a result of its ongoing review.

In 2014, UBS reached settlements with the FCA and the CFTC in connection with their foreign exchange investigations, and FINMA issued an order concluding its formal proceedings with respect to UBS relating to its foreign exchange and precious metals businesses. UBS has paid a total of approximately CHF 774 million to these authorities, including GBP 234 million in fines to the FCA, USD 290 million in fines to the CFTC, and CHF 134 million to FINMA representing confiscation of costs avoided and profits, In 2015, the Federal Reserve Board and the Connecticut Department of Banking issued an Order to Cease and Desist and Order of Assessment of a Civil Monetary Penalty Issued upon Consent (Federal Reserve Order) to UBS AG. As part of the Federal Reserve Order, UBS AG paid a USD 342 million civil monetary penalty.

In 2015, the DOJ's Criminal Division (Criminal Division) terminated the December 2012 Non-Prosecution Agreement (NPA) with UBS AG related to UBS's submissions of benchmark interest rates. As a result, UBS AG entered into a plea agreement with the Criminal Division pursuant to which UBS AG pleaded guilty to a one-count criminal information filed in the US District Court for the District of Connecticut charging UBS AG with one count of wire fraud in violation of 18 USC Sections 1343 and 2. Sentencing occurred on 5 January 2017. Under the plea agreement, UBS AG has paid a USD 203 million fine and is subject to a three-year term of probation starting on the sentencing date. The criminal information charges that, between approximately 2001 and 2010, UBS AG engaged in a scheme to defraud counterparties to interest rate derivatives transactions by manipulating benchmark interest rates, including Yen LIBOR. The Criminal Division terminated the NPA based on its determination, in its sole discretion, that certain UBS AG employees committed criminal conduct that violated the NPA, including fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange market transactions with clients and collusion with other participants in certain foreign exchange markets.

We have ongoing obligations to cooperate with these authorities and to undertake certain remediation, including actions to improve UBS's processes and controls.

UBS has been granted conditional leniency or conditional immunity by the Antitrust Division of the DOJ (Antitrust Division) from prosecution for EUR / USD collusion and entered into a non-prosecution agreement covering other currency pairs. As a result, UBS AG will not be subject to prosecutions, fines or other sanctions for antitrust law violations by the Antitrust Division, subject to UBS AG's continuing cooperation. However, the conditional leniency and conditional immunity grant does not bar government agencies from asserting other claims and imposing sanctions against UBS AG, as evidenced by the settlements and ongoing investigations referred to above. UBS has also been granted conditional immunity by authorities in certain jurisdictions, including WEKO, in connection with potential competition law

14

violations relating to foreign exchange and precious metals businesses and, as a result, will not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in those jurisdictions, subject to UBS AG's continuing cooperation as the leniency applicant.

Investigations relating to foreign exchange and precious metals matters by numerous authorities, including the CFTC, remain ongoing notwithstanding these resolutions.

Foreign exchange-related civil litigation: Putative class actions have been filed since November 2013 in US federal courts and in other jurisdictions against UBS and other banks on behalf of putative classes of persons who engaged in foreign currency transactions with any of the defendant banks. They allege collusion by the defendants and assert claims under the antitrust laws and for unjust enrichment. In 2015, additional putative class actions were filed in federal court in New York against UBS and other banks on behalf of a putative class of persons who entered into or held any foreign exchange futures contracts and options on foreign exchange futures contracts since 1 January 2003. The complaints assert claims under the Commodity Exchange Act (CEA) and the US antitrust laws. In 2015, a consolidated complaint was filed on behalf of both putative classes of persons covered by the US federal court class actions described above. UBS has entered into a settlement agreement that would resolve all of these US federal court class actions. The agreement, which has been preliminarily approved by the court and is subject to final court approval, requires, among other things, that UBS pay an aggregate of USD 141 million and provide cooperation to the settlement classes.

A putative class action has been filed in federal court in New York against UBS and other banks on behalf of participants, beneficiaries, and named fiduciaries of plans qualified under the Employee Retirement Income Security Act of 1974 (ERISA) for whom a defendant bank provided foreign currency exchange transactional services, exercised discretionary authority or discretionary control over management of such ERISA plan, or authorized or permitted the execution of any foreign currency exchange transactional services involving such

15

plan's assets. The complaint asserts claims under ERISA. The parties filed a stipulation to dismiss the case with prejudice. The plaintiffs have appealed the dismissal.

In 2015, a putative class action was filed in federal court against UBS and numerous other banks on behalf of a putative class of persons and businesses in the US who directly purchased foreign currency from the defendants and their co-conspirators for their own end use. That action has been transferred to federal court in New York. Motions to dismiss are pending.

In 2016, a putative class action was filed in federal court in New York against UBS and numerous other banks on behalf of a putative class of persons and entities who had indirectly purchased FX instruments from a defendant or co-conspirator in the US. The complaint asserts claims under federal and state antitrust laws. Motions to dismiss will be filed.

In 2015, UBS was added to putative class actions pending against other banks in federal court in New York and other jurisdictions on behalf of putative classes of persons who had bought or sold physical precious metals and various precious metal products and derivatives. The complaints in these lawsuits assert claims under the antitrust laws and the CEA, and other claims. In October 2016, the court in New York granted UBS's motions to dismiss the putative class actions relating to gold and silver. Plaintiffs in those cases are seeking to amend their complaints to add new allegations about UBS. UBS's motion to dismiss the putative class action relating to platinum and palladium remains pending.

LIBOR and other benchmark-related regulatory matters: Numerous government agencies, including the SEC, the CFTC, the DOJ, the FCA, the SFO, the Monetary Authority of Singapore (MAS), the HKMA, FINMA, the various state attorneys general in the US and competition authorities in various jurisdictions have conducted or are continuing to conduct investigations regarding submissions with respect to LIBOR and other benchmark rates. These investigations focus on whether there were improper attempts by UBS,

among others, either acting on our own or together with others, to manipulate LIBOR and other benchmark rates at certain times.

In 2012, UBS reached settlements with the FSA, the CFTC and the Criminal Division of the DOJ in connection with their investigations of benchmark interest rates. At the same time, FINMA issued an order concluding its formal proceedings with respect to UBS relating to benchmark interest rates. UBS has paid a total of approximately CHF 1.4 billion in fines and disgorgement, including GBP 160 million in fines to the FSA, USD 700 million in fines to the CFTC, USD 500 million in fines to the DOJ, and CHF 59 million in disgorgement to FINMA. UBS Securities Japan Co. Ltd. (UBSSJ) entered into a plea agreement with the DOJ under which it entered a plea to one count of wire fraud relating to the manipulation of certain benchmark interest rates, including Yen LIBOR. UBS entered into an NPA with the DOJ, which (along with the plea agreement) covered conduct beyond the scope of the conditional leniency / immunity grants described below, required UBS to pay the USD 500 million fine to the DOJ after the sentencing of UBSSJ and provided that any criminal penalties imposed on UBSSJ at sentencing be deducted from the USD 500 million fine. Under the NPA, we agreed, among other things, that for two years from 18 December 2012 UBS would not commit any US crime and we would advise DOJ of any potentially criminal conduct by UBS or any of its employees relating to violations of US laws concerning fraud or securities and commodities markets. The term of the NPA was extended by one year to 18 December 2015. In 2015, the Criminal Division terminated the NPA based on its determination, in its sole discretion, that certain UBS AG employees committed criminal conduct that violated the NPA.

In 2014, UBS reached a settlement with the European Commission (EC) regarding its investigation of bid-ask spreads in connection with Swiss franc interest rate derivatives and paid a EUR 12.7 million fine, which was reduced to this level based in part on UBS's cooperation with the EC. In December 2016, UBS reached a settlement with WEKO regarding its investigation of bid-ask spreads in connection with Swiss franc

interest rate derivatives and received full immunity from fines. The MAS, HKMA and the Japan Financial Services Agency have also resolved investigations of UBS (and in some cases, other banks). We have ongoing obligations to cooperate with the authorities with whom we have reached resolutions and to undertake certain remediation with respect to benchmark interest rate submissions.

Investigations by the CFTC, ASIC and other governmental authorities remain ongoing notwithstanding these resolutions. UBS has been granted conditional leniency or conditional immunity from authorities in certain jurisdictions, including the Antitrust Division of the DOJ and WEKO, in connection with potential antitrust or competition law violations related to submissions for Yen LIBOR and Euroyen TIBOR. As a result of these conditional grants, UBS will not be subject to prosecutions, fines or other sanctions for antitrust or competition law violations in the jurisdictions where we have conditional immunity in connection with the matters covered by the conditional grants, subject to our continuing cooperation as leniency applicant. However, since the Secretariat of WEKO has asserted that UBS does not qualify for full immunity, UBS has been unable to reach a settlement with WEKO, and therefore the investigation will continue. Furthermore, the conditional leniency and conditional immunity grants we have received do not bar government agencies from asserting other claims and imposing sanctions against us, as evidenced by the settlements and ongoing investigations referred to above. In addition, as a result of the conditional leniency agreement with the DOJ, we are eligible for a limit on liability to actual rather than treble damages were damages to be awarded in any civil antitrust action under US law based on conduct covered by the agreement and for relief from potential joint and several liability in connection with such civil antitrust action, subject to our satisfying the DOJ and the court presiding over the civil litigation of our cooperation. The conditional leniency and conditional immunity grants do not otherwise affect the ability of private parties to assert civil claims against us.

LIBOR and other benchmark-related civil litigation: A number of putative class actions and other actions are pending in the federal courts in New York against UBS and numerous other banks on behalf of parties who

transacted in certain interest rate benchmark-based derivatives. Also pending in the US and in other jurisdictions are actions asserting losses related to various products whose interest rates were linked to LIBOR and other benchmarks, including adjustable rate mortgages, preferred and debt securities, bonds pledged as collateral, loans, depository accounts, investments and other interest-bearing instruments. All of the complaints allege manipulation, through various means, of various benchmark interest rates, including USD LIBOR, Euroyen TIBOR, Yen LIBOR, EURIBOR, CHF LIBOR, GBP LIBOR, USD ISDAFIX rates, other benchmark rates, and seek unspecified compensatory and other damages under varying legal theories.

In 2013, the US district court in the USD LIBOR action dismissed the federal antitrust and racketeering claims of certain USD LIBOR plaintiffs and a portion of their claims brought under the CEA and state common law. Certain plaintiffs appealed the decision to the Second Circuit, which, in May 2016, vacated the district court's ruling finding no antitrust injury and remanded the case back to the district court for a further determination on whether plaintiffs have antitrust standing.

In December 2016, the district court again dismissed plaintiffs' antitrust claims, this time for lack of personal jurisdiction over UBS and other foreign banks. In 2014, the court in one of the Euroyen TIBOR lawsuits dismissed certain of the plaintiff's claims, including federal antitrust claims. In 2015, the same court dismissed plaintiff's federal racketeering claims and affirmed its previous dismissal of plaintiff's antitrust claims. UBS and other defendants in other lawsuits including those related to EURIBOR, CHF LIBOR, GBP LIBOR and SIBOR have filed motions to dismiss. UBS has entered into an agreement with representatives of a class of bondholders to settle their USD LIBOR class action. The agreement is subject to court approval.

Since September 2014, putative class actions have been filed in federal court in New York and New Jersey against UBS and other financial institutions, among others, on behalf of parties who entered into interest rate derivative transactions linked to ISDAFIX. The complaints, which have since been consolidated into an amended complaint, allege that the defendants conspired to manipulate ISDAFIX rates from 1 January 2006

through January 2014, in violation of US antitrust laws and certain state laws, and seek unspecified compensatory damages, including treble damages. In March 2016, the court in the ISDAFIX action denied in substantial part defendants' motion to dismiss, holding that plaintiffs have stated Sherman Act, breach- of-contract and unjust-enrichment claims against defendants, including UBS AG.

Government bonds: Putative class actions have been filed in US federal courts against UBS and other banks on behalf of persons who participated in markets for US Treasury securities since 2007. The complaints generally allege that the banks colluded with respect to, and manipulated prices of, US Treasury securities sold at auction. They assert claims under the antitrust laws and the CEA and for unjust enrichment. The cases have been consolidated in the SDNY. Following filing of these complaints, UBS and reportedly other banks are responding to investigations and requests for information from various authorities regarding US Treasury securities and other government bond trading practices. As a result of its review to date, UBS has taken appropriate action.

With respect to additional matters and jurisdictions not encompassed by the settlements and order referred to above, our balance sheet at 31 December 2016 reflected a provision in an amount that UBS believes to be appropriate under the applicable accounting standard. As in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Swiss retrocessions

The Federal Supreme Court of Switzerland ruled in 2012, in a test case against UBS, that distribution fees paid to a firm for distributing third-party and intra-group investment funds and structured products must be disclosed and surrendered to clients who have entered into a discretionary mandate agreement with the firm, absent a valid waiver.

FINMA has issued a supervisory note to all Swiss banks in response to the Supreme Court decision. UBS has met the FINMA requirements and has notified all potentially affected clients.

The Supreme Court decision has resulted, and may continue to result, in a number of client requests for UBS to disclose and potentially surrender retrocessions. Client requests are assessed on a case-by-case basis. Considerations taken into account when assessing these cases include, among others, the existence of a discretionary mandate and whether or not the client documentation contained a valid waiver with respect to distribution fees.

Our balance sheet at 31 December 2016 reflected a provision with respect to matters described in this item 6 in an amount that UBS believes to be appropriate under the applicable accounting standard. The ultimate exposure will depend on client requests and the resolution thereof, factors that are difficult to predict and assess. Hence, as in the case of other matters for which we have established provisions, the future outflow of resources in respect of such matters cannot be determined with certainty based on currently

available information and accordingly may ultimately prove to be substantially greater (or may be less) than the provision that we have recognized.

Banco UBS Pactual tax indemnity

Pursuant to the 2009 sale of Banco UBS Pactual S.A. (Pactual) by UBS to BTG Investments, LP (BTG), BTG has submitted contractual indemnification claims that UBS estimates amount to approximately BRL 2.6 billion, including interest and penalties, which is net of liabilities retained by BTG. The claims pertain principally to several tax assessments issued by the Brazilian tax authorities against Pactual relating to the period from December 2006 through March 2009, when UBS owned Pactual. These assessments are being challenged in administrative and judicial proceedings. The majority of these assessments relate to the deductibility of goodwill amortization in connection with UBS's 2006 acquisition of Pactual and payments made to Pactual employees through various profit-sharing plans. In 2015, an intermediate administrative court issued a decision that was largely in favor of the tax authority with respect to the goodwill amortization assessment. In May 2016, the highest level of the administrative court agreed to review this decision on a number of the significant issues.

Investigation of UBS's role in initial public offerings in Hong Kong

The Hong Kong Securities and Futures Commission (SFC) has been conducting investigations into UBS's role as a sponsor of certain initial public offerings listed on the Hong Kong Stock Exchange. In October 2016, the SFC informed UBS that it intends to commence action against UBS and certain UBS employees with respect to sponsorship work in those offerings. If such action is taken, there may be financial ramifications for

UBS, including fines and obligations to pay investor compensation, and suspension of UBS's ability to provide corporate finance advisory services in Hong Kong for a period of time. On 16 January 2017, a writ was filed by the SFC with Hong Kong's High Court in which UBS is named as one of six defendants from whom the SFC is seeking compensation in an unspecified amount for losses incurred by certain shareholders of China Forestry Holdings Company Limited, for whom UBS acted as a sponsor in connection with their 2009 listing application.

# Exhibit Y

Judge Slams FINRA Arbitration

By Dan Solin

Until March 12, 2012, Deborah Gale Evans, a partner in the Boston law firm of Michaels, Ward & Rabinovitz, was enjoying great professional success. The Michaels Ward firm is well known for its expertise in securities litigation and regulation. According to its website, the firm represents banks, broker dealers and others in court and arbitration proceedings. Ms. Evans specializes in representing broker-dealers in arbitrations before the Financial Industry Regulatory Authority (FINRA).

If you have an account with a retail broker, or are employed by one, you signed an agreement requiring you to submit all disputes to mandatory arbitration administered by FINRA. The idea of requiring investors and employees to arbitrate disputes before a tribunal appointed by the very industry being sued is deeply troubling. Because it deprives American citizens of their constitutional rights to access to the courtroom and trial by a jury of their peers, it has neither the appearance nor the reality of impartiality. Among others, I testified before Congress and urged it to enact legislation prohibiting mandatory arbitration clauses as being fundamentally unfair.

A study I co-authored of more than 14,000 FINRA arbitration awards over a ten-year period found that investors with significant claims suing major brokerage firms could expect to recover only 12 percent of the amount claimed. It is not surprising that many investors required to submit to this process perceive it to be biased against them.

Ms. Evans represented Wells Fargo Advisors in a dispute with a former financial adviser, Clifford J. Watts, III. Watts had signed a promissory note in favor of his former employer, Wachovia, which was later bought by Wells Fargo. The note provided for

payment of the unpaid principal, plus interest upon termination. Watts quit Wells Fargo but refused to pay the balance due on the note, claiming that it was really a bonus and that the terms of his employment were materially changed after the acquisition, forcing his termination.

The FINRA panel decided in favor of Wells Fargo and ordered Watts to pay the principal, interest and to reimburse Wells Fargo for its attorney's fees in the amount of $60,480.25. Stung by this defeat, Watts filed a motion in the United States District Court for the Western District of North Carolina to overturn the award (case # 5:11cv 48, reported at 2012 LEXIS U.S. Dist. LEXIS 32244). Wells Fargo asked the Court to enforce it. Normally, efforts to overturn an arbitration award are unsuccessful because the legal grounds for doing so are very narrow. Motions to enforce an award are almost always granted.

That's where it got interesting.

The U.S. District Judge assigned to decide the case was Max O. Cogburn Jr. He joined the Court in 2011, after being appointed by President Obama.

Judge Cogburn heard oral argument on the motions to vacate and confirm. Ms. Evans argued for Wells Fargo.

In a stinging rebuke to both Ms. Evans and (more importantly) to the FINRA arbitration process, Judge Cogburn has some choice words for both. When he asked Ms. Evans if the Court has the power to vacate an award if it found the underlying agreement was illegal (which it clearly does), Ms. Evans "... immediately challenged the Court's statement." Apparently not sensing Judge Cogburn's concerns, Ms. Evans told him that Wells Fargo "... handles hundreds of arbitrations a year" and that she handles 30 or 40 of them as

counsel. She then uttered these words, which I am sure she now regrets: "I've never lost one and I've never not gotten attorney's fees. I always win these cases."

Judge Cogburn was not impressed with this track record, noting: "Now there's a level playing field."

Either Ms. Evans is a combination of Clarence Darrow and F. Lee Bailey or the process is rigged in favor of the securities industry. Judge Cogburn made it clear how he came out on this issue.

The Court noted that the securities industry's "constant and prolific participation" in these arbitrations gave it "a clear advantage over the individual employee or customer" because the industry knows which arbitrators will favor its position. That fact, coupled with the limited review permitted by the Courts, results in a "... process in which, as in this case, counsel for the bank can remain undefeated 30 or 40 times a year."

Ms. Evans lectured the Judge on the "voluntary" nature of arbitration and its cost savings benefits. Judge Cogburn rejected these arguments as "disingenuous," correctly noting that employees and customers have no recourse other than to sign these agreements. He turned the "saving money" argument on its head, noting that "... since the individuals seldom win and are forced to reimburse costs and attorneys fees, the only ones saving money are large institutions like the claimant."

Nevertheless, and with obvious misgivings, the Court confirmed that part of the arbitration award requiring repayment of principal and interest of the note. However, it vacated the award of attorney's fees, finding that the amount of those fees was pulled "out of thin air" and was "completely arbitrary."

To date, congressional efforts to ban mandatory arbitration have met with formidable and highly effective resistance from the securities industry and business lobbies. Maybe Judge Cogburn's decision will spur renewed interest in this legislation, which is long overdue. In the interim, attorneys like Ms. Evans should ask themselves whether their stunning success is attributable to their legal skill or the lack of impartiality of FINRA arbitration panels.

I called Ms. Evans and sent her several e-mails asking for her comments on this decision. I received no response.

Dan Solin is a senior vice president of Index Funds Advisors.



US POSTAGE AND FEES PAID
PRIORITY MAIL
Mar 29 2018
Mailed from ZIP 28443
4 lb PM Zone 4

CID: 170110
CommercialPlusPrice

071S01159847

## PRIORITY MAIL 2 — DAY

Robert Zimmerman
329 SAND PIPER LN
HAMPSTEAD NC 28443

**0004**

Shipped using PostalMat
Pkg:1047

SHIP TO:

US District Court for Southern Dist. NY
Daniel Patrick Moynihan
500 PEARL ST RM 200
PROSE INTAKE SECTION
NEW YORK NY 10007 — 1316

USPS TRACKING #